UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DONNELLY, J.

J. Marutollo

————————————————————————X

DIANNE BAKER-PACIUS, and CHRISTOPHER J. GARRY,

                                Plaintiffs

-against-

                                DOCKET NO.

**ORIGINAL**

**COMPLAINT**

*Jury Trial Demanded*

THE DEPARTMENT OF EDUCATION OF THE
        CITY OF NEW YORK,

**CV 25 - 0743**

                          Defendants

————————————————————————x

**PLAINTIFFS DIANNE BAKER-PACIUS and CHRISTOPHER J. GARRY**

("Plaintiffs") proceeding Pro Se, as and for their Summons and Complaint filed to protect

their Constitutional rights against the above-captioned Defendant the **DEPARTMENT OF**

**EDUCATION OF THE CITY OF NEW YORK,** alleges upon knowledge as to their

own facts and upon information and belief as to all other matters:

<u>**PRELIMINARY STATEMENT**</u>

1.   Plaintiffs bring this action under 42 U.S.C. Section 1983, 1st, 5th and 14th

     Amendments to the United States Constitution,; violation of  ADA/504 Rehabilitation

     Act; Stigma Plus pursuant to the flag placed on Plaintiffs' fingerprints ("Problem

     code"); Education Law §3020 and §3020-a; Fraud in the Inducement; ADA/504

     REHABILITATION ACT; NYSHRL,NYCHRL and N.Y.C. Admin. Code §8-

     107(3)(a), and those parts of the New York State Constitution which similarly apply

1

with like language and together with this Court's pendent jurisdiction over causes of action arising under New York State laws, both common and statutory; State laws governing employment, seeking monetary and declaratory relief against Defendant for committing acts with the intent and for the purpose of depriving Plaintiffs of Constitutionally protected property and liberty rights pursuant to their tenured status, without procedural and substantive due process and for refusing to or neglecting to prevent such deprivations and denials to Plaintiffs.

2. Plaintiffs complain here not about the COVID Vaccine Mandate ("CVM") itself, but the deprivation of their Constitutional rights in the lawless implementation of CVM in the City of New York by the Defendants. Neither Plaintiff have been previously in any Court with a cause of action for the on-going stigma and damage done by the lawless process detailed here created by the flag on their files known as the Problem Code. Both Plaintiffs discovered that they had been flagged by Defendant after May 2022.

3. This flag is a permanent block to their getting paid to do their jobs which were Constitutionally protected and which gave both Plaintiffs the right to a due process hearing called 3020-a arbitration before they had any reduction in salary and/or were terminated. Defendants ignored this law because it was not convenient, and thus deprived both Plaintiffs of their property right of employment without due process.

4. Plaintiffs' demands for relief include recovery of monetary damages in backpay above $400,000; full reinstatement to Plaintiffs' prior titles and positions with all raises and benefits; their names and personal data removed from the Office of

2

Personnel Investigations' ("OPI") database; and/or they will each be given a 3020-a
Arbitration Hearing to defend and support their keeping their jobs without getting
vaccinated with accommodations for their requests for religious (Baker-Pacius) and
medical (Garry) accommodation..

## PARTIES

5.  Plaintiff Dianne Baker-Pacius was a tenured teacher hired in 2005 to work for the
    Department of Education of the City of New York. She had an impeccable
    reputation and record. While a tenured teacher, Baker-Pacius had Constitutional
    rights, including protected liberty and property rights, to her position. She filed a
    request for a religious exemption and a 3020-a hearing but was denied both., and
    charged with misconduct. Plaintiff was a public employee of Defendants within the
    meaning of an "employee" as defined in New York State Civil Service Law § 75-
    b(1)(b) and a covered person under the Citywide Administrative Services.

6.  Plaintiff Christopher J.topher J. Garry was formerly a tenured teacher who taught
    Physical Education at John Bowne High School for over 23 years and was the chapter
    leader there from 2009-2012. He filed a request for a medical
    exemption/accommodation and a 3020-a Hearing request form "to protect his rights"
    and knew that public policy gave him pre-deprivation Constitutional rights to his
    tenured position. He never received either. Plaintiff was a public employee of
    Defendants within the meaning of an "employee" as defined in New York State Civil
    Service Law § 75-b(1)(b) and a covered person under the Citywide Administrative
    Services.

7. Defendant the Department of Education of the City of New York ("DOE") has overseen the NYC system of public schools located throughout all five (5) boroughs of the City of New York and has been, and continues to be, a recipient of substantial federal funds, and as such, acts under color of law with its principal place of business located in 65 Court Street in Brooklyn, New York 11201.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 for claims arising federal questions under 42 U.S.C. 1983, in particular the protections given by the Free Exercise Clause, Equal Protection Clause, First, Fifth, and Fourteenth Amendments to the Constitution, as well as State law claims codified in the New York State Constitution and Education Law §§3020 and 3020-a (the "tenure law"). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C 1343(2)(4) for claims arising federal questions under 42 U.S.C. 1983 as Defendant at all times relevant herein acted under color of law.

9. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), as well as New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL") as Administrative Code §8-107, in that such claims are so related to Plaintiff's claims within the original jurisdiction of this Court that they form part of the same case or controversy. Defendants were at all times acting under color of law in breaching their covenant of good will and fair dealing with the Plaintiff as well as committing fraud in the inducement.

10. This action's venue properly lies in the United States District Court for the Eastern District of New York, pursuant to 28 U.S.C. § 1391, because the headquarters of

4

the New York City Department of Education is located at 65 Court Street, Brooklyn, N.Y. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.

## STATEMENT OF RELEVANT FACTS

### Plaintiff Dianne Baker-Pacius

11. Plaintiff, a stellar tenured teacher since 2005 was unlawfully deprived of freedom from abuse of process and malicious prosecution, stigma plus character defamation and diminution of her tenure rights due to her religious beliefs that prohibited her from getting the COVID vaccine. She had a Constitutional due process right to her continued employment with the DOE until after she was given a 3020-a arbitration as detailed in Education Law §3020 and Article 21G of the United Federation of Teachers' contract(CBA). Defendant ignored this approved public policy and Constitutional right. See **EXHIBIT 1**, Rights of Tenured Teachers.

12. Defendant ignored the Equal Protection Clause of the 14th Amendment in creating a different due process for New York City employees such as Plaintiff here, than employees similarly situated in New York State but outside of New York City. Outside of New York City tenured teachers had the right to a 3020-a hearing if charged with insubordination/misconduct. That hearing process under a neutral arbitrator is the only authority to hear evidence, witness testimony, and Plaintiff's reasons for remaining unvaccinated.

13. The Mayor's Emergency Orders also cannot alter the terms of employment within the City workforce. The terms must be negotiated and ratified under the Taylor Law. The Mayor and the Commissioner of Health had no authority to deprive

5

Plaintiff of her due process hearing as cited in Ed. Law §§3020 and 3020-a. Vaccinations never existed as terms of employment in the CBA.

14. Plaintiff submitted a religious exemption request in support of her life-long sincere religious beliefs to SOLAS – the DOE's database – on September 21, 2021. The next day, September 22, 2021, she was denied. She tried to re-submit, but the portal for submissions was closed. **EXHIBIT 2** SOLAS Denial

15. Plaintiff tried again in January 2022 to submit her statement for religious accommodation, but could not get submit her RA request. She was denied moving forward because she was listed as non-vaccinated. See **EXHIBIT 2a SOLAS** Denial Jan 13, 2022; **EXHIBIT 2b** Religious Belief Statement.

16. Plaintiff wrote letters to DOE Officials about her denial and the lawless procedures being used to deprive her of her job, and deprive her of the right to choose her bodily integrity and religious beliefs. Defendant never engaged in a statutorily cooperative dialogue thereby engaging in an unlawful discriminatory practice warranting the uniquely broad remedial powers of this Court pursuant to NYSHRL and NYCHRL to reinstate Plaintiff and compensate her for past harm.

17. Plaintiff filled out the 3020-a form and gave it to the UFT to "protect her rights". She also filed grievances to obtain her constitutional rights . See **EXHIBITS 3, 3a. 3b, 3c.**

18. Plaintiff Baker-Pacius was denied her Grievances and Appeals because, she was told by the UFT, the DOE refused to give her a hearing or an Arbitrator. Baker-Pacius has complied with all procedural prerequisites required by law.

19. In May 2022 Plaintiff received information that the DOE had placed a Problem Code on her personnel file without her consent. She could not find out why this happened, or how she could remove the flag, but she could not work in her chosen profession in New York City.

### Plaintiff Christopher J. Garry

20. Plaintiff, a stellar tenured PE teacher, was unlawfully deprived of freedom from abuse of process and malicious prosecution, stigma plus character defamation and diminution of his tenure rights due to his medical condition that prohibited him from being vaccinated with the COVID vaccine. He had a Constitutional right to his continued employment with the DOE until after he was given a 3020-a arbitration as detailed in Education Law 3020 and Article 21G of the United Federation of Teachers' contract, CBA, but Defendant ignored this right. See **EXHIBIT 1**, Rights of Tenured Teachers.

21. On September 15, 2021 Plaintiff Garry submitted his doctor's note informing Defendant that he was prohibited from getting vaccinated. See **EXHIBIT 4** Doctor's Note.

22. On September 21, 2021 Plaintiff Garry was denied a medical exemption/accommodation by Defendant because of "Other". **EXHIBIT 4a**

23. Plaintiff attempted to Appeal this ruling, but the Defendant's portal for submission was not open. Defendant never engaged in a statutorily cooperative dialogue thereby engaging in an unlawful discriminatory practice warranting the uniquely broad remedial powers of this Court pursuant to NYSHRL and NYCHRL to

7

reinstate Plaintiff and compensate him for past harm. Garry has complied with all procedural prerequisites required by law.

24. . The Mayor's Emergency Orders cannot alter the terms of employment within the City workforce. The terms must be negotiated and ratified. The Mayor and the Commissioner of Health had no authority to deprive Plaintiff of his due process hearing as cited in Ed. Law §§3020 and 3020-a. Vaccinations never existed as terms of employment in the CBA.

25. Plaintiff filled out a form with the UFT requesting that the Defendant give him a 3020-a arbitration before he received any termination notice, however the Defendant never responded. The UFT told him that the DOE refused to schedule any 3020-a hearings.

26. In May 2022 Plaintiff received information that the DOE had placed a Problem Code on his personnel file without his consent. He could not find out why this happened, or how he could remove the flag.

**Defendant's Actions Against Plaintiffs' Protected Rights**

27. In 2019 national and international media created a panic-driven public rush to allegedly "protect" the people at a global scale from a so-called lethal virus which came to be known as COVID-19.

28. Defendant did not see this as the emergency claimed, but as an opportunity to decrease the City's payroll with massive  layoffs of protected employees, after COVID-related emergencies appeared in the media.

29. Defendant has a very long history of attempting to undermine the Tenure Law job protections cited in Education Law §3020, and have tried to get the State

8

Legislature to throw out the protections and have the Jack Welch business model replace this Law. Then, the DOE under Mayoral Control could fire anyone at any time, *despite* having tenure.

30. But Defendant was never able to get the State legislature to make this change so the only way they could get rid of all the senior civil servants and tenured educators was by coercion, fraud, and lawless actions. This became the mantra of the CVM in NYC under the fraudulent scheme of "protecting the safety and welfare of the children". The CVM did nothing to pursue this goal.

31. Plaintiffs suffered extreme emotional trauma knowing that they would have to choose between their health, their religion, or their jobs. In fact, beginning in August 2021, the Commissioner, working together with the Mayor's office, issued over a hundred "emergency" orders that collectively functioned to mandate the COVID vaccine ("CVM") for nearly every working person in the City. But not everyone was required to take it. At the behest of his top donors, in Executive Order 62 (EO 62)  available at https://www.nyc.gov/office-of-the-mayor/news/062-003/emergency-executive-order-62, Mayor Adams carved out exemptions for professional athletes, performers, and their entourages, election workers, school bus drivers and delivery personnel, as well as most of the private sector. All got unilateral exemptions.

32. As tenured teachers, Plaintiffs are in a protected class of people who have a property and Constitutional right to their jobs. The Tenure Law, Education Law §§3020 and 3020-a, have been held by the Court as the public policy of New York State. A constitutionally protected due process procedure is detailed in the Education Law §§3020 and 3020-a. All tenured teachers must be given an

9

arbitration hearing called "3020-a if they have tenure before they are deprived of their salary. See Rights of Teachers, EXHIBIT 1.

33. In 2020, New York City shut down entirely, and any restaurants or public places that stayed open were punished. Teachers remained at home, teaching remotely from March 2020 to September 2021.

34. On August 5, 2021 CDC Director Rochelle Walensky said on national TV that the vaccines could not stop transmission of Covid-19.( Blitzer, W. (2021, August 5) Transcript: Interview with CDC Director Dr. Walensky. The Situation Room, CNN. **https://www.facebook.com/watch/?v=1236084540199715**

35. In 2021 national media and TV news reported that scientists and doctors did not believe that COVID vaccines stopped transmission of the COVID virus, and that natural immunity was more powerful than any vaccine. They spoke out against any mandate to vaccinate. See **Declaration of Jayanta Bhattacharya** https://www.documentcloud.org/documents/22125801-bhattacharya-declaration/; **The Man Who Talked Back: Jay Bhattacharya On The Fight Against COVID Lockdowns** at https://www.hoover.org/research/man-who-talked-back-jay-bhattacharya-fight-against-covid-lockdowns; and **EXHIBIT 5** Dr. Harvey Risch.

36. While this case challenges Defendant's deprivation of Plaintiffs' due process in the manner in which the  COVID Mandate was implemented, not the Mandate itself, it is worth noting the decision of Judge Gerard J. Neri in the case Medical Professionals For Informed Consent et al., v Mary T. Bassett, Index. No. 008575/2022:

"Arbitrary action is without sound basis in reason and is generally taken without regard to the Respondents acknowledge then-current COVID-19 shots do not prevent transmission (see Summary of Assessment of Public Comment, NYSCEF Doc. No.7,

p. 25). The Mandate defines, in the loosest meaning of the word, "fully vaccinated" as determined by the Department in accordance with applicable federal guidelines and recommendations" (ibid). "[I]t is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning" (Gawron v. Town of Cheektowaga, 117 A.D.3d 1410, 1412 [Fourth Dept. 2014], citing Majewski v. Broadalbin-Perth Cent. Sch. Dist., 91 N.Y.2d 577,583 [1998]). A term which is defined at the whim of an entity, subject to change without a moment's notice contains all the hallmarks of "absurdity" and is no definition at all. In the alternative, the Court finds the Mandate is arbitrary and capricious."

In his footnote he wrote:

"1 Absurdity -1)  the quality or state of being absurd; 2) something that is absurd –

https://www.merriam-webster.com/dictionary/absurdity

Absurd - 1) ridiculously unreasonable, unsound, or incongruous; 2) having no rational or

orderly relationship to human life; 3) dealing with the absurd (the state or condition in which

human beings exist in an irrational and meaningless universe and in which human life has no

ultimate meaning) - https://www.merriam-webster.com/dictionary/absurd"

37. On August 12, 2021 Harry Nespoli, Chairperson of the Municipal Labor Committee

and aware of the secret negotiations between the UFT and DOE on discipline and

rights, wrote a letter to Renee Campion, Commissioner of the New York City Office

of Labor Relations ("OLR") wherein Nespoli wrote about MLC's officers meeting

with the City to negotiate working conditions for municipal employees who could not

get the vaccine due to religious, medical, or other reasons. He also mentioned:

"Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criterion and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under the collective bargaining agreements and law….no policy should be implemented before it is negotiated."

38. Barely a month later on September 10, 2021, after an Impasse brought Arbitrator Martin Scheinman to the bargaining table with the DOE and UFT, Scheinman issued his Arbitration Award that changed everything for Plaintiff and all teachers in New York City who refused the Vaccine on religious or medical grounds. **EXHIBIT 6** Sheinman Award 9-10-21

39. The procedures cited in the Award were designed to unconstitutionally narrow the definition of what beliefs could qualify for religious or medical exemption/accommodations. Most religions were excluded from protection and access to accommodation.

40. There is a clear distinction between the City's public sector vaccination mandates themselves, which no union—including the UFT—agreed to, and pay and personnel policies adopted to implement the imposed mandates. Plaintiffs' union, the UFT, never agreed to ratify the CVM as a condition of employment and the CBA never changed. Rulings made in this Court refuting this are no longer valid.

41. The Scheinman Award determined that accommodations might be given if:

"religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists)." Award at 9

42. Obviously, the Award favored        Christian Scientists         and made an error in requiring the government to decide which other religions were "recognized" as "established religious organizations". Thus if an applicant belongs to a religion that is not deemed "established" and "recognized" by the government employer, whatever that means, the person must be denied.

12

43. The Award also stated that religious objection based on personally held or "philosophical" religious beliefs must be denied and that the religious objection "must be documented in writing by a religious official". In other words the certification requirement discriminates against those who practice religions that do not belong to a hierarchical organization or who have different religious beliefs than their pastor or church leader.

44. Also, it is long-established law in New York that governments cannot require a person to show a clergy letter or belong to an "established religion" to have their religious beliefs protected. See, e.g., Sherr v. Northport-E. Northport Union Free Sch. Dist., 672 F. Supp. 81, 92 (E.D.N.Y.1987). Defendants were on notice that the clergy requirement was illegal.

45. The Scheinman Award added that, even if the DOE were to determine a person does belong to an "established" and "recognized" religion, and that religious organization provided a clergy letter, the applicant must still be denied if the "leader" of their faith has publicly expressed support for vaccination. By not defining who a "Leader" might be, the Award could categorically deny accommodation to whole categories of religious employees. The DOE allowed accommodation based upon membership in a preferred religious organization. This is as clear an example of religious discrimination that can be found anywhere.

46. At the same time that Scheinman's Award was received by Plaintiffs telling them to apply to get their medical or religious exemption in to the DOE, Plaintiffs received the Scheinman "LWOP" or leave without pay that never existed in any contract or law

book. See **EXHIBIT 7** LWOP. Scheinman made up this label to remove unvaccinated employees from the DOE.

47. Employment Law and the teacher's CBA says that leaves are voluntary. But here, the leave was forced upon Plaintiffs who could not get vaccinated. The criteria was extremely restrictive and discriminatory. For example, medical accommodation would be given to:

- "medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school." (p. 7)

- "Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)- with contraindications delineated in CDC clinical considerations for COVID-19 vaccination. Note that a prior allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist."

- "Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

  *Within the isolation period after a COVID-19 infection;

  *Within ninety (90) days of monoclonal antibody treatment of COVID-19;

  *Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over

14

time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

*Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination." (p. 8)

For religious exemptions the criteria were also very limited:

- "Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations. (e.g. Christian Scientists) (p. 9)

48. The specific details for the granting of religious exemptions and medical accommodations that were cited in the Award of Martin Scheinman were considered the "challenged criteria" and "constitutionally unsound" by the Court of Appeals in the case Kane/Keil v The City of New York (21-cv-2678) on November 28, 2021. His Award was thrown out, and the LWOP process became unlawful as a matter of law.

49. This Award was held to be neither neutral nor generally applicable. See EO 62, ¶28. Defendants used this Award to engage in widespread religious discrimination in implementing Defendants' vaccine mandates by discarding due process rights outright, and adopting a facially discriminatory accommodation policy that conditioned an exemption/accommodation on membership in a favored religion or a documented contraindication of potential harm from any authorized vaccine (p. 8). Both Plaintiffs were denied without being given any reasonable accommodation. See Judge Neri's description of the Mandate ¶36

50. In his Award, Scheinman created four unconstitutional actions that deprived Plaintiffs of their Constitutionally protected due process rights:

- Scheinman created a pathway to his own enrichment by putting his own company, Scheinman Arbitration and Mediation Services ("SAMS"), in charge of hearing the appeals of religious exemptions denied by the DOE. This was an intentional scam on all Applicants, not only because New York State is one of 5 states in America which do not honor religious exemptions, but also because the arbitrators who heard the appeals, his employees, denied 100% of the applicants, deliberately, to please New York City's Mayor and the DOE for whom he does a lot of work;

- The process for deciding religious exemption requests was discriminatory and favored certain religions and titles and not others, including criteria that were never explained and were without any basis in law;

- Scheinman insisted that the Award and the newly created "LWOP" or "leave without pay" was not disciplinary, but he intentionally lied about

this. The LWOP procedure forced people to get the vaccine or lose their job, health insurance and protections guaranteed under the US Constitution and Bill of Rights. He made challenging the CVM into a disciplinary charge extreme enough to immediately remove Plaintiffs from their salaries on October 4, 2021 as punishment for their "crimes".

- Scheinman's LWOP also permanently scarred Plaintiffs by placing their fingerprints onto a secret database that not only put scarlet letters onto their personnel files and names, but permanently blocked them both from working at the DOE or for a vendor of the DOE. Both Plaintiffs found out about this Stigma Plus harm in May 2022. See **EXHIBIT 8** Problem Code Documents.

51. Scheinman was and is very aware of the stigma connected to the problem code and how the secret process works. He works as an arbitrator in 3020-a cases, where the problem code is always placed on a charged teacher's file before the hearing begins. OPI, sub-Agency of the DOE Human Resources, punitively blocks anyone from ever getting a job in New York City public schools by creating a data file on a person seeking employment that has damaging information about misdeeds that may or may not be true. Also, OPI keeps all information about the problem code secret, especially from the employee whose file has the Code on it. Plaintiffs were not told about any of this problem code information until May 2022.

52. Additionally, any determination in any Court that the mandate was neutral and generally applicable is now moot, as para. 6 in the September Mandate ruling by

Commissioner Chokshi allowed any accommodations required by law to be given consideration. See **EXHIBIT 9**, Chokshi Order September 15, 2021.

53. Additionally, the DOE allowed school bus drivers to work throughout the pandemic without getting vaccinated. This is proof that there was no criteria for the unvaccinated employees who were coerced to get the vaccine or be fired. Everyone was a target if they were unvaccinated and tenured, as Plaintiffs. (EO 62 ¶28)

54. See Judge Neri's opinion on the revised Citywide CVM, ¶36. He wrote that the Mandate was "absurd", arbitrary and capricious, and not neutral or generally applicable. The implementation procedure was unconstitutional (Judge in Kane-Keil) and made denials of medical or religious accommodations into retaliatory discrimination. The DOE placed the problem code on employees' files so that Plaintiffs were permanently scarred by asking for medical or religious accommodations as federal law allows. Thus, the City and the DOE made obeying Constitutional Law into a misconduct charge.

55. The Panel set up by Martin Scheinman and the process he created was thrown out by the Federal Judge in the Kane-Keil cases (21-CV-7863; 21-CV-8773) on November 28, 2021, because the process used to implement the CVM was "constitutionally unsound". See **EXHIBIT 10,** Court Order.

56. On September 27, 2022 Arbitrator Scheinman created a new Award in which he "apologized" for creating the LWOP. See the **Award June 27, 2022** here:

> https://wp-advocatz-uploads.s3.amazonaws.com/uploads/2023/01/Scheinman-Award-June-27.pdf

57. Thus on November 28, 2021 neither the Scheinman Award dated September 10, 2021 nor the LWOP issued at the same time which removed Plaintiffs from their salaries unlawfully, were valid. The procedures and substance of both documents were moot as a matter of law. But Plaintiffs careers were over, effectively demolished without due process.

58. Despite giving religion-based accommodations (RA) to more than 160 other tenured employees similarly situated, and placing many unvaccinated employees on reassignment ("rubber rooms") in Defendants' district offices and at home on full salary, Defendants, acting at all times under color of law, did not grant Plaintiffs exemption/accommodation requests, offered no accommodation whatsoever, never entered into a dialogue with Plaintiffs.

59. Both Plaintiffs requested an accommodation – Plaintiff Baker-Pacius, religious, and Plaintiff Garry – medical. After each received a denial without reason or explanation, both tried to submit again their requests, but the portal was blocked or closed. So both Plaintiffs tried to get the accommodation by writing to the administrators, Chancellor, and others at the DOE. No one responded. Both Plaintiffs requested a 3020-a hearing. No one at the DOE responded, and most importantly, the Defendants never honored the public policy and Constitutional due process right of both Plaintiffs, tenured teachers, to an Education Law 3020-a arbitration so they could remain on salary and working at what they loved to do and were good at.

60. Both Plaintiffs were terminated February 11, 2022 after receiving a letter dated February 15, 2022. However their punishment and the discriminatory process

created and fueled by Defendant were not over. Neither Plaintiff knew they were problem coded and could not work as a teacher in NYC or outside for the DOE or any vendor until May 2022, when they were finally and permanently scarred and blocked from working with no way to get off of the code. They are still unable to get any information about how or why they are problem coded, how they may get the Code removed, and what process they can use to clear their names. Neither Plaintiff was allowed to return to their jobs at the salary they held before their removal, and neither Plaintiff has received their due process – namely a 3020-a Arbitration on the charge of misconduct for which they are being permanently punished. See **NYC teachers with vaccine exemptions are being treated like pariahs** https://nypost.com/2022/03/05/nyc-teachers-with-vaccine-exemptions-treated-like-outcasts/

61. At St. Brigid's School, the rubber room for the unvaccinated DOE employees, RF, an unvaccinated Assistant Principal "worked" everyday by checking people in and out.

62. How and why did RF get this job on full salary, and Plaintiffs not? Teacher AP got approved for her medical exemption in 2020-2021, and then an extension until 2023, when she was told to go back to work. She has her former title and salary. Plaintiffs were given disparate treatment.


## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### FOR RELIGIOUS DISCRIMINATION (Baker-Pacius)

63. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 62 as if the same were fully set forth at length herein.

64. Plaintiff submitted to Defendants in September 2021 a statement on her sincere religious beliefs which forbade her from getting vaccinated with the COVID-19 vaccine. She was denied. She tried again soon after, and the portal was closed, so she filed a Grievance to get her 3020-a Hearing and her religious accommodation.

65. For acting on her due process rights and her religious beliefs, Plaintiff was secretly placed on a Problem Code as punishment, yet other teachers similarly situated were granted exemption/accommodations for their religious beliefs which prohibited getting vaccine.

66. Defendant have neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendants' invocation of "undue hardship" "other" and "does not meet criteria" defenses are plainly false pretexts attempting to cover for the Defendants' explicit religious discrimination.

67. Defendant had knowledge of Plaintiff's sincerely-held religious beliefs yet chose to ignore these beliefs, forced her into a suspension without pay, denied her exemption request and Appeals based upon an unconstitutional ruling that cited "undue burden" without any further details or reason, and terminated her employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023 :

"The Court holds that showing "more than a de minimis cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. ….. Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue." Bias or hostility to a religious practice or

accommodation cannot supply a defense."

68. Defendant wrongfully, deliberately, in bad faith and under color of law attempted to fraudulently induce her to choose to relinquish her protected beliefs in order to submit to an experimental vaccine, and then punished her for not agreeing to this extortion and discrimination.

69. A government employer may not punish some employees, but not others, for the same activity, due only to differences in the employees' religious beliefs. Likewise, the government may not test the sincerity of an employee's religious beliefs by judging whether her beliefs are doctrinally coherent or legitimate in the eyes of the government.

70. Nor may a government employer discriminate against religion by implementing policies that exempt employees for secular reasons more readily than religious ones. All such discrimination violates the Free Exercise and Establishment Clauses of the First Amendment and the corresponding rights incorporated against the states by the Fourteenth Amendment. "When there is no plausible explanation for religious discrimination other than animus, it is subject to strict scrutiny, regardless of whether the government employer admits that its actions were motivated by hostility to certain religions." (Jane Does et al., v Board of Regents of the University of Colorado et al., No. 22-1027, U.S. Court of Appeals D.C. No. 1:21-CV-02637-RM-KMT., May 7, 2024)

**AS AND FOR A SECOND CAUSE OF ACTION:
PLAINTIFF BAKER-PACIUS WAS DEPRIVED OF HER
FIRST AMENDMENT RIGHT TO FREE SPEECH AND RELIGION**

71. Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above in paragraphs 1 through 70 as if the same were fully set forth at length herein.

72. As a result of the Defendant's actions as set forth above, Plaintiff has been, and continues to be, deprived of her Federal rights under 42 U.S.C., Section 1983 and the Fourteenth Amendment due process rights, applying the First and Fifth Amendments' rights of the U.S. Constitution.

73. As a result of defendant's actions, Plaintiff suffered and was damaged.

74. Defendant has deprived Plaintiff of such rights under color of State Law.

75. By reason of the foregoing, Defendant unlawfully discriminated against Plaintiff as to the terms, conditions and privileges of employment, in that Defendants did not allow her to practice her religion, which caused her to be terminated unlawfully.

76. These acts by Defendants are in violation of Plaintiff's rights to practice her religion guaranteed under the First Amendment to the United States Constitution.

## AS AND FOR A THIRD CAUSE OF ACTION: VIOLATION OF ADA/504 REHABILITATION ACT
### (Plaintiff Garry)

77. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 76 as if the same were fully set forth at length herein.

78. The Rehabilitation Act is codified under Title 29 (29 U.S.C. § 794(a)) and 29 C.F.R. §33.13. The Rehabilitation Act protects disabled persons from discrimination in the provision of public services. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability, shall, solely by reason of his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 USC § 794(a).

79. Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794 (hereinafter referred to as "Section 504) provides that, no otherwise qualified individual with a disability...shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).

80. Retaliation claims are analyzed under the same framework as Americans with Disabilities Act ("ADA") claims, the elements of which to prove a prima facie case being, "(I) a Plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that Plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against Plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002); citing Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000). The Plaintiff's burden at this prima facie stage is de minimis. Treglia v.Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

81. Once the Plaintiff establishes a prima facie case of retaliation, the burden shifts to the Defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision. Thereafter, if a Defendant meets this burden, the Plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. Cifra v. Gen Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Defendant failed to accommodate

24

Plaintiff for his disabling condition.

82. Based on the foregoing, Defendant under color of law subjected Plaintiff to discrimination on the basis of his medical condition, unlawfully discriminating against the Plaintiff in the terms and conditions of his employment in violation of his Constitutional rights to property, liberty and a due process, §3020-a hearing, 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law), and N.Y.C. Human Rights Law.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**FOR FAILURE TO REASONABLY ACCOMMODATE**
**THE PLAINTIFFS' SINCERELY HELD RELIGIOUS BELIEFS AND**
**CONTRAINDICATED MEDICAL CONDITION**

83. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 82 as if the same were fully set forth at length herein.

84. Plaintiffs have sincerely held religious beliefs and a medical condition which forbid them from getting vaccinated with the COVID-19 vaccine, but Defendants never accommodated their requests for exemption from CVM.

85. Defendant had knowledge of Plaintiffs' sincerely-held religious beliefs and contraindicated medical condition yet chose to ignore these beliefs and medical condition and denied them their exemption requests. Defendant then terminated their employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023.

86. No reasonable accommodation was offered to Plaintiffs yet other employees of the Defendants received accommodations for their religious and/or medical accommodations.

87. At all relevant times Defendant knew that they had "rubber rooms" and reassignments to home as the new workplace for employees similarly removed from their positions in the Department:

**New Rubber Rooms Pop Up Throughout NYC To Warehouse Unvaccinated Employees Who have Won medical or Religious Exemptions**

**https://nycrubberroomreporter.blogspot.com/2022/03/new-rubber-rooms-pop-up-throughout-nyc.html** and

**Idled NYC educators do nothing but sign in remotely, even from Europe**

https://nypost.com/2023/01/14/idled-nyc-educators-do-nothing-but-sign-in-remotely-even-from-europe/ By Susan Edelman, NY POST, Published Jan. 14, 2023. For more than twenty years, Defendant has been re-assigning employees to "rubber rooms", some of which held about 1-2000+ employees. All tenured employees put in these rooms stayed on full salary, and remained up to 15 years doing nothing. During the pandemic, these re-assigned employees awaited their §3020-a hearings at home. Defendant never mentioned this to the Plaintiffs.

88. Defendant never engaged in a dialogue about Plaintiffs' accommodation or reassignment. This deprivation of a lawful procedure was intentional, acted on under color or law, and pursued in bad faith.

89. Defendant never gave Plaintiffs their 3020-a arbitration hearing mandated under Ed. Law §3020, which details the due process that is due in the cases cited here. Plaintiffs

26

were guaranteed their 3020-a hearing by law and contract. This is public policy and a Constitutional right held in New York State. Only the State legislature may change this.

90. Based on the foregoing, the NYCDOE failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiffs on the basis of their sincere religious beliefs and serious medical condition, and thereby unlawfully discriminated against Plaintiffs in the terms and conditions of their employment in violation of the Equal Protection of the Law contained within the 14th Amendment; 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

## AS AND FOR A FIFTH CAUSE OF ACTION: VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE

91. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 90 as if the same were fully set forth at length herein.

92. Defendant, while acting under the color of law, unlawfully deprived the Plaintiffs of their right to Equal Protection of the Laws, guaranteed by the Fourteenth Amendment of the United States Constitution, in that Defendant engaged in selective enforcement of their own laws, rules, regulations, and ordinances against Plaintiffs based upon the Plaintiffs' religion and medical condition.

93. In so doing, Defendant intentionally and, with malicious or bad faith intent to injure Plaintiffs, selectively treated Plaintiffs differently from other similarly situated employees and acted with no rational basis for the difference in treatment.

Defendant's conduct was intentional, conducted with bad faith, and wholly irrational.

94. In Garvey c City of NY (Index No. 85163/2022), Judge Ralph Porzio wrote in his decision:

> "Though vaccination should be encouraged, public employees should not have been terminated for their non-compliance….The Health Commissioner cannot create a new condition of employment for City employees. The Mayor cannot exempt certain employees from these orders. Executive Order 62 renders all of these vaccine mandates arbitrary and capricious….prohibit an employee from reporting to work."

95. New York City was the only location in New York State which mandated the vaccine or termination for public employees. New York City was also the only place where tenured educators were suspended without pay and terminated without a 3020-a hearing. Every other tenured educator in the State whether vaccinated or not, were given accommodations such as masks and testing. Anyone designated for charged misconduct received a §3020-a hearing. As a direct result of Defendant's violation of the Plaintiffs' Fourteenth Amendment rights of equal protection, Plaintiffs have suffered irreparable harm for which there is no adequate remedy of law.

96. Defendant's violation of Plaintiffs Fourteenth Amendment rights of equal protection under the law, as alleged herein above, Plaintiffs have suffered and are entitled to recover compensatory and nominal damages including backpay.

97. Based on the foregoing, Defendant subjected Plaintiffs to discrimination on the basis of their religious beliefs and medical contraindication, unlawfully discriminating against Plaintiffs in the terms and conditions of their employment on the basis of their disabling conditions, in violation of 42 U.S.C. § 1983; 1st, 5th and 14th Amendments

due process clauses; Tenure rights and Law; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR FRAUD IN THE INDUCEMENT TO DENY PLAINTIFFS THEIR PROPERTY AND LIBERTY RIGHTS TO A CONSTITUTIONALLY PROTECTED DUE PROCESS HEARING AS TENURED TEACHERS MANDATED BY EDUCATION LAW 3020

98. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 97 as if the same were fully set forth at length herein.

99. Plaintiffs were punished with wrongfully being disciplined for their alleged "insubordination" in not getting vaccinated with the COVID vaccine without any §3020-a hearing and no accommodation offers or review by the Defendants.

100.    Education Law Section §3020 , Chapter 16, Title 4, Article 61 states as follows: "Discipline of teachers (Ex. 1).

1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article;
2. No person enjoying the benefits of tenure shall be suspended for a fixed time without pay or dismissed due to a violation of article thirteen-E of the public health law….. (iii) the provisions of subdivisions one and two of this section shall not apply to agreements negotiated pursuant to this subdivision…"

101.    Plaintiffs did not, at any time, waive their rights to a §3020-a hearing on their religious and medical exemption/accommodation requests. They wanted their due process rights to be honored. Instead, they were declared insubordinate by the Department, their personnel file was flagged and their fingerprints tagged with a "Problem Code" designating misconduct and put into the same database used by the FBI.

102.    The United States Supreme Court has defined waiver as "an intentional

relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304

U. S. 458, 464 (1938). Courts should "indulge every reasonable presumption against

waiver, Aetna Ins. Co. v. Kennedy, 301U. S. 389, 393 (1937), and they should "not

presume acquiescence 526*526 in the loss of fundamental rights," Ohio Bell Tel. Co.

v. Public Utilities Comm'n,301 U. S. 292, 307 (1937).

103.    In Carnley v. Cochran, 369 U. S. 506 (1962), the Court held:

> "Presuming waiver from a silent record is impermissible. The record must show, or
> there must be an allegation and evidence which show, that an accused was offered
> counsel but intelligently and understandably rejected the offer. Anything less is not
> waiver." Id., at 516.

104.    Additionally, a waiver of a teacher's tenure rights must be knowingly and freely

given (Matter of Gould v. Bd. of Educ. of the Sewanhaka CHSD, et al., 81 NY2d

446; Matter of Abramovich v. Bd. of Educ. of the Three Villages CSD No. 1, 46

NY2d 450).

105.    Tenured teachers have a property and liberty right to their jobs, and therefore

when there is any penalty that reduces the benefits of these rights, there must be Just

Cause. Judge Desmond Green in the Richmond County Supreme Court ruled in the

case of Rosalie Cardinale that:

> "New York State created the public school tenure system guaranteeing continued
> employment to tenured teachers by statute and therefore created a property right in
> a tenured teacher's continued employment. (See Education Law§§§ 3012, 3012- a,
> 3020, Holt v. Board of Educ. Of Webutuck Cent. School Dist., 52 NY2d 625
> [1981], Matter of Abromovich v. Board of Educ. of Cent. School Dist. No. I of
> Towns of Brookhaven & Smithtown, 46 NY2d 450 [1979]). Where a property
> right in continued employment exists, such as New York's tenure system, the
> recipient of such a right may not be deprived without due process. See Cleveland
> Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 [1985].

New York State guarantees a tenured teacher's due process rights to continued employment by statute requiring that "no [tenured teacher] ... shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article or in accordance with alternate disciplinary procedures contained in a collective bargaining agreement ... " Education Law § 3020."

See Kambouris v NYC DOE, Index no. 518863/2022, Decision dated January 5, 2023. Defendants DOE did not appeal.

106.    Scheinman and the Defendant committed a fraud against Plaintiffs and breached an implied covenant of good faith and fair dealing by issuing lawless requirements of procedure such as LWOP that Plaintiffs could not comply with, yet relied on to their detriment. Scheinman's actions and those of the Defendants in this case were intentional, malicious, and deliberate. Scheinman process, LWOP and Award were found to be unconstitutional and were thrown out in November 2021 by this Court.

107.    The 5th Amendment takings clause is very clear:

"[T]he Fifth Amendment's guarantee that private property shall not be taken for a public use without just compensation was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

108.    Defendants have seized, without just compensation, the property of Plaintiffs without compensation. These uncompensated seizures violate the Takings Clause of the Fifth Amendment, made applicable to States through the Fourteenth Amendment. Without extending "just compensation".

109.    Based on the foregoing, Defendant subjected Plaintiffs to discrimination on the basis of their religious beliefs and medical condition, unlawfully discriminating against Plaintiffs in the terms and conditions of their employment in violation of 42 U.S.C. § 1983; 1st, 5th and 14th Amendments due process clauses; Tenure rights and Law; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law.

110.    Plaintiffs request (1) backpay and all benefits and pension steps; (2) reinstatement to their former working title with a salary that reflects 2 ½ years of missing time and wages, with pension steps and raises included; (3) judgment against Defendant for refusing to, or neglecting to, prevent such deprivations and denials to Plaintiffs.

## PLAINTIFFS DEMAND A TRIAL BY JURY

111.    Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment against the Defendant for all compensatory, emotional, psychological and punitive damages, injunctive relief, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court grant Plaintiffs any other relief to which they are entitled, including but not limited to:

1.    Awarding Plaintiffs their tenured positions, salary steps and raises, earned before October 2021, in full, with benefits; and

2.    Awarding Plaintiffs all the back pay owed since they were removed from their salary in 2021;

3.    Considering Plaintiffs are pro se, an opportunity to Amend their Complaint after submission of Defendant's papers.

4.    Granting such other and further relief that the Court deems just and proper.

Dated: February 10, 2025    .

Christopher J. Garry
75-27 217 Street
Oakland Gardens, NY 11364
(917) 572-9104
bgrdchris@aol.com

Dianne Baker-Pacius
55 W116th Street, STE 396
New York, NY 10026
(646) 369-6792
dbp2024court@gmail.com

# EXHIBIT 1



**The University of the State of New York**
**The State Education Department**
**Teacher Tenure Hearing Unit**
**89 Washington Ave., Room 987 EBA**
**Albany, New York 12234**

Ph:     (518) 473-2829
Fax:    (518) 402-5940

(09/21)

# Rights of Tenured Employees

*(This document only applies to cases where charges were filed on or after July 1, 2015.)*

This document, while not intended to be exhaustive, describes certain rights of tenured employees in Education Law §3020-a and §3020-b* proceedings. The information contained in this document should not act as a substitute for the applicable statutes or regulations. Individuals are advised to consult with an attorney as significant adverse consequences may result from these proceedings.

---

### Special Notice to Tenured Employees of the New York City Department of Education

Many of the provisions in Education Law §3020-a and/or §3020-b, including those described in this document, have been substantially modified by the collective bargaining agreement and subsequent amendments and/or revisions between the United Federation of Teachers ("UFT") and the New York City Department of Education ("NYCDOE"). Education Law §3020(3) permits the NYCDOE to modify the provisions of Education Law §3020-a through the collective bargaining process. If you are a tenured employee of the NYCDOE, you are advised to review your collective bargaining agreement and any amendments and/or revisions thereto to determine whether your rights may deviate from the provisions described below. If you have any questions, you should consult with the UFT and/or an attorney.

---

Tenured individuals cannot be disciplined or removed from employment except for "just cause" pursuant to Education Law §3020. The procedures for such discipline or removal are set forth in Education Law §3020-a, Education Law §3020-b, and the Commissioner's Regulations 8 NYCRR Ch. II, Sub. C, Part 82-3.

### Charges

1. The employing board of education ("board") must determine, by a majority vote, that probable cause exists to bring a disciplinary proceeding against the tenured employee ("employee").

2. If the board finds probable cause, the tenured employee must be provided with a written statement specifying: a.) the charges in detail; b.) the maximum penalty the board will seek if the employee is found guilty of the charges or that will be imposed if the employee does not request a hearing; and c.) a copy of this form outlining the employee's rights. The charges must be sent by certified or registered mail, return receipt requested or by personal delivery.

3. Charges cannot be brought more than three years after the alleged incompetency or misconduct, except when the charge is of misconduct constituting a crime when committed.

### Suspension Pending Hearing

The employee may be suspended pending a hearing on the charges and the final determination thereof. An employee may be suspended without pay if: a.) the employee has pleaded guilty to or has been convicted of certain felony drug crimes or a felony crime involving the physical abuse of a minor or student; or b.) the employee is charged with misconduct constituting physical or sexual abuse of a student. Employees suspended without pay due to charges constituting physical or sexual abuse of a student, are entitled to an expedited probable cause hearing.

### Termination Without Hearing

The employee shall be terminated without a hearing upon conviction of a sex offense as defined by Education Law §305(7-a)(b)(2). Employees acting as school administrators or supervisors shall be terminated without a hearing upon conviction of defrauding the government as defined by Education Law §305(7-b)(b)(2).

### Hearing Request/Failure to Request

1. Within 10 days of receiving charges, the employee must provide a written request to the clerk or the secretary of the employing board if the employee desires a hearing on the charges.

2. In the written request for hearing, the employee should indicate the name and contact information for the attorney who will represent the employee, if any. Such attorney shall be authorized to receive all correspondence related to the proceeding on the employee's behalf.

## Rights of Tenured Employees (cont.)

3. If the employee does not request a hearing within 10 days of receipt of the charges, the employee shall be deemed to have waived the right to a hearing if there is an unexcused failure to request a hearing.
4. If the employee waives his right to a hearing, the board shall proceed, within fifteen days, by a majority vote to determine the case and fix the penalty, if any, to be imposed.

### Hearing Officer Selection Process

1. Within 3 business days of receipt of the written hearing request, the clerk or secretary of the board shall notify the commissioner of the need for a hearing.
2. Upon receipt of such notification, the commissioner shall request that the American Arbitration Association provide a list of names of individuals to potentially serve as hearing officers along with relevant biographical information concerning the individual. The commissioner shall forthwith send such list to both parties.
3. For charges brought pursuant to §3020-a, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 15 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 15 days, the commissioner shall appoint a hearing officer from the list.
4. For charges brought pursuant to §3020-b, where an employee has received two consecutive ineffective ratings, the employee and the board must notify the commissioner of their agreed upon hearing officer selection within 7 days of receiving the list of potential hearing officers. If the parties fail to agree or fail to notify the commissioner of their selection within 7 days, the commissioner shall appoint a hearing officer from the list.
5. For charges brought pursuant to §3020-b, where an employee has received three consecutive ineffective ratings, the commissioner shall appoint a hearing officer from the list.

### Pre-Hearing Conference

1. The pre-hearing conference shall be private.
2. The hearing officer shall hold a pre-hearing conference within 10-15 days of receipt of notice from the commissioner confirming his or her acceptance to serve in such position, in the case of a standard or expedited §3020-a hearing.
3. For expedited §3020-b hearings where the employee has received 2 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 7 days of receiving notice confirming the hearing officer's agreement to serve.
4. For expedited §3020-b hearings where the employee has received 3 consecutive ineffective APPR ratings, the hearing officer shall hold a pre-hearing conference within 5 days of receiving notice confirming the hearing officer's agreement to serve.
5. At the pre-hearing conference, the hearing officer has the power to: a.) issue subpoenas; b.) hear and decide motions and applications made by either party; c.) set a schedule for full and fair disclosure of witnesses and evidence for both parties; and d.) set the time and place for hearings to ensure that the hearing is conducted within the statutory timelines.
6. Generally, pre-hearing motions must be made on written notice to the hearing officer and adverse party at least 5 days before the pre-hearing conference. Any pre-hearing motions not made as provided for herein shall be deemed waived. However, for expedited hearings, written notice to the adverse party shall be made no later than 2 days before the pre-hearing conference.

### General Hearing Procedures

1. The hearing will be conducted by a single hearing officer.
2. The employee shall have a reasonable opportunity to defend his or herself, including making any additional motions and applications and an opportunity to testify on his or her own behalf, however, the employee shall not be required to testify.
3. Each party has the right to be represented by counsel, and may subpoena and cross-examine witnesses. All testimony shall be under oath.
4. An accurate record of the hearing shall be kept at the expense of the commissioner. Upon request, the employee is entitled to a copy of the record without charge.
5. If the hearing officer needs to be replaced and the parties fail to notify the commissioner of their mutually agreed upon replacement within 2 business days, the commissioner shall select the replacement.

## Rights of Tenured Employees (cont.)

6. At the conclusion of the testimony, the hearing officer may allow the parties to submit memoranda of law; however, such submission may not delay the date that the hearing officer is required to render a decision.

7. In general, hearings must be completed within 60 days of the pre-hearing conference. Please see below for the time periods applicable to particular expedited hearings.

8. In general, all evidence must be submitted within 125 days of the filing of charges and no additional evidence shall be accepted after such time, absent extraordinary circumstances beyond control of the parties.

### Expedited Hearing Based on Revocation of Certification

1. If the charges are based upon revocation of the employee's certification, an expedited hearing must be held.

2. The hearing shall commence within 7 days of the pre-hearing conference and is limited to one day. The hearing may not be adjourned except upon request of a party and only for good cause as determined by the hearing officer.

### Expedited Hearing Based on Charges Constituting Physical or Sexual Abuse of Student

1. If the charges are based upon allegations of physical or sexual abuse of a student, an expedited hearing must be held.

2. The hearing shall commence within seven days after the pre-hearing conference and shall be completed within sixty days after the pre-hearing conference. Adjournments may not be granted that would extend the hearing beyond 60 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Expedited Hearing Based on Two Consecutive Ineffective APPR Ratings

1. The Board may bring charges alleging incompetence based upon two consecutive ineffective APPR ratings, in which case an expedited hearing would be held, but the board is not required to bring charges.

2. The hearing must begin within 7 days of the pre-hearing conference and be completed within 90 days following the date that the employee requested the hearing.  Adjournments may not be granted that would extend the hearing beyond 90 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

3. The charges must allege that the board has developed and substantially implemented a teacher or principal improvement plan for the employee following the first evaluation in which the employee was rated ineffective and the immediately preceding evaluation if the employee was rated developing.

### Expedited Hearing Based on Three Consecutive Ineffective APPR Ratings

1. The Board shall bring charges alleging incompetence where any teacher or principal receives three consecutive ineffective APPR ratings, in which case an expedited hearing must be held.

2. The hearing must commence within 5 days of the pre-hearing conference and be completed within 30 days following the date that the employee requested the hearing. Adjournments may not be granted that would extend the hearing beyond 30 days, except where the hearing officer determines that the delay is both substantially beyond control of the requesting party and an injustice would result if the adjournment were not granted.

### Decision

1. With the exception of expedited hearings, the hearing officer shall render a written decision within 30 days of the last hearing date.

2. For expedited hearings, the hearing officer shall render a written decision within 10 days of the last hearing date.

3. The commissioner must immediately forward copies of the decision to the parties.

4. The hearing officer shall render a written decision that includes findings of fact and conclusions, based upon the findings of fact, as to each charge and shall state the penalty, or other action, if any, against the employee on each charge.

## Rights of Tenured Employees *(cont.)*

5. In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, a suspension for a fixed time without pay, or dismissal.

6. In determining penalty, the hearing officer shall give serious consideration to the penalty recommended by the board, and if the hearing officer imposes a different penalty, then the hearing officer must indicate the reasons for the alternate penalty based upon the record.

7. Within 15 days of the receipt of the hearing officer's decision, the board shall implement the decision. If the employee is acquitted of the charges, he or she must be restored to his or her position with full pay for any period of suspension without pay and the charges expunged from the employment record.

8. The hearing officer shall indicate in the decision whether any of the charges brought by the board were frivolous as defined by the Civil Practice Law and Rules §8303-a. If the hearing officer finds that all of the charges were frivolous, the hearing officer shall order the board to reimburse both the employee and the department reasonable costs that were incurred. If the hearing officer finds that some, but not all of the charges were frivolous, the hearing officer shall order the board to reimburse a portion of the reasonable costs incurred to the department and the employee.

### Appeal

1. Not later than 10 days after receipt of the hearing officer's decision, either the employee or the board may make an application to the New York State Supreme Court to vacate or modify the hearing officer's decision pursuant to Civil Practice Law and Rules §7511.

2. The filing of the pendency of an appeal shall not delay the implementation of the hearing officer's decision.

### Restoration of Rights

If an employee who was convicted of a felony crime as specified in Education Law §3020-a(2)(b) has his or her conviction reversed, the employee, upon application, shall be entitled to have his or her pay and other emoluments restored, for the period of time extending from the date of suspension to the date of the decision.

---

*Pursuant to §§ 30-2.14 and 30-3.17 of the Rules of the Board of Regents, educators whose Annual Professional Performance Reviews (APPRs) include results from the State's growth model (i.e., teachers of grades 4-8 ELA and Mathematics; principals of buildings including those grade levels; and principals of buildings including all of grades 9-12) or any other measures based on the grades 3-8 ELA and Mathematics State assessments will receive both an "original" evaluation and a "transition" evaluation. This process will continue through the 2018-19 school year, during the time that the State transitions to new ELA and Mathematics learning standards and assessments and during that time the State will explore potential revisions to the evaluation framework. The "original" evaluation will include the results of the State's growth model and any other measures based on the grades 3-8 ELA and Mathematics State assessments. This evaluation is provided for advisory purposes only and cannot be used for employment related decisions. Affected educators will also receive a "transition" evaluation that excludes the above referenced measures. During the transition period, only this transition score and rating will be used for purposes of employment decisions, including tenure determinations and for purposes of proceedings under Education Law §§3020-a and 3020-b.

# EXHIBIT 2

## Your COVID-19 Vaccine Religious Exemption Application - Determination

solas_donotreply@schools.nyc.gov <solas_donotreply@schools.nyc.gov>
Wed 9/22/2021 7:43 PM
To: Baker Dianne (12X245) <DBaker5@schools.nyc.gov>

09/22/2021

Case#: A75783
File# 2284954
EMP ID: 810218

Dear DIANNE BAKER-PACIUS,

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate.

Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

Sincerely,

*HR Connect*
Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

Ref Number : GX5918247 N3418 COVID-19_VAX_ReligiousExempt_GenDenial

Exhibit 2a

**HR CONNECT**   **Self-Service Online Leave Application System**



Welcome, BAKER-PACIUS, DIANNE  (Emp ID: 810218

Help

○──────── Contact Information Confirmation ──────── ○ Selection ──────── ● Overview and Tasks ──────── ○ E-signature and Submission

**Information and Application Process**

Guidelines:

This COVID-19 Vaccine Related Exemption and Accommodation application is for a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immun response to COVID-19 due to preexisting immune conditions.

All applications that require supporting documentation must include the documentation a

Information regarding an individual's disability will be kept confidential to the extent requ

Applications including supporting documentation will be reviewed by appropriate staff incl

**NOTIFICATION OF A DETERMINATION**
The determination of eligibility for an exemption or accommodation will be emailed to the

**GENERAL INFORMATION**
Questions about the accommodation process may be directed to ODA at ODA@schools.ny
830.

---

**More Infomation**                                                   ✕

Employee must include documentation such as a letter from the employee and/or religious official supporting the application for an exemption to the COVID-19 vaccine mandate based on sincerely held religious beliefs.

---

ment (Medical).

procedures for filing discrimination complaints, can be found in Chancellor's Regulation A

| Checklist | | | | |
|---|---|---|---|---|
| **Tasks** | **Responsibility** | **Status** | **Date Completed** | **More Information** |
| 📝 Self Service Online Leave Application (In Progress now) | Applicant | In Progress | | ⓘ |
| ✕ Document(s) explaining exemption request such as from the employee and/or from a religious official [Required]   [Upload File(s)...] | Applicant | Not Received | | ⓘ |

Click **Upload File(s)** to upload supporting documents.

If you have read and understood the information above and wish to submit an online application, please click 'Continue'. You can click the 'Back' button to go back to the previous page if you need to make changes to your information.

[Back]   [Continue]   [Start Over]   [Exit]

Exhibit 2b

To Whom It May Concern:

My name is Dianne Christene Baker-Pacius and I am the Yoga and Mindfulness Instructor at Hugo Newman College Preparatory School in Harlem, New York. I am writing this letter to respectfully request a religious exemption for vaccination with the New York City Department of Education. I am providing my personal history and my deeply held religious beliefs as they relate to religion and my relationship with God. As such, because my beliefs are immensely personal, I respectfully request that this letter be received and treated with the highest level of confidentiality.

I am a veteran New York City public school educator with eighteen years of experience. From the beginning of my career, my colleagues admired my management skills and ability to connect with my students. I enjoy supporting students with their academic and social emotional development. During my career, I spearheaded programs for overaged IEP middle school students to provide them with opportunities for growth in self esteem and academic achievement. In addition, I created passion projects and Project Based Learning curriculum to focus on student interests, while maintaining state standards. I have taught students in general education and integrated co-teaching classes. I have also taught all subjects as an elementary educator and focused on Humanities and English Language Arts as a middle school educator.

In 2017, I completed my yoga certification through the Breathe for Change program with the support of my then principal. As a certified yoga instructor, I incorporated mindfulness activities into my daily interactions with students and staff. We engaged in asanas, meditations, and breathwork. For the 2021-2022 academic year, my school created a Yoga and Mindfulness Instructor position based on the work that I had been doing with the school community and I started the year creating the first ever yoga studio for my school community. I taught students from preschool through eighth grade. While in this role, my intention was to implement yoga and mindfulness practices to support students and staff with successfully assimilating into full time in person learning. The pandemic has created a series of personal and social traumas that may have made being in school challenging for children and adults alike and I wanted to ensure that a safe and courageous space was created for them to get the social emotional support that they may need. Though short lived, this particular position was one of the highlights of my career.

I would like to offer you a window into my upbringing, which influenced the development of my personal beliefs as they relate to religion and my relationship with God.

I was born first generation American to Jamaican parents. I grew up in an often tumultuously violent household due to my father's alcoholic tendencies. It was my mother who instilled in her eight children the importance of faith and religion. My siblings and I regularly attended Sunday school and Baptist church services along with having Christian Bible study at home with our mom. My sister and I were part of the church choir and we travelled throughout New York City to perform for other churches and listen to a variety of services. On Saturday mornings we would clean the house to the tunes of Christian music and children's Bible stories. At the time, I

didn't know the impact that the devotional faith my mother instilled in me would have on the rest of my life and my ever evolving sincerely held religious beliefs.

Moving from childhood to adulthood, I learned the power of spiritual understanding and growth, which has been the foundation of my current religious beliefs. Growing up, my parents had authority over the decisions that were made for my body, and upon entering the school system, chose to vaccinate me and school aged siblings. As a child, I had no say in what was put into my body and involuntarily abided by my parents' wishes. As I moved into adolescence and adulthood, I took sovereignty over my belief systems and my body.

In high school, I had a significant turning point-I discovered that I was obese. It may sound strange, but I didn't see myself as overweight as I didn't resemble the media based images of what obese people were to look like. One day, my mother was called into school and she and I were directed to go to the nurse's office where I was weighed and told that I was 196lbs-at the age of 15 and with a height of 5'6. I was mortified and knew that I had to make a change. It was then I realized the importance of understanding what I put into my body. I navigated food and my spiritual understandings at that time by attempting to understand why my body seemed to betray me and wanting answers. I attempted to speak with my mom and siblings, but came to no conclusions, so I went within. I talked with God about my life and why I was who I was, in the situation that I was in. I was often frightened, sad, and quite lonely as a child/ teenager, but sought answers and connection to God. I began to read the Bible on my own, wanting to get insight and clarity on life.

When I moved into my twenties, I chose to get baptized, a decision that was very powerful for me. It was powerful because my mom didn't convince me to do it, but God directed me to that decision, letting me know that I could hear and abide by His still voice. As I continued on my journey, my sister invited me to join her in services at a nondenominational church. My mind and spirit were nourished in ways that I had never imagined. This experience gave me the support, outlook, and understanding my foundational faith needed.

Through the process of communion with God and connection to my body, I have grown to believe, and know, that my body belongs to God. I keep my body pure, holy, sacred, and clean and as an adult, I do not inject anything impure into it. My blood is related to my body and soul, therefore knowing that vaccines contain blood goes against my belief of maintaining my body as pure and sacred. Partaking of the vaccine would infringe on my moral conscience, thereby impacting my path with God. In Leviticus 17 verse 12 it states "Therefore I say to the Israelites, 'None of you may eat blood, nor may any foreigner residing among you eat blood'", which lets me know that to have blood injected into my body is against God's law and directions for my life. My blood is my God given life force- "Because the life of every creature is its blood; anyone who eats it must be cut off" (Leviticus 17:14) and I will not be cut off from God.

As I read the Bible, I know that what I believe is true as it states: "Therefore, I urge you brothers and sisters, in view of God's mercy, to offer your bodies as a living sacrifice, holy and pleasing to God-this is your true and proper worship. Do not conform to the pattern of this world, but be

transformed by the renewing of your mind. Then you will be able to test and approve what God's will is-his good, pleasing, and perfect will" (Romans 12:1-2). Through my connection with God, I know that through my personal worship and my moral conscience, I am to maintain bodily integrity and sanctity as a directive from my Creator. Therefore, my deeply held religious beliefs are such that I cannot take any vaccines as they are deemed to interfere with my belief that my body is a living and holy sacrifice that is to always be pleasing to God.

While God continued to show me my path and I slipped as a mere human being, God gave me signs, like developing womb health issues, to follow His Divine law. The Bible states "And without faith it is impossible to please God, because anyone who comes to him must believe that he exists and that he rewards those who earnestly seek him" (Hebrews 11:6). I have been on this path for an exceptionally long time and intend to maintain and grow on this journey with God as I continue to seek His guidance in all things.

In conclusion, as stated throughout this letter, my deeply held religious beliefs guide my daily decisions and I know that God is directing me to refrain from vaccinations as they would go against my moral convictions. I humbly ask that my religious exemption based on my sincerely held beliefs presented in this letter be approved so that I may continue to be a contribution to Hugo Newman College Preparatory School and the NYC DOE. Thank you for your time.

Kindest Regards,

Signature: _____

# EXHIBIT 3

## Re: Grievances

From:  Dianne Baker (dianneb_28@yahoo.com)

To:    vcambronneuft@gmail.com

Date:  Wednesday, November 17, 2021 at 07:52 PM EST

Sounds good.

Sent from Yahoo Mail for iPhone

> On Wednesday, November 17, 2021, 12:16 PM, Velda Cambronne <vcambronneuft@gmail.com> wrote:
>
> Good afternoon ,
>
> Yes we can meet Thursday afternoon. I will call you then.
>
>> On Tue, Nov 16, 2021 at 2:50 PM Dianne Baker <dianneb_28@yahoo.com> wrote:
>> Hello Ms. Cambronne,
>>
>> Thank you for your response.  Can we meet on Thursday at 1:35PM? If so, please let me know if you'd prefer a phone call or a ZOOM meeting.  Thanks again.
>>
>> Regards,
>> Mrs. Baker-Pacius
>>
>> -"The most precious gift we can offer others is our presence.  When mindfulness embraces those we love, they will bloom like flowers."-Thich Nhat Hanh
>>
>>
>> On Tuesday, November 16, 2021, 12:20:54 PM EST, Velda Cambronne <vcambronneuft@gmail.com> wrote:
>>
>>
>> Good Morning Ms Baker,
>>
>> Thank you for reaching out. Union does not  believe grievance will be successful because it is a Department of Health mandate due to a pandemic. Understanding your situation , we( Union) are not certain the grievance will be successful but I am more than willing to help file a grievance on your behalf. Please let me know if and when you would like me to file a grievance. To address the other items such as copy of file, you may request to have a copy of file with Administration. You will have to arrange how you will view and make a copy of the

file with the administration. The additional matter of the 8 CAR days will be addressed in the grievance. Union is not certain of what the outcome will be but if and when you are ready I can assist.

UFT Prep Times
Tuesday 12:48 - 1:35pm
Wednesday 12:48 -1:35pm
Thursday 1:35 - 2:20pm
Friday 12:48pm - 2:20pm

On Mon, Nov 15, 2021 at 12:44 PM Dianne Baker <dianneb_28@yahoo.com> wrote:

Hello Ms. Cambronne,

I have two grievances, so far, that I intend to file and I am requesting your support . Please advise me on the next steps within 48 hours so I can follow the appropriate UFT steps. If you find that I should go directly to the UFT District Office, please let me know immediately or don't respond within the next 48 hours and I will direct this to the UFT office for the support needed.

The first grievance is against the New York City Department of Education for stopping my pay without "right to due process". These actions appear rather aggressive compared to teachers who have had Education Law 3020a-charges, ex: abuse of a child, and expelled to the "Rubber Room" or "Mini-Rubber Room", where these individuals are still being paid during the entirety of their investigations and due process, until the Arbitrator's decisions, yet the teachers who are not complying to the vaccine mandate, from the start, were immediately punished. It appears that the New York City Department of Education has the intention to fire those who do not comply, which also implies an intention to file Education Law 3020a-charges, but they are not informing New York City Department of Education Staff of this through the appropriate actions mandated by the law. This action of withdrawing pay is coercive on the part of the New York City Department of Education, as well as punishment for not following the vaccine mandate, prior to due process/ Education Law 3020a-procedures. The New York City Department of Education is using its power to fire non-compliant employees, as effectively as possible. This results in retaliation and harassment against innocent and committed New York City Department of Education employees.

The second grievance is for eight unauthorized absences, so far, which have been put into my Payroll Portal CAR system that I can't explain, especially since these days are while I am on unpaid leave. According to the Chancellor's Regulations, these unauthorized absences can be used as a sole basis for the New York City Department of Education to file Education Law 3020a charges against me. The collective bargaining agreement doesn't align with this idea of "unauthorized absences" which can result in New York City Department of Education employees losing their job, and licenses with the city, for non compliance. The New York City Department of Education, alongside the United Federation of Teachers, arbitration agreement does not protect ALL of its members and leaves many vulnerable to being fired without due process, resulting in a plethora of monumental hardships.

This experience has been exceptionally unfortunate and the New York City Department of Education continuing to not abide by laws and regulations that were put in place to protect those who have given their lives to serve children and the education system is causing reprehensible damage.

Also, I have emailed Ms. Nelson twice about getting a copy of my file from PS/IS 180 and she has not responded.

Again, I am requesting support from the UFT in this matter of completing and submitting these grievances that I, and so many, are dealing with.

Sincerely,

Dianne Baker-Pacius



Exhibit 3a

**HUGO NEWMAN COLLEGE PREPARATORY SCHOOL**
**P.S/ I.S. 180**

370 West 120th Street
New York, New York 10027
Telephone: (212) 678-2849
Facsimile:  (212) 665-1572

Jeneca Parker, Principal

Kristen Marren, Assistant Principal                                    Maureen Sullivan, Assistant Principal

November 29, 2021

VIA EMAIL

Dianne Baker-Pacius
Teacher
PS/IS 180 Hugo Newman
File #2284954

Dear Ms. Baker-Pacius,

You filed a grievance on November 18, 2021 claiming your rights pursuant to Article 20
of the collective bargaining agreement were violated when you were suspended and
moved to unpaid status following the vaccine mandate. I held a videoconference meeting
with you and Velda Cambronne, your UFT Chapter Leader, on Wednesday,
November 24th to discuss your grievance.

I deny your grievance because you failed to demonstrate that the collective bargaining
was violated.

Sincerely,

Jeneca Parker

Principal
PS/IS 180

Exhibit 3b

## Re: Case #M73656-Step 2 Grievance Denial Appeal

From:  Dianne Baker (dianneb_28@yahoo.com)

To:    SZalkin@uft.org

Date:  Wednesday, December 29, 2021 at 02:59 PM EST

Hello Mr. Zalkin,

I hope this message finds you well. Thank you for reaching out to me to discuss my case. I am best reached via email, so please direct all communication through email-it would be much appreciated.

As per my initial email, please provide an explanation of the denial of my grievance to step 2 regarding:

1. eight unauthorized absences put into my CAR while on unpaid leave

2. stopping my pay without due process.

Thank you again and I look forward to your reply.

Be Well,
Mrs. Baker-Pacius

Sent from Yahoo Mail for iPhone

On Tuesday, December 28, 2021, 11:48 AM, Saul Zalkin <SZalkin@uft.org> wrote:

Dear Ms. Baker,

I just tried to call you but was unable to leave a message because the mailbox is full.
Please call me at 212-598-9507 so we can discuss the case.
This week I am in the office through Thursday from 10-4:30.
Starting January 3, 2022 my normal hours resume and I am in the office daily from 3 – 6.

*Saul L. Zalkin*
Grievance Department

**From:** Dianne Baker <dianneb_28@yahoo.com>
**Sent:** Monday, December 20, 2021 3:20 PM

**To:** Saul Zalkin <SZalkin@uft.org>
**Subject:** Case #M73656-Step 2 Grievance Denial Appeal

Re: Case #M73656

School: M180

520 West 183rd Street Apt 54A
New York NY 10033
646-369-6792

Hello Mr. Zalkin,

I hope this message finds you well. My name is Dianne Baker-Pacius and I am a veteran New York City Department of Education Employee. On December 15, 2021 I received a denial letter to Step 2 of my grievance regarding eight unauthorized absences that were put into my CAR while on leave without pay and stopping my pay without my right to due process.

I am requesting a full explanation of why my grievance was denied to be pursued to step 2.

I intend to appeal this decision.

Thank you.

Regards,
Dianne Baker-Pacius



Our kids deserve smaller class sizes.
Sign and share our petition.

The views, opinions, and judgments expressed in this message are solely those of the author. The message contents have not been reviewed or approved by the UFT.

Exhibit 3c

Please find my reasons why my grievance should go to step 2:

Every UFT represented employee has the right to file a step 1 grievance. However, the Union, not the employee, files the step 2 grievance with the Chancellor and the Union, not the employee, files salary and leave grievances with the Executive Director of Human Resources. The Union only pursues these grievances if they have merit. Your grievance claims a contractual violation for being placed on an unpaid leave of absence.

The New York City Department of Health ordered that all Department of Education staff must be vaccinated. After a Municipal Labor Committee lawsuit joined by the UFT failed to stop the mandate, the UFT filed for impact bargaining. The resulting arbitration decision modifies the CBA. If the DOE is complying with the award there is nothing to grieve.

Subsequently, the arbitration decision was modified by a court order pertaining to those who appealed DoE's decision not to grant religious exemptions. Those people now have the right to appeal to a city panel. The order stated that those on unpaid leave that are granted a religious exemption will be awarded back pay for the entire time on unpaid leave.

As a tenured teacher, I have the right to a 3020A hearing to be subsequently fired from the DOE. I have not formally been brought up on any charges and have been without pay since October 2021. On Pg 14 of the arbitration agreement, it states "During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from gainful employment during leave period". The DOE has failed to offer members gainful employment opportunities during this new type of involuntary unpaid leave and the UFT has failed to protect members' gainful employment opportunities during this new type of involuntary leave. The current term prohibiting gainful employment has created financial hardships, social emotional stress, and irreparable harm such as newly developed health conditions during this involuntary unpaid leave without gainful employment opportunities to members and members' families. During this time, my husband and I have had to go through our savings to maintain basic living expenses. Our credit card debt consumption has increased by 30%. In addition, we are now considering leaving our home to live with my mother in order to relinquish finances lost during this unfortunate time. My levels of stress have increased, indicated by sleepless nights, anxiety, panic attacks, enhanced pulsatile tinnitus, and depression. This time has been exceptionally challenging to navigate and has created undue, and quite frankly unnecessary, hardship for those involved. This new type of unpaid leave I have been placed on is very different from all types of voluntary leaves without pay defined in the contract. All other leaves without pay in the contract are voluntary. However, this new type of unpaid leave I have been placed on is involuntary. Therefore, I should be allowed to have gainful employment to support my family. The UFT has failed to protect my gainful employment rights.

There are a few ongoing contractual violations in the DOE vaccine mandate roll out and its exemption application process. The UFT has failed to enforce those rights to protect members. In article 2 FAIR PRACTICES pg4 of the contract, it says "The Board agrees to continue its policy of not discriminating against any employees on the basis of race, creed (religion), color, sex,

marital status, sexual orientation, handicapping condition or age". I have been discriminated against on my religion by the DOE because the DOE has wrongfully denied my religious exemption and wrongfully placed me on unpaid leave status. My contractual rights have been violated and the Union has duties to represent me fairly in the process. All three standards in Section I.C in the arbitration agreement are violating existing laws, such as the Free Exercise Clause in the 1st Amendment, Title VII of the Civil Rights Act of 1964, the New York State and New York City Human Rights Laws. And those standards in Section I.C in the arbitration agreement have been disregarded by the court order issued on 11/15 regarding Michael Kane v. the DOE case & Matthew Keil v. the DOE case. In the determination letter I received from the DOE on 09/22/2021, it says "unvaccinated employees cannot work in a school building without posing a direct threat to health and safety." Covid-19 vaccines don't prevent infections and transmissions. Vaccinated DOE employees can still get infected and spread the virus, as has been demonstrated by classroom and school closings and the recent discussions to implement remote learning . Labeling unvaccinated employees like myself as "a direct threat to health and safety" is a discrimination against my vaccine status. This narrative will cause discrimination, segregation, harassment and irreparable harm and injuries on unvaccinated employees like me.


In reference to having absences occurring on October 4 through October 14, 2021 coded as unauthorized on payroll portal, those absences are coded in EIS (the DOE payroll system) as Vaccine Non-Compliance. According to the arbitration they cannot be cited for disciplinary purposes.

In Section 2.b under Unauthorized Absences of the Chancellor Regulation issued on 6/17/2021 and in Section 2.b of the Chancellor Regulation issued on 11/18/2021, both sections state unauthorized absence and payroll deduction "shall not preclude any disciplinary action which the Chancellor, responsible superintendent or executive director deems appropriate, including preferral of charges of unauthorized absence from duty." I discovered that I had eight unauthorized absences in my CAR via the DOE payroll portal on 11/17/21 and contacted the payroll secretary, Ms. Nelson of Hugo Newman College Preparatory School regarding this matter. She informed me that it was automatically generated. It is not appropriate for the DOE to bring a charge on me using unauthorized absence because I have been on authorized absence. On 10/2/21 the Division of Human Capital sent me a notice of leave without pay which gave me their authorization for me to be on unpaid leave although I am willing and able to report to work. Therefore, my absences should be considered as authorized absences and I shall not be disciplined or discriminated against. In Article 16 Section I of the teacher contract it says "No employee shall be disciplined … for taking an approved unpaid leave." Therefore, I shall not be disciplined for being placed on an **approved** unpaid leave.

Based on the above, being placed on an unpaid leave due to vaccine non-compliance is not a contractual violation. Therefore, the Union will not be taking the case to the Chancellor's level or to the Executive Director of Human Resources at this time. You have the right to appeal the Union's decision but we want to make sure you understand the Union's rationale for not pursuing your grievance.

# EXHIBIT 4



**Affiliated with**
**St. Francis Hospital,**
**The Heart Center®**
**Catholic Health Services**
At the heart of health

*Catholic Health Physician Partners*
*Internal Medicine Associates*
*146A Manetto Hill Road, Suite 205*
*Plainview, NY 11803*
*Tel (516) 302-8530*
*Fax (516) 838-6164*

9/15/21

Christopher Garry,
date of birth 10/6/63,
has had multiple pulmonary
embolism's over his
lifetime. Christopher
was advised to not
have the COVID vaccine
because of the risk of
another pulmonary-embolism.

Sincerely,

Jane F. Serie, M.D.
146A Manetto Hill Road, Suite 205
Plainview, NY 11803
Tel: (516) 302-8530
Fax: (516) 838-6164

Exhibit 4a

| | |
|---|---|
| **Email From:** | solas_dontreply@schools.nyc.gov |
| **Sent:** | Tuesday, September 21, 2021 07:13 PM |
| **Email To:** | cgarry@schools.nyc.gov |
| **Email CC:** | |
| **Email BCC:** | HRConnectLeaves@schools.nyc.gov |
| **Subject:** | Your COVID-19 Vaccine Medical Exemption Application – Determination |

09/20/2021

Case#: A75695
File# 0677758
EMP ID: 834161

Dear CHRISTOPHE GARRY,

This is to advise you that your request for a Medical Exemption to the COVID-19 Vaccine Mandate has been denied for the following reason(s):

- Denial Reason: Other

- Additional Information: Attn. MD: PMHx of P.E. is not a contraindication to COVID vaccine (as per CDC website)

Your application was reviewed in accordance with the ADA, the New York State and City Human Rights Laws, as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate.

Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and selecting the option: "I would like to APPEAL". As part of the appeal, you may submit additional medical documentation and must provide a reason for the appeal.

Sincerely,

*HR Connect*
Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

Ref Number : GX6903216 N3416 COVID-19_VAX_MedExemption_Denial (All Unions)

# EXHIBIT 5

# EXHIBIT 5

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FOURTH DEPARTMENT

– – – – – – – – – – – – – – – – – – – – – – – – – X

MEDICAL PROFESSIONALS FOR INFORMED
CONSENT, et al.

*Appellees-Petitioners*

**Index No. CA 23-00161**

-against-

MARY T. BASSETT, et al,

*Appellants-Respondents*

– – – – – – – – – – – – – – – – – – – – – – – – X

| STATE OF CONNECTICUT | ) | |
|---|---|---|
| | ) ss.: TRUMBULL | |
| COUNTY OF FAIRFIELD | ) | |

HARVEY A. RISCH, MD, PHD, being duly sworn, deposes and says:

1.      I make this affidavit in support of Appellee-Petitioners' opposition to Appellants' motion for stay.

2.      I am familiar with the facts set forth herein based on my review of the affidavits and evidence submitted with Appellants' motion for a stay, hundreds of scientific studies and research findings, on my own extensive research and on my personal knowledge and the expertise gained through my career as a university professor, research scientist and epidemiologist.  Some of the credentials and experience that qualify me to give this opinion are listed below.

3.      I am Professor Emeritus of Epidemiology at Yale School of Public Health, a practicing academic epidemiologist with more than 40 years of experience in epidemiologic methods, both in research and teaching. My research has included both infectious and noninfectious factors.

4.      Over this career, I have taught introductory, intermediate, and advanced epidemiologic research methods to public health graduate students, postdoctoral fellows, hospital residents, and junior faculty members. I have also taught coursework on pharmacoepidemiology, which is the epidemiologic study of vaccines, medications, and medical devices, and their antecedent conditions and reasons for use.

5.      I have published some 400 peer-reviewed original research papers in well-regarded scientific journals and have an h-index of 105, with more than 48,000 publication citations to-date.

6.      I have served as grant reviewer or chair on two dozen grant review panels, most of which were at NIH, and served as peer reviewer for 60 scientific and medical journals.

7.      I have been Associate Editor of the *Journal of the National Cancer Institute* since 2000, Member of the Board of Editors of the *American Journal of Epidemiology* from 2014–2020, and Editor of the *International Journal of Cancer* since 2008.

8.      I am an elected member of the Connecticut Academy of Science and Engineering and, based on my strong epidemiologic methods experience and PhD work in infectious epidemic models, was selected to be a member of the Academy committee that was organized in 2020 to formulate plans for helping the reopening of the state of Connecticut after its lockdown ended.

9.      I thus began researching COVID-19 epidemiology, prevention, treatment, and vaccination with my participation in the Reopening Committee. In the subsequent 2.5 years, I extensively studied medical and epidemiologic factors related to the COVID-19 virus, the vaccines, and the disease in the US and internationally.

2

NYSCEF DOC. NO. 5

RECEIVED NYSCEF: 02/28/2023

10.     I base my understandings of vaccine immunity and safety from studies and data of the three genetic vaccines that have received emergency use authorization (EUA) from the US Food and Drug Administration (FDA): the two mRNA-technology vaccines (Pfizer-BioNTech and Moderna) and the adenovirus vector-based vaccine (Johnson & Johnson).

11.     In my professional opinion, Appellants' claim that a vaccine mandate will reduce the spread of COVID-19 in any meaningful way is not supported by the great weight of evidence and does not comport with the current recommendations of the Centers for Disease Control and Prevention ("CDC").

### The Current Scientific Consensus, based on the Overwhelming Weight of Available Evidence, does not Support the Assertion that Vaccination can Meaningfully Stop the Spread of COVID-19

12.     My understanding from the papers is that Appellants assert that maintaining a vaccine mandate pending the outcome of their appeal is necessary to stop the spread of COVID-19 in hospitals and healthcare facilities and thus prevent irreparable harm.

13.     This claim is not supported by the scientific evidence, nor is it supported by the consensus of public health officials and scientists as represented by official CDC statements.

14.     In fact, in 2022, CDC specifically updated its guidance to state, "CDC's COVID-19 prevention recommendations no longer differentiate on a person's vaccination status."[1]

15.     As further discussed below, there is no reasonable scientific debate about the fact that the original primary COVID-19 vaccinations have essentially completely lost effectiveness for preventing infection transmission, nor about that currently available vaccines provide only transient

---

[1] Centers for Disease Control and Prevention.  Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems — United States, August 2022.
https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm (August 19, 2022; last visited January 31, 2023)

3

benefit and wane in effectiveness, nor about that unvaccinated employees pose no different risk of spreading COVID-19 over those vaccinated with the two-dose primary series.

16.    Given these well-established facts, there is no scientific basis to assert that a vaccine mandate will meaningfully stop the spread of COVID-19 in healthcare facilities, or that staying the lower court's decision to strike the mandate is necessary to prevent irreparable harm.

### All Available Regular-Dose COVID-19 Vaccines Target the Original SARS-CoV-2 Virus, Rendering Them Largely Ineffective

17.    All currently available COVID-19 vaccines were designed to target the spike (S) glyco-protein of the original SARS-CoV-2 strain (Wuhan HU-1) identified in Wuhan, China, in late 2019.

18.    Since then, however, substantial mutations have occurred to that structure—at least fifteen mutations of the Spike S receptor-binding domain (RBD) have been identified in Omicron alone. (Cao et al., 2022a).[2]

19.    This dramatic evolution of the variant has resulted in substantial antibody escape, estimated at above 85% of all neutralizing antibodies tested by the same group of researchers, in another study evading neutralizing antibodies with a twelve- to 44-fold higher efficiency than the Delta variant (Hoffmann et al., 2022).[3]

20.    "Antibody escape" renders antibodies elicited against the earlier virus strains ineffective against the escaped substrains.

21.    The Omicron subvariants present an even higher capacity for antibody escape while also becoming more transmissible due to additional mutations in the spike protein.

---

[2] Cao Y, Wang J, Jian F, Xiao T, Song W, Yisimayi A, Huang W, Li Q, Wang P, An R, Wang J, Wang Y, Niu X, Yang S, Liang H, Sun H, Li T, Yu Y, Cui Q, Liu S, Yang X, Du S, Zhang Z, Hao X, Shao F, Jin R, Wang X, Xiao J, Wang Y, Xie XS. Omicron escapes the majority of existing SARS-CoV-2 neutralizing antibodies. Nature 2022a;602(7898):657-663. https://www.nature.com/articles/s41586-021-04385-3

[3] Hoffmann M, Krüger N, Schulz S, Cossmann A, Rocha C, Kempf A, Nehlmeier I, Graichen L, Moldenhauer AS, Winkler MS, Lier M, Dopfer-Jablonka A, Jäck HM, Behrens GMN, Pöhlmann S. The Omicron variant is highly resistant against antibody-mediated neutralization: Implications for control of the COVID-19 pandemic. Cell 2022;185(3):447-456.e11. https://www.cell.com/cell/fulltext/S0092-8674(21)01495-1

22.     Specifically, more recently circulating variants like BA.4 and BA.5 are some four-fold more resistant to "sera from vaccinated and boosted individuals than BA.2," which itself was already more resistant than the baseline Omicron variant (Wang et al., 2022).[4] Omicron variants in turn have been far more resistant than Delta, which was more resistant than the original virus strains to original vaccine-related immunity.

23.     In other words, vaccination with the primary series, which is what this mandate requires, has little to no effect on a person's ability to become infected and/or pass on currently circulating strains of SARS-CoV-2, and may in fact even be counterproductive.

24.     The data further show that, even for currently available vaccine boosters updated to target Omicron subvariant BA.1, the recent mutations in BA.5 render such an update largely ineffective (Cao et al., 2022b).[5]

25.     Similarly, bivalent booster vaccines targeting BA.4 and BA.5 are highly ineffective against current substrains BQ.1.1 and XBB.1 (Miller et al., 2023).[6]

26.     These substrains together comprise the overwhelming majority of virus variants presently in circulation in the US (see CDC chart, next page, dated January 28, 2023).[7]

---

[4] Wang Q, Guo Y, Iketani S, Nair MS, Li Z, Mohri H, Wang M, Yu J, Bowen AD, Chang JY, Shah JG, Nguyen N, Chen Z, Meyers K, Yin MT, Sobieszczyk ME, Sheng Z, Huang Y, Liu L, Ho DD. Antibody evasion by SARS-CoV-2 Omicron subvariants BA.2.12.1, BA.4 and BA.5. Nature 2022 Aug;608(7923):603-608. https://www.nature.com/articles/s41586-022-05053-w

[5] Cao Y, Yisimayi A, Jian F, Song W, Xiao T, Wang L, Du S, Wang J, Li Q, Chen X, Yu Y, Wang P, Zhang Z, Liu P, An R, Hao X, Wang Y, Wang J, Feng R, Sun H, Zhao L, Zhang W, Zhao D, Zheng J, Yu L, Li C, Zhang N, Wang R, Niu X, Yang S, Song X, Chai Y, Hu Y, Shi Y, Zheng L, Li Z, Gu Q, Shao F, Huang W, Jin R, Shen Z, Wang Y, Wang X, Xiao J, Xie XS. BA.2.12.1, BA.4 and BA.5 escape antibodies elicited by Omicron infection. Nature 2022b;608(7923):593-602. https://www.nature.com/articles/s41586-022-04980-y

[6] Miller J, Hachmann NP, Collier AY, Lasrado N, Mazurek CR, Patio RC, Powers O, Surve N, Theiler J, Korber B, Barouch DH. Substantial neutralization escape by SARS-CoV-2 Omicron variants BQ.1.1 and XBB.1. N Engl J Med. 2023 Jan 18. https://www.nejm.org/doi/full/10.1056/NEJMc2214314

[7] Centers for Disease Control and Prevention. Variant Proportions. https://covid.cdc.gov/covid-data-tracker/#variant-proportions (2023; last visited January 28, 2023)



Weighted and Nowcast Estimates in United States for Weeks of 10/23/2022 – 1/28/2023

Nowcast Estimates in United States for 1/22/2023 – 1/28/2023

* Enumerated lineages are US VOC and lineages circulating above 1% nationally in at least one week period. "Other" represents the aggregation of lineages which are circulating <1% nationally during all weeks displayed.
** These data include Nowcast estimates, which are modeled projections that may differ from weighted estimates generated at later dates
# BA.1, BA3 and their sublineages (except BA.1.1 and its sublineages) are aggregated with B.1.1.529. Except BA.2.12.1, BA.2.75, XBB and their sublineages, BA.2 sublineages are aggregated with BA.2. Except BA.2.75.2, CH.1.1 and BN.1, BA.2.75 sublineages are aggregated with BA.2.75. Except BA.4.6, sublineages of BA.4 are aggregated to BA.4. Except BF.7, BF.11, BA.5.2.6, BQ.1 and BQ.1.1, sublineages of BA.5 are aggregated to BA.5. Except XBB.1.5, sublineages of XBB are aggregated to XBB. For all the other lineages listed, their sublineages are aggregated to the listed parental lineages respectively. Previously, CH.1.1 was aggregated to BA.2.75. Lineages BA.2.75.2, XBB, XBB.1.5, BN.1, BA.4.6, BF.7, BF.11, BA.5.2.6 and BQ.1.1 contain the spike substitution R346T.

## Vaccine Protection Wanes More Rapidly than Natural Infection

27.    By four to six months after the full course of either the Pfizer or Moderna vaccines, protection against infection by the BA.1 or BA.2 subvariants is estimated to be somewhere between zero to thirty percent—in other words, almost entirely attenuated only six months after the last injection (UK Health Security Agency, 2022).[8]

---

[8] UK Health Security Agency. COVID-19 Vaccine Surveillance Report, Week 27, Publishing reference: GOV-12727, July 7, 2022.

https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1088974/Vaccine-surveillance-report-week-27.pdf (last visited January 30, 2023).

6



Figure 3. Effectiveness of Previous Infection, Vaccination, and Hybrid Immunity against Any Symptomatic Omicron Infection According to Time since Previous Infection or Vaccination.
I bars indicate 95% confidence intervals.

28.    Dozens of studies show that circulating antibodies, T-cells and B-cells reflective of SARS-CoV-2 infection last at least as long, and in most cases longer than, protection from vaccination (Alexander, 2022).[9]

---

[9] Alexander PE. 160 Plus Research Studies Affirm Naturally Acquired Immunity to Covid-19: Documented, Linked, and Quoted. Brownstone Institute, 2022. https://brownstone.org/articles/research-studies-affirm-naturally-acquired-immunity/ (last accessed January 30, 2023)

29.     Moreover, multiple other studies show conclusively that any protection the vaccine two-dose regimen can provide against Omicron infection wanes by six months (Kirsebom et al., 2022[10]; Tseng et al., 2022[11]; Nielsen et al., 2022[12]; Altarawneh et al., 2022[13]). The relevant Figure 3 from the Altarawneh study is shown at the top of the previous page (2-dose vaccination circled in red).

30.     The Qatar study (Altarawneh et al., 2022) also shows in that figure that in contrast to vaccine effectiveness, previous infection effectiveness against reinfection remains stable for at least one year.

31.     One empirical study of 11,000 UK healthcare workers demonstrates strong resistance to reinfection for at least 6 months.[14]

---

[10] Kirsebom FCM, Andrews N, Stowe J, Toffa S, Sachdeva R, Gallagher E, Groves N, O'Connell A-M, Chand M, Ramsay M, Lopez Bernal J. COVID-19 vaccine effectiveness against the omicron (BA.2) variant in England. Lancet Infect Dis 2022; published online May 24. https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(22)00309-7/fulltext

[11] Tseng HF, Ackerson BK, Bruxvoort KJ, Sy LS, Tubert JE, Lee GS, Ku JH, Florea A, Luo Y, Qiu S, Choi SK, Takhar HS, Aragones M, Paila YD, Chavers S, Talarico CA, Qian L. Effectiveness of mRNA-1273 against infection and COVID-19 hospitalization with SARS-CoV-2 Omicron subvariants: BA.1, BA.2, BA.2.12.1, BA.4, and BA.5. medRxiv preprint, December 2, 2022. https://www.medrxiv.org/content/10.1101/2022.09.30.22280573v2

[12] Nielsen KF, Moustsen-Helms IR, Schelde AB, Gram MA, Emborg HD, Nielsen J, Hansen CH, Andersen MA, Meaidi M, Wohlfahrt J, Valentiner-Branth P. Vaccine effectiveness against SARS-CoV-2 reinfection during periods of Alpha, Delta, or Omicron dominance: A Danish nationwide study. PLoS Med 2022;19(11):e1004037. https://journals.plos.org/plosmedicine/article?id=10.1371/journal.pmed.1004037

[13] Altarawneh HN, Chemaitelly H, Ayoub HH, Tang P, Hasan MR, Yassine HM, Al-Khatib HA, Smatti MK, Coyle P, Al-Kanaani Z, Al-Kuwari E, Jeremijenko A, Kaleeckal AH, Latif AN, Shaik RM, Abdul-Rahim HF, Nasrallah GK, Al-Kuwari MG, Butt AA, Al-Romaihi HE, Al-Thani MH, Al-Khal A, Bertollini R, Abu-Raddad LJ. Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections. N Engl J Med 2022;387(1):21-34. https://www.nejm.org/doi/10.1056/NEJMoa2203965

[14] Hanrath AT, Payne BAI, Duncan CJA. Prior SARS-CoV-2 infection is associated with protection against symptomatic reinfection. J Infect 2021;82(4):e29-e30. https://www.journalofinfection.com/article/S0163-4453(20)30781-7/fulltext

32.     Four empirical studies demonstrate strong resistance to reinfection for at least 7 months, in Qatar,[15] Denmark,[16] UK[17] and Austria.[18]

33.     One empirical study in the London, UK, metropolitan area demonstrates strong resistance to reinfection for at least 8 months.[19]

34.     Three empirical studies demonstrate strong resistance to reinfection for at least 9 months, in England,[20] Israel[21] and the US,[22] and another in the US for 10 months.[23]

[15] Abu-Raddad LJ, Chemaitelly H, Coyle P, Malek JA, Ahmed AA, Mohamoud YA, Younuskunju S, Ayoub HH, Al Kanaani Z, Al Kuwari E, Butt AA, Jeremijenko A, Kaleeckal AH, Latif AN, Shaik RM, Abdul Rahim HF, Nasrallah GK, Yassine HM, Al Kuwari MG, Al Romaihi HE, Al-Thani MH, Al Khal A, Bertollini R. SARS-CoV-2 antibody-positivity protects against reinfection for at least seven months with 95% efficacy. EClinicalMedicine 2021;35:100861. https://www.thelancet.com/journals/eclinm/article/PIIS2589-5370(21)00141-3/fulltext
[16] Hansen CH, Michlmayr D, Gubbels SM, Molbak K, Ethelberg S. Assessment of protection against reinfection with SARS-CoV-2 among 4 million PCR-tested individuals in Denmark in 2020: a population-level observational study. Lancet 2021;397(10280):1204-1212. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00575-4/fulltext
[17] Lumley SF, O'Donnell D, Stoesser NE, Matthews PC, Howarth A, Hatch SB, Marsden BD, Cox S, James T, Warren F, Peck LJ, Ritter TG, de Toledo Z, Warren L, Axten D, Cornall RJ, Jones EY, Stuart DI, Screaton G, Ebner D, Hoosdally S, Chand M, Crook DW, O'Donnell AM, Conlon CP, Pouwels KB, Walker AS, Peto TEA, Hopkins S, Walker TM, Jeffery K, Eyre DW; Oxford University Hospitals Staff Testing Group. Antibody Status and Incidence of SARS-CoV-2 Infection in Health Care Workers. N Engl J Med 2021;384(6):533-540. https://www.nejm.org/doi/10.1056/NEJMoa2034545
[18] Pilz S, Chakeri A, Ioannidis JP, Richter L, Theiler-Schwetz V, Trummer C, Krause R, Allerberger F. SARS-CoV-2 re-infection risk in Austria. Eur J Clin Invest 2021;51(4):e13520. https://onlinelibrary.wiley.com/doi/10.1111/eci.13520
[19] Breathnach AS, Riley PA, Cotter MP, Houston AC, Habibi MS, Planche TD. Prior COVID-19 significantly reduces the risk of subsequent infection, but reinfections are seen after eight months. J Infect 2021 Apr;82(4):e11-e12. https://www.journalofinfection.com/article/S0163-4453(21)00010-4/fulltext
[20] Hall VJ, Foulkes S, Charlett A, Atti A, Monk EJM, Simmons R, Wellington E, Cole MJ, Saei A, Oguti B, Munro K, Wallace S, Kirwan PD, Shrotri M, Vusirikala A, Rokadiya S, Kall M, Zambon M, Ramsay M, Brooks T, Brown CS, Chand MA, Hopkins S; SIREN Study Group. SARS-CoV-2 infection rates of antibody-positive compared with antibody-negative health-care workers in England: a large, multicentre, prospective cohort study (SIREN). Lancet 2021;397(10283):1459-1469. https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(21)00675-9/fulltext
[21] Gazit S, Shlezinger R, Perez G, Lotan R, Peretz A, Ben-Tov A, Herzel E, Alapi H, Cohen D, Muhsen K, Chodick G, Patalon T. The Incidence of SARS-CoV-2 Reinfection in Persons With Naturally Acquired Immunity With and Without Subsequent Receipt of a Single Dose of BNT162b2 Vaccine : A Retrospective Cohort Study. Ann Intern Med 2022;175(5):674-681. https://www.acpjournals.org/doi/full/10.7326/M21-4130
[22] León TM, Dorabawila V, Nelson L, Lutterloh E, Bauer UE, Backenson B, Bassett MT, Henry H, Bregman B, Midgley CM, Myers JF, Plumb ID, Reese HE, Zhao R, Briggs-Hagen M, Hoefer D, Watt JP, Silk BJ, Jain S, Rosenberg ES. COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis - California and New York, May-November 2021. MMWR Morb Mortal Wkly Rep 2022;71(4):125-131. https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm
[23] Spicer KB, Glick C, Cavanaugh AM, Thoroughman D. Protective Immunity after Natural Infection with Severe Acute Respiratory Syndrome Coronavirus-2 (SARS-CoV-2) - Kentucky, USA, 2020. Int J Infect Dis 2022;114:21-28. https://www.ijidonline.com/article/S1201-9712(21)00800-6/fulltext

35.     Finally, one empirical study in Italy demonstrates strong resistance to reinfection for at least 11 months,[24] and one at the Cleveland Clinic in the US, for at least 13 months.[25]

36.     These twelve empirical studies demonstrate that natural infection with SARS-CoV-2 generates effective immunity in dramatically reducing risk of reinfection for at least 6-13 months. Such reduced risks are comparable to or more durable than the temporary reduced infection risks lasting roughly no more than 6 months provided by vaccination, as shown above.

37.     Appellants' own data set also shows that natural immunity is superior to vaccine immunity. CDC analysis of the NYSDOH COVID-19 cumulative laboratory-confirmed incidence data for the period May through November 2021 showed that 1.82% of vaccinated people without previous COVID-19 diagnosis got COVID-19, vs 0.62% of unvaccinated people who had previously had COVID-19, an almost 3-fold higher rate for vaccinated individuals[26]. This study was co-authored by Respondent-Appellant Bassett and Appellants' Affiant Dr. Emily Lutterloh in January 2022.

38.     The same CDC report found almost identical rates in California for the same period: 1.55% of vaccinated people without previous COVID-19 diagnosis got COVID-19, vs 0.50% of unvaccinated people who had previously had COVID-19, again a 3-fold rate for vaccinated vs unvaccinated persons.

39.     Similarly, the primary study that Dr. Lutterloh relies on in the affidavit submitted with these motion papers also found that vaccine effectiveness wanes over months, whereas immunity from natural infection does not. "We ... found that time since last dose of a COVID-19 vaccine (as a continuous variable) was associated with increased infectiousness of SARS Co-V2-infections. ... We

---

[24] Vitale J, Mumoli N, Clerici P, De Paschale M, Evangelista I, Cei M, Mazzone A. Assessment of SARS-CoV-2 Reinfection 1 Year After Primary Infection in a Population in Lombardy, Italy. JAMA Intern Med 2021;181(10):1407-1408. https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2780557
[25] Kim P, Gordon SM, Sheehan MM, Rothberg MB. Duration of Severe Acute Respiratory Syndrome Coronavirus 2 Natural Immunity and Protection Against the Delta Variant: A Retrospective Cohort Study. Clin Infect Dis 2022;75(1):e185-e190. https://academic.oup.com/cid/article/75/1/e185/6448857
[26] *See* fn 22, *supra.*

10

did not observe a statistically significant relationship between time since last SARS-Co-V2 infection and risk of transmission." (NYSCEF Doc. 3 at p. 225, *Lutterloh Ex. B*) (Tan et al., 2023).[27]  This means that increasingly over months after the last vaccine dose, risk of infection significantly increased, whereas after prior infection, a significant increasing risk of reinfection was not seen.

40.    I am informed that all named Petitioners and most healthcare workers seeking reinstatement as a result of the lower court's order have natural immunity.  The science does not support an inference that their return to work will pose a direct threat to public health.

41.    Dr. Lutterloh states that natural immunity should not apply to COVID-19 mandates (NYSCEF Doc. 3, Ex. L - Lutterloh Aff. ¶ 12 fn 3).  In particular, she notes, "Serology is appropriate for diseases people typically only contract once in their lifetime, well characterized serology is reliably commercially available, and positive serology indicates essentially complete immunity. COVID-19 does not fit this profile."

42.    Respectfully, these three criteria do not represent the purpose of documenting serological evidence of having had COVID-19.  The evidence cited herein at ¶¶ 28-35 shows that prior SARS-CoV-2 infection reduces the risk of reinfection in degree comparable to and for durations longer than 2-dose vaccine-based immunity.  A serological test positive for indicators of natural immunity to SARS-CoV-2 is extremely specific for having previously had COVID-19.  There is no requirement to demonstrate complete immunity by serologic evidence; there is no requirement that the previous COVID-19 not have occurred more than once, nor that infection could not theoretically recur, as breakthrough infections certainly can after vaccination (see ¶ 43 *infra*); and commercial testing for natural COVID-19 serology is available.[28]  A positive commercial serologic test demonstrates the

---

[27] Tan ST, Kwan AT, Rodríguez-Barraquer I, Singer BJ, Park HJ, Lewnard JA, Sears D, Lo NC.  Infectiousness of SARS-CoV-2 breakthrough infections and reinfections during the Omicron wave.  Nat Med 2023 Jan 2.  https://www.nature.com/articles/s41591-022-02138-x

[28] https://www.questdiagnostics.com/patients/get-tested/conditions/infectious-disease/covid-19/antibody

fact of past COVID-19, and that fact is sufficient to assert durable immunity to reinfection by the virus, as good as or better than receipt of the primary series of vaccination required by the NYSDOH regulation at issue.

43.     As discussed herein, 2-dose COVID-19 vaccine immunity does not provide complete immunity, and it does not protect the vaccinated individual from getting or transmitting COVID-19. The criteria stated by Dr. Lutterloh at ¶ 41 are not imposed on vaccine-based immunity and are therefore not comparable between vaccine-based and natural immunity. These criteria represent an ad hoc and arbitrarily incorrect characterization of the fact of a positive result in commercial serologic testing for past COVID-19.

### Currently Available Vaccines May Actually Increase The Risk of Infection or Transmission of SARS-CoV-2

44.     Data from a number of more recent high-powered studies show that currently available vaccines may eventually actually increase the risk of infection and transmission of COVID-19 rather than decrease it.

45.     A study performed during Qatar's Omicron wave in December 2021 to mid-January 2022 involving more than 1.6 million persons bears out this fact by demonstrating that any previous protection afforded by full primary doses of the currently available vaccines no longer exists (Altarawneh et al., 2022).[29]

46.     The Qatar national study showed that full vaccination with either BNT162b2 (Pfizer) or mRNA-1273 (Moderna) had "negligible" effectiveness to prevent infection, and that the vaccines were conferring null or negative efficacy—in other words, by six months after vaccination, **those vaccinated but not boosted were more likely to develop symptomatic infections than unvaccinated individuals.** (Altarawneh et al., 2022)[30] (see earlier figure).

---

[29] *See* fn 13, *supra*.
[30] *Id.*

47.     The same eventual negative efficacy is seen after five months post-vaccination in the large Southern California Kaiser Permanente study by Tseng et al. (Tseng et al., 2022).[31]

48.     The same eventual negative efficacy is seen after eight months post-vaccination in the large Swedish study by Nordström et al. (Nordström et al., 2022).[32]

49.     Public Health UK data from March 2022 similarly show that boosted adults in all age groups had approximately three times the infection risk of unvaccinated adults (UK Health Security Agency, 2022).[33]

50.     Even if there were some average behavioral differences between the vaccinated and unvaccinated individuals in the UK data, these would be very unlikely to have accounted for the large observed increased infection risks in the vaccinated, let alone suggest that the vaccinated should have had lower risk. Whatever general health differences might have tended to have been present in vaccinated vs unvaccinated individuals at the beginning of the UK vaccine rollouts were largely dissipated by March 2022 to which these data pertain.

51.     Follow-up data of some 51,000 Cleveland Clinic health-care employees shows that the cumulative risk of getting COVID-19 is positively directly related to the number of previous vaccine doses (0, 1, 2, 3, >3) received (Shrestha et al., 2022)[34] (figure at top of next page).  These risk differences between doses were statistically significant, and again demonstrate that vaccination is not associated with decreased risk of SARS-CoV-2 infection but quite possibly with increased risk.

---

[31] *See* fn 8, *supra.*

[32] Nordström P, Ballin M, Nordström A.  Risk of infection, hospitalisation, and death up to 9 months after a second dose of COVID-19 vaccine: a retrospective, total population cohort study in Sweden.  Lancet 2022 (399), February 26.  https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(22)00089-7/fulltext

[33] UK Health Security Agency.  COVID-19 vaccine surveillance report Week 13, Publishing reference: GOV-11859, March 31, 2022.  https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/1066759/Vaccine-surveillance-report-week-13.pdf (last visited January 22, 2023).

[34] Shrestha NK, Burke PC, Nowacki AS, Simon JF, Hagen A, Gordon SM.  Effectiveness of the Coronavirus Disease 2019 (COVID-19) Bivalent Vaccine.  medRxiv preprint, December 19, 2022.  https://www.medrxiv.org/content/10.1101/2022.12.17.22283625v1

medRxiv preprint doi: https://doi.org/10.1101/2022.12.17.22283625; this version posted December 19, 2022. The copyright holder for this preprint (which was not certified by peer review) is the author/funder, who has granted medRxiv a license to display the preprint in perpetuity. It is made available under a CC-BY-NC-ND 4.0 International license .



**Figure 2.** Simon-Makuch plot comparing the cumulative incidence of COVID-19 for subjects stratified by the number of COVID-19 vaccine doses previously received. Day zero was 12 September 2022, the day the bivalent vaccine began to be offered to employees. Point estimates and 95% confidence intervals are jittered along the x-axis to improve visibility.

52.    All of these data comprise definitive, large-scale evidence that the vaccines do not provide public-health benefit in reducing SARS-CoV-2 transmission, and within a few months after the last dose, may even potentially increase transmission risks.

53.    Thus, as discussed *infra* starting at ¶ 54, government and public health officials have recognized that the currently available vaccines do not protect against infection transmission.[35]

---

[35] The raw NYSDOH COVID-19 breakthrough infection tracker data cited by Dr. Lutterloh (NYSCEF Doc. 3, Ex. L - Lutterloh Aff. ¶ 8 fn 1) on infection risk in vaccinated vs unvaccinated individuals do not bear upon the risk of COVID-19 *re*infection. According to CDC NY state data in the León et al. publication (*See* fn 22, *supra*), unvaccinated New Yorkers who had had previous COVID-19 infection comprised 20.9% of all unvaccinated individuals by the time of the study analysis. The breakthrough infection tracker data thus include a very large majority who have not previously had COVID-19 and are at much higher risk of infection than those previously infected.

14

54.     The CDC, for example, acknowledged that whatever protection against transmission or infection that the currently available vaccines might have afforded against earlier variants, transmission can occur with Omicron regardless of vaccination status. They state, "Omicron spreads more easily than earlier variants, including the Delta variant. **Anyone with Omicron infection, regardless of vaccination status or whether or not they have symptoms, can spread the virus to others.**" (Centers for Disease Control and Prevention, 2022).[36]

55.     There are no statements on this CDC web page making any assertions that the vaccines have a benefit for preventing infection transmission.

56.     On August 11, 2022, CDC conceded that the COVID-19 vaccines do not provide sustained public health infection or transmission benefit: "Receipt of a primary series alone, in the absence of being up to date with vaccination* through receipt of all recommended booster doses, provides minimal protection against infection and transmission (3,6). Being up to date with vaccination provides a transient period of increased protection against infection and transmission after the most recent dose, although protection can wane over time." (Massetti et al., 2022).[37]

57.     The term "transient" means a short period of time, thus these vaccines do not serve an appreciable public health function in sustained reduction of infection or transmission risks.

58.     And, while Attorney Brockner asserts that the CDC recommends that healthcare workers follow COVID-19 vaccination recommendations and requirements, he fails to mention that the CDC has updated guidance for healthcare workers to specifically caution that "[c]onventional strategies were updated to advise that, in most circumstances, asymptomatic healthcare personnel with

---

[36] Centers for Disease Control and Prevention. Omicron Variant: What You Need to Know. https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (August 11, 2021; last visited January 22, 2023)

[37] Massetti GM, Jackson BR, Brooks JT, Perrine CG, Reott E, Hall AJ, Lubar D, Williams IT, Ritchey MD, Patel P, Liburd LC, Mahon BE. Summary of Guidance for Minimizing the Impact of COVID-19 on Individual Persons, Communities, and Health Care Systems - United States, August 2022. MMWR Morb Mortal Wkly Rep 2022;71(33):1057-1064. https://www.cdc.gov/mmwr/volumes/71/wr/mm7133e1.htm

higher-risk exposures do not require work restrictions, regardless of their vaccination status."[38] (NYSCEF Doc. 3, Ex. F at 103) as well as that "vaccination status is no longer used to inform source control, screening testing, or post-exposure recommendations."[39]

59.     Nor do Appellants mention CDC's updated generalized guidance in 2022, stating that "CDC's COVID-19 prevention recommendations no longer differentiate on a person's vaccination status.[40]

60.     **Given that the vaccines do not prevent COVID-19 infection or transmission and are officially acknowledged not to do so, clearly there can be no benefit for mandating their usage.**

61.     The regulation at issue mandated that the primary series be completed in 2021 and does not at this time appear to include any booster requirement.

62.     Given the fact that vaccine efficacy wanes substantially in a matter of a few months, there is no rational basis to exclude unvaccinated healthcare workers but allow healthcare workers to come to work who had their last dose some two years ago.

63.     Nor would the addition of a booster requirement justify the mandate from a public health perspective.

64.     The booster vaccines recently released for the fall 2022/winter 2023 season are already appearing to show failure to provide appreciable public health value.  This is because, just like the original vaccine doses, they have only transient benefit toward their targeted substrains BA.4 and BA.5, as well as that those substrains have already lost predominance in the US.  The CDC chart provided

---

[38] Centers for Disease Control and Prevention.  Strategies to Mitigate Healthcare Personnel Staffing Shortages. https://www.cdc.gov/coronavirus/2019-ncov/hcp/mitigating-staff-shortages.html (September 23, 2022; last visited January 30, 2023)
[39] Centers for Disease Control and Prevention.  Interim Infection Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic. https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html (September 23, 2022; last visited January 30, 2023)
[40] *See* fn 1, *supra*.

16

earlier shows that these Omicron variants are now of negligible circulation. The current substrains, BQ.1.1 and XBB.1, largely escape neutralization by antibodies resulting from the bivalent vaccine booster (Kurhade et al., 2022[41]; Davis-Gardner et al., 2023[42]; Miller et al., 2023[43]; Uraki et al., 2023[44]).

65.    Because the COVID-19 vaccines, both the original formulations and the bivalent boosters, fail to provide any sustained suppression of population infection spread, they are inadequate as agents for pandemic control.  This officially acknowledged lack of efficacy makes mandates for them, both for the original two-dose vaccines as well as for monovalent or bivalent boosters, unwarranted.

## Conclusion

66.    By a large body of evidence, as well as by official statements of the CDC, there is no difference in risk of SARS-CoV-2 transmission by vaccinated vs unvaccinated individuals.

67.    It is not a scientifically supportable position to state that maintenance of a vaccine mandate requiring the primary series of vaccines (effective 2021) is necessary to avoid irreparable harm.

68.    On the contrary, particularly in an unprecedented staffing crisis, it would instead cause irreparable harm to patients and caregivers to continue to ban, based on their failure to receive the first two doses of the COVID-19 vaccine, ready, willing and able experienced doctors, nurses and other healthcare personnel from returning to work.

---

[41] Kurhade C, Zou J, Xia H, Liu M, Chang HC, Ren P, Xie X, Shi PY.  Low neutralization of SARS-CoV-2 Omicron BA.2.75.2, BQ.1.1 and XBB.1 by parental mRNA vaccine or a BA.5 bivalent booster.  Nat Med 2022 Dec 6.  https://www.nature.com/articles/s41591-022-02162-x
[42] Davis-Gardner ME, Lai L, Wali B, Samaha H, Solis D, Lee M, Porter-Morrison A, Hentenaar IT, Yamamoto F, Godbole S, Liu Y, Douek DC, Lee FE, Rouphael N, Moreno A, Pinsky BA, Suthar MS.  Neutralization against BA.2.75.2, BQ.1.1, and XBB from mRNA Bivalent Booster.  N Engl J Med 2023;388(2):183-185.  https://www.nejm.org/doi/full/10.1056/NEJMc2214293
[43] See fn 6, *supra*
[44] Uraki R, Ito M, Furusawa Y, Yamayoshi S, Iwatsuki-Horimoto K, Adachi E, Saito M, Koga M, Tsutsumi T, Yamamoto S, Otani A, Kiso M, Sakai-Tagawa Y, Ueki H, Yotsuyanagi H, Imai M, Kawaoka Y.  Humoral immune evasion of the omicron subvariants BQ.1.1 and XBB.  Lancet Infect Dis 2023;23(1):30-32.  https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(22)00816-7/fulltext

Dated: February 1, 2023

Harvey A. Risch

Affirmed before me this 1st day of February 2023.

Notary Public

SOPHIA NADHAZI
Notary Public, State of Connecticut
My Commission Expires Dec. 31, 2023

18

# EXHIBIT 6



SCHEINMAN
ARBITRATION & MEDIATION SERVICES

September 10, 2021

**Via E-Mail Only**
Renee Campion, Commissioner
Steven H. Banks, Esq.
New York City Office of Labor Relations
The Office of Labor Relations
22 Cortlandt Street, 14ᵗʰ Floor
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33ʳᵈ Floor
New York, NY 10038

Beth Norton, Esq.
Michael Mulgrew, President
United Federation of Teachers
52 Broadway, 14ᵗʰ Floor
New York, NY 10004

**Re:**  **Board of Education of the City School District of the City of New York
and
United Federation of Teachers, Local 2, AFT, AFL-CIO
(Impact Bargaining)**

Dear Counsel:

    Enclosed please find my Award in the above referenced matter.

    Thank you.

Sincerely,

*Martin F. Scheinman*

MFS/sk
BOE.UFT.Impact Bargaining.awd

322 Main Street ◆ Port Washington, NY 11050 ◆ 516.944.1700 ◆ fax: 516.944.1771 ◆ www.ScheinmanNeutrals.com

Ex 1

```
---------------------------------- X
In the Matter of the Arbitration
                                   X
           between
                                   X
BOARD OF EDUCATION OF THE CITY                  Re: Impact Bargaining
SCHOOL DISTRICT OF THE CITY OF     X
NEW YORK
                                   X
            "Department"
                                   X
        -and-
                                   X
UNITED FEDERATION OF TEACHERS,
LOCAL 2, AFT, AFL-CIO              X

            "Union"               X
---------------------------------- X
```

**APPEARANCES**

### For the Department
Renee Campion, Commissioner of Labor Relations
Steven H. Banks, Esq., First Deputy Commissioner
and General Counsel of Labor Relations


### For the Union
STROOCK & STROOCK & LAVAN, L.L.P.
    Alan M. Klinger, Esq.


Beth Norton, Esq., UFT General Counsel
Michael Mulgrew, UFT President


**BEFORE**: Martin F. Scheinman, Esq., Arbitrator

## BACKGROUND

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

2

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning. They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters. In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits. This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

3

NYSCEF DOC. NO. 4                                                    RECEIVED NYSCEF: 07/19/2022

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

---

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

4

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

5

Case 1:25-cv-00743-AMD-JAM   Document 1   Filed 02/10/25   Page 84 of 127 PageID #: 84

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

**Opinion**

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

**I.    Exemption and Accommodation Requests & Appeal Process**

As an alternative to any statutory reasonable accommodation

6

process, the City, the Board of Education of the City School District
for the City of New York (the "DOE"), and the United Federation of
Teachers, Local 2, AFT, AFL-CIO (the "UFT), (collectively the
"Parties") shall be subject to the following Expedited Review Process
to be implemented immediately for full-time staff, H Bank and non-
pedagogical employees who work a regular schedule of twenty (20)
hours per week or more inclusive of lunch, including but not limited
to Occupational Therapists and Physical Therapists, and Adult
Education teachers who work a regular schedule of twenty (20) or
more hours per week. This process shall only apply to (a) religious
and medical exemption requests to the mandatory vaccination policy,
and (b) medical accommodation requests where an employee is unable
to mount an immune response to COVID-19 due to preexisting immune
conditions and the requested accommodation is that the employee not
appear at school. This process shall be in place for the 2021-2022
school year and shall only be extended by mutual agreement of the
Parties.

Any requests to be considered as part of this process must be
submitted via the SOLAS system no later than Monday, September 20,
2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be
considered    where    an    employee    has    a    documented
contraindication such that an employee cannot receive any of
the three (3) authorized vaccines (Pfizer, Moderna, J&J)—
with    contraindications    delineated    in CDC    clinical

7

NYSCEF DOC. NO. 4

considerations for COVID-19 vaccination.  Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

o Within the isolation period after a COVID-19 infection;

o Within ninety (90) days of monoclonal antibody treatment of COVID-19;

o Treatments for  conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;

o Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

9

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

10

arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an

11

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II. **Leave**

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

13

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

    i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

    ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

    iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

14

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv.  Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period.  This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v.  In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child.  As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi.  If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

15

    vii.   All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

## III. Separation

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

16

B. During the period of November 1, 2021, through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

17

contained, herein, all parties retain all legal rights at all times relevant, herein.


September 10 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator


STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NASSAU       )


I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.


September 10 , 2021.

_____
Martin F. Scheinman, Esq.
Arbitrator


DOE.UFT.Impact Bargaining.awd

18

# EXHIBIT 7

## Notice of Leave Without Pay - PLEASE READ

NYCDOE <noreply@schools.nyc.gov>
Sat 10/2/2021 3:10 PM
To:                      .@schools.nyc.gov>

 **Department of Education**

Dear                      ,

You are receiving this message because **you are being placed on a Leave Without Pay (LWOP) because you are not in compliance with the DOE's COVID-19 Vaccine Mandate.** If you are a substitute or in certain titles you have been placed in another inactive status, not a LWOP. **This means you must not report to your work or school site beginning Monday, October 4th.**

While you are on Leave Without Pay (LWOP), you:

- Cannot work and will not receive compensation, but you will continue your medical benefits
- Cannot use annual leave, CAR or sick time
- Cannot enter your work or school site
- Cannot reach out to students or families

In order to return from LWOP status, you must complete two steps using the **DOE Vaccination Portal**

1. Upload proof that you have received your first dose of a COVID-19 vaccine. **Proof of COVID-19 Vaccine can be an image of your vaccination card, NYS Excelsior Pass, or another government record**
2. E-sign the attestation stating that you are willing to return to your worksite within seven calendar days of submission.

Once you have completed these two steps, your HR Director and supervisor will also be notified and will work with you to plan your return date.

**If you have been vaccinated this weekend and upload this information by Monday morning, you may report to work as usual on Monday, October 4th, and you will be put back on active status.**

On Monday, October 4th, if you have an acceptable proof of vaccination (e.g., vaccination card, NY State Excelsior pass, or other government record) but have not been able to upload to the **DOE Vaccination Portal**, you may show your proof to the School Safety Agent and/or Principal (or designee) at the door.  You will be allowed in the building, and you must immediately upload proof of vaccination to the Vaccination Portal and confirm that you would like to return to work in order to ensure there is no break in payroll.

If you encounter technical issues accessing the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online or calling 718-935-5100. If you need support uploading your proof of vaccination, please contact your principal or HRD who can do so on your behalf.

Please be advised that if you do not intend to return to the DOE after October 1, 2021, you will need to return all DOE property, including computers, IDs, blackberries, and keys, immediately.  Failure to return any DOE property that has been assigned to you will delay the processing of your final payment and any payout of leave time.

Employees represented by UFT or CSA who have been placed on LWOP due to vaccination status may select (in SOLAS) special separation or leave options per the arbitration award:

- **Separation with benefits** (available in SOLAS as of Monday, October 4): Employees choosing to separate under this option:
  - **Must share their intention to separate via SOLAS by October 29, 2021.**
  - Will be required to waive their rights to challenge the involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process
  - Will be eligible to be reimbursed for unused CAR/sick leave on a one-for-one basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid out following the employee's separation
  - Will be eligible to maintain health insurance through September 5, 2022, unless they have health insurance available from another source.
- **Extend the leave without pay due to vaccination status through September 5, 2022** (available in SOLAS as of Monday, November 1 through November 30, 2021):
  - Employees choosing this option will also be required to waive their rights to challenge their involuntary resignation, including, but not limited to, through a contractual or statutory discipline process
  - They will remain eligible for health insurance through September 5, 2022
  - Employees who have not returned by September 5, 2022 shall be deemed to have voluntarily resigned
- Beginning December 1, 2021, the DOE will seek to unilaterally separate employees who have not selected one of the options above or otherwise separated service.

For more information about where to get vaccinated, visit vaccinefinder.nyc.gov or call 877-VAX-4-NYC. For the latest COVID-19 staffing updates, please visit the Coronavirus Staff Update InfoHub page.

Sincerely,

NYCDOE Division of Human Capital

# EXHIBIT 8

11/25/22, 8:16



**Department of
Education**

November 18, 2022


Brooklyn, New York


Title: Teacher/
Applicant ID:
PRP#:

Dear Ms.

Your name was recently submitted to the Office of Personnel Investigation (OPI) for security clearance to work with the NYC Department of Education (DOE) or a DOE contracted vendor. According to our records, your services with the DOE were terminated due to noncompliance with the vaccine mandate and you currently appear out of compliance. The purpose of our contact was to request information so that your application could be processed for security clearance. Requests were sent to you at the email address you provided          @aol.com' on November 10, 2022 and November 16, 2022. You were given a deadline to provide the requested information. To date, we have not received the required information.

Due to your non-compliance, you are unable to work with the DOE or any DOE contracted vendors. As such, your case has been administratively closed, and no security clearance determination has been made. Please note that at this time, you do not have security clearance to work with the DOE and/or one of its contracted vendors.


Sincerely,

The Office of Personnel Investigation
Division of Human Resources
NYC Department of Education


cc: File

From: kking@uft.org >
Date: Thu, Apr 28, 2022 at 12:50 PM
Subject: response from UFT regarding the problem code
>

**Karen King** (KKing@uft.org)To:you Details
Hello,

Technically you should receive charges. At this time, however, the DOE is not going to issue 3020-a charges because they do not believe they have to do so. We have filed a legal challenge to protect your due process rights, should the judge decide in our favor, you will be entitled to a hearing at that time.

The problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. DOE's central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.

**Karen King**
*Administrative Assistant to the Assistant Secretary &*
*Director of Personnel, Payroll, and Special Projects*
United Federation of Teachers
50 Broadway, 13th Floor
New York, N.Y. 10004
*kking@uft.org*

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

MICHAEL KANE, et al,

                                Plaintiffs,

           - against –                     21-CV-7863 (VEC) (Lead Case)

BILL DE BLASIO, et al.,

                               Defendants.

------------------------------------------------------------ x

MATTHEW KEIL, et al.

                              Plaintiffs,

           - against -                    21-CV-8773 (VEC)

THE CITY OF NEW YORK, et al.,

                               Defendants

------------------------------------------------------------ x

       **MALLORY O. SULLIVAN,** under penalty of perjury, declares pursuant to 28 U.S.C. §
1746, that the following statements are true and correct:

               1.          I am the Deputy Director of the Office of Employee Relations
("OER") at the New York City Department of Education ("DOE"), and I have held this position
since November 2014. Prior to serving in my current position, I was an Agency Attorney with
the DOE's Office of the General Counsel for approximately four years.

               2.          I submit this declaration to provide information about DOE's
employment record system in response to certain allegations regarding "problem codes" as set
forth in the Declaration of Natasha Solon dated May 20, 2022 (ECF dkt. 162). I am familiar

with the facts set forth herein based on my personal knowledge as well as discussions with other DOE employees and the review of DOE records.

3.      In my role as Deputy Director, I oversee the DOE's Office of Personnel Investigation ("OPI"), which is responsible for, among other things, screening and conducting background investigations for all candidates for employment with the DOE or with vendors under contract with the DOE and monitoring employee and vendor employee security clearances. As a part of these processes, OPI uses internal system codes.

4.      The DOE maintains electronic employment records and employee service histories for DOE employees ("DOE employment records"). DOE employment records are kept within a system called NYCAPS, which is operated by the City of New York for all DOE and City employees. DOE employment records are only visible to the DOE and reflect employees' dates of employment, titles held, and various changes in active employment status.

5.      In addition, DOE has codes within NYCAPS designed to engender special attention should an individual seek employment, re-employment, or change titles with the DOE. Such a code might be used where, for example, an employee left DOE employment with a performance issue, had a nomination for employment rescinded, or was the subject of an arrest. This is designed to ensure that prior to any new employment or new title within DOE, the employee's application undergoes further review by OPI. These types of codes have been colloquially referred to as "problem codes." These codes are only visible to internal DOE Human Resources staff, and the underlying basis for such code is only accessible by OPI.

8.      Separately, DOE implemented an internal NYCAPS code specific to the Commissioner of Health Order mandating vaccination of DOE employees ("Vaccination Mandate"). This code remains visible to only OPI staff to ensure vaccination status was

reviewed prior to any return of an employee placed on a leave without pay due to non-compliance with the Vaccination Mandate. A DOE employee would not have a "problem code" in their service history as a result of any non-compliance with the Vaccination Mandate.

9.      In this instant case, Natasha Solon was placed on leave without pay due to non-compliance with the Vaccination Mandate, and returned to service once compliance with the Vaccination Mandate was confirmed. At no point did Natasha Solon have a "problem code" in her service history as a result of her non-compliance with the Vaccination Mandate nor was there ever any code in her service history arising out of her vaccination status visible to anyone outside of OPI.

Dated:      May 27, 2022
            New York, New York

                                        By: _____
                                        Mallory O. Sullivan
                                        Deputy Director
                                        Office of Employee Relations

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MICHAEL KANE, et al.,

                   Plaintiffs,

         - against -                Case No. 21-cv-7863 (VEC) (Lead)

BILL DE BLASIO, et al.,

                  Defendants.

-------------------------------------------------------------X

MATTHEW KEIL, et al.

                   Plaintiffs,

         - against -                Case No. 21-cv-8773 (VEC)

THE CITY OF NEW YORK, et al.,

                  Defendants.

-------------------------------------------------------------X

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.

2. I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.

3. Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.

4. Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.

5. Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

<u>**First False Assertion in Sullivan Declaration**</u>

6. The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code. the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.

7. Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.

8. Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a "**Problem PR**" notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

1

**<u>Second False Assertion in Sullivan Declaration</u>**

9. The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways. For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18. Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8. In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19. In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

2

### Further Evidence of Irreparable Harm

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable – and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated: New York, New York

      June 3, 2022

                                   Respectfully submitted,

                                   Barry Black
                                   Nelson Madden Black LLP
                                   *Attorney for Plaintiffs*
                                   475 Park Avenue South, Suite 2800
                                   New York, NY 10016
                                   (212) 382-4303

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------X :
MICHAEL KANE, et al.,                              :
                                                   :
                                    Plaintiffs,    :
                                                   :    Case No.  21-cv-7863 (VEC) (Lead)
                      - against -                  :
DE BLASIO et al.,                                  :
                                                   :
                                    Defendants.    :
---------------------------------------------------X :
MATTHEW KEIL, et al.                               :
                                                   :
                                    Plaintiffs,    :
                                                   :    Case No.  21-cv-8773 (VEC)
                      - against -                  :
THE CITY OF NEW YORK et al.,                       :
                                                   :
                                    Defendants.    :
---------------------------------------------------X

## DECLARATION OF BETSY COMBIER

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1.  My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a paralegal consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2.  I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.  I know the facts stated herein to be true based upon my personal knowledge and based upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

2

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9.    When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10.    I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes. The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11.    I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12.    I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

3

13.    Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14.    I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15.    The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16.    Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17.    At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18.    Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

4

19.    I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20.    In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
        June 3, 2022

By: Betsy Combier

# EXHIBIT A

From: Amato Eric <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To:                                      Michael Sill <msill@uft.org>
Cc: Beth A. Norton
<hnorton@uft.org>, Kking@uft.org <Kking@uft.org>. dcampbell@uft.org <dcampbell@uft.org>

PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine
mandate leave. It was placed there the day you went on the leave. Our central offices placed this code
on all employees who went on the leave. It will be removed once you are eligible to return to work.

Thanks,
Eric

5. In October, 2021, I was involuntarily suspended for failing to get vaccinated in violation of my sincerely held religious beliefs.

6. After the Second Circuit held that the DOE's religious exemption policy was unconstitutional, I was able to apply for reconsideration by the Citywide Panel. The email sent to me stated that we did not need to submit anything because they would rely on the original material.

7. I received no response for months. Meanwhile my situation became desperate.

8. I depleted all of my savings, my son had to take a leave of absence from school because I could not pay the parental portion of tuition, and my children and I were running out of food, and on the brink of losing our home.

9. I owed over $2,000 in heating bills.

10. I applied to over sixty jobs during this period. Despite my extensive qualifications and spotless record, few positions called me back, and none offered me a job.

11. Finally, during an interview in Westchester, the woman conducting the interview took pity on me. She told me she liked me and wished she could hire me.

12. However, she said she had to be honest with me – neither she nor anyone else would be able to hire me.

13. I asked why. She said that there was a "problem" code in the system flagging my name. Outside schools cannot see the reason for the code, other than there is a problem flagged indicating not to hire. Examples she gave me of typical problem codes arose from robbery and other serious misconduct.

14. I have a spotless record and was shocked to find out about this code.

15. I investigated further and learned that the internal records at the DOE showed the reason for the problem code was that I was not vaccinated.

16. My situation grew more desperate every day, and it soon became clear that I would get no other work while this code remains.

17. Finally, to save my family and our home, I took the vaccine, which is against my sincerely held religious beliefs.

18. Within twenty-four hours of submitting my paperwork to the DOE, I was reinstated, and the problem code was removed.

19. Even though I felt I had no choice, this decision has been deeply traumatic and continues to cause irreparable harm.

20. I pray every day for help to overcome my anger, pain, and guilt for having to violate my faith.

21. The experience continues to impact me and to cause me serious distress.

22. I do not feel safe at my job. I do not feel safe in society.

23. The fact that the courts would continue to uphold this brazen unconstitutional condition and fail to intervene to protect us as we lose everything we have worked so hard to achieve continues to shake my faith in this country.

24. If, as the Second Circuit admitted, the DOE violated the Constitution, how can this Court or any other continue to allow the DOE to continue to harm so many of us for not taking the vaccine?

25. I am vaccinated now, but when the inevitable booster requirement comes, I will have to go through all of this again. I do not think that I can violate my faith again. The harm it caused me to do it to save my family was too severe.

26. I only hope that this Court intervenes before that occurs, or at least intervenes before more of my colleagues are forced to be violated the way I was.

27. This is spiritual rape. There is no other way to put it. I did not consent to this.

28. This Court must help us to stop the continuing injustice.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:        New York, New York
              May 20, 2022

                                        By: Natasha Solon

From: **Beth A. Norton** <BNorton@uft.org>
Date: Thu, Jul 28, 2022, 12:36 PM
Subject: RE: Questions about voluntary resignations and follow ups
To:
Cc: Michael Sill <MSill@uft.org>, Michael Mulgrew <MMulgrew@uft.org>, Tanisha
Franks <TFranks@uft.org>, Karen King <KKing@uft.org>

The arbitration award doesn't "expire," I am not sure what you mean by that.

As the language you quoted from the waiver indicates, you will be deemed to have voluntarily resigned your position with the DOE on September 6 if you are not, at that time, in compliance with the health order (vaccinated with 2 shots of Pfizer or Moderna, or 1 shot of J&J). This will be treated as a traditional resignation, it is not a termination. You will be permitted to cash out your CAR and vacation days at the contractual rates. The code on your file indicates that you are not vaccinated, that will not be lifted until such time as you are vaccinated.

You should be receiving an email from the DOE in the next week or so asking for your intent for the fall.

At this time there is no indication that the vaccine mandate will be lifted, so if you wish to return you would have to comply with the health order. If that changes we will let you know.

Regards,

**Beth A. Norton**
General Counsel
United Federation of Teachers
52 Broadway 14th Floor
New York, NY 10004
212-701-9420

# EXHIBIT 9

**ORDER OF THE COMMISSIONER OF HEALTH AND MENTAL HYGIENE
REVISING THE EFFECTIVE DATE FOR REQUIRED COVID-19
VACCINATION OF DEPARTMENT OF EDUCATION
EMPLOYEES, CONTRACTORS, VISITORS AND OTHERS**

**WHEREAS**, on March 25, 2020, the New York City Commissioner of Health and Mental Hygiene declared the existence of a public health emergency within the City to address the continuing threat posed by COVID-19 to the health and welfare of City residents, and such declaration and public health emergency continue to be in effect; and

**WHEREAS,** pursuant to Section 3.01(d) of the Health Code, I am authorized to issue orders and take actions that I deem necessary for the health and safety of the City and its residents when urgent public health action is necessary to protect the public health against an existing threat and a public health emergency has been declared pursuant to such section; and

**WHEREAS,** on September 15, 2021, I issued, and on September 17, 2021, the Board of Health ratified, an Order requiring proof of COVID-19 vaccination for New York City Department of Education ("DOE") employees, contractors, visitors, and others; and

**WHEREAS,** under such Order, DOE staff, charter school staff, and individuals who work in-person in a DOE school setting or DOE building were required to provide proof of vaccination no later than September 27, 2021; and

**WHEREAS,** on September 24, 2021, the United States Court of Appeals for the Second Circuit entered a temporary injunction of said Order, and then on September 27, 2021, the same Court dissolved such injunction;

**NOW THEREFORE** I, Dave A. Chokshi, MD, MSc, Commissioner of Health and Mental Hygiene, finding that a public health emergency within New York City continues, and that it is necessary for the health and safety of the City and its residents, do hereby exercise the power of the Board of Health to prevent, mitigate, control and abate the current emergency, to

**AMEND** my September 15, 2021 Order requiring COVID-19 vaccination for DOE employees, contractors, visitors and others, as ratified by the Board of Health on September 17, 2021, to:

1. Require that any proof of vaccination previously required to be provided by September 27, 2021, or before beginning employment, now be provided no later than Friday, October 1, 2021, or before beginning employment; and

2. Require that beginning Monday, October 4, 2021, any visitor to a DOE school building show proof of receipt of at least one dose of a COVID-19 vaccine, as described in such Order.

Dated:    September 28, 2021

Dave A. Chokshi, M.D., MSc
Commissioner

# EXHIBIT 10

**APPENDIX**

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand twenty-one.

Before:    Pierre N. Leval,
           José A. Cabranes,
           Denny Chin,
                  *Circuit Judges.*

---

Michael Kane, William Castro, Margaret Chu, Heather Clark, Stephanie Di Capua, Robert Gladding, Nwakaego Nwaifejokwu, Ingrid Romero, Trinidad Smith, Amaryllis Ruiz-Toro,

                  *Plaintiffs-Appellants,*                          **ORDER**

                  v.                                                21-2678-cv

Bill de Blasio, in his official capacity as Mayor of the City of New York, David Chokshi, in his official capacity of Health Commissioner of the City of New York, New York City Department of Education,

                  *Defendants-Appellees.*

---

Matthew Keil, John De Luca, Sasha Delgado, Dennis Strk, Sarah Buzaglo,

                  *Plaintiffs-Appellants,*

                  v.                                                21-2711-cv

The City of New York, Board of Education of the City School District of New York, David Chokshi, in his Official Capacity of Health Commissioner of the City of New York, Meisha Porter, in her Official

Capacity as Chancellor of the New York City
Department of Education,

*Defendants-Appellees.*

_____

     The motions of Plaintiffs-Appellants ("Plaintiffs") for an injunction pending appeal having been heard at oral argument on November 10, 2021, and Defendants-Appellees ("Defendants") having represented to this Court that "the City is working toward making an opportunity for reconsideration available more broadly to DOE employee[s] who unsuccessfully sought religious exemptions pursuant to the arbitration award's appeal process," it is hereby

     **ORDERED** that this appeal is expedited and will be heard by a merits panel sitting on November 22, 2021 (the "merits panel"). Pending further order by the merits panel,

1. Plaintiffs shall receive fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel.
2. Such consideration shall adhere to the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. Such consideration shall not be governed by the challenged criteria set forth in Section IC of the arbitration award for United Federation of Teachers members. Accommodations will be considered for all sincerely held religious observances, practices, and beliefs.
3. Plaintiffs shall submit to the citywide panel any materials or information they wish to be considered within two weeks of entry of this order. The citywide panel shall issue a determination on each request no later than two weeks after a plaintiff has submitted such information and materials. Within two business days of the entry of this order, Defendants shall inform plaintiffs' counsel how such information and materials should be transmitted to the citywide panel.
4. The deadline to opt-in to the extended leave program and execute any accompanying waiver shall be stayed for Plaintiffs, and no steps will be taken to terminate the plaintiff's employment for noncompliance with the vaccination requirement.
5. If a plaintiff's request is granted by the citywide panel, the plaintiff will receive backpay running from the date they were placed on leave without pay.
6. This order is intended only to provide for temporary interim relief until the matter is considered by the merits panel of this court, which panel may entirely supersede these provisions for interim relief, and the parties are at liberty to advocate to the merits panel for alteration of these provisions. Unless the merits panel has previously entered a superseding order, within two weeks of the conclusion of Plaintiffs' proceedings before the citywide panel, the parties shall inform the merits panel of the result of those proceedings and advise of any further relief being sought.

                              FOR THE COURT:
                              Catherine O'Hagan Wolfe, Clerk

JS 44   (Rev. 4-29-21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

DIANNE BAKER-PACIUS    CHRISTOPHER J. GARRY
55 W 116th Street, STE 396   75-27 217 Street
New York, NY 10026    Oakland Gardens NY 11364
dbp2024court@gmail.com    bgrdchris@aol.com

(b) County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

## DEFENDANTS

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* | |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* | |

*Does this action include a motion for temporary restraining order or order to show cause? Yes☐ No ☒"*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☐1 | Incorporated *or* Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☐2 | ☐2 | Incorporated *and* Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane   ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | Liability   ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Pharmaceutical Slander Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability   ☐ 368 Asbestos Personal ☐ 340 Marine Injury Product ☐ 345 Marine Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | Liability   **PERSONAL PROPERTY** ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending | **LABOR** | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability   ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Property Damage | Act | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury   ☐ 385 Property Damage ☐ 362 Personal Injury - Product Liability | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| | Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting   ☐ 463 Alien Detainee | ☐ 791 Employee Retirement | | ☐ 895 Freedom of Information |
| ☒ 230 Rent Lease & Ejectment | ☒ 442 Employment   ☐ 510 Motions to Vacate | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Sentence | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations   ☐ 530 General | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -   ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | Act/Review or Appeal of Agency Decision |
| | Employment   **Other:** ☐ 446 Amer. w/Disabilities -   ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration | | ☐ 950 Constitutionality of State Statutes |
| | Other   ☐ 550 Civil Rights ☐ 448 Education   ☐ 555 Prison Condition | Actions | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C 1983, 1st, 5th, 14th Amendment
Brief description of cause:
Civil Rights

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $** _____

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE _____   SIGNATURE OF ATTORNEY OF RECORD _____

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☐     monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐     the complaint seeks injunctive relief,

☐     the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

# NY-E DIVISION OF BUSINESS RULE 1(c)

1.)    Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County?     ☐ Yes    ☒ No

2.)    If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?     ☐ Yes    ☒ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?     ☒ Yes    ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received:

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?   ☐ Yes    ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☐    Yes          ☐    No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐    Yes    (If yes, please explain    ☐    No

I certify the accuracy of all information provided above.

**Signature**: _____