Dianne Baker-Pacius
55 West 116th Street STE 396
New York, NY 10026
646-369-6792
DBCB.CG.2025@gmail.com

Christopher J. Garry
75-27 217 Street
Oakland Gardens, NY 11364
917-572-9104
DBCB.CG.2025@gmail.com

Date: October 20, 2025

*** Filed ***
04:31 PM, 20 Oct. 2025
U.S.D.C., Eastern District of New York

**Via ECF**

The Honorable Judge Ann Donnelly
United States District Court
Eastern District of New York
225 Cadman Plaza
East Brooklyn, NY 11201

Re: Baker-Pacius, et al. v. The Dep't of Education of the City of New York, et al.
No.: 1:25-cv-00743-AMD-JAM

Plaintiffs' Notice of Timely Filing of Opposition and Submission of ECF
Confirmation

Dear Judge Donnelly:

Plaintiffs respectfully notify the Court of the following:

1. **Timely Opposition Filed.** Plaintiffs respectfully notify the Court that they **timely filed** their **Opposition to Defendant's Motion to Dismiss** on October 15, 2025, **at 4:30 PM (ET)** via the Court's CM/ECF (Pro Se E-Filing) system in this matter.

2. **ECF Confirmation / NEF Received.** Upon filing, Plaintiffs received the **ECF confirmation/Notice of Electronic Filing (NEF)** reflecting receipt by the Court. A true and correct copy is attached as **Exhibit A** (showing the filing date and time).

3. **Subsequent Court Communication.** On October 17, 2025, the Court informed the parties that the opposition had not been received and extended the time for both sides. Plaintiffs submit this letter solely to ensure the record reflects that the opposition was filed **within the original deadline** and to assist with any docket reconciliation.

4. **Requested Relief.** Plaintiffs respectfully request that the Court:
   (a) acknowledge the **timely submission** of Plaintiffs' opposition as evidenced by **Exhibit A**; and
   (b) direct the Clerk, if necessary, to **locate and docket** the opposition corresponding to the attached confirmation; **or**, in the alternative,
   (c) accept the re-attached opposition **nunc pro tunc** to **October 15, 2025**.

5. **Availability.** Plaintiffs will promptly re-file the opposition at the Court's direction and can provide the **ECF transaction email and submission metadata** to facilitate correction.

Respectfully submitted,

/s/Dianne Baker-Pacius
Dianne Baker-Pacius
55 West 116th Street, Suite 396
New York, NY 10026
646-369-6792
PRO SE
DBCB.CG.2025@gmail.com

/s/Christopher J. Garry
 Christopher J. Garry
75-27 217th Street
Oakland Gardens, NY 11364
917-572-9104
PRO SE
DBCB.CG.2025@gmail.com

# EXHIBIT A

 **Gmail**

## File Submitted to Pro Se Portal
1 message

**noreply@nyed.uscourts.gov** <noreply@nyed.uscourts.gov>    Wed, Oct 15, 2025 at 4:30 PM
To: dbcb.cg.2025@gmail.com

Dear **Dianne Baker-Pacius**,

This email confirms the Court received
**one** file you submitted to Pro Se Portal.

Thank you.

# RESUBMISSION OF OPPOSITION TO MOTION TO DISMISS

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

———————————————————————x

**DIANNE BAKER-PACIUS, and**
**CHRISTOPHER J. GARRY,**

Plaintiffs

**Docket No: 25-cv-00743-AMD-JAM**

-against-

**THE DEPARTMENT OF EDUCATION  OF**
**THE CITY OF NEW YORK, DAVID BANKS, Chancellor**
**and KATHERINE RODI, Director of Employee Relations,**

Defendant

———————————————————————x

# PLAINTIFF'S OPPOSITION TO DEFENDANTS'
# MOTION TO DISMISS

Dianne Baker-Pacius
55 West 116th Street, Suite 396
New York, NY 10026
646-369-6792
PRO SE
DBCB.CG.2025@gmail.com

Christopher J. Garry
 75-27 217th Street
Oakland Gardens, NY 11364
917-572-9104
PRO SE
DBCB.CG.2025@gmail.com

1

## PRELIMINARY STATEMENT

This case arises from Defendants' systemic retaliation and discrimination against Plaintiffs in enforcing a COVID-19 vaccine mandate that unlawfully favored exemptions/accommodations for certain religious beliefs and those employees with a secret and unexplained "medical necessity" for medical exemptions, while forcing others, such as Plaintiffs here, to go on unpaid status, which led to termination. This case is a prima facie case of retaliatory discrimination, violation of the Equal Protection Clause, Establishment Clause, Free Exercise Clause, Takings Clause pursuant to the 5th Amendment, and deprivation of Constitutional rights as a tenured public employee. In Health Freedom Def. Fund, Inc., v. Carvalho, No. 22-55908, 2024 WL 2873372 (9th Cir. June 7, 2024), the Ninth Circuit reinstated constitutional challenges to the Los Angeles Unified School District's Covid-19 vaccine mandate, overruling the district court's determination that there is a legitimate government interest in mandating a vaccine that cannot stop the spread of disease.  The Ninth Circuit concluded that the police powers do not apply to personal medical choices, which the government is not at liberty to infringe without strict scrutiny. Finally, Plaintiffs' allegations that the vaccine does not prevent the spread of COVID-19 must be accepted as true. To the extent there is dispute about whether unvaccinated employees are more likely to spread COVID-19, or if so, whether the City was unable to mitigate the risk without undue hardship, Plaintiffs prevail at this stage.

Defendants submitted no proof to back up their specious claims in their Motion To Dismiss, which is nothing more than baseless statements citing no facts or evidence. Defendants have supported false information, such as the claim that the vaccine created a new requirement for employment. This is false. Only the State legislature has the authority to change the terms of employment of Plaintiffs, and this never happened. Terms of employment are under the purview

2

of the Taylor Law. No requirement for educators exists that mandates vaccination. The UFT never changed its contract to mandate vaccination as a term of employment. The Vaccine itself, with the COVID-19 Vaccine Mandate ("CVM") to support it, was just a terrible hoax on the public and neither generally applicable nor neutral. These arguments are stale and have been rejected in this Court. Plaintiffs' well-documented claims cannot be dismissed at this stage of litigation. Defendants' motion stands on sparse merit arguments, misrepresenting the law on religious beliefs and undue hardship, as well as no standards of care in deciding medical accommodations. Instead, Defendants lean on baseless procedural objections and an irrelevant defense of the vaccine mandate's legality—a claim Plaintiffs do not raise. Their case here argues that the COVID-19 Vaccine Mandate ("CVM") _as applied_ to Plaintiffs was lawless and unconstitutional. Plaintiffs have properly pleaded a violation of Section 1983, a failure to accommodate, and deprivation of 1st, 5th, and 14th Amendment rights.

Plaintiffs request that each and every argument, cause of action, background fact, and Exhibit in their Amended Complaint ("AC") be incorporated in full into the arguments made here by reference. The Exhibits already submitted to this Court in support of their causes of action are: **EXHIBITS 1-13.** Attached to this Opposition are **EXHIBITS 14-20.** Defendants' Motion To Dismiss must be denied in its entirety.

## STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff (Lynch v. City of New York, 952 F.3d 67, 74 (2d Cir. 2020); Littlejohn v. City of New York, 795 F.3d 297, 306 (2d Cir. 2015)). To survive a motion to dismiss, a complaint needs only "state a claim to relief that is plausible on its face" (Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard

"does not require 'detailed factual allegations,'" but demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "The assessment 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal' conduct" ( Twombly, 550 U.S. at 556, 127 S.Ct. 1955; see Iqbal, 556 U.S. at 678, 129 S.Ct. 1937." Lynch, 952 F.3d at 75). A complaint should not be dismissed simply because it appears recovery is remote or unlikely (Twombly, 550 U.S. at 556). Where, as here, a plaintiff brings claims of employment discrimination, the facts "alleged in the complaint need not give plausible support to the ultimate question of whether the adverse employment action was attributable to discrimination.  They need only give plausible support to a minimal inference of discriminatory motivation" (Littlejohn, 795 F.3d at 311; see also Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86-87 (2d Cir. 2015)). Where the court finds well-pleaded factual allegations, it should assume their veracity and determine whether they plausibly give rise to an entitlement to relief (Iqbal, 129 S. Ct. at 1950). In ruling on a motion to dismiss, a court may consider the facts asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits and any documents incorporated in the complaint by reference (Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010)).

## ARGUMENT

### THE DEFENDANTS' CVM INTENTIONALLY DENIED PLAINTIFFS' PROCEDURAL CONSTITUTIONAL DUE PROCESS UNDER THE 14TH AMENDMENT

*Tenure remains public policy and a Constitutional and property right in New York State and NYC.*

Both Plaintiffs exhausted their available administrative remedies, although they were hampered by narrow timelines, cut-off submission times, secrecy, and false claims made by the Defendants

4

(AC,¶¶21-31; 32-44). Tenured employees of the NYC Department of Education have Constitutional property and Liberty rights to their jobs. Cleveland v Loudermill (470 US 532 (1985)) was a landmark 1985 U.S. Supreme Court case that established that public employees with a property interest in their jobs are entitled to a "pre-termination" hearing, which requires notice of the charges and an opportunity to respond. The Court held that this minimal hearing, coupled with subsequent post-termination procedures, satisfies the due process requirements of the Fourteenth Amendment. This ruling prevents public employees from being fired summarily without a chance to defend themselves, even if the hearing is not a full-blown trial. Plaintiffs' accommodation requests should have been given strict scrutiny, and they should not have been punished by Defendants placing a "Problem Code" on their fingerprints, marking them as guilty of misconduct for requesting these accommodations.

Plaintiffs here were never given *any* hearing, and not a §3020-a as required by Ed. Law §3020-a. These 3020-a proceedings are public policy in New York State. Recent published transcripts of Eric Eichenholtz, members of the Citywide Panel, and Katherine Rodi have shown that the Defendants have been defending their terminations and lack of accommodations given to Plaintiffs here and in multiple cases involving public employees, based upon claims made from whole cloth. See

**The Citywide Panel and the Final Judgment in Kane-Keil-New Yorkers For Religious Liberty**
https://advocatz.com/2025/01/25/new-york-state-court-of-appeals-issues-an-amended-judgment-in-new-yorkers-for-religious-liberty-et-al-v/

The post above includes the full transcript of the creator of the Citywide Panel, Eric Eichenholtz; The Affidavit of Dr. Harvey Risch; Affidavit of Dr. Peter McCullough; Declaration of Dr. Bhattacharya; Affirmation of Alan Deutsch; Affidavit of Michael Melocowsky; and the Affirmation of Florina Getman. Mr. Eichenholtz, Mr. Deutsch, Mr. Melocowsky, and Ms.

Getman could not provide any details about the number of people granted religious

accommodations, nor why these nameless individuals received the accommodations and

remained on salary. They also could not define an "undue burden" nor the criteria used to make

any decisions. Drs. Risch, Bhattacharya, and McCullough wrote about the ineffectiveness of the

vaccines to protect against COVID and how no mandate should ever have existed. The COVID

vaccine was shown to be ineffective and harmful starting in 2020, but this information was never

considered by Defendants, whose sole goal was to remove employees from the City payroll

without Just or Probable cause.

**The City of New York and the NYC Department of Education Never Intended on Honoring Requests For Religious Exemptions From Getting the COVID Vaccine By Municipal Workers**
https://advocatz.com/2025/05/28/the-city-of-new-york-and-the-nyc-department-of-education-never-intended-on-honoring-requests-for-religious-exemptions-from-getting-the-covid-vaccine-by-municipal-workers/

This testimony by Defendant Rodi, Director of Employee Relations and the Office of Personnel

Investigations ("Problem Code"), and also head of the 'General Committee', who denied all

applications for accommodations, is key to the denial of Defendants' Motion To Dismiss in this

matter:

"With further questioning, Rodi explains that the general committee members were under pressure to reopen in-person schooling and couldn't do so without replacing at least some of the DOE employees who were barred from entering school buildings. Rodi describes the flood of requests for accommodations the DOE received during the fall of 2021:

*"We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the person, name the job. And the fact is that we needed to run a school system . . ."*

She describes denying accommodation requests in order to "resign" employees so that they could be replaced:

*"[T]he only option was [sic] had was to resign them from the system without any bias so that we could hire other teachers. Because, again, we had a school to run."*

6

Later [Attorney Austin] Graff questions Rodi about the details of what happened to each individual's request for an accommodation:

*Q. "Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?"*

*A. "We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.*

*We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. And, then, if it was a medical—if it was in the wrong place, we—we immediately advised them so that they could reapply or reapply in the right place. If it was a blank piece of paper, we immediately advised them so that they could submit appropriate documentation.*

*And then, other than that, we then—we reviewed to make sure they had submitted something to support, you know, that it was religious in nature. We didn't judge what it was. And even if it was just a piece of paper that they wrote out. And then we denied their request."*

According to this description, the "individual review" the applicants received was simply a check to make sure they hadn't mistakenly submitted a blank piece of paper or a medical accommodation request.

These actions by Defendants are deliberate, misleading, and made in bad faith. No hearing was

ever held where Plaintiffs could be heard on their reasons for not getting vaccinated against

COVID. They both have been denied their procedural and substantive due process.

***The COVID Vaccine as Applied to Plaintiffs and Public School Personnel was Discriminatory Retaliation and Punishment For Requesting an Exemption/Accommodation Rather than Getting Vaccinated***

Placing a Problem Code on an employee's personnel file constitutes discipline, EDL §3020 and

§3020-a is triggered, with all Constitutional protections and procedures allowable under the 14th

Amendment. AC, **EXHIBIT 8**; see added **EXHIBIT 21** Declaration of Barry Black.

In Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006) the U.S. Supreme

Court ruled that Ms. White's suspension for 37 days from her job operating a forklift was

retaliatory discrimination and a jury awarded her compensatory damages.

7

*"The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their status, while the anti-retaliation provision seeks to prevent an employer from interfering with an employee's efforts to secure or advance enforcement of the Act's basic guarantees. To secure the first objective, Congress needed only to prohibit employment-related discrimination. But this would not achieve the second objective because it would not deter the many forms that effective retaliation can take, therefore failing to fully achieve the anti-retaliation provision's purpose of "[m]aintaining unfettered access to statutory remedial mechanisms," (Robinson* v. *Shell Oil Co.,* 519 U. S. 337, 346).

Thus… the anti-retaliation provision is not limited to actions affecting employment terms and conditions. In Perry v Sindermann (408 U.S. 593 (1972)), the U.S. Supreme Court decided that Sindermann had alleged enough facts to show that he was entitled to some kind of process and that the lack of a contractual or tenure right taken alone did not defeat his claim that the nonrenewal of his contract violated the First and Fourteenth Amendments. While Sindermann did not have tenure *per se*, his length of service at his last institution (more than the four years mentioned as the probationary period for a full-time instructor in the "Policy Paper 1" guidelines), he had asserted that he had *de facto* tenure, giving him a property interest in his job such that it fell under the 14th Amendment protection. The court ruled that "the respondent must be given an opportunity to prove the legitimacy of his claim of such entitlement in light of the policies and practices of the institution. Proof of such a property interest would not, of course, entitle him to reinstatement. But such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his non-retention and challenge their sufficiency."

Here, both Plaintiffs are tenured employees with property and liberty rights to their employment in the NYC DOE. Both, when charged with misconduct and a problem code, were placed on their personnel records, and then they were terminated, were unlawfully separated from their jobs without a hearing, in violation of the 1st, 5th, and 14th Amendments and Education Law 3020.

LWOP, or "leave without pay," which forced all unvaccinated employees of the NYC DOE off salary in October 2021 (AC, **EXHIBIT 6**), was made up by Arbitrator Martin Scheinman and applied to Plaintiffs without any law, statute, memorandum, or other contractual clause to validate it. LWOP left permanent harm on Plaintiffs in that their salaries and pension steps were permanently denied to them unfairly and without Just or Probable cause. Neither Plaintiff waived their rights to these benefits of their tenured status.  The DOE should never have proceeded with termination, as they could not proceed due to the unwaived procedural defect cited here (see, Hackett v. Milbank, Tweed, Hadley & McCloy, 86 N.Y.2d 146,154-55, 630 N.Y.S.2d 274,654 N.E.2d 95 [1995]).  Fraudulent concealment of a secret waiver of the rights of tenured employees to the tenure law Education Law 3020-a(2)(a), and Constitutional rights of property and liberty by the NYC Department of Education cannot be sanctioned. The same can be said about the Problem Code.

The fact that any NYC DOE employee who did not hand in a vaccination card on October 4, 2021, was placed immediately on a problem code triggered §3020-a disciplinary procedures. See Amended Complaint **EXHIBITS  8, 21,** Problem Code Documents, and in particular the email from DOE employee Eric Amato attached to the Declaration of Betsy Combier as **EXHIBIT A**. This shocking information criminalized the unvaccinated public employees working for the NYC DOE, who suddenly, secretly, and permanently became prohibited from working in their jobs and chosen careers. Plaintiffs did not know anything about the Problem Code flag until it was revealed to them in May 2022, and their search for jobs and always not getting hired suddenly made sense. This Code has been publicly visible since 2022.

In 2012, the UFT filed a PERB complaint against the NYC DOE regarding the secrecy of this Code. As part of that litigation, Katherine Rodi was deposed on November 3, 2015. Ms. Rodi

9

described the procedure of placing an employee on the Code/flag due to misconduct. She testified that the information from the investigators was used to designate an employee as guilty of some heinous act, and therefore, a Principal would not hire this applicant. She added that "No Respondent will ever see their flag". Defendants never gave any DOE employee information about, or notice of, a problem code on their personnel file (See AC, **EXHIBIT 8; EXHIBIT 14,** Problem Code-RODI Testimony attached).

The Decision of PERB case U-32479 (June 2022) was an Order that the DOE work with the UFT to reveal problem codes on personnel files of UFT members who can see what documents are accusing them of misconduct, and, if these documents are false, promptly remove them from the file. The Defendants have never complied. **EXHIBIT 15**.

The DOE prevents anyone from seeing their Problem Code because they do not want to provide any reasons for placing it on a person's personnel file. There usually are none. In the case of Philomena Brennan, who filed an Article 78 to remove the problem code from her file, Supreme Court Judge Alice Schlesinger ordered the DOE to submit to the Court their procedures for removal of the Code. The DOE settled the case and took Ms. Brennan immediately off the Code – all to keep the procedures secret (See Brennan v NYC Dep't of Education, Index No. 112977/2009, **EXHIBIT 16)**.

Before Loudermill, New York State Education Law §3020-a provided tenured public education employees with protected job status and Constitutional rights to their employment, as tenure rights for NYC teachers were established in 1897. The process involves a formal hearing before an arbitrator or panel where the tenured educator can present evidence, call witnesses, and challenge the school district's case. The district must have "just cause," and if the teacher is found guilty, a penalty ranging from a reprimand to termination can be imposed. The goal is to

10

protect a teacher from being removed, suspended without pay, or terminated without Just Cause or Probable Cause. Tenure remains a public policy, a Constitutional and property right in New York State and NYC, and a human right not only in state law but also in employment contracts statewide. Plaintiffs were never given a hearing on their accommodation requests (See the case of Kambouris v. NYC Dep't of Education, Index No. 518863; Abramovich v. Board of Ed. of Central School Dist. No.1 of Town of Brookhaven and Smithtown 62 A.D.2d 252 [2d Dept. 1978] (holding that the public policy expressed in the tenure statutes is designed to protect individual teachers, as public servants, from being dismissed without a hearing once their competency has been demonstrated); McElroy v. Board of Educ. of Bellmore-Merrick Cent. High School Dist, 5 Misc. 3d 321 [Sup Ct. Nassau County, 2004] (acknowledging the purpose of the statute is to protect tenured teachers from arbitrary discipline); Cardinale v. NYC Department of Education, Index No. 85165/2017).

In order for a tenured educator to be taken off of his/her salary, there must be a probable cause hearing where the NYC DOE has the burden of proof. EDL §3020-a "provides the exclusive method of disciplining a tenured teacher in New York State (Tebordo v. Cold Spring Harbor Cent. School Dist.,126 A.D.2d 542, [2d Dept. 1987]). DOE's attempt to characterize its accusations against Plaintiffs here as anything other than misconduct or wrongdoing flies in the face of the facts. And even then, its claim cannot be sustained as a matter of law see Mannix v Bd. of Ed. of City of New York, 21 NY2d 455 [1968] (holding that the employing board improperly terminated tenured teacher accused of not fulfilling a condition of employment by not providing the teacher with due process under EDL §3020-a ); Matter of Glass v. Board of Education, 21 A.D.2d 891 [1964] (finding tenured teacher entitled to EDL §3020-a hearing where board claimed teacher failed to meet a condition of employment); Lynch v Nyquist, 41

11

AD2d 363, 365 [3d Dept. 1973] (stating that certification requirements cannot be used as means to erode the protection afforded to tenured teachers and that regardless of the strength of the board's proof that the teacher was not actually certified, it had to proceed pursuant to EDL §3020-a). A tenured teacher cannot be suspended without pay unless he or she has ***been convicted*** of specified crimes (EDL §3020-a[2][a][b](emphasis added)). It follows by analogy that Plaintiffs cannot be reassigned, taken off salary, or terminated based on speculation and mystery investigations. The deprivation of constitutional rights is per se irreparable harm (See Ferreyra v. Decker, 456 F.Supp, 549 [S.D.N.Y. 2020], Mitchell v. Cuomo, 748 F.2d 804, 806 [2d Cir. 1984]). The tenure statutes reflect the Legislature's intent and purpose to protect educators who have successfully completed a probationary period from being summarily disciplined without the safeguards of Education Law § 3020-a (Holt v. Board of Educ. of Webutuck Cent. School Dist., 52 N.Y.2d 625 (1981)).

Defendants have not submitted any proof of their specious, deceptive, and false claims that Plaintiffs did not establish a prima facie case of religious and medical discrimination. Defendants' argument that they suffered an adverse employment action for "failing to comply with the conflicting employment requirement" is also false. The conflict, if any, was with the unlawful due process designed by the Defendants out of thin air. There was no employment requirement to get vaccinated with the COVID vaccine or be fired. Defendants made that up and then used it as their standard to dismiss Plaintiffs' case. In this Court, the failure to accommodate has been and continues to be a winning claim (See Hill v. The Department of Education 24-cv-3506-RPK-LB; Mumin v The City of New York et al., 23-cv-03932 (JLR) S.D.N.Y.; Hernandez v. The Richmond County District Attorney, et al., 24-CV-05790 (BMC); Masciarelli v. New York City Department of Education, 22-cv-07553, just to state a few out of many). In Di

Capua v City of New York (Richmond County Supreme Court, Index No. 85035/2023), 10 employees of the NYC DOE won their religious exemption/accommodations, jobs, and backpay. Jennifer LaBarbera also won her job, backpay, and religious accommodation/exemption, despite having signed a waiver promising she would not challenge her resignation (Index No. 85001/2023).

***The Defendants set up defenseless timelines for submitting accommodation requests.***

Defendants set up the timelines for medical and religious accommodation requests and Appeals in such a way as to deny almost anyone who submitted a request. Defendants blocked applicants for a medical or religious accommodation from applying due to limited timelines, such as one day, a holiday, or the Sabbath if the employee was Jewish. Defendants' actions were deliberate aiming to punish all public workers who would not obey the lies and false policies concerning the COVID-19 vaccine. The numbers given by the Defendants change from day to day, but there were about 168-176 employees of the NYC DOE who received exemptions and kept working in a reassigned place or "rubber room" for the duration of the CVM (made voluntary by Mayor Adams in February 2023). Hundreds of people got these exemptions based on unknown criteria (City Law Department Attorney Sarah Paulson, Kane v. De Blasio, 19 F.4th 152, 168–69 (2d Cir. 2021), **EXHIBIT 17)**.

How and why some people and not others were chosen, including Plaintiffs, are mysteries yet to be unraveled (See Amended Complaint, pp. 7-11). RF won his religious exemption and was appointed Director/administrator of the reassignment building, St.Brigids, for 90 DOE employees who received their religious or medical exemptions. Daniel Mickelson was another teacher who was at St. Brigids, and they both discussed their "rubber room" in the media (See RF's Religious Exemption appeal **EXHIBIT 18)**. Yet Plaintiffs received no such protection. This

13

is clearly systemic religious discrimination and deprivation of Constitutional rights pursuant to the Free Exercise Clause, Equal Protection, and Establishment Clause.

After the mandate was repealed in February 2023, Defendants continued to refuse to reinstate the fired employees, who now had "problem codes" on their DOE file (typically reserved for serious misconduct like child abuse). All employees with problem codes are blocked from getting jobs within the NYC DOE – and its' vendors – as well as unemployment benefits by falsely claiming they committed "misconduct" for adhering to their religious beliefs (See again, AC, **EXHIBIT 8)**. Thus, Plaintiffs' harm is continuing today, and their claims are not time-barred. This is a continuing wrong.

Almost as if he was unconscious about the harm done by the CV, NYC Mayor Eric Adams issued a countless stream of Executive Orders to please his friends and allies – and school bus drivers -, while furthering the gap between his people and municipal workers (See EXECUTIVE Order EO 62, which permitted Broadway Stars, election workers, NYC school bus drivers and baseball players, unilateral exemptions. (¶53, Amended Complaint)). Defendants denied 100% of religious accommodation applications, including Plaintiffs', via auto-generated emails. Defendant Katherine Rodi denied every request without any review. (See pp. 5-6 above) However, it was the very limited timelines given by the Defendants to appeal the denials of the medical or religious exemption/accommodation that really show bad faith, malicious prosecution, and retaliatory discrimination. Employees were given only 24 hours to appeal denials through the SOLAS online system, which frequently crashed, preventing timely submissions. Deadlines were poorly communicated, and the 24-hour appeal window often conflicted with religious observances, such as the Sabbath. This further limited an employee's ability to appeal, as in this case. System failures and arbitrary restrictions, such as barring late

submissions, prevented many from accessing the appeal process. Defendants failed to remedy this.

Defendants refused to reopen the closed religious and medical applications to those who were blocked by the systemic technical and timeline issues cited above. Defendants also refused to set up any hearings for UFT Step 2 Grievances, halting those procedures.

In sum, both Plaintiffs exhausted their administrative remedies to the full extent possible, then filed in this Court when the Defendants blocked all other options. Plaintiffs' Amended Complaint cites causes of action against the Defendants who, under color of law, denied them the due process they were entitled to under the Tenure Law, 42 U.S.C. § 1983, First, 5th and Fourteenth Amendments to the United States Constitution, Civil Service Law Section 75(b), and Human Rights Law ("SHRL and CHRL"). Defendants granted religious and medical accommodations to hundreds of similarly situated NYC DOE employees, but not either of the Plaintiffs, without any reasonable criteria or lawful justification. Plaintiffs have pled sufficient facts to support their claims of being denied constitutional rights, of being retaliated against, and of being subjected to discrimination (See AC, **EXHIBIT 1**; Usak case, **EXHIBIT 19).**

Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendants' invocation of "undue hardship" defenses are plainly false pretexts attempting to cover for the Defendant's explicit religious discrimination.

In *Does 1-11 v. Board of Regents of University of Colorado*, 100 F.4th 1251 (10th Cir. 2024), the Tenth Circuit held that state university employees were likely to succeed on Free Exercise and Establishment Clause claims and entitled to preliminary injunction against denials of religious accommodation to a vaccine mandate. In *Does*, the Court affirmed that a vaccine mandate is "in no way generally applicable" when the government evaluates employee religious

15

beliefs on a case-by-case basis, allowing "individualized exemptions" to applicants whose beliefs, at the government's discretion, merit accommodation. Additionally, in that case, the Defendant adopted a facially discriminatory policy and then, after litigation, offered a so-called "remedial" policy. Plaintiff argues here that the hostility by Defendants toward the Plaintiff in this matter defeats neutrality at every level of review, which suggests pre-textual discrimination. The U.S. Supreme Court has ruled that suspension without pay is retaliatory discrimination (See Burlington Northern and Santa Fe Railway Company, 548 US 53 (2006) ("that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay")). Bias or hostility to a religious practice or accommodation cannot supply a defense.

### Plaintiff Baker-Pacius has successfully pled deprivation of Constitutional rights to her sincere religious beliefs and an exemption/accommodation from the COVID-19 vaccination

Plaintiff Baker-Pacius has pleaded facts stating a plausible action that Defendants have violated the Free Exercise Clause, Equal Protection Clause, Establishment Clause, her Constitutional rights to Due Process under the 14th Amendment, and the Takings Clause pursuant to the 5th Amendment. She has successfully pled a Section 1983 deprivation. Under the Free Exercise Clause of the First Amendment, which applies to the states through the Fourteenth Amendment, "[g]overnment enforcement of laws or policies that substantially burden the exercise of sincerely held religious beliefs is subject to strict scrutiny." (Fifth Ave. Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002)).

In this case, for the reasons stated here, Defendants' policies imposed on Plaintiff Baker-Pacius burdened the exercise of her sincere Christian beliefs. Her claims set forth a prima facie case of discrimination because the allegations viewed in a light most favorable to the Plaintiff shows that Plaintiff was terminated because of her sincere religious beliefs (Lowman v. NVI LLC, 821 Fed.

16

Appx. 29, 31 (2d Cir. 2020); see also Offor v. Mercy Med. Ctr., 167 F. Supp. 3d 414, 429 (E.D.N.Y. 2016) (SHRL)). Specifically, Plaintiff has stated that Defendants' discriminatory imposition of the COVID-19 vaccine Mandate on employees and, at the same time, placing her fingerprints into the "Problem Code" has permanently scarred her career and life. Defendants have failed to prove that their procedures applying the COVID-19 Vaccine Mandate (CVM) and Plaintiff's termination were lawfully executed under prevailing policy and the Constitution. The Supreme Court case, the EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015) concluded that "An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. The First Amendment to the Constitution protects Plaintiff's free exercise of religion and mandates state accommodation for members of religious groups who object to the vaccinations on religious grounds. The Free Exercise Clause recognizes and guarantees Americans the "right to believe and profess whatever religious doctrine [they] desire"( Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 877 (1990)).

The Defendant never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendants' concern for a safe environment for in-person learning. The Free Exercise Clause also ascertains that the government may not attempt to regulate religious beliefs, compel religious beliefs, or punish religious beliefs (Sherbert v. Verner, 374 U.S. 398, 402 (1963); Torcaso v. Watkins, 367 U.S. 488, 492–93, 495 (1961); and United States v. Ballard, 322 U.S. 78, 86 (1944)).

Government may not discriminate against or impose special burdens upon individuals because of their religious beliefs or status (See Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; McDaniel v. Paty, 435 U.S. 618, 627 (1978)).

The Constitution's protection against government regulation of religious belief is absolute; it is not subject to limitation or balancing against the interests of the government (Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 877; Sherbert v. Verner, 374 U.S. 402 (1963)).

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith herein" (West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943)).

The Free Exercise Clause protects beliefs rooted in religion, even if such beliefs are not mandated by a particular religious organization or shared among adherents of a particular religious tradition (Frazee v. Illinois Dept. of Employment Security, 489 U.S. 829, 833–34 (1989)). As the Supreme Court has repeatedly counseled, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection" (Church of the Lukumi Babalu Aye v. Hialeah, 508 U.S. 520, 531 (1993)). They must merely be "sincerely held" (Frazee v. Illinois Dept. of Employment Security, 489 U.S. 834 (1989)). Importantly, the protections guaranteed by the Free Exercise Clause also extend to acts undertaken in accordance with such sincerely held beliefs. That conclusion flows from the plain text of the First Amendment, which guarantees the freedom to "exercise" religion, not just the freedom to "believe" in religion (Employment Div. v. Smith, 494 U.S. 877 (1990); Thomas v. Review Board of the Indiana Employment Security Division, 450 U.S. 716 (1990); McDaniel v. Paty, 435 U.S. 627 (1978; Sherbert v. Verner, 374 U.S. 403–04 (1963); and Wisconsin v. Yoder, 406 U.S. 205, 219–20 (1972)).

The Court in *Does* (10th Cir.) stated that:

18

"a government policy that requires an intrusive inquiry into the validity of religious beliefs violates the Establishment Clause regardless of any purported government interest" (100 F.4th at 1268).

A law is not neutral if it singles out particular religious conduct for adverse treatment, treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons, applies uncalled for restrictions on religious conduct"; or "accomplishes . . . a 'religious gerrymander,' an impermissible attempt to target [certain individuals] and their religious practices" (Id. 538). A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," (Id 543), including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than . . . does" the prohibited conduct, id., or enables, expressly or de facto, "a system of individualized exemptions," as discussed in Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 884 (1990); see Church, 537. "Neutrality and general applicability are interrelated, . . .[and] failure to satisfy one requirement is a likely indication that the other has not been satisfied"( Id, 531).

A law that disqualifies a religious person or organization from a right to compete for a public benefit—including a grant or contract—because of the person's religious character is neither neutral nor generally applicable (See Trinity Lutheran Church of Columbia, Inc. v. Comer, Director, Missouri Department of Natural Resources, 582 U.S. (slip opinion pages 9–11) (2017)). Even when a law is neutral and generally applicable, the government may run afoul of the Free Exercise Clause if it interprets or applies the law in a manner that discriminates against religious observance and practice. The Free Exercise Clause, much like the Free Speech Clause, requires equal treatment of religious adherents (Trinity Lutheran Church of Columbia, Inc. v. Comer 582

19

U.S. (slip opinion. Page 6) (2017); see also Good News Club v. Milford Central Sch., 533 U.S.

98, 114 (2001), and Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 837, 841

(1995)). The Defendants' Motion To Dismiss must be denied as to Plaintiff Baker-Pacius.

***Plaintiff Garry has successfully pled deprivation of Constitutional due process rights and medical necessity to obtain an exemption from the vaccine.***

Supreme Court precedent has evolved significantly since *Jacobson v. Massachusetts* (197 U.S.

11 (1905), a U.S. Supreme Court case that upheld the authority of states to enforce compulsory

vaccination laws based on their police power during public health emergencies. Since Jacobson,

the Supreme Court has consistently applied strict scrutiny to medical exemption claims,

clarifying that if a medical exemption policy is narrow enough that it might exclude even a few

who might need it, it is unconstitutional on its face (See, e.g., Stenberg v. Carhart, 530 U.S. 914,

937 (2000); Ayotte v. Planned Parenthood of N. New England, 546 U.S. 320 (2006)). The Court

now also expressly recognizes a fundamental right to refuse medical intervention, even

lifesaving medical intervention. This right was first explicitly recognized in Cruzan v. Director,

Missouri Dept. of Health, 497 U.S. 261, 269 (1990), where the Court acknowledged a due

process liberty interest in refusing unwanted medical treatment, based on the doctrine of

informed consent and the common law rule that forced medication equals battery. In recognizing

this right, the Supreme Court noted, "no right is held more sacred, or is more carefully guarded,

by the common law, than the right of every individual to the possession and control of his own

person" (Id. at 269).

In Health Freedom Def. Fund, Inc., v. Carvalho, No. 22-55908, 2024 WL 2873372 (9th Cir. June

7, 2024), the Ninth Circuit reinstated constitutional challenges to the Los Angeles Unified

School District's Covid-19 vaccine mandate, overruling the district court's determination that

there is a legitimate government interest in mandating a vaccine that cannot stop the spread of

disease. The Ninth Circuit concluded that the police powers invoked in Jacobson do not apply to personal medical choices, which the government is not at liberty to infringe without strict scrutiny. It is well-established that the Fourteenth Amendment "forbids the government to infringe 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest. Washington v. Glucksberg, 521 U.S. 702, 721 (1997) (recognizing the right to refuse medical intervention as fundamental). Defendants' criteria for medical exemption policy do not meet this burden, as Defendants never made their standard clear. Even where a vaccine mandate is itself lawful, the Court's jurisprudence on medical exemptions should require strict scrutiny where a medical exemption is withheld so long as the plaintiff can assert a prima facie case that they are likely at risk of harm due to their underlying condition, as Plaintiff Garry did in this case.

It is absurd to force an employee to take a medically contraindicated vaccine, especially where the vaccine cannot stop transmission and is only for personal benefit. Moreover, many less restrictive alternatives existed, such as providing medical accommodation. Defendants did not show as a matter of law that they could not have afforded this accommodation. Indeed, the Jacobson Court itself specifically noted that even if based on the acknowledged police powers of a state,  a public-health measure must always yield in case of conflict with any right which [the Constitution] gives or secures. Moreover, the Ninth Circuit's recent decision in Health Freedom Def. Fund v. Carvalho, 104 F.4th 715, 727 (9th Cir. 2024) recognized that Jacobson does not apply to vaccines that primarily benefit the recipient, like COVID-19 vaccines. When intervention is not for the common good, the state's police powers do not govern.

Defendants' medical exemption policy, if it indeed exists at all, is patently unfair and violates principles of harm avoidance to require an employee to choose between his job and a vaccine

that is contraindicated for him due to his underlying condition. Nor is it proportional or necessary to ask him to play Russian Roulette with his life, given the multiple carve-outs and official recognition that the vaccine is only for personal protection.

To the extent that Defendants argue they merely conditioned employment on compliance, this argument fails. The government may not deny a benefit to a person on a basis that infringes his constitutionally protected interests (Perry v. Sinderman, 408 U.S. 593, 597 (1972). The unconstitutional conditions doctrine vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving up their rights (Koontz v. St. Johns River Water Mgmt Dist., 570 U.S.595, 604 (2013)). Defendants' arguments in their Motion To Dismiss against granting Plaintiff Garry an exemption and putting him back in his job with backpay and benefits are baseless. The Motion must be denied as to Plaintiff Garry.

### NOTICE OF CLAIM REQUIREMENTS ARE NOT APPLICABLE TO §1983 SUITS BROUGHT IN FEDERAL COURT AND HUMAN RIGHTS LAWS HAVE A 3-YEAR STATUTE OF LIMITATIONS

Defendants wrote in their Motion that Plaintiffs' claims had to be dismissed because they were time-barred due to Education Law §3813 and a 1-year statute of limitations. Defendants are wrong on the Law. Human Rights Laws in New York now have a 3-year statute of Limitations. On November 17, 2023, Governor Hochul signed State Assembly Bill A00501 into law, extending the statute of limitations for discrimination and retaliation claims brought under the New York State Human Rights Law ("NYSHRL") from one year to three years.

New York's Notice of Claim requirements were applicable to §1983 suits in state court but not federal court prior to Felder v. Casey, 487 U.S. 131, 108 S.Ct. 2302 (See, e.g., Brandon v. Board of Education, 635 F.2d 971, 973 n. 2 (2d Cir. 1980), cert. denied, 454 U.S. 1123, 102 S.Ct. 970,

22

71 L.Ed.2d 109 (1981); Courtemanche v. Enlarged City School District, 686 F.Supp. 1025, 1032 (S.D.N.Y. 1988); Burroughs v. Holiday Inn, 621 F.Supp. 351, 353-55 (W.D.N.Y. 1985); Williams v. Allen, 616 F.Supp. 653, 656-59 (E.D.N.Y. 1985); Paschall v. Mayone, 454 F.Supp. 1289, 1298 (S.D.N.Y. 1978)). Felder v. Casey noted that although the Supreme Court itself "ha[d] never passed on the question, the lower federal courts have all, with but one exception, concluded that notice-of-claim provisions are inapplicable to §1983 actions brought in federal court" (487 U.S. at 140, 108 S.Ct. at 2307). In Brandon v. Board of Education, 635 F.2d at 973 n. 2, a ruling was upheld that compliance with the state's notice-of-claim provision was not a precondition to the district court action. Since the filing of a notice of claim was not a prerequisite to the federal-court suit, a municipality perforce could not require a delay of the commencement of a federal-court suit pending an examination based on such a notice (See Day v Moscow 955 F.2d 807 (2nd Cir 1992)). Thus, Plaintiffs' claims are not time-barred, and Human Rights Law has, in any case, a 3-year statute of limitations. Defendants' Motion on this point must be dismissed.

### PLAINTIFFS HAVE SUFFICIENTLY PLED FAILURE TO ACCOMMODATE

In order to adequately allege a failure to accommodate a religious belief claim, Plaintiffs must allege that "(1) (s)he has a bona fide religious belief that conflicts with an employment requirement; (2) she informed the employer of her belief; and (3) she was disciplined for failing to comply with the conflicting employment requirement" (Marte v. Monetefiore Med. Ctr., No. 22-CV-03491(CM), 2022 U.S. Dist. LEXIS 186884, at *19 (S.D.N.Y. Oct. 12, 2022)). All of these have been complied with by Plaintiffs. Defendants had knowledge of Plaintiffs' sincerely-held religious beliefs and medical necessity to remain unvaccinated, yet chose to ignore these beliefs and medical issues, denied their exemption requests, blocked their Appeals with erratic technological timelines, and declared them guilty of misconduct with a permanent

problem code, an adverse employment action. Human Rights Law says that the employer must give a reasonable accommodation, even if claiming an undue burden.

Defendants have blatantly ignored all the laws demanding a reasonable accommodation for Plaintiff. Defendants never offered any reasonable accommodation to the Plaintiff that would both satisfy the Plaintiff's sincere religious beliefs and the Defendant's concern for "a safe environment for in-person learning" (*Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68-69 (1986)). It is well-known that the City has "Absent Teacher Reserves" (ATRs) ready and willing to step into a position to fill in for an absent teacher. The Defendants also offer remote teaching in almost all their schools (**EXHIBIT 20).** Defendants never offered a single document or factual evidence that showed any effort towards accommodating Plaintiffs, and never gave any rational basis to deny their religious exemption requests. The Department totally failed in this duty.

Defendants already rent spaces throughout New York City for people who are reassigned or are ATRs (See ¶47, Complaint). The process and substance of the rubber rooms have been created and paid for by the NYC DOE for more than 22 years.

The Motion To Dismiss must be denied in full.

## CONCLUSION

Plaintiffs' demands for relief include recovery of monetary damages in backpay from the date of being removed from salary to the present; full reinstatement to Plaintiffs' prior titles and positions with all raises and benefits; their names and personal data removed from the Office of Personnel Investigations' ("OPI") Problem Code database; and/or they will each be given a §3020-a Arbitration Hearing to defend and support their keeping their

jobs without getting vaccinated with accommodations for their requests for religious

(Baker-Pacius) and medical (Garry) accommodation.

Dated: October 15, 2025


/s/Dianne Baker-Pacius                    /s/Christopher J. Garry
Plaintiff Pro Se                              Plaintiff pro se

# Exhibit 14

Page 68

```
1                    DIRECT/RODI
2              Your next witness, please.
3              MS. BILLER:  I would like to
4         call Ms. Rodi, please.
5              JUDGE BLASSMAN:  Please
6         approach and I will swear you in.
7              Do you swear or affirm to tell
8         the truth and nothing but the truth in
9         this proceeding?
10             THE WITNESS:  I do.
11             JUDGE BLASSMAN:  Thank you.
12             Can you please state your full
13        name for the record.
14             THE WITNESS:  My full name is
15        Katherine Rodi, R-O-D-I.
16   DIRECT EXAMINATION
17   BY MS. BILLER:
18        Q.      By whom are you employed by?
19        A.      I'm employed by the New York
20   City Department of Education.
21        Q.      What capacity?
22        A.      I'm the director of the office
23   of Employee Relations.
24        Q.      How long have you held that
25   position?
```

Page 69

DIRECT/RODI

1

2      A.      I held that position for two

3  and a half years.

4      Q.      And prior to being the director

5  of Employee Relations, what other job titles

6  have you held within the Department of

7  Education?

8      A.      I was an agency attorney, I was

9  a senior counsel and I was the director of

10  the Disciplinary Support Unit.

11      Q.      As director of Employee

12  Relations, what are some of your job duties

13  and responsibilities?

14      A.      I oversee several units.  I

15  oversee the Office of Personnel

16  Investigation, I oversee the Office of

17  Employee Relations, I oversee the Office of

18  Safety and Health, I oversee it, it is not

19  really an office, but the Disciplinary

20  Support Unit work.

21      Q.      Can you explain to us what the

22  Disciplinary Support Unit is?

23      A.      It is a unit within my office

24  that manages the on-line system that is the

25  Disciplinary Support System.

Page 70

DIRECT/RODI

1
2              And what we do, we check and
3    track and eventually flag folks.  We check
4    older discipline, older substantiated
5    reports, we review them, we track them and
6    then if all the qualifications that we build
7    together are met, then we may flag a person.
8         Q.       Can you give us the years that
9    you were responsible for overseeing the
10   disciplinary support unit?
11        A.       I was hired in June of 2012.  I
12   started in July, early July of 2012.  Then I
13   was promoted to the director of Employee
14   Relations in January of 2013 and then I
15   subsumed DSU into my current work.
16              JUDGE BLASSMAN:  DSU?
17              THE WITNESS:  The disciplinary
18        support unit.
19              JUDGE BLASSMAN:  So, since when
20        have you been overseeing disciplinary
21        support.
22        A.       It has basically been under my
23   portfolio since July of 2012.
24        Q.       Are you aware when the flagging
25   was implemented, began to be implemented?

Page 71

1              DIRECT/RODI

2        A.        I was invited to a meeting

3    about disciplinary support projects, I want

4    to say it was like April of 2012 at that

5    meeting there were all the senior counsel, I

6    was in the role of senior counsel at the

7    time.  So, all the senior counsel, there

8    where I think there were superintendents,

9    other random DOE staff and we got a

10   presentation about the DSU.

11             By the time I started in July

12   at least a couple of hundred people had been

13   flagged.  So, I think it started in May or

14   June of 2012.

15       Q.        Are you familiar with the

16   Galaxy system?

17       A.        Yes.

18       Q.        What is the Galaxy system?

19       A.        The Galaxy system is actually a

20   budgetary system that provides table of

21   organization for all DOE offices and

22   schools.

23             So, it is a budget driven

24   system that basically tracks all current

25   employees by the order by where they work.

Page 72

DIRECT/RODI

1

2      Q.      What, if any, involvement do
3  you have with the Galaxy system?
4      A.      As being part of Human
5  Resources, I use the Galaxy system a lot.  To
6  check people's status and then the DSU, the
7  Disciplinary Support project, it linked to
8  Galaxy, but it is not like a part of Galaxy.
9              JUDGE BLASSMAN:  It is linked
10      to Galaxy?
11              THE WITNESS:  It is linked to
12      Galaxy.
13      Q.      Are you familiar with the
14  Disciplinary Support Unit flag?
15      A.      Yes, I am.
16      Q.      I know we heard much talk about
17  it.
18              Can you briefly define for us
19  what the disciplinary support unit flag is?
20      A.      Sure.  The flag is a reflection
21  of what we pulled into the DSU system.  The
22  system is a web based system.
23              It is set up so that no one can
24  be accidentally or easily flagged.  It is set
25  up so that if I want to kind of open a folder

DIRECT/RODI

1

2 for a person, I have to put in their name or

3 an identifier such as a Social Security

4 number, an employee I.D. and then that

5 person's name would be automatically

6 populated from the Galaxy data.

7                    Once I have the person's

8 information up I can then attach documents to

9 the person's name.

10                    Just attaching a document to a

11 person's name doesn't flag them.  What it has

12 to do it has to meet two qualifications.

13                    Number one, there has to be a

14 substantiated report of discipline issued

15 from an investigatory body.

16                    Then second there has to be a

17 letter of discipline that has been --  that

18 has evidenced that the person received the

19 discipline.

20                    Once both those two factors are

21 met a person is then manually flagged.

22                    So, even if the two documents

23 were both there, unless someone went in there

24 and looked at it, a person couldn't be

25 flagged.  It is not, the system doesn't read

# Exhibit 15

**STATE OF NEW YORK**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

_____

In the Matter of

**UNITED FEDERATION OF TEACHERS, LOCAL 2,**
**AFT, AFL-CIO,**

Charging Party,

-and-                                                                  CASE NO. U-32479

**BOARD OF EDUCATION OF THE CITY SCHOOL**
**DISTRICT OF THE CITY OF NEW YORK,**

Respondent.

_____

**ROBERT T. REILLY, GENERAL COUNSEL (ARIANA A. DONNELLAN of**
**counsel), for Charging Party**

**KAREN SOLIMANDO, EXECUTIVE DIRECTOR OF LABOR RELATIONS**
**(ALLISON S. BILLER of counsel), for Respondent**

**BOARD DECISION AND ORDER**

This case comes to us on exceptions filed by the Board of Education of the City

School District of the City of New York (District) to a decision of an Administrative Law

Judge (ALJ), granting an improper practice charge alleging that the District violated

§ 209-a.1 (d) of the Public Employees' Fair Employment Act (Act).[1]  The charge alleged

that the District violated the Act when it unilaterally began placing a "flag" in its computer

system next to the names of unit employees represented by the United Federation of

Teachers, Local 2, AFT, AFL-CIO (UFT), who have been the subject of discipline,

allegedly causing those employees to be denied opportunities for transfers and

permanent assignments.  Originally, the ALJ dismissed the charge, finding that the

flagging process was a duplicate, digitized version of certain documents in employees'

_____

[1] 54 PERB ¶ 4522 (2021).

-2-

personnel files and that the manner in which the District maintains employees'

personnel files was not a mandatory subject of negotiations.[2]  On exceptions to that

decision, the Board remanded the matter to the ALJ for further development of the

record.[3]  On remand, the ALJ found that the "flagging" impacted terms and conditions of

employment, and that the District had violated the Act by instituting the flagging system.

On April 7, 2022, oral argument was held before the Board.

EXCEPTIONS

The District has filed nine exceptions to the ALJ's decision.  In its first two

exceptions, the District asserts that the ALJ incorrectly found a violation of § 209-a.1 (d)

of the Act on the basis that the evidence did not support her conclusion that employees

are unable to inquire through the UFT "what specific documents are linked to a flag."  To

the contrary, the District contends, the testimonial evidence was that the UFT could

obtain this information through the District and could check its accuracy by inspecting

the complete paper personnel file.[4]

The District's third and fourth exceptions reject the ALJ's finding that neither an

employee nor her UFT representative has access to the Galaxy system and neither is

able to personally view the flagged documents and whether they actually reflect the

contents of the documents in the personnel file.  Rather, the District maintains that the

ability to view the documents as maintained in the personnel file allows the UFT and its

members to verify the flagged documents.  Additionally, the District asserts that the UFT

---

[2] 51 PERB ¶ 4561 (2018).
[3] 52 PERB ¶ 3009 (2019).
[4] Exceptions 1-2.

did not request such documents be produced, as such documents are redundant of the personnel file, and thus "there is no reason why the [District] would not provide this information."[5]

In exceptions five and six, the District argues that the ALJ erred in finding that "the record is clear that flagging affects principals' decisions whether to select a teacher in his or her school." To the contrary, the District maintains that "the record shows that the purpose of the flagg[ing] procedure is to give principals the opportunity to consider or reconsider their decision after they have viewed the flagged documents."[6] The District further claims that no evidence was introduced that any teacher failed to obtain a transfer on the basis that they had been "flagged" in the Galaxy system.

The District further alleges that there is no contractual right to a transfer, and that "flagged" employees have the same right to apply for a transfer as those who have not been flagged, and that there is no basis to require the digitization of the entire personnel files. Additionally, the District contends that principals have multiple ways of learning about disciplinary histories, and, further, just as principals are not required to view the paper files, so too "they are not required to view the flagged documents" before making their hiring decision.[7]

The District further excepts to the ALJ's finding that "when viewing flagged documents, principals are viewing only negative information contained in an employees personnel file, without any information that might counterbalance the negative

---

[5] Exceptions 3-4.
[6] Exception 5.
[7] Exception 6, quoting 54 PERB ¶ 4522, at 4652-4653.

Case No. U-32479

-4-

information such as years of positive observation reports or other positive material that may affect a principal's decision."[8]  Finally, the District excepts to the ALJ's finding that "the record shows that, in certain cases, letters annexed to a flag will be inaccurate if an employee is found, in arbitration, to have not engaged in the conduct set forth in a file letter, or to have engaged in a less severe misconduct."[9]

The UFT supports the ALJ's decision and contends that no basis has been demonstrated for reversal.

For the reasons given below, we affirm the ALJ's decision.

## FACTS

The facts in this matter are fully set out in the ALJ's thorough decision and are only addressed here as necessary to decide the exceptions.  On March 15, 2012, the District announced plans to initiate a new method of "flagging" negative work history in an online disciplinary support system that is linked to and accessible through its "Galaxy" computer system, an online budgetary system that provides a table of organization for all District offices and schools.

The flagging procedure makes information regarding an employees' disciplinary history with the District available to school principals when an employee is applying for a new position.  The information is only available to principals if they indicate in Galaxy that they intend to hire an individual for a position in their school.[10]  This process is

---

[8] Exception 7, quoting 54 PERB ¶ 4522, at 4653.
[9] Exception 8, quoting 54 PERB ¶ 4522, at 4653.
[10] Although the parties refer to the "hiring" of individuals, most of the individuals in question are already District employees, who are simply applying to transfer to a position at a different school or are seeking a permanent assignment.  Some applicants may also be former District employees, who are seeking to return to the District.

Case No. U-32479                                                        -5-

referred to as "intending" an employee in Galaxy.  If an employee's name has been

flagged, a "flag symbol" will appear next to the employee's name when a principal

"intends" the individual's name in Galaxy.[11]  The appearance of the "flag symbol"

indicates that there is information that is available to the principal by clicking on the flag.

One or more digitized documents may be linked to a flag and can be viewed by the

"intending" principal.  However, the District has represented that the decision whether or

not to click on the flag symbol and see the attached documents remains for the

principal; the District "considers the *optional* review of the disciplinary support unit flag

by hiring Principal/supervisor as an opportunity to learn about an employee's prior

history-similar to checking reference[s] before making a hiring decision."[12]

        When an "intending" principal moves to proceed, a dialogue box appears,

headed "Notification of Prior Disciplinary Action."  This dialogue box does not provide

any hyperlink to pdf documents.  It states that the prospective hire/transfer "has been

disciplined (on occasion(s) due to a prior report(s) of allegations of misconduct that

have been substantiated.")  The box instructs that for the intending principal to obtain

more information she should "contact your Senior Field Counsel or CFN HR Director."[13]

         The dialogue box then states: "If you wish to proceed with the action to intend to

bring this individual onto your budget please click below to acknowledge that you are

aware of and acknowledge the prior disciplinary action concerning this individual."[14]

---

[11] District Brief at 6, citing Jt Ex 1.  As the "flag symbol" is not reproduced in the cited
Exhibit, and the system is not available to the UFT, we adopt the District's
characterization for purposes of this decision.
[12] *Id* (citing Tr, at 83-84 (Rodi) emphasis in original).
[13] Jt Ex 1.
[14] *Id*.

Case No. U-32479

"Intending" principals are given the option in the Galaxy system of proceeding with the hire or of cancelling the hire.[15]  In the event that the principal continues with "intending" the individual to the job, he or she is required to acknowledge awareness of the prior disciplinary action concerning the individual.[16]

At the bottom of the dialogue box, two buttons allow the "intending" principal to either "Apply" (thereby submitting a final decision either to proceed with or to cancel the hire) or to "Cancel" (thereby allowing the "intending" to pursue further information, either through the flag symbol and its attached documents, or the resources specified in the dialogue box).[17]

Katherine Rodi, Director of the District's Office of Employee Relations, oversees the Disciplinary Support Unit (DSU), which manages the District's online disciplinary support system.  The DSU tracks employee discipline and is responsible for flagging employee names when appropriate.  The DSU began flagging employee names in approximately May of 2012.

Rodi testified that the DSU will place a flag next to an employee's name in the Galaxy system only when two criteria are met.  First, a substantiated report of discipline or misconduct must have been issued by one of the District's three investigatory bodies: the Office of the Special Commissioner of Investigation, the Office of Special Investigations, or the Office of Equal Opportunity.[18]  Second, the DSU must have

---

[15] *Id*.
[16] *Id*.
[17] Jt Ex 1.
[18] Tr, at 73, 76.

Case No. U-32479                                                                 -7-

evidence that the employee received a copy of the relevant disciplinary document.[19]
That evidence normally consists of the employee's signature on the letter to be flagged,
or on a mail receipt.[20]  If those criteria have been met, the DSU will manually flag the
employee's name in the Galaxy system and will link a copy of the disciplinary document
in question to the flag.

    Rodi explained the several steps that must occur before a document is issued
that can lead to the flagging of the employee's name in Galaxy.  Initially, one of the
three investigatory bodies mentioned above must have conducted an investigation that
resulted in a report substantiating an allegation of wrongdoing against the employee.
Next, the principal must meet with the employee to discuss the report.  If the principal
issues a disciplinary letter as a result of the meeting, that letter may serve as a basis for
a flag.  As set forth above, the DSU must also have evidence that the employee
received a copy of that letter.[21]  Rodi testified that only documents that are in an
employee's personnel file can serve as a basis for flagging an employee's name.  If an
employee files a rebuttal to the letter of discipline, the rebuttal letter is also linked to the
flag in Galaxy.[22]  Disciplinary letters issued by principals due to misconduct that have
not been substantiated by an investigatory body, such as a letter admonishing an
employee for lateness, may not serve as a basis for flagging an employee's name and
cannot be annexed to a flag.[23]

---

[19] Tr, at 73.
[20] Tr, at 81.
[21] Tr, at 90.
[22] Tr, at 81.
[23] Tr, at 108.

Case No. U-32479                                                                                                          -8-

Other documents that can be linked to a flag are those resulting from a disciplinary proceeding held pursuant to § 3020-a of the New York State Education Law (EL), but only if the employee was brought up on charges based on misconduct that is set forth in a disciplinary letter that meets the criteria for imposing a flag.  An award or settlement issued as part of such a proceeding can be attached to a flag, but only if the award or settlement includes a finding or admission of culpability relating to the initial disciplinary letter.[24]

A flag remains next to an employee's name as long as the underlying disciplinary letter remains in the employee's file.[25]  Rodi testified that the DSU will remove a flag or a document linked to a flag if an award issued in a EL § 3020-a disciplinary proceeding dismisses the charges against an employee based on a finding that the alleged misconduct did not occur, and if the award directs the District to remove the underlying disciplinary letter from the employee's personnel file.[26]  If an award finds that the misconduct occurred, but is insufficient for dismissal, the flag will remain next to the employee's name, because the underlying letter finding misconduct remains in the employee's personnel file.  The DSU will also remove a flag if a settlement requires it to remove the disciplinary letter on which the flag was based.  Similarly, the DSU will remove a flag if an employee successfully pursues a grievance challenging a letter on which a flag is based, and the grievance decision directs the District to remove that

---

[24] Tr, at 90-91.  The EL § 3020-a disciplinary charges are not linked to a flag.  Tr, at 109.
[25] Tr, at 113.
[26] Tr, at 95, 98.

Case No. U-32479                                                          -9-

letter from the employee's personnel file.[27]

      According to the District, all documents linked to a flag are already included in employees' personnel files.  Although the UFT is unable to view the flags and the documents linked to them, it does not dispute that the linked documents are intended to be limited to the discipline related documents in each individual's personnel files.  Those paper files are maintained at the school where an employee is currently employed, or was last employed.  Because the District has not digitized the entire contents of employee personnel files, principals cannot view them online.  To view a copy of an employee's personnel file, a principal considering whether to hire an employee must contact the school where the employee's file is kept, and request that a copy be made and sent to him or her.  A principal should see, in an employee's personnel file, any document that has been flagged in Galaxy.

      Rodi testified that the flag serves a purely informational function in assuring that a hiring principal is aware of flagged information.  She further testified that flagging an employee's name does not restrict an employee's ability to apply for a new position or impose any restriction or limitation on the employee.  Rodi testified that principals are not required to take, or refrain from taking, any action when an employee's name has been flagged; they may, if they so choose, hire an employee whose name is flagged.[28] Rodi testified that she personally knows principals who have hired employees whose

---

[27] Tr, at 113. The collective bargaining agreement between the parties includes a grievance procedure that allows employees to seek the removal of disciplinary letters from their personnel files.
[28] Tr, at 87-88.

Case No. U-32479

-10-

names are flagged in Galaxy.[29]

Other than those working in the DSU, only an employee's current principal and the principal who intends to hire the individual can view whether an employee's name is flagged in Galaxy.[30]  However, before their names are flagged, employees have received a copy of the letter of misconduct that is linked to the flag and have been advised that the document has been placed in their personnel file.

Amy Arundell, the UFT's Director of Personnel, testified that she first learned of the flagging system in October 2012 when Mathew Polisheck, a unit member, called her and told her that a principal rescinded his offer of a position and told him that he could not hire him because there was a flag on his file in Galaxy.[31]  After Polisheck contacted her, Arundell received complaints from other employees who stated that they had interviewed for a position and were later told that they could not be hired, or that the principal had reconsidered his or her decision, because a flag was placed on their file in Galaxy.[32]  In Polisheck's case, Arundell learned that the principal decided not to hire him after learning of the existence of a substantiated case of discipline against Polisheck and a EL § 3020-a disciplinary proceeding.[33]

Prior to the implementation of the flag symbols, principals could only view online an employee's service history, which shows whether an employee was rated effective or ineffective in his or her yearly evaluation, and whether an employee was suspended.[34]

---

[29] Tr, at 123.
[30] Tr, at 83.
[31] Tr, at 154-155.
[32] Tr, at 161.
[33] Tr, at 180.
[34] Tr, at 89, 126.

Case No. U-32479                                                                    -11-

To view an employee's disciplinary history, an "intending" principal would have to request the employee's personnel file from the employee's school.[35]

<u>DISCUSSION</u>

A public employer violates its duty to negotiate in good faith, in violation of § 209-a.1 (d) of the Act, when it unilaterally implements a change to a mandatorily negotiable term or condition of employment.[36]  We have long held that procedures for transfer and transfers themselves "are a mandatory subject of negotiations."[37]

On remand, the ALJ reassessed her prior finding that Rodi's testimony demonstrated that "[e]mployees may inquire through the UFT whether their name has been flagged in Galaxy *and what documents are linked to a flag*."[38]  As the ALJ correctly noted, we held that, although Rodi's testimony supports the first part of her finding, it does not support the latter part of that finding, and hence we remanded this issue for a full review of the record.[39]

On her review of the record, the ALJ concluded that the record does not support a finding that employees may inquire through the UFT to learn what specific documents

---

[35] Tr, at 78.

[36] *See, eg, Town of Islip v NYS Pub Empl Relations Bd*, 23 NY3d 482, 484, 47 PERB ¶ 7006 (2014); *Patchogue-Medford Union Free Sch Dist*, 30 PERB ¶ 3041, 3094 (1997); *Monticello Cent Sch Dist*, 22 PERB ¶ 3002, 3008 (1989), *enforced* 22 PERB ¶ 7022 (Sup Ct, Albany County 1989).

[37] *City of Buffalo*, 9 PERB ¶ 3024, 3040 (1976); *see also White Plains PBA*, 9 PERB ¶ 3007, 3009 (1976) ("Assignment of 'both permanent jobs and work details on the basis of preference and seniority is a term and condition of employment and thus a mandatory subject of negotiations.'"), quoting *City of Albany [Albany Firefighters]*, 7 PERB ¶ 3142, 3147 (1974).

[38] 52 PERB ¶ 3009, at 3043 (emphasis added by the ALJ).

[39] 51 PERB ¶ 4561, at 4764.

Case No. U-32479                                                                                     -12-

are linked to a flag."[40]

From there, the ALJ moved to consideration of the impact of this finding on the

claims before her.  The ALJ's findings of fact and law here are instructive:

> The record is clear that flagging affects principals' decision whether
> to select a teacher for a position in his or her school.  Principals see
> flags, and the documents linked to a flag, when they are in the
> process of selecting a teacher for a position in their school.  At that
> point, the decision to select a teacher is not final.  In fact, the
> purpose of the flagged procedure is to give principals the opportunity
> to consider, or reconsider, their decision once they have viewed the
> flagged documents.
>
> Although the flagged documents are included in an employee's
> official school file, the record shows that principals are not required
> to, and often do not, request a copy of a teacher's entire official file
> before finally deciding whether to select an employee for a position in
> their school.  That is apparent from the fact that the record shows
> that only *if* a principal makes that request does the principal receive
> a copy.  It is also apparent from the fact that the flagging system was
> created for that reason; that is, principals had placed employees in
> their school without being aware of the employees' negative
> disciplinary history involving serious matters.
>
> Further, when viewing flagged documents, principals are viewing
> only negative information contained in an employee's file, without
> any information that might counter-balance the negative information,
> such as years of positive observation reports or other positive
> material, that may affect a principal's decision whether or not to
> select an employee for a position.  The record also shows that, in
> certain cases, letters annexed to a flag will be inaccurate if an
> employee is found, in arbitration, to have not engaged in the conduct
> set forth in a file letter, or to have engaged in a less severe
> misconduct.[41]

---

[40] 54 PERB ¶ 4522, at 4652.  As neither the District nor the UFT submitted additional
evidence, the ALJ relied on the evidence at the hearing before her; in her review, she
based her determination on the limited information Arundell received from Rodi, that is,
whether specific individuals had been flagged, and not the documents attached to the
flags.  *Id*.
[41] 54 PERB ¶ 4522, at 4563.

Case No. U-32479

As the ALJ found, Rodi testified that flagged letters are only removed from Galaxy if the arbitration award specifically directs that the letter be removed from a teacher's official file. Therefore, a principal may view a flagged letter when the conduct underlying that letter has been held in arbitration to either not have occurred or to have occurred in a different manner or degree than that which is set forth in the flagged letter, if the arbitration award does not specifically direct removal of the letter.

The ALJ's factual determinations, particularly her credibility determinations, "are generally entitled to great weight unless there is objective evidence in the record compelling a conclusion that the credibility finding is manifestly incorrect."[42]  No such objective evidence has been raised before us.  The ALJ reasonably exercised her discretion in taking a closer look at the specific testimony of both Arundell and of Rodi on remand.  Moreover, both parties had the opportunity to submit further evidence on the factual issues.  Neither availed themselves of the opportunity, and they are now bound by the evidence they chose to submit.

We affirm the ALJ's finding that the District made a change to the procedures to be used to fill a position, a mandatory subject of negotiations.  Prior to the implementation of the "flagging" system, an "intending" principal who wished to see an employee's disciplinary history would request the employee's full personnel file from the employee's school.  The personnel file would include not only the employee's negative

---

[42] *Pine Valley Cent Sch Dist*, 51 PERB ¶ 3036, 3160 (2018), quoting *Village of Scarsdale*, 50 PERB ¶ 3007, n 51 (2017), *confd sub nom Village of Scarsdale v NYS Pub Empl Relations Bd*, 55 PERB ¶ 7008 (2d Dept 2022).  *See also Pleasantville Union Free Sch Dist*, 51 PERB ¶ 3024, 3100 (2018); *Village of Endicott*, 47 PERB ¶ 3017, 3051 (2014).

Case No. U-32479

-14-

disciplinary history, but also any positive history, such as positive performance evaluations, commendations from managers, and awards, that might counterbalance the disciplinary history.  Under the new "flagging" system, however, such positive history is no longer available to "intending" principals, who receive only negative information on employees they intend to hire.

Moreover, prior to the change at issue here, whether to look at the personnel file at all was left to an "intending" principal's discretion.  Now, the negative portion of an employees' personnel file is fed automatically to "intending" principals regardless of whether they express a desire to see the employee's personnel file or not.  As the District concedes, this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

These changes, both the automatic nature of providing the information and providing solely the negative portions of the employee's personnel file, represent changes to the prior procedure as to effectuating transfers within the District.  These changes have an adverse effect on employees' terms and conditions of employment as the "intending" principle receives a purely negative, decontextualized version of the personnel file, unlike in the past, where "intending" principals, if they saw the personnel file at all, would see the full personnel file, including both positive and negative history.  Consistent with our prior precedent, we find these unilateral changes to the procedure used to fill positions affect terms and conditions of employment, and are a mandatory

subject of bargaining.[43]  For that reason, we affirm the ALJ's finding that the District violated the Act.

We do not find the adoption of flagging to be in and of itself a disciplinary action. The record is clear that teachers who have been flagged remain eligible to apply for transfers just as do their colleagues who have not been.  Rather, we grant relief because of the unilateral change of procedures impacting terms and conditions of employment—here, by procedurally incentivizing principals to peruse and assess prior discipline, or, at a minimum, requiring them to acknowledge the existence of such discipline.  For these reasons, we find that the unilateral adoption of this new procedure without negotiation with the UFT violates § 209-a.1 (d) of the Act.

The charge also states that "[i]n addition, none of the affected employees would have an opportunity to review the information upon which the 'flag symbol' was entered or to ascertain or contest whether the disciplinary action the entry is based on actually occurred or is in error."[44]  Later in the charge, the UFT asserts that the District "failed to bargain in good faith over a mandatory subject of bargaining—employee discipline, *transfer* and other personnel actions—and therefore committed an improper practice

---

[43] *See Niagara Falls Police Captains and Lieutenants Assn*, 33 PERB ¶ 3058, 3161 (2000) ("We have held . . . that the procedures to be used to fill a position . . . are a mandatory subject of negotiation."), citing *Schenectady Patrolmen's Benevolent Assn*, 21 PERB ¶ 3022 (1988); *Dutchess County BOCES Faculty Assn, NEA/NY*, 17 PERB ¶ 3120 (1984), *confd sub nom Matter of Dutchess County Bd of Coop Educ Serv,* 122 AD2d 845, 19 PERB ¶ 7018 (2d Dept 1986); *White Plains Police Benevolent Assn*, 9 PERB ¶ 3007 (1976).  *See also Dutchess Community College and County of Dutchess*, 46 PERB ¶ 3009, 3016 (2013).  *See generally City of Watertown v State of NY Pub Empl Relations Bd*, 95 NY2d 73, 33 PERB ¶ 7007 (2000) ("bargaining is mandatory if the procedures qualify as a "term and condition" of employment").
[44] Charge, ¶ 6.

Case No. U-32479

-16-

under the Act."[45]  Among the relief sought, the charge requested an order "compelling the Board to negotiate in good faith with the UFT regarding the implementation, procedures for and impact of the employee 'flag symbols.'"[46]

We note that we have long held that "the right of an employee to review his personnel file bears a direct and significant relationship to working conditions, including possible demotion, promotion, and discipline, rendering the demand mandatorily negotiable."[47]  Here, the District has culled out the disciplinary history portion of the personnel file, and made only that portion easily and immediately available for principals to consult in determining whether or not to finalize the decision to grant an employee's request to transfer, or an application to a promotional position.  Indeed, by requiring the "intending" principal to acknowledge that she is aware that the employee has a disciplinary history, the District has created an incentive for the "intending" principal to consult the digitized materials.

The convenience of accessing the digital excerpt from the personnel file, rather than taking the steps to obtain the full paper file, mean that the excerpted digital materials are more likely than not to be used in place of the full file in making decisions as to transfers, promotions and other lateral hiring or recall decisions.  However, as the UFT has alleged, and the District has admitted, neither the UFT nor the individual

---

[45] Charge, ¶ 9 (emphasis added).
[46] Charge, ¶ 12.
[47] *City of Schenectady*, 21 PERB ¶ 3022, 3049 (1988); *Town of Carmel,* 29 PERB ¶ 3053, 3121-3122, n 3 (1996) ("notice of entries in personnel files" a mandatory subject). *See  generally Niagara Falls Police Club (Drinks-Bruder)*, 52 PERB ¶ 3007, 3029 (2019) (union satisfied its statutory obligation by successfully resolving a previously filed unit-wide grievance in the matter so that everyone, including the charging party, had the opportunity to review their personnel files).

Case No. U-32479

employee has the ability to access the "flag symbol" and the materials attached thereto, to ascertain if they are in fact materials that have been properly placed, and properly remain, in the personnel file.

The reasons that underlay our finding in *City of Schenectady* that access to paper personnel files is a mandatory subject apply with full force and vigor to these digitized disciplinary history excerpts, which are every bit as likely, if not more so, to affect working conditions, including transfer, promotion and other opportunities. We therefore find that the District violated § 209-a.1 (d) of the Act by unilaterally instituting the flagging system without having negotiated with the UFT as to notification to employees that they have been "flagged" and access to the materials attached to the "flag symbol" sufficient to permit verification that such materials were placed in the employees' personnel files and properly remain within them.

These same factors lead us to conclude that the flagging system is not, as the District argued, a mere optional "opportunity to learn about an employee's prior history-similar to checking reference[s] before making a hiring decision." Moreover, the District concedes that this data is meant to be taken into consideration by the "intending" principals as they make their hiring decisions.

Taken as a whole, then, the flag, the dialogue boxes encouraging the intending principals to either review the flagged documents, seek information through Senior Field Counsel or the CFN HR Director, and the requirement, prior to finalizing or canceling the transaction, that the "intending" principal acknowledge the existence of the disciplinary history, effectively amount to the addition of a new procedure with respect to

Case No. U-32479

-18-

such transfers.

Additionally, the flagging process may reasonably be found to establish a new criterion for such appointments, that is, the consideration of the applicant's disciplinary history.  As we have long held, a "criterion for appointment or promotion is a managerial prerogative beyond the scope of mandatory negotiation, if applicable only to prospective employees or to future promotion of current employees."[48]  The same considerations and the same result applies to criteria for transfers.[49]  Accordingly, we find that the UFT did not establish a violation of § 209-a.1 (d) of the Act by requiring principals to consider the disciplinary history of applicants for transfer or promotional positions.

However, we affirm the ALJ's finding that the "flagging" process is a mandatory subject of negotiations to the extent that the process affects terms and conditions of employment by denying employees notice that they have been "flagged" and an opportunity to view the materials attached to the "flag symbol" and to contest its appropriateness for inclusion as part of the personnel file.  To the extent that the District has imposed a new criteria for transfer and promotional applications, the consideration of the applicant's disciplinary history, we find that no violation of the Act has been established.  We note that our decision is made without prejudice to the right to bargain upon demand the impact of this decision.

---

[48] *Rensselaer City Sch Dist*, 13 PERB ¶ 3051, 3084-3085 (1980).  *See also City of Niagara Falls*, 33 PERB ¶ 3058, 3161-3162 (2000); *City of Buffalo*, 29 PERB ¶ 3023, 3053 (1996) (qualifications non-mandatory); *Addison Cent Sch Dist*, 13 PERB ¶ 3060, (1980) (criteria for promotion non-mandatory); *see generally Levitt v Bd of Collective Bargaining of the City of NY*, 79 NY2d 120, 128, 29 PERB ¶ 7516 (1992).
[49] *City of Schenectady*, 21 PERB ¶ 3022, at 3050-3051.

Case No. U-32479

IT IS, THEREFORE, ORDERED that the District will forthwith:

1.      Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file; and

2.      Sign and post the attached notice at all physical and electronic locations customarily used by it to post notices to unit employees.

DATED:  June 13, 2022
      Albany, New York

_____
John F. Wirenius, Chair

_____
Anthony Zumbolo, Member

_____
Rosemary A. Townley, Member

# NOTICE TO ALL EMPLOYEES

**PURSUANT TO**
**THE DECISION AND ORDER OF THE**

**NEW YORK STATE**
**PUBLIC EMPLOYMENT RELATIONS BOARD**

**and in order to effectuate the policies of the**

**NEW YORK STATE**
**PUBLIC EMPLOYEES' FAIR EMPLOYMENT ACT**

**we hereby notify all employees of the Board of Education of the City School District of the City of New York (District) in the unit represented by the United Federation of Teachers, Local 2, AFT, AFL-CIO (UFT), that the District will forthwith:**

1. Negotiate in good faith with the UFT procedures by which unit employees who have been the subject of discipline are notified that they have been "flagged" in its "Galaxy" computer system, are able to verify the accuracy and propriety of inclusion of supporting documentation attached to the flag symbol, and seek removal of such materials as are not properly part of the personnel file.

**Dated . . . . . . . . . .        By . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**

on behalf of the **BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK**

*This Notice must remain posted for 30 consecutive days from the date of posting, and must not be altered, defaced, or covered by any other material.*

# Exhibit 16

SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT:    ALICE SCHLESINGER                    PART IA PART 16
                    _____
                              *Justice*

Philomena Brennan                    INDEX NO. _112977/09_

                                     MOTION DATE _____

- v -                                MOTION SEQ. NO. _001_

NYC Dept of Education                MOTION CAL. NO. _____

The following papers, numbered 1 to _____ were read on this motion to/for _____

|                                                              | PAPERS NUMBERED |
|--------------------------------------------------------------|-----------------|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____               | _____ |
| Replying Affidavits _____                           | _____ |

**Cross-Motion:**  ☒ Yes    ☐ No

Upon the foregoing papers, it is ordered that this ~~motion~~ Article 78 proceeding and respondent's cross-motion to dismiss are determined in accordance with the accompanying memorandum decision.

**UNFILED JUDGMENT**
This Judgment has not been entered by the County Clerk and notice of entry cannot be served based hereon. To obtain entry, counsel or authorized representative must appear in person at the Judgment Clerk's Desk (Room 141B).

JUL 13 2010

Dated: _July 13, 2010_                    ALICE SCHLESINGER J.S.C.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE FOR THE FOLLOWING REASON(S):**

Check one:  ☒ FINAL DISPOSITION    ☐ NON-FINAL DISPOSITION

Check if appropriate:  ☐ DO NOT POST    ☐ REFERENCE

☐ SUBMIT ORDER/JUDG.    ☐ SETTLE ORDER /JUDG.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------------X

In the Matter of the Application of

PHILOMENA BRENNAN,

                                    Petitioner,                    Index No. 112977/09
                                                                   Motion Seq. No. 001

For An Order and Judgment Pursuant to Article 78 of
the Civil Practice Law and Rules,

              -against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

                                    Respondent.

--------------------------------------------------------------------------X

**SCHLESINGER, J.:**

        Petitioner Philomena Brennan, a tenured teacher, commenced this Article 78

proceeding against the New York City Department of Education (DOE) seeking to have her

name removed from the DOE's Ineligible/Inquiry List, as the basis for the listing was a

criminal complaint against her that was long ago dismissed. In addition, Ms. Brennan seeks

to compel the DOE to allow her to withdraw the resignation she submitted when the

criminal charges were first filed. The DOE has moved to dismiss, contending that

petitioner's challenge to the listing is time-barred. With respect to the resignation issue, the

DOE has sought dismissal for failure to state a cause of action, alleging that no

administrative decision exists on that issue for this Court to review and that Ms. Brennan

must pursue contractual remedies under her collective bargaining agreement before

coming to court.

        The background facts are set forth in this Court's May 12, 2010 interim decision and

will be briefly reviewed here.

At the time in question, the spring of 2006, Ms. Brennan was working as a full-time teacher at Frederick Douglas Academy in Brooklyn. Toward the end of the school year, the principal Tamika Matheson advised Ms. Brennan that she was giving her an unsatisfactory rating, the first she had ever received. Following their discussion, Ms. Brennan formally resigned from her teaching position, but she thereafter did some substitute teaching.

Some years later, having decided to take steps to withdraw her resignation, Ms. Brennan returned to the school on January 30, 2009 to speak with the principal. According to Ms. Brennan, she saw the principal and was escorted to her office and told to wait. About ten minutes later she was arrested, handcuffed and charged with the misdemeanor of trespass and the violation of harassment. In accordance with the rules, Ms. Brennan promptly reported the arrest to the DOE.

Due to the arrest, Ms. Brennan was placed on the DOE's Ineligible/Inquiry List, making her ineligible for rehire or for a teaching assignment. Six months later, on June 10, 2009, all criminal charges were dismissed against Ms. Brennan. Within a day or so, Ms. Brennan formally requested that the DOE remove her name from the Ineligible/Inquiry List based on proof of that dismissal, but despite some follow-up meetings, she received no response to her request. She commenced this proceeding in September 2009; as of May 12, 2010 when oral argument was held, Ms. Brennan had still not received a decision on her request to be removed from the List. Nor had she been able to withdraw her resignation.

Following oral argument, this Court issued an interim decision dated May 12 denying the DOE's motion to dismiss the proceeding as time-barred. The Court further directed the

2

DOE to promptly determine Ms. Brennan's request to have her name removed from the Ineligible/Inquiry list and to appear again on July 7, 2010 for further argument.

On July 7, counsel for the DOE appeared with a copy of an undated letter addressed to Ms. Brennan and signed by Santiago Taveras, IA Deputy Chancellor Teaching and Learning (as designee for Joel I. Klein, Chancellor). The letter is brief, consisting of only two sentences. In it, Deputy Chancellor Taveras indicates that he has carefully considered the matter and "determined to sustain the recommendation regarding removal of [Ms. Brennan's] name from the Invalid/Inquiry List."

While the letter does not include an effective date, it can only logically be construed as having an effective date of June 11, 2009, the date when Ms. Brennan applied to have her name removed from the Ineligible/Inquiry List based on the dismissal of the criminal charges. As no legal basis existed for keeping Ms. Brennan's name on the List after that point, the DOE should have acted promptly to remove the name so Ms. Brennan could be considered for rehire as a substitute teacher.

Somewhat more complex is Ms. Brennan's request for relief based on her failed attempts to withdraw her resignation as a full-time teacher. Ms. Brennan was not eligible to withdraw her resignation until her name was removed from the Ineligible/Inquiry List. Now that that has been accomplished, she may apply to withdraw her resignation by following the set DOE procedures, whatever they may be. As respondent correctly argues, no DOE decision exists determining that issue for this Court to review in this proceeding. Therefore, that part of petitioner's request for relief is premature, and the DOE's cross-motion to dismiss that claim for failure to state a cause of action is granted. As no other issues are extant, no further submissions or appearances by either party are necessary.

3

Accordingly, it is hereby

ORDERED that respondent's cross-motion to dismiss this proceeding as time-barred is denied in accordance with this Court's May 12, 2010 interim decision; and it is further

ADJUDGED that the petition is granted insofar as it requests the removal of the name of Philomena Brennan from the Ineligible/Inquiry List maintained by respondent New York City Department of Education, effective June 11, 2009; and it is further

ORDERED that respondent's cross-motion to dismiss petitioner's claim regarding the withdrawal of her resignation as a teacher is granted, and that claim is dismissed without prejudice and without costs or disbursements to either party.

This constitutes the final decision, order and judgment of this Court.

Dated: July 13, 2010

JUL 1 3 2010

_J.S.C._
**ALICE SCHLESINGER**

**UNFILED JUDGMENT**
This judgment has not been entered by the County Clerk and notice of entry cannot be served based hereon. To obtain entry, counsel or authorized representative must appear in person at the Judgment Clerk's Desk (Room 141B).

4

# Exhibit 17

| From: | Paulson, Susan (Law) |
|---|---|
| To: | Sujata Gibson; bblack@nelsonmaddenblack.com; Jonathan Nelson; Sarah Child |
| Cc: | Dearing, Richard (Law); Slack, Devin (Law) |
| Subject: | FW: Appeal Panel Decision Summaries |
| Date: | Monday, December 13, 2021 4:27:15 PM |

Counsel,

I am forwarding to you the below summaries of the reasons for the decisions on your clients' appeals, which I received at 3:02 p.m. from the Citywide Panel.

Susan

Susan Paulson
Senior Counsel │ Appeals Division
New York City Law Department
100 Church Street
New York, New York 10007
(212) 356-0821 │ spaulson@law.nyc.gov

The summaries of the reason for the decision in each appeal is below:

**APPEAL NO. 00004822, Sarah Buzaglo**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Buzaglo's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination. Rather, the appellant's decision not to vaccinate comes from non-religious sources: a belief that the mandate is unconstitutional – a legal contention that has been rejected by courts of competent jurisdiction -- and factual beliefs about the vaccination that conflicts with the factual findings of the DOHMH Commissioner in imposing the mandate.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004823, Matthew Keil**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Keil's reasonable accommodation. One panel member found that appellant articulated a sincerely held religious belief that precludes vaccination and be entitled to a reasonable accommodation if one did not present an undue

hardship.  The others did not reach this issue because the panel determined that a religious accommodation cannot be granted because, even assuming a valid basis for a reasonable accommodation, the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004824, Ingrid Romero**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Romero's reasonable accommodation. The record before the Panel demonstrated that the employee's articulated religious beliefs do not appear to be the basis for the appellant's decision not to vaccinate in view of the fact that she has previously accepted comparable medical treatments.  While the appellant claims that she changed her views three years ago, she points to no examples to demonstrate how she has acted on these changed beliefs outside the specific context of COVID-19 vaccines.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004825, Heather Clark**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Clark's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Rather, the appellant's decision not to vaccinate comes from non-religious sources:  a fact-based review of CDC information about the vaccine and concerns about vaccine efficacy.  Supplemental questions further support the conclusion, at bottom, that the appellant is making fact-based choices about foods and medicines.

One panel member would also deny the reasonable accommodation on the grounds of undue hardship.  One panel member believes appellant has sufficiently established a sincerely held religious belief that precludes vaccination, and would vote to grant the accommodation sought.

**APPEAL NO. 00004826, Robert Gladding**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Gladding's reasonable accommodation.  The record before the Panel demonstrated that the employee's sincerely held

religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his view of the facts and circumstances and his documentation from clergy likewise supports this understanding.  In this case, appellant acknowledged he considered whether to take the vaccine and ultimately chose not to.  The appellant is not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004827, Michael Kane**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Kane's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Indeed, the appellant explains his understanding of the religious doctrine articulated is that it is ultimately appellant's choice to take or abstain from food and medication based on his factual determination as to whether he considers the item to contain pollutants.  Appellant, despite being given an opportunity to do so, did not list any substances that fall into this category. The appellant is not entitled, under the law, to a reasonable accommodation concerning his personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004828, Stephanie DiCapua**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant DiCapua's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.  Rather, it appears the employee's decision to refuse vaccination is based on her factual views of the COVID-19 mandate and vaccine.  The employee did not provide, beyond the most general response, any examples of other medications or specific vaccines she has refused due to her articulated religious belief.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004829, Nwakaego Nwaifejokwu**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Nwaifejokwu's reasonable accommodation. The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.

**APPEAL NO. 00004830, Sasha Delgado**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Delgado's reasonable accommodation. The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief she articulated would preclude her from vaccination. While appellant said she would abstain from other medication should she learn similar things about its development, the only medication in which appellant seems to have had sufficient concern to research whether it was tested on such cells is the COVID-19 vaccine. Indeed, appellant suggests that she may have taken similar medications in the past based on the "belief" that they were not tested on fetal cells. These responses strongly indicate appellant is taking a different approach with respect to the COVID-19 vaccine than she does in analogous circumstances.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004831, Margaret Chu**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Chu's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the

panel does not question, are not preventing the employee from vaccination. Indeed, the religious doctrine articulated provides, ultimately, for appellant to choose to take or abstain from vaccination based on her view of the facts and circumstances. The appellant is not entitled, under the law, to a reasonable accommodation concerning her personal, fact-based decision not to take the vaccine.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population. DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004832, John Deluca**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Deluca's reasonable accommodation. The record before the Panel demonstrated that the employee holds sincerely held religious beliefs sufficient to justify a reasonable accommodation if such accommodation did not present an undue hardship. However, the panel believes the DOE has successfully demonstrated that an accommodation, in appellant's case, would create an undue hardship if granted. Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.

**APPEAL NO. 00004833, William Castro**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to REVERSE the DOE's determination and grant Appellant Castro's reasonable accommodation. The record before the Panel demonstrated, to the satisfaction of two panel members, that the employee has sufficiently established that he holds sincerely held religious beliefs, of which he and his family have consistently adhered to, that require appellant to abstain from vaccination. The other panel member would deny the accommodation on the ground that the record demonstrates the appellant's choice not to vaccinate is a result of his personal decision, not a religious practice or belief.

The record is unclear whether the DOE denied appellant's accommodation because it believed the accommodation presented an undue hardship. In any event, the DOE did not respond to the panel's request for specific details about such an argument if it did. However, we note that, as part of the accommodation, the DOE may, if it so chooses, reassign appellant to a non-classroom position in order to comply with the Health Commissioner's mandate that unvaccinated individuals should not be present in schools or around children.

**APPEAL NO. 00004834, Trinidad Smith**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has

voted to AFFIRM the DOE's determination to deny Appellant Smith's reasonable accommodation. The record before the Panel demonstrated that the employee's sincerely held religious beliefs, which the panel does not question, are not preventing the employee from vaccination.   Indeed, the appellant, in his documentation, refused to rule out use of such medications if ultimately it was a necessary medical intervention for him instead noting, thus far, he has had no such occasions to require medication and had not previously been vaccinated.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

**APPEAL NO. 00004835, Dennis Strk**

After carefully reviewing the documentation provided by all parties, the Citywide Appeal Panel has voted to AFFIRM the DOE's determination to deny Appellant Strk's reasonable accommodation.  The record before the Panel demonstrated facts that cast doubt on appellant's claim that the religious belief he articulated would preclude him from vaccination.  Specifically, appellant's responses are equivocal with regard to how acts on the articulated belief outside of the specific context of COVID-19 vaccination.  For example, appellant does not deny using medications that are tested on fetal cell lines, only that he tends to "avoid" them and pursue alternatives if available.   The submissions demonstrate the appellant is making a fact-based decision concerning vaccination and, in doing so, relying on incorrect facts regarding COVID-19 vaccines, such as that all COVID vaccines contain fetal cells.

Even assuming the appellant had established a valid basis for a reasonable accommodation, the panel believes the DOE has satisfied what is necessary under the law to demonstrate undue hardship.  Appellant is a classroom teacher who, under the present circumstances, cannot physically be in the classroom while unvaccinated without presenting a risk to the vulnerable and still primarily unvaccinated student population.  DOE has met its burden under the law that diverting the appellant from classroom duties constitutes an undue hardship.

# EXHIBIT 18

September 13th, 2021

To whom it may concern,

      **My name is R    F.    , my employee ID is #....... I have been employed with the NYCDOE for 20 years now. I am extremely proud of all the work I've done with the communities of the Bronx that I've had the privilege of working with. I am currently an Assistant Principal with Frederick Douglas Academy V in the Bronx.**

      **"Religious liberty is a foundational principle of enduring importance in America enshrined in our Constitution and other sources of Federal law."** I know that the law in this Country allows for personal religious beliefs and that's what makes me so proud to be an American, where my beliefs and freedoms are protected. I get to work in a city that is literally called the Melting Pot of the Country. It is filled with all different cultures and religions and we can live together respecting and encouraging one another's differences.

      My faith, and religious journey is the most important thing in my life. I am a devout Christian; my life is led by the Holy Spirit that lives inside of me. It is my religious belief that my God is my healer and I put all my faith and hope in Him. It is my religious belief that it is a complete betrayal of faith to put my hope and faith in any vaccine to keep my body healthy. My God will heal me and my family. We have all contracted covid and He kept us all, safe and whole.

      Any blood that may be in any vaccines is sacrilegious and I cannot allow my body to be corrupted or made unclean. 1 Corinthians 3:17 "If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple". Exodus 15:26 "I am the Lord that heals you." Fetal cells that may be used in creating this vaccine, goes against my stance on abortion. As a Christian I am against murder. Exodus 20:13 "You shall not murder." Therefore, taking this vaccine will desecrate my body. Even though I have been fully vaccinated in my childhood, that choice was performed by the choices of my non-religious parents, whom I loved dearly. As an adult, husband and father, I choose to live out my life through God's command from His Holy word, the Bible.

      My faith and relationship in God are what helps guide my life and helps me discern what is needed to keep my body in line with the Word of God. I am created in the image of God. My body/blood is a sacred being and must remain pure in the sight of God. Taking this vaccine or any other vaccine for that matter would go against everything I believe and base my life upon.

      I ask that you please keep this confidential, I am only sharing these personal things so you could have a better understanding of my declination of this vaccine due to my religious beliefs. Please understand my convictions. Thank you for your time and consideration.

                                          Sincerely,

                                            R.    F

# EXHIBIT 19

| STATE OF NEW YORK EDUCATION DEPARTMENT |
| --- |
| |
| |
| In the Matter of the Arbitration of Education Law § 3020 (a) Proceedings |
| |
| Elmira City School District, Employer, |
|          -against- |
| Theresa Usack Armstrong, Respondent |
| |
| |



Subject: SED File # 6,371

Nancy Faircloth Eischen, Arbitrator

### Appearances

For the Employer:

> SAYLES & EVANS. LLP
> By:
>     James Young, Esq.

For the Respondent:     SCHOOL ADMINISTRATORS
ASSOCIATION OF NEW YORK STATE
By:
    Arthur Scheuremann, Esq.
    Robert Fullem, Esq.

## PROCEEDINGS

The NY State Education Department designated me hear this case and issue an Opinion and Award, under the terms of Section 3020 (a) of the Education Law.  Hearings were held on September 2 and 3, 2009, November 5 and 6, 2009 and January 28 and 29, 2010, in Elmira, N. Y.  Both Parties were represented by Counsel and afforded full opportunity to present testimony subject documentary evidence, testimony subject to cross-examination and oral argument in support of their positions.   Ms. Theresa Usack Armstrong (hereinafter "Usack" or "Respondent") was present throughout the proceedings and testified as a witness in her own behalf.  Following receipt of the transcribed stenographic record, Counsel for the Parties submitted and exchanged post-hearing briefs, whereupon the record was declared closed.

## ISSUES

1)    Did the Elmira School District have just cause to suspend the Grievant, Theresa Usack Armstrong?

2)    If not, what shall be the remedy?

## PERTINENT STATUTORY PROVISIONS

## NEW YORK STATE EDUCATION LAW

**Section 3012**

[Teachers] ... shall hold their respective positions during good behavior and efficient and competent service, and shall not be removed except for any of the following causes, after a hearing, as provided by section three thousand twenty - a of such law: (a) insubordination, immoral character or conduct unbecoming a teacher, (b) inefficiency, incompetency, physical or mental disability, or neglect of duty-, (c) failure to maintain certification.
*  *  *

2

**Section 3020**

1. No person enjoying the benefits of tenure shall be disciplined or removed during a term of employment except for just cause and in accordance with the procedures specified in section three thousand twenty-a of this article.

*** 

**Section 3020-a**

*4. Post hearing procedures.* (a) The hearing officer shall render a written decision within thirty days of the close of the hearing ... , and shall forthwith forward a copy thereof to the commissioner of education who shall immediately forward copies of the decision to the employee and to the clerk or secretary of the employing board. The written decision shall include the hearing officer's findings of fact on each charge, his or her conclusions with regard to each charge based on said findings and shall state what penalty or other action, if any, shall be taken by the employing board. At the request of the employee, in determining what, if any, penalty or other action shall be imposed, the hearing officer shall consider the extent to which the employing board made efforts toward correcting the behavior of the employee which resulted in charges being brought under this section through means including but not limited to: remediation, peer intervention or an employee assistance plan.  In those cases where a penalty is imposed, such penalty may be a written reprimand, a fine, suspension for a fixed time without pay, or dismissal.  In addition to or in lieu of the aforementioned penalties, the hearing officer, where he or she deems appropriate, may impose upon the employee remedial action including but not limited to leaves of absence with or without pay, continuing education and/or study, a requirement that the employee seek counseling or medical treatment or that the employee engage in any other remedial or combination of remedial actions.

## BACKGROUND

Theresa Usack Armstrong, formerly known as Theresa Armstrong ("Ms. Usack" or "Respondent"), entered employment with the Elmira New York School District, ("District") in March 2002.  Her initial probationary appointment was as an Assistant Principal position at Southside High School ("SHS"), under Principal Lisa Kelly. Principal Kelly and Assistant Principal Usack were assigned at SHS, and later Ernie Davis Middle School ("EDMS"), as part of a special team of professional educators charged by the State Education Department ("SDE") with implementing Commissioner of Education directives to develop a corrective action plan for the District's chronically underperforming District schools. Such corrective action plans for SINI-listed schools

3

can involve school reorganization, staff removal and re-assignment or closing the school. To no one's great surprise, such corrective plan work can often generate a push back response of procrastination, resistance and hostility, including both covert and open political action, by affected teachers, parents and other community members.

Based on her performance of this difficult work during the 8 months following her probationary appointment, the District's then Board of Education promoted Ms. Usack to Acting Principal of SHS, when Principal Kelly took a medical leave of absence. To enable Usack to continue the politically controversial remediation work unimpeded, the Board at that time also granted Ms. Usack early tenure; followed soon thereafter, by a merit pay increase. Based upon continued superior job performance, from the time of her initial appointment in 2002 to the present, Ms. Usack has received consistently positive performance evaluations from her professional educator supervisors.

At the request of then Superintendent Bryant, Ms. Kelly agreed to implement remedial corrective action at the still under-performing EDMS, on condition that the District also assign Ms. Usack to the remediation team. Thus, in the 2005-2006 school year, Superintendent Bryant's administrative team at EDMS consisted of Principal Lisa Kelly, Assistant Principal Theresa Usack and Assistant Principal Mack Knight. At that time, after 5 consecutive years on the SINI list, EDMS had been placed on the SED's list of "School Under Registration Review" ("SURR"). In the performance of corrective action plan implementation duties, Ms. Usack and the rest of the team met predictable resistance from affected EDMS teachers and parents. One of the EDMS teachers who expressed and displayed open animosity to Assistant Principal Usack, in particular, was Ms. Ginger Woolever; a teacher with whom Usack previously had worked in another school district.

The charges under arbitral review arose out of an incident during a field trip by the 8th grade class of Ernie Davis Middle School ("EDMS"), on April 7, 2006. EDMS teachers Ginger Woolever and Jeremy Sager planned and directed that excursion. They had originally set up a day trip to a nearby amusement park for most of the class, which excluded certain students they deemed to have "discipline problems". After Principal Kelly disapproved that plan, a more educational trip to Washington, D.C. was arranged, to which the entire 8th grade class, approximately two hundred (200) students, was invited.

Assistant Principals Knight and Usack were designated to accompany Ms. Woolever on that trip and subsequently asked to serve, along with teachers and volunteer parents, as "chaperones". When the two assistant principals were first asked to participate, neither were assigned students to supervise. However, approximately one week prior to the trip, Organizer G. Woolever informed Principal Kelly that there were "certain" students that "no one wants to supervise". At that time, Ms. Kelly asked Knight and Usack each to take on a group of those students for supervision throughout the trip.

Specifically, Ms. Usack was assigned students SH, PD, RD and CG, all described by Principal Kelly as "somewhat troubled girls" with whom Ms. Usack had "good rapport". For his part, Mr. Knight was assigned a group of five (5) boys, among them student IH, whose presence is particularly pertinent to one of the the incidents giving rise to the charges against Usack. Finally, Elmira Police Officer ("PO") Johnson, described by Ms. Woolever as the "School Resource Officer" assigned to EDMS, also was on the trip. He did not directly supervise any of the student participants, but rather was asked to attend in an "administrative" capacity.

5

On the evening of April 3, 2006, four days before departure, at a meeting with parents to which Assistant Principals Knight and Usack were not invited, Woolever presented the set of *ad hoc* instructions she had worked up for the trip. As of April 2006, there was neither a District policy nor standardized rules relating to the conduct of class trips. As noted, below, central office administrators pointed out the policy void surrounding the Washington, D.C. trip when they tried, unsuccessfully, to dissuade the then Board of Education from pursuing the instant charges against Ms. Usack. That Board did later articulate some supervisory standards of conduct in a new class trip policy enacted after the fact, which Superintendent Bryant distributed in a subsequent email notice to staff and principals advising them of the new policy.

On April 4, 2006, Woolever distributed her instructions for the upcoming trip to participants, including Knight and Usack, as an email attachment she labeled "DC for Dummies", including: "Students are expected to stay with their chaperones at all times [and] "students and chaperones need to be back on the bus (parked at the Lincoln Monument) by 7:55 PM. We leave at 8:00 PM sharp." Of note, all of the chaperones were also instructed to exchange cell phone numbers with one another, to "be available at all times" throughout the trip and to "call Johnson, Sager or Woolever if you have any problems".

The record demonstrates that almost nothing went right or according to plan on that April 7, 2007 trip from Elmira to Washington, D.C. The five buses from "Covered Wagon Tours" were about 15 minutes late for the 3:15 AM scheduled departure. When the group did get on the road, no preorder or prepay arrangements had been made for the planned breakfast stop for the 244 participants. As a result of this and other delays, the busses did not arrive in Washington until 11:30 AM; more than two (2) hours behind

schedule. That late arrival necessitated cancellation of the planned visit to the Capital Building and Congressional offices. According to parent/chaperones Ms. Nancy Wallace and Mr. Randy Zigenhagen, the trip immediately became "even more chaotic"; with the groups chaperones left "on our own" for the duration of the day.

Following the aborted visit to the Capital, the various dispersed EDMS groups toured museums and ate lunch before reassembling at 2:30 PM for the final scheduled stop: a guided instructional tour of the Holocaust Museum. After a dinner meal at the Reagan Center, they dispersed again for a "Walking Tour of the Monuments along the Mall". Chaperones were instructed by Woolever to reassemble the groups at the circle at the base of the Lincoln Memorial "at 7:55 PM for an 8 PM departure". Due to the tardy 11:30 am arrival time at the Capital that morning, however, the promised busses did not arrive at that rendezvous location until close to 9:00 pm [1]

Several chaperoned groups were the last to have dinner at the Reagan Center and begin the trek down the National Mall to the Lincoln Memorial. Three of those groups left together: Assistant Principal Usack with four (4) female students, Assistant Principal Knight and his group five (5) boys and parent Nancy Wallace, with a group of five (5) students that included her daughter. Shortly after 7:15 PM, Mr. Knight and his group of "rambunctious boys", including student I.H., went on ahead. They arrived at the Lincoln Memorial several minutes ahead of the Usack/Wallace groups. Meanwhile, Usack/Wallace and their intermingled groups meandered toward the rendezvous point, stopping at various souvenir kiosks and taking pictures along the way.

---

[1] During cross-examination at the hearing, Ms. Woolever conceded that the contract she signed with the bus company specified that the roundtrip bus drivers must have an uninterrupted 9-hour rest period between destination arrival time and return trip departure time under governing federal DOT regulations.

7

Shortly after the Knight group went ahead, eight of the nine girls in the merged groups, including Nancy Wallace's daughter, asked if they could also "walk on ahead" to see the Lincoln Memorial before they boarded the busses. (Student R.D. elected to remain with Usack). Given the unimpeded view of the well-illuminated pathway for the remaining distance to the Lincoln Memorial, Wallace and Usack granted their request; after again reminding the eight students to be at the bus assembly point promptly at Tssp.m.

Nancy Wallace testified that when she reached the circle at approximately 7:45 p.m., none of her students was in sight. She walked up the steps of the Lincoln Memorial to view the famous statue before returning to the circle, where she reunited with her daughter and the other four girls of her group.[2] When Ms. Usack arrived at the circle a few minutes later, with student RD, the other students in her group were not in sight. An EDMS student told Usack they had climbed the steps to have a look at the Lincoln Memorial. Usack walked to the top of the Lincoln Memorial expecting to find the three students, but CG, PD and SH were not there. Ms. Usack asked teachers and fellow chaperones, including Assistant Principal Mack Knight, if anyone had seen her students PD, SH and CG, but no one recalled having seen the errant group of girls on the circle.[3]

With student RD in tow, Usack set off on an unassisted search of the area around the Lincoln Memorial and retraced her steps down the National Mall to the Washington

---

[2]     Ms. Wallace testified that they then "huddled together for warmth" on the circle and waited "at least another hour" for the busses to arrive.

[3]     At that time, Mr. Knight was not aware that student IH, from his own group and students PD and SH, from Ms. Usack's group, had all disobeyed instructions to remain at the circle and wandered away together to a nearby park.

Monument, all without locating the wayward students.  She had attempted to call trip organizers Sanger and Woolever and P.O. Johnson on their cell phone, but received no answer.  Finally, Usack called parent chaperone Randy Zigenhagen· and asked him to "tell Johnson, Woolever or Sager to call 911".   When Ms. Usack returned to the bus circle, she approached Officer Johnson and personally asked if he had yet made the requested 911 calls.  It is undisputed that Johnson stated, in words or substance, that he had not done so and would not do so; asserting that he "had no jurisdiction in DC".[4] Taken aback by this dismissive reply, Usack made her way to a nearby a nearby Park Police kiosk to report that CG, PD and SH were "missing" and might have "run away".

While Usack was speaking with the police officer at the kiosk, PD and SH approached from the direction of the nearby park in the company of IH, the male student whose unauthorized absence from Knight's group had not yet been yet noticed. When Usack admonished them for wandering away from the rendezvous point, IH asserted falsely that Knight had given him permission to go to the park until the busses arrived.  In fact, Knight had not granted such permission and did not even know that IH had left the area until Usack brought him back with PD and SH.[5] Student CG was not with the other three wandering students, nor was she at the bus circle when Usack returned with the IH, PD and SH.  Usack asked group organizer Woolever if she had seen student CG, and Woolever asserted, erroneously, that CG was "already on the bus". Usack searched each of the five busses and called for her by name using the bus

---

[4]    At the hearing, Ms. Woolever identified Johnson as a friend of hers who had served as a personal reference when she was hired in the District.

[5]    Mr. Knight estimated that I.H., P.D., and S.H. were gone between 15 to 2 0 minutes, in total, and also corroborated Ms. Usack's testimony that all three of those students were returned to the departure point prior to the arrival of the busses.

microphone, however, student CG was nowhere to be found. Usack therefore returned to the nearest Park Police kiosk, with the intention of again asking for police assistance, but that kiosk was no longer manned.

When Usack trudged back to the bus line, EMDS teacher S. Dal$_{rym}$ple thrust a cell phone toward the Respondent, without revealing that CG's father was on the line. When Usack answered, CG's father angrily reported, in words or substance: "A police sergeant named Weis has my daughter. Are you going to turn those busses around and go back and get her?" Ms. Usack responded that she would follow up with Sergeant Weis, that the busses had not yet departed for Elmira and that she never would leave any student behind.

On cross examination, CG testified that Sergeant Weis had detained her at the Capital Hill Park Police Station, not because she was "lost", but to question her in connection with his investigation of reported rock-throwing activity by some youths she was with when he picked her up near the World War II Memorial. Sergeant Weis reported to Ms. Usack that CG was safely in his custody and that he would return the wayward EDMS student to Ms. Usack "after completing the necessary paperwork". Sergeant Weis also told Usack that he had picked up the missing student "in the opposite direction of the Lincoln Memorial; clearly not where she was supposed to be". Following that conversation with Sergeant Weis, Ms. Usack called Mr. G. back, reassured him that his daughter was safe and that she would be placed on her bus as soon as the Park Police completed requisite paperwork.

Next, Ms. Usack contacted EDMS Principal Lisa Kelly, to whom she spoken several times throughout the day, and updated her on the situation. Ms. Kelly directed Ms. Usack to stay behind with her bus to await CG's return and let the other busses go

on ahead under the supervision of Assistant Principal Knight. *As* Usack completed yet another call to CG's father to update him on the now delayed timetable, Woolever approached and asked: "What are we supposed to do?" The Respondent replied, "You are supposed to do what the administrator on duty, Mr. Knight, asks you to do". Shortly thereafter, Sergeant Weis delivered the errant student CG and all of the busses departed for Elmira where they arrived within minutes of one another.

Two days later, Principal Kelly contacted Superintendent Bryant at home, to give him an update about the trip, "in case he got any parent feedback". Ms. Kelly testified that when she told him CG had "disengaged from the group" but was located and returned home safe, he replied: "Good, that's all I need to know. There is nothing else to worry about." For his part, Superintendent Bryant testified: "The good news, as far as I was concerned, was that everybody came back safe and sound. So, we thought we would process it and take what we learned from it and move forward. Certainly, neither Lisa (Kelly) nor I thought any discipline was warranted, or appropriate in the circumstances".

However, Superintendent Bryant testified, "some" members of the Elmira School Board, as well as "certain very vocal" members of the community, were not satisfied with those conclusions. Specifically, Superintendent Bryant recalled: "I had talked with (Board President) Mike Crimmins, who told me that he was getting 'a lot of letters and e-mails about the trip'. So we decided to do a full investigation, which (School District attorney) John Ryan conducted. Concerning that investigation, Ms Usack testified: "In addition to the written narrative I provided, attorney John Ryan interviewed me on three occasions. I never had representation, nor was I ever told that whatever I said could be used against me in formal discipline". However, by the end of April 2007, the

11

Respondent learned that the "community" was pressuring the District's administration to "bring charges" against her.

In that regard, former Superintendent Bryant testified: "Given the uproar over what happened, I thought people would be appeased with 'some' discipline.  So I suggested, to the Board, that perhaps a counseling memo would be appropriate.  Because, really, given the circumstances, as I understood them . . . the young lady in question had met someone on the Internet and planned to 'leave' all along.  I also got some information that some other chaperones on the trip had actually seen the young lady, going in the wrong direction, and made no attempt to stop her.  You know, it seemed not to be a negligent act, but rather it was middle school kids, and things happen".

The Superintendent went on to state: "Part of my job as superintendent is to both be fair to staff and represent the Board.  So at my request, John (Ryan) searched for similar types of cases.  One of our own Board members shared that he supervised a field trip to our revolutionary battle monument, Battle Monument Park, and when the seventh grade kids got off the bus, they 'just took off.  Another time, I got a call from one of our teachers, who was actually at that same park, and he reported that he had found a 'misplaced' child and would I call and let the supervising teacher know, as he did not have that teacher's cell phone number.  Things like that happen with kids that age.  My own car got pretty well known because if I was out during the school day, and I saw a kid just walking along, I knew they weren't where they were supposed to be".

Superintendent Bryant's investigation and recommendation notwithstanding, by the end of April 2007, "some members of the community" were still lobbying him to "bring charges" against Ms. Usack.  As Dr. Bryant testified: "At the time, John Ryan was

12

completing the investigation and, after he reported what had happened on other trips, I thought that would settle it.  But I then learned that Board members Graham, Woods and Hurley, as well as Mary Beth Turner, as I recall, were insisting on a board meeting. Mary Beth Turner told Mike Crimmins that if I didn't convene such a meeting, she would request a 'special' Board meeting, maintaining that she was 'within her rights' to do so".  Soon after that conversation, a Board meeting was convened, during which Dr. Bryant again recommended that the Respondent be issued a "Counseling Memo", in lieu of formal discipline.

According to the former Superintendent's unrefuted testimony, there was no support for that recommendation and the Board continued to pressure him to implement formal disciplinary action against Assistant Principal Usack.  When asked what action the Board contemplated taking against Assistant Principal Knight, regarding his missing student IH, Dr. Bryant stated: "Really, nothing.  The kids strayed, and then they came back.  Those things happen with kids that age."  When asked what he thought would have happened if he had not followed the Board's "strongly worded recommendation" to file disciplinary charges against Usack, the Superintendent opined: "I think two things would have happened.  Mr. Graham indicated that State Ed. law allowed that 'anyone could bring charges so if I wasn't going to do it, they would'; let's just say, I felt my own tenure would be tenuous".

In short, Superintendent Bryant's testimony establishes that the Board members were determined to lodge §3020 (a) charges against Ms. Usack, irrespective of whether he filed such charges as District Superintendent and irrespective of whether the evidence supported such charges; and if he did not comply with the Board's "recommendation" that he file the charges as District Superintendent, his own

13

termination was "a real possibility". Against that context, Dr. Bryant reluctantly asked Attorney Ryan to draft charges proposing "the minimum we thought the Board would accept".

Ms. Usack received the following notification, dated August 16, 2006, over the signature of then Superintendent of Schools, Dr. Raymond Bryant:

> YOU ARE HEREBY CHARGED pursuant to Education Law Sections 3012 and 3020-a with neglect of duty and conduct unbecoming a tenured assistant principal, which conduct constitutes just cause for discipline against you or your removal as follows:
>
> **CHARGE 1: Conduct Unbecoming a Teacher and Misconduct**
>
> You are hereby charged with conduct unbecoming a teacher and misconduct in that:
>
> Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".
>
> Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.
>
> Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.
>
> Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom (sic) you had been assigned to supervise.
>
> Specification 5. The student "CG" was later found by Capital Park Police.
>
> Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.
>
> **CHARGE 2: Neglect of Duty; Incompetent or Inefficient Service**
>
> You are hereby charged with neglect of duty and with incompetent or inefficient service in that:
>
> Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. One of the students was "CG".

14

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the student "CG" became separated from your group of four students.

Specification 3. There existed a period of time when the student "CG" was missing from your assigned group during which period you failed to discover her absence.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The student "CG" was later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 3: Conduct Unbecoming a Teacher and Misconduct

You are hereby charged with conduct unbecoming a teacher and misconduct in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.
Specification 3. There existed a period of time when the students "SH" and "PD") were missing from your assigned group during which period you failed to remain aware of their location and activities.

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you bad been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and engaged in conduct unbecoming a teacher and in misconduct by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

### CHARGE 4: Neglect of Duty; Incompetent or Inefficient Service

You are hereby charged with neglect of duty and with incompetent or inefficient service, in that:

Specification 1. On Friday, April 7, 2006, you accompanied students from the Ernie Davis Middle School eighth grade on a field trip to Washington, D.C. You were assigned and you accepted the responsibility to supervise at all times four named students while they participated in the activities in Washington D.C. Two of the students were "SH" and "PD".

Specification 2. After eating dinner with your four students and prior to departure from Washington D.C. on the evening of April 7, 2006, the students "SH" and "PD" became separated from your group of four students.

Specification 3. There existed a period of time when the students "SH" and "PD" were missing from your assigned group during which period you failed to remain aware of their location and activities

Specification 4. During this same period, you were interacting or otherwise engaged with individuals, including other chaperones or students, who were not the four students to whom you had been assigned to supervise.

Specification 5. The students "SH" and "PD" were later found by Capital Park Police.

Specification 6. By reason of the foregoing, you endangered the safety of students and neglected your duty and rendered incompetent and inefficient service by failing to provide adequate supervision to ensure the presence of all four assigned students at all times.

Based on the conduct set forth in these charges, I am seeking a penalty of five (5) days suspension without pay as a tenured assistant principal in the Elmira City School District. [6]

## Positions of the Parties

The following statements of position are extrapolated from the respective post hearing briefs filed by Counsel.

### The District

In light of Respondent's failure to adequately supervise the students placed in her care, she was charged with neglect of duty and conduct unbecoming a tenured assistant principal. It is obvious that she showed extremely poor judgment in permitting the students to leave her company. Allowing eighth grade students to walk around unattended was entirely unreasonable considering, among other things, the Mall's expansive size, the students' lack of familiarity with the surrounding area, the large number of unknown (and potentially dangerous) people simultaneously moving through the Mall area, and the fact that dusk was approaching as the students set out on their own. The additional fact that Student CG had a well-known history of absenteeism and other forms of misconduct makes Respondent's lax supervision all the more troubling.

_____

[6]    The Board Members rejected the Superintendent Bryant's proposed 5-day suspension penalty and some pushed for escalation to a discharge. Eventually, the Board settled on a 20-day suspension of Ms. Usack without pay as the penalty sought.

This proceeding does not concern whether certain parties have resisted Respondent's reform initiatives.  Neither does it concern whether Respondent is a competent administrator.  It is solely concerned with Respondent's conduct on the evening of April 7, 2006.  On this point, the facts could not be clearer.  Respondent allowed three students to move ahead of her group without adult supervision.  She failed to keep the students within view and allowed thirty minutes or more to pass before making an effort to determine their whereabouts.  This represented an undue risk to the students' safety and exposed the District to significant potential liability.  For all of these reasons, Respondent is guilty of the charges against her by far more than a simple preponderance of the evidence.

Respondent plainly neglected her duty to supervise the students in her group and should be penalized accordingly.  Her actions exhibited an extreme lack of care. As such, her conduct was plainly unbecoming a tenured assistant principal and constituted a serious neglect of her duty to supervise the students with the same care and prudence as a reasonably minded parent or guardian.  To argue, as Respondent does, that no penalty is warranted in this instance is both nonsensical and contrary to precedent.  A twenty-day suspension without pay is entirely reasonable, given Respondent's conduct and the forms of discipline imposed in prior proceedings.

## **The Respondent**

The Charges fail for three reasons. First, the District failed to introduce competent and sufficient evidence in support of the Charges. Second, the District has not shown the presence of Just Cause, which is required to impose discipline.  Just Cause is unavailable because its notice component is lacking given the absence of any relevant Board policy regarding class trips and any relevant provisions for this trip in particular.  Therefore, Ms. Usack had no notice that any of her proven actions or inactions could result in discipline. Third, Just Cause is precluded also by the selective prosecution of Ms. Usack for events and behavior for which previously no District official or employee has been disciplined in prior, similar instances. This disparate treatment also precludes Just Cause.

In the final analysis, the District did not meet its burden by a preponderance of the evidence and the charges should be dismissed in their entirety.  The District's chief administrative officers as well as Ms. Usack's immediate supervisor did not believe her behavior warranted any form of discipline.  These administrators insisted Charges were unwarranted both substantively and constitutionally.  Nevertheless, the Board rejected those objections and insisted Charges be filed or it would punish or fire School Superintendent Raymond Bryant and Human Resources Director Bob Van Keuren.  Under the Board's ultimatum, the superintendent reluctantly filed the Charges at issue. Not surprisingly, at the hearing, the Board failed to adequately support the charges.

These circumstances demonstrate the frivolity of the charges, which emphatically warrants the imposition of sanctions against the District. The instant charges are an example of an abuse of power that was condemned by the Commissioner of Education in the early 1990s. As the supporting affidavits show, Ms. Usack and her counsel have expended significant costs in defending this baseless disciplinary arbitration. These costs should be reimbursed upon the hearing officer's finding of frivolity.

17

## OPINION OF THE HEARING OFFICER

Under amended §3020 of the Education Law, Ms. Usack cannot be disciplined or removed from her position, except for "just cause". As I have held in prior cases, the statutory standard of §3020 (a) "just cause" is not expressly defined in the Education Law or in Education Department regulations, but a working definition has evolved over the years in the myriad decisions of Hearing Officers. Some have simply applied the administrative law standard of "arbitrary, unreasonable or capricious". But the better reasoned majority have adopted the "common law" definition evolved from thousands of reported decisions by arbitrators of "just cause" discipline cases arising under collectively bargained labor-management agreements in both the private and public sectors. *See. e.g.,* In re Board of Education. Wayne-Finger Lakes Board of Cooperative Educational Services (Donald Bogart), Decision No. 13,226 (1994); In re Greenburgh Central School Dist. No. 7 (Robert DeMichele), Decision No. 13/397 (1995); Appeal of Bd. of Ed. of Port Washington, Decision No. 14,280 (1999). *See also* South Eastern Pennsylvania Transportation Authority, 90 LA 844 (Lang, 1988); Carter-Wallace Inc. 89 LA 587 (Katz, 1987); Menasha Corporation. Lewisystems Division, 89 LA 1316 (Barren, 1987); Hussman Refrigerator Company, 68 LA 656 (Mansfield, 1977); Kroger Company, 25 LA 906 (Russell Smith, 1955), Warren Assemblies. Inc., 92 LA 521, 524 (Roumell, 1989); Pete Pasquinell Co., 68 LA 1068, 1070 (Jones, 1977); Polysar Incorporated, 91 LA 482, 484 (Strasshofer, 1988); SK Hand Tool Corp., 98 LA 643, 647 (Hodgson, 1992); Koven and Smith, Just Cause: The Seven Tests, 2nd Ed. (BNA, )at 8-9.

One such frequently cited arbitration decision contains the following just cause analysis checklist. *See* <u>Enterprise Wire Company</u> 46 LA 359 (Daugherty, 1966):

> Question 1.  Did the employer give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?
>
> Question 2.  Was the employer's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?
>
> Question 3.  Did the employer, before administering discipline to an employee, conduct a fair and objective investigation to determine whether the Employee did in fact violate or disobey a rule or order of management?
>
> Question 4.  Does the investigative record contain substantial evidence or proof that the employee was guilty as charged?
>
> Question 5.  Has the employer applied its rules, orders, and penalties even handedly and without discrimination to all similarly situated employees?
>
> Question 6.  Was the degree of discipline administered by the employer in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the service record of the employee?

The District presented four witnesses in support of its alleged factual premises for the charges and specifications: EDMS Principal Lisa Kelly, EDMS Assistant Principal Mack Knight, EDMS Teacher Ginger Woolever and EDMS Student CG. The consistent, credible and forthright testimony of Ms. Kelly and Mr. Knight contradict rather than support the District's allegations against the Respondent. Moreover, both of those District witnesses fully corroborate Ms. Usack's account of the incident, as does the testimony of Respondent's witnesses Bryant, Wallace and Zigenhagen. By contrast, the testimony of the District's other two witnesses, teacher Ginger Woolever and student CG, exhibit significant relevancy and credibility defects which render their contrary accounts of the incident on April 7, 2006 unworthy of belief.

On the threshold question of culpability, the record shows irreconcilable credibility conflicts between the sworn testimony of the District's chief witnesses and that of the charged employee and the other witnesses. Testimonial standoffs are not rare in adversarial proceedings and resolution of diametrically opposing testimony is a task which arbitrators frequently are called upon to perform. Numerous factors must be considered in making credibility determinations. These include: (1) The witness's opportunity and capacity to observe the event or act in question; (2) the witness's character; (3) any prior inconsistent statement by the witness; (4) a witness's bias, or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness's version of events; and (7) the witness's demeanor.

In some cases, ostensibly differing recollections of witnesses can be reconciled in different but coherent and believable versions of "the Truth". In this case, however, it is apparent that District witnesses CG and Woolever did not give persuasive or even believable testimony. Specifically, CG's testimony that she "got lost" because Usack left her all on her own on the National Mall, but dutifully reported to the bus rendezvous point only to find no one from EDMS there, is flatly contradicted by all of the record evidence. Moreover, assertions by CG regarding her whereabouts and motivations for leaving her group that day are completely inconsistent with statements she gave to the District's school attorney during his investigation. Indeed, that evidence not only effectively impeaches the testimony CG gave at the hearing but also supports the former Superintendent's original assessment that she intentionally wandered away that day to pursue a separate agenda of her own.

Ms. Woolever's testimony is fatally undermined primarily by her long-standing admitted *animus* against Ms. Usack and her personal motivation to have Usack removed from the District; a personal bias and ulterior motive which Ms. Woolever openly acknowledged and amply demonstrated at the hearing in this matter. [7]  In that regard, Woolever testified she considered Usack, with whom she had worked in another district before coming as a probationary teacher to Elmira, "involved in" the decision of that other district to deny her tenure.  In addition to that lingering resentment, the record persuasively demonstrates that Woolever had good reason to deflect blame for the many shortcomings of the trip to someone other than herself.  Finally, the record is replete with evidence that Woolever was one of several teachers subject to possible involuntary transfer from EMDS as part of the District Administration's corrective action plan at that historically underperforming school.

If Ms. Woolever's demonstrated bias against Ms. Usack were not discrediting enough, her hearing testimony also is riddled with self-contradiction, inconsistency, evasiveness, duplicity and outright implausibility.  Just one example is the preposterous claim that she personally sprinted "as fast as humanly possible" from the Lincoln Memorial to the Washington Monument, circled that Monument twice trying to locate CG, and then dashed back to the Lincoln Memorial--all in the paranormal time of "no more than 10 minutes."

---

[7]  Indeed, under cross-examination by Usack's attorney at the hearing, Woolever concluded her testimony with the summary declaration: "I don't like your client".  She also conceded that she was one of several similarly disaffected EMDS teachers and a displaced EDMS administrator who pressured the Board for months to bring disciplinary charges against Usack.  In that connection, Woolever admitted initiating personal back channel assistance to the four Board members who insisted upon bringing charges against the Respondent, despite the Ryan investigation and the Superintendent's recommendations.

## CONCLUSIONS

Under any and all of the above-quoted principles and authoritative precedent, the District failed to meet its burden of proving the charges it lodged against the Respondent.  For that reason alone, there is no just cause for imposition of the proposed disciplinary action.  Even if, *arguendo,* the District had persuasively demonstrated that some degree of culpability attached to Ms. Usack (which it failed to do), singling Usack out for discriminatory and disparate disciplinary action while overlooking identical conduct by her colleague Mack Knight (which it did do), violated the just cause standard.  In that regard, it is also undisputed that, except for unjustly targeting Usack for disparate treatment in this case, the District did not take formal disciplinary action against teachers or administrators in virtually indistinguishable facts and circumstances.  In short, to sustain the Board's prosecution of these charges against this Respondent in the facts and circumstances of this record would violate the fundamental just cause principle that disciplinary action of an employee be imposed fairly and justly to correct proven culpable negligence, incompetence or misconduct; not simply to harass and punish the charged employee.

In the 1990's the Commissioner of Education noted in a series of decisions Appeal of Bd. of Ed. Eastchester U. F. S. Q. 31 EDR 301 (1992); Appeal of Bd of Ed. Goshen CSD, 30 Ed. Dept. Rep 181, 187, (1990); Matter of Bott v. Bd. of Ed., 41 NY2d 265 (1997) that "[t]he primary purpose of a disciplinary hearing is not punitive, but rather, to determine a teacher's fitness to teach and to carry on professional responsibilities... As [the Commissioner] noted, in Goshen, *supra,* '[t]his case raises serious questions about the use of the 3020-a process for multiple charges that largely lack substance and, in only one instance, even approach the level of teacher misconduct.'

22

. . . In such cases, one must question whether the extraordinary expenditure of time, energy, and resources is warranted. Given the high stakes in such proceedings and the obvious diversion of resources, I urge the district to consider less drastic alternatives to resolve personnel matters that, on the whole, fail to raise to the level of serious misconduct." Appeal of Bd. of Ed. Eastchester U.F.S.D, *supra* at 312

The New York State Legislature heard the Commissioner's concerns and amended Education Law in 1994, by directing a §3020-a hearing officer to formulate appropriate penalties against school districts for bringing such politically motivated prosecutions completely lacking in merit. Thus, Education Law §3020-(a)(4)(c) was enacted to provide for the reimbursement of State Education Department ("SED") costs and legal fees and costs incurred by a Respondent professional educator as a result of a District bringing, in whole or in part, "frivolous" charges. Specifically, Education Law Section 3020-a(4)(c), provides, in pertinent part (Emphasis added):

> The school board's decision to proceed with the charges may not be arbitrary, capricious, or discriminatory. If a hearing officer determines that any or all 3020-a charges filed against a teacher or administrator are frivolous, a district will have to reimburse the State Education Department and the teacher for all or a portion of the reasonable costs incurred as a result of the hearing, including the teacher's or administrator's attorney fees. The hearing officer shall indicate in the decision whether any of the charges brought by the employing board were frivolous as defined in section eight thousand three hundred three-a of the civil practice law and rules. If the hearing officer finds that all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges. If the hearing officer finds that some but not all of the charges brought against the employee were frivolous, the hearing officer shall order the employing board to reimburse the state education department a portion, in the discretion of the hearing officer, of the reasonable costs said department incurred as a result of the proceeding and to reimburse the employee a portion, in the discretion of the hearing officer, of the reasonable costs, including but not limited to reasonable attorneys' fees, the employee incurred in defending the charges.

In the final analysis, the record supports the conclusion that this case is not about negligence or incompetence by the Respondent, but rather all about a school board's knowing misuse of its §3020 (a) disciplinary powers by bringing frivolous charges against Assistant Principal Usack, in furtherance of a political agenda. Indeed, such abuse of power prompted Chancellor Emeritus of the New York State Board of Regents, Carl Hayden, to comment publicly: "There is nothing more unseemly to me than what I read about persistently in our paper, and I'm thinking in particularly about Elmira, where what we end up witnessing is a fight between adults over power." *(Elmira Star Gazette*, June 6, 2008). The conduct of the Elmira City School Board in bringing and prosecuting meritless charges against Teresa Usack, which were unsupported by its own investigations and dismissed for complete failure of proof after hearing, was precisely the type of power abuse which prompted the SED to recommend and the New York Legislature to enact Section 3020-a (4)(c) of the New York State Education Law.

## AWARD

1)    For all of the reasons stated, *supra*, Charges 1,2,3 and 4 made against the Respondent Theresa Usack, by the Elmira City School District under §302o(a) of the NYS Education Law on August 16, 2006, are dismissed.

2)    Pursuant to the authority vested in me by Education Law §3020-a 4(c), the Elmira City School District is ordered to reimburse the NYSED the reasonable costs said Department incurred as a result of this proceeding and to reimburse the Respondent Theresa Usack for $4,330.00 of the legal fees and costs set forth in her sworn affidavit dated July 21, 2010.

_____
Nancy Faircloth Eischen
Signed at Spencer, New York on February 17, 2011

STATE OF NEW YORK
COUNTY OF TOMPKINS SS:

On this 17th day of February 2011, I, NANCY FAIRCLOTH EISCHEN, do hereby affirm and certify, that I am the individual described herein, that I executed the foregoing instrument and acknowledge the same as my decision on NYSED File #6, 371.

24

EXHIBIT 20

# TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

NYC Department of Education
3.93.9 out of 5 stars
Remote
Full-time

## Location

Remote

## Full job description

## TEACHER VACANCY CIRCULAR NO 4 CENTRAL REMOTE TEACHERS iZONE 2022 2023

Posted Date: May 6, 2022 Deadline: Jun 3, 2022
New York United States
VIRTUAL

## Job Details

**(SUBJECT TO BUDGET AVAILABILITY)**

**POSITION:**

## Teacher - Central

Remote Instruction Teachers

**License/Eligibility Requirements:**

New York City licensed Social Studies, Science, English, Foreign Language, Math and Health tenured teachers in High School Grade Levels.

**Office:**

iZone

**Location:**

82-01 Rockaway Blvd, Ozone Park, NY 11416

Or other DOE offices

**Remote Teachers**

**Position Summary:**

Virtual Learning Classrooms aim to partner teachers from around the city with students to provide them with increased access to courses not available in their home schools, including, but not limited to Electives, AP Courses, and Foreign Language courses. This posting is for teachers interested in teaching in this full time program from September 2022 - June 2023. Remote instruction teachers will deliver instruction to and communicate with high school students in other locations using internet and required technological platforms. Please note that while students will not be in the same location as the teacher, this is an in person teaching position.

Remote Teachers are licensed teachers of high school grade levels who teach students virtually. Remote teachers will teach students in the following subject areas: Advanced Placement Subjects (Including but not limited to, AP Psychology, AP Spanish, AP US History, AP World History, AP Government, AP Calculus AB/BC, AP Macroeconomics, AP Statistics, AP Computer Science Principles and A, AP Environmental Science, AP English Language and Literature, and AP Seminar), electives (Including but not limited to, Forensics, Health, Media Literacy, Financial Literacy, science electives, Computer Science and Business) and Foreign Languages (Including but not limited to, Spanish, Chinese and French). Other subjects may be added. Students may be enrolled from multiple schools simultaneously, but total class size will not exceed contractual limits. Remote Teachers will be expected to participate in 10 sessions of professional learning workshops including an online course leading to a Learning Management System certification to occur during July and/or August prior to commencement of position with remaining

on-going professional learning during the year and will be paid at the per session rate for work beyond the contractual workday/work year. Remote teachers will perform required duties (including corresponding with home school staff, planning for remote instruction and assessment, communication and conferencing with students and/or parents). Duties and responsibilities are intended to emulate traditional teaching paradigms and create an equitable learning experience.

**Reports to:**

DIIT iZone Supervisor

**QUALIFICATIONS:**

- Minimum of four (4) years of teaching experience as a regularly appointed teacher. Knowledge of the common core standards as it relates to course.

- Extensive knowledge of the New York State and City Standards, meets Advanced Placement requirements (as appropriate) and is licensed in subject matter.

- Demonstrated expertise in an online learning environment designing and implementing standards-based instruction that specifies clear learning objectives, includes engaging activities and authentic assessments to measure mastery.

- Willingness to promote online dialogue to deepen the learning experience.

- Demonstrated ability with written and oral communications emphasis placed on the delivery of digital presentations.

- Demonstrated ability to use online learning, communication and other edtech tools as appropriate.

- Can differentiate instruction for individuals or groups of students based on instructional data and analysis as well as student characteristics.

- Can sustain and document flexible teaching schedules, which account for asynchronous and synchronous activities that are student-centered and maintain high standards for student engagement and success.

- Selected candidates will be asked to facilitate a demonstration lesson or planning activity to demonstrate aforementioned qualifications.

**PREFERRED SKILLS:**

- Demonstrated skill in team building, group dynamics, and facilitating collaborative learning.
- Proven history of being a self-starter who works well without constant supervision.

**DUTIES AND RESPONSIBILITIES:**

- Demonstrate competency in using data from assessments and other data sources to modify content and guide student learning.

- Modify engaging content and appropriate assessments in an online environment.

- Provide quality instruction to students using asynchronous and synchronous teaching methods (I.e. asynchronous = discussion forums, group work, written and digital assignments, posted content. Synchronous = online classrooms, webinars, chat rooms).

- Employ student-centered instructional strategies that are connected to real-world applications to engage students in learning.

- Facilitate and monitor online instruction groups/discussions to promote learning through higher-order thinking and group interaction.

- Provide a variety of ongoing and frequent teacher-student, teacher-teacher, and teacher-administrator interaction with participating schools.

- Provide prompt feedback, communicate high expectations, and teach to diverse talents and learning styles.

- Online communication between students and teachers is a significant component of this program to mimic in person communication. Therefore, teachers are expected to respond to student emails and grade assignments within 2 workdays, as well as monitor and respond to discussion postings daily during the school week.

- Regularly share with home school(s) student data including but not limited to grades and attendance. This includes the use of school selected platforms and systems.

- Incorporate and comply with FERPA, AUP and communicate privacy guidelines to students.

- Select and use a variety of online tools for communication, productivity, collaboration, data and performance analysis, presentation, research, and online content delivery as appropriate to the content area and student needs.

- Use communication technologies in a variety of mediums and contexts for teaching and learning.

- Apply technical troubleshooting skills (downloading plug-ins, uploading assignments, etc.)

- Participate in all professional development and peer mentoring exercises throughout the duration of service.

- Develop key relationships in order to work closely with home school staff, students and parents of participating schools, guidance counselors and central iZone staff.

- Participate in activities to identify best practices, address challenges and assess efficacy.

**WORKING CONDITIONS & LOCATION:**

- The maximum class size of a full virtual course not exceed UFT contractual limits.

- Teachers shall not be assigned more than twenty five (25) teaching periods per week and may teach up to five (5) remote classes; however, the maximum number of distinct courses shall not exceed three (3).

- Teachers must confer with students synchronously during programmed periods each week, as well as be available for asynchronous teaching approaches including but not limited to office hours, individual and small group conferencing and providing direction for independent student

work. Facilitate learning through supplied curriculum that teachers may supplement.

- Teachers are expected to teach in person from 82-01 Rockaway Blvd, Ozone Park, NY 11416 or other DOE office.

**Hours:**

As per Article Six of the Collective Bargaining Agreement

**Salary:**

As per UFT Contract

**Work Year:**

As per Article Six of the Collective Bargaining Agreement

**APPLICATION INSTRUCTIONS:**

Please be sure application includes cover letter, resume and your 6-digit file number.

Please send application via email to the following email address: iLearnNYC@schools.nyc.gov with the Subject line: "Fulltime Remote Teacher application."

Applications will be accepted through:

# JUNE 3, 2022

# An Equal Opportunity Employer M/F/D

It is the policy of the Department of Education of the City of New York to provide equal employment opportunities without regard to actual or perceived race, color, religion, creed, ethnicity, national origin, alienage, citizenship status, age, marital status, partnership status, disability, sexual orientation, gender(sex), military status, unemployment status, caregiver status, consumer credit history, prior record of arrest or conviction(except as permitted by law), predisposing genetic characteristics, or status as a victim of domestic violence, sexual offenses and stalking, and to maintain an environment free of harassment on any of the above - noted grounds, including sexual

harassment or retaliation. For more information, please refer to the DOE Non -
Discrimination Policy.

 

EXHIBIT 21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
                                                            :
MICHAEL KANE, et al.,                                       :
                                                            :
                          Plaintiffs,                       :
                                                            :
           - against -                                      :      Case No.  21-cv-7863 (VEC) (Lead)
                                                            :
BILL DE BLASIO, et al.,                                     :
                                                            :
                          Defendants.                       :
------------------------------------------------------------X
                                                            :
MATTHEW KEIL, et al.                                        :
                                                            :
                          Plaintiffs,                       :
                                                            :
           - against -                                      :      Case No.  21-cv-8773 (VEC)
                                                            :
THE CITY OF NEW YORK, et al.,                               :
                                                            :
                          Defendants.                       :
------------------------------------------------------------X

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.

2. I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.

3. Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.

4. Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.

5. Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

### First False Assertion in Sullivan Declaration

6. The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code, the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.

7. Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.

8. Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a "**Problem** PR" notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

1

**<u>Second False Assertion in Sullivan Declaration</u>**

9.  The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways.  For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18.  Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8.  In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19.  In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

**<u>Further Evidence of Irreparable Harm</u>**

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable – and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated:  New York, New York

       June 3, 2022                       Respectfully submitted,

                                     Barry Black
                                     Nelson Madden Black LLP
                                     *Attorney for Plaintiffs*
                                     475 Park Avenue South, Suite 2800
                                     New York, NY 10016
                                     (212) 382-4303