*** Filed ***
11:14 PM, 24 Aug, 2026
U.S.D.C., Eastern District of New York

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**X**

**DIANNE BAKER-PACIUS, and CHRISTOPHER J. GARRY,**

Plaintiffs

**DOCKET NO. 25-cv-00743 (AMD)(JAM)**

**-against-**

**SECOND AMENDED COMPLAINT**

***Jury Trial Demanded***

**THE DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, MELISSA AVILES-RAMOS, Chancellor; KATHERINE RODI, Director of Employee Relations, sued in her official capacity; and STEVE BANKS, General Counsel for the Office of Labor Relations, sued in his official and individual capacities,**

Defendants

**X**

PLAINTIFFS DIANNE BAKER-PACIUS and CHRISTOPHER J. GARRY, ("Plaintiffs") proceeding Pro Se, as and for their Summons and Complaint filed to protect their Constitutional rights against the above-captioned Defendants the DEPARTMENT OF EDUCATION OF THE CITY OF NEW YORK, MELISSA AVILES-RAMOS, KATHERINE RODI, and STEVE BANKS, allege upon knowledge as to their own facts and upon information and belief as to all other matters:

## PRELIMINARY STATEMENT

1. While government is fully empowered to make emergency action against life-threatening dangers, it is bedrock law in this country that constitutional rights and prohibitions do not change in an emergency. "The Constitution was adopted in a period of grave emergency. Its grants of power to the Federal Government and its limitations of the power of the States were determined in the light of emergency and they are not altered by emergency." Home

Bldg. & Loan Ass'n v Blaisdell, 290 U.S. 398, 425 (1934). Thus "even in a pandemic, the Constitution cannot be put away and forgotten." Roman Catholic Diocese of Brooklyn v Cuomo, 208 L.Ed. 2d 206, 210 (2020).

2. Plaintiffs challenge the implementation of the COVID Vaccine Mandate ("CVM") in New York City as it was applied to them, and seek injunctive relief, monetary relief, including past and on- going economic loss, compensatory and equitable damages for the deprivation of Constitutionally protected rights pursuant to 42 U.S.C. Section 1983 and Monell municipal liability, EUA and the right to refuse 21U.S.C §360bbb-3, 1st and 14th Amendments to the United States Constitution, retaliatory medical and religious discrimination, failure to accommodate pursuant to New York State and New York City Human Rights Law (NYSHRL and N.Y. Executive Law§ 296; NYCHRL, as Administrative Code §8-107 ), and Free Exercise Clause the First Amendment (Plaintiff Baker-Pacius).

3. Plaintiffs are not challenging the validity of the CVM, but the *as-applied* process used by Defendants under color of law to deprive them of their Constitutional rights ending in their unlawful termination. These actions by Defendants may clearly be defined as disciplinary retaliation, motivated by an intent to harm. Animus infects all levels of implementation.

4. Newly discovered emails and letter show that Defendants deliberately ignored, destroyed and denied Plaintiffs' Constitutional rights and statutes as New York City municipal policy and custom, and misused their public City positions pursuant to a Monell scheme under 42 U.S.C. §1983. Here, constitutional violations resulted from an official policy, practice, or custom that was fraudulently concealed for several years, and show intent to discriminate. **EXHIBIT 1 and 1(a)**

5. Plaintiffs allege violations of their fundamental statutory, contractual, and constitutional rights, seeking declaratory and injunctive relief, as well as reinstatement, nominal, compensatory, actual and punitive damages and other remedies for harms arising from the actions complained of herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. Plaintiffs filed timely requests for medical and religious exemptions/accommodations to the DOE via SOLAS (HR database), were denied any accommodation, and blocked from appealing these decisions and getting to the Appeals Panels headed by Martin Scheinman and his Company, Scheinman Arbitration and Mediation ("SAMS) and the Citywide Panel.

7. Plaintiffs were unlawfully disciplined with termination by Defendants on February 11, 2022, after being denied their accommodation requests for no lawful reason.

8. Plaintiffs filed the case cited herein on February 10, 2025.

9. Plaintiffs state a cause of action under the Human Rights Laws, both City and State, pursuant to a three-year statute of limitation and continuing wrong doctrine under *Riccardo v. New York City Dep't of Ed., 2016 WL 7106048 *6* [Report and Recommendation] (S.D.N.Y. Dec. 2, 2016), adopted by District Judge for reasons set forth in Report and Recommendation 2017 WL 57854 (S.D.N.Y. Jan. 4, 2017) ("There is no apparent reason to treat [filings with the EEOC or NYSDHR] differently under the one-year statute of limitations that applies to claims against school districts and their officers under the human rights laws.").

10. Plaintiffs also have a cause of action under Section 1983, Monell, and Relation Back Doctrine for the recently publicized secret emails sent to former Department of Health

Commissioner David Chokshi, Defendant Steve Banks, and other City officials, colluding together to misuse their City offices in order to deny Plaintiffs their Constitutional and contractual rights. These emails show that from the start, high level City policy makers participated in directing decision-makers to reject whole categories of sincere religious beliefs and improperly used their authority to favor certain religious positions over others. The denials of accommodations given to Plaintiffs was predetermined and pretextual discrimination by the DOE and the City of New York. As these emails were seen for the first time by Plaintiffs in April 2026, and there was no way they could have found them earlier, Plaintiffs argue that their Monell claim under Section 1983 is pursued under a new timeline, using the Relation Back Doctrine to include all the prior lawless acts of Defendants since 2021 that were unconstitutional.

## PARTIES

11. Plaintiff Dianne Baker-Pacius was a tenured teacher hired in 2005 to work for the Department of Education of the City of New York. She had an impeccable reputation and record. While a tenured teacher, Baker-Pacius had Constitutional rights, including protected liberty and property rights, to her position. She filed a request for a religious exemption and a 3020-a hearing but was denied both, and charged with misconduct. Plaintiff was a public employee of Defendants within the meaning of an "employee" as defined in New York State Civil Service Law § 75- b(1)(b) and a covered person under the Citywide Administrative Services and Education Law §§3020 and 3020-a.

12. Plaintiff Christopher J. Garry was formerly a tenured teacher who taught Physical Education at John Bowne High School for over 23 years and was the chapter leader there from 2009-2012. He filed a request for a medical exemption/accommodation

and a 3020-a Hearing request form "to protect his rights" and knew that public policy gave him pre-deprivation Constitutional rights to his tenured position. He never received either. Plaintiff was a public employee of Defendants within the meaning of an "employee" as defined in New York State Civil Service Law § 75-b(1)(b) and a covered person under the Citywide Administrative Services and Education Law §§3020 and 3020-a.

13. Defendant the Department of Education of the City of New York ("DOE") is a municipal agency which includes under its' authority the population of New York, Bronx, Queens, Kings and Richmond Counties in New York State. The DOE is under Mayoral Control since 2002. The First Amendment of the United States Constitution applies to this Defendant by virtue of the Fourteenth Amendment. The DOE employed Plaintiffs and is liable under 42 U.S.C. § 1983 for constitutional violations caused by its policies, customs, and the decisions of final municipal policymakers, including those challenged in this action. The DOE has overseen the NYC system of public schools located throughout all five (5) boroughs of the City of New York and has been, and continues to be, a recipient of substantial federal funds, and has offices at 65 Court Street in Brooklyn, New York 11201.

14. Defendant Melissa Aviles-Ramos was the Chancellor of the Department of Education of the City of New York ("DOE") during the time detailed in this case (Kamar Samuels is the current Chancellor) and had a responsibility to oversee and manage the NYC system of public schools located throughout all five (5) boroughs of the City of New York at all times relevant to this Complaint.

15. Defendant Katherine Rodi is employed by the Department of Education of the City of

New York ("DOE") and started work as the Director of Employee Relations in 2012. She also has the responsibility of overseeing the DOE's Office of Safety and Health, and the Office of Personnel Investigations where she decides who among the DOE's employees are placed on a "Problem Code". She monitors the disciplinary information in the personnel file that is highlighted by the Problem Code for principals who may want to hire a former or current employee. In 2021-2023 Ms. Rodi was in charge of the DOE General Committee, where all the requests for religious and medical accommodations were submitted and Ms. Rodi denied all of them without review. She is sued in her official capacity.

16. Defendant Steven Banks was, at all times relevant herein, the First Deputy Commissioner and General Counsel of the New York City Office of Labor Relations ("OLR"). In that capacity, Banks exercised authority on behalf of the City over the negotiation and administration of the accommodation process applicable to DOE employees under the September 2021 COVID-19 vaccine mandate, including coordinating with various high level City policy makers, arranging policy and strategy with the unions and arbitrators, advising on criteria used at all phases of the DOE religious exemption process, and directing the development of guidance used by officials adjudicating religious accommodation requests. He is sued in his individual and official capacities. OLR, authorized by Executive Order 38 (February 7, 1967) and amended by Executive Order 13 (July 24, 1990), represents the Mayor in the conduct of all labor relations between the City of New York and labor unions representing employees of the City. The Commissioner serves on behalf of the Mayor as the City's liaison with both labor and management in the private sector. The Commissioner

represents the Mayor before the Office of Collective Bargaining in representations and all other matters over which the Office of Collective Bargaining possesses jurisdiction. Additionally, the Commissioner administers the Health Benefits Program, Management Benefits Fund, Employee Assistance Program, Medicare Part B Reimbursement and Pre-Tax Benefits & Citywide Programs including the Deferred Compensation Plan and NYCE IRA. Banks is sued here because he has a close working relationship to both the Mayor and the DOE – OLR sets up hearings for charged DOE Respondents and contract issues – and he knew, or should have known, that he would be sued pursuant to Section 1983 and Monell. See **EXHIBIT 1** Memo-UFT Accommodation Process and **EXHIBIT 1(a),** letter to Martin Scheinman.

17. The improperly withheld emails establish his personal involvement in the conduct at issue, including directing, drafting, and approving the guidance used to justify denial of valid religious accommodation requests. These allegations are sufficient at the pleading stage to support individual-capacity claims under 42 U.S.C. § 1983. Defendant Banks, an attorney, knew or should have known he would be named. In the email chain, Jackie Bray even states that the memo they were drafting for Chokshi would "absolutely be subject to litigation." No prejudice results to Defendants, as this case is at its inception, they have not turned over any discovery and the delay is attributable solely to the City's own multi-year suppression of these records. Fed. R. Civ. P. 15(C)(1)(C)(ii).

18. Melissa Aviles-Ramos, Katherine Rodi, and Steven Banks are named Defendants in this Second Amended Complaint SAC because under HRL § 296(1), supervisors who own some portion of the employer-entity, or who possess sufficient authority to affect personnel decisions, may be held individually liable for acts of

discrimination. See Bonner v. Guccione, 916 F. Supp 271, 279 (S.D.N.Y. 1996) (holding that there is no unfairness in imputing liability to an owner or person high enough up in a company's hierarchy that she or he has power over personnel decisions); Sacay v. The Research Foundation of the City University of New York, 44 F. Supp.2d 505 (E.D.N.Y. 1999) (noting that inference that a supervisor played a role in the allegedly discriminatory decision to discharge an employee provided a minimally sufficient basis for individual liability under the HRL). Additionally, there is a direct link between the violations of law, statute and constitutional rights and a municipal policy or custom that caused the harm.

## **JURISDICTION AND VENUE**

19. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 for claims arising federal questions under 42 U.S.C. 1983, in particular the protections given by the Free Exercise Clause, Equal Protection Clause, First, and Fourteenth Amendments to the Constitution, as well as State law claims codified in NYSHRL and NYCHRL, New York Executive Law §296 and Administrative Code §8-107, in that such claims are so related to Plaintiffs' claims within the original jurisdiction of this Court that they form part of the same case or controversy. Defendants were at all times acting under color of law in breaching their covenant of good will and fair dealing with the Plaintiffs as well as committing fraud in the inducement.

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C 1343(2)(4) for claims arising federal questions under 42 U.S.C. 1983 as Defendant at all times relevant herein acted under color of law.

21. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367(a), as well as

28 U.S.C. § 1391, because the New York City Department of Education has offices at 65 Court Street, Brooklyn, N.Y. This Court has the power to issue declaratory relief pursuant to 28 U.S.C. §§2201 and 2202.

22. The Eastern District of New York (EDNY) takes jurisdiction over Monell claims under Section 1983 based on federal law, specifically the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983. This statute allows individuals to sue municipalities for civil rights violations when those violations stem from official policies or customs.

23. A municipality – the City of New York - is liable when the facts of a matter show a constitutional violation resulting from an official policy, custom, or practice where Defendants (1) discriminated against Plaintiff based on his/her religious beliefs; (2) wrongfully forced Plaintiff into a suspension without pay and then terminated him/her, tenured teachers, by circumventing public policy and placing unconstitutional conditions on employment, due process laws, and the property and liberty rights of the Tenure statute. Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

24. The landmark case Monell v. Department of Social Services established that municipalities can be held liable when their policies or customs lead to constitutional violations. The EDNY has jurisdiction over cases involving violations of federal law occurring within its geographic boundaries. This act provides the legal foundation for individuals to seek redress against local governments for civil rights infringements.

25. The claims in this Second Amended Complaint arise out of the same transaction, occurrence, and series of transactions and occurrences alleged in Plaintiffs' original Complaint and Amended Complaint, and the Second Amended Complaint relates back to the date of the original filing pursuant to Federal Rule of Civil Procedure 15(c)(1)(B).

## BACKGROUND FACTS

### Plaintiff Baker-Pacius

26. Plaintiff, a stellar tenured teacher since 2005, was unlawfully deprived by Defendants acting under color of law, of freedom from abuse of process and malicious prosecution, stigma plus character defamation and diminution of her tenure rights due to her religious beliefs that prohibited her from getting the COVID vaccine. She had a Constitutional due process right to her continued employment with the DOE until after she was given a 3020-a arbitration as detailed in Education Law §3020 and Article 21G of the United Federation of Teachers' contract(CBA). Defendants ignored this approved public policy and Constitutional right.

    Then they set up a different due process for New York City employees such as Plaintiff here, than employees similarly situated with tenure in New York State but outside of New York City. Outside of New York City tenured teachers had the right to a 3020-a hearing if charged with insubordination/misconduct. This arbitration hearing process under a neutral arbitrator is the only "due process" due Plaintiffs. Education Law §§3020 and 3020-a.

27. The Mayor's Emergency Orders also did not, and cannot alter the terms of employment within the City workforce. All terms of employment must be negotiated and ratified by the Union's respective members under the Taylor Law. NYSUCS v PERB, 2026 NY Slip Op 00621.

28. The Mayor and the Commissioner of Health had no authority to deprive Plaintiff of her due process hearing as cited in Ed. Law §§3020 and 3020-a. Vaccinations never existed as terms of employment in the CBA.

29. Plaintiff submitted a religious exemption request in support of her life-long sincere religious beliefs to SOLAS – the DOE's database – on September 21, 2021. **EXHIBIT 2**.

30. The next day, September 22, 2021, she was denied. **EXHIBIT 3**. She tried to re-submit, but the portal for submissions was closed. **EXHIBIT 4**

31. Plaintiff tried again in January 2022 to submit her statement for religious accommodation, but could not get her RA request submitted. She was denied moving forward because she was listed as non-vaccinated.

32. Plaintiff wrote letters to DOE Officials about her denial and the lawless procedures being used to deprive her of her job, and deprive her of the right to choose her bodily integrity and religious beliefs. Defendants never engaged in a statutorily cooperative dialogue thereby engaging in an unlawful discriminatory practice warranting the uniquely broad remedial powers of this Court pursuant to NYSHRL and NYCHRL to reinstate Plaintiff and compensate her for past harm.

33. Plaintiff received the §3020-a hearing request form and also filed grievances to obtain her constitutional rights.

34. Plaintiff Baker-Pacius was denied her Grievances because, she was told by the UFT, the DOE refused to give her a hearing or an Arbitrator. Baker- Pacius has complied with all procedural prerequisites given to her by the DOE and the UFT.

35. In May 2022 Plaintiff received information that the DOE had placed a Problem Code on her personnel file without her consent. She could not find out why this happened, or how she could remove the flag, but she could not work in her chosen profession in New York City.

**<u>Plaintiff Christopher J. Garry</u>**

36. Plaintiff, a stellar tenured PE teacher, was unlawfully deprived by Defendants acting under color of law, of freedom from abuse of process and malicious prosecution, stigma plus character defamation and diminution of his tenure rights due to his medical condition that prohibited him from being vaccinated with the COVID vaccine.

37. Plaintiff Garry at all times had a Constitutional right to informed consent and bodily integrity as well as his continued employment with the DOE until after he was given a 3020-a arbitration as detailed in Education Law §§3020 and 3020-a, as well as in Article 21G of the United Federation of Teachers' "UFT" contract ("CBA").

38. In federal court, the right to bodily integrity, encompassing the right to control one's body, is a complex issue with roots in both common law and constitutional protections, particularly the Fourteenth Amendment's due process clause. In this matter, the vaccine was EUA only, and the forced mandate violated Garry's right to refuse and informed consent pursuant to 21U.S.C §360bbb-3

39. Bodily integrity is the inviolability of the physical body and emphasizes the importance of personal autonomy, self-ownership, and self-determination of human beings over their own bodies. In the field of human rights, violation of the bodily integrity of another is regarded as an unethical infringement, intrusive, and possibly criminal.

40. Defendants ignored the mandatory ratification process and deprived Plaintiff his rights under statute and contract.

41. On September 15, 2021 Plaintiff Garry submitted to SOLAS (Katherine Rodi's and the General Committee's email address) his doctor's note informing Defendants that he was prohibited from getting vaccinated due to a condition where he was in danger of getting blood clots that could cause serious harm, even death. **EXHIBIT 5**

42. On September 21, 2021 Plaintiff Garry was denied a medical accommodation by Defendants because of "Other". He was given one day to appeal. **EXHIBIT 6**

43. Plaintiff attempted to Appeal this ruling, but the Defendants' portal for submission was not open.

44. Other medical accommodation applicants were able to apply anytime. **EXHIBIT 7** Giannakoulis email. Thus, Plaintiff Garry was discriminated against not only because of his category – medical accommodation – but also within that category.

45. Defendants never engaged in a statutorily cooperative dialogue thereby engaging in an unlawful discriminatory practice warranting the uniquely broad remedial powers of this Court pursuant to NYSHRL and NYCHRL to reinstate Plaintiff and compensate him for past harm. Garry has complied with all procedural prerequisites required by law.

46. The Mayor's Emergency Orders cannot alter the terms of employment within the City workforce. The terms must be negotiated and ratified by vote of all members. As this never happened, the Mayor and the Commissioner of Health had no authority to deprive Plaintiff of his due process hearing as cited in Ed. Law §§3020 and 3020-a.

47. Vaccinations for COVID never existed as terms of employment in the CBA, and the CBA was never changed to add such mandated vaccinations. The Supreme Court has repeatedly held that there is a right to be free from unjustified intrusions on personal bodily integrity, suggesting that such a right is protected by the due process clause of the Fourteenth Amendment. These include unsolicited medical procedures. Union pacific Ry. Co. v Botsford, 41 U.S. 250 (1891); Cruzan ex rel. Cruzan v. Director, Missouri Department of Health, 497 U.S. 261, 312 (1990) ("Thus, the State's general interest in life must accede to Nancy Cruzan's particularized and intense interest in self-determination in her choice of

medical treatment. There is simply nothing legitimately within the State's purview to be gained by superseding her decision.")

48. Plaintiff filled out a form with the UFT requesting that the Defendants give him a 3020-a arbitration before he received any termination notice, however the Defendants never responded. The UFT told him that the DOE refused to schedule any Education Law §3020-a hearings.

49. In May 2022 Plaintiff received information that the DOE had placed a Problem Code on his personnel file without his consent. He could not find out why this happened, or how he could remove the flag from his file, scarring his good name and career and leaving him without any information on how to remove this scarlet letter.

**Defendant's Actions Against Plaintiffs' Protected Rights**

50. In 2020, the virus responsible for COVID-19 was officially named SARS-CoV-2, which stands for severe acute respiratory syndrome coronavirus 2. The disease it causes was named COVID-19, short for coronavirus disease 2019. The virus was first identified in late 2019 and was initially referred to as the 2019 novel coronavirus. On February 11, 2020, the World Health Organization (WHO) officially named the disease COVID-19 and the virus SARS-CoV-2. The name SARS-CoV-2 was chosen due to its genetic similarity to the original SARS virus from 2003. By early 2020, the virus had rapidly spread, leading to a global pandemic declaration by WHO on March 11, 2020.

51. At no time did Defendants inform Plaintiff Garry or anyone submitting medical accommodation requests that the vaccines were Emergency Use Authorization (EUA). For EUA use, federal law required individualized assessment, prohibited coercive conditions, and mandated informed consent. Full FDA approval did not arrive until after

the mandate was announced and after DOE/UFT had already begun constructing the blanket denial scheme. One of the mandates of the EUA designation is that no one can be forced to get vaccinated, and must be given the right to refuse. In 2021 all vaccines were EUA only. Federal Law 21 U.S.C. §360bbb-3 required the option to refuse, and the DOE did not tell any employee this information. Also, the UFT did not advise members of their statutory right to decline an EUA product.

52. In March, 2020, the UFT General Counsel and the General Counsel for the DOE signed a Memorandum of Understanding wherein they agreed to team up on promoting vaccinations and changing conditions of employment whenever and wherever necessary. Nothing ever came of this MOU, because any changes made in the UFT contract must be ratified by a vote of the membership before validation. This vote and any mention of this secret MOU was not made public. But this secret agreement allowed the DOE to proceed to fire DOE employees without interference by the UFT.

53. The UFT hid from membership that in 2020 through November 2021 they paused all grievances concerning the forced leave without pay and denial process for requests of accommodations. These actions violated the Taylor Law, exactly as the summary terminations did. See Matter of New York State Unified Court System v New York State Public Employment Relations Board, 2026 NY slip Op 00621; Decided February 10, 2026 by the Appellate Division, First Department (“PERB rationally found, based on the record before it, that UCS's procedure implementing its decision to require employees to be tested weekly for COVID-19 and, later, to be vaccinated, was not excluded from mandatory bargaining with respondent unions. Even if an employer has the undisputed right to make a particular decision that is "not a subject of mandatory negotiation, the

[employer] must negotiate the procedures necessary to effectuate that right" (Matter of City of Long Beach v New York State Pub. Empl. Relations Bd., 39 NY3d 17, 26 [2022]; Matter of City of Watertown v State of N.Y. Pub. Empl. Relations Bd, 95 NY2d 73 [2000])).

54. The concealment of Federal law and rights can be seen not only by the coverup of the EUA status of the vaccines, but also the many years of delay before Attorney Jimmy Wagner was allowed to see the emails that were so shocking, and brought in Monell claims to Federal lawsuits. (Ex. 1, 1(a))

55. In 2019 national and international media created a panic-driven public rush to allegedly “protect” the people at a global scale from a so-called “lethal” virus which came to be known as COVID-19.he City of New York conspired to make money from this pandemic. Plaintiffs argue that Defendants did not see this as the emergency claimed, but as an opportunity to decrease the City’s payroll with massive layoffs of protected employees, after COVID-related emergencies appeared in the media.

56. Under color of law, the City has Mayoral Control over the DOE, and conspired to fire anyone at any time, despite the employees’ tenure status. However, Defendants were never able to get the State legislature to make this change so the only way they could get rid of all the senior civil servants and tenured educators was by coercion, fraud, and lawless actions hidden from the general public. This became the mantra of the CVM in NYC under the fraudulent scheme of “protecting the safety and welfare of the children”. The CVM did little or nothing to pursue this goal.

57. In 2020, New York City shut down entirely, and any restaurants or public places that stayed open were punished. Teachers remained at home, teaching remotely from March

2020 to September 2021.

58. On August 5, 2021 CDC Director Rochelle Walensky said on national TV that the vaccines could not stop transmission of Covid-19.( Blitzer, W. (2021, August 5) Transcript: Interview with CDC Director Dr. Walensky. The Situation Room, CNN. http://www.cnn.com/TRANSCRIPTS/2108/05/sitroom.02.html

59. This widespread anti-CVM media message was not convenient for New York City and the Defendants, so they doubled down on trashing all who dared challenge their removal from employment because they would not, could not, or did not get the vaccine. With Mayoral Control over the DOE, the City had authority to push policies on employees at any time.

60. In 2021 national media and TV news reported that scientists and doctors did not believe that COVID vaccines stopped transmission of the COVID virus, and that natural immunity was more powerful than any vaccine. They spoke out against any mandate to vaccinate. See **Declaration of Jayanta Bhattacharya** https://www.documentcloud.org/documents/22125801-bhattacharya-declaration/ **The Man Who Talked Back: Jay Bhattacharya On The Fight Against COVID Lockdowns** at https://www.hoover.org/research/man-who-talked-back-jay-bhattacharya-fight-against-covid-lockdowns.

61. Judge Gerard J. Neri in the case Medical Professionals For Informed Consent et al., v Mary T. Bassett, Index. No. 008575/2022 wrote: “the Court finds the Mandate is arbitrary and capricious.”

62. On August 12, 2021 Harry Nespoli, Chairperson of the Municipal Labor Committee and

aware of the secret negotiations between the UFT and DOE on discipline and rights, wrote a letter to Renee Campion, Commissioner of the New York City Office of Labor Relations ("OLR") wherein Nespoli wrote about MLC's officers meeting with the City to negotiate working conditions for municipal employees who could not get the vaccine due to religious, medical, or other reasons. He also mentioned:

> "Make no mistake, despite calling this a vaccination policy, the City's proposal creates a new criterion and process for discipline that would allow agencies to suspend workers without pay and without the typical forms of due process provided for under the collective bargaining agreements and law….no policy should be implemented before it is negotiated."

63. On August 24, 2021, DOHMH Commissioner Chokshi imposed the first version of a COVID-19 vaccination mandate (the "CVM") for all employees in the City school district, which required all DOE staff, City employees, and contractors who "work in-person in a DOE school setting or DOE building" and others in City schools to – no later than September 27, 2021 – provide proof that they have at least received the first dose of a vaccine.( Order of the Commissioner of Health and Mental Hygiene to Require COVID-19 Vaccination For Department of Education Employees, Contractors, and Others, NEW YORK CITY DEPARTMENT OF HEALTH AND MENTAL HYGIENE (Aug. 24, 2021), https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe.pdf.

64. The Mandate was amended twice: on September 15, 2021 to provide for reasonable accommodations, wherein Chokshi wrote: "¶6. Nothing in this Order shall be construed to prohibit any reasonable accommodations otherwise required by law."); and on September 28, 2021 to change the compliance deadline to October 1, 2021.

https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-vaccination-requirement-doe-3.pdf).

65. On September 10, 2021 Arbitrator Martin Scheinman issued an Award that set up an accommodations process for DOE employees after the United Federation of Teachers (UFT) and the Department of Education (DOE) reached an impasse on allowing accommodations under the Law and First Amendment. This Award detailed a procedure that was discriminatory and excluded any general applicability, giving lip service to fairness and due process. His Award also violated the Taylor Law and the UFT contract, which Arbitrator Scheinman assisted in writing. He therefore knew he was defrauding the unknowing victims, Plaintiffs and others similarly situated and handing in accommodation requests that were never reviewed by the Defendants. Scheinman assigned his company, Scheinman Arbitration and Mediation Services ("SAMS"), to determine eligibility to retain employment without getting vaccinated, but the hidden goal was to deny everyone. SAMS heard 20 or so 15-minute appeals per day and made, allegedly, $7500/day denying all appeals. The decisions were sent out with an "X" in the box beside "DENIED". **EXHIBIT 8** Scheinman Award. The City wanted an expedited policy, so Martin Scheinman complied, in his Award. (See the Scheinman Award, "expedited" Review Process pp. 8, 12, 14).

66. In his Award, Scheinman created a forced Leave Without Pay (LWOP) from whole cloth. A forced leave ("LWOP") or suspension without pay is retaliatory discrimination, according to the U.S. Supreme Court in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006). Justice Breyer delivered the opinion of the Court:

> Title VII of the Civil Rights Act of 1964 forbids employment discrimination against "any individual" based on that individual's "race, color, religion, sex, or national

> origin." Pub. L. 88–352, §704, 78 Stat. 257, as amended, 42 U. S. C. §2000e–2(a). A separate section of the Act—its anti-retaliation provision—forbids an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. §2000e–3(a).
>
> …. an indefinite suspension without pay could well act as a deterrent, even if the suspended employee eventually received backpay. Cf. *Mitchell,* 361 U. S., at 292 ("[I]t needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions"). Thus, the jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one…..suspension without pay is retaliatory discrimination."

67. The Scheinman Award (EX. 8) generally provides, as relevant here, that:

(a) Employees had until November 30, 2021 to elect to either (1) separate from service with incentives or (2) remain on an extended unpaid leave through September 5, 2022 with health benefits and the ability to return if vaccinated or the mandate is lifted.

(b) If an unvaccinated employee did not select either of these options by the November 30, 2021 deadline, as of December 1, 2021, the City employers "shall seek to unilaterally separate employees who have not opted" to either separate from service or remain on an unpaid leave. However, all parties reserved their existing rights in this regard, as the Awards explicitly state: "except for the express provisions contained, herein, all parties retain all legal rights at all times relevant, herein." (EX 8, pp. 17-18).

68. The Award did not provide for any policy related to termination, and the Award does not determine that the DOE has a right to summarily terminate unvaccinated employees who have not selected from the personnel policies available to them by November 30, 2021. Rather, the Award states that City employers can *"seek to"* terminate those employees, which they have now done in an impermissible manner, given the Awards' explicit reservation of rights.

69. In an AFFIRMATION dated February 8, 2022, UFT General Counsel Beth Norton wrote,

> "Approximately 240 UFT-represented DOE employees continue to work for the DOE remotely without being vaccinated for COVID-19, having received a medical exemption or a religious accommodation. The DOE has advised that some of these employees will be directed to work in-person at non-school facilities later this month, which is permissible under the Mandate.
> From August 23, 2021 through at least November 22, 2021, the DOE sent numerous emails to staff regarding the vaccine mandate and consequences of an employee's failure to comply with the DOE Mandate. None of the email communications indicate, or even mention, that unvaccinated UFT members will be subject to summary termination without regard to due process rights.
> Since the order in Kane was issued, many UFT members have advised the UFT that they were deterred from filing an application for accommodation under the original narrow parameters because they knew they would be denied. Others applied and were deterred from appealing on the same basis. Indeed, by communicating the narrow parameters the DOE hoped to cut down on applications that it did not intend to grant. While the DOE has begun denying these post-Kane applications at the agency level, they are not permitting those employees to appeal, as others were able. Now, some of these employees – who are subject to the same unconstitutional procedures rejected by the Second Circuit – are among those who received notices earlier this week that they will be summarily terminated effective February 11, 2022. By placing these individuals on the termination list before some of their initial applications have been determined, the DOE demonstrates that they will be summarily denied, just as the DOE is seeking to summarily terminate them……
> Before the most drastic action of termination, UFT members are entitled to access to the due process protections embodied in statutes and agreements the DOE is compelled to follow. To hold otherwise would dismantle the statutory and contractual due process procedures afforded to UFT members as public employees…….Tenured pedagogues such as classroom teachers, guidance counselors, school secretaries, school social workers, and school psychologists, can only be disciplined after an Education Law § 3020-a due process hearing before a neutral hearing officer. See Education Law 3020-a; Article 21 of the Classroom Teacher CBA….. Therefore, the DOE's attempt to summarily terminate unvaccinated employees denies UFT-represented DOE employees the rights they are guaranteed by statute and contract prior to adverse employment action."

(The New York City Municipal Labor Committee et al., v The City of New York et al., Index. No. 151169/2022, Doc. No. 30.)

70. Defendants created a fundamental constitutional problem: the arbitration policy required accommodation if religious beliefs qualified under the discriminatory standard (in which

case employees "shall remain on payroll" regardless of hardship), while the Citywide Panel routinely denied similarly situated employees on alleged "undue hardship" grounds. The only difference was whether the employees' beliefs qualified under the discriminatory arbitration standards. Defendants made sure that almost no one did qualify.

71. While Plaintiffs remained without appeal for the denial of their requests for accommodation, the City rewarded exemptions to professional athletes, performing artists, and those "accompanying" them from vaccination requirements. Many of the now-exempt earn millions of dollars a year. This is in sharp contrast to unvaccinated (now-terminated) UFT members similarly situated to Plaintiffs. See Executive Order 62,https://www.cbsnews.com/newyork/live-updates/eric-adams-vaccine-mandate-pro-athletes-performers-kyrie-irving/

72. In November 2021 the Court found that the procedures and criteria created by Martin Scheinman and used by Defendants for approving or denying CVM accommodations were likely unconstitutional. The process used by SAMS was thrown out as invalid as a matter of law. A new city-run entity, the Citywide Panel, was put in place of SAMS to determine appeals of the denials by SAMS and SOLAS. **EXHIBIT 9.** Court of Appeals.

73. The Citywide Panel also handed out blanket denials with acceptable buzz words such as "undue burden" and "did not meet criteria" to deny all applicants. Thus, the Citywide Panel decisions did not comply with Title VII or Human Rights Laws and was no better than SAMS. This was recently proven with the Affirmation of the official who set up this Panel, Eric Eichenholtz. Mr. Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel -

appeared to not even know that there is a heightened “undue hardship” standard in the New York State and New York City Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the “more than a de minimus burden” standard when assessing undue hardship. He admitted not complying with any Title VII criteria for approving or denying accommodation/exemption requests because there were simply too many people asking for these accommodations. **EXHIBIT10** Affirmation of Eric Eichenholtz, and **EX.11,** his Deposition from Masciarelli v NYC Dep’t of Education, 1:2022-cv-00752, May 24, 2022.

74. The DOE General Committee, never heard of before Defendant Katherine Rodi was deposed in 2025, handled the first denials of all requests for accommodations/exemptions by SOLAS, the email of Human Resources. (See docket #44, Exhibit A Deposition of Katherine Rodi; and Masciarelli v New York City Department of Education, DOCKET #22-cv-07553 (CBA)(VS)). In her testimony she said that she was part of a NYC DOE “General Committee” and she denied every DOE employee’s accommodation appeal without reviewing any of them, and explains that the general committee members were under pressure to reopen in-person schooling and couldn’t do so without replacing at least some of the DOE employees who were barred from entering school buildings. Rodi describes the flood of requests for accommodations the DOE received during the fall of 2021:

> “We received it from teachers, from custodians, from school food workers, from principals, from assistant principals, from, you know, name the person, name the job. And the fact is that we needed to run a school system . . . [T]he only option was [sic] had was to resign them from the system without any bias so that we could hire other teachers. Because, again, we had a school to run.”

75. Later [Attorney Austin] Graff questions Rodi about the details of what happened to

each individual’s request for an accommodation:

> “Q. Okay. So when you received an application for religious exemption, what did you review to make a determination whether to grant or deny?
> A. We made sure that the person had appropriately applied in the right area. A number of people would check religious exemption, but they were really looking for a medical exemption.
> We also made sure that they actually submitted something with their application, because some people included blank sheets of paper. … And then we denied their request.”

76. The Citywide Panel made no independent inquiry of whether accommodating applicants would pose an undue hardship to the various agencies’ operations, instead relying on whatever agency description of undue hardship already existed in the record. The Citywide Panel also did not seek information regarding whether employees posed a direct threat to others, the number of employees agencies could afford to accommodate, agencies’ ability to make payroll, any additional costs of accommodating employees, the degree to which the geographic separateness or administrative or fiscal relationship of the facilities would make accommodations more difficult or expensive, agencies’ capacities to work with remote workers, agencies’, employer’s ‘undue hardship’ as ‘an accommodation requiring significant expense or difficulty,’ and mandating that ‘[t]he employer shall have the burden of proof to show such hardship.’” Litzman v. New York City Police Dep’t, 2013 U.S. Dist. LEXIS 162968, *20 (S.D.N.Y. 2013) (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

77. The denials of appeals without individual review for religious or medical accommodations/exemptions were part of a secret scheme designed by the City of New York to remove as many public workers from the City payroll as possible, not only to reduce the City budget, but to enforce the animus NYC government has for anyone who wants to challenge any policy put into place by fiat, especially religious objectors

to the COVID Vaccine Mandate (CVM). Title VII, Human Rights Laws, and cost details for undue burden excuses were ignored. These emails were followed up with a letter sent from OLR Defendant Banks to Martin Sheinman. See **EXHIBIT 1** Memo-Accommodation Process; **Ex. 1(a)** letter.

78. Fiat is an authoritative decree, order, or authorization, while law is a system of rules created and enforced through social or governmental institutions to regulate behavior.

79. The lawless termination without probable cause was without support from the Plaintiffs' Union, ("UFT"), and conflicted with the terms and conditions of employment in the contract, which was never changed because the Mandate was never ratified by a vote by the membership, never voted on and approved by the State legislature, and violated the Taylor law.

80. The constitutionality and legality of the DOE's implementation procedures — as distinct from the mandate itself — was not judicially confirmed to be unlawful until February 10, 2026, when the Appellate Division, First Department, decided Matter of New York State Unified Court System v. New York State Public Employment Relations Board , 2026 NY Slip Op 00621, holding that an employer's failure to bargain the procedures for implementing a COVID-era vaccine mandate violated the Taylor Law, *regardless of the legality of the underlying mandate decision.* That ruling confirmed what Plaintiffs could not previously have known: the Defendants' categorical denial procedures were procedurally unlawful from their inception.

81. At all times relevant to this complaint Plaintiffs oppose Defendants' misuse of their City positions to fire anyone who requested a religious or medical accommodation/exemption from getting vaccinated with the COVID vaccine, without legislative approval or

contractual right. Plaintiffs' rights to the job protections in their UFT contract were never changed because despite any policies of the Defendants saying otherwise, all changes to the contract must be ratified by the membership. This never happened. Defendants tried to sway the arbitrators to deny all applicants. This policy was successful, and all who applied to SAMS were denied..

82. At no time did the DOE warn the Plaintiffs or any teacher similarly situated that if they did not get vaccinated they would be terminated. Not only that, but neither Plaintiff has been previously in any Court with a cause of action for the on-going stigma and damage done by the lawless process detailed here when both Plaintiffs were unilaterally placed on the Problem Code on or about October 4, 2021. Both Plaintiffs did not know they were flagged until on or after May 2022. See **EXHIBIT 12** Problem Code documents.

83. This Problem Code flag is a disciplinary code that permanently blocks Plaintiffs from getting paid to do their jobs which were Constitutionally protected by the rules of tenure and Education Law §3020.Defendants, under color of law, ignored this law because it was not convenient, and thus deprived both Plaintiffs of their property right of employment with a property right to due process.

84. Despite the trashing of the Scheinman Award as unconstitutional, and the denial of medical accommodations without informed consent as mandated by EUA Regulations, Defendants did not remediate the harm done for those who were denied, including Plaintiffs, under this so-called "accommodation process". Indeed, Defendants have stood by the arbitration policy and procedure, despite its untenable and unconstitutional procedures. Under Masterpiece Cakeshop v. Colorado Civil Rights Commission, 138

S.Ct. 1719, 1730 (2018), a failure to disavow discriminatory standards defeats neutrality and triggers strict scrutiny. In this matter, Plaintiffs challenge their terminations as barred by law, and their employment contract.

85. Plaintiffs are entitled to relief under the Second Circuit's holding in Kane v. de Blasio, 19 F.4th 152 (2d Cir. 2021), in which the Court held that the criteria in the implementation of the COVID Vaccine Mandate ("CVM") were not neutral or generally applicable and likely violated the First Amendment. The City failed to offer any defense that could justify their actions under strict scrutiny, and at no time gave details of what they meant by "undue burden" or "did not meet criteria".

86. This sordid tale of animus in providing religious and medical accommodations should have stopped before Plaintiffs were terminated and they should have been given either the same mask-and-test policy they worked under from March 2020-September 2021, or they should have been given a remote teaching position or a reassignment for the duration of the mandate.

87. The DOE did not consider the consequences of their policy, and did not care to know about any consequences. Defendants rule by fiat, not by recognized Law. The secret is out. The Defendants never wanted any accommodations to interfere with the firing of public employees and played along with those who protested in order to secretly undermine Constitutional Law and union contracts citywide. Their goals were powered by their animus toward unvaccinated employees. Even the UFT played along by pausing grievances and telling unvaccinated members that they had no right to their jobs unless they got vaccinated. This clearly shows misuse of power by the City officials and intent to discriminate. See EEOC v Abercrombie & Fitch Stores, Inc., U.S. Supreme Court No.

14-86, June 1 2015.

88. Plaintiffs submitted timely requests for a religious exemption/accommodation (Baker-Pacius) and a medical accommodation/exemption (Garry) to the DOE per instructions from SOLAS (HR database). They tried to get their accommodation by applying to the Citywide panel, but their requests were consistently denied without explanation.

89. On February 10, 2023 Mayor Adams ended the COVID-19 vaccine mandate and made it voluntary. Yet no one at the DOE told Plaintiffs they could re-apply for their jobs. When Plaintiff Baker-Pacius tried to be reinstated, she never received a response.

90. Plaintiffs were found guilty of misconduct without knowing they had been charged with anything, denied a full and fair hearing, then terminated for their religious beliefs. Fairness requires the opposite – charges, hearing, found guilty, terminated.

91. Plaintiffs were denied a due process hearing and given no accommodation whatsoever, despite the fact that the DOE has hundreds of employees throughout the City that either got the exemption from getting the vaccine or they were placed into a reassignment location at home. Employees who worked for private companies or organizations were treated differently than public employees.

92. The chaotic mess of the explosion of inequalities of law and vaccinations continue today. The New York Post highlighted the hundreds of employees who were getting exemptions: **City Grants Vaccine Mandate Exemptions For Hundreds Of Public School Employees** https://gothamist.com/news/city-grants-vaccine-mandate-exemptions-hundreds-public-school-employees; Gothamist, Sept. 24, 2021. Plaintiffs were denied, reasons unknown.

93. Plaintiffs are former tenured employees of the New York City Department of Education ("DOE") who were disciplined without notice by termination on February 11, 2022 after the DOE categorically denied Plaintiff Baker-Pacius' sincerely held religious accommodation request and Plaintiff Garry's request for a medical accommodation/exemption request without individualized review.

94. Plaintiffs received no justification for their being denied their appeal for accommodation despite their completion of their administrative remedies to obtain such an accommodation.

## CAUSES OF ACTION

## AS AND FOR A FIRST CAUSE OF ACTION FOR RELIGIOUS DISCRIMINATION, LIABILITY UNDER THE FREE EXERCISE CLAUSE AND MONELL (42 U.S.C. 1983) (Baker-Pacius)

95. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 96 as if the same were fully set forth at length herein.

96. Under 42 U.S.C. § 1983, a plaintiff may seek damages against any person who, acting under color of state law, deprives the plaintiff of rights secured by the Constitution or laws of the United States. A municipality is a "person" within the meaning of § 1983. Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 690 (1978). Municipal liability attaches when a constitutional deprivation results from: (1) an official policy or custom of the municipality; (2) a failure to train amounting to deliberate indifference to known constitutional rights; or (3) a decision by an official with final policymaking authority. Each of these three independent pathways is satisfied here, and Plaintiff pleads all three in the alternative and in the conjunctive.

97. Plaintiff Baker-Pacius submitted to Defendants in September 2021 a statement on her sincere religious beliefs which forbade her from getting vaccinated with the COVID-19 vaccine. She was denied. She tried again soon after, and the portal was closed, so she filed a Grievance to get her 3020-a Hearing and her religious accommodation. She completed her administrative remedies as known to her after asking the DOE and the UFT for relief.

98. The implementation process used by Defendants to deny Plaintiff Baker-Pacius her accommodation was unconstitutional because it violated her rights and those of others similarly situated to religious freedom under the First Amendment.

99. Rules, Orders and Memoranda of Agreements that burden religion are subject to strict scrutiny under the Free Exercise Clause when they are not neutral or not generally applicable. The policies at issue here are neither.

100. Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts medical disabilities in such a way as to bring harm to the person inflicted with these specific needs, such as Plaintiff Garry. Animus need not appear in the text of the regulation but must be examined in context through scrutiny of legislative history, related regulations and policies, implementing policies and commentary by decision-makers, among other sources. Here, in the MEMO Ex. 1 and other documents applied to both religious and medical accommodations, such as the response to timelines of one day v "anytime" (Ex. 7), animus against any DOE employee who submitted a request for an accommodation is clear. Martin Scheinman's Award (Ex. 8) created two unequal tracks – one, available for Christian Scientists, which had no mechanism for

denial based on undue hardship, and the other available for the disfavored religions, revealing further animus.

101. Neither the Mandate nor the religious accommodation policies were generally applicable.

102. Here, there is no compelling reason to mandate vaccines, as the COVID-19 vaccines cannot stop the spread of disease. Thus the implementation of the CVM also was unconstitutional as it targeted some religions and not others.

103. Moreover, to the extent that stopping the spread of COVID-19 is the interest, far more effective and less intrusive measures exist that could be adopted instead.

104. For acting on her due process rights and her religious beliefs, Plaintiff was secretly placed on a Problem Code as punishment, yet other teachers similarly situated were granted exemption/accommodations for their religious beliefs which prohibited getting vaccine.

105. The two most visible signposts of religious discrimination are (1) the continuing wrong of aligning the accommodation process with a vacuous argument that any remote classroom or other such reassignment would be an "undue burden" and no review of any religious accommodation request was necessary; and (2) once the vaccine was declared voluntary and found to be ineffective, no reinstatement or restitution was made available.

106. Defendants have neither a legitimate nor compelling interest in exercising express and overt religious discrimination. Defendants' invocation of "undue hardship" "other" and "does not meet criteria" defenses are plainly false pretexts attempting to cover for the Defendants' explicit religious discrimination.

107. Defendants had knowledge of Plaintiff's sincerely-held religious beliefs yet chose to ignore these beliefs, forced her into a suspension without pay, denied her exemption request and Appeals based upon an unconstitutional ruling that cited "undue burden"

without any further details or reason, and terminated her employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023:

> "The Court holds that showing "more than a de minimis cost," as that phrase is used in common parlance, does not suffice to establish "undue hardship" under Title VII. ….. Further, a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice, cannot be considered "undue." Bias or hostility to a religious practice or accommodation cannot supply a defense."

108. Defendants wrongfully, deliberately, in bad faith and under color of law attempted to fraudulently induce Plaintiff to choose to relinquish her protected religious beliefs in order to submit to an experimental vaccine, and then punished her for not agreeing to this extortion and discrimination.

109. A government employer may not punish some employees, but not others, for the same activity, due only to differences in the employees' religious beliefs. Likewise, the government may not test the sincerity of an employee's religious beliefs by judging whether her beliefs are doctrinally coherent or legitimate in the eyes of the government.

110. A government employer may not discriminate against religion by implementing policies that exempt employees for secular reasons more readily than religious ones. All such discrimination violates the Free Exercise and Establishment Clauses of the First Amendment and the corresponding rights incorporated against the states by the Fourteenth Amendment. "When there is no plausible explanation for religious discrimination other than animus, it is subject to strict scrutiny, regardless of whether the government employer admits that its actions were motivated by hostility to certain religions." (Jane Does et al., v Board of Regents of the University of Colorado et al., No. 22-1027, U.S. Court of Appeals D.C. No. 1:21-CV-02637-RM-KMT., May 7, 2024).

111. At all relevant times, the City had full discretion to repeal, amend, carve-out or pause any aspect of the Mandates and appeal procedures, or repeal them altogether. Yet despite mounting evidence that the Mandates were unnecessary, and knowledge that Plaintiff and thousands of others needed religious accommodation, the City did not amend any of the temporary "emergency" policies to provide relief. And when they did announce possible reinstatement in 2023 and again in 2025, no one was reinstated who had been wrongfully terminated.

112. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

113. Based on the foregoing, Defendants under color of law subjected Plaintiff to discrimination on the basis of her religious beliefs, unlawfully discriminating against the Plaintiff in the terms and conditions of her employment in violation of her Constitutional rights to property, liberty and a due process, 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law), N.Y.C. Human Rights Law 8-107, and Monell Section 1983.

**AS AND FOR A SECOND CAUSE OF ACTION: VIOLATION OF EUA RULES and MONELL LIABILITY FOR UNCONSTITUTIONAL POLICY COMPELLING ACCEPTANCE OF EUA MEDICAL PRODUCTS (42 U.S.C. 1983)**

**(Both Plaintiffs)**

114. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 113 as if the same were fully set forth at length herein.

115. 21 U.S.C. § 360bbb-3 has no private right of action, but is used here to prove Monell liability under Section 1983 as well as Defendants' discrimination, retaliation and

harassment against Plaintiffs after they submitted their requests for a medical (Garry) and a religious (Baker-Pacius) accommodation to remain on salary while unvaccinated and assigned to any remote location.

116. EUA, or Emergency Use Authorization has rules and guidelines that were ignored by Defendants in order to keep their fraudulent scheme, keeping intact their denial of almost all medical and religious accommodation requests. Two rules are: there can be no forced vaccinations, and there must be informed consent.

117. Congress enacted 21 U.S.C. § 360bbb-3 as part of the Project BioShield Act of 2004 to authorize the Secretary of Health and Human Services ("HHS Secretary") to permit emergency use of medical products that have not received full FDA approval when specified emergency conditions are satisfied. The statute confers a narrow, condition-laden grant of authority to expedite access to unapproved products during declared emergencies — it does not constitute, create, or substitute for full FDA licensure, and it does not authorize state actors or municipalities to override the individual rights Congress simultaneously and expressly enshrined within the same statutory text.

118. The EUA framework operates as a congressionally designed bargain: in exchange for the expedited deployment of products whose safety and efficacy profiles remain incompletely established, Congress guaranteed that each individual to whom an EUA product is offered retains an unconditional right of refusal. That right is not aspirational, not suggestive, and not subject to administrative override. It is a statutory mandate imposed by Congress in the exercise of its plenary authority over the regulation of drugs and biologics under the Commerce Clause.

119. Section 360bbb-3(e)(1)(A)(ii)(III) mandates — using the word "shall," which is the

language of legal obligation and not of discretion — that individuals must be informed "of the option to accept or refuse administration of the product." The statute creates no exception for government employees, for uniformed personnel, for healthcare workers, for public school employees, or for any other employment category. Congress drew no such distinction, and no federal agency, state legislature, or municipal council possesses authority to engraft one.

120. 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III): The full text reads that individuals must be informed

"of the option to accept or refuse administration of the product, of the consequences, if any, of refusing administration of the product, and of the alternatives to the product that are available and of their benefits and risks." No provision of the statute authorizes a state actor or employer to substitute termination of employment for this neutral, individualized disclosure."

121. The distinction between Emergency Use Authorization and full FDA approval under the Biologics License Application ("BLA") process is not merely technical — it is constitutionally and legally foundational to this case. A product authorized under EUA has not completed the clinical trial process required for full licensure. The FDA's own regulations and the text of § 360bbb-3 acknowledge that the risks and benefits of EUA products are, in the statutory phrase, "potential" rather than established. An EUA authorization and a BLA approval are distinct legal instruments conferring distinct legal statuses on the products they govern. Courts confronting vaccine mandate litigation must not conflate these two categories.

122. At all times relevant to this Complaint, the vaccine implemented here was the Pfizer-BioNTech COVID-19 Vaccine authorized under Emergency Use Authorization — it was not Comirnaty, the product that received BLA approval on August 23, 2021. The two products are legally distinct instruments. On the very day FDA approved Comirnaty, FDA simultaneously reissued the

Pfizer-BioNTech EUA, expressly confirming in writing that Comirnaty and the EUA product are "legally distinct with different labels." Defendants' argument that the BLA approval of Comirnaty rendered the EUA mandate a mandate of an approved product is legally untenable: Comirnaty was not available in meaningful quantities in the United States at the relevant time, and Plaintiffs were offered and compelled under threat of termination to accept only the EUA-authorized product.

123. The informed-consent notice requirements embedded in § 360bbb-3 are not advisory. Section 360bbb-3(e)(1)(A)(ii)(I) requires that individuals be informed "that [the Secretary has authorized] the emergency use of the product." Defendants' vaccine mandate gave no such notice. Defendants did not inform Plaintiffs that the product was authorized under EUA rather than fully approved. Defendants did not present Plaintiffs with the FDA-mandated fact sheet. Defendants did not inform Plaintiffs of the option to refuse. This complete failure of statutory notice stripped Plaintiffs of the informed consent Congress mandated and rendered Defendants' conduct unlawful from its inception.

124. The federal EUA statutory scheme operates as a preemption floor. Congress constructed a federal framework that occupies the field of informed consent for EUA-authorized products and establishes a minimum below which no state or local actor may operate. A municipality that mandates consumption of an EUA product, threatens termination for refusal, and provides none of the disclosures Congress prescribed contravenes federal law directly. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, state and local law that conflicts with the federal EUA framework is void. Defendants' mandate, as applied to Plaintiffs, is void under this analysis.

125. The statutory acknowledgment that EUA product risks are "potential" — Congress's own word — is not rhetorical. Section 360bbb-3(c)(2)(B) conditions any EUA authorization on a finding that "the known and potential benefits of the product . . . outweigh the known and potential risks."

Congress's deliberate use of "potential risks" is a legislative acknowledgment that the risks of EUA-designated products remain incompletely characterized at the time of authorization — a point that defeats any argument that an EUA product may be treated as equivalent to a fully licensed product for purposes of mandatory employment conditions.

126. Congress's use of "potential risks" is a legislative finding that the risk profile of EUA products is not fully established at the time of authorization. A municipality that compels employees to accept a product whose risks Congress itself declared "potential" — on pain of losing their livelihoods — does not act within any lawful zone of authority.

127. Under 42 U.S.C. § 1983, a plaintiff may seek damages against any person who, acting under color of state law, deprives the plaintiff of rights secured by the Constitution or laws of the United States. A municipality is a "person" within the meaning of § 1983. Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 690 (1978). Municipal liability attaches when a constitutional deprivation results from: (1) an official policy or custom of the municipality; (2) a failure to train amounting to deliberate indifference to known constitutional rights; or (3) a decision by an official with final policymaking authority.[FN5] Each of these three independent pathways is satisfied here, and Plaintiffs plead all three in the alternative and in the conjunctive.

128. Here, Defendants promulgated an express, written vaccine mandate and accommodation process requiring all covered employees to be fully vaccinated against COVID-19 as a condition of continued employment or give a valid reason to remain unvaccinated and continue to work. The process was made meaningless by the total disregard of Defendants for constitutional rights and any other rule, law, or contractual benefit.

129. The CVM and accommodation process were issued by Defendants, who believed they held final policymaking authority over employment conditions for covered employees, but they did not. Yet

they used instead official written directives, agency memoranda, and administrative enforcement mechanisms. The mandate is a formal, official policy of the municipality within the meaning of Monell. The mandate made no provision for employees to assert their federally-protected right to refuse an EUA product; it made no EUA disclosures; and it imposed termination as the sole consequence for non-compliance.

130. When Defendants compelled employees to accept an experimental product as a condition of employment — on pain of termination — without providing the informed-consent disclosures the federal statute mandates, Defendants violated Plaintiffs' constitutionally protected liberty interest in bodily integrity, secured by the substantive due process component of the Fourteenth Amendment. Washington v. Glucksberg, 521 U.S. 702, 720 (1997).

131. The right to refuse unwanted medical treatment is a fundamental liberty interest. The Supreme Court held in Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261, 278 (1990), that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." That right does not diminish when the person seeking to exercise it is a government employee. In Rochin v. California, 342 U.S. 165, 172 (1952), the Supreme Court held that government-compelled physical intrusion into the human body that "shocks the conscience" violates due process. Compelling the injection of an EUA-designated substance into a person's body, under threat of termination, without the informed consent Congress required, shocks the conscience within the meaning of Rochin.

132. Defendants were on actual notice, as a matter of law, of the requirements of 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(III) before issuing the vaccine mandate. The statute was publicly available and in force since 2004. The FDA's Emergency Use Authorization documentation for the Pfizer-BioNTech COVID-19 Vaccine — published on FDA's public website and provided to all

vaccine administrators — expressly recited recipients' right to accept or refuse the product. Defendants' decision to issue a mandate with no right-to-refuse option and no EUA disclosure constitutes deliberate indifference to a known federal statutory protection and to the constitutional right that protection embodies.

133. The official policy described herein was the direct and moving force behind the deprivation of Plaintiffs' federally protected rights. Plaintiffs' terminations were not the independent act of a rogue supervisor. It was the mandated, foreseeable, and intended outcome of Defendants' official policy as applied to any employee who declined vaccination. The causal chain between Defendants' official policy and Plaintiffs' injuries is unbroken and direct.

134. As a direct and proximate result of Defendants' unconstitutional policy, Plaintiffs suffered: termination of employment; loss of salary and wages from the date of termination through the present; loss of pension, retirement, and health benefits; severe emotional distress, anxiety, and reputational harm within Plaintiffs' professional community; and consequential economic damages flowing from the loss of employment.

135. Also, the Rehabilitation Act is codified under Title 29 (29 U.S.C. § 794(a)) and 29 C.F.R. §33.13. The Rehabilitation Act protects disabled persons from discrimination in the provision of public services. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability, shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 USC § 794(a).

136. Here, Plaintiffs were discriminated against because of their medical condition and sincere religious beliefs. In Garry's case, taking the vaccine could have killed him.

137. The acts or omissions of Defendants were conducted within the scope of their official duties and

employment under color of law.

138. The elements of retaliation needed to prove a prima facie case are: "(i) a Plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that Plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against Plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002); citing Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000). The Plaintiffs' burden at this prima facie stage is de minimis. Treglia v.Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

139. Once the Plaintiffs establish a prima facie case of retaliation, the burden shifts to the Defendants to articulate a legitimate, non-retaliatory reason for the challenged employment decision. Thereafter, if Defendants meet this burden, Plaintiffs must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. Cifra v. Gen Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

140. Bodily integrity is defined by the Courts as the right of a competent person to refuse forced medical treatment that conflicts with individual conditions and could cause harm or death. See Glucksberg, 521 U.S. at 725, 117 S.Ct. at 2270 ("The right [to refuse medical treatment is] not simply deduced from abstract concepts of personal autonomy." Here, Plaintiff Garry was never told that the COVID vaccine was EUA, thus necessitating informed consent.

141. This conclusion aligns with the Supreme Court's understanding of the bodily integrity right under the Due Process Clause, which traces its roots to common-law battery. See Cruzan, 497 U.S. at 278, 110 S.Ct. at 2851 (stating that previous Supreme Court cases implied a right to refuse medical treatment); Vacco v. Quill, 521 U.S. 793, 807, 117 S.Ct. 2293, 2301 (1997) (explaining that the reasoning of Cruzan, which assumed the existence of a federal constitutional right to refuse medical

treatment, was grounded in "well-established, traditional rights to bodily integrity and freedom from unwanted touching"); see also, e.g., Rochin v. California, 342 U.S. 165, 174, 72 S.Ct. 205, 210 (1952).

142. When litigants assert the right to bodily integrity under the Federal Constitution, they sometimes make First Amendment religious freedom arguments. Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 270, 110 S.Ct. 2841, 2847 (1990). "The right to be free of state-sponsored invasion of a person's bodily integrity is protected by the [constitutional] guarantee of due process." Guertin v. Michigan, 912 F.3d 907, 921 (6th Cir. 2019) (quoting In re Cincinnati Radiation Litig., 874 F.Supp. 796, 810-11 (S.D. Ohio 1995)).

143. Defendants failed to accommodate Plaintiffs, gave no valid reason to do so, and gave them false information of the status of the vaccine and that others similarly situated had been given accommodations and could apply anytime. see Ex. 7, while both Garry ad Baker-Pacius were blocked from filing appeals.

144. Additionally, the City lied to Plaintiffs about the status of the vaccine, namely that it was Emergency Use Authorization (EUA) only, not approved. Had they announced this information, Plaintiffs would have been given informed consent, and not forced to choose between their health, religion, or job.

145. Plaintiffs plead that Defendants' denial of their religious and medical accommodations — while simultaneously granting religious and medical accommodations to similarly-situated employees who objected to vaccination on grounds unrelated to documented policy/medical contraindication — constitutes discrimination in violation of 42 U.S.C. § 12112(b)(1) and 42U.S.C. § 12112(b)(6).

146. Based on the foregoing, Defendants under color of law subjected Plaintiffs to discrimination on the basis of medical condition and relious beliefs, unlawfully discriminating

against the Plaintiffs in the terms and conditions of their employment in violation of their Constitutional rights to property, liberty and a due process, §3020-a hearing, 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law), and N.Y.C. Human Rights Law 8-107, and Monell Section 1983.

**AS AND FOR A THIRD CAUSE OF ACTION FOR FAILURE TO REASONABLY ACCOMMODATE THE PLAINTIFFS' SINCERELY HELD RELIGIOUS BELIEFS AND CONTRAINDICATED MEDICAL CONDITION (Both Plaintiffs)**

147. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 146 as if the same were fully set forth at length herein.

148. Plaintiffs have sincerely held religious beliefs and a medical condition which forbid them from getting vaccinated with the COVID-19 vaccine, but Defendants never accommodated their requests for exemption from CVM.

149. Defendants had knowledge of Plaintiffs' sincerely-held religious beliefs and contraindicated medical condition yet chose to ignore these beliefs and medical condition and denied them their exemption requests without explanation. Defendants then terminated Plaintiffs' employment. This directly contradicts the ruling in Groff v Dejoy, U.S. Supreme Court Docket 22-174, June 29, 2023.No reasonable accommodation was offered to Plaintiffs yet other employees of the Defendants received accommodations for their religious and/or medical accommodations.

150. At all relevant times Defendants knew that they had "rubber rooms" and reassignments to home as the new workplace for employees similarly removed from their positions in the Department: **New Rubber Rooms Pop Up Throughout NYC To Warehouse Unvaccinated Employees Who have Won medical or Religious Exemptions**

https://nycrubberroomreporter.blogspot.com/2022/03/new-rubber-rooms-pop-up-throughout-nyc.html and **Idled NYC educators do nothing but sign in remotely, even from Europe** https://nypost.com/2023/01/14/idled-nyc-educators-do-nothing-but-sign-in-remotely-even-from-europe/

By Susan Edelman, NY POST, Published Jan. 14, 2023.

151. For more than twenty years, Defendant has been re-assigning employees to "rubber rooms", some of which held about 1-2000+ employees. All tenured employees put in these rooms stayed on full salary, and remained up to 15 years doing nothing. During the pandemic, these re-assigned employees awaited their §3020-a hearings at home. Defendants never mentioned this to the Plaintiffs. See **EXHIBIT 13**, "RF" was the administrator of the rubber room for the unvaccinated at St. Brigid's school; AP is an unvaccinated teacher who received an approved medical exemption. **EXHIBIT 14**

152. Defendants never engaged in a dialogue about Plaintiffs' accommodation or reassignment. This deprivation of a lawful procedure was intentional, acted on under color or law, and pursued in bad faith. This is a clear Monell cause of action under Section 1983.

153. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

154. Based on the foregoing, the Defendants failed to provide a reasonable accommodation and as a result, discriminated against the Plaintiffs on the basis of their sincere religious beliefs and serious medical condition, and thereby unlawfully discriminated against Plaintiffs in the terms and conditions of their employment as they failed to accommodate Plaintiffs.

**AS AND FOR A FOURTH CAUSE OF ACTION: VIOLATION OF THE FOURTEENTH AMENDMENT EQUAL PROTECTION CLAUSE**
**(Both Plaintiffs)**

155. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 154 as if the same were fully set forth at length herein.

156. Defendants, while acting under the color of law, unlawfully deprived the Plaintiffs of their right to Equal Protection of the Laws, guaranteed by the Fourteenth Amendment of the United States Constitution, in that Defendants engaged in selective enforcement of their own laws, rules, regulations, and ordinances against Plaintiffs based upon the Plaintiffs' religion and medical condition.

157. Defendants engaged in widespread religious discrimination in implementing its vaccine mandates by discarding due process rights outright, and adopting a facially discriminatory religious accommodation policy that conditioned an exemption on membership in a favored religion.

158. Defendants ignored the Equal Protection Clause of the 14th Amendment in creating a policy of assessing religious and medical requests for accommodations that limited the number of employees who could obtain them. The criteria blatantly approved accommodations for favored faiths such as Christian Scientists, while denying the same to Catholics, Jews, Buddhists, Christians of certain sects, and other religious without reasons that can be determined. Defendants gave approved medical accommodations to some who applied and not to others, without any clear rationale for their actions. See Ex. 3, 4, 5, 6,7, 13, 14.

159. The timeline given to applicants for accommodations was intentionally inconsistent. Many applicants were denied their accommodations on September 22, 2021, and told they had one day to appeal. Others heard back from the DOE that they could apply anytime. For example, in 2021,

September 22 – the day most DOE denials of accommodations were sent out via email - was the first day of Sukkot, a 7-day holiday in the Jewish faith. Religious Jews cannot use a computer or any other technology the first two days or at all, and restrictions cannot be relaxed for business or school needs; they are only overridden in circumstances that present a danger to a human life. Thus this policy of giving an applicant one day to apply for an appeal, if it is during a Jewish holiday with Sabbath-like restrictions, can be seen as unconstitutional. Other teachers were allowed to apply anytime.(Ex. 7). Plaintiffs argue here that the timelines given those who applied for accommodations were based on the animus that the City showed for anyone who wanted to work for the DOE without being vaccinated, and the wide-spread antisemitism that is in every classroom, school, and newspaper throughout the period of time relevant to this lawsuit. Even today, Jews and the Jewish religion are subjects of attack in the education system, and the DOE has not addressed this issue.

160. Rather than engaging in the individualized, good-faith assessment required by the Constitution and governing statutes, the City and Defendants adopted and enforced policies that categorically excluded most religions and all personally held religious beliefs, while automatically accommodating members of a narrow set of favored faiths, gender, national origin or some other unknown criteria. This violated the First Amendment.

161. In so doing, the City and Defendants intentionally and deliberately, with malicious or bad faith, injured Plaintiffs, selectively treated Plaintiffs differently from other similarly situated employees and acted with no rational basis for the difference in treatment.

162. The City and Defendants' conduct was intentional, conducted with bad faith, and wholly irrational.

163. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

164. In Garvey v City of NY (Index No. 85163/2022), Judge Ralph Porzio wrote in his decision:

> "Though vaccination should be encouraged, public employees should not have been terminated for their non-compliance….The Health Commissioner cannot create a new condition of employment for City employees. The Mayor cannot exempt certain employees from these orders. Executive Order 62 renders all of these vaccine mandates arbitrary and capricious….prohibit an employee from reporting to work."

165. New York City was the only location in New York State which mandated the vaccine or termination for public employees. Every other tenured educator in the State whether vaccinated or not, were given accommodations such as masks and testing. As a direct result of Defendants' violation of the Plaintiffs' Fourteenth Amendment rights of equal protection, Plaintiffs have suffered irreparable harm for which there is no adequate remedy of law.

166. At all times, Defendants intent was malicious, and they intended on denying Plaintiffs their accommodations. Defendants' refusal to provide a reasonable accommodation shows deliberate indifference to Constitutional rights. These allegations satisfy the pleading standard under EEOC v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015).

167. Because of Defendants' violation of Plaintiffs Fourteenth Amendment rights of equal protection under the law, as alleged herein above, Plaintiffs have suffered and are entitled to recover compensatory and nominal damages including backpay. There are multiple errors of procedural and substantial due process which cannot give any penalty a fair cloak, as the procedural errors have not been explained nor remedied.

168. Based on the foregoing, Defendants subjected Plaintiffs to discrimination on the basis of their religious beliefs and medical contraindication, unlawfully discriminating against Plaintiffs in the terms and conditions of their employment on the basis of their disabling conditions, in violation of 42 U.S.C. § 1983; Monell, 1st, and 14th Amendments, and Law; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law 8-107.

**AS AND FOR A FIFTH**
**CAUSE OF ACTION**
**FOR RETALIATION**
**(Both Plaintiffs)**

169. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs through 168 as if the same were fully set forth at length herein.

170. In October 2021 Defendants changed the course of Plaintiffs' lives and careers by placing them on involuntary forced leave without pay (LWOP) because they requested an accommodation to remain working without getting vaccinated.

171. Plaintiffs at that time had been masking and testing, while working in the school performing excellent and professional service to the children. There is no reason other than retaliatory discrimination for Plaintiffs to have been terminated. In Garvey v City of NY (Index No. 85163/2022), Judge Ralph Porzio wrote in his decision:

"Though vaccination should be encouraged, public employees should not have been terminated for their non-compliance….The Health Commissioner cannot create a new condition of employment for City employees. The Mayor cannot exempt certain employees from these orders. Executive Order 62 renders all of these vaccine mandates arbitrary and capricious….prohibit an employee from reporting to work."

172. The elements of retaliation needed to prove a prima facie case are: "(i) a Plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that Plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against Plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 148 (2d Cir. 2002); citing Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir. 2000). The Plaintiff's burden at this prima facie stage is de minimis. Treglia v.Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002).

173. For a Title VII claim, undue hardship is shown "when a burden is substantial in the overall context of an employer's business". Groff v DeJoy, 143 S Ct 2279, 2294 (2023). "[A]n employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." To prevail on this defense, Defendants must show they considered all options for accommodation in good faith and proved, prior to denial, that such options were untenable according to statutory factors and analysis of objective evidence assessed against each individual's circumstances.

174. Defendants did not meet their undue hardship burden, and the denials on this basis were pretextual.

175. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

176. Once the Plaintiffs establish a prima facie case of retaliation as they do here, the burden shifts to the Defendants to articulate a legitimate, non-retaliatory reason for the challenged employment decision. Thereafter, if Defendants meet this burden, Plaintiffs must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation. Cifra v. Gen Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).

177. Plaintiff Baker-Pacius presented a sincere religious belief to SOLAS, the DOE database, and was denied for no valid reason and removed from her salary and then her job;

similarly, Plaintiff Garry submitted a doctor's note where the doctor prohibited him from getting vaccinated. Defendants ignored this, in retaliation for Garry not getting vaccinated anyway, despite what his doctor wrote, then Garry was removed from his salary and terminated.

178. Plaintiffs have shown: (i) they were engaged in protected activity; (ii) the alleged retaliator knew that Plaintiffs were involved in protected activity; (iii) an adverse decision or course of action was taken against Plaintiffs; and (iv) a causal connection exists between the protected activity and the

adverse action."

179. It is well-known that tenured teachers have a contract. The CBA for teachers such as Plaintiffs detail the process for a Leave. See Laura Campbell-Lui v. New York City Department of Education et al, Index No. 153518/19, doc. 14, p.125:

"Teachers may be granted a leave of absence without pay of up to two years to adjust personal affairs (such as the winding up of a family business on the death or incapacitation of the family member in charge) in accordance with existing rules and regulations. The teacher may consult with the Union with respect to the matter. Teachers who are denied such a leave may refer the matter to the Chief Executive of the Division of Human Resources for review and final determination."

180. In other words, the leave without pay is requested by the employee, it is not forced on the employee. There is actually no forced leave without pay unless you look at "suspension without pay", which is a disciplinary punishment after a misconduct charge is served on a teacher in preparation for a hearing:

"5. Serious Misconduct The parties agree that certain types of alleged misconduct are so serious that the employee should be suspended without pay pending the outcome of the disciplinary process.

Serious misconduct shall be defined as actions that would constitute:

- the felony sale, possession, or use of marijuana, a controlled substance, or a precursor of a controlled substance or drug paraphernalia as defined in Article 220 or 221 of the Penal Law; or
- any crime involving physical abuse of a minor or student (crimes involving sexual abuse of a minor or student are addressed in paragraph 6 below); or
- any felony committed either on school property or while in the performance of teaching

duties; or

- any felony involving firearms as defined in Article 265 of the Penal Law; or
- actions that would constitute a class A-I or A-II felony or any felony defined as a violent felony offense in NY Penal Law § 70.02. If an employee is accused of committing serious misconduct, the employee shall be removed from payroll for a term not to exceed two (2) months after a finding by the "probable cause arbitrator" that there is probable cause to believe that the actions alleged were committed by the employee and that they constitute "serious misconduct" as defined above. Probable cause exists when evidence or information which appears reliable discloses facts or circumstances making it likely that such conduct occurred and that such person committed the conduct. To establish probable cause, the investigator assigned to the matter must be present and testify under oath before the arbitrator. The Board may also be required to produce signed statements from the victim or witnesses, if any…." CBA, p. 156, ARTICLE TWENTY-ONE DUE PROCESS AND REVIEW PROCEDURES

181. Martin Scheinman's LWOP, supported by Defendants to the present day, was made up out of whole cloth and is not in any Union contract in its alleged form in 2021 connected to the COVID vaccine.

182. The U.S. Supreme Court has ruled that the actions of Defendants in forcing employees into leave without pay, is retaliatory discrimination. See Burlington Northern and Santa Fe Railway Company, 548 US 53 (2006) ("that White suffered retaliatory discrimination when she was reassigned to less desirable duties and suspended without pay"). Justice Breyer delivered the opinion of the Court.

183. But for the approval of the denial of protected rights by the Defendants, Plaintiffs were maliciously and in bad faith harassed for challenging the CVM and requesting an accommodation to work

without getting vaccinated, as allowed in the DOH Order.

184. Plaintiffs were also permanently placed on a Problem Code.

185. All these actions are retaliatory discrimination, part of a "punish without proof" procedure and "you better do what we say you must do, get vaccinated, or you will be sorry".

186. The MEMO-UFT Accommodation Procedure (EXHIBIT 1) shows the animus and retaliatory discrimination that the process detailed in this case shows at every step. From the start, the City, DOE and Steven Banks all wanted any employee who submitted accommodation requests to be denied, terminated, removed from salary. Banks called religious beliefs against getting the COVID vaccine "BS". From this statement, Banks seemed to believe that all teachers who claimed a sincere religious belief in order to remain unvaccinated were basically lying. The same goes for anyone asking for a medical accommodation.

187. Plaintiffs were never given a chance to be heard on their accommodation requests. This is part of the retaliation and discrimination. Martin Scheinman's panel denied everyone. So did Katherine Rodi's General Committee. This is retaliation and discrimination.

188. Another lie was seen in the Problem Code documents, Ex. 12. Mallory O'Sullivan wrote that the Problem Code is not available to anyone except DOE employees. This is totally false. The Declaration of Betsy Combier shows that, as Ms. Combier never worked for the DOE and was able to tell employees whether or not they were on the Code, when asked. Karen King also did not work for the DOE or any vendor, yet knew all about the Problem Code and sent emails to members about it. The Code is accessible by government agencies and principals, and UFT Representatives, among others. The label means that the individual has committed misconduct and was found guilty of "something".

189. Based on the foregoing, Defendants under color of law subjected Plaintiffs to

discrimination on the basis of their religious beliefs and/or disability, unlawfully discriminating against Plaintiffs and the terms and conditions of their employment. In violation of their Constitutional rights to property, and liberty, 42 U.S.C. § 1983; N.Y. Executive Law§ 296 (New York State Human Rights Law), and N.Y.C. Human Rights Law 8-107.

**AS AND FOR A SIXTH CAUSE OF ACTION FOR MUNICIPAL LIABILITY UNDER SECTION 1983**

190. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 189 as if the same were fully set forth at length herein.

191. Under § 1983, the CITY and DOE may be liable for unconstitutional actions taken by its employees where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the City]'s officers." Monell v. Dep't of Social Servs., 436 U.S. 658, 690, 98S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

192. To establish a municipal liability (or Monell) claim, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007) (quotation marks omitted); Agosto, 982 F.3d at 97.

193. Governments can only be held responsible for the actions of their employees when "their official policies cause their employees to violate another person's constitutional rights." City of St. Louis v. Praprotnik, 485 U.S. 112, 122, 108 S. Ct. 915, 99 L. Ed. 2d 107 (1988). Therefore, a plaintiff must "demonstrate that 'through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" Agosto, 982F.3d at 98 (quoting Bd. of City Comm'rs of Bryan County, Okla. v. Brown, 520 U.S. 397, 404, 117 S. Ct. 1382, 137L. Ed. 2d 626 (1997)).

194. Here, Plaintiffs have stated sufficient facts to plead a Monell claim, as their complaint challenges an official municipal policy. Wray, 490 F.3d at 195.

195. Plaintiffs include numerous allegations as to Defendants' actions regarding their termination process, and the policy and custom which they created in order to deny anyone an accommodation. Plaintiffs have sufficiently alleged that the City and DOE are responsible for the Mandate itself, its' enforcement, and implementation. See Praprotnik, 485 U.S. at 122; Agosto, 982F.3d at 98-99.

196. Plaintiffs have enough facts to establish a constitutional violation in the implementation of the CVM as-applied to them and to all DOE employees similarly situated.

197. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

198. Based on the foregoing, the Defendants failed to provide a reasonable accommodation to either Plaintiff and as a result, discriminated unlawfully against the Plaintiffs in the terms and conditions of their employment in violation of the First Amendment, Free Exercise Clause, and Establishment Clause, the 14th Amendment; 42 U.S.C. § 1983 and Monell; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law 8-107.

**AS AND FOR A SEVENTH CAUSE OF ACTION**
**FOR VIOLATION OF NEW YORK STATE and NEW YORK CITY HUMAN RIGHTS LAW**
**(Both Plaintiffs)**

199. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 198 as if the same were fully set forth at length herein.

200. Defendants have adopted an unlawful discriminatory policy and practice by imposing vaccine mandates upon Plaintiffs as a condition of retaining their employment.

201. Plaintiffs alerted the Defendants that they are unable to be vaccinated because of sincere religious beliefs (Baker-Pacius) and medical disability (Garry) but were nonetheless suspended, harassed

and retaliated against, terminated and otherwise adversely impacted, because Defendants refused to accommodate them for no valid reason supported by any material facts.

202. Defendants' actions violate the New York State and New York City Human Rights Laws, both under a failure to accommodate and disparate impact claim.

203. The acts or omissions of Defendants were conducted within the scope of their official duties and employment under color of law.

204. The NYSHRL states that an undue hardship exists when the accommodation would cause significant expense or difficulty, not "more than a minimal burden" (which is the standard the City applied). Neither the city agencies nor the Citywide Appeals Panel carried their burdens to demonstrate why the requested accommodations would constitute an undue hardship under Title VII, an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

205. In 2005, the City Council amended the administrative code to emphasize the New York City Human Rights Law's (NYCHRL) uniquely broad and remedial purposes, and again in 2016 to clarify its intent to foster jurisprudence that maximally protects civil rights in all circumstances. Thus Constitutional rights must be reviewed "independently from and more liberally than their federal and state counterparts." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009) (internal quotation marks omitted); Albunio v. City of New York, 16 N.Y.3d 472, 477-78, 947 N.E.2d 135, 922 N.Y.S.2d 244 (2011) (requiring the NYCHRL to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); Makinen v. City of NY, 857 F3d 491, 495 (2d Cir. 2017).

206. Mr. Eric Eichenholtz—an attorney in the City's Law Department who played a critical role in the formation of the Citywide Appeals Panel and served on the Citywide Appeals Panel

himself—appeared to not even know that there is a heightened "undue hardship" standard in the New York State and New York City Human Rights Law and stated that the Citywide Appeals Panel followed only the EEOC guidance and the "more than a de minimus burden" standard when assessing undue hardship.

207. Yet neither the DOE nor their lawless accommodation policy described here have shown any evidence whatsoever that would answer the question why the requested accommodations would constitute an undue hardship under the New York State Human Rights Law, and an undue hardship under the New York City Human Rights Law—which is what the law requires.

208. Indeed, the NYCHRL adopts a rigorous definition of an employer's 'undue hardship' as 'an accommodation requiring significant expense or difficulty,' and mandating that '[t]he employer shall have the burden of proof to show such hardship.'" Litzman v. New York City Police Dep't, 2013 U.S. Dist. LEXIS 162968, *20 (S.D.N.Y. 2013) (quoting N.Y.C. Admin. Code § 8-107(3)(b)).

209. Defendants have not stated a cost of accommodating Plaintiffs, including the costs of loss of productivity and of retaining or hiring employees. In fact, Defendants' cost of not accommodating Plaintiffs itself constitutes a significant expense or difficulty on the agencies, as each agency was facing a major staffing shortage before and after the Plaintiffs were terminated. The animus directed toward Plaintiffs for their not getting vaccinated drove Defendants to overlook all financial damages they incurred, both for Plaintiffs as well as themselves. This makes no sense.

210. Based on the foregoing, the Defendants failed to provide a reasonable accommodation to either Plaintiff and as a result, discriminated unlawfully against the Plaintiffs in the terms and conditions of their employment in violation of the First Amendment, Free Exercise Clause, and Establishment Clause, the 14th Amendment; 42 U.S.C. § 1983 and Monell; N.Y. Executive Law§ 296 (New York

State Human Rights Law); and N.Y.C. Human Rights Law 8-107.

**AS AND FOR AN EIGHTH**
**CAUSE OF ACTION**
**LIABILITY UNDER THE**
**ESTABLISHMENT CLAUSE**
**(Both Plaintiffs)**

211. Plaintiffs repeat, reiterate, and reallege each and every allegation contained in paragraphs 1 through 210 as if the same were fully set forth at length herein.

212. The implementation of all versions of the CVM violate the Establishment Clause because the City declared, in implementing them, that they intended to preference orthodox religious beliefs over unorthodox or personally held beliefs, and the City specifically noted that they would preference Christian Scientists. This requires strict scrutiny, which the City cannot withstand.

213. Commissioner of Health further compounded this violation by sending a letter to the Citywide Panel and the arbitrators, as well as City agencies, instructing them to deny religious objections grounded in the use of aborted fetal cell lines in testing the vaccines. (EX. 1(a). In so doing, he took an official position on a disputed religious matter, favoring the views of the Pope and other "religious leaders" that he was persuaded by and imposing special disability on those who did not share the majority viewpoint on this issue.

214. Other decision-makers openly adopted the same discriminatory positions and instructed reviewers to deny beliefs grounded in personal prayer or objection to abortion unlawfully.

215. The Mandates also violate the Establishment Clause because they fail the coercion test and are enforced by the City to coerce everyone with minority religious views on vaccines to violate their faith and get vaccinated or lose the ability to earn income anywhere in New York City for the foreseeable future.

216. As Plaintiff Garry was denied his medical accommodation without any valid reason, it is argued

here that the Defendants presumed he was lying about his medical disabilities, belonged to a religious group that they could not support, or some other nefarious policy requirement which at this point is a mystery.

217. Based on the foregoing, the Defendants failed to provide a reasonable accommodation to either Plaintiff and as a result, discriminated unlawfully against the Plaintiffs in the terms and conditions of their employment in violation of the First Amendment, Free Exercise Clause, and Establishment Clause, the 14th Amendment; 42 U.S.C. § 1983 and Monell; N.Y. Executive Law§ 296 (New York State Human Rights Law); and N.Y.C. Human Rights Law 8-107.

**WHEREFORE,** Plaintiffs demand judgment against the Defendants for all compensatory, emotional, psychological and punitive damages, injunctive relief, and any other damages permitted by law pursuant to the above referenced causes of action. It is respectfully requested that this Court grant Plaintiffs any other relief to which they are entitled, including but not limited to:

1. Awarding Plaintiffs all the back pay and financial losses owed since they were removed from their salary in 2021;
2. Removal of the Problem Code from the personnel records, FBI and Criminal Justice databases for both Plaintiffs;
3. Granting such other and further relief that the Court deems just and Proper.

Dated: August 24, 2026

/s/Dianne Baker-Pacius /s/Christopher J. Garry

# Exhibit 1:
# Memo-Accommodation Process

**From:** Nellie Afshar
**To:** Dave Chokshi
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process
**Date:** Wednesday, September 22, 2021 10:25:11 AM
**Attachments:** Memo_09 21 21 Final.pdf

Final version for your awareness. No changes from what you saw last.

**From:** Dave Chokshi <dchokshi@health.nyc.gov>
**Sent:** Wednesday, September 22, 2021 8:13 AM
**To:** Nellie Afshar <nafshar@health.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

Thanks—looks good

On Sep 21, 2021, at 10:19 PM, Nellie Afshar <nafshar@health.nyc.gov> wrote:

Here is latest version of the memo – includes addition of the list of meds and animal products.

For awareness, we have not been able to verify the list of meds, I asked Jackie if she can track it down w Jay.

**From:** Dave Chokshi <dchokshi@health.nyc.gov>
**Sent:** Tuesday, September 21, 2021 8:04 PM
**To:** Nellie Afshar <nafshar@health.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

Thank you!!

Dave A. Chokshi, MD MSc

Commissioner

NYC Department of Health and Mental Hygiene

347-396-4133

**From:** Nellie Afshar <nafshar@health.nyc.gov>
**Sent:** Tuesday, September 21, 2021 8:03 PM
**To:** Dave Chokshi <dchokshi@health.nyc.gov>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

Yes I'm making those revisions now, and also adding line about Tylenol, advil, etc

Thank you!

**From:** Dave Chokshi <dchokshi@health.nyc.gov>
**Sent:** Tuesday, September 21, 2021 8:02 PM
**To:** Nellie Afshar <nafshar@health.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

Nellie, this looks fine to me and no issues with it coming from me. We had to remove the section about pork and animal products? Seemed they wanted it specifically.

Also happened to notice that 'fetal' is misspelled as 'feral' in one place.


Dave A. Chokshi, MD MSc

Commissioner

NYC Department of Health and Mental Hygiene

347-396-4133


---

**From:** Nellie Afshar <nafshar@health.nyc.gov>
**Sent:** Tuesday, September 21, 2021 7:18 PM
**To:** Dave Chokshi <dchokshi@health.nyc.gov>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

Commissioner – we're still refining this but here is the current version in case you can review in parallel. On our side – Jane, Celia, Jen Rosen, and PIO reviewed. Let me know if any issues w this coming from you.

**From:** Bray, Jackie <JBray@cityhall.nyc.gov>
**Sent:** Tuesday, September 21, 2021 5:15 PM
**To:** Nellie Afshar <nafshar@health.nyc.gov>; Dave Chokshi <dchokshi@health.nyc.gov>; Celia Quinn Md <cquinnmd@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>; Rebecca Giglio <rgiglio@health.nyc.gov>
**Cc:** 'Anne Mabus' <mabusa@nychhc.org>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

Here is the latest draft from OLR who reformatted some.

Happy to merge the edits if useful once I have yours.

*Jackie Bray*
*Pronouns: she/her/hers*

*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Nellie Afshar <nafshar@health.nyc.gov>
**Sent:** Tuesday, September 21, 2021 4:49 PM
**To:** Bray, Jackie <JBray@cityhall.nyc.gov>; Chokshi, Dave (DOHMH) <dchokshi@health.nyc.gov>; Celia Quinn Md <cquinnmd@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>; Rebecca Giglio <rgiglio@health.nyc.gov>
**Cc:** 'Anne Mabus' <mabusa@nychhc.org>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

We have edits and I will send your way Jackie

---

**From:** Bray, Jackie <JBray@cityhall.nyc.gov>
**Sent:** Tuesday, September 21, 2021 4:46 PM
**To:** Dave Chokshi <dchokshi@health.nyc.gov>; Celia Quinn Md <cquinnmd@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>; Nellie Afshar <nafshar@health.nyc.gov>; Rebecca Giglio <rgiglio@health.nyc.gov>
**Cc:** 'Anne Mabus' <mabusa@nychhc.org>
**Subject:** FW: Urgent Need for Help--UFT Accommodation Process

Thoughts? Can we close this out?

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Bray, Jackie
**Sent:** Tuesday, September 21, 2021 4:46 PM
**To:** Varma, Jay <JVarma@cityhall.nyc.gov>; Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>; Siciliano Lauren <LSiciliano2@schools.nyc.gov>; 'Anne Mabus' <mabusa@nychhc.org>; Chokshi, Dave (DOHMH) <dchokshi@health.nyc.gov>; Afshar, Nellie (Health) <nafshar@health.nyc.gov>; 'Jane Zucker' <jzucker@health.nyc.gov>; 'Celia Quinn Md' <cquinnmd@health.nyc.gov>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

OK I've added a line about pork, beef, and animal products. DOHMH needs to confirm if the line is accurate.

COH and team – we need your approval on this memo and then we need guidance from you on who at the DOHMH would sign it. I think it should go from dOHMH to OLR officiallu once you are comfortable with it. We are moving fast here on negotiations and hearings on exemptions so wanting to wrap this up today.

Thank you!

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Bray, Jackie
**Sent:** Tuesday, September 21, 2021 2:00 PM
**To:** Varma, Jay <JVarma@cityhall.nyc.gov>; Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>; Siciliano Lauren <LSiciliano2@schools.nyc.gov>; Anne Mabus <mabusa@nychhc.org>; Chokshi, Dave (DOHMH) <dchokshi@health.nyc.gov>; Afshar, Nellie (Health) <nafshar@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>; 'Celia Quinn Md' <cquinnmd@health.nyc.gov>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

+Celia too.

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Varma, Jay <JVarma@cityhall.nyc.gov>
**Sent:** Tuesday, September 21, 2021 1:58 PM
**To:** Bray, Jackie <JBray@cityhall.nyc.gov>; Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>; Siciliano Lauren <LSiciliano2@schools.nyc.gov>; Anne Mabus <mabusa@nychhc.org>; Chokshi, Dave (DOHMH) <dchokshi@health.nyc.gov>; Afshar, Nellie (Health) <nafshar@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

Memo ok with me.

Get Outlook for iOS

From: Bray, Jackie <JBray@cityhall.nyc.gov>
**Sent:** Tuesday, September 21, 2021 1:56:53 PM
**To:** Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>; Siciliano Lauren <LSiciliano2@schools.nyc.gov>; Anne Mabus <mabusa@nychhc.org>; Chokshi, Dave (DOHMH) <dchokshi@health.nyc.gov>; Varma, Jay <JVarma@cityhall.nyc.gov>; Afshar, Nellie (Health) <nafshar@health.nyc.gov>; Jane Zucker <jzucker@health.nyc.gov>
**Subject:** RE: Urgent Need for Help--UFT Accommodation Process

++adding MDs.

Attached is a memo Annie drafted. Obviously need Dave, Jane, and Jay to review and then need to know from OLR whether this works.

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Sent:** Monday, September 20, 2021 10:08 PM
**To:** Bray, Jackie <JBray@cityhall.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>; Siciliano Lauren <LSiciliano2@schools.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

+Lauren for awareness and to see if an example or 2 can be provided by the DOE

The first page of the North Dakota document is a little bit more neutral than I was thinking. But the second and third page get to the point. We can go further and make an argument about how even if someone is concerned about fetal cells it should not prevent them from being vaccinated.

Yes the list is good. Because to the extent there are hearings in these cases, the employees can be asked about whether they use or have used those medications.

And yes to a little more time, there is no definitive time limit but I said I'd get the UFT something tomorrow and the idea is that hearings are going to start on Wednesday. If it's later in the afternoon I'm sure that's ok.

On Sep 20, 2021, at 9:56 PM, Bray, Jackie <JBray@cityhall.nyc.gov> wrote:

OK. Need you to weigh in on three things:

1. Here's a memo from the North Dakota Department of Health. If we created something similar is that what you need? COVID-19_Vaccine_Fetal_Cell_Handout.pdf

2. The MDs were also batting around the idea of making someone attest to rejecting all the medications on this list and look for proof that they have rejected all of these "sincerely" for some time: https://www.patheos.com/blogs/throughcatholiclen-tested-on-hek-293-is-immoral-goodbye-modern-medicine/

3. Can you send me some of the letters? Are there phrases that appear in many of them?

And finally, we clearly have very good material here and we also want to give you the best product we can because this will absolutely be subject to litigation and will go far. Is there a way to buy us more than 12 hours overnight?

Thanks,
Jackie

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Sent:** Monday, September 20, 2021 9:50 PM
**To:** Bray, Jackie <JBray@cityhall.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

Yep. Thanks much

> On Sep 20, 2021, at 9:07 PM, Bray, Jackie <JBray@cityhall.nyc.gov> wrote:

OK. Yes. We can get you something and have a shell of something to use from LA County.

Might take till noon or 1pm. that OK?

*Jackie Bray*
*Pronouns: she/her/hers*
*Deputy Executive Director*
*NYC COVID-19 Test & Trace Corps*
*jbray@cityhall.nyc.gov*
*Cell: 347-453-3697*

---

**From:** Bray, Jackie
**Sent:** Monday, September 20, 2021 8:27 PM
**To:** Steve Banks (OLR) <sbanks@olr.nyc.gov>
**Cc:** Thamkittikasem, Jeff <JThamkittikasem@cityhall.nyc.gov>; Campion, Renee (OLR) <rcampion@olr.nyc.gov>
**Subject:** Re: Urgent Need for Help--UFT Accommodation Process

I have no clue if we can pull this together because this is a "new one" but I will absolutely try. Will circle back later tonight with an update.

Sent from my iPhone

> On Sep 20, 2021, at 8:22 PM, Steve Banks (OLR) <sbanks@olr.nyc.gov> wrote:
>
> Now that the UFT exemption requests have been coming in for several days and the cases have been reviewed at the DOE, it turns out that upwards of 2/3 of the exemption requests are religious not medical. But there is a medical aspect to the religious requests that I could use some help on. Many of the religious claims cite that fetal tissue and/or certain animal products were used in the research, development, and/or actual formula for the COVID vaccines.
>
> Since many of these cases are going to labor arbitrators, there is a need for factual

information for the arbitrators to reference. It would be very very helpful if we could get a document signed off on by a City Doctor that essentially makes the argument as to why this is BS. The purpose of the document would be for the arbitrators to reference, and I would vet it with the UFT first. So I'm looking for basically a point by point analysis of why the potential claims that taking this would violate the rights of someone who religiously opposes abortion and/or consumption of certain animals is not consistent with the science of the virus. In some areas, there may be a distinction between the 3 brands of vaccine and I think as long as one is available the claim should also be denied.

Is this something you guys could pull together by late morning tomorrow?

Thanks,

Steven Banks
First Deputy Commissioner & General Counsel
NYC Office of Labor Relations
22 Cortlandt Street, 14th Floor
New York, NY 10007
(212) 306-7238

Sent from the New York City Department of Health & Mental Hygiene. This email and any files transmitted with it may contain confidential information and are intended solely for the use of the individual or entity to whom they are addressed. This footnote also confirms that this email message has been swept for the presence of computer viruses.
<Draft Memo - Religious Exemption DOE_DOHMH v2_JZ v3.docx>

# Exhibit 1(a):
# Letter to Martin Scheinman

NYC Health
NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE
Dave A. Chokshi, MD, MSc
*Commissioner*

September 21, 2021

Martin F. Scheinman
Scheinman Arbitration & Mediation Services
322 Main Street
Port Washington, NY 11050

Dear Mr. Scheinman,

Some people have expressed concerns about the use of fetal cells in the development and production of the COVID-19 vaccines. This assertion is often based on a misunderstanding of the vaccine development and production processes. **None of the COVID-19 vaccines authorized or approved by the US Food and Drug Administration contain fetal tissue or fetal cells.**

A fetal cell line was used in the development of the Johnson & Johnson/Janssen vaccine. A fetal cell line is not the same as fetal tissue. Fetal cell lines are grown in a laboratory. The origin of the cell line was from an elective abortion that occurred decades ago. The fetal cells have since multiplied millions of times in the laboratory. It is these new cells that were created in the laboratory that were used to grow the adenovirus used in the Johnson & Johnson/Janssen vaccine. Steps are taken to purify the vaccine to make sure none of the cells are included in the final vaccine product. People who are nonetheless concerned with use of a fetal cell line in Johnson & Johnson/Janssen vaccine production can get the Pfizer or Moderna vaccine.

The Pfizer and Moderna vaccines do not use any fetal cell lines for vaccine production and manufacturing. A fetal cell line (also from an abortion that occurred decades ago) was used early in the research phase of the Pfizer and Moderna vaccines to test their safety and efficacy. This is common practice in the development of drugs, from over-the-counter pain medications to prescription treatments, many of which were tested on cells that originated from the same cell line used to test the Pfizer and Moderna vaccines. Examples of over-the-counter pain medications that have used fetal cell lines include Tylenol, Advil, Aspirin, Aleve, Sudafed, Benadryl, Claritin, Tums, Mucinex, Ex-Lax, and Pepto Bismol. No fetal cells, fetal tissue, or fetal cell lines are used to produce the Pfizer or Moderna vaccines.

Finally, while ingredients made from animal byproducts are sometimes used in vaccines for a stabilizing effect, they are not present in any of the three approved COVID-19 vaccines. Moderna and Pfizer have provided a full list of ingredients. The COVID-19 vaccines also do not contain latex or preservatives.

An array of religious groups have stressed the importance of COVID-19 vaccination to save lives from COVID-19 and have called on all people to get vaccinated. As an example, the Catholic Church has issued a clear statement that Roman Catholics can in good faith receive COVID-19 vaccines that use fetal cell lines in development. Vaccination is the most important thing people can do to protect themselves and others from COVID-19.

Additional information on the COVID-19 vaccines are available at nyc.gov/covidvaccine.

# Exhibit 2:
# Religious Accommodation Request

To Whom It May Concern:

My name is Dianne Christene Baker-Pacius and I am the Yoga and Mindfulness Instructor at Hugo Newman College Preparatory School in Harlem, New York. I am writing this letter to respectfully request a religious exemption for vaccination within the New York City Department of Education. I am providing my personal history and my deeply held religious beliefs as they relate to religion and my relationship with God. As such, because my beliefs are immensely personal, I respectfully request that this letter be received and treated with the highest level of confidentiality.

I am a veteran New York City public school educator with eighteen years of experience. From the beginning of my career, my colleagues admired my management skills and ability to connect with my students. I enjoy supporting students with their academic and social emotional development. During my career, I spearheaded programs for overaged IEP middle school students to provide them with opportunities for growth in self esteem and academic achievement. In addition, I created passion projects and Project Based Learning curriculum to focus on student interests, while maintaining state standards. I have taught students in general education and integrated co-teaching classes. I have also taught all subjects as an elementary educator and focused on Humanities and English Language Arts as a middle school educator.

In 2017, I completed my yoga certification through the Breathe for Change program with the support of my then principal. As a certified yoga instructor, I incorporated mindfulness activities into my daily interactions with students and staff. We engaged in asanas, meditations, and breathwork. For the 2021-2022 academic year, my school created a Yoga and Mindfulness Instructor position based on the work that I had been doing with the school community and I started the year creating the first ever yoga studio for my school community. I taught students from preschool through eighth grade. While in this role, my intention was to implement yoga and mindfulness practices to support students and staff with successfully assimilating into full time in person learning. The pandemic has created a series of personal and social traumas that may have made being in school challenging for children and adults alike and I wanted to ensure that a safe and courageous space was created for them to get the social emotional support that they may need. Though short lived, this particular position was one of the highlights of my career.

I would like to offer you a window into my upbringing, which influenced the development of my personal beliefs as they relate to religion and my relationship with God.

I was born first generation American to Jamaican parents. I grew up in an often tumultuously violent household due to my father's alcoholic tendencies. It was my mother who instilled in her eight children the importance of faith and religion. My siblings and I regularly attended Sunday school and Baptist church services along with having Christian Bible study at home with our mom. My sister and I were part of the church choir and we travelled throughout New York City to perform for other churches and listen to a variety of services. On Saturday mornings we would clean the house to the tunes of Christian music and children's Bible stories. At the time, I

didn't know the impact that the devotional faith my mother instilled in me would have on the rest of my life and my ever evolving sincerely held religious beliefs.

Moving from childhood to adulthood, I learned the power of spiritual understanding and growth, which has been the foundation of my current religious beliefs. Growing up, my parents had authority over the decisions that were made for my body, and upon entering the school system, chose to vaccinate me and school aged siblings. As a child, I had no say in what was put into my body and involuntarily abided by my parents' wishes. As I moved into adolescence and adulthood, I took sovereignty over my belief systems and my body.

In high school, I had a significant turning point-I discovered that I was obese. It may sound strange, but I didn't see myself as overweight as I didn't resemble the media based images of what obese people were to look like. One day, my mother was called into school and she and I were directed to go to the nurse's office where I was weighed and told that I was 196lbs-at the age of 15 and with a height of 5'6. I was mortified and knew that I had to make a change. It was then I realized the importance of understanding what I put into my body. I navigated food and my spiritual understandings at that time by attempting to understand why my body seemed to betray me and wanting answers. I attempted to speak with my mom and siblings, but came to no conclusions, so I went within. I talked with God about my life and why I was who I was, in the situation that I was in. I was often frightened, sad, and quite lonely as a child/ teenager, but sought answers and connection to God. I began to read the Bible on my own, wanting to get insight and clarity on life.

When I moved into my twenties, I chose to get baptized, a decision that was very powerful for me. It was powerful because my mom didn't convince me to do it, but God directed me to that decision, letting me know that I could hear and abide by His still voice. As I continued on my journey, my sister invited me to join her in services at a nondenominational church. My mind and spirit were nourished in ways that I had never imagined. This experience gave me the support, outlook, and understanding my foundational faith needed.

Through the process of communion with God and connection to my body, I have grown to believe, and know, that my body belongs to God. I keep my body pure, holy, sacred, and clean and as an adult, I do not inject anything impure into it. My blood is related to my body and soul, therefore knowing that vaccines contain blood goes against my belief of maintaining my body as pure and sacred. Partaking of the vaccine would infringe on my moral conscience, thereby impacting my path with God. In Leviticus 17 verse 12 it states "Therefore I say to the Israelites, 'None of you may eat blood, nor may any foreigner residing among you eat blood", which lets me know that to have blood injected into my body is against God's law and directions for my life. My blood is my God given life force- "Because the life of every creature is its blood; anyone who eats it must be cut off" (Leviticus 17:14) and I will not be cut off from God.

As I read the Bible, I know that what I believe is true as it states: "Therefore, I urge you brothers and sisters, in view of God's mercy, to offer your bodies as a living sacrifice, holy and pleasing to God-this is your true and proper worship. Do not conform to the pattern of this world, but be

transformed by the renewing of your mind. Then you will be able to test and approve what God's will is-his good, pleasing, and perfect will" (Romans 12:1-2). Through my connection with God, I know that through my personal worship and my moral conscience, I am to maintain bodily integrity and sanctity as a directive from my Creator. Therefore, my deeply held religious beliefs are such that I cannot take any vaccines as they are deemed to interfere with my belief that my body is a living and holy sacrifice that is to always be pleasing to God.

While God continued to show me my path and I slipped as a mere human being, God gave me signs, like developing womb health issues, to follow His Divine law. The Bible states "And without faith it is impossible to please God, because anyone who comes to him must believe that he exists and that he rewards those who earnestly seek him" (Hebrews 11:6). I have been on this path for an exceptionally long time and intend to maintain and grow on this journey with God as I continue to seek His guidance in all things.

In conclusion, as stated throughout this letter, my deeply held religious beliefs guide my daily decisions and I know that God is directing me to refrain from vaccinations as they would go against my moral convictions. I humbly ask that my religious exemption based on my sincerely held beliefs presented in this letter be approved so that I may continue to be a contribution to Hugo Newman College Preparatory School and the NYC DOE. Thank you for your time.

Kindest Regards,

Signature: ______________________

# Exhibit 3:
# Religious Denial

## Your COVID-19 Vaccine Religious Exemption Application - Determination

solas_donotreply@schools.nyc.gov <solas_donotreply@schools.nyc.gov>
Wed 9/22/2021 7:43 PM
To: Baker Dianne (12X245) <DBaker5@schools.nyc.gov>

09/22/2021

Case#: A75783
File# 2284954
EMP ID: 810218

Dear DIANNE BAKER-PACIUS,

We have reviewed your application and supporting documentation for a religious exemption from the DOE COVID-19 vaccine mandate. Your application has failed to meet the criteria for a religious based accommodation. Per the Order of the Commissioner of Health, unvaccinated employees cannot work in a Department of Education (DOE) building or other site with contact with DOE students, employees, or families without posing a direct threat to health and safety. We cannot offer another worksite as an accommodation as that would impose an undue hardship (i.e. more than a minimal burden) on the DOE and its operations.

This application was reviewed in accordance with applicable law as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate.

Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and using the option "I would like to APPEAL". As part of the appeal, you may submit additional documentation and also provide a reason for the appeal.

Sincerely,

*HR Connect*
Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

Ref Number : GX5918247 N3418 COVID-19_VAX_ReligiousExempt_GenDenial

# Exhibit 3(a): Grievance Appeal

Please find my reasons why my grievance should go to step 2:

Every UFT represented employee has the right to file a step 1 grievance. However, the Union, not the employee, files the step 2 grievance with the Chancellor and the Union, not the employee, files salary and leave grievances with the Executive Director of Human Resources. The Union only pursues these grievances if they have merit. Your grievance claims a contractual violation for being placed on an unpaid leave of absence.

The New York City Department of Health ordered that all Department of Education staff must be vaccinated. After a Municipal Labor Committee lawsuit joined by the UFT failed to stop the mandate, the UFT filed for impact bargaining. The resulting arbitration decision modifies the CBA. If the DOE is complying with the award there is nothing to grieve.

Subsequently, the arbitration decision was modified by a court order pertaining to those who appealed DoE's decision not to grant religious exemptions. Those people now have the right to appeal to a city panel. The order stated that those on unpaid leave that are granted a religious exemption will be awarded back pay for the entire time on unpaid leave.

As a tenured teacher, I have the right to a 3020A hearing to be subsequently fired from the DOE. I have not formally been brought up on any charges and have been without pay since October 2021. On Pg 14 of the arbitration agreement, it states "During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from gainful employment during leave period". The DOE has failed to offer members gainful employment opportunities during this new type of involuntary unpaid leave and the UFT has failed to protect members' gainful employment opportunities during this new type of involuntary leave. The current term prohibiting gainful employment has created financial hardships, social emotional stress, and irreparable harm such as newly developed health conditions during this involuntary unpaid leave without gainful employment opportunities to members and members' families. During this time, my husband and I have had to go through our savings to maintain basic living expenses. Our credit card debt consumption has increased by 30%. In addition, we are now considering leaving our home to live with my mother in order to relinquish finances lost during this unfortunate time. My levels of stress have increased, indicated by sleepless nights, anxiety, panic attacks, enhanced pulsatile tinnitus, and depression. This time has been exceptionally challenging to navigate and has created undue, and quite frankly unnecessary, hardship for those involved. This new type of unpaid leave I have been placed on is very different from all types of voluntary leaves without pay defined in the contract. All other leaves without pay in the contract are voluntary. However, this new type of unpaid leave I have been placed on is involuntary. Therefore, I should be allowed to have gainful employment to support my family. The UFT has failed to protect my gainful employment rights.

There are a few ongoing contractual violations in the DOE vaccine mandate roll out and its exemption application process. The UFT has failed to enforce those rights to protect members. In article 2 FAIR PRACTICES pg4 of the contract, it says "The Board agrees to continue its policy of not discriminating against any employees on the basis of race, creed (religion), color, sex,

marital status, sexual orientation, handicapping condition or age". I have been discriminated against on my religion by the DOE because the DOE has wrongfully denied my religious exemption and wrongfully placed me on unpaid leave status. My contractual rights have been violated and the Union has duties to represent me fairly in the process. All three standards in Section I.C in the arbitration agreement are violating existing laws, such as the Free Exercise Clause in the 1st Amendment, Title VII of the Civil Rights Act of 1964, the New York State and New York City Human Rights Laws. And those standards in Section I.C in the arbitration agreement have been disregarded by the court order issued on 11/15 regarding Michael Kane v. the DOE case & Matthew Keil v. the DOE case. In the determination letter I received from the DOE on 09/22/2021, it says "unvaccinated employees cannot work in a school building without posing a direct threat to health and safety." Covid-19 vaccines don't prevent infections and transmissions. Vaccinated DOE employees can still get infected and spread the virus, as has been demonstrated by classroom and school closings and the recent discussions to implement remote learning . Labeling unvaccinated employees like myself as "a direct threat to health and safety" is a discrimination against my vaccine status. This narrative will cause discrimination, segregation, harassment and irreparable harm and injuries on unvaccinated employees like me.

In reference to having absences occurring on October 4 through October 14, 2021 coded as unauthorized on payroll portal, those absences are coded in EIS (the DOE payroll system) as Vaccine Non-Compliance. According to the arbitration they cannot be cited for disciplinary purposes.

In Section 2.b under Unauthorized Absences of the Chancellor Regulation issued on 6/17/2021 and in Section 2.b of the Chancellor Regulation issued on 11/18/2021, both sections state unauthorized absence and payroll deduction "shall not preclude any disciplinary action which the Chancellor, responsible superintendent or executive director deems appropriate, including preferral of charges of unauthorized absence from duty." I discovered that I had eight unauthorized absences in my CAR via the DOE payroll portal on 11/17/21 and contacted the payroll secretary, Ms. Nelson of Hugo Newman College Preparatory School regarding this matter. She informed me that it was automatically generated. It is not appropriate for the DOE to bring a charge on me using unauthorized absence because I have been on authorized absence. On 10/2/21 the Division of Human Capital sent me a notice of leave without pay which gave me their authorization for me to be on unpaid leave although I am willing and able to report to work. Therefore, my absences should be considered as authorized absences and I shall not be disciplined or discriminated against. In Article 16 Section I of the teacher contract it says "No employee shall be disciplined … for taking an approved unpaid leave." Therefore, I shall not be disciplined for being placed on an **approved** unpaid leave.

Based on the above, being placed on an unpaid leave due to vaccine non-compliance is not a contractual violation. Therefore, the Union will not be taking the case to the Chancellor's level or to the Executive Director of Human Resources at this time. You have the right to appeal the Union's decision but we want to make sure you understand the Union's rationale for not pursuing your grievance.

# Exhibit 4:
# Solas Process Step 3

HR DOE NYC CONNECT **Self-Service Online Leave Application System**

*Welcome, BAKER-PACIUS, DIANNE (Emp ID: 81021*

Help

Contact Information Confirmation — Selection — Overview and Tasks — E-signature and Submission

**Information and Application Process**

Guidelines:

This COVID-19 Vaccine Related Exemption and Accommodation application is for a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immur response to COVID-19 due to preexisting immune conditions.

All applications that require supporting documentation must include the documentation a

Information regarding an individual's disability will be kept confidential to the extent requ

Applications including supporting documentation will be reviewed by appropriate staff incl ment (Medical).

**NOTIFICATION OF A DETERMINATION**
The determination of eligibility for an exemption or accommodation will be emailed to the

**GENERAL INFORMATION**
Questions about the accommodation process may be directed to ODA at ODA@schools.ny procedures for filing discrimination complaints, can be found in Chancellor's Regulation 830.

**More Infomation**

Employee must include documentation such as a letter from the employee and/or religious official supporting the application for an exemption to the COVID-19 vaccine mandate based on sincerely held religious beliefs.

**Checklist**

| Tasks | Responsibility | Status | Date Completed | More Information |
|---|---|---|---|---|
| Self Service Online Leave Application (In Progress now) | Applicant | In Progress | | i |
| Document(s) explaining exemption request such as from the employee and/or from a religious official [Required] Upload File(s)... Click **Upload File(s)** to upload supporting documents. | Applicant | Not Received | | i |

If you have read and understood the information above and wish to submit an online application, please click 'Continue'. You can click the 'Back' button to go back to the previous page if you need to make changes to your information.

Back | Continue | Start Over | Exit

# Exhibit 5:
# Doctor's Note

*Affiliated with*
**St. Francis Hospital, The Heart Center®**
**Catholic Health Services**
At the heart of health

*Catholic Health Physician Partners*
*Internal Medicine Associates*
*146A Manetto Hill Road, Suite 205*
*Plainview, NY 11803*
*Tel (516) 302-8530*
*Fax (516) 838-6164*

9/15/21

Christopher Garry, date of birth 10/6/63, has had multiple pulmonary embolism's over his lifetime. Christopher was advised to not have the covid vaccine because of the risk of another pulmonary embolism.

Sincerely,

Jane F. Serio, M.D.
146A Manetto Hill Road, Suite 205
Plainview, NY 11803
Tel: (516) 302-8530
Fax: (516) 838-6164

# Exhibit 6:
# Denial-Medical Accommodation

| | |
|---|---|
| **Email From:** | solas_dontreply@schools.nyc.gov |
| **Sent:** | Tuesday, September 21, 2021 07:13 PM |
| **Email To:** | cgarry@schools.nyc.gov |
| **Email CC:** | |
| **Email BCC:** | HRConnectLeaves@schools.nyc.gov |
| **Subject:** | Your COVID-19 Vaccine Medical Exemption Application - Determination |

09/20/2021

Case#: A75695
File# 0677758
EMP ID: 834161

Dear CHRISTOPHE GARRY,

This is to advise you that your request for a Medical Exemption to the COVID-19 Vaccine Mandate has been denied for the following reason(s):

- Denial Reason: Other
- Additional Information: Attn. MD: PMHx of P.E. is not a contraindication to COVID vaccine (as per CDC website)

Your application was reviewed in accordance with the ADA, the New York State and City Human Rights Laws, as well as the Arbitration Award in the matter of your union and the Board of Education regarding the vaccine mandate.

Under the terms of the Arbitration Award, you may appeal this denial to an independent arbitrator. If you wish to appeal, you must do so within one school day of this notice by logging into SOLAS https://dhrnycaps.nycenet.edu/SOLAS and selecting the option: "I would like to APPEAL". As part of the appeal, you may submit additional medical documentation and must provide a reason for the appeal.

Sincerely,

*HR Connect*
Medical, Leaves, and Records Administration

Please do not reply to this message via e-mail. This email address is automated.

Ref Number : GX5903216 N3416 COVID-19_VAX_MedExemption_Denial (All Unions)

# Exhibit 7:
# Apply Anytime

## Notice of Leave Without Pay - PLEASE READ

NYCDOE <noreply@schools.nyc.gov>
Sat 10/2/2021 3:10 PM
To: @schools.nyc.gov>

NYC Department of Education

Dear ,

You are receiving this message because **you are being placed on a Leave Without Pay (LWOP) because you are not in compliance with the DOE's COVID-19 Vaccine Mandate**. If you are a substitute or in certain titles you have been placed in another inactive status, not a LWOP. **This means you must not report to your work or school site beginning Monday, October 4th.**

While you are on Leave Without Pay (LWOP), you:

- Cannot work and will not receive compensation, but you will continue your medical benefits
- Cannot use annual leave, CAR or sick time
- Cannot enter your work or school site
- Cannot reach out to students or families

In order to return from LWOP status, you must complete two steps using the **DOE Vaccination Portal**

1. Upload proof that you have received your first dose of a COVID-19 vaccine. **Proof of COVID-19 Vaccine can be an image of your vaccination card, NYS Excelsior Pass, or another government record**
2. E-sign the attestation stating that you are willing to return to your worksite within seven calendar days of submission.

Once you have completed these two steps, your HR Director and supervisor will also be notified and will work with you to plan your return date.

**If you have been vaccinated this weekend and upload this information by Monday morning, you may report to work as usual on Monday, October 4th, and you will be put back on active status.**

On Monday, October 4th, if you have an acceptable proof of vaccination (e.g., vaccination card, NY State Excelsior pass, or other government record) but have not been able to upload to the **DOE Vaccination Portal**, you may show your proof to the School Safety Agent and/or Principal (or designee) at the door. You will be allowed in the building, and you must immediately upload proof of vaccination to the Vaccination Portal and confirm that you would like to return to work in order to ensure there is no break in payroll.

If you encounter technical issues accessing the Vaccination Portal, please contact the DOE Help Desk by opening a ticket online or calling 718-935-5100. If you need support uploading your proof of vaccination, please contact your principal or HRD who can do so on your behalf.

Please be advised that if you do not intend to return to the DOE after October 1, 2021, you will need to return all DOE property, including computers, IDs, blackberries, and keys, immediately. Failure to return any DOE property that has been assigned to you will delay the processing of your final payment and any payout of leave time.

Employees represented by UFT or CSA who have been placed on LWOP due to vaccination status may select (in SOLAS) special separation or leave options per the arbitration award:

- **Separation with benefits** (available in SOLAS as of Monday, October 4): Employees choosing to separate under this option:
  - **Must share their intention to separate via SOLAS by October 29, 2021.**
  - Will be required to waive their rights to challenge the involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process
  - Will be eligible to be reimbursed for unused CAR/sick leave on a one-for-one basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid out following the employee's separation
  - Will be eligible to maintain health insurance through September 5, 2022, unless they have health insurance available from another source.
- **Extend the leave without pay due to vaccination status through September 5, 2022** (available in SOLAS as of Monday, November 1 through November 30, 2021):
  - Employees choosing this option will also be required to waive their rights to challenge their involuntary resignation, including, but not limited to, through a contractual or statutory discipline process
  - They will remain eligible for health insurance through September 5, 2022
  - Employees who have not returned by September 5, 2022 shall be deemed to have voluntarily resigned
- Beginning December 1, 2021, the DOE will seek to unilaterally separate employees who have not selected one of the options above or otherwise separated service.

For more information about where to get vaccinated, visit vaccinefinder.nyc.gov or call 877-VAX-4-NYC. For the latest COVID-19 staffing updates, please visit the Coronavirus Staff Update InfoHub page.

Sincerely,

NYCDOE Division of Human Capital

# Exhibit 8:
# Scheinman Sept. 10, 2021

SCHEINMAN
ARBITRATION & MEDIATION SERVICES

September 10, 2021

**Via E-Mail Only**
Renee Campion, Commissioner
Steven H. Banks, Esq.
New York City Office of Labor Relations
The Office of Labor Relations
22 Cortlandt Street, 14th Floor
New York, NY 10007

Alan M. Klinger, Esq.
Stroock & Stroock & Lavan, L.L.P.
180 Maiden Lane, 33rd Floor
New York, NY 10038

Beth Norton, Esq.
Michael Mulgrew, President
United Federation of Teachers
52 Broadway, 14th Floor
New York, NY 10004

Re: **Board of Education of the City School District of the City of New York and United Federation of Teachers, Local 2, AFT, AFL-CIO (Impact Bargaining)**

Dear Counsel:

Enclosed please find my Award in the above referenced matter.

Thank you.

Sincerely,
Martin F. Scheinman

MFS/sk
BOE.UFT.Impact Bargaining.awd



Ex 1

---------------------------------- X
In the Matter of the Arbitration X

between X

BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK X

"Department" X

-and- X

UNITED FEDERATION OF TEACHERS, LOCAL 2, AFT, AFL-CIO X

"Union" X

---------------------------------- X

Re: Impact Bargaining

**APPEARANCES**

**For the Department**
Renee Campion, Commissioner of Labor Relations
Steven H. Banks, Esq., First Deputy Commissioner and General Counsel of Labor Relations

**For the Union**
STROOCK & STROOCK & LAVAN, L.L.P.
Alan M. Klinger, Esq.

Beth Norton, Esq., UFT General Counsel
Michael Mulgrew, UFT President

**BEFORE:** Martin F. Scheinman, Esq., Arbitrator

**BACKGROUND**

The Union ("Union" or "UFT") protests the Department of Education's ("Department" or "DOE") failure to reach agreement on the impact of its decision mandating all employees working in Department buildings show proof they started the Covid-19 vaccination protocols by September 27, 2021. The Union contends the Department failed to adequately provide, among other things, for those instances where employees have proof of a serious medical condition making the vaccine a danger to their health, as well as for employees who have a legitimate religious objection to vaccines.

Most of the basic facts are not in dispute.

For those in the New York City ("NYC" or "City") metropolitan area, we are now in the 18th month of the Covid-19 pandemic. During that time, we have seen substantial illness and loss of life. There have been periods of significant improvement and hope, but sadly, we have seen resurgence with the Delta variant. Throughout this period, NYC and its municipal unions have worked collaboratively to provide needed services for the City's 8.8 million residents in as safe an environment as possible. Yet, municipal employees have often borne great risk. The Department and the UFT are no exception. The DOE and the UFT immediately moved to remote instruction and then later a hybrid model of both in-person and remote learning for the 2020-2021 school year. Educators at all levels strove to deliver the best experience possible under strained circumstances. For this

coming school year, both the DOE and the UFT have endeavored to return, as much as possible, to in-person learning. They have developed protocols regarding masking and distancing to effectuate a safe environment for the City's students and educators.

To this end, the Delta resurgence has complicated matters. In recognition of increased risk, there have been various policies implemented at City agencies and other municipal entities. Mayor de Blasio in July 2021 announced a "Vaccine-or-Test" mandate which essentially requires the City workforce, including the UFT's educators, either to be vaccinated or undergo weekly testing for the Covid-19 virus effective September 13, 2021.

Most relevant to this matter, on August 23, 2021, the Mayor and the NYC Commissioner of Health and Mental Hygiene, David A. Chokshi, MD, announced a new policy for those workforces in NYC DOE buildings. Those employees would be subject to a "Vaccine Only" mandate. That is, such employees would need to show by September 27, 2021, they had at least started the vaccination protocol or would not be allowed onto DOE premises, would not be paid for work and would be at risk of loss of job and benefits. This mandate was reflected in an Order of Commissioner Chokshi, dated August 24, 2021. That Order, by its terms, did not expressly provide for exceptions or accommodations for those with medical contraindications to vaccination or sincerely-held religious objections to inoculation. Nor did it address matters of due process with regard to job and benefits protection.

The UFT promptly sought to bargain the impact and implementation of the Vaccine Only mandate. A number of discussions were had by the parties but important matters remained unresolved.

On September 1, 2021, the UFT filed a Declaration of Impasse with the Public Employment Relations Board ("PERB") as to material matters. The City/DOE did not challenge the statement of impasse and PERB appointed me to mediate the matters. Given the exigencies of the imminent start of the school year and the coming of the September 27, 2021, mandate, together with the importance of the issues involved to the workforce, mediations sessions were held immediately on September 2, 3, 4 and 5, 2021, with some days having multiple sessions. Progress was made, and certain tentative understandings were reached, but significant matters remained unresolved. By agreement of the parties, the process moved to arbitration. They asked I serve as arbitrator.[1]

Arbitration sessions were held on September 6 and 7, 2021. During the course of the hearings, both sides were given full opportunity to introduce evidence and argument in support of their respective positions. They did so. Both parties made strenuous and impassioned arguments reflecting their viewpoints on this entire issue.

During the course of these hearings, I made various interim rulings concerning the impact of the "Vaccine Only" mandate. I then

[1] My jurisdiction is limited to the issues raised during impact bargaining and not with regard to the decision to issue the underlying "Vaccine Only" order.

directed the parties to draft language reflecting those rulings. Even though I am very familiar with the language of the current Collective Bargaining Agreement, as well as the parties' relationship since I am a member of their permanent arbitration panel and have served as a fact-finder and mediator during several rounds of bargaining, I concluded the parties are more familiar with Department policy and how leave and entitlements have been administered in accordance with prior agreements. As such, my rulings reflect both the understandings reached during the negotiations prior to mediation, those reached in the mediation process and the parties' agreed upon language in response to my rulings. All are included, herein.

I commend the parties for their seriousness of purpose and diligence in addressing these complicated matters. The UFT made clear it supports vaccination efforts and has encouraged its members to be vaccinated. Nonetheless, as a Union, it owes a duty to its members to ensure their rights are protected. The City/DOE demonstrated recognition of the importance of these issues, particularly with regard to employees' legitimate medical or religious claims. I appreciate both parties' efforts in meeting the tight timeline we have faced and the professionalism they demonstrated serving the citizens of the City and what the million plus students deserved. They have invested immense effort to insure such a serious issue was litigated in such a thoughtful way.

Yet, in the end, it falls to me, as Arbitrator, to arrive at a fair resolution of the matters at hand.

This matter is one of the most urgent events I have been involved with in my forty (40) plus years as a neutral. The parties recognized the complexity of the issues before me, as well as the magnitude of the work that lies ahead to bring this conflict to completion in a timely manner. For this reason, they understood and accepted the scope and complexity of this dispute could not be handled by me alone. They agreed my colleagues at Scheinman Arbitration and Mediation Services ("SAMS") would also be involved.

I want to thank my colleagues at SAMS, especially Barry J. Peek, for their efforts and commitment to implementing the processes to resolve this matter. This undertaking could not be accomplished by any single arbitrator.

**Opinion**

After having carefully considered the record evidence, and after having the parties respond to countless inquiries. I have requested to permit me to make a final determination, I make the rulings set forth below. While some of the language has been drafted, initially, by the parties in response to my rulings, in the end the language set forth, herein, is mine alone. I hereby issue the following Award:

**I. Exemption and Accommodation Requests & Appeal Process**

As an alternative to any statutory reasonable accommodation

process, the City, the Board of Education of the City School District for the City of New York (the "DOE"), and the United Federation of Teachers, Local 2, AFT, AFL-CIO (the "UFT), (collectively the "Parties") shall be subject to the following Expedited Review Process to be implemented immediately for full-time staff, H Bank and non-pedagogical employees who work a regular schedule of twenty (20) hours per week or more inclusive of lunch, including but not limited to Occupational Therapists and Physical Therapists, and Adult Education teachers who work a regular schedule of twenty (20) or more hours per week. This process shall only apply to (a) religious and medical exemption requests to the mandatory vaccination policy, and (b) medical accommodation requests where an employee is unable to mount an immune response to COVID-19 due to preexisting immune conditions and the requested accommodation is that the employee not appear at school. This process shall be in place for the 2021-2022 school year and shall only be extended by mutual agreement of the Parties.

Any requests to be considered as part of this process must be submitted via the SOLAS system no later than Monday, September 20, 2021, by 5:00 p.m.

A. Full Medical Exemptions to the vaccine mandate shall only be considered where an employee has a documented contraindication such that an employee cannot receive any of the three (3) authorized vaccines (Pfizer, Moderna, J&J)—with contraindications delineated in CDC clinical

considerations for COVID-19 vaccination. Note that a prior immediate allergic reaction to one (1) type of vaccine will be a precaution for the other types of vaccines, and may require consultation with an allergist.

B. Temporary Medical Exemptions to the vaccine mandate shall only be based on the following valid reasons to defer or delay COVID-19 vaccination for some period:

- Within the isolation period after a COVID-19 infection;
- Within ninety (90) days of monoclonal antibody treatment of COVID-19;
- Treatments for conditions as delineated in CDC clinical considerations, with understanding CDC guidance can be updated to include new considerations over time, and/or determined by a treating physician with a valid medical license responsible for the immunosuppressive therapy, including full and appropriate documentation that may warrant temporary medical exemption for some period of time because of active therapy or treatment (e.g., stem cell transplant, CAR T-cell therapy) that would temporarily interfere with the patient's ability to respond adequately to vaccination;
- Pericarditis or myocarditis not associated with COVID-19 vaccination or pericarditis or myocarditis associated with COVID-19 vaccination.

Length of delay for these conditions may vary, and the employee must get vaccinated after that period unless satisfying the criteria for a Full Medical Exemption described, above.

C. Religious exemptions for an employee to not adhere to the mandatory vaccination policy must be documented in writing by a religious official (e.g., clergy). Requests shall be denied where the leader of the religious organization has spoken publicly in favor of the vaccine, where the documentation is readily available (e.g., from an online source), or where the objection is personal, political, or philosophical in nature. Exemption requests shall be considered for recognized and established religious organizations (e.g., Christian Scientists).

D. There are cases in which, despite an individual having sought and received the full course of the vaccination, he or she is unable to mount an immune response to COVID-19 due to preexisting immune conditions. In these circumstances, each individual case shall be reviewed for potential accommodation. Medical accommodation requests must be documented in writing by a medical doctor.

E. The initial determination of eligibility for an exemption or accommodation shall be made by staff in the Division of Human Capital in the Office of Medical, Leaves and Benefits; the Office of Equal Opportunity; and Office of Employee

Relations. These determinations shall be made in writing no later than Thursday, September 23, 2021, and, if denied, shall include a reason for the denial.

F. If the employee wishes to appeal a determination under the identified criteria, such appeal shall be made in SOLAS to the DOE within one (1) school day of the DOE's issuance of the initial eligibility determination. The request for appeal shall include the reason for the appeal and any additional documentation. Following the filing of the appeal, any supplemental documentation may be submitted by the employee to the Scheinman Arbitration and Mediation Services ("SAMS") within forty eight (48) hours after the filing of the appeal. If the stated reason for denial of a medical exemption or accommodation request is insufficient documentation, the employee may request from the arbitrator and, upon good cause shown, the arbitrator may grant an extension beyond forty eight (48) hours and permit the use of CAR days after September 27, 2021, for the employee to gather the appropriate medical documentation before the appeal is deemed submitted for determination.

G. A panel of arbitrators identified by SAMS shall hear these appeals, and may request the employee or the DOE submit additional documentation. The assigned arbitrator may also request information from City and/or DOE Doctors as part of the review of the appeal documentation. The assigned

arbitrator, at his or her discretion, shall either issue a decision on the appeal based on the documents submitted or hold an expedited (virtual) factual hearing. If the arbitrator requests a factual hearing, the employee may elect to have a union representative present but neither party shall be required to be represented by an attorney at the hearing. The expedited hearing shall be held via Zoom telecommunication and shall consist of brief opening statements, questions from the arbitrator, and brief closing statements. Cross examination shall not be permitted. Any documentation submitted at the arbitrator's request shall be provided to the DOE at least one (1) business day before the hearing or the issuance of the written decision without hearing.

H. Appeal decisions shall be issued to the employee and the DOE no later than Saturday September 25, 2021. Appeal decisions shall be expedited without full Opinion, and final and binding.

I. While an appeal is pending, the exemption shall be assumed granted and the individual shall remain on payroll consistent with Section K below. However, if a larger number of employees than anticipated have a pending appeal as of September 27, 2021, as determined by SAMS, SAMS may award different interim relief consistent with the parties' intent. Those employees who are vaccinated and have applied for an

accommodation shall have the ability to use CAR days while their application and appeal are pending. Should the appeal be granted, these employees shall be reimbursed any CAR days used retroactive to the date of their initial application.

J. The DOE shall cover all arbitration costs from SAMS under this process. To the extent the arbitrator requests additional medical documentation or information from the DOE, or consultation with City and/or DOE Doctors, arranging and paying for such documentation and/or consultation shall be the responsibility of the DOE.

K. An employee who is granted a medical or religious exemption or a medical accommodation under this process and within the specific criteria identified above shall be permitted the opportunity to remain on payroll, but in no event required/permitted to enter a school building while unvaccinated, as long as the vaccine mandate is in effect. Such employees may be assigned to work outside of a school building (e.g., at DOE administrative offices) to perform academic or administrative functions as determined by the DOE while the exemption and/or accommodation is in place. For those with underlying medical issues granted an accommodation under Section I(D), the DOE will make best efforts to ensure the alternate work setting is appropriate for the employee's medical needs. The DOE shall make best efforts to make these assignments within the same borough as

the employee's current school, to the extent a sufficient number of assignments exist in the borough. Employees so assigned shall be required to submit to COVID testing twice per week for the duration of the assignment.

L. The process set forth, herein, shall constitute the exclusive and complete administrative process for the review and determination of requests for religious and medical exemptions to the mandatory vaccination policy and accommodation requests where the requested accommodation is the employee not appear at school. The process shall be deemed complete and final upon the issuance of an appeal decision. Should either party have reason to believe the process set forth, herein, is not being implemented in good faith, it may bring a claim directly to SAMS for expedited resolution.

## II. Leave

A. Any unvaccinated employee who has not requested an exemption pursuant to Section 1, or who has requested an exemption which has been denied, may be placed by the DOE on leave without pay effective September 28, 2021, or upon denial of appeal, whichever is later, through November 30, 2021. Such leave may be unilaterally imposed by the DOE and may be extended at the request of the employee consistent with Section III(B), below. Placement on leave without pay for these reasons shall not be considered a disciplinary action for any purpose.

B. Except as otherwise noted, herein, this leave shall be treated consistent with other unpaid leaves at the DOE for all purposes.

C. During such leave without pay, employees shall continue to be eligible for health insurance. As with other DOE leaves without pay, employees are prohibited from engaging in gainful employment during the leave period.

D. Employees who become vaccinated while on such leave without pay and provide appropriate documentation to the DOE prior to November 30, 2021, shall have a right of return to the same school as soon as is practicable but in no case more than one (1) week following notice and submission of documentation to the DOE.

E. Pregnancy/Parental Leave

i. Any soon-to-be birth mother who starts the third trimester of pregnancy on or before September 27, 2021, (e.g. has a due date no later than December 27, 2021), may commence UFT Parental Leave prior to the child's birth date, but not before September 27, 2021.

ii. No documentation shall be necessary for the early use of Parental Leave, other than a doctor's written assertion the employee is in her third trimester as of September 27, 2021.

iii. Eligible employees who choose to start Parental Leave prior to the child's birth date, shall be required to first use CAR days until either: 1) they exhaust CAR/sick days,

at which point the Parental Leave shall begin, or 2) they give birth, at which point they shall be treated as an approved Parental Leave applicant for all purposes, including their prerogative to use additional CAR days prior to the commencement of Parental Leave.

iv. Eligible employees who have a pregnancy disability or maternity disability outside of the regular maternity period may, in accordance with existing rules, borrow CAR/sick days and use a Grace Period. This eligibility to borrow CAR/sick days does not apply to employees during the regular maternity recovery period if they have opted to use Parental Leave.

v. In the event an eligible employee exhausts CAR/sick days and parental leave prior to giving birth, the employee shall be placed on a leave without pay, but with medical benefits at least until the birth of the child. As applicable, unvaccinated employees may be placed in the leave as delineated in Section II(A).

vi. If not otherwise covered by existing Family Medical Leave Act ("FMLA") or leave eligibility, an employee who takes Parental Leave before the birth of the child shall be eligible to be on an unpaid leave with medical benefits for the duration of the maternity recovery period (i.e., six weeks after birth or eight weeks after a birth via C-Section)

vii. All other eligibility and use rules regarding UFT Parental Leave as well as FMLA remain in place.

**III. <u>Separation</u>**

A. During the period of September, 28, 2021, through October 29, 2021, any employee who is on leave without pay due to vaccination status may opt to separate from the DOE. In order to separate under this Section and receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's involuntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. If an employee opts to separate consistent with this Section, the employee shall be eligible to be reimbursed for unused CAR days on a one (1) for one (1) basis at the rate of 1/200th of the employee's salary at departure per day, up to 100 days, to be paid following the employee's separation with documentation including the general waiver and release. Employees who elect this option shall be deemed to have resigned involuntarily effective on the date contained in the general waiver as determined by the DOE, for non-disciplinary reasons. An employee who separates under this Section shall continue to be eligible for health insurance through September 5, 2022, unless they are eligible for health insurance from another source (e.g., a spouse's coverage or another job).

B. During the period of November 1, 2021 through November 30, 2021, any employee who is on leave without pay due to vaccination status may alternately opt to extend the leave through September 5, 2022. In order to extend this leave pursuant to this Section, and continue to receive the commensurate benefits, an employee must file a form created by the DOE which includes a waiver of the employee's rights to challenge the employee's voluntary resignation, including, but not limited to, through a contractual or statutory disciplinary process. Employees who select this option shall continue to be eligible for health insurance through September 5, 2022. Employees who comply with the health order and who seek to return from this leave, and so inform the DOE before September 5, 2022, shall have a right to return to the same school as soon as is practicable but in no case more than two (2) weeks following notice to the DOE. Existing rules regarding notice of leave intention and rights to apply for other leaves still apply. Employees who have not returned by September 5, 2022, shall be deemed to have voluntarily resigned.

C. Beginning December 1, 2021, the DOE shall seek to unilaterally separate employees who have not opted into separation under Sections III(A) and III(B). Except for the express provisions

contained, herein, all parties retain all legal rights at all times relevant, herein.

September 10, 2021.

Martin F. Scheinman, Esq.
Arbitrator

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

I, MARTIN F. SCHEINMAN, ESQ., do hereby affirm upon my oath as Arbitrator that I am the individual described herein and who executed this instrument, which is my Award.

September 10, 2021.

Martin F. Scheinman, Esq.
Arbitrator

DOE.UFT.Impact Bargaining.awd

# Exhibit 9:
# Court of Appeals Order

**APPENDIX**

# United States Court of Appeals
FOR THE
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of November, two thousand twenty-one.

Before: Pierre N. Leval,
José A. Cabranes,
Denny Chin,
*Circuit Judges.*

---

Michael Kane, William Castro, Margaret Chu, Heather Clark, Stephanie Di Capua, Robert Gladding, Nwakaego Nwaifejokwu, Ingrid Romero, Trinidad Smith, Amaryllis Ruiz-Toro,

*Plaintiffs-Appellants,*

**ORDER**

v.

21-2678-cv

Bill de Blasio, in his official capacity as Mayor of the City of New York, David Chokshi, in his official capacity of Health Commissioner of the City of New York, New York City Department of Education,

*Defendants-Appellees.*

---

Matthew Keil, John De Luca, Sasha Delgado, Dennis Strk, Sarah Buzaglo,

*Plaintiffs-Appellants,*

v.

21-2711-cv

The City of New York, Board of Education of the City School District of New York, David Chokshi, in his Official Capacity of Health Commissioner of the City of New York, Meisha Porter, in her Official

Capacity as Chancellor of the New York City
Department of Education,

*Defendants-Appellees.*

---

The motions of Plaintiffs-Appellants ("Plaintiffs") for an injunction pending appeal having been heard at oral argument on November 10, 2021, and Defendants-Appellees ("Defendants") having represented to this Court that "the City is working toward making an opportunity for reconsideration available more broadly to DOE employee[s] who unsuccessfully sought religious exemptions pursuant to the arbitration award's appeal process," it is hereby

**ORDERED** that this appeal is expedited and will be heard by a merits panel sitting on November 22, 2021 (the "merits panel"). Pending further order by the merits panel,

1. Plaintiffs shall receive fresh consideration of their requests for a religious accommodation by a central citywide panel consisting of representatives of the Department of Citywide Administrative Services, the City Commission on Human Rights, and the Office of the Corporation Counsel.
2. Such consideration shall adhere to the standards established by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law, and the New York City Human Rights Law. Such consideration shall not be governed by the challenged criteria set forth in Section IC of the arbitration award for United Federation of Teachers members. Accommodations will be considered for all sincerely held religious observances, practices, and beliefs.
3. Plaintiffs shall submit to the citywide panel any materials or information they wish to be considered within two weeks of entry of this order. The citywide panel shall issue a determination on each request no later than two weeks after a plaintiff has submitted such information and materials. Within two business days of the entry of this order, Defendants shall inform plaintiffs' counsel how such information and materials should be transmitted to the citywide panel.
4. The deadline to opt-in to the extended leave program and execute any accompanying waiver shall be stayed for Plaintiffs, and no steps will be taken to terminate the plaintiff's employment for noncompliance with the vaccination requirement.
5. If a plaintiff's request is granted by the citywide panel, the plaintiff will receive backpay running from the date they were placed on leave without pay.
6. This order is intended only to provide for temporary interim relief until the matter is considered by the merits panel of this court, which panel may entirely supersede these provisions for interim relief, and the parties are at liberty to advocate to the merits panel for alteration of these provisions. Unless the merits panel has previously entered a superseding order, within two weeks of the conclusion of Plaintiffs' proceedings before the citywide panel, the parties shall inform the merits panel of the result of those proceedings and advise of any further relief being sought.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk

# Exhibit 10:
# Affirmation of Eric Eichenholtz

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------------- x

ANNABELLE MATYAS,

Petitioner,

FOR A JUDGMENT PURSUANT TO ARTICLE 78

-against-

THE BOARD OF EDUCATION OF THE CITY SCHOOL DISTRICT OF THE CITY OF NEW YORK AND COMMUNITY SCHOOL DISTRICT 25 OF THE BOARD OF EDUCATION OF THE CITY OF NEW YORK, UNITED FEDERATION OF TEACHERS,

Respondents.

-------------------------------------------------------------------------- X

**AFFIRMATION OF ERIC J. EICHENHOLTZ**

Index No. 155983/2022

**ERIC J. EICHENHOLTZ**, an attorney admitted to practice before the Courts of the State of New York, affirms, pursuant to the Civil Practice Law and Rules ("CPLR") and under penalty of perjury, that the following is true and correct:

1. I am the Chief Assistant Corporation Counsel for Employment Policy and Litigation within the New York City Office of the Corporation Counsel. I have held this position since October, 4, 2021. In this capacity, I oversee the Law Department's Labor and Employment Law, Affirmative Litigation, Worker's Compensation and E-Discovery Divisions. I also provide legal advice and counsel to City agencies and officials in employment matters. Prior to October 4, 2021, I served as the Chief of the Labor and Employment Law Division within the Office of the Corporation Counsel. As Chief of the Labor and Employment Law Division I oversaw all litigation brought against the City arising out of the City's role as an employer.

This Affirmation is based on my own personal knowledge, as well as the books and records of the City of New York, and statements made to me by other employees of the City of New York. I submit respectfully this Affirmation in order to provide the Court with information regarding the review of Andrew Schiefer's application for appeal of the denial of his requested religious accommodation.

**Background Information on the Citywide Panel**

2. On October 20, 2021, Commissioner of the New York City Department of Health and Mental Hygiene ("DOHMH") Dave A. Chokshi, M.D., issued an order requiring all City employees to show proof of at least one dose of a vaccination against COVID-19 by 5:00 p.m. on October 29, 2021 (the "City Order").

3. In response to the City Order, the City established additional procedures specific to requests for vaccination-related accommodations in an effort to address the anticipated increase in accommodation requests that would be made by City employees. These procedures specified that a reasonable accommodation was to be submitted by an employee to their agency's EEO Officer on or before October 27, 2021. Any employee who is or was denied a reasonable accommodation by their agency has the right to appeal that denial to the City of New York Reasonable Accommodation Appeals Panel ("Citywide Panel").

4. The Citywide Panel was created specifically in response to the City Order to consider appeals filed by employees whose accommodation requests had been denied by their respective agency.

5. The purpose of the Citywide Panel is to ensure that employees who are denied a reasonable accommodation can have their appeals heard and considered consistent with the standards established by the Americans with Disabilities Act ("ADA"), Title VII of the Civil

Rights Act of 1964 ("Title VII"), the New York State Human Rights Law, and the New York City Human Rights Law. The Citywide Panel evaluates appeals under the standards set by those laws and consistent with the guidance issued by the U.S. Equal Employment Opportunity Commission ("EEOC") to assist employers in implementing COVID-19 related strategies compliant with Title VII and the ADA. This EEOC guidance specifically addresses accommodation requests made in response to an employer-issued vaccine mandate.

6. The Citywide Panel is comprised of representatives from the Office of the Corporation Counsel ("Law Department"), the New York City Department of Citywide Administrative Services ("DCAS"), the New York City Department of Health and Mental Hygiene ("DOHMH") and the City Commission on Human Rights ("CCHR"). The composition of the Citywide Panel was specifically designed to utilize the extensive subject matter expertise and knowledge-base of individuals employed at these City agencies with respect to medical and religious accommodation requests.

7. Furthermore, in order to tailor the Citywide Panel to best evaluate accommodation requests, the composition of the Citywide Panel that considers a particular request changes depending on the nature of the request. When the appeal concerns a request for a medical accommodation, the Law Department, DCAS and DOHMH panel members consider the appeal. If the appeal concerns a request for an accommodation based on a religious need, the Law Department, DCAS and CCHR consider the appeal.

8. Each case is reviewed by three Panel members (one Panel member from each applicable agency). As detailed below, following a thorough review of the appeal, each Panel member exercises their agency's vote on the Citywide Appeal for that particular appeal. Each agency may vote to affirm the denial of the accommodation or to reverse the agency decision and

grant the accommodation. When there is disagreement amongst the three agencies concerning the outcome, the majority rules.

9. Each agency separately reviews each request, although the Panel members can confer if they deem it necessary. Once all three agencies have voted, either myself or the General Counsel of DCAS, Sanford Cohen, will perform a final review of the case for quality assurance purposes and finalize the case. Once the case is finalized, the agency and employee are notified of the appeals panel's decision.

10. Prior to reaching the appellate level, with respect to agency-level denials, all City employees who are denied a vaccine mandate accommodation by their agency are provided with written information on the appeals process, including a link to the City's online appeals request portal: www.nyc.gov/vaxappeal. An employee may submit an appeal via the online review request portal, which will automatically notify their agency EEO Officer of the appeal. Upon notification of the appeal, the agency's EEO Office will upload all records concerning the agency's denial of the reasonable accommodation request within one business day.

11. Once the Citywide Panel is in receipt of an appeal, it is reviewed to determine whether supplemental information is necessary from either the agency or the employee in order to make a determination on the appeal. If such information is necessary, the Panel makes that request to the agency, the employee or both.

12. The applicable panel members then review all the materials provided by the agency and the employee. In so reviewing, the Panel utilizes the below-described standards which comport with city, state and federal law.

13. The Citywide Panel considers whether the requested religious accommodation presents an undue hardship on City operations. EEOC guidance provides that

requiring an employer to bear more than a "de minimis," or a minimal, cost to accommodate an employee's religious belief is an undue hardship.

14. It is with these guiding principles in mind that the Citywide Panel considers each and every appeal put before it. Once the panel members have had sufficient time to review all materials provided, each agency votes as to whether to affirm the denial or grant the requested accommodation.

15. Prior to voting on an appeal, any Citywide Panel member may request that the request be remanded back to the agency. This request is not subject to a vote. Any request by a Panel member for a remand results in a request being sent to the agency for further review or continued cooperative dialogue at the agency level. A Panel member may remand back to the agency in advance of a vote for a multitude of reasons, including because: (1) information is missing from the record on appeal; (2) the agency appeared to have overlooked information that had been previously submitted; (3) the employee raised a new matter for the first time on appeal that merits agency review; or (4) the Panel member believes additional cooperative dialogue between the agency and employee is needed to better understand the employee's request. Again, these remands are designed to ensure that the employee's request for an accommodation is accorded all reasoned consideration and attention under the circumstances.

16. The above-described process is uniform for all City agencies and employees.

17. With respect to DOE employees, any DOE employee who submitted a request for a religious accommodation to DOE and had that request denied, was afforded the opportunity to appeal that denial before a neutral arbitrator. In the event the arbitrator affirmed the denial, the DOE employee was subsequently given the opportunity to submit an additional

appeal to the Citywide Panel. Once an appeal is filed with the Citywide Panel, the process applies described in Paragraphs 5 through 16 above. The Citywide Panel does not accept appeals of denials of medical accommodations from DOE employees.

**Petitioner's Appeal to the Citywide Panel**

18. By letter dated September 20, 2021, Petitioner requested a religious exemption which was denied by the DOE. The request was denied by the DOE because the accommodation would impose an undue hardship on the DOE and its operations.

19. On or about September 23, 2021, Petitioner appealed via the collective bargaining agreement process involving the DOE and Petitioner's Union, the United Federation of Teachers. On October 6, 2021, Petitioner received an email that Petitioner's appeal was denied by an arbitrator.

20. Petitioner next appealed the denial of his accommodation request to the Citywide Panel. The Citywide Panel received a letter dated December 3, 2021.

21. The Citywide Panel requested additional information regarding Petitioner's appeal. The request for additional information included the following:

1. Whether you have previously taken any vaccinations.

2. If you have stated that you have a personal religious aversion to foreign or other impermissible substances entering your body, please describe this with more clarity, including describing any other commonly used medicines, food/drink and other substances you consider foreign/impermissible or that violate your religious belief.

3. If you have stated that you cannot take the vaccine because of an objection to using derivative fetal cells in the development of a vaccine, please provide more information about your stated objection and whether there are other medications or vaccinations that you do not take because of this objection.

4. Any additional occasions you have acted in accordance with the cited belief outside the context of a COVID-19 vaccination, to the extent not previously described in the documentation already submitted.

22. Petitioner provided the additional information which focused on Petitioner's religious beliefs regarding vaccines. Petitioner wrote that, as of 1994, she has not previously taken any vaccinations, does not take any vaccinations or preventive medications, and is actively against vaccinations for herself and "any child of" hers.

23. DOE sent a position statement in support of its denial of Petitioner's accommodation request. This position statement included reasoning as to why granting the accommodation request would be an undue hardship. The reasons provided by the DOE as to why granting the request would be an undue hardship include that Petitioner would not be able to perform the essential functions of the position, mainly serving students attending school in-person. Additionally, over 3,300 DOE staff requested religious exemptions and DOE lacks flexibility to transfer existing DOE staff to fill gaps created by DOE employees granted exemptions due to state law and applicable collective bargaining agreements. Granting an exemption would require the DOE to bear significant costs and operational difficulties including having to pay additional employees to perform the essential functions of the exempted employee's position. DOE stated the undue hardship will only grow with each exemption granted.

24. After a review of all the documentation provided by both Petitioner and the DOE, including Petitioner's appeal and supplemental response to the Panel's request for additional information from Petitioner as well as DOE's position statement, all three members of the Citywide Panel voted to affirm the denial of the reasonable accommodation.

25. The Panel voted unanimously to affirm the denial of the reasonable accommodation for substantially the same reasons as indicated in the DOE's position statement. In this regard, the Panel was mindful that the DOE was to consider both the petitioner's individual work circumstances and her role within the DOE as well as the cumulative effect that any accommodation, if granted, would have on the ability of the DOE to operate under the criteria set forth federal, state and local laws.

26. To this end, the Panel understood that hundreds of other DOE employees had sought a similar accommodation and that fact, combined with the importance of having pedagogical personnel present for in-person learning "the number of employees who are seeking a similar accommodation, i.e., the cumulative cost or burden on the employer"[1] weighed heavily here in favor of the DOE.

27. Thus, on March 28, 2022, the Citywide Panel denied Petitioner's appeal and affirmed the DOE's denial of Petitioner's reasonable accommodation request because granting the accommodation would be an undue hardship given the need for a safe environment for in-person

[1] EEOC guidance, Section L.4., available at https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws. The City Commission on Human Rights guidance, available at https://www1.nyc.gov/site/cchr/community/covid-employment.page#:~:text=An%20employer%20must%20provide%20a,Commission's%20Disability%20Legal%20Enforcement%20Guidance, likewise allows for denial on undue burden grounds in these circumstances, stating "With respect to religion, the NYCHRL defines an undue hardship as "an accommodation requiring significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace or a violation of a bona fide seniority system)." In this regard, the NYCHRL itself notes that "The number of individuals who will need the particular accommodation to a sincerely held religious observance or practice" is a key factor.

learning.

Dated: New York, New York
October 7, 2022

ERIC J. EICHENHOLTZ

# Exhibit 11:
# Eichenholtz Deposition

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------x
NEW YORKERS FOR RELIGIOUS LIBERTY, INC., GENNARO AGOVINO, CURTIS CUTLER, LIZ DELGADO, JANINE DEMARTINI, BRENDAN FOGARTY, SABINA KOLENOVIC, KRISTA O'DEA, DEAN PAOLILLO, DENNIS PILLET, MATTHEW RIVERA, LAURA SATIRA, FRANK SCHIMENTI and JAMES SCHMITT, individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

THE CITY OF NEW YORK, ERIC ADAMS, in his official capacity as Mayor of the City of New York, DAVE CHOKSHI, in his official capacity as Health Commissioner of the City of New York, AND ROBERTA REARDON, in her capacity as new York State Commissioner of Labor,

Defendants.

Case No.: 1:2022-cv-00752
-------------------------------------------x

(Via Zoom Videoconference)

May 24, 2022
9:11 a.m.

Video-recorded Videoconference Deposition of ERIC EICHENHOLTZ, before Kristi Cruz, a Stenographic Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

NELSON MADDEN BLACK LLP
Attorneys for Plaintiffs
475 Park Avenue South, Suite 2800
New York, New York 10016
BY: JONATHAN R. NELSON, ESQ.
SARAH E. CHILD, ESQ.
jnelson@nelsonmaddenblack.com

THE GIBSON LAW FIRM PLLC
407 North Cayuga Street, Suite 201
Ithaca, New York 14850
BY: SUJATA SIDHU GIBSON, ESQ.
sujata@gibsonfirm.law

NEW YORK CITY LAW DEPARTMENT
Attorneys for Defendant
100 Church Street
New York, New York 10007
BY: BILAL H. HAIDER, ESQ.
LORA MINICUCCI, ESQ.
ANDREA M. O'CONNOR, ESQ.
bhaider@law.nyc.gov

A P P E A R A N C E S (cont'd):

ALSO PRESENT:

DEAN PAOLILLO

BARRY BLACK

KRISTA O'DEA

FRANK SCHIMENTI

SABINA KOLENOVIC

LIZ DELGADO

GENNARO AGOVINO

BRANDON BABWAH, Paralegal

ROCCO MERCURIO, Videographer

PROCEEDINGS

THE VIDEOGRAPHER: We are now going on the record. Today is May 24, 2022, and the time is approximately 9:11. Please note that this deposition is being conducted virtually. Quality of the recording depends on the quality of the camera and internet connection of the participants. What is heard from the witness and seen on the screen is what will be recorded. Audio and video recording will continue to take place until all parties agree to go off.

This is the remote video deposition of Eric Eichenholtz in the matter of New Yorkers For Religious Liberty Inc. et al. versus the City of New York et al., filed in the U.S. Eastern District Court of New York, case number 1:2022cv00752. My name is Rocco Mercurio, and the court reporter is Kristi Cruz, and we are from Veritext.

Will counsel please introduce yourselves and who you represent for the record.

MR. NELSON: For the plaintiffs,

E. EICHENHOLTZ

Jonathan Nelson of Nelson Madden Black LLP.

MS. CHILD: For the plaintiffs, this is Sarah Child from Nelson Madden Black LLP.

MR. NELSON: Sujata, will you please introduce yourself? Perhaps you will do so later on; perhaps she's away.

Defendants' counsel?

MR. HAIDER: Bilal Haider for the defendants on behalf of the Corporation Counsel.

MS. MINICUCCI: Lora Minicucci for defendants.

MS. O'CONNOR: Andrea O'Connor for defendants.

THE VIDEOGRAPHER: Okay. Will the court reporter please swear the witness.

E R I C E I C H E N H O L T Z,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. NELSON:

Q. Good morning, Mr. Eichenholtz.

E. EICHENHOLTZ

A. Good morning.

Q. Thank you for being here, although your here is not here; it's where you are in your office, I suppose.

A. Virtually, yes.

Q. So you're here for the deposition, the 30(b)(6) deposition on behalf of the City defendants in this lawsuit. And you're an attorney; is that correct?

A. That's correct.

Q. And have you ever taken part in depositions before?

A. Never as a witness, but as counsel, I've taken part in many depositions, yes.

Q. Okay. So you know the rules.

A. Yes.

Q. Very good. We can dispense with those, I think.

One thing we should discuss is breaks. There's a very important aspect with respect to breaks, and that is that breaks should not occur between the question that is posed and the answer that's given, and I would ask, also, that that extend to communications

E. EICHENHOLTZ

between the witness and counsel. You have
counsel sitting right next to you. There's
potential for passing notes, and I would
direct you not to do that, please.
A. Understood.
Q. Any time somebody needs a break in
this matter, then please raise that for the --
you know, raise that on the record and, you
know, we'll be very generous with respect to
that. Anybody who needs a bathroom break gets
it. And we will be breaking for lunch, if we
continue that long. So we can certainly
negotiate the amount of time that's necessary
for lunch, but I would say it should be at
least probably 45 minutes. Is that acceptable
to City counsel?
MR. HAIDER: Bilal Haider, yes, it
is acceptable.
MR. NELSON: Very good.
Q. So, Mr. Eichenholtz, what is your
position?
A. I am the Chief Assistant Corporation
Counsel for employment policy and litigation.
Q. Okay. And how long have you been

E. EICHENHOLTZ

doing that?

A. Since October of 2021.

Q. You know, that's fairly recent. What were you doing before then?

A. Before then, I was the Division Chief of The Labor and Employment Law Division here at the New York City Law Department.

Q. And how long did you do that?

A. Since February of 2013.

Q. And you are testifying as a Rule 30(b)(6) witness on behalf of all of the City defendants; is that correct?

A. Correct. On behalf of the corporate entity, the City of New York, yes.

Q. Now, do you have a personal knowledge of the matters that are to be covered by today's deposition by order of the magistrate judge?

A. Some, I'd imagine.

Q. Okay. And what is the basis for the personal knowledge that you have with respect to the topics that have been mentioned in the judge's order?

A. I was involved with the formation

E. EICHENHOLTZ

and have served on the Citywide Appeals Panel for the New York City employee vaccine mandate.

Q. And how were you involved in the formation of the panel?

A. I was consulted and a part of the team that put the panel together, and worked through the reasonable accommodation process with respect to the commissioner of health's order, I believe, in October, October 20th of 2021.

Q. And who else was on that team that put the panel together?

A. Various individuals. We worked -- there were several agencies that worked collaboratively together, and at different stages, different people would weigh in. But it was primarily the New York City Law Department, the New York City Department of Citywide Administrative Services, the New York City Mayor's Office of Labor Relations, as well as the New York City Department of Health and Mental Hygiene, as well as those working in City Hall to coordinate, you know, the

E. EICHENHOLTZ

interagency policy issues that were going on with respect to the COVID-19 public health emergency.

Q. So were there any other persons from the New York City Law Department that were involved in that process, then, just the putting together of the panel?

A. Yes.

Q. And who were they?

A. Georgia Pestana.

Q. And who was involved on behalf of DCAS, the Department of Citywide Administrative Services?

A. It varied, but primarily Sanford Cohen, their general counsel, Barbara Dannenberg, who was the Deputy Commissioner of Human Capital, and Stella Xu, she's in an executive role then. I'm sorry, I don't know her precise title. Those were the individuals who were working on employee policy and implementation with respect to the COVID-19 emergency, so they were involved in the discussion. And certain also -- at various points we also consulted with Silvia

E. EICHENHOLTZ

Montalban, who is the Deputy Commissioner for Citywide Equity and Inclusion.

Q. Who was on that group that put together the panel from the Mayor's Office of Labor Relations?

A. It was Renee Campion, the Commissioner of Labor Relations, as well as Steven Banks, who at the time was the first deputy commissioner. They were both involved in the discussions.

Q. And who was involved from the Department of Health and Mental Hygiene?

A. I do not recall at this time. They were -- I don't recall the name of the individual. They were primarily involved when it came to the commissioner's order. I spoke primarily with Lisa Landau, who was their general counsel, but I know that there were doctors and medical policy people who Lisa consulted with as needed. Their involvement was more about the order than it was the reasonable accommodation and appeal process, however. So they were not as involved in discussions about the appeal panel and the

E. EICHENHOLTZ

appeal -- and the reasonable accommodation process.

Q. Okay. And then, you mentioned that there were people who were involved from City Hall in the coordination, I guess, of interagency kinds of policies and that sort of thing. Who were they?

A. I'm trying to remember who was -- Molly Schaeffer is -- was and remains someone over there who coordinates between the agencies. I don't believe there was anyone directly involved as we were discussing matters of the panel and the composition. That was done primarily discussions between the various agencies. But when we would have our structure set up, we would obviously check in with, it would have been the first deputy mayor's team at City Hall, and the first deputy mayor at the time was Dean Houlihan.

Q. Thank you.

Now, you've mentioned that Georgia Pestana was also involved from the Law Department. What was her role in that process of the formation of the panel?

E. EICHENHOLTZ

A. At the time, Georgia Pestana was the Corporation Counsel of the City of New York, so she was serving as the City's chief legal officer. This was obviously a legal compliance issue, so she as well as I were actively involved in that regard.

Q. And she is also a person who is representing the City departments in the lawsuit in which you're involved. Is that true?

A. No, that's not accurate. As she is -- as Corporation Counsel, when she was Corporation Counsel, she no longer is, she was obviously listed as the primary counsel of record in the same way, you know, a firm's headline would appear in every case. But Ms. Pestana was not personally involved in those representations, outside of an executive and supervisory role.

Q. So what was your role in this process of putting the panel together?

A. Basically, to be a part of the discussion, to provide my thoughts on what the legal requirements were, the needs were, and

E. EICHENHOLTZ

how we could go about putting together a structure to satisfy that, what resources the City might have to bring to bear to make sure that we were able to perform those functions well. That was really my involvement in the discussion, as really, quite frankly, was everyone who was involved in that discussion.

Q. Now, are you familiar with the standards for adjudicating religious and medical accommodation requests that were set forth in the various decisions that were issued by an arbitrator in the arbitration in the Department of Education that related to religious accommodation requests?

A. I'm aware of the arbitration award and generally aware of the process that resulted from that award, yes.

Q. And were the standards that were set forth in that process for the decision-making on religious accommodation requests considered by the persons who were involved in the formation of the appeals panel that you formed in late October?

A. The citywide vaccine mandate that

E. EICHENHOLTZ

we're discussing here, that October 20th mandate, was a different mandate, a different discussion, a different process. And when we were discussing how to put together the panel and the standards that it would apply, that arbitration award was not a consideration, no.

Q. Did you discuss it in the course of the formation of the panel, or it simply was never mentioned?

A. I -- I don't recall it ever being discussed when it came to how we were going to go about a citywide appeal panel process. Our focus and our discussion was both the legal standards, as well as the City's existing Equal Employment Opportunity, or EEO policy, as well as our Reasonable Accommodation policies, and how we could adapt those policies to effectively address this circumstance in the public health emergency. That was our consideration in designing and discussing the panel.

Q. And what adaptations did your group decide it was necessary to make in order to serve those needs?

E. EICHENHOLTZ

A. Well, we had received I think two, what I would describe as, broad policy-based, whether you want to call them, requests or considerations for what was desired from policy perspective. What was desired was that this mandate be and the reasonable accommodations be implemented in a uniform manner such that we were not going to have appeals of denials dependent on agency by agency, as well as to have a process that could both, you know, that could handle a large number of appeals that we anticipated would be coming from the agency EEO officer's determinations, so do it uniformly and be able to handle the volume, and of course to do it with effectiveness and proper consideration. Those were really the policy asks.

And ultimately, our determination was that we wanted to use -- the City had significant internal resources in many of these agencies that provided a unique perspective based on that agency's work and mission, and that we wanted to bring those resources to bear to create a citywide

process, and that's ultimately the process the panel evolved from.

Q. Was part of this discussion a desire to have uniform decisions at the agency level, also, as well as at the Citywide Appeals Panel level?

A. No. I think the concern was more, you know, the reasonable accommodation -- reasonable accommodations were essentially going to be an exception, but an important legal exception to the vaccine mandate, and obviously our focus was on making sure that employees who were denied at the agency level had that opportunity for additional review and to bring that perspective and experience to bear in that review. It is, as it's named, intended to be an appellate review process much like, you know, a court of appeals would be.

Q. So in the process of putting this panel together and organizing the City's response to a request for exemptions from the citywide mandate, did your panel discuss or were you personally involved in speaking with

E. EICHENHOLTZ

the agencies about the processes that they would go through to process their own original reasonable accommodation requests?

A. So agencies were -- we had meetings in the lead-up to the implementation of the mandate with, what we call, agency personnel officers, those are your HR leads, as well as EEO officers, where we gave very high-level instructions, as well as answered questions in a group setting. I was involved -- I should also say, we also had meetings with agency general counsel to discuss the legal issues and implications. I was involved in all of those meetings as, you know, as an executive at the Law Department overseeing employment policy and overseeing sort of that legal advice as one of the people who had been paying very close attention to the law and legal developments with respect to vaccine mandates and human resources, employee issues, including, of course, reasonable accommodations.

Q. Now, at any time in those discussions with the agencies or in the

E. EICHENHOLTZ

formation of the panel, did you or anyone else discuss Mayor de Blasio's desires with respect to the implementation of the mandates and with respect to limitation of the number of people who should benefit from them, from the exemptions, or with respect to the limitation with respect to the religions to which they should -- to which they belonged?

A. No.

Q. No one?

A. No. That was not a subject of our discussion, no.

Q. Did you talk about Mayor de Blasio's desires at all in those meetings?

A. Quite frankly, Mayor de Blasio's desires were irrelevant.

Q. And why were they irrelevant?

A. Because what we were discussing was a public health order issued by the Commissioner of Health; not the Mayor of the City of New York; a reasonable accommodation process that is mandated by the laws of federal, state, local level, and a citywide policy. And the mayor's opinions on what

E. EICHENHOLTZ

should happen there were not relevant to the issue of what was required under the law, what was required under policy, and what the vaccine mandate allowed for.

Q. Who else was involved from the people who were putting the panel process together and implementing the RA exception policy in the sort of high-level meetings that you discussed having at the various agencies of the meeting?

A. Yeah, the primary -- the actual compensation of the panel primarily was myself, Ms. Pestana, Commissioner Campion, First Deputy Commissioner Banks, in terms of what agencies would serve on it. The nuts and bolts of how the reasonable accommodation process would be implemented, the process of you have X days to appeal and you would get interim accommodation if you timely appealed, those sorts of policy calls were those two agencies, as well as the Department of Citywide Administrative Services.

Q. And did the -- was the Department of Citywide Administrative Services involved in

E. EICHENHOLTZ

the sort of agency-to-agency process that you went through to, you know, make sure that there was some understanding at the high level of those agencies of the processes that were going to be involved and the standards?

A. Yes. Actually, DCAS, which is the acronym for that agency, I'll use it so that we can -- we don't need to say the whole term the whole time.

Q. I accept that.

A. Yeah. DCAS was the one who organized those agency personnel officer and EEO officer meetings and calls. And I would say that they weren't -- yes, those were actually regular calls dealing with pandemic, COVID pandemic and public health emergency related issues that had been ongoing obviously before the health commissioner had issued a vaccine mandate. So they were sort of -- those were the topics that were covered in the lead-up to implementation.

Q. And those calls were telephone calls or Zoom calls?

A. They were -- yeah, I don't remember

E. EICHENHOLTZ

the medium. It was a virtual video call much like this one.

Q. Now, were those conversations of those meetings, were they recorded?

A. Not that I'm aware of, no.

Q. And why not?

A. Because there was no need to. There was no -- there was no need to record it. We had all the agencies in attendance.

Q. And could you make an inquiry, please, as to whether or not there are any recordings of those calls?

A. Yes, we will do so.

Q. Thank you.

RQ MR. NELSON: And if there are, we ask that you produce those.

MR. HAIDER: We ask that you just put that request in writing. Thank you.

Q. Were any documents produced for any of these agency meetings?

A. Yes. Those meetings, generally there was a high-level PowerPoint that DCAS prepared with just some basic bullets about what was going on and what agencies needed to

E. EICHENHOLTZ

do.

RQ MR. NELSON: Okay. We are also going to make that document request with respect to that, but I will put it in writing.

Q. Now, and what about, how were the meetings set up? Were they set up by email or some other written method?

A. DCAS has both on the agency personnel officer and on the EEO officer side contact lists that they maintain, and excuse me, an invitation, I believe, Outlook invitation was sent out to either the APOs, the EEO officers, or both, as the circumstances warranted.

Q. Were you personally involved in the drafting of any standards for the individual City agency's consideration of RA requests from employees?

A. I'm sort of working on the word "standards" there. I was involved in the drafting of sort of a FAQ policy document. My recollection, it was really more about the nuts and bolts. There was some very

E. EICHENHOLTZ

high-level guidance, I think, put in there, but it wasn't like this is, you know, how you decide an RA request. I mean, those sorts of documents already existed, you know, in terms of general applicability in the City's various EEO and Reasonable Accommodation policies.

Q. So that was an FAQ that was for the Citywide Appeals Panel?

A. Not just the Citywide Appeals Panel; it was, as I remember, it was all aspects of implementation of the vaccine mandate, including both reasonable accommodations and the RA process. Obviously the Citywide Appeals Panel is just one phase of the RA process, so it would have been there to the extent we discussed the RA process.

Q. Now, are you going to be giving any testimony today which is not from personal knowledge?

A. I couldn't tell you at the moment, but obviously as we go along, if you'd like to inquire as to the source of my knowledge on anything, I'd be happy to respond to you.

Q. Of course.

E. EICHENHOLTZ

Did you review any documents or other, you know, either virtual or physical writings in order to prepare for today's testimony?

A. Yes. I reviewed the Complaint in this action, I reviewed four declarations that I prepared over the course of the last six months or so in response to various litigation to describe the Citywide Appeal Panel and its process. I also reviewed the EEOC's -- re-reviewed, I should say, I reviewed it many times, the EEOC's guidance on COVID-19, and specifically I believe it's sections K and L which dealt with COVID-19 vaccinations and reasonable accommodation requests.

Q. And in order to prepare for today's deposition, did you speak with anyone to obtain information that you needed from them?

A. No.

Q. Going back to the question I was asking about, your meetings with the agencies to prepare them for their role: In the course of those meetings or afterward concerning the topic of those meetings, were any other

E. EICHENHOLTZ

documents shared or exchanged, or were there any follow-up emails that were involved with respect to those meetings?

A. I'm certain there were. My recollection is the follow-up documents were usually links to the posted FAQ, guidance on various topics that DCAS was preparing for review by agency personnel officers, EEO officers, etcetera. There was no, at least that I can recall, there was never any email or document that said, oh, in addition to what [audio interruption].

Q. We've lost you.

A. Sorry, yeah, I accidentally pressed the space bar.

In addition -- there was no documents of, like, sort of, in addition to the guidance at the meeting, here's additional guidance. It was generally to point people to the resources that were available that were referenced at the meetings.

Q. You used the word "generally" there. Specifically, were there any other follow-up emails or documents that you shared or

E. EICHENHOLTZ

exchanged that refer to other -- that were of another nature or that referred to other materials or contained other discussions than what you just testified?

A. None that I can recall.

Q. And in the prior -- in affidavits that you've submitted that you referenced, you also mentioned that you had relied upon books and records of the City of New York in the course of preparing them.

A. Yes.

Q. And can you please, you know, tell us what the nature was of those books and records? Which books, which records?

A. Generally, of -- it would generally be, like, things like the FAQ document; it would be, for example, if in a few of them I've had to discuss, like, we've done X number of appeals and Y number of, you know, decisions and we have -- and there were similar documents about the statistics, the number of RAs that had been requested, and I have access to the number of appeals filed with the panel, how many they've decided and

E. EICHENHOLTZ

the like, I would often consult with those. If it was a specific case, I might review, to understand what the panel's votes were, I might review the panel votes and notes from that case, and that would be a book and record, obviously. So it's those sorts of things that I would be reviewing in preparation of that, of those declarations and affirmations.

Q. And are you familiar at this time with the numbers involved with the -- well, I'll ask it in a different way.

How many religious accommodation requests were lodged with, you know, putting all of the City agencies together?

A. So offhand, I don't know the number of requests. I can tell you the number of requests that made it to appeal, that were filed with either the Citywide Panel -- and this, I should mention, very important, as I mentioned this earlier, but I don't want us to get confused, as you mentioned, the Department of Education was under a separate set of rules, and it is -- while there is mayoral

E. EICHENHOLTZ

control in the Department of Education, it is a separate entity for many purposes. So when I talk citywide here, I am excluding the Department of Education, right?

So I know that there were roughly about I believe between 6,500 and 7,000 appeals filed. I do not know, I'm not privy to the current numbers as to how many total religious reasonable accommodations were requested. I know it approached 10,000, I don't know if it reached there, but I could tell you with respect to those, those are the approximate numbers with respect to religious reasonable accommodation appeals.

Q. And so, when you refer to about 10,000 requests, that's at the agency level, the initial level, or at some other level?

A. That is at the agency level, yes.

Q. How many cases have been adjudicated to date by the Citywide Panel?

A. To date, it is roughly I believe somewhere around, fully adjudicated, 3,200 cases. Partially adjudicated at this point, another 1,015.

E. EICHENHOLTZ

Q. And what does it mean to be "partially adjudicated"?

A. So the panel is composed of three different agencies, so those are cases in which one or two agencies have voted -- actually two agencies have voted. If we do one agency, I think we're somewhere around 7,000. But there are three agencies. And so, partial adjudications are one of the agencies has reviewed and voted on that case, and one or two agencies has not, so it is not ready for us to issue our final decision.

Q. And do you have an estimate as to when all these decisions will be finally adjudicated?

A. I -- because I can't really, you know, predict the time it takes for -- I've very much gotten out of the prediction business. We are working as promptly and efficiently as we can, but we also want to make sure we do our review correctly.

Q. So is the Citywide Panel created by a regulation or ordinance?

A. No.

E. EICHENHOLTZ

Q. And why not?

A. I think the context that's really important here is that it has two characteristics. One is that it is created in response to a order issued in the context of a public health emergency for which there was a compelling public health reason that there be quick and lawfully compliant implementation. So it was a matter of just creating the structure, advising of the structure. And the other piece is that it is very limited in its scope and function. It is, although we've added on, as you are well aware, several hundred Department of Education appeals, but our primary focus is to hear appeals of the Department of Health mandate that affected existing City employees on October 20, 2021. It's a very limited function in that regard.

Q. Sure. Just getting a little more of the statistics involved with the panel's burden, how many cases to date have been denied, requests for religious accommodation?

A. I cannot break it out between religious and medical. I don't have access to

E. EICHENHOLTZ

those numbers. I can -- I know denials and I know approvals, but I don't know how many of them would be religious or how many of them would be medical.

Q. So then how many in total religious -- not religious, I'm sorry.

How many in total accommodation requests or appeals have been denied by the Citywide Panel to date?

A. First off, with the context that these numbers literally change by the day, obviously --

Q. Well, I get it.

A. -- we are -- and that's why I'm going to give you a rough number. Were roughly around 3,200 appeals that were denied.

Q. And how many were granted?

A. Roughly 100.

Q. And do you know the statistics with respect to what percentage of the appellants in these appeals had raised religious accommodation requests and what percentage had raised medical accomodation requests?

A. It fluctuates as the appeals came

E. EICHENHOLTZ

in, but the vast majority were religious. It was somewhere between 80 to 85 percent of appeals were religious reasonable accommodations.

Q. And in terms of the grants, do you know the numbers of religious versus medical accommodation cases that were involved, either specifically or at a reasonable estimate?

A. As I say, I can't. I don't have that break down. I can tell you a substantial number of our grants were religious reasonable accommodations. Whether it's 85 percent or something -- you know, or somewhere around there, I couldn't say that for certain.

Q. Now, 100 as opposed to 3,200, it seems like a small percentage of the appeals were granted. And how do you explain that?

A. I think context here is very important. We are not getting every reasonable accommodation request submitted, right? We are getting virtually 100 percent because most people appealed, but every single accommodation we get has already been denied by an EEO officer. Certainly, if we also --

E. EICHENHOLTZ

for example, the agencies have the right to appeal a grant of a reasonable accommodation, I'm certain our grant rate would be higher than it is. So you're taking something that's 100 percent denial, and it's already been reviewed and information gathered and carefully considered, you would expect that a substantial number -- you'd expect the sort of numbers we have, right? If they were significantly higher than these sorts of numbers, it would be a question as to what the EEO officers were doing or not doing. So it's, you know -- I think of it like an appellate reversal rate. You wouldn't expect appeals courts to reverse even, you know, even a third or a majority of cases. Then something would be wrong.

Q. Who has to -- who can provide us with current accurate statistics with respect to the number of grants and denials and the percentages that were religious and medical accommodation matters?

A. Well, certainly that data exists. I think the question really would be how we

E. EICHENHOLTZ

would go about cutting it in the way you'd want to cut it there, because it is not -- at least I do not have access to data cut in that particular way.

Q. And who in your organization would be the person who would be performing that function?

A. Well, is this in regard to appeals, or is this in regard to reasonable accommodations overall?

Q. With respect to appeals.

A. With respect to appeals, generally we would -- it wouldn't necessarily be a person. We would generate a report from the system we are using to facilitate the appeal process, the database system we're using.

Q. And who would be able to provide that information with respect to all accommodation requests?

A. We have -- the Department of Information Technology and Telecommunications would do it, host the database, I believe they have a vendor working with them, and we would put the request in to that vendor, and the

vendor would run the reports, as we needed it.

Q. Now, is the Citywide Appeals Panel within the organizational structure of any of the departments or agencies or other organized entities that are a part of the City?

A. No, it's -- I view it, and I think structurally it is sort of a collaboration between the agencies that vote, and there are -- when it comes to citywide personnel policy and various citywide matters, there are agencies that oversee various, you know, aspects of that. So the Law Department obviously is the City's legal oversight. The Department of Citywide Administrative Services is personnel, EEO policy oversight. So those agencies basically have responsibility to make sure this is implemented properly. The panel itself essentially steps into the shoes of the agency head of the various City agencies who, under the City's EEO policy, would ordinarily decide the appeal of a reasonable accommodation request.

Q. So, I'm sorry, but I don't understand that answer at all.

E. EICHENHOLTZ

A. Okay. I'll try and explain it. If you ask me a clarifying question, I would be happy to clarify.

Q. So, first of all, who's in charge of the Citywide Appeals Panel?

A. As I said, it's collaborative. Obviously, I've been doing, as the Law Department representative, I've been doing a lot of the work in organizing the meetings and moving the panel process forward. I have worked with Sanford Cohen, who is the general counsel at DCAS, who is also working with me on sort of oversight and quality control work on the process. And other than that, it is a collaborative effort of the various agencies, and particularly the panel members, to move the appeals process forward. So, you know, I, as well as Mr. Cohen will review the stats, the cases, we'll confirm when the cases are ready to go out, things like that, and move the process forward in that administrative respect.

Q. So is no one, then, in charge of the Citywide Appeals Panel?

E. EICHENHOLTZ

A. No one individual? No, there's no one individual in charge of the Citywide Appeals Panel. We obviously report to our respective agency heads, but there is -- and obviously, there's a mandate and a directive that we do our work. But we all report, with respect to our work, to our respective supervisors at the agency. So with respect to my work in the panel, I would report to the Corporation Counsel of the City of New York, and Mr. Cohen would report to the Commissioner of the Department of Citywide Administrative Services.

Q. So your personal authority is limited to the work that is performed by the members from the Law Department, and Mr. Cohen has authority over the persons who come from DCAS, and other administrative heads have authority over the CCHR, you know, component? Is that your testimony?

A. Yes. And in terms of process-related questions and decisions, we'll discuss them collaboratively at the various agencies. So there's never been a need sort

E. EICHENHOLTZ

of to have one final decision-maker in the process. You know, again, we function the way I envision it, we function very much like an appellate court. And while there is a chief judge who has an administrative role, all the judges have both the authority and discretion to review cases and exercise their -- that level of discretion as they see appropriate, given the mandate and the constraints of the law and the policies we're talking about.

Q. So you would oversee and give quality control with respect to the decisions that are -- votes that are made by members of the Law Department?

A. Oh, okay, now I understand where the confusion is.

No, I will -- Mr. Cohen and I have an additional oversight role where we will review every case after all three votes are in for administrative and quality control purposes, and basically confirm they are ready to go out and, you know, they're in regular form and order and things like that.

Q. And so, you personally have reviewed

E. EICHENHOLTZ

every case that has gone out with a grant or a denial of an appeal?

A. Well, in the oversight role, I review half of them; Mr. Cohen reviews half of them?

Q. So when you have done that, on the average, how much time have you spent on each case?

A. In the oversight role or in reviewing and deciding a case? I just want --

Q. In the oversight role.

A. In the oversight role, it doesn't take very much time. Sometimes, you know, a minute or two. What you're doing in the oversight role is just making sure that the votes and the comments are in order, assigning a decision code and confirming the case is ready to be sent out. So it doesn't -- doesn't take very long at all.

Q. So do you review the substance of the work that is done by the persons who cast the votes?

A. No. The people responsible for the substance of that review are the individuals.

E. EICHENHOLTZ

The review of that work -- so if I see, for example, a decision or a vote that I personally might disagree with, given the facts and circumstances of the case, that's not my function in the oversight role to say, hey, I wouldn't vote the way you voted in this case. My job is to make sure that the agencies voted, the agency reps voted, and that their votes are properly recorded and that we are, you know, properly sending out the case as a denial or an affirmance and that that's accurate. It's more of an administrative, ministerial role at that stage.

Q. What does that --

A. To be clear, if there was some substantive issue I would flag, I would speak with the panel member and say, for example, and this has happened on occasion, you know, their notes don't seem to match their vote. So, you know, you see a rejection and the notes suggest that they're approving, I would go back to that panel member and say, please review this to confirm it's accurate before we

E. EICHENHOLTZ

send it out. But I wouldn't, like, say, oh, I think you meant to do what you said in your comments, or I think you meant to do what you said in the vote. That's up for them to review and to confirm whether it's accurate or not.

Q. What if the vote or the comment that supported the vote was purely inconsistent with the evidence of the case? Would you flag that?

A. Generally, I'm not doing that level of review because that is the function of the three agency voters on any given appeal. I am -- you know, and I perform that function, as you're aware, in many cases. But it is their job to review the evidence and to make a determination based on their review of the evidence and the record that's been presented to us.

Q. Mr. Eichenholtz, just stepping aside for a second, at times it looks as if you are reading something when we are -- when you're answering a question, and I'm wondering, are you reading something as you answer these

E. EICHENHOLTZ

questions, or have you been? And have you been typing notes to anybody?

A. Absolutely not. I think what you are seeing is the camera is oriented higher than my face. I'm looking at the screen, not the camera, so the angle of the camera has my eyes looking at the computer screen. I'm actually looking right at you, Mr. Nelson, when you're asking questions, and I have my Zoom in gallery view, so you're sort of off to the right-hand, top corner of my screen.

Q. Thank you for that explanation.

A. No problem.

Q. You mentioned also that the panel is reviewing DOE denials as a result of the second circuit decision. And have you been reviewing them with the same appellate style review that you described, taking into account the fact that all of those cases were denied prior to coming to the Citywide Appeals Panel?

A. Those cases were -- what we've done in those cases, there was a slightly different approach. When we got those cases -- and when I say "those cases" right now, I'm talking

E. EICHENHOLTZ

about the first 14 named plaintiffs which we were assigned following decision of the second circuit. You know, it was clear to us that what the DOE and the award there had done did not exactly mimic what the agencies had done. But we reached out both to the employees and to the Department of Education to get more information about the nature of their appeals to try and make sure that the records were more fulsome. So the employees -- those 14, the employees were asked a series of questions about their requests to give us some more information. Sometimes it duplicated material they had already provided the arbitrator, sometimes it did not. And the Department of Education was asked to give more information about why they were denying the request. We reviewed that record so that we could do more of an appellate style review.

Q. Now, with respect to the information you got in that process from the DOE, did you provide that information to the appellants?

A. No.

Q. Why not?

E. EICHENHOLTZ

A. Because the purpose of obtaining that information was to allow the panel to understand the relevant facts of the case.

Q. Would it not have been useful to the appeals panel to also understand or to receive the point of view of the plaintiffs with respect to the accuracy or completeness or, you know, correct interpretation of the material that the Department of Education was providing?

A. Yes.

MR. HAIDER: Objection.

THE WITNESS: Thank you. Sorry about that.

A. Yes, and that is why we made inquiry of the individuals.

Q. So you made inquiry of the individuals after you received materials from the DOE?

A. No, we made inquiry from both parties.

Q. So did you examine whether or not due process required you to get input from the plaintiffs with respect to the information

E. EICHENHOLTZ

that's being provided to you by the DOE?

DI MR. HAIDER: Objection. Objection. This question appears to be outside the scope of the order here. We're at -- we're getting into legal questions with respect to the DOE appeals, specifically. This is not within the scope of the Citywide Panel's process of reviewing or the standards that it applies.

So I'm going to instruct my witness to not answer -- the witness to not answer this question.

Q. So how did the process that the panel followed with respect to the other DOE employees, some -- at least one or two of which are involved in the instant lawsuit, differ, if it did differ in any way, from the treatment that the panel gave to the 14 from the Kane and Kyle lawsuit?

A. So other than that a lot of those inquiries became a more standard part of the process, and I think it was gathered by the DOE and sent to the panel rather than the panel needing to reach back out to everyone

E. EICHENHOLTZ

and say, please do this. That was a significant difference.

Q. So the DOE provided additional information with respect to those persons?

A. Yes, both on behalf of the DOE and based on information they collected from those persons.

Q. And those persons were not confronted with that information or given an opportunity to rebut it?

A. Confronted in what way?

Q. Well, did you send the information that you had received from the DOE to the other appellants from the DOE to get their comments?

A. No. This isn't a litigation, you know, an adversarial litigation. It's a cooperative dialogue, it's a reasonable accommodation process.

Q. So if it's a dialogue, did you reach out orally or in some other way to the appellants to get their views with respect to the information you received from DOE?

A. So just to be -- we're talking about

E. EICHENHOLTZ

the 500-and-so DOE individuals who were doing their -- they're having essentially the review of the earlier denial from the arbitration ordered by the panel? That's what we're talking about here?

Q. I don't think you captured it quite correctly.

A. Okay. I want to hear from you what -- because I want to make sure I'm accurate.

Q. So in tandem with the Second Circuit's order sending the 14 Kyle and Kane plaintiffs to the Citywide Appeals Panel, the Law Department agreed that access to the Citywide Appeals Panel would also be provided to those persons who not only went through the initial stage, but also filed an appeal and were denied in the DOE reasonable accommodation process.

A. Uh-huh.

Q. So with respect to those add-on persons, the persons who were not plaintiffs, not named plaintiffs in the other litigation, did the Citywide Appeals Panel engage in a

E. EICHENHOLTZ

dialogue with them with respect to the information that the panel received from the DOE?

A. The Citywide Appeals Panel reviewed the appellate record that it was provided by the DOE with the information from the DOE and from the employee.

Q. But you'd indicated that the DOE also was provided additional information that had not been a part of the proceeding below?

A. Right. Not -- general -- not always, but yes, they had the opportunity to do so.

Q. And did the panel members engage any kind of a dialogue, whether written or oral, with the other 500 or so appellants from the DOE?

A. Yes, we received responses to queries in writing that the DOE gathered. What follow up the DOE did or did not do, I could not tell you before providing the records to us on the panel.

Q. So I'm not understanding. I thought that you had said that the panel engaged in a

E. EICHENHOLTZ

dialogue; not the DOE engaging in a dialogue with the appellants.

MR. HAIDER: Objection.

Q. So I'm asking you to clarify this.

A. Okay. So what I said was, a reasonable accommodation is a cooperative dialogue; it is not an adversarial process. So I would not ordinarily -- it is not a standard part of a reasonable accommodation cooperative dialogue to have, you know -- generally, the person gathering the facts will speak with the employee, will gauge the needs of the employer, and reach a determination. It's not like this, you know, confrontational back and forth, and that's what you were describing, so that's what I was trying to express there. And I was really talking more about the information-gathering stage, which, as I said, is generally the agency level. And with respect to DOE employees, we were asking DOE to query their employees to gather that information so that we had as full a record as possible for our review.

Q. Okay. With respect to appellants

E. EICHENHOLTZ

who are not from the DOE, did the Citywide Appeals Panel reach out to any of them to obtain information that was not in the record below?

A. So I'm going to say, because I think -- so the panel will ask the agency to do that. Again, the panel is performing an appellate function, and so if we believe additional cooperative dialogue is necessary, we would essentially, in essence, remand to the agency for cooperative dialogue, which means we will send, and any one panel member can request this, a request that the agency engage the employee in a specific way with a specific question or a specific issue. The employee would then have that dialogue and then report back to the panel, generally upload any documentation of that exchange for our review so that we can consider it when rendering a final decision on the appeal.

Q. And in how many cases did any panel engage in making that request and sending the matter back on rematch of the agency?

A. Hundreds.

E. EICHENHOLTZ

Q. I'm sorry?

A. Hundreds.

Q. Hundreds. Okay.

MR. HAIDER: Mr. Nelson, just could we take a ten-minute break at this point?

MR. NELSON: That's fine, sure. Thank you. We'll reconvene in ten minutes.

THE VIDEOGRAPHER: We're now going off the record. The time is 10:14.

(Recess was taken.)

THE VIDEOGRAPHER: Back on, the time is 10:25.

BY MR. NELSON:

Q. So welcome back, Mr. Eichenholtz.

A. Thank you.

Q. So we were just talking about contrasting the DOE people who were not in the Kane/Kyle named plaintiffs and those other 14 people. And there's a series of concepts with which I'm absolutely certain you're familiar, as an experienced lawyer, with respect to the appellate review standards that are not the kind of standards we're talking about in

E. EICHENHOLTZ

terms, you know, of how do you get a religious accommodation, but rather, what approach does the person who is deciding a case on appeal take toward the decision below. So for example there, there is an abuse of discretion standard which is used in some kinds of cases. There is a de novo standard which is used in other kinds of cases. And there's a range of other sort of intermediate kinds of standards.

So what appellate review standard does the Citywide Appeals Panel utilize in its -- in the cases that are not the Kane/Kyle cases?

A. It uses -- yeah, and I agree with you, Mr. Nelson, you can't exactly get precisely the same analogy, but it is akin to a de novo standard. We are reviewing and doing sort of an independent and open-minded review of the record, mindful of the agency's grounds, excuse me, for denying the reasonable accommodation that we're seeing on appeal.

Q. And so, how much consideration -- sorry. Strike that question.

And why is it -- I mean, can you

E. EICHENHOLTZ

explain why on a de novo standard only 100 cases would have been granted out of the more than 3,000 before you to decide or --

MR. HAIDER: Objection.

Q. -- not quite that many? Just to see if I got the numbers --

A. Right. I refer you to my earlier answer. 100 percent of the cases the panel sees was -- were denied after a conscientious review by a trained EEO professional. I would not imagine a much more significant amount of reversals there because we, in the City of New York, train our EEO officers and our Disability Rights Coordinators and the various personnel who review reasonable accommodation requests how to do it. So if they're reaching a conclusion of denial, generally there is a basis for that; obviously not in every case, but generally there is.

Q. Now, in some of the cases that were decided at the agency level, the agency instructions gave two options to the employees who were asking for accommodations. They have an option to go to an arbitration using the

E. EICHENHOLTZ

arbitration standards that were referenced in Kane and Kyle, and they had an option to go to the appeals panel. So did the appeals panel review any of the cases that were decided by arbitrators outside of the Kane/Kyle cases?

A. And when you say "the Kane/Kyle cases," again, I don't want us to get confused, you're talking about the 14 plaintiffs or the additional 500-and-so that the panel reviewed? You're talking about that whole universe when you say "the Kane/Kyle cases," or are you talking about the 14?

Q. In this question, yes, the whole universe.

A. The whole universe. So outside the whole universe of those cases -- I hate to do this, Mr. Nelson, I'm sorry, what was the question? I lost it. I'm trying to figure out what universe we were talking about.

Q. Understood.

So in some of the cases from many of the agencies, the employees are given the option either to go through an arbitral proceeding using the Kane/Kyle standards, that

E. EICHENHOLTZ

is to say the arbitral standards on the one hand, or they were given an option to pursue an appeal to the Citywide Appeals Panel. So outside of the people from the Department of Education, did the appeals panel consider any appeals from decisions that had been rendered by an arbitrator under the arbitral process?

MR. HAIDER: Objection.

A. Yeah, and that's not quite how they worked on the non-DOE basis. The arbitral process was not, even though it was the same -- there were arbitrators that made that, the arbitrators were essentially the option for appeal. In all cases with respect to the October 20, 2021 Commissioner of Health order that concerned City employees, the agency made a determination in the first instance. So you didn't -- you know, you couldn't skip the agency level by going to arbitration. It's when you were denied by the agency and you were covered by a union that had reached an arbitration agreement through collective bargaining, you could appeal to an arbitrator rather than the Citywide Panel.

E. EICHENHOLTZ

Q. And so, you're saying that after the arbitrator decided, there was no further recourse to the Citywide Appeals Panel for those people?

A. No, no, no, no, you had to decide after it was denied which path you wanted to take, whether you wanted to appeal to the Citywide Appeals Panel or whether you wanted to appeal to the arbitrator. The arbitrator, arbitration by its definition is binding. There was no appeal after the arbitrator back to the Citywide Appeals Panel. So it was, you know, it ended with the -- that path ends with the arbitrator.

Q. Now, the DOE people who -- the 500, let's say that number which is an estimate for all the people who are named plaintiffs in the Kane/Kyle matter, all of those 500 had had their denials below adjudicated under a set of standards that the second circuit had found to be faulty.

A. Correct.

MR. HAIDER: Objection.

A. Correct.

E. EICHENHOLTZ

MR. NELSON: Just as a predicate for the question I'm about to ask, Mr. Haider. I think I understand your objection though.

Q. So did the Citywide Appeals Panel treat the record below or the decisions that were made below in respect of those 500 or so DOE employees any differently than it treated the appeals from the other City agencies?

A. No. That was -- the whole point was our, function when we got those cases was to look at the record and review and resolve them under the standards set forth by Title VII, the State Human Rights Law and the City Human Rights Law, rather than whatever standard had been set forth in the arbitration process that the arbitrators used. It was precisely to give that fresh look, and we understood that, and we did not take into account any standard or qualification or whatever you want to characterize it as that was present at the arbitration stage of the process.

Q. So you were -- Citywide Appeal Panel members, then, did not take into account the

E. EICHENHOLTZ

fact that the standards that had been applied below to DOE cases were [inaudible]?

MR. HAIDER: Objection.

A. I don't -- we didn't -- we -- we were -- we reviewed it as if we were getting the record from the agency and we were making the appellate determination; that the agency was denying the request and that we were making the appellate determination of whether or not the agency was right to deny it. And we applied the same standard in those cases that we applied to all of the other appeals that we reviewed.

Q. Were the individual members of the Citywide Appeals Panel who were adjudicating DOE cases given any information about the different standards that had been employed below in the DOE religious accommodation determinations than had been applied below to accommodation requests made to the other agencies?

MR. HAIDER: Objection. And I just want to note as to the form, the use of the word "below" here, are we referring to

the agency or the arbitration?

MR. NELSON: So you know what? I'm going to rephrase that question.

THE WITNESS: Okay.

MR. NELSON: So I withdraw it.

Q. At the agency level, which in terms of an appeal, I would characterize sometimes as being the level below, at the agency level, were the initial decisions being made on the basis of the arbitral standards or on some other basis?

A. On the basis, as I understand it, of the Title VII standards, and that was one of the reasons we asked the Department of Education to advise us what their basis for denial was, because it could not and would not be that the arbitrator had previously denied the case.

Q. And in the conversations that you had with agencies prior to their making initial decisions with respect to the religious accommodation requests, did you instruct them with respect to the Title VII standards?

E. EICHENHOLTZ

A. In the sense that -- and when I say "you," by the way, I'm going to be a little more generic here. I don't know if the words came out of my mouth or someone else's mouth. We pointed the agency officers to the EEOC Guidance that existed, as well as the FAQs that DCAS had prepared. Those were their resources.

Again, I think it's important to remember that the crowd we're talking to are people who are EEO professionals, who do this for a living, who are trained in reasonable accommodation and adjudicative processes and other related staff who are under the supervision and instruction of those individuals. So it was not really necessary to sort of give a Reasonable Accommodation 101 to the group. It was sort of to say, here's sort of how the standard is being -- here's the guidance for how to apply the standard in the context of COVID-19 vaccination.

Q. Do you have any records of the meetings in which these instructions with respect to Title VII or other standards were

E. EICHENHOLTZ

being given to agency personnel, you know, in connection with the formation of this citywide appeals process and RA process for COVID-19?

A. That was --

MR. HAIDER: Objection.

A. Yeah, that was the FAQ I was describing. And I -- it's challenging for me, I will say, just generally because, again, I hear you severing off the Citywide Appeals Panel. I'll say it again: The Citywide Appeals Panel is the appellate stage of a broader process. We did not at any point, that I can recall, focus EEO officers, agencies on the appeal panel in its process. But overall, the overall process and how it was going to work mechanically was what was being discussed.

Q. And did you discuss routinely with the agency personnel, with whom you were discussing the first stage of this process, the heightened standards that are provided in the New York State and New York City Human Rights Laws for the determination of religious accommodation requests?

E. EICHENHOLTZ

MR. HAIDER: Objection.

A. We were following the guidance of those agencies. They had, in the context of this public health emergency, being, adopting the guidance provided by the EEOC. But the City's EEO policy, obviously since the City Human Rights Law is our law, makes great note of the different standards and things like that. But in terms of the guidance of the application with respect to COVID-19 vaccination, my understanding is that both at the state and city level was that they were adopting the policy guidance provided by the United States Equal Employment Opportunity Commission.

Q. And how did you learn that?

A. In conversations with the agencies, and I believe they had posted that guidance publicly at various stages, but I don't recall, specifically.

Q. And is it your understanding that the New York State and New York City Human Rights Laws were altered or modified in some way with respect to the way in which undue

E. EICHENHOLTZ

hardship for the agency had to be determined?

A. Not that I'm aware of.

Q. So the way the law is written is the way that it should have been applied. You would agree with that?

A. Well, I think the City Commission on Human Rights, in discussing how to apply it in this context, you know, was referring back to the EEOC. But yes, I mean, the law as it's written applied. There was no suspension of the law or anything like that.

Q. So with whom did you have discussions about these questions in the New York City Human Rights Law Department?

A. What's the New York City Human Rights -- I'm not familiar with that.

Q. You're not familiar with the New York City Human Rights Law?

A. I'm familiar with the New York City Human Rights Law. You're asking if I had conversations with the law. I don't know what you mean.

Q. I used the word department, I'm sorry.

E. EICHENHOLTZ

Did you have discussions concerning the way that the New York City Human Rights Law ought to be applied consistent with the equal opportunity law of the federal government, did you have those conversations with people from the City Commission on Human Rights or other human rights officials with the City?

A. Yeah, I'm certain either directly or indirectly. I either directly had a conversation or I was advised indirectly that the commission had been consulted at some phase by DCAS or some other agency. I could not tell you, as I sit here today, how that came about.

Q. And can you identify any individuals with whom you spoke from those human rights departments of the City?

A. On that topic, no, I could not, as I sit here today, tell you I spoke with this specific person or that specific person.

Q. But your understanding with respect to how the Citywide Appeals Panel ought to decide issues of undue burden, after

E. EICHENHOLTZ

conversation with those persons from the City's human rights departments, what was your understanding that you had after those conversations?

MR. HAIDER: Objection.

A. Again, that we would follow the EEOC Guidance with respect to specific applicability of the COVID-19 vaccine mandate, that we still, in the City, had an EEO policy and reasonable accommodation guidance that was generally applicable. That was always my understanding. It remains my understanding to this day.

Q. So with respect to the issue of undue hardship, what did you understand the EEOC Guidance to be in the context with COVID-19?

A. Well, I understood that in order -- I view undue -- generally, I would expect that if -- undue hardship is something that the employer will raise in the context of a reasonable accommodation request if it determines that there is some greater than de minimus burden on the agency's operations

E. EICHENHOLTZ

that would articulate in some manner that would prevent it from granting a religious reasonable accommodation. In a nutshell, that's my understanding.

Q. So was it your understanding that the agency did not have to show a significant hardship or burden --

A. Yes.

MR. HAIDER: Objection.

Q. -- from the granting of an individual's religious accommodation request?

DI MR. HAIDER: Objection. I'd just note that this question is directing the witness' understanding rather than the Citywide Panel's standards and process. It's outside the scope.

So I would direct the witness to not answer the question as to his understanding.

Q. Okay. I'll ask the same question with respect to what standard the Citywide Appeals Panel was expected to apply.

A. And I don't have the precise letter and number in front of me, but it is -- there

is a discussion of undue burden with respect to religious reasonable accommodations and the COVID-19 vaccination in the EEOC Guidance, and they were instructed to both review, apply, and follow that guidance, the specific request of vaccination exemption reasonable accommodation request.

Q. And with respect to the level of burden that the agency needed to show, was it something simply greater than the de minimus or was it a substantial burden?

MR. HAIDER: Objection.

A. As I sit here today, I don't remember the precise words; I don't remember if it was substantial appears or not. I do not want to create a greater or lesser burden than what the EEOC Guidance says by saying one word or omitting a word. Obviously, there had to be some substance to the burden, whether there was a legal term of art of substantial or something in that regard. As I sit here today, it needed to be something and we needed to see a, you know -- some sort of burden that they were articulating and to evaluate whether

E. EICHENHOLTZ

it was of substance, which we've done. I don't remember if the word "substantial" is in that. And again, I don't want to put words that don't exist or remove words that do exist.

Q. So did you ever have any discussions with or exchanges of correspondence with individual panel members in which you discussed the amount of burden that an agency might be required to show?

MR. HAIDER: Objection.

A. I know in our regular check-ins, we had discussed some issues with substantial -- with undue burdens -- no, substantial -- undue burden and evaluating them in the context of the various agencies that were making that argument. We had discussions, certainly, that some agencies were not making that argument and that we were proceeding to evaluate based on, you know, the information the agencies were giving us. You know, but I can't tell you specifically, like, that category, this was said about that category. We had general discussions about undue hardship claims in

E. EICHENHOLTZ

appeals during our check-ins.

Q. I'll take just a moment of silence while I find out where I am in my outline --

A. Sure.

Q. 30-second-or-so delay that we're going to have here.

Did you ever discuss this issue of how to evaluate undue burden in any emails with individual panel numbers or with all the membership of the Citywide Panel?

A. No. It would have been at our weekly check-ins we were discussing it.

Q. And were your weekly check-ins recorded in any manner?

A. No.

Q. And why not?

MR. HAIDER: Objection.

A. Again, because the panel members were there and were participating in the discussion, and there was no identified need to go back and review those discussions afterward.

Q. You spoke of "weekly check-ins." And did you have a check-in weekly with

E. EICHENHOLTZ

respect to the work with the Citywide Appeal Panel?

A. Yes. It was weekly until roughly early to mid March.

Q. And who participated in these check-ins?

A. All the members of the Citywide Appeal Panel, so all the people who were reviewing and voting on cases.

Q. And these check-ins took place by Zoom?

A. Like I said, a videoconference. I can't recall at the moment whether it was Zoom. It may have been Microsoft Teams.

Q. And were these conferences recorded?

A. No.

Q. And were notes taken?

A. No.

Q. And why not?

MR. HAIDER: Objection.

A. Again, as I mentioned a few moments ago, these check-ins were meant to be somewhat informal opportunities for the panel members to confer, to discuss any questions, concerned

E. EICHENHOLTZ

trends they had. I also would often review our progress in deciding cases, go through some of the metrics and statistics.

The purpose of it really was to bring the group together because a lot of the cases -- obviously the cases, because we want each panel member and each agency to bring their own unique perspective, when they're reviewing cases, they're reviewing them individually. So we wanted to have these opportunities for everyone collectively, you know, to share announcements, you know, important developments, and to have the opportunity to talk at a higher level about various issues.

Q. And among the things that you did in these weekly check-ins, did you discuss how to adjudicate cases in, you know, various kinds of situations that had been presented in individual applications?

A. So generally, it wasn't one -- like, in this individual case, you know, I encountered this. It was more about trends and issues that people had encountered and may

E. EICHENHOLTZ

have said, hey, I wanted to see what you all thought, here is my thought process when I encountered this issue. And we'd have conversations, respectful of the fact, as I said, that everyone is entitled to their own independent opinion and judgment on the application of the [inaudible] fact and the assessment of credibility, things like that. So we would have those sorts of higher-level conversations.

Generally, the conversations about specific cases were more procedural; I would like more information on this issue or, you know, from the agency, I would like more cooperative dialogue on this; there seems to be a missing document in this case, can you -- you know, someone follow up with the agency and see what it is, more so than a discussion of the individual panel member's assessment of the merits of the appeal.

Q. Were there also situations in which the three persons who were assigned to vote on a particular case, you know, spoke to each other?

E. EICHENHOLTZ

A. Yes, that's happened.

Q. And how frequent is that?

A. That's rare.

Q. Okay. And what about engaging in email communication?

A. We will on occasion engage in email communication, as well as, you know, Microsoft Teams, we will send a message to the group. You can do that, there's a function in Teams that does that. Our protocol is that when we do so about a specific case, we include the case number so that we can identify later on if it's relevant to any inquiry that we received, whether it's litigation related, what have you, we can identify those communications easily.

Q. You used the word "protocol."

A. Uh-huh.

Q. Are there any protocols that are in writing that are, you know, established by your Citywide Appeals Panel?

A. No. As I've said, and I think I've been, you know, as direct as I can about it, this was a process developed in the context of

E. EICHENHOLTZ

a public health emergency. I can see in an ideal world where we were spending months or even years building it up and preparing it, there would be manuals, protocols, you know, rules and regs. That's not how this went.

This was something where we had to build the foundation off of the structure, you know, make sure we're firm on the standards, and then as we went along, as we encountered things, we would discuss as a panel, you know, we should do this in this situation or that. In that situation, one of the things that developed early on was that we generally were working out of our database, but there were times where we needed to communicate outside the database and wanted to make sure those communications were assessable, should we ever need them moving forward.

Q. What database are you using? What database program?

A. Yeah, sure. It's called SalesForce.

Q. SalesForce?

A. Yes.

Q. Now, in one of your affidavits,

E. EICHENHOLTZ

Mr. Eichenholtz, you used the word "guidelines," and you applied it to consist of two documents that you specifically referenced. One was the FAQ on New York City Employees Vaccine Mandate, and you've already referred to that document in this deposition, and we could call it the FAQ. And the other was applying for a reasonable accommodation from the COVID-19 vaccine mandate.

A. Uh-huh.

Q. You indicated that you had been at least one of the people involved in drafting the FAQ.

A. Yes, yes.

Q. And who else participated in that drafting?

MR. HAIDER: Objection.

A. Yeah, and like I said, I can tell you the agencies rather than the individuals. It would have been DCAS and OLR, the Native's Office of Labor Relations would have been involved in those drafts.

Q. And so, they were also involved in the applying for a reasonable accommodation

E. EICHENHOLTZ

document?

A. Yes.

Q. And you were involved in that, also?

A. Yes.

Q. Okay. Now, have these guidelines changed at all since the creation of the Citywide Panel?

A. I -- with respect to the Citywide Panel, which is really what I'm here to discuss, I don't believe so. I could not tell you if there were other elements of the process that were altered, that were less, shall we say, relevant to directly to my work. I could not say for certain, as I sit here today, whether other elements of it were altered outside the scope of what we're here to discuss today.

Q. And both elements of the guidelines appear on the internet.

A. Uh-huh, yes.

Q. How has information about the existence of these guidelines been disseminated?

MR. HAIDER: Objection.

E. EICHENHOLTZ

A. As I've said earlier, generally we were disseminating it to the agency personnel officers, the EEO officers, the general counsel of the agencies, so those managers who have responsibility in the areas that that guidance covers, and how the agencies took those, that guidance and directives, and that was really up to the individual agencies and how the individual agencies operated.

Q. And you disseminated them by email or by some other means?

A. By email, by email. I'm certain there was an email, multiple emails probably to the different groups, but there were emails.

Q. Aside from the quality control review that you and Sanford Cohen give to decisions, is there any oversight of the work of the City Panel from anyone?

MR. HAIDER: Objection.

A. Yeah, I'm trying to, you know -- generally, no, because there is no -- you know, there is general oversight of the overall process by Department of Citywide

Administrative Services Law with respect to legal or compliance, Office of Labor Relations with respect to compliance with agreements, but there's no sort of, like, super appeal panel that reviews the work of the appeal panel or, you know, an appeal panel manager or something like that.

Q. Do panelists on the individual panels ever change their minds or their comments in the course of deciding an appeal?

A. Yes.

Q. And is that reflected anywhere in the record of the appeal?

A. Yes. As I understand it, all changes to the comments would be logged in the database.

Q. So there is a spreadsheet that has been provided to us that provides the information from the database with respect to the individual clients that we have in this lawsuit. There's a column that says Old Value. And is that column for the purpose of providing comments that had been superceded?

MR. HAIDER: Objection.

E. EICHENHOLTZ

A. Yes. As I understand it, that is listing comments that have since been changed.

Q. And if the column is blank, does that mean that there's been no change in position or that some material has been deleted, or does it mean something else?

A. Well, I -- so I just want to go -- if it is blank, it means the comment has not been changed. A change in a comment does not necessarily reflect a change in position. Most frequently, a change in a comment will be because the Comment field is being used to flag that there's been a follow-up request of some kind so that a different reviewer doesn't go in and vote and we wait -- and then it's also flagged so the reviewer can go back in and know -- and check to see whether the agency has uploaded material in response to the follow-up request. So it's not necessarily that, oh, I'm putting in one position in the comment, now I'm changing my position. Comment field also is used for flags as the case is being -- the appeal is being decided.

E. EICHENHOLTZ

Q. How many individual members does the Citywide Panel have at this time?

A. So let me walk through it. So there are currently five people voting for the Law Department, there are four people voting for DCAS, there are two people actively voting on the City Commission in Human Rights, and I believe we just added one more person from the Department of Health and Mental Hygiene, so they're up to three.

Q. Up to three now?

A. Yeah.

Q. Okay.

A. They've gone back and forth because they've had some personnel changes.

Q. So you've indicated that the personnel who are involved on behalf of the Department of Health and Mental Hygiene has changed. What about from the other departments? Are the same people providing votes now from law, DCAS, and CCHR that were involved at the very start?

A. Yes. And the fifth person in DCAS was added fairly recently in response to the

E. EICHENHOLTZ

fact that we had a large number in February, I think it was, of appeals filed with our panel from the New York City Police Department. By large, I mean I think it doubled the numbers of appeals we had.

Q. What was the procedure for choosing panel members?

A. The agencies were asked to -- told what the panel was and what its function was, and they were asked to supply qualified and appropriate personnel to review these cases, and they would report back to us with, you know -- report back with name and email, and at one point I, you know, after the agencies reported in, I put together a meeting invite to the group, and that was the panel.

Q. And that meeting invite was for sort of a founding meeting for the Citywide Panel?

A. It was an orientation meeting, yes, yes.

Q. And when was the orientation?

A. November 1, 2021.

Q. And how long did it take place?

A. I can't recall. It was between a

E. EICHENHOLTZ

half an hour and an hour.

Q. And was it recorded?

A. No.

Q. And is there any kind of a transcript or notes that relate to the meeting?

A. No.

Q. Do you know whether or not any of the people who attended took notes or recorded it?

A. I don't believe so, but I wouldn't know for 100 percent certainty.

Q. What does it mean to say that somebody is qualified to work on the Citywide Appeals Panel? That's a word that you used, "qualified and appropriate."

A. So --

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. Yeah, so the -- I think that that's someone who understands the reasonable accommodation process, someone who is capable of reviewing a record, applying law to the policy, and capable of understanding and, you

E. EICHENHOLTZ

know, and reaching a determination. So, you know, primarily most of the agencies assign lawyers to do it by and large. There may be one or two who are nonlawyer EEO professionals, but obviously experienced with EEO process. Yeah, so that's what I mean by "qualified."

Q. So the people who are on the panel, what percentage of them have participated in the initial stage of religious accommodation reviews for various agencies?

MR. HAIDER: Objection.

A. Okay. "Initial stage" -- so you're talking about making a determination for their agency. Two members of laws panel, the DOHMH -- one of the DOHMH representatives, and that's it. I don't think any of the other panel members were involved in the agency EEO review, the actual sort of reasonable accommodation process that took place pre-appeal.

Q. And is there a procedure or a protocol that the Citywide Panel has to make sure that people who engaged in agency level

E. EICHENHOLTZ

initial reviews of reasonable accommodation requests, are not also involved in determination of their appeals to the Citywide Appeals Panel?

A. Yeah, so, like, on the law side, as I said, the only people involved at agency-level determinations were two panel members who are attorneys for the New York City Housing Authority, and they do not vote on any matters regarding the New York City Housing Authority. The Department of Health and Mental Hygiene, same sort of process. If someone made the decision, they're not going to turn around and then review the decision on appeal.

Q. And is that protocol in writing?

A. No.

Q. How is it communicated to persons?

A. It was discussed -- when the various agencies organized themselves, they discussed how they were going to handle that, and so I had that discussion with the two NYCHA Panel members and DOHMH have that discussion amongst their panelists.

E. EICHENHOLTZ

Q. And does anything, any record in writing in the City, you know, a video record or audio record, is there any record that relates to those conversations?

A. No.

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. No.

Q. What subject matter expertise do the individual panel members of the Citywide Panel have with respect to medical and religious accommodation requests?

MR. HAIDER: Objection.

A. As I said, by and large generally, they are individuals who have either done one of two things. Primarily, they're individuals either legal or nonlegal who have been involved in EEO reasonable accommodation and compliance work and are familiar in that regard.

Or with respect to the law panel members, we have two attorneys on the panel who are in our appeals division, and we sought some assistance and support from the appeals

E. EICHENHOLTZ

division because they may not have as direct EEO experience, but they have extensive expertise in reviewing records and applying, you know, factual and legal standards. And so we wanted to tap into especially the law panel, because if you think about our perspective, our perspective is more the legal compliance perspective, it seemed like that would be good value added for the law panel.

Q. So from the standpoint of the law panel, the two who are in the appeals division who are members of the panel, they've had experience in litigation, I presume?

A. Yes.

Q. And what about the other persons who are -- the other three Law Department members of the Citywide Appeals Panel? Do they also have litigation experience?

A. So I am one of them, and yes, I have litigation experience. The two members who come from us, from the NYCHA General Counsel's Office, I know at least one does; I don't know if the other one does. There's one who's the Head of NYCHA's Appeals Division, so same sort

E. EICHENHOLTZ

of concept, and then the other is an attorney in their general couple's office who handles the employment issues, but I don't know if that's in an in-house capacity or a litigation capacity.

Q. Now, you used the word "NYCHA," and I'm presuming that is N-Y-C-H-A, a shorthand for the New York City Housing Authority?

A. That is correct. I apologize for not defining it. Yes, it is the New York City Housing Authority.

Q. You see, I'll define it for you, if you don't.

A. Thank you.

Q. So you spoke of the two who are in the Appeals Division of the City Law Department. Did they specifically have experience with appeals involving matters that are related to religion?

A. They don't focus on it, but they have had -- I don't know religion specifically, but they've worked on employment matters in the past. I don't know whether there was a religious reasonable accommodation

E. EICHENHOLTZ

at issue in any of their cases.

Q. So is there any kind of a firewall that the Citywide Appeals Panel or the Law Department puts in place to make sure that the people who are deciding religious accommodations and medical accommodations have not also been directly involved in litigating issues related to, you know, persons who are making religiously-related claims against the City or who are making medical accomodation kinds of claims against the City?

MR. HAIDER: Objection.

A. So the answer is yes. Our EEO officer and her staff are not on the panel, and they handle the Law Department's agency determinations pre-appeal. And obviously, none of the attorneys or personnel in The Labor and Employment Law Division are on the panel because their function will be to defend the mandate and defend individual cases in litigation.

Q. I understand what you've said with respect to the people who are not acting on the panel. But with respect to the people who

E. EICHENHOLTZ

are on the panel, is there any kind of a firewall set up to make sure that they have not litigated issues that are, you know, relevant to the determination of whether or not a claim is religious in nature in the religious accommodation appeals? That's the end of the question.

A. I mean --

MR. HAIDER: Objection.

A. Yeah, other than if, for example, there's a review of a case and this is a case that someone's either been involved with in litigation or something like that, which is almost, you know, would be virtually impossible outside of me, and I can tell you in the context of me, if I was reviewing a case, and this did happen on at least one occasion that I can think of, and I understood the fact pattern and the agency to be something not that I litigated, but that I provided legal advice to the agency, I would not vote on it, and I would not, you know, talk with any -- we don't talk with each other about the merits, for example.

E. EICHENHOLTZ

You know, so I think that's what you mean by "firewall." It wouldn't -- you know, if we had some first-level involvement or litigation involvement with a particular individual or their issue, we wouldn't be influencing any panel member in any way on how it goes. We might have to have a procedural discussion, but, I mean, we wouldn't be discussing substance at all.

Q. So with respect to yourself, it's kind of a personal understanding of what your responsibilities are; is that correct?

A. I think the -- I -- the remaining panel has the same understanding. We all understood we should not be -- the reason I say me personally is because I cannot think of a member of the panel serving who -- the other members of the panel, that are outside of the NYCHA example and the Department of Health, I cannot think of another member of the panel who is dealing with religious, reasonable accommodation issues with respect to the individuals whose appeals we're hearing. Obviously, broadly speaking, we have members

E. EICHENHOLTZ

of Citywide Equity & Inclusion on the panel, so they deal with it broadly speaking, but not with respect to any individual case.

Q. Well, okay. I understand that you all individually feel a duty not to participate in a case in which you're personally involved. But, you know, there is also an issue of subject matter and whether or not a person has worked on that subject matter in litigation in a way that may be contrary to the religious -- the nature of the religious claim that is being raised in an accomodation request. Do you have any kind of a subject matter firewall in place to prevent people who have formed legal opinions about religious issues from participating in decision-making with respect to religious accommodation claims that are made by employees?

DI MR. HAIDER: Objection. I'm going to instruct my witness not to answer, most importantly because it's outside the scope of the order for the Rule 30(b)(6).

At this point we've allowed a lot of background questions and foundational

E. EICHENHOLTZ

questions to get to the two topics, which is the Citywide Panel's process and the standards used by the Citywide Panel.

The composition of the Citywide Panel, while we have allowed some questions, is certainly not at issue here, so I would instruct the witness to not answer that question.

MR. NELSON: I'll ask -- I think I am entitled to know with respect to the issues into which I am inquiring with respect to standards and also with respect to procedures.

Q. Specifically, with respect to procedures, is there any written firewall policy that the Law Department has that relates to the Citywide Panel participation?

MR. HAIDER: Objection.

And just to get to the point of whether that's in the scope, can you define what you mean by "firewall"? I think that's a little confusing here, and then perhaps I will allow it even, maybe it's within the scope. At this point, I

E. EICHENHOLTZ

don't see how it is.

MR. NELSON: So firewall is a pretty well understood concept which creates a bar for people who have a prior knowledge with respect to a subject matter or other kind of involvement with a subject matter from participating in matters that might be thought to be kind of a conflict which would involve the same subject matter. And so, that's my definition of firewall. So --

MR. HAIDER: Can you repeat the question? With that understanding of that definition?

MR. NELSON: I can't repeat it exactly, no, but I will ask it again.

BY MR. NELSON:

Q. Does the Law Department have any kind of a firewall, written or oral, that relates to the participation of Law Department members on the Citywide Panel?

MR. HAIDER: Objection.

A. So I think we're mindful of -- and I know there have been courts that have weighed

E. EICHENHOLTZ

in on this issue that someone's legal work as an advocate for a client is not disqualifying in any way from their ability to be a neutral adjudicator. So I think as I understand the premise of the question, it's if someone has, for example, defended a religious -- a denial of a religious reasonable accommodation in religion, that somehow we should be disqualifying them from serving on the panel. No, we did not do that.

I think the whole point here, and I talk about the different perspectives of the agency, is to bring in -- different perspectives of the agency, is to bring in multiple areas of knowledge and perspective and people who have dealt with, be it in an EEO capacity or in a litigation capacity on either side of the V, religious reasonable accommodation requests, EEO matters, employment discrimination, the duty to reasonably accommodate, have knowledge that can improve our reasonable accommodation process. So no, there would not be a policy that if someone has expertise in that area

E. EICHENHOLTZ

owing from litigation generally, that we would remove them or screen them off from the panel.

Q. And have you ever had any discussions with other members of the Law Department about whether or not it would be appropriate for them to participate either in the Citywide Panel process as a whole or on an individual panel relating to a specific appeal?

MR. HAIDER: Objection. I'm going to instruct my witness to limit his answer to things that are not covered by the attorney/client privilege.

THE WITNESS: Right.

A. And I would say that I think I've covered the substance of any discussion I've had on that with why we engage certain groups of people and did not engage certain groups of people. Obviously, our EEO officer in our staff would be highly qualified, but they had to handle all the individual cases in the first instance, all the individual requests that the Law Department received. And The Labor and Employment Law Division was having a

E. EICHENHOLTZ

function where they would actually defend these decisions and mandate any reasonable accommodation and employment discrimination issues that arose from it in litigation, and that was the substance of how we decided to choose -- or where we drew members of the panel from.

Q. Now, at the -- withdrawn.

The Citywide Appeals Panel members were chosen, as I understand your testimony to be, in part because of their prior experience with issues that relate to religious accommodation. And what materials, if any, were provided to these members of the Citywide Appeals Panel that related to or trains them on the nature the religious accommodations and on the way in which adjudicators of religious accommodation claims, you know, should consider such questions?

MR. HAIDER: Objection. Again, outside the scope.

I'll allow the witness to answer.

A. Yeah, I -- again, you have to remember we're dealing with people who have

E. EICHENHOLTZ

extensive knowledge and expertise of that. There was not a particularly strong need to train people on things they were already familiar with. We did refer the entire panel to the EEOC Guidance specific to COVID-19 vaccination, and the two documents, the FAQ document, I believe the reasonable accommodation process document, so that they can familiarize themselves with the particulars of our work. But every member of the panel came to the panel with an understanding of the law of reasonable accommodations, both religious and medical generally, and how those processes work at a city agency level and the legal level.

Q. Have you personally discussed or participated in the Kane/Kyle case or the NYFRL case, the instant case in which we're deposing you in?

A. Yeah.

DI MR. HAIDER: Objection. I'm going instruct the witness, well, not to answer with respect to questions related to the Kane and Kyle litigation.

E. EICHENHOLTZ

I believe the second part of the question, you were directing him about this litigation; is that correct, Mr. Nelson?

MR. NELSON: This litigation, yes.

MR. HAIDER: You can answer with respect to this litigation.

A. So with respect to this litigation, I've participated essentially in a -- primarily in a position fairly unique to me, which is as someone who is more of a client resource than as an attorney overseeing and directing litigation.

MR. NELSON: What is the nature of the objection with respect to the Kane and Kyle question?

MR. HAIDER: Again, outside the scope of the two fact -- the two topics that are subject to this 30(b)(6), which is the Citywide Panel's process in reviewing and the standards used by the Citywide Panel.

MR. NELSON: So referring to standards, Mr. Eichenholtz's repeatedly

E. EICHENHOLTZ

referred to the EEOC's Guidance with
respect to COVID-19.

Q. Do you understand -- withdrawn.

Does that guidance, in the view of the panel, alter the sort of nonCOVID-19 EEOC Guidance with respect to how cases should be adjudicated?

MR. HAIDER: Objection.

A. I understand it to be guidance applying those standards to a specific and very unique set of circumstances.

Q. And is there any way in which the -- when which the guidance is to be applied or is applied by the Citywide Panel to COVID-19 circumstances and applications made during COVID-19 that relate to the vaccination that is different from the way that the EEOC standards would be applied in other contexts?

MR. HAIDER: Objection.

A. Not that I'm aware of.

Q. All right. So all the definitions that are in the EEOC Guidance would remain the same, so far as the panel is concerned as, you know, in the nonCOVID-19 context?

E. EICHENHOLTZ

A. Yes. Again, the understanding that we're talking about an area of the law that turns on very specific and individualized facts and circumstances, right, so yes, but I'm trying to also make space for the fact that we are -- you know, this is not your run-of-the-mill, nonemergent EEO reasonable accommodation request. So I just wanted to make that distinction. That's one of the reasons the EEOC issued specific and detailed guidance on this topic.

Q. In what percentage of the cases that have been decided to date by the Citywide Panel have you acted as one of the voters?

A. I do not have those numbers.

Q. In about how many cases have you acted as a voter?

A. I don't have that -- we don't break it down -- I don't have access to numbers -- direct access to numbers to break it down by voter. So I can't say that Eric Eichenholtz voted on X number of appeals thus far. I could tell you how many the Law Department voted on, but how many of those Law Department

E. EICHENHOLTZ

votes are mine personally, I could not tell you.

Q. But you are a voter, of course?

A. Yes.

Q. And you've voted on some cases that are involved in NYFRL obviously, we know that?

A. Yes, of course.

Q. So my question about your involvement in the Kane/Kyle litigation relates to the question of conflict of interest. You know, very similar issues are raised in both matters, and so, you know, we're really entitled to know whether or not you've been involved in the City's defense in that litigation.

I ask the question again: Have you been involved or participated in any way in the Kane and Kyle cases?

DI MR. HAIDER: Objection. At this stage of limited discovery and the order that provided for this 30(b)(6) witness, Mr. Eichenholtz's potential conflict that you are articulating for how many votes he has done, whether it's in this litigation,

E. EICHENHOLTZ

the Kane and Kyle litigation, or all Citywide Panel, is not subject to this 30(b)(6) witness testimony here today, and I'm instructing my witness to not answer that question.

Q. Do the DCAS or DOHMH or CCR agencies have any firewall policies relating to participation of their employees in the Citywide Appeals Panel process?

MR. HAIDER: Objection.

A. Yes. The City Commission on Human Rights does not involve its Law Enforcement Bureau in the Citywide Appeals Panel process because the Law Enforcement Bureau of the City Commission on Human Rights is charged with reviewing and potentially prosecuting charges of discrimination that could involve denials of reasonable accommodations from City employees or otherwise. The Department of Citywide Administrative Services -- oh, and also, CCHR similarly does not involve its in-house EEO officer and their staff on these matters.

The Department of Citywide

E. EICHENHOLTZ

Administrative Services, again, their panel members are citywide policy -- Citywide Equity & Inclusion and general counsel office policy makers, not members of their EEO office, who would be asked in the first instance to review these request for reasonable accommodations so that you don't have the issue of someone whose been involved in these cases below, to use your word, Mr. Nelson, are then voting on these cases on appeal.

Q. Just to clarify, this is not a question, but below has no qualitative or, you know, there's no disparagement in saying that a person in this context is someone who is --

A. As someone who has practiced my entire legal career in terms of litigation in trial courts, I can tell you that below does not have any negative connotations.

Q. Right. We'll agree on that.

So in this context of the formation of the Citywide Panel, was there ever any discussion of the Kane and Kyle case?

A. No.

Q. And in subsequent communications

among the Citywide Panel, has there been any discussion of developments in the Kane/Kyle case?

DI MR. HAIDER: Objection. Again, I'm going to instruct the witness not to answer.

This question does not touch on the Citywide Panel's process nor the standard that the Citywide Panel applies.

MR. NELSON: But it does go to the question of the panel, since one of the major issues involved in Kane/Kyle was the unconstitutionality of the standards that are being applied by the Department of Education. So I would ask you to waive your objection and permit the client -- the witness to answer.

DI MR. HAIDER: I will at this point direct him not to answer.

However, I am open if the question is rephrased in a manner that is on point as more similar to the way you just phrased it to me.

Q. So Mr. Eichenholtz, was the decision

E. EICHENHOLTZ

of the second circuit or the question of standards applied in the Kane/Kyle case ever discussed among members of the Citywide Panel, to your knowledge?

A. In the context of when we received the DOE cases that we were receiving, the background of the decision and the fact that we were to be applying the legal standards we had been applying to City cases were discussed. Certainly the 14 plaintiffs, there was a discussion of the fact that we were being court ordered to do so, so the panel was aware of why we were -- you know, we would sort of go through cases in the order we received them, we were given a short time frame there, so we had to discuss the time frame and things like that. So those sorts of discussions were had with the panel.

Q. And what about the nature of the standards that had been used at Kane and Kyle for the agency adjudications?

A. Other than the standard -- we discussed the standards we were going to be using based on what the Court had told us we

E. EICHENHOLTZ

were going to be using, which was essentially what we had been using, so -- you know, I don't think there was a discussion of, well, there was this arbitration award that applied this standard, and we're not going to use this standard because, you know, when it was being discussed, you wouldn't muddy the issue in that way. The important thing was what we were getting, when we had to decide, and what standard we, the Citywide Appeal Panel, needed to decide. It didn't matter what happened before the arbitration, other than we were going to disregard that and apply the standards that we were applying.

Q. So, just to clarify and follow up, the Second Circuit's decision sending cases to the panel also severely criticized certain standards that had been applied to those decisions -- the agency decisions in the Kane and Kyle cases. And are you saying, then, that the panel members were never instructed to stay away from the standards and methods of decision-making that were criticized by the Second Circuit Panel?

MR. HAIDER: Objection.

A. We were never using, nor would we use those standards and methods of decision-making that the Second Circuit criticized in that case. We were applying the legal standards, the guidance provided, and that has been, at least in my understanding, consistently affirmed in subsequent cases and litigation. So we wanted to do what we were doing because the judicial feedback, the legal research we were doing, we were doing the right thing. So we're not going to start discussing other standards and saying, well, there's other standard used in this other circumstance and that's wrong. We were talking about the standards we were using and how we were applying it in our work.

MR. HAIDER: Mr. Nelson, I would request another ten-minute break.

MR. NELSON: That's fine. We're almost up to noon. Would you like to break now for 45 minutes to have lunch?

THE WITNESS: It's --

MR. HAIDER: It's a little on the

E. EICHENHOLTZ

early side.

THE WITNESS: I don't know how much more you have to go, but, you know, if we're going to go deep into the afternoon, I'd rather go a little further, personally.

MR. NELSON: That's fine. Let's take ten minutes, then.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're now going off the record. The time is 11:41.

(Recess was taken.)

THE VIDEOGRAPHER: We are now back on. The time is 11:53.

MR. NELSON: Very good.

BY MR. NELSON:

Q. Do you recall the last question that I asked you, Mr. Eichenholtz?

A. Not at all, Mr. Nelson, I apologize.

Q. Oh, okay.

MR. NELSON: I'll ask the court reporter to read back the last question, please.

(Record read.)

E. EICHENHOLTZ

Q. Okay. So my follow-up question, Mr. Eichenholtz, is: Can you give a yes or no answer to that question?

A. The answer's yes. Oh, wait, and I apologize, because there was a double negative. I need to -- the answer is -- let me just phrase it.

They were instructed not to apply that standard when they were instructed to apply the Title VII standard.

Q. Were they given the negative instruction not to use the standards that were used in the Kane and Kyle adjudications?

A. Yes.

Q. So they were told, these were the standards that were used in Kane and Kyle, they are the wrong standards, you are not to use these, or words to that effect?

A. I don't know if it was words to that effect, but they were told that the arbitrators utilized this standard, that we were to disregard that, and to apply the standards we've been applying in our cases.

Q. And were they told what the

E. EICHENHOLTZ

standards were that they were not to apply?

A. I don't recall if we -- I -- like I said, certainly we did not go into detail as to what that arbitration award standard was, no.

Q. So you didn't go into detail as to the specific standards that they were not to apply that had been applied by the arbitrators; is that correct?

MR. HAIDER: Objection.

A. I don't recall the extent to which those standards were referenced. The important information that was conveyed to the panel was the standards they were to apply.

Q. How were the members of the agencies that were making the decisions below, the decisions that were being reviewed by the Citywide Appeals Panel, how were the decision-makers in those agencies trained with respect to the applications of law or standards to religious accommodation requests?

DI MR. HAIDER: Objection. I would instruct my witness not to answer.

That question is outside the scope

E. EICHENHOLTZ

of the 30(b)(6) witness. The topics are the Citywide Panel's process and standards; not the agencies below or, you know, any other City agency's process or standard. So I'm going to instruct my witness not to answer.

Q. How were the Citywide Appeals Panel members trained with respect to the standards that they were to apply to religious accommodation requests?

A. So I think I've addressed this a few times now. They were -- most of the members of the panel came to us with significant EEO and reasonable accommodation employment discrimination experience and were very familiar with how a reasonable accommodation process works. We provided the EEOC Guidance. We discussed generally as we went along any big-picture issues at our check-in. Obviously if there were legal developments, we -- the legal developments were shared with all the panel members. And so, the panel members were kept abreast of the standard, but they came in with a base of knowledge regarding the work

E. EICHENHOLTZ

that they were doing.

Q. Do you know how these individual panel members were trained with respect to the application of standards to religious accommodation claims?

DI MR. HAIDER: Objection. Again, I'm going to instruct the witness not to answer.

You know, the training is certainly not a topic here. Again, the two topics are the Citywide Panel's process of reviewing and the standards used by the Citywide Panel in its review. Although we allowed some questions about the formation, the formation and training of the Citywide Panel is not subject to this 30(b)(6).

MR. NELSON: Well, it is, because the testimony has been so far that the reason why these persons are members of the panel in the first place is that they have experience and are familiar and they have -- you know, that they've done this before. You know, and so presumably the

E. EICHENHOLTZ

people are relying upon that experience and their familiarity with rules in making their decisions on the panel, which are not reviewed in substance at the quality-control level. So the entire framework of this depends upon the training and the understanding that these people had before they became members of the panel because they never got it on the panel.

MR. HAIDER: You know, whether or not their training of the panel members is relevant, I'm not really going to argue at this point. The only thing I will point to is that the training of the Citywide Panel is not a topic here.

MR. NELSON: It goes strictly to the standards.

DI MR. HAIDER: Yeah, Mr. Eichenholtz can testify to the standards that the Citywide Panel was asked to apply, which he has done numerous times. You know, the panel members' history, you know, prior to this being put on the panel is actually

E. EICHENHOLTZ

not relevant. Admittedly, we allowed some of these questions for foundational purposes so as to, you know, allow the depositions to go smoothly to provide some context. However, training or, you know, experience is not -- the panel members' experience is not subject to this 30(b)(6) witness.

And so I'm instructing the witness not to answer.

MR. NELSON: Well, you know, we know from the information we've been given about the structure of the panel and the procedure that the panel follows that these persons, each of them is essentially acting as independent decision-maker, independent judge, and, you know, since that's the procedure, you know, and it sounds like there's no enforcement of whether they follow one set of guidelines or another, I think it's very important to know, you know, what these persons had been trained to do, because clearly, you know, I think the whole purpose for

E. EICHENHOLTZ

bringing them on to the panel was to have them use their training. We don't know what the training is. And we know very little about what each of these panel members is bringing to the process of making these votes, these sovereign votes.

MR. HAIDER: So we have allowed questions and answers about what was discussed during the Citywide Panel meeting as to the standards being used, how that message was conveyed. You are now asking, the previous question was about prior training as to the subject matter here. Again, that's outside the scope. So we've already allowed the questions as to what information they received from the Citywide Panel or, you know, Mr. Eichenholtz or other members of the panel discussed as relates to the standards.

BY MR. NELSON:

Q. Mr. Eichenholtz, do you at least know what training they received?

DI MR. HAIDER: Objection. Again, I'm

E. EICHENHOLTZ

instructing the witness not to answer based on the previous stated grounds.

MR. NELSON: Well, this goes to the basis of his knowledge.

DI MR. HAIDER: Okay. Again, this is knowledge to questions that are not relevant. We can flag this, we can call the Court now, we can flag it to call the Court.

But I am going to instruct the witness to not answer any questions about training that panel members may have received prior to the formation of the panel. It's not relevant to this testimony at this stage of the litigation.

BY MR. NELSON:

Q. Mr. Eichenholtz, did you or anyone else involved in the panel have any direct communications with Bill DeBlasio about the panel?

A. No.

Q. And did you have any such conversations with him about the nature of religious accommodations or the process for

E. EICHENHOLTZ

religious accommodations or the standards?

A. I've never spoken with Bill DeBlasio in my life about any topic.

Q. All right. And what about Mayor Adams?

A. I have had discussions with the mayor about the vaccine mandate generally, not about the citywide appeal process or how cases are adjudicated.

Q. And please tell us the sum and substance of those conversations.

A. I --

MR. HAIDER: Objection.

THE WITNESS: Yeah.

MR. HAIDER: You can answer.

A. I cannot do so due to attorney/client privilege. I was in the function of conveying legal advice to the mayor.

Q. Do you know whether or not any of the panelists were aware of former Mayor de Blasio's statements that he made, while he was mayor, regarding what criteria would be acceptable for religious exemptions?

E. EICHENHOLTZ

MR. HAIDER: Objection.

A. I would have no independent way of knowing that other than our discussions, and it never came up in those discussions when we talked about standards and how they were to be applied.

Q. Did you ever discuss with anyone on the panel about, you know, Pope Francis having a view that there's nothing in the scripture that suggests people shouldn't get the vaccine?

A. We had discussions in discussing various cases and how to handle them, that Pope Francis, in his capacity as the institutional leader of the Catholic Church, had made such pronouncements and that the fact that he did so was not dispositive in any given case.

Q. And did you ever discuss in conversations with members of the Citywide Appeals Panel the assertion that two well-established religions, Christian Science and Jehovah's Witnesses, have a history of religious opposition to vaccination?

E. EICHENHOLTZ

A. I don't remember specifically having those discussions. With respect to all religions, we discussed we were going to review the facts and the documentation before us to understand the source of the employees' belief and whether or not there's a conflict between that belief and the vaccine requirement.

Q. Did you have any discussion with anyone on the Citywide Appeals Panel as to whether or not Pope Francis' views were relevant to the determination of anyone's religious accommodation, even if they were not dispositive?

A. Certainly the fact that institutionally, the church was permitting vaccination could potentially be relevant in particular fact patterns. Beyond that, no, we were -- we review these requests based on the information the employee provides us about the nature of their religious belief, their record as a whole, and all of the facts underpinning that belief.

Q. And in any of these discussions, you

E. EICHENHOLTZ

know, what fact patterns did you discuss, if any, were ones in which Pope Francis' views might be relevant?

A. No particular fact patterns; however, it isn't to say it isn't this fact pattern or that fact pattern. There are cases in which the employee would say sort of as a blanket statement, as a Catholic, I should be exempt from this vaccine, without more detail or explanation even after interaction, for example, you know, that that might not be enough because there is no -- we're not stereotyping Catholicism one way or the other, right? We're not stereotyping Catholicism based on the Pope's pronouncement, we're not stereotyping Catholicism based on the fact that some Catholics would have a contrary view to the Pope. We were looking at -- with Catholics, we would have to look at the nature of the employee's belief, the source, and whether the beliefs the employee was articulating were conflicting with the vaccine requirement.

Q. And what if one of the voters failed

E. EICHENHOLTZ

to do that? Was there any control that you or anyone else would have that, you know, would empower you to bring that voter back to look again at the facts if the voter had failed to -- apparently failed to see or to reflect upon the existence of facts that would support having such an objection to vaccines, despite the contrary opinion of someone in authority in the faith?

MR. HAIDER: Objection.

You can answer.

A. I'm not aware of any such circumstance. So I do know that when there's a potential issue that's flagged either because we've had a change of information or a whole host of reasons, and we may need a panel to review what they did, we will do that. I'm not aware of any circumstance where a panel member did not properly apply the standard in reviewing the reasonable accommodation request.

Q. But would it be fair to say that that wasn't one of the objects of your quality control review, that you take two minutes on

E. EICHENHOLTZ

the average to perform for each case?

MR. HAIDER: Objection.

A. So it wouldn't be a primary focus, but, you know, a lot of the -- yeah, I mean, no. Like I said, we would flag substantive issues if they were raised when we were doing quality control. But in doing that work, I have never seen a substantive issue raised with respect to the application of the standard.

Q. On how many occasions did you raise a substantive issue with a voter, aside from just a conflict between a vote and the comment, in your experience?

A. It's rare. Like I said, maybe a dozen times. It's usually some sort of irregularity, and it may often not be the voter's fault. For example, a medical appeal routed to the religious, you know, CCHR. You know, things like that. So generally, it is rare.

Q. But that wasn't something you were specifically looking for in the course of your quality control; is that correct? Because as

E. EICHENHOLTZ

I recall your testimony about quality control, it had more to do with procedural things than substantive questions.

A. Yeah. Again, but if there's a substantive issue that stood out to me, you know, let's say it's, you know, it's a Catholic requesting a reasonable accommodation and there's some comment about the Muslim religion, obviously, I would flag that. That's never happened.

But I'm not -- I guess the best way I can put it for you is, I'm not there to second guess the judgment, the factual -- the balancing of the various facts and the credibility assessments of each individual panelist. That's why we have three panelists from three different agencies.

Q. You indicated that the cooperative dialogue process was something that ought to occur or was -- if it were to occur, it should have occurred at the agency level. If that was a process that -- well, I'll withdraw the second sentence there.

Did you observe that there were some

E. EICHENHOLTZ

agencies that engaged in the cooperative dialogue process more than other agencies?

DI MR. HAIDER: Objection. I'm going to instruct the witness to not answer that question as it's outside the scope as to, you know, comparing the agencies.

Again, the scope here is the Citywide Panel's process in reviewing and the standards used by the Citywide Panel.

Q. Mr. Eichenholtz, in review of an agency's decision, did the Citywide Appeal Panel members have a practice of giving the same standards and process of review for decisions that were made by agencies which engaged frequently in the cooperative dialogue process as opposed to those that did not do so?

MR. HAIDER: Objection.

You can answer.

A. So agencies generally went about going through the cooperative dialogue process in different ways. Agencies went about gathering the information and engaging the employees in different ways. I would not say

E. EICHENHOLTZ

it was a competition where one did a better
job than the other.
There were times where we would
have, you know, them be very brief cooperative
dialogue, but it would be very relevant and
salient, and there would be times where there
may be a longer one where there wasn't. So
what we would do is, we would look at the
materials that the agency had done, the
cooperative dialogue they had engaged in, and
we'd review it. And if we felt that
additional questions, cooperative dialogue
usually was very targeted when we do so, if it
was necessary, we would make that inquiry of
the agency.
Q. Do all the members of the Citywide
Panel work full time and exclusively on
matters related to the Citywide Panel?
A. No.
Q. Then what percentage of the work
time of panel members is devoted to Citywide
Panel matters?
A. That is heavily dependent on the
panel members, you know, and what percentage

E. EICHENHOLTZ

of the agency's cases they're reviewing,
things like that.

Q. And is there is a range of the amount of time that people spend or the percentage of time that they spend? Does every panel member, for example, work at least 50 percent of the time? Does no panel member work more than 80 percent of the time on, you know, panel matters?

A. It's --

MR. HAIDER: Objection.

THE WITNESS: Yeah, okay. Sorry.

A. It's tough to quantify in that way because, to be quite frank, I think everyone on the panel member are City managers, and the obligation of City managers is to work the time needed to get the work done. So, for example, if I have or any panel member has an insufficient amount of time in that workweek to get the work that they wanted to get done on the panel work done, then they're working on it maybe over the evening or over the weekend. So it's not like you're there 9 to 5 and you're spending three hours a day on

E. EICHENHOLTZ

average on it, so it's tough to quantify in that way.

And like I said, given the work obligations and the involvement of various panel members, the amount of cases they need to review are different. Obviously DOHMH, as you can tell from the numbers we discussed earlier, have far less cases to review than DCAS for the Law Department, for example.

Q. On average, how many appeals is each panelist expected to decide each week?

A. There is no expectation. The agencies divide the work amongst the panel members as they best -- as best fits that agency's needs and to keep the workflow going.

Q. Now, do you know whether or not there was ever a meeting in which you did not participate in any of the agencies in which the procedures or standards that the voters from that agency would be expected to follow in performing their work as voters on the Citywide Appeals Panel?

MR. HAIDER: Objection.

Just seeking clarification. Are you

E. EICHENHOLTZ

referring to the Citywide Panel meetings? You did reference agency meetings.

MR. NELSON: So what I'm referring to is some meeting at which the panel members from a particular department met to discuss how they were going to handle their work on the panel.

MR. HAIDER: Objection.

You can answer.

A. So I obviously can't definitively rule out any discussions, but I can tell you from my work with the individual panel members and my discussions with the different agency panel members, agency-specific discussions were primarily on issues of dividing up cases, case management, etcetera. They were not focused -- because again, we work generally -- we were all working off the same standards and we discussed them as a group. You know, I generally, when there were questions about standards, they were brought up in the group, you know, and sometimes even panel members from other agencies would raise the issue to me and I'd say, well, let's discuss it at our

E. EICHENHOLTZ

next check-in, for example. So based on my understanding, if it was happening, it was exceptional and rare, that generally we were discussing standards together.

Q. But you don't know whether there were such meetings or not?

A. Right, I can't rule it out definitively because I'm not in the room with every panel member all the time, so no, I can't rule it out definitively.

Q. And that sort of raises the question of: What is the basis of your knowledge for how the other departments, not the Law Department, handle the reviews that their panel members conduct of the appeals?

A. Because we've had both in check-ins and myself with each agency-specific discussions with those agencies on how they are handling the cases. So I'm aware of how every agency is handling the appeals.

Q. Now, previously you've indicated, you know, that so far as you know, there are no notes that had been taken at the various kinds of meetings we've been discussing. The

E. EICHENHOLTZ
answer is really, though, with respect to that, that if there were some there, you just don't know about them, right?
MR. HAIDER: Objection.
A. Yes, that's entirely possible.
Q. Okay. So in reviewing appeals from the City agency's denial decisions, how much weight were panel members instructed to give to the reasoning or analysis of the agency?
A. In terms of weight, you know, no more or less than any other fact that we had. We were looking at why the agency did what it did, right? And so, it was relevant because we needed to understand why it was denied. But if the agency didn't have a basis for denial or the agency had multiple bases for denial and the panel member says it thinks -- if you have one really strong basis here and a bunch that are questionable, the panel member doesn't have to say, follow what the agency did. So it's, you know, like I said, it's close in our appellate review spectrum that we discussed before, it was closest to de novo review as it was described to the panel

E. EICHENHOLTZ

members.

Q. Did the City have a policy of asking only vaccinated people to serve as panelists on the Citywide Appeals Panel?

A. No.

THE WITNESS: Sorry.

MR. HAIDER: Objection.

A. No.

Q. Are there any unvaccinated persons who are serving on the Citywide Appeals Panel?

DI MR. HAIDER: Objection. I would instruct the witness not to answer as it's outside the scope of the order.

MR. NELSON: It does relate to the ability of the panelists to serve their function objectively, so I think it's pretty important.

Q. I would ask you to answer.

DI MR. HAIDER: Again, objection. I'd instruct the witness not to answer.

It's outside the scope of the Citywide Panel's process or the standards used by the Citywide Panel.

Q. Can service on the Citywide Panel be

E. EICHENHOLTZ

performed remotely?

A. Yes.

Q. Again, I apologize for being quiet. I've got a number of questions that have been answered already and I'm scrolling through them to get to one that hasn't been answered.

To your knowledge, has any panel member ever received an instruction from anyone else as to how to consider any specific appeal?

A. A specific appeal? No.

Q. Now, in the production of documents in this case, we received an email that you had sent to I think somebody else in the Law Department in connection with procedures for deciding certain kinds of religious accommodation questions. Are you familiar with that email?

A. I am.

Q. Okay. Now, have you or Mr. Sanford ever sent any other email to any panelist that, you know, discussed how to deal with any specific or hypothetical situation arising in appeals to the Citywide Panel?

E. EICHENHOLTZ

A. No, not that I'm aware of.
Q. So that's the only email you ever sent to any panelist that discussed a hypothetical situation?
A. In email? Yes, in email.
Q. Uh-huh. And when you say -- when you distinguish email from something else, was there any situation -- other than a --
A. Now, a hypothetical -- I apologize for cutting you off.
Q. Sure.
A. Hypotheticals, as I said, sometimes would be part of our broad, big-picture check-in discussions. If there was a pattern we were seeing or an issue, we might want to talk it through as a group. Certainly that was the form where we did it. Communication such as emails were generally case-specific.
Q. And so, with respect to case-specific situations, did you send any emails to any panelists about how to deal with it?
A. Procedurally? Yes. On the substance, no. So we might have an agency

E. EICHENHOLTZ

uploading more documents, the employee approaches the EEO officer and says, I have more information, the EEO wants to reconsider, so I might say, hold off, or, we have more information for you to consider. Those sorts of procedural matters generally I've been lead point for the panel. So I will email panel members and say, you know, this is going on, so could you, you know, take another look again. But I'm very conscientious that those emails are kept to procedural discussions because, again, I want to have the three separate perspectives on every appeal and everyone exercising their independent judgment on the appeal.

MR. NELSON: I've just received some communication from some of the other people in the firm here that we need to take a lunch break. So it's 12:30, or it's 12:29, soon going to be 12:30. Let's take a lunch break now. I'm indifferent as to whether we take a one hour or a 45-minute break. I think --

THE VIDEOGRAPHER: Let me just go

E. EICHENHOLTZ

off.

We're now going off record. The time is 12:29.

(Lunch recess taken at 12:29 p.m.)

E. EICHENHOLTZ

A F T E R N O O N   S E S S I O N

(Time noted: 1:18 p.m.)

THE VIDEOGRAPHER: We're now back on. The time is 1:18.

E R I C   E I C H E N H O L T Z,

resumed and testified as follows:

CONTINUED EXAMINATION

BY MR. NELSON:

Q. Good afternoon, gentlemen.

A. Good afternoon.

Q. So, Mr. Eichenholtz, at this point I'd like to introduce an exhibit, and it's the part of defendants' production that was labelled DEF with a number of zeros and then 1 and a 2 and a 3. And it appears to be an email from Eric Eichenholtz dated November 30, 2021, and it's to someone at the Law Department, and it's regarding new law agency panel users. We're going to get the -- we're going to ask the videographer to -- so Brandon will be pulling that up. Brandon is our paralegal who is part of our team who is admitted to this session. So I guess we'll wait for that to be pulled up by Brandon and

then we'll ask for the court reporter to mark it.

(Exhibit 1, Email chain of November 2021, marked for identification, as of this date.)

Q. Are you able to see that marked exhibit?

A. Yes, I am.

Q. Okay, very good. Let's proceed with that, then.

A. Oh, sure.

Q. Okay. So, Mr. Eichenholtz, what is this exhibit, please?

A. This is an email exchange between myself and actually two of the law panel members going up from the bottom of the exchange. This is when we were getting them set up with the SalesForce system to be able to vote, and then the chain continued into a discussion about the standards to be applied, and that's what the remainder of the chain is.

Q. So the start of this chain predates the use of the SalesForce system for the panel; is that correct?

E. EICHENHOLTZ

A. It predates these individuals voting on the panel. The sort of the timeline here is we added -- we had added -- we had had these two individuals on the panel, but we had not yet set them up and got them ready to vote, and we were in the process of doing so here.

Q. Well, were there some votes that were, then, performed on the SalesForce system that you have prior to November 24, 2021?

A. Yes, oh, yes, yes.

Q. Okay.

A. Just to be clear, not by these two individuals.

Q. Sure. Now, the exhibit indicates that you'd had verbal conversations with one or more of the panelists. What was the substance of those conversations?

A. So when these individuals were brought on board to help out with the project, I was telling them a little about the panel and its work and the standards and sort of the different sources that I wanted them to review before they began voting, including the EEOC

E. EICHENHOLTZ

Guidance and the DCAS document, which you see listed in this chain.

Q. Were there any other sources that you were instructing them to view?

A. Not at that time.

Q. And is there anything inconsistent with the testimony you've given so far that you told them with respect to the procedures and standards that they were to follow?

A. No.

Q. Did you give them any other instructions in addition to the ones you've told us about so far?

A. Yes. I explained to them how we were going about dividing up the work, how we would go about dividing up the work, I give them instructions on that.

Q. In the email, one of the panelists asked you for two or three examples of the kind of fact pattern where the panel would grant a religious accommodation, and you wrote back, quote, "Given that all we see on appeal is agency denials, there aren't too many," close quote. What did you mean by this?

E. EICHENHOLTZ

A. Precisely what I said to you this morning, that we don't -- that the reversal in the agency was not a particularly frequent occurrence, so I had far more examples at that moment of specific denials than I did of grants. But I wanted to make sure if -- you know, you cut that quote off mid sentence, the full quote is, "Given that all we see on appeal is agency's denials, there aren't too many, but there are definitely some." And then, I provided a specific case example. I was concerned because I could not provide a broader array of case examples that also wanted to give, as it says in the next paragraph, the general gist of the fact pattern that thus far I had encountered and the panel had encountered in which we would approve on a religious ground, and you see that described in the next paragraph.

Q. And why did you provide the specific example that you gave to the people who had addressed you in their email, and how does that differ from others?

A. Again, these were -- these two panel

E. EICHENHOLTZ

users were coming in after we had sort of had a big-picture orientation discussion and the check-ins, so they were sort of getting caught up, in a sense, and asking some questions that I think we had talked through as a panel, you know, previously. And so, what was happening here was we'd had that sort of discussion and there were these follow ups as these two -- or one of the two panelists was thinking through what we discussed, and in particular, I think this one panelist was not clear on a couple of things and wanted some clarification and clarity.

Q. So my reading of the November 30th, 4:12 p.m. email from this one identified panelist. It starts off, "I think it would be helpful to have two or three examples of the kind of fact pattern where we would," and "would" is emphasized by being in italics, "grant a religious RA." And I'm curious about that because it sounds to me like he was mostly getting instruction with respect to the kinds of fact patterns where he would not grant a religious, you know, accommodation

E. EICHENHOLTZ

requests.

What -- you know, what examples of fact patterns had this panelist been given before he wrote this email?

A. That's -- what you said is not accurate.

Q. Well, it's certainly accurate with respect to the text that I read, right?

A. No, no.

Q. I'm sorry. What was incorrect in the text?

A. You specifically gave an explanation that was your explanation as to why the word "would" was italicized. That is not an accurate explanation as to why he was italicizing that word and the context for which the panel member was italicizing that word.

Q. So what personal knowledge do you have with respect to the reason for the italicization?

A. Having spoken with that panel member, the other panel member who was on the chain, and being involved in their onboarding

E. EICHENHOLTZ
process.
Q. Well, I'm sorry, but that's a -- those -- the thing you just described all would have preceded, I think, would it not, the date, Tuesday, November 30th, on which this email was sent?
A. Correct, and that's why I'm in a position to say that word "would" was not italicized for the reasons you stated in your earlier question.
Q. And did you discuss specifically with the person who sent this email why "would" was italicized?
A. Not that specific issue, but again, I was sent this email, I responded to this email, and I understand the context in which this email was sent.
Q. And so, you are making assumptions about what the word "would" means in this email?
A. No.
Q. I don't understand. You said that from the context, you were deriving meaning. But if you do it from context, then it's your

E. EICHENHOLTZ

judgment, correct?

A. It's my judgment. I was the intended recipient. I understand what I was being asked here.

Q. But you're not the seller, correct, and you can't testify with respect to the seller's intention from personal knowledge?

A. I believe I have the context and the understanding to be able to understand what was being asked here, and it was not what you were saying, that the instructions that were given were about how to deny reasonable accommodations.

Q. Well, was this panelist given a list of examples or a set of examples of fact patterns where a religious accommodation appeal would be denied?

A. They were given -- we went through as a group, the three of us, one maybe two cases that I pulled up in completely random order, they were the next two cases to come, and we talked them through together, as I did the vote on those cases. Both of those cases turned out to be denials, and that is why this

E. EICHENHOLTZ

question was asked, because in our discussion, in our onboarding process, we'd not yet gone through a case or he'd not yet seen a case where there would be a grant of a religious reasonable accommodation, and as he was beginning his voting, he was asking for the fact pattern so he could make sure that he was seeing both sides as he went through the process. That was my understanding of what was going on here, and based on the context of when it was sent and what we had done thus far.

Q. So generally, in the instructions that you were giving to the panelists and the panelists were supposed to follow, what types of factors would you have needed to see in order to grant an application?

A. Generally, what you would need to see is a sincerely-held religious belief that, either through the belief itself or the way the employee practiced the belief, would conflict with the vaccination requirement. That's what we were looking for.

Q. Doesn't the EEOC Guidance state that

E. EICHENHOLTZ

you should start by assuming that the employee has a sincerely-held religious belief rather than assuming that he or she does not?

A. Did anyone say that there was an assumption that an employee does not have a religious belief? I certainly did not.

Q. Did you -- and were you --

A. And I never -- in fact, when I review these, I presume what the employee's saying is accurate and what the employee's saying is sincere, unless I have objective facts in the record that say that that's not the case.

Q. What kind of objective facts would accomplish that result?

A. Inconsistencies. Sometimes either inconsistencies, explanations of how the employee practiced. There are a whole host of factors, I couldn't possibly list them all, because it really -- you have to review the specifics of every individualized case, and it is, you look at the entire record, you look at all these various things, and you look for that, what I described before --

E. EICHENHOLTZ

Q. So --

A. -- which is a sincerely-held religious belief which conflicts with the vaccination requirement.

Q. So what kinds of inconsistencies would you -- would the members of the panel have been instructed to view as being inconsistent with sincerely-held religious belief of that type?

A. We did not instruct people in that way. These are -- the panel is composed of knowledgeable individuals who, as I said, you can have experience in reasonable accommodations and EEO and the subject matter experience or exposure to this area, experience or exposure to appellate work, and whose job it is to review records and apply standards, especially when those standards have to be applied in a highly individualized and a highly fact-specific way.

It would, in my view, have run contrary to what the law requires us to do to have engaged overly in discussion of, well, this type of person or this type of case is

E. EICHENHOLTZ

always going to be a yes and this is always going to be a no, because you can't review these appeals and these requests in that manner. So we -- that's not the way we had instructed the panel to go about their work.

Q. So in this kind of a situation, you expected each panelist to rely on the panelist's prior experience and instruction with respect to these kinds of issues?

A. Right. And as I've said previously, we had discussions on trends and particular issues that people find troubling that we would discuss as a group during our check-ins to balance the need to remain current to make sure that we're all, you know, being able to rely on each other in our thoughts and shared experiences in a general sense, versus maintaining our independent and our appropriately-varied perspectives based on the missions of our agencies when it comes to our individual thoughts.

Q. Now, in your November 30, 2021 response to the requests made in this email, you give an example of the case the appeals

E. EICHENHOLTZ

panel approved, a number of zeros and then there's 1452.

RQ MR. NELSON: We would request a redacted copy of this model acceptance so that we have an idea of how it reads. You can redact all the personal, specific information about them.

MR. HAIDER: We ask that you follow up in writing.

Q. Now, how are cases distributed to individual panelists?

A. As I said, each agency handles it differently. I'm aware of how each agency does -- would you like me to go through each one, or how would you like me to do this?

Q. I'll ask you to go through each one.

A. Okay. We'll start with law. The Law Department, as I said, has five reviewers. When a reviewer goes into our SalesForce system, they will, generally speaking, just go to the case with the lowest -- appeal with the lowest case number first and work their way through as many cases as they can get through in the time allocated. And when another panel

E. EICHENHOLTZ

member comes in, they pick up from there.

With some exception, as I mentioned earlier, you know, the New York City Housing Authority people wouldn't vote on their cases. You know, if I encountered a case I'd given legal advice to at one time, I would leave it alone and leave it empty so that it would be ready for another panel member to review. And we'd just go through it in that general way.

For the Department of Citywide Administrative Services, they have divided up the work using the last digit of the case number. So someone gets 0, 1, and 2, someone else gets 3, 4, 5, someone else gets 6, 7, 8. I don't know if it's consecutive like that, but they divided it up based on the last digit of the case number.

The City Commissioner on Human Rights, there's one individual who has done the primary work there, and so that individual does most of the voting. But when other individuals have voted, they've just done the same thing; they've come in and voted as appropriate. And the --

E. EICHENHOLTZ

Q. I'm sorry. You're saying they've just come in and voted as appropriate, you mean on the --

A. Picked up the next case, right.

Q. Okay. Thank you. So give me your answer.

A. Right, right, I apologize. They will pick up the next case that needs to be voted on. There is one exception across the board to this process, in that I will on a weekly basis distribute a report to the committee -- to the panel on cases that have two out of three votes registered, by case number and by agency that needs to vote for the third vote. The reason for that is because we're hoping that we can move as many cases to completion as promptly as possible, so they may go out of order to do what they call those two-vote cases so that we can get more decisions out and someone doesn't -- you know, two agencies very quickly vote on something and someone doesn't have to wait an overly extensive period of time for the third agency to vote. So we will provide that

E. EICHENHOLTZ

information to the panel on a weekly basis. We do not provide in that report how the other panel members voted, obviously. Just, they get a number of a case and that that agency is an agency that needs to vote on the case.

Q. Okay. And these reports are written; is that correct?

A. Yes.

Q. Okay. What other information is in these reports?

A. That is literally it. It is a series of numbers segmented by agency, and an additional column for DCAS's use that allows you to sort by the last number so they can figure out whose cases are whose responsibility. That is what the document is.

Q. Are there any other reports that are issued, from time to time, within or by the Citywide Appeals Panel?

A. Not within. Obviously in requests -- in litigation requests and things like that, like this case, we will -- the attorneys will pass those along and we will get the relevant documents pulled. The panel

E. EICHENHOLTZ

does not have the ability, including me, to access the data in the database in terms of downloading it. We can hear it when we're reviewing a case, but I can't, for example, download a series of documents or a series of information. Only the SalesForce administrators can do that, and then they will send that to either me or litigation counsel in the litigation request.

Q. When a denial is issued on a case to the appellant, does the denial list a reason for the denial?

A. Initially, there was no reason listed on the email. Eventually, we did split it up into very broad categories, and those categories were listed on the emails sent to both the employee, as well as the agency.

Q. When was that change effective?

A. Probably sometime in late November, early December 2021, as we were sort of reviewing sort of the process and how it was working and talking with the SalesForce team, we added that feature.

Q. So why did you add that feature?

E. EICHENHOLTZ

A. Just to allow for a bit more clarity in the -- not necessarily in the email, but just in the decision when it was issued, that it would at least be a broad category of the sort of decision that we were issuing.

Q. Is there any written record that reflects the or explains this decision to change the way in which denials were drafted?

A. It wasn't changing the way in which denials were drafted. It was adding a feature that allowed us to do some broad case categories. It wasn't -- we added it to the denials, but that wasn't, like, you know -- we weren't like, oh, we need to change how our denials were. We just wanted to have a -- for a whole host of reasons, we wanted to add that broad case category. There may have been communications; I don't know in what medium they were.

Q. So there may have been some communications. We would like to find out, of course, if there were, and if they're in writing and/or if they're oral, whether the writing's an email or a memo or something. Do

E. EICHENHOLTZ

you have any information about that?

A. Not as I sit here today, no.

Q. And were you the one who made that communication, if one was made?

A. I honestly do not remember whether it was me or whether it was someone else. I remember the discussions, and I remember the admission, but I don't remember who communicated it to who.

Q. And if there was such a communication that was made in writing, where would we look to see a record of it or find a record?

A. If there's something in writing, it would almost certainly be via email, and so, obviously, it could -- you know, if appropriate and directed by my counsel, I would conduct or we would conduct a search of that to be able to figure that out.

Q. So aside from the database, is there a repository of records that relate to the workings of the committee -- of the panel, I mean?

A. Just the database. Yeah, just the

E. EICHENHOLTZ

database.

Q. Does the database also contain the denial and grant letters that are sent by the panel?

A. No, the City -- it's not done in such a way that the City would retain a copy, you know, with respect to -- I mean, agencies would receive a copy of it, but that is -- the database automatically generates that email, so it's not like something, someone does it from Outlook and it's in a sent folder. That email is generated out, and it's sent out to the recipients, so the recipients would have those emails.

Q. And no one in the City would have those emails?

A. Well, the agencies, when they are the recipients, would have those emails.

Q. What are the broad categories that are, you know, among the choices that can be put into those automatically-generated denial letters?

A. So there's does not meet criteria, there is insufficient documentation, which I

E. EICHENHOLTZ

would mention parenthetically is for medical appeals, other, and reason meets criteria, as well as failure to engage in cooperative dialogue.

Q. How are people who received denial letters that contain either the does not meet criteria or the others, you know, broad category listings in the denial letter, how are they supposed to understand what it was in their application that was deficient in the minds of the appeals panel?

MR. HAIDER: Objection.

A. They would know that from their proceedings before the agency. You know, that is, they have engaged in cooperative dialogue prior to at that point, they generally would receive a denial letter notification, they have interacted with the agency's EEO officer, Disability Rights Coordinator, or whatever agency personnel was handling their request on multiple occasions, and we are providing basically an affirmance or denial after appellate review, and that's really all we are attempting to convey in that email, is whether

E. EICHENHOLTZ

after appellate review, the RA's been affirmed or denied -- the decision has been affirmed or denied, sorry.

Q. So having read the complaint in this matter carefully, you are aware, are you not, that the complaint alleges that the denials below did not contain specific reasons for the rejection of the religious accommodation requests?

A. Uh-huh. Yes, I'm aware of the allegation.

Q. Okay. So in that circumstance, isn't it the truth that if, in fact, they were not aware of the reason for the rejection of the application by the agency, that receiving either a does not meet criteria or an other designation in the appeals denial letter is not going to give them any further information with respect to why they were denied?

A. That's -- I -- there were a bunch of things in there that I cannot factually agree with, so I can't really answer that.

Q. So how are they supposed to know under those circumstances why their religious

E. EICHENHOLTZ

application was denied?

A. So you're talking about, you're saying a hypothetical employee who's made it through the interactive -- the cooperative dialogue, the interactive process with their agency EEO, is aware of the agency's decision, has chosen to appeal the agency's decision, and is now receiving a decision on appeal, and that employee has not, at any point in that process, understood the basis for their reasonable accommodation or why it might be wanted, is what you're -- is the hypothetical you're exploring? I'm not aware of a case where that would have happened.

Q. No, the hypothetical is they're not aware of why their religious accommodation was denied. Not why it was wanted. Why it was denied at both levels.

A. Right. I'm not aware of an occasion where -- at least that I'm aware of, where that's -- and I certainly -- if I -- you know, yeah, I can't -- I just don't understand the hypothetical. I'm sorry. I'm trying to, but I don't.

E. EICHENHOLTZ

Q. And so, it's your understanding that the appeals panel was not under any legal obligation to provide more reasons than this?

A. Yes, that's my understanding, that's correct.

Q. Are there any statistics with respect to the amount of -- to the average time that each panelist on the Citywide Appeals Panel spends in adjudicating the cases before the panel?

A. No, there are no such statistics.

Q. So no one keeps statistics of that kind, so far as you're aware?

A. Not unless panel members are timing themselves and writing it down, but I do not understand that to be happening.

Q. And do you know whether or not the CCHP or DCAS or the Department of Health and Mental Hygiene, you don't know whether or not they keep statistics of that kind?

A. No. I -- no, no. I -- I don't see why they would.

Q. But you don't know?

A. I don't. I assume not, but yes, I

E. EICHENHOLTZ

would -- I could not tell you for a hundred percent certain, as we sit here today, that they did.

Q. Okay. Thank you.

A. No problem.

Q. Now, does the Citywide Appeals Panel have a procedure for determining whether or not someone is eligible to file an appeal?

A. You mean after we've received it? Sorry, so we have an appeal before us?

Q. No. Some people are permitted to file an appeal, as I understand it, other people are not permitted to file an appeal. Do you have some way of determining whether or not an appeal -- whether or not a person who files an appeal is eligible to do so?

A. I know of no circum- -- perhaps there other circumstances you're thinking of where someone is not permitted to file an appeal?

Q. No --

A. I can't --

Q. Let me just name a couple of circumstances.

E. EICHENHOLTZ

A. Sure. I just don't know -- I don't know what that describes. I --

Q. Sure. There are two or three -- let me just throw them out one, two, three.

A. Sure.

Q. Situation number 1 might be a person who -- from the Department of Education, for example, who attempted to file an appeal to the arbitration appeal, but they were never given an opportunity actually to speak to an arbitrator or have an arbitral decision of the appeal, and so therefore, you know, they might have been interested in filing with the Citywide Appeals Panel. That's situation 1.

Situation 2 might be those people who in another department opted to file an appeal with the arbitration panel and were denied by the arbitration panel.

Situation 3 might be that there are -- that there was a person who filed an appeal with the arbitration panel in the Department of Education, and I think did so outside the window of a few days in which they were, you know, permitted to make that appeal,

E. EICHENHOLTZ

and so were not -- and they got a denial based on that, or perhaps they got no decision at all from that arbitral panel.

So those are three different options. If each one of these persons wants to file an appeal with your panel, how would you determine whether or not they were eligible to do so?

DI MR. HAIDER: Objection. Outside the scope.

I've been reading the topics, and there's a subsequent sentence in the order from the judge which states that, "A plaintiff may inquire as to the Citywide Panel's general practices, to the extent they exist, as a foundation for acquiring as to the practices applied to the individual plaintiffs' appeals." The scenarios of the examples that you provided are not applicable here because they don't apply to any of the individuals in this litigation's appeal.

So given the order and the explanation by the Court as to what the

E. EICHENHOLTZ

purpose of this is, these hypotheticals that are posed are outside the scope, and thus I instruct the witness not to answer that question.

Q. Has anyone associated with the Citywide Panel expressed a goal for a percentage of the number of appeals that should be granted or a limit on the number of them?

A. No.

Q. And do you know by personal knowledge that no one has ever done so, or are you assuming so?

MR. HAIDER: Objection.

A. Based on my personal knowledge, no one has done so, and my understanding, as I've gone through this process, is we could affirm 100 percent of the appeals. That's our prerogative as we review them, if the facts and circumstances justified those decisions. No one's ever framed this in a, oh, you have to deny this amount or affirm this amount. If they were all denied, if they were all affirmed, as long as the panel was doing its

E. EICHENHOLTZ

job, the panel was doing its job.

Q. So what was the policy of the Citywide Appeals Panel with respect to applicants for religious accommodation who had received vaccinations at a previous time?

A. There is no blanket policy. We would consider that as one of many possible objective facts to evaluate whether or not the individual had a sincerely-held religious belief that conflicted with the vaccination requirement, and those facts, along with the employee's explanation of those facts, could be relevant to a bunch of levels of that analysis.

Q. So what was the policy of the Citywide Appeals Panel with respect to employees who had experienced a religious conversion and had been vaccinated prior to the conversion and were no longer vaccinated after the conversion?

A. So that is an example of what I said a moment ago, right? That is an example of in employee had been vaccinated, let's say, throughout their life and in 2017, for

E. EICHENHOLTZ

example, they converted, they became a born-again Christian, they converted to another religion, what have you, as a result of that conversion, they took on a set of religious values presumably they had been developing prior to that, then they have a sincerely-held religious belief, and if some of those values that they've explained conflict with the vaccine requirement, then they would be entitled to a reasonable accommodation. So in that case, that sort of fact would, you know, compel a grant of an accommodation notwithstanding that fact that, like, standing alone the fact they had vaccines in the past might mitigate against that accommodation.

Q. Now -- oh, sorry.

A. Sorry. One last thing. As you said moments ago, you're going to review what the employee said there, and obviously, you know, absent some reason not to, you're going to accept the employee's explanation.

Q. Well, and so, accepting the employee's explanation, if those two facts

E. EICHENHOLTZ

were expressed in the application, are there other factors that would, you know, reasonably cause a panel member to vote to deny the application, despite the fact that the person had no vaccination after the conversion?

A. Yes. And it could be a whole host of factors that either, as I said, demonstrates an inconsistency, that something about the employee's description may also suggest that even though they haven't been vaccinated, their religious beliefs that they have developed after the conversion don't conflict with the vaccine requirement. There are a whole host of reasons that notwithstanding that conversion and notwithstanding the fact the employee's not been vaccinated since the conversion, that a reasonable accommodation might not be appropriate.

And again, this is why when you say, do you have a policy, this factual scenario or not, you know, and having seen several thousand now, Mr. Nelson, I can tell you with certainty, there are all different

E. EICHENHOLTZ

permutations and combinations of these facts, so it is very challenging to generalize in the way you were generalizing a moment ago.

Q. So given all of these different permutations, is there anybody who has authority to restrict the ability of the decision-maker of the voter to decide one way or as opposed to another?

A. Generally, no. Absent some -- you know, anything that would be a judgment call is left to the judgment of the voter. The check that we have on that, again, is the fact that we have three agencies individually reviewing these cases, right? So that if you have one voter who just really reads it, maybe gets the wrong feel, and the other two voters, you know, seem to have a, you know, different view on it, you know, that employee has a chance, you know, obviously then the employee would get the accommodation.

In order to be denied an accommodation, the employee has to go through at least three people who are knowledgeable in the process; the agency EEO officer or EEO

E. EICHENHOLTZ

personnel or whoever in the agency was designated to review it, the Disability Rights Coordinator, for example, and two of the three panel members at least. And then other occasions I think that are in this case, as well, sometimes it's everyone who's reviewed the request has determined the RA is not appropriate or is appropriate, you know, other circumstances.

Q. Just talking about that at the Citywide Appeal Panel level, supposed you have a situation where you have a person who had a vaccination as a child, had a religious conversion, had no vaccinations after religious conversion, you get one vote for a grant, and you get two votes for no grant for reasons that are perhaps not, you know, clearly explained in the comments. You know, is that a situation that is acceptable to the Citywide Appeals Panel, first of all? Is that an acceptable way to decide, with two to one, despite the fact that you've got a religious belief which is presumed or assumed to be valid?

E. EICHENHOLTZ

A. So I'm not aware of that scenario you've described ever coming up, where there were two voters who had infirm justifications on a record that was very clear purely at a religious conversion. You know, again, it would have to be had a religious conversion, the religious belief conflicts with the vaccine requirement in this way, and, you know, and all the other factors, all the other facts that are in the record point to the grant of the RA, and two voters disregarded that entirely -- you know, that's not really -- that's a very out-there scenario, from my experience working on these cases.

Q. Well, is it possible that -- are there situations, for example, in which the panel members disagree with each other, without regard to whether one side wins or the other side loses, whether it's a grant or a denial, where it's possible that both positions can reasonably be taken by the panel members on the basis of the material that is provided to the panel?

A. Yes. And, in fact, you know, I've

E. EICHENHOLTZ

seen every permutation and combination that exists. I've seen unanimous grants, unanimous denies, two to one with the different -- all the various agencies at various times being the two, some of agencies at various times being the one, and those generally do occur, as I think you succinctly stated there, in a case where the factual record might -- where there is support for both conclusions depending on how you balance the various things, if there may be some contradictory or conflicting information that needs to be reconciled, and that two agencies reconciled it in one direction and one agency reconciled it in another.

Q. SO it's fair to say, then, that each voter has discretion with respect to the decision that the person makes?

A. Between the bounds of the legal framework and the analysis that, you know, they're supposed to be applying, yes, for things like, you know -- for things like, you know, balancing of factors, things like credibility assessments to the extent those

E. EICHENHOLTZ

come up with respect to objective reasons to be concerned of credibility, things like that, yes. The individual panel members exercise that discretion as the law allows and as individuals considering these requests are permitted to do.

Q. What was the policy of the Citywide Appeals Panel with respect to applicants who only objected to the COVID-19 vaccine based upon religious objections, but it didn't object to any other vaccines?

A. So this is going to sound familiar. There is no uniform blanket policy because that is a factual determination. There can certainly be a basis for granting of reasonable accommodation. I'm sure if we put a series of facts together, you may have some ready to go, where an RA might be granted, and there are many scenarios where if someone is objecting solely to the COVID-19 vaccine, where the RA would be denied, I think, you know, there -- so there's no rule that, oh, if they just said COVID, you've got to deny, or they just said COVID, you've got to grant.

E. EICHENHOLTZ

There's no rule or policy like that.

Q. So again, each voter is left to his or her own discretion with respect to that analysis?

A. Yes and no. I mean, I think it's not fair to say it's some, you know, shoot a dart at the dartboard discretionary call here. What the panel members are doing is looking at the objective facts provided in the request and weighing those and coming to a reasonable conclusion, right? These -- you know, or if they need additional cooperative dialogue, there have been some cases roughly along that line that you just said where you might need some additional cooperative dialogue if it's not in the record already. But they're applying their reasoning and their judgment to facts. They're not just saying, well, this is the factual scenario, so it's totally up to me, yes or no. They are applying the facts in a reasonable manner, and if they are competing facts on the record, some people, you know, might -- the balance might tip one way for one person, it might tip the other way for the

other person.

Q. So among other things, you're saying that that particular scenario is not necessarily dispositive?

A. Yes. There's very -- there is -- I cannot think of something that would dispositive in all cases, and I'm sort of laughing, other than maybe someone coming in and saying, I have no religious belief that is the basis of this request. That might be dispositive. Surely no one has done that, that I'm aware of, short of that. It is, you're really looking at the record and having to look at all the different facts that are presented by it.

Q. So if an applicant was silent on whether or not he or she had taken other vaccines, was there a policy of the panel as to how that would affect the analysis of whether the person's religious objection to taking the COVID-19 vaccine was sincerely held?

A. So there was no policy of the panel. That factor would be looked at amongst --

E. EICHENHOLTZ

you'd have to look at the other facts in the record, the information that the employee provided, the circumstances presented in the appeal, and make a determination as to whether you want to grant or deny, or if necessary, seek additional cooperative dialogue, if it was felt it was needed.

Q. Did the Citywide Panel have a policy as to how an applicant's children might affect the analysis of an appellate's sincere religious belief? For example, if the children were vaccinated but the appellant was objecting to a COVID-19 vaccine?

A. Again, you would consider that -- the panel would consider that in the context of all the facts presented in the case. As I sit here today, I can think of factual scenarios where that might be, you know, relevant and compel a grant and there are factual scenarios where it might not be relevant and/or it might be denied, but obviously, if it's something the employee offers or provides, it can be and it will be considered by the panel members when weighing

E. EICHENHOLTZ

all those different competing facts to determine whether a reasonable accommodation is appropriate.

Q. And is the same answer appropriate to the question of whether, you know, the question of a situation in which an applicant fails to mention whether his or her children are vaccinated?

A. I mean, not -- no, it's not -- you know, there's no implication by silence, right? You know, there's no -- so yes, the answer is: You look at the facts, and if the fact's not there, it's one of the factors you're weighing. You're not saying, oh, you know, I'm going to imply through this employee silence that their children are vaccinated or they even have children, right? So what would happen in that scenario is that would not be a factor of how this person's family has been vaccinated or not vaccinated when you're weighing the various factors.

Q. Now, if a person was not scrupulous in their observance of their professed religious belief with respect to vaccines,

E. EICHENHOLTZ

would that be a basis for, a potential basis for a panel number to decide against granting a religious accommodation against the use of the COVID-19 vaccine?

MR. HAIDER: Objection.

You can answer.

THE WITNESS: Okay.

A. It could potentially be a factor one way or the other the panel would consider, be considered in connection with what the employee is saying and all the other factors. Obviously, I think this is a good example, you used the word unscrupulous. One may feel it was, you know, someone just hasn't been, you know, that there's -- you know, that that may not be a dispositive factor in one case, and depending on that record, it may be a highly-relevant factor decision in another case.

Q. Well, of course I used the words "not scrupulous."

A. Yes.

Q. Rather than "unscrupulous."

A. Sorry. I heard unscrupulous. So I

E. EICHENHOLTZ

heard that through my computer. So if you used "not scrupulous," I will substitute not scrupulous into my answer.

Q. Are all the members of the Citywide Panel familiar with that portion of the EEOC Guidance that says that employees need not be scrupulous in their observance of their religious belief?

A. Yes.

Q. Okay. And in your observation of the decisions that you've reviewed in your quality control responsibility, have you seen decisions or votes by members of the Citywide Panel that rely upon the unscrupulous, if you will, or not scrupulous observance of vaccine objections by applicants to deny the religious accommodation request?

A. In cases where there are a variety of factors that compel denial or cause someone to question the sincerity, it is entirely possible that there may be an inconsistency that is unexplained and does not -- and the other factors that are provided by the employee in the circumstances don't mitigate

E. EICHENHOLTZ

to a degree where one of two things may become true dependent on the facts and the circumstances. One, the belief may not be seen as sincere, or two, that the employee's practice of that particular belief does not extend to the sort of practice that would conflict with the vaccine requirement, but --

Q. And -- go ahead, please finish your answer.

A. So I was going to say, so it's not necessarily -- the conclusion there isn't necessarily, oh, it's not scrupulous, right? But there may be related issues where the frequency or the consistency of practice becomes a factor.

Q. Could the lack of scrupulous observance of objection to vaccines be the sole basis for denying religious accommodation request?

A. There is generally -- that would presume, and this is why I'm pausing here for a moment, that would presume that's the only thing presented either by the employee or the agency on the record, and that is almost

E. EICHENHOLTZ

never -- you know, I don't see how that would -- like, I haven't encountered that situation where someone just says, I need an RA because I abstained from some vaccines but not others, you know, period, please consider my request. That's another one of those I put in the bucket of, to me, comes off as a highly unusual fact pattern.

Q. Have you ever seen such a fact pattern?

A. Not that -- certainly not where there weren't other things to examine about the employee's request beyond that statement.

Q. Have you seen situations in which an applicant's conduct pursuant to their religious beliefs has changed over time. A degree of appearance, for example, that increases so that one's current observation of a religious belief has become more stringent, even though it might be different earlier on? Have you seen situations like that?

A. Yes.

Q. And how should -- does the Citywide Panel have a policy with respect to how that

E. EICHENHOLTZ

pattern should affect the determination of a voter on whether or not to grant a religious accommodation?

A. So the employee -- so that would be one of the facts that the panel members consider in connection with all the facts of the entire record to determine whether or not the employee has a sincerely-held religious belief and whether there's a conflict with the vaccine requirement that could play a role in that fact, could play a role in the consideration, yes.

Q. And what about, there's a provision, there's a guidance, there's a discussion in the EEOC Guidance that says that, "an employee's newly adopted or inconsistently observed practices may nevertheless be sincerely held." And to what extent have you ever seen that guidance applied by a panel member in supporting the grant of a religious accommodation?

A. Well, as I think you -- you know, I will just sort of echo back to you that that would be applied. As the EEOC says, you can't

E. EICHENHOLTZ

say without looking at the entire record, the new adoption of religious belief automatically makes it insincere. What you would do, what the panel would do in the way the panel animates that, you know, I focus here on the word may, they would review the entire record, all the relevant facts, and make a determination on the overall record, of which that issue may or may not be a contributing factor.

Q. And so, does your Citywide Panel have a policy following the EEOC Guidance that no one factor or consideration should be determinative and that the religious objective should be evaluated on an individual basis?

A. Finally, yes, we do have a policy. And that is generally how we approach it. You know, we look at all the facts, and we weigh those facts. And like I said, to the extent I've seen disagreements between the panel members, it is usually over how the facts are waived.

Q. So I'd like to refer again to our Exhibit 1, which is the email exhibit.

E. EICHENHOLTZ

A. Uh-huh.

Q. So in that exhibit, one of the panelists from the Law Department states, "I'm mostly seeing folks expressing their view that all COVID vaccines contain or were tested using fetal stem cells and some personal statements saying I've never taken vaccines ever, or not since I become an adult (vaccinated as an adult). My understanding from our conversation is that those would not constitute sincerely-held religious beliefs."

Do you find that text in the email? Have you seen that?

A. Yes, I see that text.

Q. And that's what it says, right?

A. That is what it says.

Q. Okay. Now, it looks like this email is saying that the Citywide Panel had a policy that the objection that all COVID vaccines contain fetal stem cells does not constitute a sincerely-held religious belief. Was that a policy that the panel ever had in place? That's the first question.

A. No.

E. EICHENHOLTZ

Q. Is that a policy?

A. Yeah, no, no.

Q. Aside from in this email, have you heard that view expressed in the course of your discussions with the other panel members?

A. Only in this email, and it was a part of what animated my response to this email and my follow up with that panel member, was seeing that particular comment in the previous email. It showed me there was confusion that needed to be clarified.

Q. So why didn't you clarify that in your response in the email?

A. That is the line General Gist and the fact pattern is, employee articulates sincerely-held belief, has articulated how they act on that belief outside the COVID context, and has properly applied the belief to the COVID vaccination. That was my first step in doing it. You know, we had follow-up discussions to this email, not via email, but that was my very quick response to let him know that that is -- that yes, there are occasions where that would be the basis of a

E. EICHENHOLTZ

grant.

Q. Well, you didn't specifically mention the objection of using fetal stem cells or any of the other details that the panelists wrote in the email. Why is that?

A. Again, because -- and I've expressed this throughout this discussion, my view was I was very hesitant to put any particular religious belief, religion issue in a particular yes or no bucket because I don't think that is the way -- that shortcuts things too much. And so, what I was doing more was I was talking about the various factors that would weigh in one direction or another.

Q. Well, you said you were not wanting to put specific religious beliefs into one bucket or other, but it seems to me that this -- well, and I see in the email, it says that this person's understanding was that this didn't even constitute a religious belief, a sincerely-held religious belief. Did you unequivocally tell this person either -- it would have had to have been orally because you said it's not in an email --

E. EICHENHOLTZ

A. Right, right.

Q. -- that a belief with respect to COVID vaccines could be a religious belief?

A. With respect to COVID -- you mean the fetal stem cell testing?

Q. Yes.

A. Yes, if -- I wouldn't have said it unequivocally because it's not an unequivocal concept. There are people who oppose fetal stem cells in testing and do not do so as a matter of religious belief. There are individuals who possess a religious belief that might cause them opposition to the use of fetal stem cells in testing, but nonetheless their religious beliefs in their personal view would permit them to take the vaccine. So I would not say anyone who says fetal stem cells, that's always religious, that's always a yes. You have to look at the record, understand what the source of the religious belief is. Obviously, if the employee says, I'm a Catholic and through my Catholic upbringing and the teachings of the church, I believe that life begins at conception, or

E. EICHENHOLTZ

life begins at fertilization, if that's what they believe and the source of that is a religious belief, and I have practiced that religious belief by making sure I was never even remotely connected to abortion, including I will not take any vaccines that were tested on cell lines derived from fetal cell lines, then yes, that would be a scenario. But there are a lot of pieces of that scenario that come together. You can't generalize and say that everyone who is opposed to the use of cells derived from -- and by the way, fetal stem cells, fetus that are a product of abortion I think is really the key there. You cannot generalize or assume, you know, absent more from the employee, what the source of that belief is or how it's practiced.

Q. Now, some of the applications may have contained claims of belief that vaccines actually contain aborted fetal cells as opposed to being somehow, you know, derived from them or being somehow perhaps tested using them. And were the panel members given any instructions with respect to whether or

E. EICHENHOLTZ

not any one of or all of those factual contentions were truthful or accurate?

A. So we go off of the CDC Guidelines and have DOHMH available to us for any medical questions. My understanding and the factual understanding that we've been functioning on is, because we're doing this in the context of the City Health Commissioner's order and the City Health Commissioner has the authority to make those sorts of medical determinations, is that there is for, I believe, the Pfizer and the Moderna vaccines, there was fetal -- there were cells that were derived from fetal stem cells that were a product of abortion a lengthy period of time ago used in the testing, and that in Johnson & Johnson it was used in sort of the manufacturing, and that neither actually contained those cells, particularly the Pfizer and the Moderna.

And when we're applying facts, we are going off the facts that the health commissioner relied on in issuing his order. One could not change those facts by saying that, I do not believe the factual findings of

E. EICHENHOLTZ

the health commissioner to be true.

Q. So if a person cited something that you found to be factually incorrect, was it the policy of the panel that that should be a count against the application for religious accommodation on behalf of that person?

A. No, no. What would happen there is we would look at all the facts and the basis for the belief. What might happen there, for example, if someone says, the way I practice, I have a religious belief that prevents me from being associated with abortion, and that belief compels me to never inject cells derived from an aborted fetus into my body, well, these vaccines do not require that, so when you review that record, absent something more, there may be something more that suggests a broader conflict, there would be no RA there because there would be no conflict because the employee could take that vaccine without offending the employee's religious beliefs.

So that's not -- I wouldn't call that counting it against the employee. That's

E. EICHENHOLTZ

assessing the employee's own religious beliefs on the terms and in the manner the employee is explaining it to the agency and that we're reviewing it on appeal.

Q. So essentially, then, under those circumstances, the panelist would be determining that the applicant was not violating his own beliefs if he or she were to be taking the COVID-19 vaccine?

A. No, the applicant made that statement in connection with a request. The panel's not making that determination.

Q. No --

A. The applicant is providing us the circumstances under which there is a conflict.

Q. Yes.

A. We would be applying the applicant's circumstances. We're not making any determination there about the applicant's religious belief.

Q. Well, you are making a -- if a religious belief, you know, if it's expressed as an opposition to taking the COVID-19 vaccine and it's expressed as being on the

E. EICHENHOLTZ

basis of a belief that the COVID-19 vaccine, you know, contained aborted fetal stem cells, then aren't you saying essentially that the religious belief is wrong of the applicant, or are you saying something else?

A. No, absolutely not. I'm saying in that circumstance, I'm saying that the employee doesn't have those -- the employee has a belief that's sincerely held, they practice it in a certain way, and taking the vaccine is not inconsistent with how they've articulated they will practice their belief. There is no judgment whatsoever in that scenario about the employee and their belief.

Q. Well, are you -- it seems to me that there is, and correct me if I'm wrong, but aren't you essentially the determining in the course of that adjudication that a person's belief that there are fetal stem cells contained in the vaccine is not religious?

A. No.

MR. HAIDER: Objection.

A. Absolutely not. I'm -- in that scenario I described, I made the following

E. EICHENHOLTZ

conclusions. One, that the person's objection to fetal stem cells is religious in nature, let's say for our hypothetical that person says as a result of their Catholic religion. Second, that they have a sincerely-held belief that is practiced in such a manner that it could potentially apply to vaccinations. And third, that they've provided an explanation of what practices would offend their religious beliefs. And all of those things are accepted is true in that scenario. There is no judgment about the employee's belief there.

What is done is factually, it's actually the judgment is on the vaccine mandate. Looking factually at the vaccine mandate, there is nothing that conflicts with that religious belief as the employee has expressed it. So there are no judgments being made in that scenario about the sincerity or the extent of the employee's religious belief.

Q. But you are making a judgement with respect to the voracity of the belief --

A. No.

Q. -- to the extent that the belief

E. EICHENHOLTZ

includes an assertion that stem cells are contained in the vaccine?

MR. HAIDER: Objection.

A. That's not a religious belief.

Q. I was asking. That's my question. You're saying that's not a religious belief?

A. Yes, that's not a religious belief. That's not part of the employee's religious belief. The employee's believing that stem cells are in a vaccine that doesn't contain stem cells. That's a fact, the employee may be mistaken about how -- what's contained in the vaccine, there may be a misunderstanding by the employee about the vaccine's ingredients, but that doesn't constitute a religious practice or belief when an employee makes a -- you know, is applying -- is describing, this is how I apply my beliefs, and the vaccine mandate doesn't require the employee to do something that doesn't -- you know, that doesn't conflict with those beliefs.

Q. What if the employee is basing the employee's belief on -- with respect to the

E. EICHENHOLTZ

presence of fetal stem cells in a vaccine on information or direction that has been provided to the applicant by a spiritual director or a clergy person of their faith?

A. It's not a religious belief. They cannot -- an employee cannot claim a vaccine contains something they don't claim. If the clergy says it, if -- regardless. If someone says the sky is green, that is -- you know, and we know the sky is blue, then the sky is blue. You know, that is not -- you can't change the underlying facts of what the mandate requires by having a member of clergy say, well, actually the facts are different than what the mandate requires. You can't -- there's no legal or factual basis to do something like that.

MR. HAIDER: Mr. Nelson, if we could just take a ten-minute bathroom break.

MR. NELSON: Sure. We'll break for ten minutes. I have 2:32, but whatever ten minutes is, let's take it and come back.

THE VIDEOGRAPHER: We're now going

E. EICHENHOLTZ

off the record. The time is 2:32.

(Recess was taken.)

THE VIDEOGRAPHER: We're now back on. The time is 2:43.

BY MR. NELSON:

Q. So, Mr. Eichenholtz, who gets to make the decision as to whether or not a belief is religious in nature?

A. "Religious in nature." It would be assessed obviously in the first instance, in the primary instance, at the agency level as a result of the information they have, the cooperative dialogue, upon consideration of what the employee has advised, the information the employee has provided.

Q. Why would it not be a matter for the individual involved and his or her pastor or religious leader to make that determination as to whether or not it was a religious, you know, bit of information or a belief?

A. It would be. I don't think we're -- I'm referring more to the process. We're here talking about the process. You're absolutely right, the agency is obtaining information

E. EICHENHOLTZ

from the employee and potentially, if they provide some furnished information from the employee's religious leader, and that is what the agencies consider.

Q. So if an individual, if an employee is making a religious accommodation request based upon instructions the employee has received from his religious leader that the panel finds to be factually untrue, what turns that into not being a religious belief?

A. It's not, not a religious -- it is a religious belief.

Q. So, for example, taking the scenario that we were discussing before, if the religious leader has told the congregation to which the employee belongs, the applicant, that there stem cells derived from abortion that are contained in all of the vaccines, and that therefore, in order to be religiously observant, the applicant must not take any of the COVID vaccines, how can the panel be empowered to determine that it's not a religious belief?

A. That -- they wouldn't be. In this

E. EICHENHOLTZ

circumstance, the panel will not be questioning that that is the employee's religious belief.

Q. And so, as a consequence, what the panel in that circumstance should do is not to count the inaccuracy of any factual element of that belief as disqualifying the person from having a religious belief with respect to the use of the vaccine, correct?

MR. HAIDER: Objection.

A. With respect to the determination that the employee has a particular religious belief, yes, that's correct.

Q. Okay. And so, if the panel, then, decides to deny that application, the panel would be requiring the appellant to violate a sincerely-held religious belief; isn't that correct?

A. No, that's not correct.

Q. Well, you've got a denial that sanctions the person for not taking a vaccine, right? The person loses his job.

A. A denial that -- well, the person would then be subject to the vaccine mandate,

E. EICHENHOLTZ

yes.

Q. Okay. And to be subject to the vaccine mandate, a person has to take the vaccine or --

A. Correct.

Q. -- suffer sanctions, correct?

A. "Suffer sanctions"? Well, to continue in their employment, yes, they're going to have to take the vaccine.

Q. Okay. So how is that -- if granted what you just conceded is a sincerely-held religious belief, how does that -- how does a denial of the exemption application not force this person either to violate their sincerely-held religious belief or to suffer sanctions for refusal to violate the belief?

A. Because, and I think we're really getting into legal arguments which are not, quite frankly, for me to make in this context, what the panel is doing there is not denying -- or the agency and then the panel is affirming in this instance is not affirming a denial on the ground that the employee does not have a sincerely-held religious belief.

E. EICHENHOLTZ

Q. What would it be doing in the contrary, if it is not doing that?

MR. HAIDER: Objection.

A. It's denying the -- it's not -- it's making a determination that a reasonable accommodation is not appropriate under the facts and circumstances presented, and there are a whole panoply of reasons that the panel would do that, one of which is the sincerity of a religious belief.

Q. But haven't you just conceded that we're dealing with a scenario in which we have a sincerely-held religious belief? They couldn't under those certain circumstances, given no other facts on the matter, conclude otherwise, correct?

A. If the belief was insincere? Correct.

Q. That it was insincere.

A. The panel under those circumstances could not conclude the belief is insincere, that is correct.

Q. Or that --

A. I mean, absent some additional

E. EICHENHOLTZ

circumstances, we're not talking about a hypothetical. But that's not the only reason a reasonable accommodation would be denied. So that's what I'm trying -- you know, I'm trying to answer your question to the best of my ability.

Q. Sure. And again, I'm trying to get through an outline that I have, and I'm skipping over all the ones where we've asked the question before, so I'm actually saving you time by doing it like this.

So were Citywide Panel members given an instruction as to how to handle applications that contained objections that were based upon factual beliefs about vaccination that were in conflict with the actual findings of the health commissioner?

A. They were to consider it, you know, based on the facts and circumstances, applying the various standards of Title VII, and make the determination whether the agency had properly denied the reasonable accommodation.

Q. So the decision they were making was whether the agency had properly denied the

E. EICHENHOLTZ

reasonable accommodation; it was not whether or not the person was entitled to a religious accommodation?

A. Well, when we're reviewing it, we're reviewing the denial. So if the person was entitled to a reasonable accommodation, the agency's decision would be reversed.

Q. Okay. So what if the facts were imbalanced? What if the evaluator, the panel member, found that the, on the one hand, there were perhaps reasons for the denial, but on the other hand, that they were equally balanced by the reasons for affirmance? Was there a policy of the panel as to whether that should lead to a denial or a grant?

A. No specific policy about how one would deal with something where they truly believed the factors were equally balanced.

Q. But if the matter deemed decided was whether or not the agency was justified in making its determination, isn't that a different determination than whether or not the applicant was entitled to an accommodation?

E. EICHENHOLTZ

A. I'm a little confused. Can you try to rephrase it?

Q. Sure. There are -- these are two different standards, are they not? One is whether or not the panel, the agency below, was justified, you know, had justification for its decision. The other is, if you're on a de novo standard, whether or not the applicant is entitled to an exemption. They're different standards, they have different weights. It sounds to me like what you're saying is that in making an adjudication of this kind, the Citywide Appeal Panel members were expected to deny if they felt that there was justification for the agency's denial; is that correct? Is that what was being done?

A. That -- no, I really that's not an accurate description of how we go about doing it and I -- yeah, that's all I...

Q. Where was the expectation?

A. There was no expectation. The panel was required to review the record, which included the reasons the agency gave for their denial, the information provided by the

E. EICHENHOLTZ

employee, any information provided by the agency, balance all of that, review all of that, and make a determination. If they determine that the reasonable accommodation should have been denied, the agency's decision would be affirmed. If they believed the record demonstrated an accommodation ought to have been granted, then they would essentially reverse the agency and grant a reasonable accommodation.

Q. Did the Citywide Panel have a policy as to how to treat applications that stated objections to the vaccine based upon aborted fetal cells, but where the applications were silent on the applicant's use of Tylenol or Pepto Bismol?

A. No specific policy on that. An employee providing us information on use of medications, because at some point in the cooperative dialogue either they volunteered it or the agency solicited that information obviously would be considered along with any explanation the agency -- the employee presented about whether they used or did not

E. EICHENHOLTZ

use those medications.

Q. And what would be the purpose for eliciting that information about the use of ibuprofen or Pepto Bismol or any other medications?

A. To understand how the employee applies his or her sincerely-held religious belief concerning in that case aborted -- a religious belief that concerned opposition or a feeling that there was a prohibition on abortion, because again, you know, you have to understand not only the general category of what the belief is, but how the employee practices.

Q. So what is the relevance of the use of Pepto Bismol to understanding a person's religious practices?

A. Well, it depends on what they're claim -- there may be no relevance. It depends on what their particular claim of their religious belief is. I think we're -- we've been focused recently on the idea of religious opposition to fetal cells derived from abortion, and there are many, many

E. EICHENHOLTZ

people, probably millions, who have that religious opposition, would use those sorts of products and would use many and all products in which there was scientific testing where there may or may not have been those sorts of cells. That their religious practice is baited upon, for example, not, you know, carrying a baby to term, not engaging or encouraging abortions, things like that, but that is where their personal practice of that religious belief ends, and that there are others who will practice it differently and practice it far more deeply when it comes to the area relevant to the vaccine mandate. And not all people -- you know, we don't stereotype. Not all people who have a religious belief concerning abortion believe in the same things and practice their beliefs in the same way.

Q. Why would the Citywide Panel or the agencies below ask a question about Pepto Bismol?

A. As I said, first thing, I don't know why they would ask about Pepto Bismol or not.

E. EICHENHOLTZ

As I said, if they did and if the employee did it, we would consider it amongst a variety of other factors in the record to the extent there's any relevance to determine it. And that at the end of the day is what we're doing.

Q. I'm sorry, but that doesn't get at the nature of the question. I was asking about Pepto Bismol. Why in the world would anyone involved in the City's, you know, determination of these questions or the appeals, believe that use of Pepto Bismol was somehow relevant to the sincerity of a religious belief that the aborted fetal cells should not be, you know, ingested?

MR. HAIDER: Objection.

A. I don't -- I don't know the answer to that question. To the extent it's helpful, I can tell you that I'm not aware, and I don't believe there's any member of the panel who has denied an appeal on the ground that an employee has taken Pepto Bismol.

Q. And the same questions with respect to ibuprofen. Why would anybody -- well, I

E. EICHENHOLTZ

mean, you can see -- well, first of all, let me step back. I'll take that pending question off the record, please.

You are aware, were you not, that questions have been raised repeatedly, frequently by the agency's below and discussed in the records that you've reviewed in the Citywide Appeal Panel process concerning the applicant's use of Pepto Bismol, correct? You're aware of that?

A. Yes.

Q. Okay. Is there some fact that relates to Pepto Bismol that you think might make use of Pepto Bismol relevant in any way to an inquiry into the sincerity of someone's religious belief?

A. I don't know if this is the case or not, but it could be that if Pepto Bismol was a product that was derived indirectly or tested indirectly from abortion, aborted fetal cells, it might have an analogy. So, you know, an employee might say, well, I understand Pepto Bismol to be this case and that's why I abstain from it. You know,

E. EICHENHOLTZ

generally it would -- you know, as I sit here, you know, I don't know. I don't know for sure. I'm not looking at a specific case, and I can't tell you, as I sit here now.

Q. Are you aware that the City Health Commissioner, the former commissioner, Mr. Chokshi issued a statement or a paper mentioning Pepto Bismol and ibuprofen and containing certain factual assertions with respect to the use of fetal stem cells in connection one way or another with those two products?

MR. HAIDER: Objection.

A. I'm not aware of a specific paper issued by the City Health Commissioner, no. I -- no.

Q. And are you aware that the commissioner had made some statements with respect to that topic?

A. No.

Q. And are you aware that some of the adjudicators of religious accommodation requests at both the agency level and at the City Appeals Panel level relied upon some

E. EICHENHOLTZ

assertions with respect to the use of fetal stem cells in connection in one way or another with Pepto Bismol and ibuprofen in adjudicating religious accommodation requests?

MR. HAIDER: Objection. I'm going to instruct the witness to limit his answer to as the process of the Citywide Panel --

THE WITNESS: Right.

MR. HAIDER: -- agency.

THE WITNESS: Thank you, counsel.

A. The records I've seen in the panel generally -- like, what I'm trying to wrap my head around is I cannot recall, as I sit here today, did you use Pepto Bismol, yes or no, or any discussion where it's like, someone used Pepto Bismol. I remember there have been questions that tended to group together products such as Tylenol, Tums, ibuprofen, and as I understand it, these are products that at one point in their, you know, in their creation, in their development, were tested on cell lines that may have been derived -- again, I don't know if Pepto Bismol was or was

E. EICHENHOLTZ

not, and as I sit here today and I keep thinking about it, I certainly can't think of Pepto Bismol in isolation. The one that I've seen most frequently is Tylenol.

Q. Okay. What is the relevance of Tylenol, asking questions about Tylenol use to the existence of a sincerely-held religious belief?

A. Well, the first thing I want to say, Mr. Nelson, is I see it in both directions, correct? I see employees volunteering in support, when they're -- especially where it's a religious belief that's connected with abortion. Seeing them affirmatively say, I don't use Tylenol, acetaminophen, ibuprofen, and Tums because those products have been tested on cell lines that derive from abortion. I do not just see it in agencies -- some agencies have asked that question. I do not just see it from the agencies. I also see it from the employees. So, you know, certainly -- and I've never seen in the records that I've reviewed a situation where the agencies, you know, list a bunch of

E. EICHENHOLTZ

products and the employee said, well, I've used these because, for example, I don't understand these to have any connection to abortion.  So that's -- you know, so it's not accurate to say that this is just something agencies have asked and that's how I've encountered it and that's how the panel's encountered it in their work.

Q.    What would the -- withdrawn.

Does the City have a policy with respect to the manner in which a religious accommodation applicant explains what a use of ibuprofen despite having an objection to the use of stem cells in the development of the vaccines and, you know, are there explanations for which -- of such behavior which the City panel finds to be acceptable or not?

MR. HAIDER:  Objection.

A.    There's no particular policy with respect to that.  You know, I know employees provided various explanations, and they're reviewed in conjunction with the other facts in the record to make the various determinations that we need to make.  So it

E. EICHENHOLTZ

would not be -- there's no specific policy as to do this or do that or consider it in this way or that way.

Q. Are you aware of any decisions of the Citywide Panel that granted a religious accommodation to anyone who continues to use Tylenol?

A. Offhand, I mean, I can't recall whether, you know, whether there was an application that was granted where someone said specifically, I use Tylenol. I couldn't tell you that for certain. But like I said, I can say, categorically, if someone said they use Tylenol, that's not going to be a guaranteed rejection of their reasonable accommodation by any stretch of the imagination.

Q. What training or information, if any, did Citywide panelists receive with respect to any connection between Tylenol and Pepto Bismol to aborted fetal cells?

MR. HAIDER: Objection.

A. I -- we did not have any specific training as to Tylenol or Pepto Bismol with

E. EICHENHOLTZ

respect to aborted fetal cells.

Q. And did the Citywide Panel rely on any particular authority to support the relevance of Tylenol or Pepto Bismol use in determining an objection based upon abortion?

A. Not that I'm aware of. No one particular specific authority, no.

Q. And did the Citywide Panel consult with any expert or any scientific studies about whether Tylenol or Pepto Bismol was developed using aborted fetal cell lines?

A. My understanding is Tylenol wasn't developed using aborted fetal cell lines in the first instance. It was developed many, many years before, but that over the years, some testing, manufacturing-type work had been done. That was always my understanding. No, I don't think there was any specific, you know -- I'm trying to think of the way to put this -- a study or -- you know, obviously some of the medical questions were resolved through the health commissioner and the Department of Health and Mental Hygiene who have expertise in the public health emergency we're going

E. EICHENHOLTZ

through, as well as some of the medical issues that were being encountered.

Q. So was the Citywide Panel made aware that the actual development of Tylenol and Pepto Bismol did not involve aborted fetal cell lines, but after these products were on the markets, tests were performed on them using fetal cell lines?

A. Yes. I mean, I don't think we did it in a systemic way, but certainly through the records that have been reviewed, I'm aware of that because it's been pointed -- you know, like I said, there is a lot of assertions in the cooperative dialogue both from employees and from the agencies on this issue that I've encountered and the panel's encountered in their work.

RQ MR. NELSON: So, you know, we think that pursuant to the requests we've already made in this litigation, that we should be entitled to any written materials that may have been disseminated to Citywide Appeal Panel members who relied upon them on these topics prepared

E. EICHENHOLTZ

by Dr. Chokshi or wherever they came from.

A. Okay. That's --

MR. HAIDER: Objection. You can ask a question, but in terms of following up on documents, we can do it in writing. If you have a more pointed question about the existence of documents, go ahead.

Q. So the information that was provided to Citywide Appeal Panel members with regard to Tylenol and Pepto Bismol, was any of that in writing, or was it orally communicated?

A. It was -- it was presented -- we, and I'll say this again because we seem to lose sight of this. The Citywide Appeal Panel is an appellate body. We are not a body to gather facts. Our function is not to do that. We are reviewing the information that is provided by the agency and by the employee about the employee's -- the basis for the employee's requested reasonable accommodation, about the vaccine mandate, about the agency's position to the extent it's relevant, we're reviewing those documents, and we're determining, because we're only seeing

E. EICHENHOLTZ

denials, whether the reasonable accommodation should have been denied or should be granted. That is what we are doing. It is the -- you know, so no, we did not have any proceedings where we were gathering facts about Tylenol or Pepto Bismol or anything like that. The writings we were reviewing were the records that were presented to us by the employee and by the employer and the assertions that were presented to us by the employee and by the employer.

Q. Did the Citywide Appeals Panel not send requests to applicants for information about their use of certain products, including Tylenol and others --

MR. HAIDER: Objection.

Q. -- and for information also about what foods or medications they abstained from for religious reasons?

MR. HAIDER: Objection.

A. That's correct. We did that based on the Department of Education cases, and we did that based on the fact that we were trying to approximate as best we could the process

E. EICHENHOLTZ

agencies had been using to gather that information so there were inquiries in the Department of Education cases that approximated inquiries that we had seen from other agencies. And in fact, one of the reasons we asked that question in a more open-ended way, the way you just described it, tell us what you abstain from and why, is because in our view, it was a better way to allow the employee to explain their religious practice or belief, because the primary source, other than maybe practicing employee's religious leader, if they wanted to provide documentation from that, to educate us about extent of the employee's religious belief and the associated religious practices would be the employee. So we asked the sort of more closed-ended question, but we also made sure that there was also an open-ended question so that the employee could educate us.

Q. Did the Citywide Appeals Panel or individual panels not also send out questionnaires about using or abstaining products to applicants who were not in the

E. EICHENHOLTZ

Department of Education, but were employees of other agencies of the City?

MR. HAIDER: Objection.

A. It could be in isolated incidents in other cases. Generally the inquiry we have sent out is a general question of how one practices their -- the cited religious belief, whatever it might be, outside the -- you know, outside of I don't want the COVID vaccine, so that we can better understand the connection between that religious practice and the COVID vaccine and we can understand how the employees sincerely-held personal belief does potentially or does not conflict with the COVID vaccine when the record isn't clear. So yes, and many employees, again, you know, this doesn't just come from the agencies, many employees affirmatively offer that they abstain from certain products and give us a reason why to help, you know, the agency in the first instance, but if the panel feels that that was missing from the cooperative dialogue and relevant, ultimately the panel, after the case is remanded, to understand the

E. EICHENHOLTZ

nature of their practice. Because as I said, you know, you need to understand whether there is a conflict between the religious belief and the vaccine requirement.

Q. Okay. But are you saying that just because some of the applicants did not follow the same religious beliefs of other applicants, that there was to be an adverse inference to be drawn from their continued use of products that other people abstained from?

MR. HAIDER: Objection.

A. No.

Q. Well, then what is the purpose of obtaining the information?

A. I explained that in the answer previously. I'm not going to re-explain that.

Q. Is it not true that the Citywide Appeals Panel drew adverse inferences from the answers that they obtained from applicants in the response to questions there concerning their use of over-the-counter products, like Tylenol and Pepto Bismol?

MR. HAIDER: Objection.

A. No. The panel considered various

E. EICHENHOLTZ

facts presented in the record, balanced those facts and determined whether the employee had a sincerely-held religious belief and whether that religious belief was of such a nature that the employee's practice with that religious belief conflicted with the vaccine requirement. There might be facts that weighed in one favor or in the other. There were no adverse inferences drawn. As I said previously, the panel does not, you know, imply if an employee volunteers one thing and not another, and that the other thing would be unfavorable. That's not, you know, how we go about these reviews. And you keep trying to sort of re-characterize and change the way the panel reviews, and I can't answer the questions when it doesn't accurately describe the work that the panel is doing.

Q. Did anyone instruct the Citywide Appeals Panel that as to whether -- I'm going to withdraw that question.

Did anyone instruct the members of the Citywide Appeals Panel as to how to determine when the connection between aborted

E. EICHENHOLTZ

fetal cell lines in a drug or vaccine become strong enough to form the basis of a sincerely held religious objection?

A. No, because that's not what -- we're not looking at the strength of the religious belief at all.

Q. So what definition of "sincerely held" do you use in reviewing religious applications for accommodation, and where do you get that definition?

A. Does the employee sincerely believe what they are describing what they believe. And the get that definition from the EEOC Guidance and the law.

Q. How do you determine if an applicant's beliefs are sincere?

A. The EEOC Guidance provides generally, you will start at the place that what they're saying is accurate and sincere. If you start seeing facts that suggest otherwise and you may choose to engage in limited inquiry to test the sincerity of that belief if you're starting to see those objective facts, and you look at those facts.

E. EICHENHOLTZ

And if there are facts, you know, through inconsistencies, through other factors, you know, undermine the sincerity of the belief, then you would find the belief insincere. And, you know, you could undergo that inquiry if necessary. It's certainly not always necessary.

Q. So you used the word "accurate." What role does the accuracy of a person's religious belief have with respect to whether or not it is sincerely held?

A. So, you know, I don't think I described an accuracy of a religious belief. A religious belief --

Q. "Accurate and sincere," I'm quoting you.

A. I don't believe --

Q. You said, "accurate and sincere."

A. I don't believe I used the word "accurate." I said --

MR. NELSON: Would the court reporter please read back the --

A. I need to hear the context.

MR. NELSON: -- the question that is

E. EICHENHOLTZ

the last substantive question that I asked and then the first two sentences of the witness' response.

(Record read.)

MR. NELSON: Thank you. That's enough.

Q. So what relevance does the accuracy of a belief have to do with whether or not it is sincerely held?

A. I don't -- I understand the court reporter read back that word. There is no accuracy of a religious belief. What you have to look at -- oh, that's what I said, I said you start at the place where you assume that the religious belief is sincere, and then if you start seeing objective facts that might cause you to question the sincerity, you then might consider in the agency, on appeal the agency may have already taken this step, so the appeals panel may not take it, but you start -- you might do some limited factual inquiry to explore that further, and then you review those facts. That's how you're supposed to go about it.

E. EICHENHOLTZ

Q. But the accuracy of the belief has nothing to do with whether or not this is sincere; is that correct?

A. That is correct. I mean, listen, I don't even know conceptually how a religious belief could be accurate or inaccurate because it is what someone believes.

Q. So -- sorry.

A. No, go ahead.

Q. Is it an objective fact or a subjective standard that is used to determine whether or not an applicant's beliefs are sincere?

A. You're relying on objective facts. So if you don't have objective facts to cause -- you know, if someone denies, you know, essentially subjectively, without being able to point to objective facts, that's not appropriate. You need to point to objective facts. And generally, in our review, I think when the agency EEO officers are making their determination, as well, we're looking for those objective facts. It can't be, like, a gut feeling or something like that.

E. EICHENHOLTZ

Q. Oh, okay. Who determines that a religious belief cannot be a gut feeling?

A. No, no, no, no, no. I said "it," meaning the determination of the person about sincerity, the determination of the adjudicator about sincerity cannot be a gut feeling. I'm not talking about the religious beliefs. I'm sorry I used a pronounce there and you assumed it was the other part that I was referring to. I'm saying as someone -- if you're analyzing whether or not a belief is -- the person who is analyzing whether or -- let me do this to be perfectly clear: The person who is analyzing whether or not a religious belief is sincere cannot say it's insincere because I have a gut feeling that person's belief is insincere. That's what I'm saying. Does that make -- does that clarify it?

Q. Can a religious belief be considered sincere if it contradicts what other members of the religion believe?

A. Yes.

Q. Can a new found religious belief be considered sincere?

E. EICHENHOLTZ

A. Yes.

Q. How are panel members trained on these distinctions?

MR. HAIDER: Objection.

A. Sure, okay. They're asked -- they review the EEOC's Guidance which covers these things, and they're asked to apply each case individually based on the facts and circumstances of those cases, and we have, in the course of this deposition, gone through many hypotheticals and scenarios that would approximate some discussions, you know, a check-ins, not those exact scenarios, that the panel members might discuss to refine their understanding, as well, as we went through the process.

Q. So was the panel instructed to characterize a belief as personal if involved abstaining from substances?

MR. HAIDER: Objection.

A. I don't understand that question.

Q. Suppose an employee stated that they ate a plant-based diet because of their religious beliefs. Was it the policy of the

E. EICHENHOLTZ

Citywide Panel to conclude that the employee was making secular, fact-based choices about food as opposed to religious decisions?

A. No, the panel was instructed to consider that fact in the context of what the employee was describing as their beliefs, the reasons for their beliefs, and any other objective facts or circumstances in the record, weigh those facts, and make a determination about whether the employee had a sincerely-held religious belief and whether that belief conflicts with the vaccine requirement.

Q. So if an employee stated that he or she avoided painkillers, for example, or alcohol or synthetic sweeteners or other substances because of his or her religious beliefs, was it the policy of the Citywide Panel to treat such decisions as personal preferences?

MR. HAIDER: Objection.

A. The policy of the Citywide Panel was to consider those facts, to review what the employee was saying the nature of their

E. EICHENHOLTZ

religious belief was, and to look at all the other facts and circumstances in the record to determine whether the employee had a sincerely-held religious belief, and to the extent the employee did so, that that belief was in conflict with the vaccine requirement.

Q. Would it have been improper for a panel to characterize abstaining from those substances that I described in my last question as being personal preferences rather than elements of a religious belief?

A. No.

Q. From the standpoint of the Citywide Panel's determinations, what difference did they draw between personal preferences and religious beliefs?

A. It depends on the facts and circumstances presented by the employee, all the other circumstances presented in the record, and the assessment of all those facts and the weighing of them.

Q. So, for example, what circumstances, what additional circumstances would justify characterizing, you know, abstaining from

E. EICHENHOLTZ

substance use of various kinds as personal preferences as opposed to religious beliefs?

A. I abstain from those substances because my health is important to me, without, you know -- you know, just in isolation, that. But again, that's why the context, the facts and the circumstances of what the employee's saying and why is important.

Q. What if the justification is, it is both for religious reasons and health reasons that the person's abstaining?

A. Then you have to look at the individual facts and circumstances, see what the employee's saying, you might look at other facts that are presented by the employee in the record and determine whether it's either or a combination of both, as best you can determine given the record.

Q. How are Citywide Panel members instructed to consider appeals from employees whose religious exemption requests contain both religious and political beliefs?

MR. HAIDER: Objection.

A. Okay. I'll repeat this. What you

E. EICHENHOLTZ

do is you look at -- the panel member's instructed to look at all the various facts, circumstances, assertions, what the employee's saying, any cooperative dialogue that was held, look at all those factors, weigh them, look at the objective facts, and make a determination as to whether it was a religious belief or political belief or a combination of the two, and proceed accordingly.

Q. If an application cited scripture to support the objection that the applicant had to the use of the COVID-19 vaccine, was there an instruction to members of the Citywide Panel as to how to apply that fact, the citation of scripture, to their analysis or to an application's religious basis?

MR. HAIDER: Objection.

A. I may repeat this. If someone cited to scripture to help describe their religious belief, it would be considered, you know, as any employee description of what their religious belief or the source of the belief is, and it would be considered in conjunction with the other facts and circumstances

E. EICHENHOLTZ

presented by the employee and the agency in connection with the application.

Q. If an employee's application indicates that their religion prohibits them from being vaccinated, is there any circumstance under which it would be appropriate for Citywide Appeals Panel to conclude that the applicant's beliefs do not prohibit vaccination?

A. Yes, if the facts and circumstances of the application suggest that based on the employee's description, the other facts and circumstances in the application suggest that there is no conflict between the vaccine mandate and the employee's religious beliefs, then the panel could conclude there is no conflict.

Q. But if the person states that their religious beliefs do prohibit them from being vaccinated, what basis, what justification could the panel have for concluding that that is not the truth?

A. Whatever justification --

MR. HAIDER: Objection.

E. EICHENHOLTZ

THE WITNESS: Oh, sorry.

A. Whatever justification may exist in that particular case and the facts and circumstances presented by the employee and reviewed by the panel. It would be highly fact dependent, highly fact dependent, and there's no universal answer to that.

Q. What possible evidence could provide a sufficient basis for concluding that what the applicant says is his or her religious belief is not his or her religious belief?

MR. HAIDER: Objection.

A. Again, I've discussed this numerous -- the first thing, that's a different question than the one you asked moments ago, but let's focus on that. That applicant may say, this is my religious belief and then describe facts and circumstances that are inconsistent with that religious belief. So the panel might conclude either one of two things; either the employee does not have that religious belief or the employee does have that religious belief and it's not practiced in a way that conflicts with the vaccine

E. EICHENHOLTZ

requirement. You know, amongst a variety of other factors and possibilities that can lead to that conclusion.

Q. Were panelists instructed as to what to do if they disagreed with an applicant's interpretation of religious scripture?

A. I cannot think of a circumstance where a panel member would be placed in a position to disagree with the -- you know, you're talking about saying, well, they're saying scripture says this, but I believe scripture says something else? That would never happen.

MR. HAIDER: Mr. Nelson, I would note that, you know, we've been doing close to 90 minutes of hypotheticals of testimony time, and obviously, we can do endless amount of hypotheticals, given how fact sensitive these religious combination appeals -- requests and appeals are. I will just, you know, pursuant to rule 30, it is approaching -- if we continue along the line of hours of hypotheticals, we are close to being in a manner that's

E. EICHENHOLTZ

unreasonably annoying. So I just want to note that for the record, as we continued here. And if need be, if this continues, we may have to call the Court, and as you know, Judge Scanlon said she's leaving prior to 4:30 -- or she's leaving at 4:30. So if we feel the need to terminate or stop the deposition to call the Court, we may, if it continues in this manner.

MR. NELSON: I certainly have not intended to act in -- I forget exactly what the word, I think "annoying" was the word that you used, but that's not been my intent. Every question I've asked has been a legitimate question that is relevant to the case and within the scope of the order pursuant to which we are proceeding. However, it happens that my next set of questions is not hypothetical.

BY MR. NELSON:

Q. What input, if any, did the Citywide Panel receive concerning hardship from the Department of Buildings?

A. Did you say "hardship"?

E. EICHENHOLTZ

Q. Undue hardship.

A. "Undue hardship." So generally on an undue hardship case, we would have some sort of explanation or declination letter in the file that set forth the agency's basis for concluding that the reasonable accommodation if granted would present an undue hardship.

Q. And did the Citywide Appeals Panel receive any materials regarding undue hardship from the Department of Buildings that was not contained within an individual file sent to them with respect to an individual employee's application for religious accommodation?

A. Not that I'm aware of.

Q. And was information about the question of undue hardship received -- oh, I'm sorry.

Was it considered outside of the individual case with respect to which it was submitted to the Citywide Appeals Panel?

A. Generally, as an answer to that, no. Theoretically if someone saw something, you know, if a panel -- if there was a denial on undue hardship or a panel member saw something

E. EICHENHOLTZ

that suggested there might be an undue hardship and felt that that was a grounds for affirmance, they might note that. But generally, undue hardship cases involve the agency providing us in the record some sort of write-up.

Q. So are you saying that a -- I'm not sure that I understand your answer. I was asking about whether there was material that had been contained within one appeal file with respect to that subject that might have been considered by a panel member in another appeal with respect to which it was not contained.

A. Oh, no, that would not happen; that would not. I mean, there -- there could be information about agency operations that the panel generally knows, but it would not be material from one appeal file considered in another appeal, no.

Q. All right. Then, let's go through the agencies. From the police department, did the Citywide Appeals Panel receive any information about undue hardship, other than in connection with individual appeals that

E. EICHENHOLTZ

were submitted?

A. So there are more than 5,000 -- individual appeals? No, no.

Q. I'm sorry, what is your answer?

A. So I apologize, I thought you were saying did we categorically receive anything from the NYPD about undue hardship, and I was starting to explain that 5,000 appeals, then I heard your qualifier that outside of individual appeals.

No, we did not hear anything about from NYPD outside of individual appeals about undue hardship.

Q. Okay. Same question about the fire department.

A. The fire department -- to the panel? No, no. The fire department, again, the fire department provides a denial letter that sets forth its basis for undue hardship.

Q. What about the Department of Education?

A. The Department of Education, yes, in many but not all the cases, the Department of Education puts in essentially an explanation

E. EICHENHOLTZ

when they were determining that they were denying on undue hardship grounds.

Q. Was anything received by the Citywide Appeals Panel other than in connection with the individual cases, whether it's in general?

A. No.

Q. Okay.

A. No. Outside, of course, the EEOC Guidance that describes how one would analyze undue hardship.

Q. First of all, did the Citywide Appeals Panel receive any information about undue hardship from any of the agencies that -- you know, from which appeals were taken, other than in the individual appeal files?

MR. HAIDER: Objection.

A. No.

Q. All right.

A. No.

Q. Now --

A. Yeah, because -- right, if there was a follow-up inquiry, it would be in the

E. EICHENHOLTZ

individual appeal files. So yes, no, only in the individual appeals files.

Q. And did individual panels of the Citywide Appeals Panel make inquiries with respect to information about undue hardship in any of the individual cases that they have adjudicated?

A. Yes.

Q. Okay. In which departments did they ask for this information?

A. I couldn't tell you categorically it was always this department or that department or these are the exhaustive lists of the departments.

Q. So potentially from all departments?

A. Sure. It would appear in the file of the appeal.

Q. And was any of this information about undue hardship shared with the individual applicants for their feedback?

A. No.

Q. And why not?

A. I mean, the denial letters certainly were, and the applicants had the ability to

E. EICHENHOLTZ

respond. But the undue hardship issue, again, is for the agency to describe. You know, it is the agency's description of their needs and how their requested accommodation would interfere with potentially their needs under the standards set forth in the law.

Q. And it's your position, it's the City's position that the applicants had no right to respond to the position that the City was taking with respect to undue hardship or to provide information to rebut what the departments were saying?

MR. HAIDER: Objection.

A. No, that's not the City's position.

Q. Then how could they rebut or how could they respond if they were not provided with the information that the departments were providing on the issue of undue hardship?

A. You're making this binary distinction. I've reviewed multiple appeals where the employees in the first instance have asserted that there's no undue hardship --

Q. It is binary. You win or you lose, the department fires you or you keep your job.

E. EICHENHOLTZ

It's binary.

A. Sir, we're not here to have a debate.

MR. HAIDER: Objection.

A. If you have a question for me, you can ask it.

Q. Isn't it binary?

A. No.

Q. How many outcomes are there, potentially, then?

A. There are many outcomes on --

Q. So how many different outcomes there could be in one of these decisions?

A. Well, there -- they -- there's -- an accommodation can be granted, it can be granted permanently, it can be granted temporarily, the accommodation could be denied, it can be denied for a whole host of reasons and a whole host of justifications depending on the facts and circumstances of each case. So I mean the point of the cooperative dialogue is for the employer and -- the employer to assess whether or not an accommodation is appropriate by engaging

E. EICHENHOLTZ

with the employee, by having a dialogue with the employee. As I said earlier, it's not a litigation proceeding, it's not, you know, employee verse employer. It is the employee engaging in cooperative dialogue, making a determination. And with respect to the City's policy, we also build into that process and appeal, and that appeal is being reviewed and a determination being made on appeal either affirming or reversing or sometimes remanding and then affirming or reversing the agency's determination.

Q. Isn't there a possible alternative conclusion also, which is that the accommodation is not granted exactly as requested, but in some other form?

A. In connection with many reasonable accommodation requests, yes, that is a possibility, certainly.

Q. How often did the Citywide Appeals Panel decision result in that kind of accommodation?

A. So I'm going to say this again. What the Citywide Appeals Panel is doing is

E. EICHENHOLTZ

not gathering facts. They are reviewing a record on appeal. In virtually all of our appeals, the employees are requesting a particular accommodation, they have engaged in cooperative dialogue with the employer, and a determination has been rendered, and we are reviewing the factual record to determine whether or not the decision of the agency should be affirmed or reversed.

Q. Now, do you have any statistics with respect to the percentage of times in which cooperative dialogue actually was engaged in, in these appeals prior to the filing of the appeal at the agency level?

A. I mean, I can't think of a file -- there may be one or two where we made follow-up inquiry, but I can't think of a file where there wasn't cooperative dialogue of some sort.

Q. What to you would indicate that cooperative dialogue took place?

A. Agency solicited information from employee, the employee provided information, or vice versa.

E. EICHENHOLTZ

Q. And is that a kind of a dialogue that, in your mind, results in potentially an alternative -- a grant of an alternative accommodation; not perhaps one that was specifically requested by the applicant?

A. I don't think what's in my mind is relevant here. You know, the law requires that back and forth, and there are sometimes circumstances where an agency is part of that cooperative dialogue, says we can't give you, employee, what we want, but we could provide this alternative.

Q. In your observation, in what percentage, approximate percentage of your cases have you seen that exhibited in the file?

A. I mean, I can't put a percentage on it. Most of them, I'd say the vast majority are the employee saying, I don't want to be vaccinated, and I want to come to work, and the employer saying, well, you -- you know, basically either you're not entitled to a reasonable accommodation at all, you know, or this presents an undue hardship or a

E. EICHENHOLTZ

combination of those.

Q. So how many times have you seen --

A. In the religion.

Q. Now, how many times have you seen an employer offer some accommodation which is not exactly what was requested by the employee, but that offers some less restrictive means of trying to accommodate the employee's religious beliefs?

DI MR. HAIDER: Objection. I'm going to instruct the witness not to answer.

The agency's determinations on the reasonable accommodations are not subject to this 30(b)(6) testimony.

Q. Well, so it's your position that the Citywide Appeals Panel was not in a position to grant any kind of accommodation short of the accommodation that was expressly requested in an accommodation request?

A. So, Mr. Nelson, you've been telling me a lot today what the City's position is or is not. I think I'm here to explain that.

Q. I'm sorry, that was a question. There was a question mark at the end of that.

E. EICHENHOLTZ

A. Yes, it was a statement with a question mark. The answer is no, that is not the City's position.

Q. Okay. So then the Citywide Appeals Panel was empowered to consider and grant accommodations that were not exactly what was requested by the applicant; is that correct?

A. What we would do in that sort of scenario, if the cooperative dialogue and the review of the record suggested that that might be appropriate is we would remand to the agency for that sort of additional cooperative dialogue. But, you know, that would require to be a relevant consideration that would turn on, you know -- that would be determinative on whether or not a reasonable accommodation is requested or denied, and I cannot think of a circumstance where either the requests or the cooperative dialogue were turning on that issue. But, you know, again, there were some certainly in the medical context that were considered. But in the religious context, I can't think of an example.

Q. Right. So you can't think of an

E. EICHENHOLTZ

example in which a case was sent back to -- remanded to the agency in a religious accommodation context for consideration of some alternative accommodation?

A. I mean, I can't think of an example where it was appropriate to do so.

Q. What would have determined whether it was appropriate or not?

A. If there was something -- again, if the reasonable accommodation issue was turning on the nature of the accommodation, there was suggestion in the record that a lesser accomodation would both be permissible under the City's public health order and possibly -- you know, because we wouldn't know, possibly acceptable to the employee, I'm certain there could be, you know, if there was something in the record that suggested that, we might remand to the agency. But that's generally not what these requests were about.

Q. Well, I'm trying to think of less restrictive results that might have, you know, come from application of a mandate. Did the Citywide Appeals Panel ever give

E. EICHENHOLTZ

consideration, for example, to suggesting or finding or somehow ruling that being on leave without pay might permit as a condition that a person could be employed outside the agency?

A. So that --

MR. HAIDER: Objection.

A. Yeah, I mean, employees -- many employees had the ability to do so, at least in the short term. And again, I'm not thinking of requests where that's what the employee was seeking or interested in. These requests were generally for an exception to a vaccine requirement that requires the employee -- where the employee's stating they would like to continue coming to work and testing, and the employee's purpose in requesting the accommodation is they want to come to work in their existing job, so, you know --

Q. But were you aware that there was more at stake for employees, and at least in most of these agencies, than simply whether they were going to be coming to the office every day and working?

E. EICHENHOLTZ

A. Obviously from the employee's perspective, if they were unwilling to get vaccinated and were seeking an accommodation, a great deal would be at stake from the employee's perspective.

Q. Are you aware that the terms of being on the leave without pay status also included a rule for bidding them, the employee who was on leave without pay, from working outside the agency for gain, for income?

MR. HAIDER: Objection.

A. I mean, that -- not -- I don't -- I have no -- no such prohibition, and there were many different leave statuses at issue here and I'm, quite frankly, not here to discuss leave status.

Q. Well, you're not aware that being on leave without pay, which many of these people were pursuant to your, you know -- the program that you designed and that other people designed for the City, that they were not permitted to earn outside income while they were on leave without pay?

MR. HAIDER: Objection.

E. EICHENHOLTZ
A. So -- I mean, we're -- we are sort of in this hypothetical world where, you know --
Q. It's not hypothetical. It's a fact. That's what these people are subject to. They can't -- they have no income while they're on leave without pay, and that's why things are so desperate for them. If they were given an option to work at McDonald's even, they might be able to pay their rent.
MR. HAIDER: Objection.
Is that a question or --
A. Yeah, that's a --
Q. So why did the Citywide Appeals Panel not consider other alternative means of providing some accommodation to the applicants, for example, to alter the conditions of their leave without pay status so that they could earn outside income while the pandemic continued?
MR. HAIDER: Objection.
A. I understand. I will say that, as I said, those considerations, at least in the cases that I've reviewed, never presented

E. EICHENHOLTZ

themselves as, given the nature of the cooperative dialogue, the nature of the request, the facts underlying the request, and the nature of the vaccine mandate, as the sort of accommodation requests that were either being sought or that were appropriate in the circumstances.

Q. If you were giving a de novo review of the cases, why did you not consider such alternative grants of accommodations? Since it was de novo, you should have been -- should you not have been considering all the different aspects of the case?

MR. HAIDER: Objection.

A. Not if there is a dispositive issue. And again, this is an appellate review. So this is the appeal stage. The employee has had their cooperative dialogue with the agency, and there is a record, and we're reviewing the record for sufficiency. That is our function. And in that record an accommodation is sought as cooperative dialogue, and we're reviewing that process and the outcome.

E. EICHENHOLTZ

Q. So how many cases were denied on the basis of undue hardship?

A. I couldn't give you a number.

Q. A percentage?

A. I would -- the vast majority of denials are not undue hardship.

Q. Were there any --

A. That I've seen, that I've seen. What?

Q. Were there any appeals that were denied on the basis of undue hardship?

A. Of course.

Q. Okay. And the hardship generally consisted of what?

A. It's -- that's very fact specific. There's no general.

Q. So what hardship would it have caused the agencies that were employers of these applicants to permit them to earn income outside the agency while they were on leave without pay?

A. In- --

MR. HAIDER: Objection.

A. Indefinitely?

E. EICHENHOLTZ

Q. What harm would they have suffered?

A. I'm trying to understand the purpose of that accommodation. If someone is not and never willing to comply and unable to comply with a mandate that's going to prevent them from ever returning to the job, what would the purpose of an accommodation that allows them essentially to be on leave without pay from the City and continue their career elsewhere give them? I'm really -- this is sort of getting into -- this is becoming -- you know, it almost sounds like it's a reverse-engineered hypothetical. Like, I'm not seeing the purpose in that. You know, I know that's -- I'm trying to do my best, Mr. Nelson, to kind of engage with you to help understand the various processes and things, but I -- you -- I'm lost.

Q. So forgive me, but I thought that the mandates were emergency orders. Is that not the case?

A. That is the case. Well, the order is borne out of a public health emergency, yes.

E. EICHENHOLTZ

Q. And isn't every emergency order limited in time?
A. This isn't an emergency executive order.
Q. I'm sorry, what isn't?
A. This is not an emergency executive order. This is a public health order of the City's Health Commissioner.
Q. Well, aren't there both emergency orders and public health orders?
A. Yes, there are.
Q. And doesn't each public health order refer to, you know, a currently-existing emergency?
A. Yes.
Q. And isn't every emergency, by its definition, temporary in character?
A. Not -- I mean, certainly the steps -- there is no -- yeah, I mean, yes. You know, we're talking theoretically here, there is obviously, and hopefully there will be a point where, you know, this order doesn't need to be necessary.
RL Q. Well, and isn't it a fact that if

E. EICHENHOLTZ

and when the pandemic ends, that the public health order will also end?

DI MR. HAIDER: Objection. This is way beyond the scope of this witness' purview at this point.

We're now getting into what neither the mayor or the Department of Health orders when he's here to simply testify about the Citywide Panel's process and the standards used by the Citywide Panel.

So with that, I'm going to instruct him not to answer that question.

Q. Was the Citywide Panel instructed to assume that the City's public health emergency would never end?

A. No.

Q. I'm sorry, did you miss the question?

A. I said no.

Q. All right.

MR. NELSON: Okay. We're going to preserve the question that I asked to which you made the objection for raising with the magistrate judge. We're not

E. EICHENHOLTZ

going to do that right now.

I'll just note I understand the magistrate judge is leaving at 4 p.m. It's 4 p.m. now. We can't raise it now with her.

MR. HAIDER: She said she's leaving at 4:30 p.m., so we can raise it, if you --

MR. NELSON: Thank you.

MR. HAIDER: Oh, just to be clear, do you intend on raising it? If so, we ask that you raise it now before 4:30. We have no plans to pause this deposition.

MR. NELSON: Yes, I understand. I'm not going to ask it right now.

BY MR. NELSON:

Q. Did any agency provide information to the Citywide Panel as to the number of employees it could afford to employ without causing undue hardship?

A. No, that's not the context of which generally the agencies were borne --

Q. And --

A. -- [inaudible].

E. EICHENHOLTZ

(Discussion held off the written record.)

A. I was saying the agencies, that's not really the basis under which some of the agencies were making their argument. They were making -- you know, they were explaining the necessity to have personnel present and at work and the importance of the agency's mission and things of that nature.

Q. You know, I am certain -- are you certain that the agencies never mentioned an inability to afford to pay employees who were not working in the course of their explanations of undue hardship at the agency level?

MR. HAIDER: Objection.

A. It could be that they did. That certainly would not be in -- a dispositive inability to pay employees? That certainly has never been a dispositive factor in any appellate determination I've made while on the panel.

Q. How do you know -- I'm sorry.

You're not referring to the votes of

E. EICHENHOLTZ

other panel members, however?

A. Right. I'm referring to -- I mean, I could also include, based on our, as I said, we've had discussions about undue hardship, defenses and various agencies that have made the assertion and denials on those grounds, and certainly the ability to pay employees has not come up.

Q. So as far as you know, that wasn't an element of undue hardship for any of the agencies with respect to which religious accommodation or medical accommodation appeals were made?

A. I can't --

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. I can't rule out that that was some assertion, you know, fits that characterization was made by an agency.

Q. And was any information about their ability or inability to make payroll with unvaccinated persons ever submitted in any of these cases, so far as you know?

MR. HAIDER: Objection.

E. EICHENHOLTZ

A. Not that -- I've never seen any document like that, no.

Q. Did any agency provide any information as to the additional costs it could afford to spend without causing undue hardship?

A. Additional costs -- I don't -- what does that mean, additional costs they can afford to spend without causing undue hardship?

Q. Yeah.

A. I'm sorry, I'm just -- I don't understand that.

Q. I can --

A. Try to re- -- yeah, if you can rephrase.

Q. I'm not asking a question if I respond to you.

In context of the question, the last question that I'm still asking you to answer, costs are money that an agency might need to spend in the context of making an accommodation to a request for religious accommodation.

E. EICHENHOLTZ

A. Right.

Q. So did any agency provide you with any information as to those kinds of additional costs that it could afford without causing undue hardship?

A. Not that I recall.

Q. Okay. Did any agency provide any information to the panel as to the number or nature of unfilled positions it was seeking to fill at any time?

A. Unfilled positions? It could have been; I don't know. I know -- I think there was some discussion of staffing of certain requests. Whether those were vacancies that needed to be filled or the importance of maintaining proper staffing I can't characterize accurately, as I sit here today.

Q. Was any of that information considered to be relevant as to whether or not the agencies would suffer undue hardship by granting a religious accommodation?

A. I can't specifically recall whether the information meeting that description was made, so I certainly can't tell you whether it

E. EICHENHOLTZ

was relevant or not. As I said, we assess the agency's explanation and generally with the needs of the agency, the importance of staffing, things like that.

Q. Did any agency provide information about its capacity to work with remote workers?

A. Generally speaking, and again, there may be specific exceptions to this, but I will state this as the rule, agencies that have positions for which remote work is permissible were not claiming undue hardship. There may have been agencies that asserted undue hardship in those sorts of positions, and the panel would take into consideration whether the described nature of the work was such that maybe an alternative accommodation like remote work was permissible when determining whether or not, you know, it would be appropriate to deny a reasonable accommodation on the ground of undue hardship.

Q. You used the word "may" in your last answer. Did the Citywide Appeals Panel ever, you know, consider that, the question of the

E. EICHENHOLTZ

capacity of agencies to work with remote workers in deciding a religious accommodation appeal?

A. So again, now we're sort of talking about two slightly different things. You're talking about agency capacity, budgets, things like that. I'm focused more on the nature of the position the employee has, right? So an agency may have a capacity for remote work, but if the employee is engaged in a job for which the presence at work is needed, even if the agency has other positions that other people believe they may be able -- they can do potentially remote, it might not be a factor. And that's why I say "might," because it's highly dependent on the specific facts. Again, as I've said so many times today, this is an individualized fact-based interview -- process, and so it really depends on the particular facts; what the employee's title is, what the agency's claiming is undue hardship. And we would review all those things in connection with an undue hardship application.

E. EICHENHOLTZ

Q. Did agencies provide information -- and this is not just to the panel directly, but in any of the -- this applies also to the files that they have for the individual cases. Did they provide any information to the panel about arrangements they have already made to accommodate unvaccinated workers whose accommodation requests were granted?

A. There may have been. I can't recall any, offhand.

Q. Did any agencies fail to provide information about their ability to accommodate unvaccinated workers with remote work or with work in an isolated site for unvaccinated employees?

A. No.

Q. So they all provided you with that information?

A. No, we were aware -- I can think of one example in particular of an agency that had provided accommodations for remote work sites.

Q. And what agency was that?

A. That was the Department of

E. EICHENHOLTZ

Education.

Q. And did their provision of remote work sites have any effect upon the -- did it result in the grant of any accommodations for a religious accommodation by the Citywide Appeals Panel?

A. It was a factor considered in whether or not to grant -- you know, to affirm the denial or grant the reasonable accommodation.

Q. What was the information that the Department of Education provided to you concerning remote sites for unvaccinated employees?

A. I believe that they had given teachers sort of temporary accommodations working in remote work sites, you know, in connection with some of their reasonable accommodation cases, and the panel inquired and wanted an explanation as to why the employees that we were reviewing would present an undue hardship on the agency. And they provided the explanation, and the panel members reviewed it and voted accordingly.

E. EICHENHOLTZ

Q. So was that information provided only in connection with individual cases, or was it provided to the appeals panel as general information available to all the members of the panel?

A. I don't -- we certainly made the inquiry of DOE I think because whether the entire panel was aware, whether it was just some of us were aware that that had happened and we wanted to understand the basis for an undue hardship assertion and to evaluate that.

Q. So it may very well have been provided to the panel as a whole and not something to individual panelists?

A. I know that in our check-ins, we discussed DOE and undue hardship and even the fact the DOE had some people working sort of temporarily offline was discussed in those discussions. So we were generally aware, and I know that we made inquiry of the Department of Education in regards to cases that we were reviewing to understand their position on the undue hardship issue.

Q. And some of the information was

E. EICHENHOLTZ

provided to you in writing from the Department of Education?

A. Yes. The writings were submitted in -- the inquiry and the writings were made in individual cases, and I think eventually, you know, the inquiry almost became, like, a standard inquiry, and they would give us the writing in appropriate cases. You know, there were cases the DOE did not assert an undue hardship position, and they didn't give us a writing in those cases.

RQ MR. NELSON: Well, so we are going to be requesting copies of any writings that reflected or constituted any of that information from the DOE regarding the remote sites.

Q. Did the DOE ever tell you whether their remote sites were filled to capacity?

A. I don't think we asked about that, whether they were filled to capacity or not.

Q. And you didn't --

A. We didn't ask.

Q. -- information about it?

A. Not that I am aware of.

E. EICHENHOLTZ

Q. And why didn't you ask about the extent of their capacity remaining?

A. Because it was for DOE to explain to the panel why DOE was asserting an undue hardship in these individual circumstances.

Q. At what time did the Department of Education first provide you with this information about its remote site capacity?

A. Again, I don't think DOE provided us the information. I think we were aware that there had been people, you know, who were assigned to remote sites through the reasonable accommodation process, and we wanted to understand what their position was with respect to the appeals that we were reviewing, and they provided us in each individual case that they were asserting undue hardship, the DOE that is, the DOE provided us with an explanation for that assertion.

Q. When did you first obtain that information?

A. Again, the DOE filed that information into SalesForce, either contemporaneously with other documentation or

E. EICHENHOLTZ

separately, when the panel was considering various DOE appeals.

Q. So did you -- did the panel consider that in connection with all DOE appeals?

A. No. As I said moments ago, there were cases where DOE did not make any assertion that they were denying on undue burden grounds, and in those cases or those appeals, there was nothing in the record to support -- undue hardship, sorry, undue hardship grounds, and in those cases there was nothing -- you know, if there was a case where there was nothing in the record to support undue hardship, then there was nothing in the record to support undue hardship and you focused on other inquiries.

Q. Did any agencies in the -- either in the individual files or outside of those files, the appeal files, state that individual plaintiffs or employees -- I'm sorry, not the individual plaintiffs, I can't inquire about that.

Did any employees state that their employees posed a direct threat to others if

E. EICHENHOLTZ

they remained employed?

A. Yes, there were employees who asserted specifically a direct threat, and then there was, you know, the health commissioner's order that said that given the nature of the public health emergency, that only vaccinated individuals, with the exception of those who demonstrated that they were entitled to a reasonable accommodation to be without vaccination, should be present at City work sites.

MR. HAIDER: Mr. Nelson, I'd just ask to take another ten-minute break.

MR. NELSON: Okay. We'll come back in ten minutes.

THE VIDEOGRAPHER: Going off record. The time is 4:17.

(Recess was taken.)

THE VIDEOGRAPHER: We're now back on. The time is 4:30.

MR. NELSON: Thank you. Gentlemen and ladies, toward the end of the deposition I'm going to be surrendering the mic to my co-counsel, Sujata Gibson,

E. EICHENHOLTZ

who has some very specific kinds of questions, lines of questions, not very long that she's going to be asking. And I just wanted to let you know in advance so it's not some sort of a surprise. But, you know, we're definitely going to get this done within the seven hours that we're allowed for the deposition, so no need to worry about that.

BY MR. NELSON:

Q. So my first question, I want to just follow up on, and who knows, maybe -- well, I want to follow up on a line of questioning I was asking before.

Are the panelists, like, provided with one or more objective criteria which would determine whether an exemption request ought to be granted or denied by itself?

A. No.

Q. There's none, okay.

Now, how many agencies made a claim that granting a religious accommodation would cause a direct threat to anyone?

A. Correction is the only one that

E. EICHENHOLTZ

stands out as we sit here today.

Q. Did they make that in 100 percent of their cases or something less?

A. I'm not sure.

Q. I'm sorry?

A. I'm not sure.

Q. Oh, you're not sure. Thanks.

A. Yeah.

Q. All right. I didn't hear the --

A. Sorry, yeah I'll get a little closer, yeah.

Q. And was it in most of the files that they sent you or less than half?

A. I can't remember. It was in many of the ones that I reviewed.

Q. And what about the other agencies? Did any of the others raise the claim of a direct threat?

A. Not -- again, I can't recall an example with another agency.

Q. Did the Citywide Appeals Panel deny any appeals on the basis that the appellant would have caused a direct threat?

A. Can the caveat that I, you know,

E. EICHENHOLTZ

that maybe that I'm either not aware of or haven't seen, I cannot think of a single example that was denied on -- of a reasonable accommodation request that was denied on direct threat and affirmed solely on the issue of direct threat.

Q. So there may have been some that would have been affirmed partially on the basis of direct threat?

A. Again, at least that I've seen, I haven't seen where someone's focused -- a panel member has focused on the direct threat issue in their notes about their affirmance.

Q. So insofar as you know, the direct threat issue was not a basis for any affirmances from any department?

A. As far as I'm aware, yes. But there may be, and they would be, you know, indicated in the particular case.

Q. And what, if you recall, was the basis for the Department of Corrections claim that direct threats existed from the granting of religious accommodation to employees?

A. I don't recall offhand, I don't

E. EICHENHOLTZ

recall offhand.

Q. Okay. Do you recall whether there was any objective or scientific, you know, analysis that was provided in support of the Corrections Department's assertion that a direct threat existed?

A. As I said, I don't remember precisely what the explanation was.

Q. Okay. Thank you.

So one presumes -- and again, this is not a question, but a preface to a question. One presumes that the City is concerned that unvaccinated people may get COVID-19 and spread it. So that's the predicate, that's the assumption that I'm stating, and I have a question: Can vaccinated people get COVID-19?

DI MR. HAIDER: Well, objection. I'm going to instruct the witness not to answer.

He's here to be -- you know, questions that should be directed at a medical professional or someone similar. Again, subject to Citywide Panel's process

E. EICHENHOLTZ

in reviewing beyond the standards of the Citywide Panel. So I'm going instruct the witness to not answer that question.

Q. So in considering undue hardship requests, has the Citywide Appeals Panel or any of its individual panels considered whether it makes any difference to the spreading of COVID-19 whether an employee is vaccinated or unvaccinated?

MR. HAIDER: Objection.

You can answer.

A. Yeah, as I said, I don't remember the particular rationale. You know, obviously I'm aware of the various rationales of the vaccine and their effectiveness and it might play a role in depending on the agency's explanation. But to say here it played a role in this way or this way, I can't say.

Q. So is there a finding on the part of the panel or any individual panels that it makes a difference whether unvaccinated people spread COVID-19 in any greater extent than vaccinated people do?

A. The purpose of --

E. EICHENHOLTZ

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. The purpose of the panel is not to gather facts and make a determination in the first instance. It's to review the record presented to it on appeal that has follow-up inquiry in any particular case, to engage in follow-up inquiry to make sure that it has all the facts it needs to decide an appeal.

Q. But isn't it true that on occasion, in cases where applicants present discussions of their own religious beliefs and other bases for their religious accommodation, that the Citywide Appeals Panel considers whether the basis is valid or true or accurate?

A. Yes, and also whether -- I mean, I wouldn't say that -- you see, that's -- you're -- sort of there are two things that are getting mixed up, and we kind of got mixed up on this before. There's a difference between validity of a religious belief, whether a religious belief has a conflict with the COVID-19 vaccine mandate, the factual issue as to whether, we talked about this

E. EICHENHOLTZ

before, whether the refusal to vaccinate or the desire not to vaccinate comes from a religious source or a secular source or a political source. Those are all three separate issues that may come into play in any given case.

Q. Okay. Well, when considering those issues, those questions of, for example, accuracy and that sort of thing, why do you not also consider the question of the accuracy of whether there is a difference -- whether it makes a difference to exclude unvaccinated people from employment?

MR. HAIDER: Objection.

You can answer.

A. So there are factual findings that -- you know, there's a factual basis for the mandate that is basically that there is a necessary public health benefit to employees engaging in the actions contained in the health commissioner's order that has been challenged and upheld, and so we are reviewing these requests in that context. Reasonable accommodations are not a vehicle to challenge

E. EICHENHOLTZ

the underlying health order. It is a vehicle to -- for legal -- on specific legal bases to request expectations in that order. One of those bases is not personal, factual disagreement with the findings of the health commissioner.

Q. So do any Citywide Panel conduct an independent undue hardship analysis in considering whether or not a sincere religious accommodation might be accommodated offsite or remotely?

MR. HAIDER: Objection.

A. The Citywide Appeal Panel is doing appellate-type work. They do not in the first instance gather fact. We may have factual inquiries that we direct off into the agency or the employee, as appropriate, and ask them to provide the facts to us that we need to make our determination. We are making our determination based on the record developed on appeal.

Q. Isn't there a contradiction between saying you are making your determination on the -- based on the record that was developed

E. EICHENHOLTZ

on appeal, that is to say, the record that comes to you from the agency on the one hand, and then to say that, you know, if there are questions that you think require additional information, you go out and ask the agency for them, or you ask the applicant for it? Aren't those two statements in contradiction?

A. No.

Q. How can that be?

A. Because they're not.

Q. Well, all right. Either you're deciding it on the basis of -- well, withdrawn.

So the materials that you solicit from the agencies, those are not materials that are contained in the record on appeal; is that correct? The record that --

A. They are -- they are part of the record when we make our determination on the appeal, yes.

Q. But they are not part of the record that was sent to you by the agency at the start of the appeal?

A. Right, because we've made a

E. EICHENHOLTZ

determination that we want to remand for
further development of the record and we have
done so.

Q. Okay. So the additional information
is always done on remand?

A. Well, again, functionally, yes,
that's how this works. We make an inquiry of
the agency, either on rare occasion directly
to the employee, but generally, the agency to
either provide us an explanation or get
information from the employee, to review it,
and to submit it to augment the record.

Q. You just used the word "remand."
Are you saying that you are giving the case
back for a fresh consideration for its own
decision to the City agency, or are you saying
something else?

A. We are sending it back, and when
information is provided, there are occasions
where the agency will advise the panel that
when it obtained the information, it
determined that the reasonable accommodation,
in fact, should be granted, and at that point,
we close our appeal administratively because

E. EICHENHOLTZ

we do not review appeals of grants of reasonable accommodations.

Q. How often has that been done, how many times?

A. I couldn't give you a number. I would certainly -- yeah, I couldn't give you a number.

Q. And do -- withdrawn.

Is there any written communication or document that sets forth, like, the terms of the remand, including that the agency may reconsider its decision before sending it back to you?

A. No, no. Usually what happens is there is a communication agency, the panel is interested in this information in any particular case, and the agency will provide our response -- its response to the panel, and we'll proceed from there.

RQ MR. NELSON: So we're going to want to see procedure, in connection with our procedural request for information on copies of such communications made to each agency that received at least one of those

E. EICHENHOLTZ

things that you call a "remand."

MR. HAIDER: We'd just ask that you follow up in writing.

MR. NELSON: Okay.

Q. Now, when you informed the agency that you are doing this thing that you call a "remand," do you provide any similar notice to the applicant?

A. So again, we are an appeals panel.

Q. Yes.

A. The entity that is doing the interaction with the applicant is the agency; not the appeals panel. There have been circumstances, they're rare, that we will directly communicate with the applicant for a variety of reasons, you know, exceptional reasons is what I'll call it. But generally, the interaction is because that is their function, through the agency and its EEO office. Our function is to review these matters on appeal.

Q. So does the applicant even have any knowledge, typically, that the matter has been remanded to the agency for further development

E. EICHENHOLTZ

of the record?

A. It would have to because the agency EEO officer or someone in the agency is reaching out to the employees and requesting information, and sometimes they may say, the City Appeal Panel wanted us to ask or wants to know, sometimes they say, we need to know this. But the employee is notified that the information is needed in considering with their RA request.

Q. So you never remand a case unless the information you want is coming from the applicant?

A. No. As I said, we've had ones where we've made inquiries to both the applicant and the agency, but it is very -- you know, it's rare that we would have specific follow up for the agency because it's generally outside of the context of something like undue hardship, you know. We really need to understand the nature of the request from the applicant; not the agency.

Q. Are there times when you are requesting information from the agency; not

E. EICHENHOLTZ

from the applicant? Have there been such instances?

A. Exclusively the agency? I can't recall any, offhand.

Q. Were individual panels that were confronted with undue hardship claims from the agency involved in an appeal, were those panels expected to attempt to verify that the hardship claimed by the agency existed?

A. No, they were expected to review the explanation of the agency and look at the facts in the record and assess whether the agency had established an undue hardship.

Q. So what level of evidence was the agency required to provide to the appeals panel to meet that standard?

A. The agency was required to articulate what about its needs and operations was causing an undue hardship.

Q. Were they able to provide any evidence that that was true?

A. I don't -- certainly if there was inconsistencies in the agency's statement that required further inquiry or suggested that it

E. EICHENHOLTZ

was untrue, we would have followed up. You know, and certainly in circumstances where the description doesn't seem to match the nature of the job the employee's doing, there may have been some follow up in those cases, as well. But no, they're not required -- no one in this process is required to -- you know, it's put to a burden of evidentiary proof. You know, it's all about assertions and, you know, information that is generated as part of the cooperative dialogue.

Q. But it seems to me it isn't true that no one is required to provide evidentiary proof because there very clearly is a burden on the applicant to provide evidence to support their claim that they have a religious objection. Why is -- I mean, you would agree with that statement, wouldn't you?

A. No, I would not agree with that statement.

Q. Okay. The religious applicant is not required to provide any evidence?

A. That's -- I mean, not in a -- in a -- you know, in an evidentiary backup,

E. EICHENHOLTZ

burden of proof way. The requirement is that the employee articulate their religious belief and explain what the belief is, the source of the belief, and the conflict between the belief and the vaccine requirement. It could simply be the employee saying so.

Q. But isn't it a fact that normally, in such a case, the employee is also required to respond to specific questions that are addressed to the employee, and if the response is not sufficient, then there's a denial of the application?

DI MR. HAIDER: Objection. Again, this is outside the scope.

We're now talking about what an agency is supposed to do rather than what the Citywide Panel does in reviewing the appeal through the agency and where the standards apply.

So I would instruct the witness not to answer.

MR. NELSON: That's actually not true though because what I'm dealing with here is the inconsistent standards that

E. EICHENHOLTZ

the appeals panel has with respect to evidentiary requirements. They require evidence of the applicant for an exemption, but they require no evidence of undue burden, if it's asserted by the agency.

MR. HAIDER: Well, I think it was phrased in a different way. You can go ahead and ask it, if it's phrased with respect to the Citywide --

THE WITNESS: Well, I -- yeah, sorry. Okay.

MR. HAIDER: Can you phrase the question?

BY MR. NELSON:

Q. Isn't it a fact that you do not require evidence from the agencies with respect to any claims that they make of undue hardship?

A. No. Like I said, there's no evidentiary requirement of any participants in cooperative dialogue here. There are many cases where it will simply be the employee explaining their needs and the basis for their

E. EICHENHOLTZ

accomodation and the agency explaining their needs.

Q. Again, I'm trying to eliminate questions that we've written, so I'm saving us time by being quiet for a moment.

A. I understand. Thank you.

Q. Were panelists instructed to assume that any or all of the agencies that had denied religious accommodation requests had a compelling interest of any kind?

A. I don't understand -- I'm not familiar with the term "compelling interest" in this context.

Q. Are you aware that the term "compelling interest" is used in the context of the application of the United States Constitution's First Amendment to situations of religious discrimination?

MR. HAIDER: Objection.

THE WITNESS: Yeah.

DI MR. HAIDER: I'm going to -- you're calling for a legal response to a question about, you know, First Amendment, which has not been testified as a standard

E. EICHENHOLTZ

that's applicable here.

So I'm going instruct the witness not to answer.

Q. So did the individual panelists have any instructions with respect to whether or not to consider alternative accommodation possibilities?

A. If the record -- well, I can't recall if there are -- other than the guidance that they were provided, that they reviewed, I can't recall any specific discussions on alternative accommodation possibilities at the panel level.

Again, you know, I want to be extra clear as often as I can that we are really talking about half, and I don't even want to say "half," but the final phase of the reasonable accommodation process, the post-determination phase of the reasonable accommodation process. So what may have been appropriate at other phases, you know, we're not really, you know, here to discuss. But, you know, in terms of the panel, we did not get records where the cooperative dialogue

E. EICHENHOLTZ

really went too deeply into that issue.

Q. So the, as you stated, the Citywide Panel was governed not only by Title VII, but also by the New York State and New York City Human Rights Laws. To what extent did the panel actually implement the requirements of the New York State and New York City Human Rights Laws?

A. It wasn't charged with implementing those laws, it was charged with applying the standards necessary to review an appeal of the denial of a reasonable accommodation under the framework of federal, state, and city law.

Q. And that would have included the New York State and City Human Rights Laws, correct?

A. As I just said, federal, state, and city law.

Q. Right, okay. So what is the standard for -- what do you understand the -- sorry, I'm sorry.

You stated previously that in consideration whether or not an undue hardship existed for the agency to grant a religious

E. EICHENHOLTZ

accommodation, that the City or the agency was required to show more than a de minimus cost or burden on their operations from the granting of such an accomodation. Do you recall that testimony?

A. That's correct.

Q. How much more?

MR. HAIDER: Objection.

A. Again, this is actual inquiry that we review in every case. We have to see sufficient level of disruption to agency operations and justification for why the reasonable accommodation would present an undue burden to the particular agency, when we're considering undue burden.

Q. So the standards that the -- I'm sorry.

Were express instructions ever given to the members of the individual panels with respect to the exact standards that they were to apply with respect to determining if there's an undue burden?

MR. HAIDER: Objection.

A. With respect to the COVID-19 vaccine

E. EICHENHOLTZ

requirement and health emergency, the panel was directed to the EEOC Guidance, and as I said earlier, my understanding was, given the nature, the emergent nature of the pandemic, the City Commission of Human Rights, which is the agency charged with enforcing the human rights law, adopted that guidance, so we felt that that was the guidance that those agencies that are, unlike the Citywide Panel, charged with implementing those laws were directing us to.

Q. Did the Citywide Panel routinely request from agencies that were having an undue hardship from granting an accommodation, did they routinely request from those agencies information about the identifiable cost of the accommodation request, and including the costs of loss of productivity and of retaining or hiring employees or transferring employees from one facility to another in relation to the size and operating cost of the employer?

MR. HAIDER: Objection.

A. So again, as I've said, the agencies provided the justification for asserting undue

E. EICHENHOLTZ

hardship, which was factually reviewed in every case in which it was asserted by the panel members, and a determination rendered as to whether or not they had established an undue hardship under the standards set forth in the guidance.

Q. Did the Citywide Appeal Panel specifically examine whether or not the information that I identified in my last question had been provided by the agency employers?

MR. HAIDER: Objection.

A. So again, you know, I'll try and explain this as best I can, that that is the agency's, you know -- the agency is doing that when they are assessing the employee's request for reasonable accommodation. On appeal, we review the material that was provided to us by the employee and the agency and make a determination on appeal whether the accommodation was denied, properly denied, or should have been granted based on the facts and circumstances presented to us by the agency and by the employee.

E. EICHENHOLTZ

Q. Does the civil -- oh, I'm sorry.

Does the Citywide Appeals Panel routinely examine whether or not the materials provided by the agency employer in connection with the file from their denial of the religious accommodation includes information concerning the identifiable cost of the accommodation, including the costs of loss of productivity and of retaining and hiring employees or transferring employees from one facility to another in relation to the size and operating cost of the employer?

MR. HAIDER: Objection.

A. Again, the various factors, costs, etcetera, pertinent to a reasonable accommodation is made during the cooperative dialogue and the review of the employee's request by the agency, the Citywide Panel receives the information provided by the employee and by the agency, reviews that information and makes a determination as to whether the reasonable accommodation was properly denied, or if it was not, whether the reasonable accommodation should be granted.

E. EICHENHOLTZ

Q. And so, in effect, your answer to my last question is no?

A. No, that is not accurate.

Q. So, again, I will ask a question that is designed to produce the same information that I did not receive in response to the last several questions.

Does the Citywide Appeals Panel routinely examine whether or not the record on appeal provided by the agency that claims undue hardship has included information about "the identifiable cost of the accommodation," and this is statutory language I'm reading, "including the costs of loss of productivity and of retaining or hiring employees or transferring employees from one facility to another, in relation to the size and operating costs of the employer"?

A. So again, the way the reasonable accommodation process works is those facts are reviewed by the agency, they engage in a cooperative dialogue with the employee, and they make a determination. The information the employee provided and the explanation of

E. EICHENHOLTZ

the agency is submitted to the Citywide Appeal Panel, and the Citywide Appeal Panel will decide on appeal whether the agency's determination to deny the reasonable accommodation was appropriate, and if it wasn't appropriate, whether it's appropriate to grant the reasonable accommodation.

Q. So in reviewing a decision to deny a reasonable accommodation on the basis of undue hardship, is it the case that the Citywide Appeals Panel does not consider it dispositive, whether or not the record on appeal contains information provided by the agency employer about "the identifiable cost of the accomodation, including the costs of loss of productivity, and retaining or hiring employees or transferring employees from one facility to another, in relation to the size and operating cost of the employer"?

A. There does not need to be -- the employer is providing us the explanation for why they believe they have an undue hardship. In making those determinations, they consider the factors they necessarily need to consider

E. EICHENHOLTZ

for their operations, and that either is or is not reflected factually in their summary and their explanation that they provide us, and we can take that into consideration as needed when making our determination on appeal.

Q. So are you aware that the language that I've repeatedly cited here is contained in the New York State and New York City Human Rights Laws in context of whether or not an undue burden has been sufficiently demonstrated?

A. I'm well aware of that, yes.

Q. Okay. Then why does the Citywide Appeals Panel not bother to consider whether or not that criteria has been met in a claim of undue burden by the agencies?

A. Your --

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. Your characterization is incorrect, and I'm not going to engage in argument. This is legal argument, and I'm not going to entertain it. If you have a factual question, I'd be happy to answer a factual question.

E. EICHENHOLTZ

Q. Does the Citywide Appeals Panel consider to be dispositive in adjudicating appeals from agency employers based on undue hardship, whether that file contains information about the number of individuals who will need the particular accommodation to a sincerely-held religious observance or practice that is involved in that appeal?

A. Do we consider that dispositive? We consider the explanation the agency provides as to why there's an undue burden. That is what we consider, and we look at the facts that are generated by that and our understanding of those facts in connection with what the employee is claiming the facts provided by the employee, and the panel will make an appellate determination from that point forward.

Q. So same question about whether or not the appeal file contains information from the agency employer for an employer with multiple facilities about the degree to which the geographic separateness or administrative or fiscal relationship of the facilities will

E. EICHENHOLTZ

make the accommodation more difficult or expensive.

A. I know of no legal requirement that requires at the appellate phase of a review that that sort of assessment be provided at that level of detail. What we are getting on appellate review from both the employee and the employer is an explanation as to why an RA is appropriate, an explanation as to why the RA may have been denied on reasons, including, but not limited to, undue hardship, and we assess that. There is no requirement, statutory or otherwise, that the employer, that the agency, that the City -- the City's internal appeal process specifically provide that sort of data. What they need to do is explain their justification for undue burden.

Q. So I'm going to ask about some factors that are listed in the New York City Human Rights Law concerning how an undue hardship is to be explained by an employer, and ask you whether or not this list of factors is expressly considered by the Citywide Appeals Panel in making its

determinations on undue hardship cases where the accommodation has been denied on the basis of undue hardship.

So that list is as follows: Nature and cost of the accomodation; the overall financial resources of the facility or the facilities involved in the provision of the reasonable accommodation; the number of persons employed in such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of a facility; the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number type and location of its facilities; and the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness; administrative or fiscal relationship of the facility or facilities in connection to the covered entity.

A. So we would of course review any

E. EICHENHOLTZ

requests for an undue hardship asserted by the agency with an understanding that those are some of the factors that the agency is -- should be looking at when making its determination that a particular accomodation requires an undue hardship.

Q. Does the Citywide Panel require evidence that the agency employer has, in fact, provided information or obtained information or relied upon information of this kind?

A. Again, we are -- the panel does not -- the panel reviews the assertions of the parties from the cooperative -- not "parties." The employer and the employee in a cooperative dialogue determine whether the reasonable accommodation is granted or should be denied, outside of -- there's some requirement obviously for documentation in the medical context. There was no specific evidentiary rule or showing that is required on an appeal of the employer or of the employee. That is not how the appeal process works. The appeal process is reviewing the record and the

E. EICHENHOLTZ

assertions of the employer and the employee of why the accomodation is necessary and why it was denied in determining whether or not the accomodation was properly denied and whether the accomodation should be granted based on the facts presented to the panel in that record. And if we need more information, if there is a particular aspect of the explanation that we might need information about one of those particular elements that one might need to consider, we can certainly make inquiry of the agency and have done so.

Q. But the Citywide Appeals Panel is basically not required to determine whether or not the agency employer has complied with the New York State Human Rights Law or the New York City Human Rights Law. Is that a fair --

A. Yeah, and to do this, to engage in this kind of back and forth, you know, I think we need -- you know, and it's not my role here to have a legal discussion with you about what the law requires, what the law requires someone to show at certain stages of the process, and so I'm not going to dig into

E. EICHENHOLTZ

that. I've explained what the panel looks for, I've explained how we go about looking for it. I don't think there's more factual information I can provide, other than what I've already provided.

Q. So when assessing whether or not it would be an undue hardship to accommodate the Department of Education employees, does the Citywide Panel consider the fact that there are only 30 accommodated Department of Education employees working remotely at the department's workspace in Brooklyn at 1087 Ocean Avenue and that it can accommodate 312 employees?

MR. HAIDER: Objection.

A. To the extent that that fact would be relevant to a determination in any individual case, we would consider that.

Q. Has the panel ever considered that evidence?

MR. HAIDER: Objection.

A. Again, I think right -- you know, I can't answer that without really discussing the facts and circumstances of an individual

E. EICHENHOLTZ

case. I certainly would not say that it is a dispositive factor on the issue of undue hardship, that there may be seats available in any given facility or desks available or what have you. It would not necessarily be a dispositive factor.

Q. When assessing whether or not it would be an undue hardship to accommodate City employees, did the Citywide Panel ever consider whether it would constitute an undue hardship on the employing agencies to modify their termination descriptions so that they might be eligible to collect unemployment insurance?

MR. HAIDER: Objection.

A. I don't know if that came up in any cooperative dialogue. I can't say here for certain.

MR. NELSON: All right. We have some other questions that are going to be posed by Sujata Gibson, but we need to take a short break before that begins. This is -- you know, we have -- I guess we have -- I'm not sure exactly how much more

E. EICHENHOLTZ

time we have.

But where are we on the time spent so far? I'm asking the videographer.

THE VIDEOGRAPHER: You have 29 minutes left.

MR. NELSON: Thank you.

So let's take a short break, another ten minutes, please, and we'll -- sorry, go ahead.

THE VIDEOGRAPHER: We're now going off record. The time is 5:16.

(Recess was taken.)

THE VIDEOGRAPHER: We're now back on. The time is 5:27.

EXAMINATION BY

MS. GIBSON:

Q. Mr. Eichenholtz, I wanted to follow up on some of your direct threat comments. The first was, you stated that you don't want to second guess the commissioner's mandate. Where did the mandates say that unvaccinated employees with religious and medical exemptions cannot be accommodated without posing a direct threat to others?

E. EICHENHOLTZ

A. It doesn't. To the contrary, it specifically contemplates that those who have religious and medical exemptions to the -- to the vaccination requirement can be at the workplace, I believe with certain conditions, obviously.

Q. Thank you.

And you also said that Corrections was the only department, that you're aware of, agency, that did provide any kind of analysis on direct threat. Isn't it true that they provided no scientific support with that?

A. Again, as I said earlier, I don't remember the precise explanation that the Department of Correction provided regarding direct threat.

Q. But is it fair to say that other than their conclusory statements, they didn't provide any citations to science or anything evidentiary to support their assertion that there could be a direct threat based on vaccination status?

A. Ms. Gibson, I can't give you a characterization when I don't remember

precisely what it says.

Q. Okay. I was looking through the discovery materials, and the FDNY didn't provide any direct threat analysis, but said there could be a potential for a direct threat. Would you consider that as persuasive evidence to uphold an undue hardship determination?

A. As I --

DI MR. HAIDER: Objection.

You know, Ms. Gibson, I know you're referencing discovery materials particular to one of the plaintiffs, which is, you know, not permitted in this deposition.

Even though it's posed as a hypothetical question, I'm going direct the witness to not answer that question.

MS. GIBSON: Well, I'm not going to accept that. The FDNY put a policy statement out for all FDNY employees about the potential for undue hardship, and I'm not going to accept in a deposition not answering a question, so we reserve the right to bring this back up with the

E. EICHENHOLTZ

Court.

Q. I would ask again: If the FDNY put out a potential, as they did, potential undue hardship without any individualized review of an individual person and why they would pose a direct threat, would you uphold that as an undue hardship determination?

MR. HAIDER: Objection.

You can answer.

A. Yeah, I know of no circumstances where the Citywide Panel was provided an explanation of direct threat without other information that allowed for some individualized understanding of the particular employee, such as job title, job location, and the like, elsewhere in the record.

Q. Did the Citywide Panel ever uphold undue hardship determinations for anyone else than DOE employees?

A. Yes.

Q. And you say that none of these agencies, other than Department of Corrections, ever provided any information about direct threats?

E. EICHENHOLTZ

A. Not that I recall, no.
Q. So how could you have an undue hardship determination based on fear of COVID spread without a direct threat analysis?
A. I'm not aware of an undue hardship determination based on fear of COVID spread, as you've characterized that. Yeah, I --
Q. Well, the basic premise --
A. I can't answer that question, yeah.
Q. You said that the mandates do not say that these employees cannot be reasonably accommodated, correct?
A. Yes, if they're entitled to accommodation under the parameters set forth in the law, yeah.
Q. Okay. Thank you.
But so how, then, would it be an undue hardship to accommodate any of these employees if they were not a direct threat to others?
A. Because the nature of the -- the mandate and the nature of their job is such that they cannot be taken offline -- I mean, I'm not quite sure with this -- how you're

E. EICHENHOLTZ

saying it's -- you know, the -- there are individuals and agencies that require physical presence in the workplace, and there is -- and there are people who work with vulnerable populations and things like that, and that would obviously be relevant to a direct threat analysis. It's also relevant to an undue hardship analysis in appropriate circumstances. That doesn't mean that one needs to prove the other. You know, I understand that may be your legal position. I'm not sure we see eye to eye on the law there.

Q. I'm trying to understand your position. So my -- I guess let me dial this back.

Does anything in these mandates, specific mandates covering these plaintiffs, does anything in these mandates state, if accommodated for religious or medical concerns, these employees cannot be physically present at the workplace, as a blanket rule?

A. If accommodated? If an accommodation is granted, they can be

E. EICHENHOLTZ

physically present subject to certain conditions that I don't want to misstate because I don't have the order in front of me --

Q. Okay. But just to clarify, the mandate does not say they cannot be accommodated by allowing them to remain at work with sincere religious objections, correct?

A. Correct. It says --

Q. Okay.

A. -- that --

Q. So unless they were a direct threat to others, there's no reason why, if they were found to have sincere religions objections, they couldn't continue at their job, correct?

A. No, because their requested accommodation may pose an undue hardship.

Q. Only if they're a direct threat, though, right?

A. No, that's not correct. I understand that is your legal position, I think --

Q. Well, why else?

E. EICHENHOLTZ

A. -- that is a legal argument, and I'm not here, respectfully, to argue the law. I'm here to provide you facts about the Citywide Appeal Panel and its processes.

Q. And the Citywide Appeal Panel granted multiple undue hardship claims, correct?

A. That's correct.

Q. So I'm asking you: If it's not based on a direct threat analysis, what possible reason could there be if somebody is not a direct threat, what possible reason could there be for undue hardship?

A. Because granting the reasonable accommodation in the context of that employer, employer, they're based on the functions and the operations, will cause a significant enough disruption that it constitutes an undue hardship under the law.

Q. How, if they're not a direct threat, would that be true?

A. Because the granting enough accommodations can impair the function of an agency, granting particular accommodations in

E. EICHENHOLTZ

particular functions can impair the agencies, and there may be some, as I said to you, Ms. Gibson, I'll say it again, there may be some facts that go into the undue hardship analysis that are similar to those that we might think of in the direct threat analysis. But that doesn't mean that the direct threat is a prerequisite to undue hardship. Again, that is a legal argument you are making, and I'm not here to debate the law.

Q. Mr. Eichenholtz, I'm asking for your explanation of how anybody -- how it would be an undue hardship. If they are not a direct threat and they can be accommodated in their current job physically present, how is that an undue hardship absent a direct threat analysis?

A. Because the agency articulates that granting that accomodation, either alone or in a certain amount, will impair the agency's operations, and there could be a way that having unvaccinated personnel poses a certain amount of risk. This is a slightly different issue, we're looking at a different area of

E. EICHENHOLTZ

the law here when we're talking about undue hardship, that might also factor in to the potential disruption to the agency's operations, if that accomodation is granted, so --

Q. What kind of threat would not be part of a direct threat analysis?

MR. HAIDER: Objection.

A. Again, the fact -- I keep saying this, and I understand it's your legal argument, and once again I --

Q. Please stick to the question I'm asking you. I'm just asking you: What type of threat would not be part of a direct threat analysis?

A. What type of --

Q. What type of risk?

A. Okay. Obviously risk is a very important part of direct threat analysis --

Q. Yes. What type is not -- if you're saying direct threat is irrelevant, I'm -- you cannot be a direct threat, but you can still pose an undue hardship because of the risk you pose. Why -- what possible type of risk would

E. EICHENHOLTZ

not be part of that direct threat analysis?
A. That's not what I said, Ms. Gibson.
Q. Okay. I'm going move on.
So have you relied on any documents at all, any science, anything, any evidence at all to establish that the risk that these employees posed because of their vaccination status is substantial?
MR. HAIDER: Objection.
You can answer.
A. Risk because of their vaccination status is substantial?
Q. Yes.
A. Again, this is sort of completely divorced from any context, and you're talking about me personally --
Q. Could you -- I would direct you to just answer the question: Is there any evidence at all that you relied on, let's start with -- actually I'm going to rephrase -- no, I'm going to stick with the original question.
A. Okay.
Q. Any evidence at all that you relied

E. EICHENHOLTZ

on to determine that unvaccinated employees with sincere religious beliefs pose a substantial risk to others based on their vaccination status?

MR. HAIDER: Objection just to the form as to what he relied on or as to the panel relied on.

MS. GIBSON: Well, that's a good distinction, and I do want to clarify. And I would ask, Mr. Haider, to continue to clarify the reasons for your objections if you can so that I have a chance to respond.

Q. So both. Did you rely on any evidence, and to your knowledge, did the panel rely on any actual evidence to establish that unvaccinated employees could pose a higher risk to others based on their vaccination status?

A. So as I said earlier, in the appeals that I've reviewed, I've never affirmed an appeal on the basis of direct threat. I have affirmed on the basis of undue hardship.

Q. I think as yes or a no would be

E. EICHENHOLTZ

great. Have you ever relied on any evidence for that determination?

A. What's "that determination"? That's where I'm confused, Ms. Gibson. I'm not trying to be difficult. I'm just trying to understand what you want to know from me.

Q. Okay. Have you ever assessed the duration of the risk that an individual might pose to others using evidence?

A. In my lifetime?

Q. In these panel proceedings, have you or the panel ever looked at the duration of the risk an individual might pose based on their vaccination status?

A. So, and I think I explained this earlier, this is done in a context that includes a public health emergency order that has a factual predicate, and so we work off of that factual predicate and --

Q. Did you rely on any evidence to make the determination on the duration of the risk that an individual might pose for an undue hardship analysis?

A. Again, I will repeat again, I have

E. EICHENHOLTZ

not affirmed denials of reasonable accommodations on the grounds -- specifically the grounds that they present -- oh, I'm sorry, undue hardship. On the grounds -- you know, on the direct -- on the undue hardship grounds, I have looked at the potential disruption to agency operations if the reasonable accommodations were granted, and there could be a multitude of reasons for those.

Q. Were any -- again, you haven't answered my question. Did you rely on any evidence for those determinations?

A. We've had this conversation with --

Q. For your undue hardship determinations, did you rely on any evidence?

A. My function in the panel is not to gather --

Q. I would ask that you say yes or no.

A. -- evidence.

I'm trying to explain to you why I can't answer it yes or no. So it is -- it is challenging because you're using terms like "you," which I can't even tell whether you're

E. EICHENHOLTZ

asking me personally, you're asking the panel, you're asking the whole reasonable accommodation process. You know, we're here to discuss what the Citywide Panel does, and you're asking me what I would do without really an explanation as to -- I'm trying to explain to you why this is so confusing to me.

Q. You trained the panel, correct?

MR. HAIDER: Objection.

A. No.

Q. Who trained the panel?

A. I mean, I -- as I said, the panel was given, you know, the guidance and things like that, and we've had group discussions and there's, you know, the City Commissioner's on the panel. So we do it collaboratively.

Q. Okay. But you wrote the FAQ?

MR. HAIDER: Objection.

A. No.

Q. You participated in writing the FAQ?

A. Yeah, I reviewed it. I reviewed the draft.

Q. With how many other people?

A. As I said earlier, I cannot tell you

E. EICHENHOLTZ

the specific people, but the agencies would have been the Department of Citywide Administrative Services, as well as the City Commission on -- I mean, I'm sorry, not "City Commission"; the Office of Labor Relations. Sorry, it's getting late.

Q. And people came to you for advice on how to handle -- what the standards were and the criteria that they were supposed to employ, correct?

MR. HAIDER: Objection.

A. No, that's not correct.

Q. So those emails to you were random?

A. No. That -- they were -- so that was -- Ms. Gibson, I'm really lost. So generally, I was not -- the guidance we were given comes from the EEOC policy. That was a request from a City panel to explain what was going on. I was not the source of the guidance, you know, as --

Q. Why --

A. I would talk with panel members and the panel would talk directly about the issues we were dealing with.

E. EICHENHOLTZ

Q. So just to clarify, neither you nor the City Panel, to your knowledge, was given any evidence, beyond conclusory statements, to support undue hardship or direct threat analysis?

MR. HAIDER: Objection.

A. I -- no, I wouldn't agree with that characterization.

Q. Okay. So what evidence were you given to support a direct threat or an undue hardship determination?

A. I can't answer that question in that generalization. I've tried to explain the framework and the context in which we've decided these cases.

Q. Mr. Eichenholtz, there are either documents or there are not. What I'm trying to determine is whether we need to make a request for these documents or not.

Did you or the Citywide Panel, to your knowledge, rely on any documents, evidence or documents, to support your undue hardship determination?

A. Yes.

E. EICHENHOLTZ

Q. What were they?

A. The documents provided in the appeal files for the agencies, the EEOC Guidance with respect to undue hardship, and direct threat to the extent panel members were considering direct threat.

Q. So any scientific studies?

A. The reason I hesitate to answer that question is because we are working from a public health order that was based on a scientific determination that was made by the Commissioner of Health who was lawfully able to find those determinations. It is not the function of the reasonable accommodation process or the Citywide Panel to question or to demand evidence to support why the City Health Commissioner was making a particular, you know, requirement or why the public health order was necessary.

Q. But these public health orders all said that reasonable accommodation -- nothing in the order should suggest that you shouldn't reasonably accommodate employees. So what from that did you take as saying you had to

E. EICHENHOLTZ

not reasonably accommodate those with sincere religious beliefs?

MR. HAIDER: Objection.

A. I've never taken the position that the City is not to accommodate sincere religious belief.

Q. And yet you're saying to me right now that you based your undue hardship determinations for those with sincere religious belief on the commissioner's order?

A. No, that's not what I'm saying. I'm saying, you -- that was -- no, that's not what I'm saying, no.

Q. So what are you saying about the relevance of the commissioner's order to an undue hardship determination?

A. I said the commissioner's order contextualizes the basis and the process for which we are proceeding, that there is a public health emergency, that vaccination of City employees is an important measure to address that public health emergency, is all within the context in which we're deciding this. So, for example, there was no need to

E. EICHENHOLTZ

review scientific studies to determine whether there was a public health emergency or to review scientific studies to determine whether by and large vaccination would be beneficial to address that emergency.

And at least that's how I'm understanding your questions now, which is, did you do those things. And that is my response, that we have a public health order that I think, you know, establishes that framework. But the specific undue hardship analysis was about impact of granting accommodations on agency operations. So the reason that fits within the legal framework of the health commissioner's order is because the health commissioner's order requires reasonable accommodations to the extent permitted by law, and law requires -- allows an agency to deny an accomodation on certain grounds with respect to undue hardship.

Q. Going back to the personal rather than religious distinction, a frequent reason, and I'm not speaking about any particular, you know, panels, but a frequent reason that came

E. EICHENHOLTZ

up in the notations on the spreadsheet was, "Appellant explains his or her understanding of her sincerely-held religious beliefs" -- oh, "Under appellant's," you know, "explanation of his understanding of sincerely-held religious belief, it is ultimately appellant's choice whether to take or abstain from food or medication."

So my understanding is you're saying they have a sincerely-held religious belief, but because they have a choice under their religious belief system, we're going to deny them; is that correct?

MR. HAIDER: Objection.

A. I -- yeah, I could not tell you for sure without understanding the facts and circumstances of --

Q. Well, this was regularly put in the notations on the spreadsheet, and I'm trying to understand what that means.

A. Well --

Q. So what would it mean for somebody to have a sincerely-held religious belief that allows for choice? Why would that be a basis

E. EICHENHOLTZ

for denial?

A. The record --

MR. HAIDER: Objection.

THE WITNESS: Sorry.

A. The record is important to understand what that might mean in any particular context. As I've explained many times now, those determinations are based on the balancing of a variety of factors, and I could not give you an answer without understanding the particular factors that may have been at play in any particular case because these determinations truly are individualized.

Q. So but help me understand this, because you said in your email response that these notations on the spreadsheet are largely shorthand for you, that they're not supposed to explain anything to anyone else, correct?

A. They're not shorthand for me, no. They're shorthand -- they're basically for the panel members to take notes.

Q. Right. But they're not meant as an -- they're not necessarily transparent for

E. EICHENHOLTZ

other people to understand what that means, right?

MR. HAIDER: Objection.

A. Yeah, I'm not sure I understand that question.

Q. They're for personal notes to remember the basis for an exemption, correct?

A. Yes, yes, that's correct.

Q. Okay. So what would that type of personal note indicate? And I'm going to back up for a moment and say that I've noticed that whenever someone has an objection based- personal prayer, direction from personal prayer, they get that notation. So what, in your mind, are the Citywide Panel's approach to these cases would say that that's not religious in nature somehow?

MR. HAIDER: Objection.

A. I could not tell you without seeing the factual circumstances in each case. I can tell you that there have been cases involving personal prayers that I voted to grant, and there are ones that I voted to deny. It depends on the factual circumstances of the

E. EICHENHOLTZ

records. It really -- it depends on what the employee is describing and the nature of their -- what the nature of their religious belief is, the factual application, the other facts that are present.

Q. Well, let's go back, then, a little bit higher level. You made a distinction between two kind of levels. One is a sincerity analysis, does this person have sincere religious beliefs. And the other, are there religious beliefs actually in conflict with the vaccine. You're nodding your head yes, so I think we're on the same page.

A. Yes, yes. I'm sorry, I didn't know if you were done with your question.

Q. It's fine, just for the record. I know it's been a long day.

But so in the latter category of these determinations that you say yes, they have a sincere religious belief, that's actually quite related to this kind of notation, but we don't think that that's actually holding them back from vaccination. How in cases where the applicant is saying,

E. EICHENHOLTZ

yes, that my sincere religious belief is what is holding me back from vaccination, how is it permissible for you to step into their shoes and say it's not?

MR. HAIDER: Objection.

A. Again, you would evaluate that on the basis of objective facts, right? It's not for me or any member of the panel to step into someone's shoes and say this is who they are, this is what they believe. It's looking at all of the relevant facts of the particular belief and making a determination as to whether the employee has established that they possess a belief that is in conflict with the vaccine mandate.

Q. So in these cases where employees say, I get my direction from prayer and god just tells me not to take these vaccines, how would that not be -- how would you say to that, how would you respond to that, yes, they have sincere religious beliefs, but these beliefs aren't holding them back from vaccination?

MR. HAIDER: Objection.

E. EICHENHOLTZ

A. So prayerful contemplation, while it has a religious element to it, is not necessarily establishing a religious belief that conflicts with the vaccine mandate. So, for example, if an employee were to say, I think this vaccine is dangerous, so after prayerful contemplation, I've chosen not to take it --

Q. What if they don't say that? What if they say, god told me not to take this vaccine?

A. If they say, god -- then again, we'd need to understand the facts and the circumstances. You know, we spent a great deal of time earlier in the deposition talking about how we might review those sorts of things factually. I won't recap it now, but there are a lot of different factual analyses and balancing that can go into play, you know, if someone were to make that sort of assertion that might compel a conclusion one way or the other.

Q. Okay. Just a few more short questions. So one question is about the DOE

E. EICHENHOLTZ

reviews.

You noted that the DOE reviews, the Citywide Panel did about 500 of them; is that about right?

A. I think it was closer to 550-plus, but yes, it was lower than 600, I know that.

Q. Okay. Lower than 600.

And is your understanding -- I'm going to tell you what I think the facts are from before that process just so we know where we are.

A. Yeah.

Q. The initial applications, the DOE denied every one under undue hardship. The arbitrators awards, some 165 were granted, and then 550 or so denials from the arbitration awards were sent to the Citywide Panel; is that correct?

A. Based on my -- all I can tell you is that roughly 550 to 600 were sent to the panel. I cannot tell you with certainty what category they were in and how they got there. And I was focused on, you know, the DOE was to file qualified candidates who needed to be

E. EICHENHOLTZ

reviewed by the panel, with the panel. And when they came in, we took a look at those --

Q. Okay. So you don't know whether or not everybody was denied initially at the DOE?

A. The ones that came to us certainly were, as I said, because we don't hear appeals of affirmances -- of grants, sorry.

Q. But you don't have any independent knowledge of whether every one was denied initially under undue hardship?

A. Yeah, I have no independent knowledge of that.

Q. Okay. So how many did you grant through the Citywide Appeals Panel for the DOE?

A. I don't have that number, offhand.

Q. Can you get that number?

A. DOE cases? Certainly, as I said before, we can obtain that information from our databases --

Q. Are you aware if any teachers were granted at the Citywide --

A. Yes, there were.

Q. Teachers; not administrators.

E. EICHENHOLTZ

A. My understand -- I mean, I could be wrong, but my understanding was at least one teacher, but I --

Q. So what would the difference be between a classroom teacher that is accepted and the rest that are told that they have sincere religious beliefs, but it would be an undue hardship to grant them accommodation?

MR. HAIDER: Ms. Gibson, our time is up I'll obviously allow Mr. Eichenholtz to answer this question.

A. Well, there could be teachers who have non-classroom functions, for example. But, you know, it depended on the particular circumstances, and there were cases, as I mentioned earlier, where the Department of Education did not present an explanation of undue hardship, and so we did not consider undue hardship in cases where it was not, you know, it was not presented as part of the record, or at least I didn't, but I don't think -- you know, so there were ones that were -- where undue hardship wasn't a factor.

MS. GIBSON: Mr. Haider, I just have

E. EICHENHOLTZ

one more very short line of questioning.
Can I ask it?

MR. HAIDER: I'll allow two questions.

MS. GIBSON: Okay. I just want to do the background of --

Q. You can just correct me if I'm wrong, because this is just background for the question.

A. Sure, sure.

Q. There was, and I'm sure you're aware of it, an arbitration proceeding between the DOE and Scheinman Arbitration that resulted in an arbitration award that the Second Circuit found unconstitutional or likely unconstitutional, setting forth various criteria, and there were also related arbitrations that resulted in similar awards for many other departments and union members.

My question is: Did you, before you took your current position in October 2021, did you participate in any of those arbitration proceedings resulting in those awards? I'm not talking about individual people's, you know, arbitrations. I'm talking

E. EICHENHOLTZ

about, you know, the agency wide or department
wide ones, the award from Scheinman saying
this is the arbitration.
A. No, with the sole exception of I may
have been -- as the process was going on and
the people who were engaged in such processes
were doing it may have had my legal opinion
solicited on various issues --
Q. And was that legal opinion ever
solicited for suggested criteria for
determining religious accommodations?
A. I cannot say due to attorney/client
privilege.
MR. NELSON: Well, that was two
questions, and Mr. Eichenholtz, you get
the last word. So we thank you both, all
of you, really, for participating in this,
and we look forward to seeing you again.
MR. HAIDER: I hope not. Thank you,
Mr. Nelson.
THE VIDEOGRAPHER: This concludes
today's deposition. The time is 5:59.
We're now off the record.
(Time noted: 5:59 p.m.)

A C K N O W L E D G M E N T

STATE OF NEW YORK )

:SS

COUNTY OF )

I, ERIC EICHENHOLTZ, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of May 24, 2022; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

______________________
ERIC EICHENHOLTZ

Signed and subscribed to before
me, this day
of , 20__.

________________________________
Notary Public, State of New York

-------------------I N D E X--------------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| ERIC EICHENHOLTZ | MR. NELSON | 5 |
| | MS. GIBSON | 305 |

DIRECTION: 46, 67, 92, 98, 102, 105, 111, 113, 114, 116, 117, 125, 132, 164, 246, 256, 275, 286, 288, 307

RULING: 255

---------------DOCUMENT PRODUCTION--------------

| PAGE | | |
|---|---|---|
| PAGE | 22 | Recordings of agency personnel officer and EEO officer calls |
| | 23 | DCAS PowerPoint |
| | 150 | Redacted copy of model acceptance |
| | 215 | Any written materials that may have been disseminated to Citywide Appeal Panel members |
| | 267 | Any writings that reflected or constituted any of that information from the DOE regarding the remote sites |

---------DOCUMENT PRODUCTION (cont'd)-----------

PAGE 281 Procedure for information on copies of such communications made to each agency that received at least remand

--------------------EXHIBITS--------------------

| EICHENHOLTZ | | FOR I.D. |
|---|---|---|
| EX 1 | Email chain of November 2021 | 138 |

C E R T I F I C A T E

STATE OF NEW YORK )

) SS.:

COUNTY OF SUFFOLK )

I, KRISTI CRUZ, a Notary Public within and for the State of New York, do hereby certify:

That the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of May 2022.

Kristi Cruz

KRISTI CRUZ

***ERRATA SHEET***

VERITEXT LEGAL SOLUTIONS

NAME OF CASE: NYFRL V. CITY OF NEW YORK

DATE OF DEPOSITION: MAY 24, 2022

NAME OF WITNESS: ERIC EICHENHOLTZ

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |
| ____ | _____ | ___________ | __________ | _____________ |

_______________________

Subscribed and Sworn before me
this _____ day of _________, 20__.

___________________ _______________________

Notary Public My Commission Expires:

## &

**&** 92:2 104:4 189:17

## 0

**0** 151:14
**00752** 1:15

## 1

**1** 82:23 137:15 138:4 151:14 163:7,15 183:25 338:9
**1,015** 29:25
**10,000** 29:11,17
**100** 2:20 32:19 33:16,22 34:6 54:3,9 83:13 165:19 272:3
**10007** 2:21
**10016** 2:7
**101** 61:18
**102** 337:7
**105** 337:7
**1087** 303:13
**10:14** 52:11
**10:25** 52:14
**111** 337:7
**113** 337:8
**114** 337:8
**116** 337:8
**117** 337:8
**11:41** 109:12
**11:53** 109:15
**125** 337:8
**12:29** 135:21 136:4,5
**12:30** 135:20,21
**132** 337:8
**138** 338:9
**14** 44:2,11 46:19 48:13 52:20 55:9 55:13 106:11
**1452** 150:3
**14850** 2:14
**150** 337:16
**164** 337:8
**165** 331:16
**19** 10:3,22 25:13 25:15 61:22 62:4 63:11 66:9,18 68:4 76:10 98:6 100:3,6,15,17,25 173:10,21 175:22 176:14 178:5 191:10,24 192:2 231:13 274:15,18 275:9,23 276:24 291:25
**19939** 339:24
**1:18** 137:3,5
**1:2022** 1:15
**1:2022cv00752** 4:19

## 2

**2** 137:16 151:14 163:16
**20** 31:18 56:16 336:20 340:21
**201** 2:13
**2013** 8:10
**2017** 166:25
**2021** 8:3 9:12 31:18 56:16 82:23 137:18 138:5 139:11 149:23 154:21 334:21 338:9
**2022** 1:17 4:3 336:10 339:22 340:4
**20th** 9:11 15:2
**215** 337:17
**22** 337:13
**23** 337:15
**24** 1:17 4:3 139:11 336:10 340:4
**246** 337:8
**255** 337:10
**256** 337:8
**267** 337:20
**275** 337:9
**2800** 2:6
**281** 338:3
**286** 337:9
**288** 337:9
**28th** 339:21
**29** 305:6
**2:32** 195:22 196:2
**2:43** 196:5

## 3

**3** 137:16 151:15 163:20
**3,000** 54:4
**3,200** 29:23 32:17 33:16
**30** 6:8 8:12 70:6 92:23 99:20 102:22 103:4 112:2 113:18 115:8 137:17 149:23 234:22 246:15 303:11
**305** 337:5
**307** 337:9
**30th** 142:15 144:6
**312** 303:14

## 4

**4** 151:15 257:4,5
**407** 2:13
**45** 7:16 108:23 135:24
**46** 337:7
**475** 2:6
**4:12** 142:16
**4:17** 270:18
**4:30** 235:7,7 257:8 257:13 270:21

## 5

**5** 127:24 151:15 337:4
**5,000** 238:3,9
**50** 127:8
**500** 48:2 49:17 55:10 57:16,19 58:8 331:4
**550** 331:6,17,21
**5:16** 305:12
**5:27** 305:15
**5:59** 335:23,25

## 6

**6** 6:8 8:12 92:23 99:20 102:22 103:4 112:2 113:18 115:8 151:15 246:15
**6,500** 29:7
**600** 331:7,8,21
**67** 337:7

## 7

**7** 151:15
**7,000** 29:7 30:9

## 8

**8** 151:15
**80** 33:3 127:9
**85** 33:3,13

## 9

**9** 127:24
**90** 234:17
**92** 337:7

**98** 337:7
**9:11** 1:18 4:4

**a**

**a.m.** 1:18
**ability** 95:4 132:16 154:2 169:7 201:7 240:25 249:9 259:8,22 264:13
**able** 14:5 16:15 35:18 138:7,19 145:10 149:16 156:20 225:19 251:11 263:14 284:21 322:13
**aborted** 188:21 190:15 192:3 204:14 205:9 207:15 208:21 213:22 214:2,12 214:14 215:6 221:25
**abortion** 188:6,14 189:15 190:13 197:18 205:12,25 206:18 208:21 211:15,19 212:5 214:6
**abortions** 206:10
**abreast** 112:24
**absent** 167:22 169:10 188:16 190:17 200:25 313:17
**absolutely** 43:4 52:22 192:7,24 196:24
**abstain** 208:25 218:9 219:20 230:4 325:9
**abstained** 181:5 217:19 220:11
**abstaining** 218:24 227:20 229:9,25 230:12
**abuse** 53:6
**accept** 21:11 167:23 307:20,23
**acceptable** 7:16,19 118:25 170:20,22 212:18 248:17
**acceptance** 150:5 337:16
**accepted** 193:11 333:6
**accepting** 167:24
**access** 27:24 31:25 35:4 48:15 101:20 101:21 154:3
**accidentally** 26:15
**accommodate** 95:22 246:9 264:8 264:13 303:8,14 304:9 309:19 322:24 323:2,6
**accommodated** 278:11 303:11 305:24 309:13 310:21,24 311:8 313:15
**accommodation** 9:9 11:23 12:2 14:11,15,21 15:17 17:9 18:4 19:22 20:17,20 24:7 25:16 28:14 29:15 31:23 32:8,23 33:8,21,24 34:3,23 35:20 36:23 47:20 48:20 50:7,10 53:3,22 54:16 59:19,21 60:23 61:14,18 62:25 66:11,23 67:4,12 68:8 76:9,25 83:23 84:11,21 85:2 86:13,19 88:25 90:7 91:23 92:18 95:8,20,23 97:4,14,19 98:9 101:9 111:22 112:11,15,17 113:6 120:14 122:21 124:8 133:18 140:22 142:25 145:17 146:6 159:9 160:12,17 166:5 167:12,14,17 168:19 169:21,23 173:17 177:3 178:4 179:18 180:19 182:4,22 190:7 197:7 200:7 201:4,23 202:2,4,7 202:25 204:5,8,11 209:23 210:5 212:13 213:7,17 216:21 217:2 222:10 236:7,14 241:5 242:16,18 242:25 243:16,19 243:23 244:5 245:5,24 246:6,18 246:19,20 247:17 248:4,5,11,12 249:18 250:4 251:17 252:6,23 254:4,8 259:13,13 260:24,25 261:22 262:18,21 263:3 264:9 265:6,11,20 268:14 270:10 271:23 273:5,24 276:14 278:11 280:23 288:10 289:7,13,19,21 290:13 291:2,14 292:15,18 293:18 293:22 294:7,9,17 294:23,25 295:13 295:21 296:6,8,10 298:7 299:2 300:3 300:9,12 301:18 309:15 310:25 311:19 312:16 319:4 322:15,22 333:9
**accommodations** 16:8 17:10 18:23 24:13 29:10 33:5 33:13 35:11 54:24 68:3 89:7,7 97:17 98:14 103:19 104:7 117:25 118:2 145:14 148:15 246:14 247:7 252:11 264:22 265:5,17 277:25 281:3 312:24,25 318:3,9 324:14,18 335:12
**accomodation** 32:24 89:11 92:13 248:14 288:2 291:5 296:16 300:6 301:6 302:3 302:5,6 313:20 314:5 324:20
**accomplish** 147:16
**account** 43:19 58:20,25
**accuracy** 45:8 223:10,14 224:8 224:13 225:2

277:10,11
**accurate** 13:12 34:20 41:13,25 42:6 48:11 143:7 143:8,16 147:11 189:3 203:19 212:6 222:20 223:9,16,19,21 225:7 276:16 295:4
**accurately** 221:18 261:18
**acetaminophen** 211:16
**acquiring** 164:17
**acronym** 21:8
**act** 185:18 235:12
**acted** 101:15,18
**acting** 89:24 115:17
**action** 25:7 339:17
**actions** 277:21
**actively** 13:7 81:7
**actual** 20:12 84:20 201:18 215:5 291:10 316:17
**adams** 1:10 118:6
**adapt** 15:18
**adaptations** 15:23
**add** 48:22 154:25 155:17
**added** 31:14 81:9 81:25 87:10 139:4 139:4 154:24 155:13
**adding** 155:11
**addition** 26:12,17 26:18 140:13
**additional** 17:15 26:19 39:19 47:4 49:10 51:10 55:10 126:13 153:14 174:13,16 176:7 200:25 229:24 247:13 260:5,8,9 261:5 279:5 280:5
**address** 15:19 323:23 324:6
**addressed** 112:12 141:23 286:11
**adjudicate** 72:19
**adjudicated** 29:20 29:23,24 30:3,16 57:20 100:8 118:10 240:8
**adjudicating** 14:10 59:16 161:10 210:5 298:3
**adjudication** 192:19 203:13
**adjudications** 30:10 106:22 110:14
**adjudicative** 61:14
**adjudicator** 95:5 226:7
**adjudicators** 97:18 209:23
**administrative** 9:21 10:14 20:23 20:25 36:15 37:22 38:13,19 39:6,21 41:14 79:2 103:21 104:2 151:12 298:24 300:22 320:4
**administratively** 280:25
**administrators** 154:8 332:25
**admission** 156:9
**admitted** 137:24
**admittedly** 115:2
**adopted** 182:17 292:8
**adopting** 63:5,14
**adoption** 183:3
**adult** 184:9,10
**advance** 271:5
**adversarial** 47:18 50:8
**adverse** 220:9,19 221:10
**advice** 18:18 90:22 118:19 151:7 320:8
**advise** 60:16 280:21
**advised** 65:12 196:15
**advising** 31:11
**advocate** 95:3
**affect** 175:20 176:10 182:2
**affidavits** 27:7 75:25
**affirm** 165:18,23 265:9
**affirmance** 41:12 158:23 202:14 237:4 273:14
**affirmances** 273:17 332:8
**affirmations** 28:10
**affirmatively** 211:15 219:19
**affirmed** 108:9 159:2,3 165:25 204:7 244:10 273:6,9 316:22,24 318:2
**affirming** 199:23 199:23 243:11,12
**afford** 257:20 258:13 260:6,10 261:5
**afternoon** 109:5 137:10,11
**afterward** 25:24 70:23
**agencies** 9:16 12:12,16 16:22 18:2,5,25 20:10,16 20:22 21:5 22:10 22:25 25:22 28:16 30:5,6,7,9,10,12 34:2 36:5,9,12,17 36:20 37:16 38:25 41:9 44:6 55:23 58:10 59:22 60:21 62:15 63:4,18 69:17,19,21 76:20 78:5,7,9,10 82:9 82:15 84:3,12 85:21 103:7 111:16,20 112:4 124:18 125:2,3,7 125:15,21,23 128:14,19 129:24 130:19 149:21 152:22 157:8,18 169:14 172:5,6,14 197:5 206:22 211:19,20,21,25 212:7 215:16 218:2,6 219:3,18 237:22 239:15 249:23 253:19 257:23 258:4,6,12 259:6,12 261:21 262:11,14 263:2 264:2,12 269:18

271:22 272:17 279:16 287:18 288:9 292:9,14,16 292:24 297:17 304:12 308:23 310:3 313:2 320:2 322:4
**agency** 16:10,11 16:14 17:5,14 18:7,12 21:2,2,8 21:13 22:21 23:10 26:9 29:17,19 30:8 36:20 38:5,9 41:9 42:14 50:20 51:7,12,14,24 54:22,22 56:17,20 56:21 59:7,8,11 60:2,7,9 61:6 62:2 62:20 64:2 65:14 67:7 68:10 69:10 72:8 73:15,18 78:3 80:19 84:16 84:19,25 85:8 89:16 90:20,22 95:14,15 98:16 106:22 107:20 124:22 126:10,16 128:21 129:3,14 129:15 130:18,21 131:10,13,16,17 131:21 134:25 137:19 140:24 141:4 150:13,14 152:15,25 153:5,6 153:13 154:18 158:15,21 159:16 160:7 169:25 170:2 172:15 180:25 191:4 196:12,25 199:22 201:22,25 202:21 203:6,24 204:3,10 204:22,24 209:24 210:11 216:19 219:21 224:19,20 225:22 232:2 237:6,17 241:3 244:9,15,23 245:10 247:13 248:3,20 249:5 250:11 252:20 253:21 257:18 258:15 259:20 260:4,22 261:3,8 262:4,6 263:7,10 263:13 264:21,24 265:23 272:21 278:17 279:3,6,23 280:9,10,17,21 281:12,16,18,25 282:6,13,20,25 283:3,4,17,19,23 283:25 284:4,8,10 284:12,14,16,18 286:17,19 287:7 288:2 290:25 291:2,12,15 292:7 293:11,16,20,25 294:5,19,21 295:11,22 296:2 296:15 298:4,11 298:22 299:15 301:3,4,9 302:13 302:16 306:11 312:25 313:19 318:8 324:14,20 335:2 337:13 338:5
**agency's** 16:23 23:19 53:20 66:25 112:5 125:12 127:2 128:16 131:8 141:10 158:19 160:7,8 202:8 203:16 204:6 208:7 216:22 236:6 241:4 243:12 246:13 258:9 262:3 263:22 275:17 284:24 293:16 296:4 313:21 314:4
**ago** 71:23 166:23 167:20 169:4 189:16 233:17 269:6
**agovino** 1:4 3:11
**agree** 4:13 53:15 64:6 104:20 159:22 285:18,20 321:8
**agreed** 48:15
**agreement** 56:23
**agreements** 79:4
**ahead** 180:9 216:8 225:10 287:10 305:10
**akin** 53:17
**al** 4:16,17
**alcohol** 228:17
**allegation** 159:12
**alleges** 159:7
**allocated** 150:25
**allow** 45:3 93:24 97:23 115:4 155:2 218:11 333:11 334:4
**allowed** 20:5 92:24 93:6 113:15 115:2 116:8,16 155:12 271:9 308:14
**allowing** 311:8
**allows** 153:14 173:5 254:8 324:19 325:25
**alter** 100:6 251:18
**altered** 63:24 77:13,17
**alternative** 243:14 245:4,4,13 248:5 251:16 252:11 262:18 289:7,13
**amendment** 288:18,24
**amount** 7:14 54:12 69:10 127:5 127:20 128:6 161:8 165:23,23 234:19 313:21,24
**analogy** 53:17 208:22
**analyses** 330:19
**analysis** 131:10 166:15 172:21 174:5 175:20 176:11 231:16 274:5 278:9 306:11 307:5 309:5 310:8,9 312:11 313:6,7,18 314:8,16,20 315:2 317:24 321:6 324:13 328:10
**analyze** 239:11
**analyzing** 226:12 226:13,15
**andrea** 2:24 5:15
**angle** 43:7
**animated** 185:8
**animates** 183:6
**announcements** 72:13

**annoying** 235:2,13
**answer** 6:24 36:25 42:25 46:12,12 54:9 67:19 89:14 92:21 93:9 96:12 97:23 98:23 99:7 103:5 105:7,18,20 110:4,7 111:24 112:7 113:9 115:11 117:2,12 118:16 122:12 125:5,20 129:10 131:2 132:13,19 132:21 152:7 159:23 165:4 177:5,13 178:7 179:4 180:10 201:6 207:18 210:8 220:16 221:17 233:8 236:22 237:9 238:5 246:12 247:3 256:13 260:21 262:24 274:21 275:4,12 277:16 286:22 289:4 295:2 297:25 303:24 307:18 308:10 309:10 315:11,19 318:23 321:13 322:9 326:11 333:12
**answer's** 110:5
**answered** 18:10 133:6,7 318:13
**answering** 42:24 307:24
**answers** 116:9 220:20 336:12
**anticipated** 16:13
**anybody** 7:11 43:3 169:6 207:25 313:13
**anyone's** 120:13
**apologize** 88:10 109:20 110:6 133:4 134:10 152:8 238:6
**apos** 23:14
**apparently** 122:6
**appeal** 11:23,25 12:2 15:13 20:19 25:10 28:19 34:3 35:16 36:22 40:3 42:14 48:18 51:21 53:4,22 56:4,15,24 57:8,10,12 58:24 60:8 62:15 71:2,9 73:21 79:5,6,7,11 79:14 80:24 84:22 85:16 89:17 96:10 104:11 107:11 118:9 123:19 125:12 133:11,12 135:14,16 140:23 141:10 145:18 150:22 160:8,9 162:9,11,13,14,16 162:17,21 163:9 163:10,13,18,22 163:25 164:7,23 170:12 176:5 191:5 203:14 207:22 208:9 215:24 216:10,15 224:19 237:11,13 237:19,20 239:17 240:2,18 243:9,9 243:10 244:3,15 252:18 263:4 269:20 276:7,10 278:14,22 279:2 279:17,21,24 280:25 282:22 283:7 284:8 286:19 290:12 293:8,18,21 295:11 296:2,3,4 296:14 297:6 298:9,21 299:16 301:22,24,24 312:5,6 316:23 322:3 337:18
**appealed** 20:20 33:23
**appeals** 9:2 14:23 16:10,13 17:6,19 24:9,10,15 27:20 27:24 29:8,15 31:15,16 32:9,17 32:22,25 33:4,17 34:16 35:9,12,13 36:3 37:6,18,25 38:4 43:21 44:9 45:6 46:7 48:14 48:16,25 49:5 51:3 53:12 55:4,4 56:4,6,7 57:4,9,13 58:6,10 59:13,16 62:4,10,12 65:24 67:23 70:2 74:22 82:3,6 83:16 85:4 85:5 86:24,25 87:12,18,25 88:17 88:19 89:4 90:7 91:24 97:10,16 101:23 103:10,14 111:19 112:8 119:22 120:11 128:11,23 130:16 130:21 131:7 132:5,11 133:25 149:4,25 153:20 158:3,12 159:18 161:3,10 162:7 163:15 164:19 165:8,19 166:4,17 170:21 173:9 207:13 209:25 217:13 218:22 220:19 221:21,24 224:21 230:21 232:8 234:21,21 236:9,21 237:23 237:25 238:4,9,11 238:13 239:5,14 239:16 240:3,5 241:21 243:21,25 244:4,14 246:17 247:5 248:25 251:15 253:11 259:13 262:24 265:7 266:4 268:16 269:3,5,10 272:22,23 275:6 276:15 281:2 282:10,14 284:16 287:2 294:3 295:9 296:12 297:15 298:2,4 299:25 302:14 316:21 332:7,15
**appear** 13:17 77:20 240:17
**appearance** 181:18
**appears** 46:4 68:16 137:16
**appellant** 154:12 176:13 198:17 272:23 325:3

**appellant's** 325:5 325:8
**appellants** 32:21 44:23 47:15,23 49:17 50:3,25
**appellate** 17:18 34:15 39:5 43:18 44:20 49:6 51:9 52:24 53:11 59:8 59:10 62:12 131:23 148:17 158:24 159:2 216:16 252:17 258:22 278:15 298:18 299:5,8
**appellate's** 176:11
**applicability** 24:6 66:9
**applicable** 66:12 164:21 289:2
**applicant** 175:17 177:7 191:8,11,15 192:5 195:4 197:17,21 202:24 203:9 212:13 231:12 233:11,18 245:6 247:8 279:7 282:9,13,16,23 283:14,16,22 284:2 285:16,22 287:4 328:25
**applicant's** 176:10 181:16 191:18,20 204:16 208:10 222:17 225:13 232:9 234:6
**applicants** 166:5 173:9 179:17 217:14 218:25 220:7,9,20 240:21 240:25 241:9 251:18 253:20 276:12
**application** 63:11 73:8 113:5 123:10 146:18 158:11 159:16 160:2 168:2,5 190:6 198:16 199:14 213:11 231:11 232:3,4,12,14 236:14 248:24 263:25 286:13 288:17 328:5
**application's** 231:17
**applications** 72:21 100:16 111:21 188:19 201:15 204:13,15 222:10 331:14
**applied** 59:2,12,13 59:20 64:5,11 65:4 76:3 100:14 100:15,19 105:15 106:3 107:5,19 111:9 119:7 138:21 148:20 164:18 182:20,25 185:19
**applies** 46:10 105:10 205:8 264:4
**apply** 15:6 61:21 64:8 67:23 68:5 107:14 110:9,11 110:23 111:2,9,15 112:10 114:22 122:20 148:18 164:22 193:8 194:19 227:8 231:15 286:20 291:22
**applying** 76:9,25 83:24 87:4 100:11 106:9,10 107:15 108:6,18 110:24 172:22 174:18,21 189:21 191:18 194:18 201:20 290:11
**approach** 43:24 53:3 183:18 327:16
**approached** 29:11
**approaches** 135:3
**approaching** 234:23
**appropriate** 39:9 82:12 83:17 96:7 151:25 152:3 156:18 168:20 170:9,9 177:4,5 200:7 225:20 232:8 242:25 247:12 248:7,9 252:7 262:20 267:9 278:18 289:22 296:6,7,7 299:10 310:9
**appropriately** 149:20
**approvals** 32:3
**approve** 141:19
**approved** 150:2
**approving** 41:23
**approximate** 29:14 217:25 227:13 245:15
**approximated** 218:5
**approximately** 4:4
**arbitral** 55:24 56:2,8,11 60:11 163:12 164:4
**arbitration** 14:13 14:16 15:7 48:4 54:25 55:2 56:20 56:23 57:11 58:17 58:23 60:2 107:5 107:13 111:5 163:10,18,19,22 331:17 334:12,13 334:14,23 335:4
**arbitrations** 334:18,25
**arbitrator** 14:13 44:15 56:8,24 57:3,10,10,12,15 60:18 163:12
**arbitrators** 55:6 56:13,14 58:18 110:22 111:10 331:16
**area** 95:25 101:3 148:16 206:15 313:25
**areas** 78:6 95:16
**argue** 114:14 312:3
**argument** 69:18 69:19 258:6 297:22,23 312:2 313:10 314:12
**arguments** 199:19
**arising** 133:24
**arose** 97:5
**arrangements** 264:7
**array** 141:14
**art** 68:21
**articulate** 67:2 284:19 286:3

**articulated** 185:17 192:13
**articulates** 185:16 313:19
**articulating** 68:25 102:24 121:23
**aside** 42:21 78:17 123:13 156:21 185:4
**asked** 44:12,17 60:15 82:9,11 104:6 109:19 114:22 140:20 145:5,11 146:2 201:10 211:20 212:7 218:7,18 224:2 227:6,8 233:16 235:15 256:23 267:20
**asking** 25:22 43:10 50:5,21 54:24 64:21 116:13 132:3 142:5 146:7 194:6 207:9 211:7 237:10 260:18,21 271:4,15 305:4 312:10 313:12 314:14,14 319:2,2 319:3,6
**asks** 16:18
**aspect** 6:21 302:9
**aspects** 24:11 36:13 252:14
**assert** 267:10
**asserted** 241:23 262:14 270:4 287:6 293:3 301:2
**asserting** 268:5,18 292:25
**assertion** 119:22 194:2 259:7,19 266:12 268:20 269:8 274:6 306:21 330:21
**assertions** 209:10 210:2 215:14 217:10 231:4 285:10 301:14 302:2
**assess** 242:24 262:2 284:13 299:13
**assessable** 75:18
**assessed** 196:11 317:8
**assessing** 191:2 293:17 303:7 304:8
**assessment** 73:9 73:20 229:21 299:6
**assessments** 124:16 172:25
**assign** 84:3
**assigned** 44:3 73:23 268:13
**assigning** 40:17
**assistance** 86:25
**assistant** 7:23
**associated** 165:6 190:13 218:17
**assume** 161:25 188:16 224:15 256:15 288:8
**assumed** 170:24 226:10
**assuming** 147:2,4 165:14
**assumption** 147:6 274:16
**assumptions** 144:19
**ate** 227:24
**attempt** 284:9
**attempted** 163:9
**attempting** 158:25
**attendance** 22:10
**attended** 83:10
**attention** 18:19
**attorney** 6:10 88:2 96:14 99:13 118:18 335:13
**attorneys** 2:5,19 85:9 86:23 89:18 153:24
**audio** 4:11 26:13 86:4
**augment** 280:13
**authority** 38:15,18 38:20 39:7 85:10 85:12 88:9,12 122:9 151:5 169:7 189:10 214:4,8
**automatically** 157:10,22 183:3
**available** 26:21 189:5 266:5 304:4 304:5
**avenue** 2:6 303:14
**average** 40:8 123:2 128:2,11 161:8
**avoided** 228:16
**award** 14:16,18 15:7 44:5 107:5 111:5 334:14 335:3
**awards** 331:16,18 334:18,24
**aware** 14:16,17 22:6 31:14 42:16 64:3 100:21 106:14 118:22 122:13,19 130:20 134:2 150:14 159:6,11,15 160:7 160:14,17,20,21 161:14 171:2 175:13 207:20 208:5,11 209:6,15 209:18,22 213:5 214:7 215:4,12 236:15 249:21 250:7,18 264:20 266:9,10,20 267:25 268:11 273:2,18 275:15 288:15 297:7,13 306:10 309:6 332:22 334:11

**b**

**b** 6:8 8:12 92:23 99:20 102:22 103:4 112:2 113:18 115:8 246:15
**babwah** 3:12
**baby** 206:9
**back** 25:21 41:24 46:25 50:16 51:18 51:24 52:13,16 57:12 64:9 70:22 80:17 81:15 82:13 82:14 109:14,23 122:4 137:4 140:23 182:24 195:24 196:4 208:3 223:23 224:12 245:9 248:2 270:15,20 280:16,19 281:13 302:20 305:14

307:25 310:17 324:22 327:11 328:7,24 329:3,23
**background** 92:25 106:8 334:7,9
**backup** 285:25
**baited** 206:8
**balance** 149:15 172:11 174:24 204:3
**balanced** 202:14 202:19 221:2
**balancing** 124:15 172:24 326:10 330:20
**banks** 11:9 20:15
**bar** 26:16 94:5
**barbara** 10:16
**bargaining** 56:24
**barry** 3:6
**base** 112:25
**based** 16:3,23 42:18 47:7 69:20 106:25 117:3 120:20 121:16,17 130:2 146:11 149:20 151:17 164:2 165:16 173:10 197:8 201:16,20 204:14 214:6 217:22,24 227:9,24 228:3 232:12 259:4 263:19 278:21,25 293:23 298:4 302:6 306:22 309:4,7 312:11,17 316:4,19 317:14 322:11 323:9 326:9 327:13 331:20
**bases** 131:17 276:13 278:3,5
**basic** 22:24 309:9
**basically** 13:23 36:17 39:22 158:23 245:23 277:19 302:15 326:22
**basing** 194:24
**basis** 8:21 54:19 56:11 60:11,12,13 60:16 117:5 130:13 131:16,19 152:12 153:2 160:11 171:23 173:16 175:11 178:2,2 180:19 183:16 185:25 190:9 192:2 195:17 216:20 222:3 231:17 232:21 233:10 236:6 238:20 253:3,12 258:5 266:11 272:23 273:10,16,22 276:16 277:18 279:13 287:25 296:10 300:3 316:23,24 323:19 325:25 327:8 329:8
**bathroom** 7:11 195:20
**bear** 14:4 16:25 17:17
**becoming** 254:12
**began** 139:25
**beginning** 146:7
**begins** 187:25 188:2 304:23
**behalf** 1:7 5:11 6:8 8:12,14 10:12 47:6 81:18 190:7
**behavior** 212:17
**belief** 120:7,8,22 120:24 121:21 146:20,21,22 147:3,7 148:4,10 166:11 167:8 170:24 171:8 175:10 176:12 177:25 179:9 180:4,6 181:20 182:10 183:3 184:22 185:17,18 185:19 186:10,21 186:22 187:3,4,12 187:13,22 188:4,5 188:18,20 190:10 190:12,14 191:21 191:23 192:2,5,10 192:13,15,20 193:6,13,18,21,23 193:25 194:5,7,8 194:10,17,25 195:6 196:9,21 197:11,13,24 198:4,8,9,14,18 199:13,16,17,25 200:11,14,18,22 205:9,10,14,22 206:12,18 207:15 208:17 211:9,14 218:12,16 219:8 219:14 220:4 221:4,5,7 222:7,24 223:4,5,11,14,15 224:9,13,16 225:2 225:7 226:3,12,16 226:18,20,24 227:19 228:12,13 229:2,5,6,12 231:9 231:9,21,23,23 233:12,12,18,20 233:23,24 276:22 276:23 286:3,4,5,6 323:7,11 325:7,11 325:13,24 328:5 328:21 329:2,13 329:15 330:4
**beliefs** 121:22 168:12 181:17 184:12 186:17 187:16 190:23 191:2,9 193:11 194:19,23 201:16 206:19 220:8 222:17 225:13 226:9 227:25 228:7,8,19 229:17 230:3,23 232:9,16 232:20 246:10 276:13 316:3 323:3 325:4 328:11,12 329:22 329:23 333:8
**believe** 9:11 12:12 23:13 25:14 29:7 29:22 35:23 51:9 63:19 77:11 81:9 83:12 98:8 99:2 145:9 187:25 188:3 189:12,25 206:18 207:13,21 222:12,13 223:18 223:20 226:22 234:12 263:14 265:16 296:23 306:6 329:11
**believed** 202:19 204:7

**believes** 225:8
**believing** 194:10
**belonged** 19:9
**belongs** 197:17
**beneficial** 324:5
**benefit** 19:6 277:20
**best** 124:12 128:15 128:15 201:6 217:25 230:18 254:16 293:15
**better** 126:2 218:10 219:11
**beyond** 120:19 181:14 256:5 275:2 321:4
**bhaider** 2:25
**bidding** 250:9
**big** 112:20 134:14 142:3
**bilal** 2:22 5:10 7:18
**bill** 117:20 118:3
**binary** 241:20,24 242:2,8
**binding** 57:11
**bismol** 204:17 205:5,17 206:23 206:25 207:10,13 207:23 208:10,14 208:15,19,24 209:9 210:4,16,18 210:25 211:4 213:22,25 214:5 214:11 215:6 216:11 217:7 220:23
**bit** 155:2 196:21 328:8
**black** 2:4 3:6 5:2,5 158:8
**blank** 80:4,9
**blanket** 121:9 166:7 173:14 310:23
**blasio's** 19:3,14,16 118:23
**blood** 339:17
**blue** 195:11,12
**board** 139:21 152:11
**body** 190:15 216:16,16
**bolts** 20:17 23:25
**book** 28:6
**books** 27:9,14,15
**born** 167:3
**borne** 254:24 257:23
**bother** 297:15
**bottom** 138:17
**bounds** 172:20
**brandon** 3:12 137:21,22,25
**break** 7:7,11 31:24 33:11 52:6 101:19 101:21 108:20,23 135:20,22,24 195:20,21 270:14 304:23 305:8
**breaking** 7:12
**breaks** 6:21,22,22
**brendan** 1:4
**brief** 126:5
**bring** 14:4 16:24 17:16 72:6,8 95:14,15 122:4 307:25
**bringing** 116:2,6
**broad** 16:3 134:14 154:16 155:5,12 155:18 157:20
**broader** 62:13 141:14 190:19
**broadly** 91:25 92:3
**brooklyn** 303:13
**brought** 129:22 139:21
**bucket** 181:8 186:11,18
**budgets** 263:7
**build** 75:8 243:8
**building** 75:4
**buildings** 235:24 236:11
**bullets** 22:24
**bunch** 131:20 159:21 166:14 211:25
**burden** 31:22 65:25 66:25 67:8 68:2,10,12,17,20 68:24 69:10,16 70:9 269:9 285:9 285:15 286:2 287:6 291:4,15,16 291:23 297:11,17 298:12 299:18
**burdens** 69:15
**bureau** 103:14,15
**business** 30:20 300:15

**c**

**c** 2:2 3:2 5:19,19 88:8 137:6,6 336:2 339:2,2
**call** 16:4 18:7 22:2 76:8 117:8,9 152:20 169:11 174:8 190:24 235:5,9 282:2,7,18
**called** 5:20 75:22
**calling** 288:23
**calls** 20:21 21:14 21:16,23,23,24 22:13 337:14
**camera** 4:8 43:5,7 43:7
**campion** 11:7 20:14
**candidates** 331:25
**capable** 83:23,25
**capacity** 1:10,11 1:12 88:5,6 95:18 95:18 119:15 262:7 263:2,7,10 267:19,21 268:3,9
**capital** 10:18
**captured** 48:7
**career** 104:17 254:10
**carefully** 34:8 159:6
**carrying** 206:9
**case** 1:15 4:19 13:17 28:3,6 30:11 39:20 40:2 40:9,11,18 41:5,8 41:12 42:10 45:4 53:4 54:19 60:19 72:23 73:17,24 74:12,13 80:24 90:12,12,18 92:4,7 98:18,19,19 104:23 105:4 106:3 108:6 119:19 123:2 129:17 133:14 134:19,21 141:12 141:14 146:4,4 147:14,22 148:25 149:25 150:22,23

151:6,13,18 152:5 152:9,14 153:5,6 153:23 154:5,11 155:12,18 160:14 167:12 170:6 172:9 176:17 178:17,20 205:9 208:18,24 209:4 219:25 227:8 233:4 235:17 236:4,20 242:22 248:2 252:14 254:22,23 268:18 269:13 273:20 276:8 277:7 280:15 281:18 283:12 286:9 291:11 293:3 296:11 303:19 304:2 326:13 327:21 340:4
**cases** 29:20,24 30:5 31:22 33:8 34:17 37:20,20 39:8 42:16 43:20 43:22,23,24,25 51:22 53:7,9,13,14 54:3,9,21 55:5,6,8 55:13,17,22 56:15 58:12 59:3,12,17 71:10 72:3,7,7,10 72:19 73:13 82:12 89:2,21 96:22 100:7 101:13,17 102:6,19 104:9,11 106:7,10,15 107:17,21 108:9 110:24 118:9 119:14 121:7 127:2 128:6,9 129:16 130:20 145:21,22,24,24 150:11,24 151:5 152:13,18,20 153:16 161:10 169:15 171:15 174:14 175:8 179:19 217:23 218:4 219:6 227:10 237:5 238:24 239:6 240:7 245:16 251:25 252:10 253:2 259:24 264:5 265:20 266:3,22 267:6,9 267:10,12 269:7,9 269:12 272:4 276:12 285:6 287:24 300:2 321:16 327:17,22 328:25 329:17 332:19 333:16,20
**cast** 40:22
**categorically** 213:14 238:7 240:12
**categories** 154:16 154:17 155:13 157:20
**category** 69:23,24 155:5,18 158:9 205:13 328:19 331:23
**catholic** 119:16 121:9 124:8 187:23,23 193:5
**catholicism** 121:14,15,17
**catholics** 121:18 121:20
**caught** 142:4
**cause** 168:4 179:20 187:14 224:18 225:17 271:24 312:18
**caused** 253:19 272:24
**causing** 257:21 260:6,10 261:6 284:20
**caveat** 272:25
**cayuga** 2:13
**cchp** 161:19
**cchr** 38:20 81:22 103:22 123:20
**ccr** 103:7
**cdc** 189:4
**cell** 187:6 188:8,8 210:24 211:18 214:12,14 215:7,9 222:2
**cells** 184:7,21 186:5 187:11,15 187:19 188:12,14 188:21 189:14,15 189:19 190:14 192:3,20 193:3 194:2,11,12 195:2 197:18 204:15 205:24 206:7 207:15 208:22 209:11 210:3 212:15 213:22 214:2
**certain** 10:24 26:5 33:15 34:4 52:22 65:10 77:15 78:13 96:18,19 107:18 133:17 162:3 192:11 200:15 209:10 213:13 217:15 219:20 248:17 258:11,12 261:14 302:24 304:19 306:6 311:2 313:21,23 324:20
**certainly** 7:13 33:25 34:24 69:18 93:7 106:11 111:4 113:10 120:16 134:17 143:8 147:7 156:16 160:22 173:16 181:12 211:3,23 215:11 223:7 235:11 240:24 243:20 247:22 255:19 258:19,20 259:8 261:25 266:7 281:7 284:23 285:3 302:12 304:2 332:6,19
**certainty** 83:13 168:25 331:22
**certify** 336:7 339:9,15
**chain** 138:4,20,22 138:23 140:3 143:25 338:9
**challenge** 277:25
**challenged** 277:23
**challenging** 62:8 169:3 318:24
**chance** 169:20 316:13
**change** 32:12 79:10 80:5,10,11 80:12 122:16 154:19 155:9,15 189:24 195:13

221:16
**changed** 77:7 80:3 80:10 81:20 181:17
**changes** 79:16 81:16
**changing** 80:22 155:10
**character** 255:18
**characteristics** 31:5
**characterization** 259:20 297:21 306:25 321:9
**characterize** 58:22 60:8 221:16 227:19 229:9 261:18
**characterized** 309:8
**characterizing** 229:25
**charge** 37:5,24 38:3
**charged** 103:16 290:10,11 292:7 292:10
**charges** 103:17
**check** 12:17 69:13 70:2,13,14,24,25 71:7,11,23 72:18 80:18 112:20 130:2,17 134:15 142:4 149:14 169:13 227:14 266:16
**chief** 7:23 8:7 13:4 39:5
**child** 2:9 5:4,5 170:14
**children** 176:10 176:13 177:8,17 177:18
**choice** 325:8,12,25
**choices** 157:21 228:3
**chokshi** 1:11 209:8 216:2
**choose** 97:7 222:22
**choosing** 82:7
**chosen** 97:11 160:8 330:8
**christian** 119:23 167:3
**church** 2:20 119:16 120:17 187:24
**circuit** 43:17 44:4 57:21 106:2 107:25 108:5 334:14
**circuit's** 48:13 107:17
**circum** 162:18
**circumstance** 15:20 108:16 122:14,19 159:13 192:8 198:2,6 232:7 234:8 247:19
**circumstances** 23:16 41:5 100:12 100:16 101:5 159:25 162:19,25 165:21 170:10 176:4 179:25 180:4 191:7,16,19 200:8,15,21 201:2 201:20 227:10 228:9 229:3,19,20 229:23,24 230:8 230:14 231:4,25 232:11,14 233:5 233:19 242:21 245:10 252:8 268:6 282:15 285:3 293:24 303:25 308:11 310:10 325:18 327:21,25 330:15 333:16
**citation** 231:16
**citations** 306:20
**cited** 190:3 219:8 231:11,19 297:8
**city** 1:10,10,12 2:18 4:17 6:8 7:17 8:8,12,15 9:3,19 9:20,22,23,25 10:6 12:5,19 13:3,9 14:4 16:20 19:22 23:19 27:10 28:16 31:18 36:6,20 38:11 54:13 56:17 58:10,15 62:23 63:7,13,23 64:7,15 64:16,19,20 65:3,7 65:9,19 66:10 76:5 78:20 81:8 82:4 85:10,11 86:3 88:9,11,17 89:11,12 98:16 103:12,15,19 106:10 112:5 127:16,17 131:8 132:3 151:4,19 157:6,7,16 189:9 189:10 209:6,16 209:25 212:11,17 219:3 241:10 250:22 254:10 270:12 274:13 280:17 283:7 290:5,8,14,16,19 291:2 292:6 297:9 299:15,20 302:18 304:9 319:16 320:4,5,19 321:3 322:17 323:6,22 340:4
**city's** 13:4 15:15 17:22 24:6 36:14 36:21 63:7 66:3 102:15 207:11 241:9,15 243:7 246:22 247:4 248:15 255:9 256:15 299:15
**citywide** 9:2,21 10:13 11:3 14:25 15:13 16:25 17:6 17:24 19:24 20:23 20:25 24:9,10,14 25:10 28:20 29:4 29:21 30:23 32:10 36:3,10,11,15 37:6 37:25 38:3,13 43:21 46:9 48:14 48:16,25 49:5 51:2 53:12 56:4 56:25 57:4,9,13 58:6,24 59:16 62:3,10,11 65:24 67:16,22 70:11 71:2,8 74:22 77:8 77:9 78:25 81:3 82:19 83:15 84:24 85:4 86:11 87:18 89:4 92:2 93:3,4,5 93:18 94:22 96:8 97:10,15 99:21,23 100:15 101:14

103:3,10,14,21,25
104:3,3,22 105:2,9
105:10 106:4
107:11 111:19
112:3,8 113:12,14
113:17 114:16,22
116:10,18 118:9
119:21 120:11
125:9,10,12
126:17,19,22
128:23 129:2
132:5,11,23,24,25
133:25 151:11
153:20 161:9
162:7 163:15
164:15 165:7
166:4,17 170:12
170:21 173:8
176:9 179:5,14
181:24 183:12
184:19 201:13
203:14 204:12
206:21 208:9
210:8 213:6,20
214:3,9 215:4,24
216:10,15 217:13
218:22 220:18
221:20,24 228:2
228:19,23 229:14
230:20 231:14
232:8 235:22
236:9,21 237:23
239:5,13 240:5
243:21,25 246:17
247:5 248:25
251:15 256:10,11
256:14 257:19
262:24 265:6
272:22 274:25
275:3,6 276:15
278:8,14 286:18
287:11 290:3
292:10,13 293:8
294:3,19 295:9
296:2,3,11 297:14
298:2 299:25
301:8 302:14
303:10 304:10
308:12,18 312:4,6
319:5 320:3
321:21 322:16
327:16 331:4,18
332:15,23 337:18

**civil** 294:2

**claim** 90:6 92:13 195:7,8 205:20,21 271:22 272:18 273:22 285:17 297:16

**claimed** 284:10

**claiming** 262:13 263:22 298:16

**claims** 69:25 89:10 89:12 92:18 97:19 113:6 188:20 284:7 287:19 295:11 312:7

**clarification** 128:25 142:13

**clarified** 185:12

**clarify** 37:4 50:5 104:12 107:16 185:13 226:19 311:6 316:10,12 321:2

**clarifying** 37:3

**clarity** 142:14 155:2

**classroom** 333:6 333:14

**clear** 41:17 44:4 139:14 142:12 171:5 219:16 226:14 257:11 289:16

**clearly** 115:24 170:19 285:15

**clergy** 195:5,9,14

**client** 95:3 96:14 99:12 105:17 118:18 335:13

**clients** 79:21

**close** 18:19 131:23 140:25 234:17,25 280:25

**closed** 218:19

**closer** 272:12 331:6

**closest** 131:24

**code** 40:18

**cohen** 10:16 37:12 37:19 38:12,17 39:18 40:5 78:18

**collaboration** 36:8

**collaborative** 37:7 37:16

**collaboratively** 9:17 38:24 319:17

**collect** 304:14

**collected** 47:7

**collective** 56:23

**collectively** 72:12

**column** 79:22,23 80:4 153:14

**combination** 172:2 230:18 231:9 234:20 246:2

**combinations** 169:2

**come** 38:18 87:22 145:22 151:24 152:3 173:2 188:10 195:23 219:18 245:21 248:24 249:19 259:9 270:15 277:6

**comes** 36:10 149:21 151:2 181:8 206:14 277:3 279:3 320:18

**coming** 16:14 43:21 142:2 171:3 174:11 175:9 249:16,24 283:13

**comment** 42:8 80:9,10,12,13,22 80:23 123:15 124:9 185:10

**comments** 40:17 42:4 47:16 79:11 79:16,24 80:3 170:19 305:19

**commission** 63:16 64:7 65:7,13 81:8 103:12,16 292:6 320:5,6 340:25

**commissioner** 1:11,12 9:10 10:17 11:2,8,10 19:21 20:14,15 21:19 38:12 56:16 151:19 189:10,23 190:2 201:18 209:7,7,16,19 214:23 255:9 278:7 322:13,18

**commissioner's** 11:17 189:9 270:6 277:22 305:21 319:16 323:11,16 323:18 324:16,17

**committee** 152:13 156:23
**communicate** 75:16 282:16
**communicated** 85:19 156:10 216:12
**communication** 74:6,8 134:18 135:18 156:5,12 281:10,16
**communications** 6:25 74:17 75:18 104:25 117:20 155:19,22 281:24 338:4
**comparing** 125:7
**compel** 167:13 176:20 179:20 330:22
**compelling** 31:8 288:11,13,16
**compels** 190:14
**compensation** 20:13
**competing** 174:22 177:2
**competition** 126:2
**complaint** 25:6 159:5,7
**complete** 336:11
**completely** 145:21 315:15
**completeness** 45:8
**completion** 152:18
**compliance** 13:6 79:3,4 86:20 87:9
**compliant** 31:9
**complied** 302:16
**comply** 254:5,5
**component** 38:20
**composed** 30:4 148:12
**composition** 12:14 93:5 300:19
**computer** 43:8 179:2
**conceded** 199:12 200:12
**concept** 88:2 94:4 187:10
**conception** 187:25
**concepts** 52:21
**conceptually** 225:6
**concern** 17:8
**concerned** 56:17 71:25 100:24 141:13 173:3 205:10 274:14
**concerning** 25:24 65:2 205:9 206:18 208:9 220:21 235:23 265:14 294:8 299:21
**concerns** 310:22
**conclude** 200:16 200:22 228:2 232:9,17 233:21
**concludes** 335:22
**concluding** 232:22 233:10 236:7
**conclusion** 54:18 174:12 180:12 234:4 243:15 330:22
**conclusions** 172:10 193:2
**conclusory** 306:19 321:4
**condition** 249:4
**conditions** 251:19 306:6 311:3
**conduct** 130:16 156:19,19 181:16 278:8
**conducted** 4:6
**confer** 71:25
**conferences** 71:16
**confirm** 37:20 39:22 41:25 42:6
**confirming** 40:18
**conflict** 94:9 102:11,23 120:7 123:14 146:23 167:10 168:14 180:8 182:10 190:19,20 191:16 194:22 201:17 219:15 220:4 229:7 232:15,18 276:23 286:5 328:12 329:15
**conflicted** 166:11 221:7
**conflicting** 121:23 172:13
**conflicts** 148:4 171:8 193:17 228:13 233:25 330:5
**confrontational** 50:15
**confronted** 47:10 47:12 284:7
**confused** 28:23 55:9 203:2 317:5
**confusing** 93:23 319:8
**confusion** 39:17 185:12
**congregation** 197:16
**conjunction** 212:23 231:24
**connected** 188:6 211:14
**connection** 4:8 62:3 133:16 178:11 182:7 191:12 209:12 210:3 212:4 213:21 219:11 221:25 232:3 237:25 239:6 243:18 263:24 265:19 266:3 269:5 281:22 294:5 298:15 300:23
**connotations** 104:19
**conscientious** 54:10 135:11
**consecutive** 151:16
**consequence** 198:5
**consider** 51:20 56:6 97:20 133:10 135:6 166:8 176:15,16 178:10 181:6 182:7 197:5 201:19 207:3 213:3 224:19 228:6,24 230:21 247:6 251:16 252:10 262:25 269:4 277:11 289:7 296:12,24 296:25 297:15 298:3,10,11,13

302:12 303:10,19 304:11 307:7 333:19
**consideration** 15:7 15:21 16:17 23:19 53:23 182:13 183:14 196:14 247:15 248:4 249:2 262:16 280:16 290:24 297:5
**considerations** 16:5 251:24
**considered** 14:21 34:8 176:25 178:11 204:23 220:25 226:20,25 231:21,24 236:19 237:13,19 247:23 261:20 265:8 275:7 299:24 303:20
**considering** 173:6 252:13 269:2 275:5 277:8 278:10 283:10 291:16 322:6
**considers** 276:15
**consist** 76:3
**consisted** 253:15
**consistency** 180:15
**consistent** 65:4
**consistently** 108:9
**constitute** 184:12 184:21 186:21 194:16 304:11
**constituted** 267:15 337:21
**constitutes** 312:19
**constitution's** 288:18
**constraints** 39:10
**consult** 28:2 214:9
**consulted** 9:7 10:25 11:21 65:13
**cont'd** 3:2 338:2
**contact** 23:12
**contain** 157:3 158:7 159:8 184:6 184:21 188:21 194:11 230:22
**contained** 27:4 188:20 189:19 192:3,21 194:3,13 197:19 201:15 236:12 237:11,14 277:21 279:17 297:8
**containing** 209:10
**contains** 195:8 296:14 298:5,21
**contemplates** 306:3
**contemplation** 330:2,8
**contemporaneou...** 268:25
**contentions** 189:3
**context** 31:3,6 32:11 33:19 61:22 63:4 64:9 66:17 66:22 69:16 74:25 90:17 100:25 104:15,21 106:6 115:6 143:17 144:17,24,25 145:9 146:11 176:16 185:19 189:8 199:20 223:24 228:6 230:7 247:22,23 248:4 257:22 260:20,23 277:24 283:20 288:14,16 297:10 301:21 312:16 315:16 317:17 321:15 323:24 326:8
**contexts** 100:19
**contextualizes** 323:19
**continue** 4:12 7:13 199:9 234:23 249:16 254:10 311:17 316:11
**continued** 137:8 138:20 220:10 235:3 251:21
**continues** 213:7 235:4,10
**contradiction** 278:23 279:8
**contradictory** 172:12
**contradicts** 226:21
**contrary** 92:11 121:18 122:9 148:23 200:3 306:2
**contrasting** 52:19
**contributing** 183:10
**control** 29:2 37:14 39:13,21 78:17 114:6 122:2,25 123:8,25 124:2 179:13
**conversation** 65:12 66:2 184:11 318:15
**conversations** 22:4 60:20 63:18 64:22 65:6 66:5 73:5,11,12 86:5 117:24 118:12 119:21 139:17,19
**conversion** 166:19 166:20,21 167:5 168:6,13,16,18 170:15,16 171:6,7
**converted** 167:2,3
**convey** 158:25
**conveyed** 111:14 116:12
**conveying** 118:19
**cooperative** 47:19 50:7,11 51:10,12 73:16 124:19 125:2,16,22 126:5 126:11,13 158:4 158:16 160:5 174:13,16 176:7 196:14 204:21 215:15 219:23 231:5 242:23 243:6 244:6,13,19 244:22 245:11 247:10,13,20 252:3,19,23 285:12 287:23 289:25 294:17 295:23 301:15,16 304:18
**coordinate** 9:25
**coordinates** 12:11
**coordination** 12:6
**coordinator** 158:20 170:4
**coordinators** 54:15

**copies** 267:14 281:24 338:3
**copy** 150:5 157:7 157:9 337:16
**corner** 43:12
**corporate** 8:14
**corporation** 5:11 7:23 13:3,13,14 38:11
**correct** 6:10,11 8:13,14 45:9 57:23,25 88:10 91:13 99:4 111:10 123:25 138:25 144:8 145:2,6 153:8 161:6 192:17 198:10,14 198:19,20 199:6,7 200:17,19,23 203:16 208:10 211:12 217:22 225:4,5 247:8 279:18 290:17 291:7 309:13 311:10,11,17,22 312:8,9 319:9 320:11,13 325:14 326:20 327:8,9 331:19 334:8 336:11,13
**correction** 271:25 306:16
**corrections** 273:22 274:6 306:9 308:24
**correctly** 30:22 48:8
**correspondence** 69:8
**cost** 291:3 292:17 292:22 294:8,13 295:13 296:15,20 300:6
**costs** 260:5,8,9,22 261:5 292:18 294:9,15 295:15 295:19 296:16
**counsel** 4:22 5:9 5:12 6:14 7:2,3,17 7:24 10:16 11:19 13:3,13,14,15 18:13 37:13 38:11 78:5 104:4 154:9 156:18 210:12 270:25
**counsel's** 87:22
**count** 190:6 198:7
**counter** 220:22
**counting** 190:25
**county** 336:5 339:5
**couple** 142:12 162:24
**couple's** 88:3
**course** 15:8 16:16 18:22 24:25 25:8 25:23 27:11 79:11 102:4,8 123:24 155:23 178:21 185:5 192:19 227:11 239:10 253:13 258:14 300:25
**court** 1:2 4:18,20 5:18 17:19 39:5 106:13,25 109:22 117:9,10 138:2 164:25 223:22 224:11 235:5,9 308:2
**courts** 34:16 94:25 104:18
**covered** 8:18 21:21 56:22 96:13 96:17 300:14,15 300:19,24
**covering** 310:19
**covers** 78:7 227:7
**covid** 10:3,22 21:17 25:13,15 61:22 62:4 63:11 66:9,18 68:4 76:10 98:6 100:3 100:15,17 173:10 173:21,24,25 175:22 176:14 178:5 184:6,20 185:18,20 187:4,5 191:10,24 192:2 197:22 219:10,12 219:16 231:13 274:15,18 275:9 275:23 276:24 291:25 309:4,7
**create** 16:25 68:17
**created** 30:23 31:5
**creates** 94:4
**creating** 31:10
**creation** 77:7 210:23
**credibility** 73:9 124:16 172:25 173:3
**criteria** 118:24 157:24 158:3,8 159:17 271:17 297:16 320:10 334:17 335:11
**criticized** 107:18 107:24 108:6
**crowd** 61:11
**cruz** 1:22 4:21 339:7,25
**curious** 142:21
**current** 29:9 34:20 149:15 181:19 313:16 334:21
**currently** 81:5 255:14
**curtis** 1:4
**cut** 35:3,4 141:8
**cutler** 1:4
**cutting** 35:2 134:11
**cv** 1:15

**d**

**d** 336:2 337:2
**dangerous** 330:7
**dannenberg** 10:17
**dart** 174:8
**dartboard** 174:8
**data** 34:24 35:4 154:3 299:17
**database** 35:17,23 75:15,17,20,21 79:17,20 154:3 156:21,25 157:2,3 157:10
**databases** 332:21
**date** 29:21,22 31:22 32:10 101:14 138:6 144:6 340:4
**dated** 137:17
**dave** 1:11
**day** 32:12 66:14 127:25 207:6 249:25 328:18 336:20 339:21 340:21
**days** 20:19 163:24
**dcas** 10:13 21:7,12 22:23 23:10 26:8 37:13 38:19 61:8

65:14 76:21 81:7 81:22,24 103:7 128:10 140:2 161:19 337:15
**dcas's** 153:14
**de** 19:3,14,16 53:8 53:18 54:2 66:25 68:11 118:22 131:24 203:8 252:9,12 291:3
**deal** 92:3 133:23 134:22 202:18 250:5 330:16
**dealing** 21:16 91:22 97:25 200:13 286:24 320:25
**dealt** 25:15 95:17
**dean** 1:5 3:5 12:20
**debate** 242:4 313:11
**deblasio** 117:20 118:3
**december** 154:21
**decide** 15:24 24:4 36:22 54:4 57:6 65:25 107:10,12 128:12 169:8 170:22 178:3 276:10 296:4
**decided** 27:25 54:22 55:5 57:3 80:25 97:6 101:14 202:20 321:16
**decides** 198:16
**deciding** 40:11 53:4 72:3 79:11 89:6 133:17 263:3 279:13 323:24
**decision** 14:20 30:13 39:2 40:18 41:3 43:17 44:3 51:21 53:5 85:14 85:15 92:17 105:25 106:8 107:17,24 108:5 111:20 115:17 125:12 155:4,6,8 159:3 160:7,8,9 163:12 164:3 169:8 172:19 178:19 196:8 201:24 202:8 203:8 204:6 243:22 244:9 280:17 281:13 296:9
**decisions** 14:12 17:5 27:21 30:15 38:23 39:13 56:7 58:7 60:10,22 78:19 97:3 107:20 107:20 111:17,18 114:4 125:15 131:8 152:21 165:21 179:12,14 213:5 228:4,20 242:14
**declarations** 25:7 28:9
**declination** 236:5
**deemed** 202:20
**deep** 109:5
**deeply** 206:14 290:2
**def** 137:15
**defend** 89:20,21 97:2
**defendant** 2:19
**defendants** 1:14 5:9,11,14,16 6:9 8:13 137:14
**defended** 95:7
**defense** 102:15
**defenses** 259:6
**deficient** 158:11
**define** 88:13 93:22
**defining** 88:11
**definitely** 141:11 271:7
**definition** 57:11 94:11,15 222:8,11 222:14 255:18
**definitions** 100:22
**definitively** 129:11 130:9,11
**degree** 180:2 181:18 298:23
**delay** 70:6
**deleted** 80:7
**delgado** 1:4 3:10
**demand** 322:17
**demartini** 1:4
**demonstrated** 204:8 270:9 297:12
**demonstrates** 168:9
**denial** 34:6 40:3 41:12 48:4 54:18 60:17 95:7 131:8 131:17,18 154:11 154:12,13 157:4 157:22 158:6,9,18 158:23 159:18 164:2 171:21 179:20 198:21,24 199:14,24 202:6 202:12,16 203:16 203:25 236:24 238:19 240:24 265:10 286:12 290:13 294:6 326:2
**denials** 16:10 32:2 34:21 43:16 57:20 103:18 140:24 141:6,10 145:25 155:9,11,14,16 159:7 217:2 253:7 259:7 318:2 331:17
**denied** 17:14 31:23 32:9,17 33:24 43:20 48:19 54:10 56:21 57:7 60:18 131:15 145:18 159:3,4,20 160:2,18,19 163:19 165:24 169:22 173:22 176:22 201:4,23 201:25 204:6 207:22 217:3 242:19,19 247:18 253:2,12 271:19 273:4,5 288:10 293:22,22 294:24 299:11 300:3 301:18 302:4,5 331:15 332:5,10
**denies** 172:4 225:17
**dennis** 1:5
**deny** 59:11 145:13 165:23 168:4 173:24 176:6 179:17 198:16 203:15 262:21 272:22 296:5,9 324:20 325:13 327:24
**denying** 44:18 53:21 59:9 180:19

199:22 200:5 239:3 269:8
**department** 2:18 8:8 9:20,20,23 10:6,13 11:13 12:24 14:14 18:16 20:22,24 28:23 29:2,5 31:15,17 35:21 36:13,15 37:9 38:13,17 39:15 44:8,16 45:10 48:15 56:5 60:15 64:15,24 78:25 81:6,10,19 82:4 85:12 87:17 88:18 89:5 91:20 93:17 94:19,21 96:6,24 101:24,25 103:20,25 105:15 128:10 129:6 130:15 133:16 137:19 150:19 151:11 161:19 163:8,17,23 184:4 214:23 217:23 218:4 219:2 235:24 236:11 237:22 238:16,17 238:18,19,21,23 238:24 240:13,13 241:25 256:8 264:25 265:13 266:21 267:2 268:7 273:17,22 303:9,11 306:10 306:16 308:23 320:3 333:17 335:2
**department's** 89:16 274:6 303:13
**departments** 13:9 36:5 65:19 66:3 81:21 130:14 240:10,15,16 241:13,18 334:19
**depended** 333:15
**dependent** 16:10 126:24 180:3 233:7,7 263:17
**depending** 172:11 178:18 242:21 275:17
**depends** 4:7 114:7 205:19,21 229:18 263:20 327:25 328:2
**deposing** 98:20
**deposition** 1:21 4:5,14 6:7,8 8:18 25:18 76:7 227:11 235:9 257:14 270:24 271:9 307:15,23 330:16 335:23 336:9 339:10,12 340:4
**depositions** 6:13 6:15 115:5
**deputy** 10:17 11:2 11:10 12:18,20 20:15
**derive** 211:18
**derived** 188:8,13 188:22 189:14 190:15 197:18 205:24 208:20 210:24
**deriving** 144:24
**describe** 16:3 25:10 221:18 231:20 233:19 241:3
**described** 43:19 131:25 141:20 144:4 147:25 171:3 192:25 218:8 223:14 229:10 262:17
**describes** 163:3 239:11
**describing** 50:17 62:8 194:19 222:13 228:7 328:3
**description** 168:10 203:19 231:22 232:13 241:4 261:24 285:4
**descriptions** 304:13
**designated** 170:3
**designation** 159:18
**designed** 250:21 250:22 295:6
**designing** 15:21
**desire** 17:4 277:3
**desired** 16:5,6
**desires** 19:3,15,17
**desks** 304:5
**desperate** 251:9
**despite** 122:8 168:5 170:23 212:14
**detail** 111:4,7 121:10 299:7
**detailed** 101:11
**details** 186:5
**determination** 16:19 42:18 50:14 56:18 59:8,10 62:24 84:2,15 85:4 90:5 120:13 173:15 176:5 182:2 183:9 191:13,20 196:19 198:12 200:6 201:22 202:22,23 204:4 207:12 225:23 226:5,6 228:11 231:8 243:7,10,13 244:7 258:22 276:5 278:20,21,24 279:20 280:2 289:20 293:4,21 294:22 295:24 296:5 297:6 298:18 301:6 303:18 307:9 308:8 309:4,7 317:3,4,22 321:12 321:24 322:12 323:17 329:13
**determinations** 16:15 59:20 85:8 89:17 189:11 212:25 229:15 246:13 296:24 300:2 308:19 318:14,17 322:14 323:10 326:9,14 328:20
**determinative** 183:15 247:16
**determine** 164:8 177:3 182:8 197:23 204:5 207:5 221:25 222:16 225:12 229:4 230:17,19 244:8 271:18 301:17 302:15 316:2 321:19

324:2,4
**determined** 64:2 170:8 221:3 248:8 280:23
**determines** 66:24 226:2
**determining** 162:8 162:15 191:8 192:18 214:6 216:25 239:2 262:19 291:22 302:4 335:12
**developed** 74:25 75:14 168:13 214:12,14,15 278:21,25
**developing** 167:7
**development** 210:23 212:15 215:5 280:3 282:25
**developments** 18:20 72:14 105:3 112:21,22
**devoted** 126:22
**di** 46:3 67:13 92:20 98:22 102:20 105:5,19 111:23 113:7 114:20 116:25 117:6 125:4 132:12,20 164:10 246:11 256:4 274:19 286:14 288:22 307:11
**dial** 310:16
**dialogue** 47:19,21 49:2,16 50:2,2,8 50:11 51:10,12,17 73:16 124:20 125:3,16,22 126:6 126:11,13 158:5 158:16 160:6 174:13,16 176:7 196:14 204:21 215:15 219:24 231:5 242:23 243:2,6 244:6,13 244:19,22 245:2 245:11 247:10,14 247:20 252:3,19 252:24 285:12 287:23 289:25 294:18 295:23 301:17 304:18
**diet** 227:24
**differ** 46:18,18 141:24
**difference** 47:3 229:15 275:8,22 276:21 277:12,13 333:5
**different** 9:17,18 15:3,3,4 28:13 30:5 43:23 59:18 63:9 78:15 80:15 95:13,14 100:18 124:18 125:23,25 128:7 129:14 139:24 164:5 168:25 169:5,18 172:4 175:15 177:2 181:21 195:15 202:23 203:5,10,11 233:16 242:13 250:15 252:14 263:6 287:9 313:24,25 330:19
**differently** 58:9 150:14 206:13
**difficult** 299:2 317:6
**dig** 302:25
**digit** 151:13,17
**direct** 7:5 67:18 74:24 87:2 101:21 105:20 117:19 269:25 270:4 271:24 272:19,24 273:6,7,10,13,15 273:23 274:7 278:17 305:19,25 306:12,17,22 307:5,6,17 308:7 308:13,25 309:5 309:20 310:7 311:14,20 312:11 312:13,21 313:7,8 313:14,17 314:8 314:15,20,22,23 315:2,18 316:23 318:6 321:5,11 322:5,7
**directed** 156:18 274:23 292:3
**directing** 67:14 99:3,14 292:11
**direction** 172:15 186:15 195:3 327:14 329:18 337:7
**directions** 211:11
**directive** 38:6
**directives** 78:8
**directly** 12:13 65:10,11 77:14 89:8 264:3 280:9 282:16 320:24
**director** 195:5
**disability** 54:15 158:20 170:3
**disagree** 41:4 171:18 234:10
**disagreed** 234:6
**disagreement** 278:6
**disagreements** 183:21
**discovery** 102:21 307:4,13
**discretion** 39:7,9 53:6 172:18 173:5 174:4
**discretionary** 174:8
**discrimination** 95:21 97:4 103:18 112:16 288:19
**discuss** 6:20 15:8 17:24 18:13 19:3 27:19 38:24 62:19 70:8 71:25 72:18 75:11 77:11,18 106:17 119:8,20 121:2 129:7,25 144:12 149:14 227:15 250:16 289:23 319:5
**discussed** 15:12 20:10 24:17 62:18 69:10,14 85:20,21 98:17 106:4,11,24 107:8 112:19 116:10,20 120:4 128:8 129:20 131:24 133:23 134:4 142:11 208:7 233:14 266:17,19
**discussing** 12:13 15:2,5,22 19:19 62:21 64:8 70:13

91:10 108:14 119:13 130:5,25 197:15 303:24
**discussion** 10:24 13:24 14:7,8 15:4 15:14 17:4 19:13 68:2 70:21 73:19 85:23,24 91:9 96:17 104:23 105:3 106:12 107:4 120:10 138:21 142:3,8 146:2 148:24 182:15 186:8 210:17 258:2 261:14 302:22
**discussions** 11:11 11:25 12:15 18:25 27:4 64:14 65:2 69:7,18,25 70:22 96:5 106:19 118:7 119:4,5,13 120:3 120:25 129:12,14 129:15 130:19 134:15 135:12 149:12 156:8 185:6,22 227:13 259:5 266:20 276:12 289:12 319:15
**disparagement** 104:14
**dispense** 6:18
**dispositive** 119:18 120:15 175:5,8,12 178:17 252:16 258:19,21 296:13 298:3,10 304:3,7
**disqualifying** 95:3 95:10 198:8
**disregard** 107:14 110:23
**disregarded** 171:12
**disruption** 291:12 312:19 314:4 318:8
**disseminated** 77:24 78:11 215:23 337:18
**disseminating** 78:3
**distinction** 101:10 241:21 316:10 324:23 328:8
**distinctions** 227:4
**distinguish** 134:8
**distribute** 152:12
**distributed** 150:11
**district** 1:2,2 4:18
**divide** 128:14
**divided** 151:12,17
**dividing** 129:16 140:16,17
**division** 8:6,7 86:24 87:2,12,25 88:17 89:19 96:25
**divorced** 315:16
**doctors** 11:20
**document** 23:4,23 26:12 27:17 73:17 76:7 77:2 98:8,9 140:2 153:17 260:3 281:11 337:12 338:2
**documentation** 51:19 120:5 157:25 218:15 268:25 301:20
**documents** 22:20 24:5 25:2 26:2,6 26:18,25 27:22 76:4 98:7 133:13 135:2 153:25 154:6 216:6,8,24 315:5 321:18,20 321:22,23 322:3
**doe** 43:16 44:5,22 45:20 46:2,7,15,24 47:4,6,14,15,24 48:2,19 49:4,7,7,9 49:18,20,21 50:2 50:21,22 51:2 52:19 56:11 57:16 58:9 59:3,17,19 106:7 266:8,17,18 267:10,16,18 268:4,5,10,19,19 268:23 269:3,5,7 308:20 330:25 331:3,14,24 332:5 332:16,19 334:13 337:22
**dohmh** 84:17,17 85:24 103:7 128:7 189:5
**doing** 8:2,5 34:13 34:13 37:8,9 40:15 42:12 48:2 53:19 108:11,12 108:12 113:2 123:7,8 139:7 165:25 166:2 174:9 185:21 186:13 189:8 199:21 200:2,3 201:12 203:19 207:7 217:4 221:19 234:16 243:25 278:14 282:7,12 285:5 293:16 335:8
**double** 110:6
**doubled** 82:5
**download** 154:6
**downloading** 154:4
**dozen** 123:17
**dr** 216:2
**draft** 319:23
**drafted** 155:9,11
**drafting** 23:18,23 76:13,17
**drafts** 76:23
**draw** 229:16
**drawn** 220:10 221:10
**drew** 97:7 220:19
**drug** 222:2
**due** 45:24 118:17 335:13
**duly** 5:20 339:11
**duplicated** 44:14
**duration** 317:9,13 317:22
**duty** 92:6 95:21

**e**

**e** 2:2,2,9 3:2,2 5:1 5:19,19,19 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1

51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 137:2,2,6,6,6 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1 159:1 160:1 161:1 162:1 163:1 164:1 165:1 166:1 167:1 168:1 169:1 170:1 171:1 172:1 173:1 174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:1 185:1 186:1 187:1 188:1 189:1 190:1 191:1 192:1 193:1 194:1 195:1 196:1 197:1 198:1 199:1 200:1 201:1 202:1 203:1 204:1 205:1 206:1 207:1 208:1 209:1 210:1 211:1 212:1 213:1 214:1 215:1 216:1 217:1 218:1 219:1 220:1 221:1 222:1 223:1 224:1 225:1 226:1 227:1 228:1 229:1 230:1 231:1 232:1 233:1 234:1 235:1 236:1 237:1 238:1 239:1 240:1 241:1 242:1 243:1 244:1 245:1 246:1 247:1 248:1 249:1 250:1 251:1 252:1 253:1 254:1 255:1 256:1 257:1 258:1 259:1 260:1 261:1 262:1 263:1 264:1 265:1 266:1 267:1 268:1 269:1 270:1 271:1 272:1 273:1 274:1 275:1 276:1 277:1 278:1 279:1 280:1 281:1 282:1 283:1 284:1 285:1 286:1 287:1 288:1 289:1 290:1 291:1 292:1 293:1 294:1 295:1 296:1 297:1 298:1 299:1 300:1 301:1 302:1 303:1 304:1 305:1 306:1 307:1 308:1 309:1 310:1 311:1 312:1 313:1 314:1 315:1 316:1 317:1 318:1 319:1 320:1 321:1 322:1 323:1 324:1 325:1 326:1 327:1 328:1 329:1 330:1 331:1 332:1 333:1 334:1 335:1 336:2,2 337:2 339:2,2

**earlier** 28:22 48:4 54:8 78:2 128:9 144:11 151:4 181:21 243:3 292:4 306:14 316:21 317:17 319:25 330:16 333:17

**early** 71:5 75:14 109:2 154:21

**earn** 250:23 251:20 253:20

**easily** 74:17

**eastern** 1:2 4:18

**echo** 182:24

**educate** 218:15,21

**education** 14:14 28:24 29:2,5 31:15 44:8,17 45:10 56:6 60:16 105:16 163:8,23 217:23 218:4 219:2 238:22,23 238:25 265:2,13 266:22 267:3 268:8 303:9,12 333:18

**eeo** 15:16 16:14 18:9 21:14 23:11 23:15 24:7 26:9 33:25 34:13 36:16 36:21 54:11,14 61:12 62:14 63:7 66:10 78:4 84:5,7 84:19 86:19 87:3 89:14 95:18,20 96:20 101:8 103:23 104:5 112:14 135:3,4 148:15 158:19 160:7 169:25,25 225:22 282:20 283:4 337:14

**eeoc** 61:6 63:6 64:10 66:7,17 68:4,18 98:6 100:6,18,23 101:11 112:18 139:25 146:25 179:6 182:16,25 183:13 222:14,18 239:10 292:3 320:18 322:4

**eeoc's** 25:11,13 100:2 227:7

**effect** 110:19,21 265:4 295:2 300:10

**effective** 154:19

**effectively** 15:19

**effectiveness** 16:17 275:16

**efficiently** 30:21

**effort** 37:16

**eichenholtz** 1:21 4:15 5:1,25 6:1

7:1,21 8:1 9:1
10:1 11:1 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1 39:1
40:1 41:1 42:1,21
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1,16 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1,2 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1,22
102:1 103:1 104:1
105:1,25 106:1
107:1 108:1 109:1
109:19 110:1,3
111:1 112:1 113:1
114:1,20 115:1
116:1,19,23 117:1
117:18 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1,11 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1,12,17
138:1,13 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1 159:1 160:1
161:1 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
170:1 171:1 172:1
173:1 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
191:1 192:1 193:1
194:1 195:1 196:1
196:7 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1
241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1 270:1
271:1 272:1 273:1
274:1 275:1 276:1
277:1 278:1 279:1
280:1 281:1 282:1
283:1 284:1 285:1
286:1 287:1 288:1
289:1 290:1 291:1
292:1 293:1 294:1
295:1 296:1 297:1
298:1 299:1 300:1
301:1 302:1 303:1
304:1 305:1,18
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1,12
314:1 315:1 316:1
317:1 318:1 319:1
320:1 321:1,17
322:1 323:1 324:1
325:1 326:1 327:1
328:1 329:1 330:1
331:1 332:1 333:1
333:11 334:1
335:1,16 336:7,17
337:4 338:8 340:5
**eichenholtz's**
99:25 102:23
**either** 23:14 25:3
28:20 33:8 55:24
65:10,11 86:16,18
90:13 95:19 96:7
122:15 146:21
147:17 154:9
158:7 159:17
168:8 180:24
186:23 199:15
204:21 230:17
233:21,22 243:10
245:23 247:19
252:6 268:24
269:18 273:2
279:12 280:9,11
297:2 313:20
321:17
**element** 198:7
259:11 330:3
**elements** 77:12,16
77:19 229:12
302:11
**eliciting** 205:4
**eligible** 162:9,17
164:9 304:14
**eliminate** 288:4
**else's** 61:5
**email** 23:8 26:11
74:6,7 78:11,13,13
78:14 82:14
133:14,19,22
134:3,6,6,8 135:8
137:17 138:4,15
140:19 141:23
142:16 143:5
144:7,13,16,17,18
144:21 149:24
154:15 155:3,25
156:16 157:10,13
158:25 183:25
184:13,18 185:4,7
185:9,11,14,22,22
186:6,19,25
326:17 338:9

**emails** 26:3,25 70:9 78:14,16 134:19,22 135:12 154:17 157:15,17 157:19 320:14
**emergency** 10:4 10:23 15:20 21:17 31:7 63:5 75:2 214:25 254:21,24 255:2,4,7,10,15,17 256:15 270:7 292:2 317:18 323:21,23 324:3,6
**emergent** 292:5
**emphasized** 142:20
**employ** 257:20 320:11
**employed** 59:18 249:5 270:2 300:10
**employee** 9:3 10:21 18:21 49:8 50:13 51:15,17 120:21 121:8,22 135:2 146:22 147:2,6,19 154:18 160:4,10 166:24 167:21 169:19,20 169:23 176:3,23 177:16 178:12 179:25 180:24 182:5,9 185:16 187:22 188:17 190:21,25 191:3 192:9,9,15 193:18 194:12,15,17,21 194:24 195:7 196:15,16 197:2,6 197:8,17 198:13 199:24 204:2,19 204:24 205:7,14 207:2,23 208:23 212:2 216:19 217:9,11 218:11 218:18,21 221:3 221:12 222:12 227:23 228:2,7,11 228:15,25 229:4,6 229:19 230:16 231:22 232:2 233:5,22,23 243:2 243:3,5,5 244:24 244:24 245:12,20 246:7 248:17 249:12,15 250:9 252:18 263:9,11 275:9 278:18 280:10,12 283:9 286:3,7,9,11 287:24 293:20,25 294:21 295:23,25 298:16,17 299:8 301:16,23 302:2 308:16 328:3 329:14 330:6
**employee's** 121:21 147:10,11 166:13 167:23,25 168:10 168:17 180:5 181:14 182:17 190:22 191:2 193:13,21 194:9 194:10,25 197:4 198:3 216:20,21 218:13,16 221:6 230:8,15 231:4 232:4,13,16 236:13 246:9 249:15,17 250:2,6 263:21 285:5 293:17 294:18
**employees** 17:14 23:20 31:18 44:7 44:11,12 46:16 50:21,22 54:23 55:23 56:17 58:9 76:6 92:19 103:9 103:20 120:6 125:25 166:18 179:7 211:12,22 212:21 215:15 219:2,14,17,19 230:21 241:22 244:4 249:8,9,22 257:20 258:13,20 259:8 264:16 265:15,22 269:21 269:24,25 270:3 273:24 277:20 283:5 292:20,20 294:11,11 295:16 295:17 296:18,18 300:16 303:9,12 303:15 304:10 305:23 307:21 308:20 309:12,20 310:22 315:8 316:2,18 322:24 323:22 329:17
**employer** 50:14 66:22 217:10,12 242:23,24 243:5 244:6 245:22 246:6 292:22 294:5,13 295:19 296:15,20,22 298:22,22 299:9 299:14,22 301:9 301:16,23 302:2 302:16 312:16,17
**employers** 253:19 293:12 298:4
**employing** 304:12
**employment** 7:24 8:7 15:16 18:16 63:15 88:4,23 89:19 95:21 96:25 97:4 112:15 199:9 277:14
**empower** 122:4
**empowered** 197:23 247:6
**empty** 151:8
**encountered** 72:24 72:25 73:4 75:10 141:17,18 151:6 181:3 212:8,9 215:3,17,17
**encouraging** 206:10
**ended** 57:14 218:8 218:19,20
**endless** 234:19
**ends** 57:14 206:12 256:2
**enforcement** 103:13,15 115:20
**enforcing** 292:7
**engage** 48:25 49:15 51:15,23 74:7 96:18,19 158:4 222:22 254:17 276:8 295:22 297:22 302:19
**engaged** 49:25 84:25 125:2,16 126:11 148:24 158:16 244:5,13 263:11 335:7
**engaging** 50:2 74:5 125:24 206:9 242:25 243:6

277:21
**engineered** 254:14
**entertain** 297:24
**entire** 98:5 104:17 114:6 147:23 182:8 183:2,7 266:9
**entirely** 131:6 171:13 179:21
**entities** 36:6
**entitled** 73:6 93:11 102:14 167:11 202:3,7,24 203:10 215:22 245:23 270:10 309:14
**entity** 8:15 29:3 282:12 300:14,15 300:19,21,24
**envision** 39:4
**equal** 15:16 63:15 65:5
**equally** 202:13,19
**equity** 11:3 92:2 104:3
**eric** 1:10,21 4:15 101:22 137:17 336:7,17 337:4 340:5
**errata** 340:2
**especially** 87:6 148:19 211:13
**esq** 2:8,9,15,22,23 2:24
**essence** 51:11
**essentially** 17:10 36:19 48:3 51:11 56:14 99:10 107:2 115:16 191:6 192:4,18 204:9 225:18 238:25 254:9
**establish** 315:7 316:17
**established** 74:21 119:23 284:14 293:5 329:14
**establishes** 324:11
**establishing** 330:4
**estimate** 30:14 33:9 57:17
**et** 4:16,17
**etcetera** 26:10 129:17 294:16
**evaluate** 68:25 69:20 70:9 166:9 266:12 329:7
**evaluated** 183:16
**evaluating** 69:16
**evaluator** 202:10
**evening** 127:23
**eventually** 154:15 267:6
**everybody** 332:5
**evidence** 42:10,17 42:19 233:9 284:15,22 285:16 285:23 287:4,5,18 301:9 303:21 307:8 315:6,20,25 316:16,17 317:2 317:10,21 318:14 318:17,21 321:4 321:10,23 322:17
**evidentiary** 285:9 285:14,25 287:3 287:22 301:21 306:21
**evolved** 17:3
**ex** 338:9
**exact** 227:14 291:21
**exactly** 44:6 53:16 94:17 235:12 243:16 246:7 247:7 304:25
**examination** 5:23 137:8 305:16 337:3
**examine** 45:23 181:13 293:9 294:4 295:10
**examined** 5:21
**example** 27:18 34:2 41:3,19 53:6 90:11,25 91:20 95:7 121:12 123:19 127:7,19 128:10 130:2 141:12,22 149:25 154:5 163:9 166:22,23 167:2 170:4 171:17 176:12 178:13 181:18 190:11 197:14 206:8 212:3 228:16 229:23 247:24 248:2,6 249:2 251:18 264:21 272:21 273:4 277:9 323:25 330:6 333:14
**examples** 140:20 141:5,14 142:18 143:3 145:16,16 164:20
**exception** 17:11 17:12 20:8 151:3 152:10 249:13 270:9 335:5
**exceptional** 130:4 282:17
**exceptions** 262:10
**exchange** 51:19 138:15,18
**exchanged** 26:2 27:2
**exchanges** 69:8
**exclude** 277:13
**excluding** 29:4
**exclusively** 126:18 284:4
**excuse** 23:12 53:21
**executive** 10:19 13:19 18:15 255:4 255:7
**exempt** 121:10
**exemption** 68:7 199:14 203:10 230:22 271:18 287:5 327:8
**exemptions** 17:23 19:7 118:25 305:24 306:4
**exercise** 39:8 173:4
**exercising** 135:15
**exhaustive** 240:14
**exhibit** 137:13 138:4,8,14 139:16 183:25,25 184:3
**exhibited** 245:16
**exhibits** 338:7
**exist** 69:5,6 164:17 233:3
**existed** 24:5 61:7 273:23 274:7 284:10 290:25
**existence** 77:23 122:7 211:8 216:8
**existing** 15:15 31:18 249:19

255:14
**exists** 34:24 172:3
**expect** 34:8,9,15 66:20
**expectation** 128:13 203:21,22
**expectations** 278:4
**expected** 67:23 128:12,21 149:8 203:14 284:9,11
**expenses** 300:11
**expensive** 299:3
**experience** 17:16 87:3,14,19,21 88:19 97:12 112:16 113:23 114:2 115:7,8 123:15 148:14,16 148:17 149:9 171:15
**experienced** 52:23 84:6 166:18
**experiences** 149:18
**expert** 214:10
**expertise** 86:10 87:4 95:25 98:2 214:24
**expires** 340:25
**explain** 33:18 37:2 54:2 218:11 220:17 238:9 246:23 268:4 286:4 293:15 299:18 318:22 319:8 320:19 321:14 326:20
**explained** 140:15 167:9 170:19 220:16 299:22
303:2,3 317:16 326:8
**explaining** 191:4 258:7 287:25 288:2
**explains** 155:8 212:13 325:3
**explanation** 43:13 121:11 143:13,14 143:16 164:25 166:13 167:23,25 193:9 204:24 236:5 238:25 262:3 265:21,24 268:20 274:9 275:18 280:11 284:12 295:25 296:22 297:4 298:11 299:9,10 302:10 306:15 308:13 313:13 319:7 325:6 333:18
**explanations** 147:18 212:16,22 258:15
**explore** 224:23
**exploring** 160:14
**exposure** 148:16 148:17
**express** 50:18 291:19
**expressed** 165:7 168:2 185:5 186:7 191:23,25 193:19
**expressing** 184:5
**expressly** 246:19 299:24
**extend** 6:25 180:7
**extensive** 87:3 98:2 152:24
**extent** 24:17 111:12 164:16 172:25 182:19 183:20 193:21,25 207:4,19 216:23 218:16 229:6 268:3 275:23 290:6 303:17 322:6 324:18
**extra** 289:15
**eye** 310:13,13
**eyes** 43:8

**f**

**f** 137:2 339:2
**face** 43:6
**facilitate** 35:16
**facilities** 298:23 298:25 300:8,17 300:23
**facility** 292:21 294:12 295:17 296:19 300:7,10 300:13,23 304:5
**fact** 43:20 59:2 73:5,8 82:2 90:20 99:19 101:6 106:8 106:12 119:17 120:16,19 121:2,5 121:6,7,17 131:12 140:21 141:16 142:19,24 143:4 145:16 146:8 147:9 148:21 159:14 167:13,14 167:15 168:5,17 169:13 170:23 171:25 181:9,10 182:12 185:16 194:12 208:13 217:24 218:6 225:11 228:3,6
231:15 233:7,7 234:20 251:5 253:16 255:25 263:19 266:18 278:16 280:24 286:8 287:17 301:10 303:10,17 314:10
**fact's** 177:14
**factor** 175:25 177:20 178:9,17 178:19 180:16 183:11,14 258:21 263:15 265:8 304:3,7 314:3 333:24
**factors** 146:17 147:20 168:3,8 171:10 172:24 177:14,22 178:12 179:20,24 186:14 202:19 207:4 223:3 231:6 234:3 294:15 296:25 299:20,24 301:4 326:10,12
**facts** 41:5 45:4 50:12 101:5 120:5 120:23 122:5,7 124:15 147:13,15 165:20 166:9,12 166:13 167:25 169:2 171:11 173:18 174:10,19 174:21,23 175:15 176:2,17 177:2,13 180:3 182:6,7 183:8,19,20,22 189:21,22,24 190:9 195:13,15 200:8,16 201:20

202:9 212:23 216:17 217:6 221:2,3,8 222:21 222:25,25 223:2 224:17,24 225:15 225:16,19,21,24 227:9 228:9,10,24 229:3,18,21 230:7 230:14,16 231:3,7 231:25 232:11,13 233:4,19 242:21 244:2 252:4 263:17,21 276:5 276:10 278:19 284:13 293:23 295:21 298:13,15 298:16 302:7 303:25 312:4 313:5 325:17 328:6 329:8,12 330:14 331:10

**factual** 87:5 124:14 168:22 172:9 173:15 174:20 176:18,21 189:2,6,25 195:17 198:7 201:16 209:10 224:22 244:8 276:24 277:17,18 278:5 278:16 297:24,25 303:4 317:19,20 327:21,25 328:5 330:19

**factually** 159:22 190:4 193:14,16 197:10 293:2 297:3 330:18

**fail** 264:12

**failed** 121:25 122:5,6

**fails** 177:8

**failure** 158:4

**fair** 122:23 172:17 174:7 302:18 306:18

**fairly** 8:4 81:25 99:11

**faith** 122:10 195:5

**familiar** 14:9 28:11 52:22 64:17 64:18,20 86:20 98:5 112:17 113:23 133:18 173:13 179:6 288:13

**familiarity** 114:3

**familiarize** 98:10

**family** 177:20

**faq** 23:23 24:8 26:7 27:17 62:7 76:5,8,14 98:7 319:18,21

**faqs** 61:7

**far** 100:24 101:23 113:20 128:9 130:23 140:8,14 141:5,17 146:13 161:14 206:14 259:10,24 273:18 305:4

**fault** 123:19

**faulty** 57:22

**favor** 221:9

**fdny** 307:4,20,21 308:3

**fear** 309:4,7

**feature** 154:24,25 155:11

**february** 8:10 82:2

**federal** 19:24 65:5 290:14,18

**feedback** 108:11 240:21

**feel** 92:6 169:17 178:14 235:8

**feeling** 205:11 225:25 226:3,8,17

**feels** 219:22

**felt** 126:12 176:8 203:15 237:3 292:8

**fertilization** 188:2

**fetal** 184:7,21 186:4 187:6,10,15 187:18 188:8,13 188:21 189:13,14 192:3,20 193:3 195:2 204:15 205:24 207:15 208:21 209:11 210:2 213:22 214:2,12,14 215:6 215:9 222:2

**fetus** 188:14 190:15

**field** 80:13,23

**fifth** 81:24

**figure** 55:19 153:16 156:20

**file** 162:9,13,14,20 163:9,17 164:7 236:6,12 237:11 237:19 240:17 244:16,18 245:17 294:6 298:5,21 331:25

**filed** 4:17 27:24 28:20 29:8 48:18 82:3 163:21 268:23

**files** 162:17 239:18 240:2,3 264:5 269:19,20,20 272:13 322:4

**filing** 163:14 244:14

**fill** 261:11

**filled** 261:16 267:19,21

**final** 30:13 39:2 51:21 289:18

**finally** 30:15 183:17

**financial** 300:7,13

**find** 70:4 149:13 155:22 156:13 184:13 223:5 322:14

**finding** 249:3 275:20

**findings** 189:25 201:18 277:17 278:6

**finds** 197:10 212:18

**fine** 52:7 108:21 109:8 328:17

**finish** 180:9

**fire** 238:15,17,18 238:18

**fires** 241:25

**firewall** 89:3 90:3 91:3 92:15 93:16 93:22 94:3,11,20 103:8

**firm** 2:12 75:9 135:19

**firm's** 13:16

**first** 11:9 12:18,19 20:15 32:11 37:5 44:2 56:18 62:21

91:4 96:23 104:6 113:22 150:23 170:21 184:24 185:20 196:11 206:24 208:2 211:10 214:15 219:22 224:3 233:15 239:13 241:22 268:8,21 271:12 276:6 278:15 288:18,24 305:20
**fiscal** 298:25 300:22
**fits** 128:15 259:19 324:15
**five** 81:5 150:19
**flag** 41:18 42:10 80:14 117:8,9 123:6 124:10
**flagged** 80:17 122:15
**flags** 80:24
**fluctuates** 32:25
**focus** 15:14 17:13 31:16 62:14 88:21 123:4 183:6 233:17
**focused** 129:18 205:23 263:8 269:17 273:12,13 331:24
**fogarty** 1:5
**folder** 157:12
**folks** 184:5
**follow** 26:3,6,24 49:21 66:7 68:6 73:18 80:14,20 107:16 110:2 115:21 128:21 131:21 140:10 142:9 146:16 150:9 185:9,21 220:7 239:25 244:18 271:13,14 276:7,9 282:4 283:18 285:6 305:18
**followed** 46:15 285:2
**following** 44:3 63:3 183:13 192:25 216:5
**follows** 5:22 115:15 137:7 300:5
**food** 228:4 325:9
**foods** 217:19
**force** 199:14
**forget** 235:12
**forgive** 254:20
**form** 39:24 59:24 134:18 222:3 243:17 316:7
**formation** 8:25 9:6 12:25 14:23 15:9 19:2 62:3 104:21 113:16,16 117:14
**formed** 14:23 92:16
**former** 118:22 209:7
**forth** 14:12,20 50:16 58:14,17 81:15 236:6 238:20 241:7 245:9 281:11 293:6 302:20 309:15 334:16 339:11
**forward** 37:11,18 37:22 75:19 298:19 335:19
**found** 57:21 190:4 202:11 226:24 311:16 334:15
**foundation** 75:8 164:17
**foundational** 92:25 115:3
**founding** 82:19
**four** 25:7 81:6
**frame** 106:17,18
**framed** 165:22
**framework** 114:7 172:21 290:14 321:15 324:12,15
**francis** 119:9,15 120:12 121:3
**frank** 1:6 3:8 127:15
**frankly** 14:7 19:16 199:20 250:16
**frequency** 180:15
**frequent** 74:3 141:4 324:23,25
**frequently** 80:12 125:16 208:7 211:5
**fresh** 58:19 280:16
**front** 67:25 311:4
**full** 50:23 126:18 141:9
**fully** 29:23
**fulsome** 44:11
**function** 31:13,19 35:8 39:3,4 41:6 42:13,15 51:9 58:12 74:10 82:10 89:20 97:2 118:19 132:17 216:17 252:22 282:20,21 312:24 318:18 322:15
**functionally** 280:7
**functioning** 189:7
**functions** 14:5 300:20 312:17 313:2 333:14
**furnished** 197:3
**further** 57:3 109:6 159:19 224:23 280:3 282:25 284:25 339:15

**g**

**g** 336:2
**gain** 250:11
**gallery** 43:11
**gather** 50:22 216:17 218:2 276:5 278:16 318:19
**gathered** 34:7 46:23 49:20
**gathering** 50:12 50:19 125:24 217:6 244:2
**gauge** 50:13
**general** 10:16 11:19 18:13 24:6 37:12 49:12 69:24 78:4,24 87:22 88:3 104:4 141:16 149:18 151:10 164:16 185:15 205:13 219:7 239:7 253:17 266:5
**generalization** 321:14
**generalize** 169:3 188:11,16

**generalizing** 169:4
**generally** 14:17 22:22 26:20,23 27:16,16 35:13 42:12 50:12,20 51:18 54:18,20 62:9 66:12,20 72:22 73:12 75:14 78:2,23 86:15 96:2 98:15 112:19 118:8 123:21 125:21 129:18,21 130:4 134:19 135:7 146:14,19 150:21 158:17 169:10 172:7 180:21 183:18 209:2 210:14 219:6 222:19 225:21 236:3,22 237:5,18 248:20 249:13 253:14 257:23 262:3,9 266:20 280:10 282:18 283:19 320:17
**generate** 35:15
**generated** 157:13 157:22 285:11 298:14
**generates** 157:10
**generic** 61:4
**generous** 7:10
**gennaro** 1:4 3:11
**gentlemen** 137:10 270:22
**geographic** 298:24 300:21
**georgia** 10:11 12:22 13:2
**getting** 31:20 33:20,22 46:6 59:6 107:10 138:18 142:4,23 199:19 254:12 256:7 276:20 299:7 320:7
**gibson** 2:12,15 270:25 304:22 305:17 306:24 307:12,19 313:4 315:3 316:9 317:5 320:16 333:10,25 334:6 337:5
**gibsonfirm.law** 2:16
**gist** 141:16 185:15
**give** 32:16 39:12 44:13,17 58:19 61:18 78:18 110:3 131:9 140:12,17 141:15 149:25 152:6 159:19 219:20 245:11 248:25 253:4 254:11 267:8,11 281:6,7 306:24 326:11
**given** 6:24 39:10 41:4 42:14 47:10 55:23 56:3 59:17 62:2 106:16 110:12 115:13 119:19 128:4 140:8,23 141:9 143:4 145:13,15 145:19 151:6 163:11 164:24 169:5 188:24 200:16 201:13 230:19 234:19 251:9 252:2 265:16 270:6 277:7 291:19 292:4 304:5 319:14 320:18 321:3,11 336:12 339:13
**giving** 24:18 69:22 125:13 146:15 252:9 280:15
**go** 4:13 14:2 15:13 18:3 24:22 35:2 37:21 39:23 41:24 54:25 55:3,24 70:22 72:3 80:8 80:16,17 105:11 106:15 109:4,5,6 111:4,7 115:5 135:25 140:17 149:6 150:15,17 150:21 151:10 152:19 169:23 173:19 180:9 189:4 203:19 216:8 221:14 224:25 225:10 237:21 279:6 287:9 303:3 305:10 313:5 328:7 330:20
**goal** 165:7
**god** 329:18 330:11 330:13
**goes** 91:8 114:18 117:4 150:20
**going** 4:2 10:2 15:12 16:9 17:11 21:6 22:25 23:4 24:18 25:21 32:16 46:11 51:6 52:10 56:20 60:4 61:3 62:17 70:7 85:14 85:22 92:20 96:11 98:22 105:6 106:24 107:2,6,14 108:13 109:5,11 112:6 113:8 114:14 117:11 120:4 125:4,22 128:16 129:7 135:9,21 136:3 137:20,21 138:17 140:16 146:11 149:2,3 159:19 167:20,22 173:13 177:16 180:11 189:22 195:25 199:10 210:6 213:15 214:25 220:17 221:21 243:24 246:11 249:24 254:6 256:12,22 257:2 257:16 267:13 270:17,24 271:4,7 274:20 275:3 281:21 288:22 289:3 297:22,23 299:19 302:25 304:21 305:11 307:17,19,23 315:4,21,22 320:20 324:22 325:13 327:11 331:10 335:6
**good** 5:25 6:2,18 7:20 87:10 109:16 137:10,11 138:10 178:13 316:9
**gotten** 30:19
**governed** 290:4

**government** 65:6
**grant** 34:3,4 40:2 140:22 142:21,25 146:5,18 157:4 167:13 170:17,17 171:12,20 173:25 176:6,20 182:3,21 186:2 202:16 204:10 245:4 246:18 247:6 265:5,9,10 290:25 296:8 327:23 332:14 333:9
**granted** 32:18 33:18 54:3 165:9 173:19 199:11 204:9 213:6,11 217:3 236:8 242:16,17,17 243:16 264:9 271:19 280:24 293:23 294:25 301:18 302:6 310:25 312:7 314:5 318:9 331:16 332:23
**granting** 67:3,11 173:16 178:3 261:22 271:23 273:23 291:5 292:15 312:15,23 312:25 313:20 324:13
**grants** 33:6,12 34:21 141:7 172:3 252:11 281:2 332:8
**great** 63:8 250:5 317:2 330:15
**greater** 66:24 68:11,17 275:23
**green** 195:10
**ground** 141:19 199:24 207:22 262:21
**grounds** 53:21 117:3 237:3 239:3 259:7 269:9,12 318:3,4,5,7 324:21
**group** 11:4 15:23 18:11 61:19 72:6 74:9 82:17 129:20 129:22 134:17 145:20 149:14 210:19 319:15
**groups** 78:15 96:18,19
**guaranteed** 213:16
**guess** 12:6 124:12 124:14 137:24 304:24 305:21 310:16
**guidance** 24:2 25:13 26:7,19,20 61:7,21 63:3,6,10 63:14,19 66:8,11 66:17 68:4,6,18 78:7,8 98:6 100:2 100:5,7,10,14,23 101:12 108:7 112:18 140:2 146:25 179:7 182:15,16,20 183:13 222:15,18 227:7 239:11 289:10 292:3,8,9 293:7 319:14 320:17,21 322:4
**guidelines** 76:3 77:6,19,23 115:21 189:4
**gut** 225:25 226:3,7 226:17

**h**

**h** 2:22 5:19,19 88:8 137:6,6
**haider** 2:22 5:10 5:10 7:18,18 22:18 45:13 46:3 50:4 52:5 54:5 56:9 57:24 58:3 59:4,23 62:6 63:2 66:6 67:10,13 68:13 69:12 70:18 71:21 76:18 77:25 78:21 79:25 83:19 84:13 86:7,14 89:13 90:10 92:20 93:19 94:13,23 96:11 97:21 98:22 99:7,18 100:9,20 102:20 103:11 105:5,19 108:2,19 108:25 111:11,23 113:7 114:12,20 116:8,25 117:6 118:14,16 119:2 122:11 123:3 125:4,19 127:12 128:24 129:9 131:5 132:8,12,20 150:9 158:13 164:10 165:15 178:6 192:23 194:4 195:19 198:11 200:4 207:17 209:14 210:6,11 212:19 213:23 216:4 217:17,21 219:4 220:12,24 227:5 227:21 228:22 230:24 231:18 232:25 233:13 234:15 239:19 241:14 242:5 246:11 249:7 250:12,25 251:12 251:22 252:15 253:24 256:4 257:7,11 258:17 259:16,25 270:13 274:19 275:11 276:2 277:15 278:13 282:3 286:14 287:8,14 288:20,22 291:9 291:24 292:23 293:13 294:14 297:19 303:16,22 304:16 307:11 308:9 314:9 315:10 316:6,11 319:10,19 320:12 321:7 323:4 325:15 326:4 327:4,19 329:6,25 333:10,25 334:4 335:20
**half** 40:5,5 83:2 272:14 289:17,18
**hall** 9:25 12:6,19
**hand** 43:12 56:3 202:11,13 279:3 339:21
**handle** 16:12,16 85:22 89:16 96:22 119:14 129:7 130:15 201:14 320:9
**handles** 88:3 150:13

**handling** 130:20 130:21 158:21
**happen** 20:2 90:18 177:19 190:8,10 234:14 237:15
**happened** 41:20 74:2 107:12 124:11 160:15 266:10
**happening** 130:3 142:7 161:17
**happens** 235:19 281:15
**happy** 24:24 37:4 297:25
**hardship** 64:2 66:16,21 67:8 69:25 235:23,25 236:2,3,4,8,10,17 236:25 237:3,5,24 238:8,14,20 239:3 239:12,15 240:6 240:20 241:2,11 241:19,23 245:25 253:3,7,12,14,18 257:21 258:15 259:5,11 260:7,11 261:6,21 262:13 262:15,22 263:23 263:24 265:23 266:12,17,24 267:11 268:6,19 269:11,12,15,16 275:5 278:9 283:20 284:7,10 284:14,20 287:20 290:24 292:15 293:2,6 295:12 296:11,23 298:5 299:12,22 300:2,4 301:2,7 303:8 304:4,9,12 307:8 307:22 308:5,8,19 309:4,6,19 310:9 311:19 312:7,14 312:20 313:5,9,14 313:17 314:3,24 316:24 317:24 318:5,6,16 321:5 321:12,24 322:5 323:9,17 324:12 324:21 331:15 332:11 333:9,19 333:20,24
**harm** 254:2
**hate** 55:17
**head** 36:20 87:25 210:15 328:13
**headline** 13:17
**heads** 38:5,19
**health** 1:11 9:23 10:3 11:13 15:20 19:20,21 21:17,19 31:7,8,17 56:16 63:5 75:2 81:10 81:19 85:12 91:20 161:19 189:9,10 189:22 190:2 201:18 209:6,16 214:23,24,25 230:5,11 248:15 254:24 255:8,9,11 255:13 256:3,8,15 270:5,7 277:20,22 278:2,6 292:2 317:18 322:11,13 322:18,19,21 323:21,23 324:3 324:10,16,17
**health's** 9:10
**hear** 31:16 48:9 62:10 154:4 223:24 238:12 272:10 332:7
**heard** 4:9 178:25 179:2 185:5 238:10
**hearing** 91:24
**heavily** 126:24
**heightened** 62:22
**held** 146:20 147:3 148:3,9 166:10 167:8 175:23 182:9,19 184:12 184:22 185:17 186:22 192:10 193:6 198:18 199:12,16,25 200:14 205:8 211:8 219:14 221:4 222:4,9 223:12 224:10 228:12 229:5 231:6 258:2 298:8 325:4,7,11,24
**help** 139:21 219:21 231:20 254:17 326:16
**helpful** 142:18 207:19
**hereinbefore** 339:11
**hereunto** 339:21
**hesitant** 186:9
**hesitate** 322:9
**hey** 41:7 73:2
**high** 18:9 20:9 21:4 22:23 24:2
**higher** 34:4,11 43:5 72:15 73:10 316:18 328:8
**highly** 96:21 148:20,21 178:19 181:8 233:6,7 263:17
**hiring** 292:20 294:10 295:16 296:17
**history** 114:24 119:24
**hold** 135:5
**holding** 328:24 329:3,23
**honestly** 156:6
**hope** 335:20
**hopefully** 255:22
**hoping** 152:17
**host** 35:23 122:17 147:19 155:17 168:7,15 242:19 242:20
**houlihan** 12:20
**hour** 83:2,2 135:23
**hours** 127:25 234:24 271:8
**house** 88:5 103:23
**housing** 85:10,12 88:9,12 151:4
**hr** 18:8
**huh** 48:21 74:19 76:11 77:21 134:7 159:11 184:2
**human** 10:18 18:21 58:15,15 62:23 63:8,23 64:8,15,16,19,21 65:3,7,8,18 66:3 81:8 103:12,16 151:19 290:6,8,16 292:6,7 297:9 299:21 302:17,18
**hundred** 31:15 162:2

**hundreds** 51:25 52:3,4
**hygiene** 9:24 11:13 81:10,19 85:13 161:20 214:24
**hypothetical** 133:24 134:5,10 160:4,13,16,24 193:4 201:3 235:20 251:3,5 254:14 307:17
**hypotheticals** 134:13 165:2 227:12 234:17,19 234:24

**i**

**i.d.** 338:8
**ibuprofen** 205:5 207:25 209:9 210:4,20 211:16 212:14
**idea** 150:6 205:23
**ideal** 75:3
**identifiable** 292:17 294:8 295:13 296:15
**identification** 138:5
**identified** 70:21 142:16 293:10
**identify** 65:17 74:13,16
**imagination** 213:18
**imagine** 8:20 54:12
**imbalanced** 202:10
**impact** 300:11 324:13
**impair** 312:24 313:2,21
**implement** 290:7
**implementation** 10:22 18:6 19:4 21:22 24:12 31:9
**implemented** 16:8 20:18 36:18
**implementing** 20:8 290:10 292:11
**implication** 177:11
**implications** 18:14
**imply** 177:16 221:12
**importance** 258:9 261:16 262:4
**important** 6:21 17:11 28:21 31:4 33:20 61:10 72:14 107:9 111:14 115:22 132:18 230:5,9 314:20 323:22 326:6
**importantly** 92:22
**impossible** 90:16
**improper** 229:8
**improve** 95:23
**inability** 258:13 258:20 259:22
**inaccuracy** 198:7
**inaccurate** 225:7
**inaudible** 59:3 73:8 257:25
**incidents** 219:5
**include** 74:12 259:4
**included** 203:24 250:9 290:15 295:12
**includes** 194:2 294:7 317:18
**including** 18:22 24:13 139:25 154:2 188:6 217:15 281:12 292:18 294:9 295:15 296:16 299:11 300:19
**inclusion** 11:3 92:2 104:4
**income** 250:11,23 251:7,20 253:20
**inconsistencies** 147:17,18 148:6 223:3 284:24
**inconsistency** 168:9 179:22
**inconsistent** 42:9 140:7 148:9 192:12 233:20 286:25
**inconsistently** 182:17
**incorrect** 143:11 190:4 297:21
**increases** 181:19
**indefinitely** 253:25
**independent** 53:19 73:7 115:17,18 119:3 135:15 149:19 278:9 332:9,12
**indicate** 244:21 327:11
**indicated** 49:9 76:12 81:17 124:19 130:22 273:19
**indicates** 139:16 232:5
**indifferent** 135:22
**indirectly** 65:11 65:12 208:20,21
**individual** 11:16 23:18 38:2,3 59:15 69:9 70:10 72:21,23 73:20 78:9,10 79:9,21 81:2 86:11 89:21 91:6 92:4 96:9,22 96:23 113:3 124:16 129:13 149:22 150:12 151:20,21 164:19 166:10 173:4 183:16 196:18 197:6 218:23 230:14 236:12,13 236:20 237:25 238:4,11,13 239:6 239:17 240:2,3,4,7 240:21 264:5 266:3,15 267:6 268:6,18 269:19 269:20,22 275:7 275:21 284:6 289:5 291:20 303:19,25 308:6 317:9,14,23 334:24
**individual's** 67:12
**individualized** 101:4 147:22 148:20 263:19 308:5,15 326:15
**individually** 1:6 72:11 92:6 169:14 227:9

**individuals** 9:15 10:20 40:25 45:17 45:19 48:2 61:17 65:17 76:20 86:16 86:17 91:24 139:2 139:5,15,20 148:13 151:23 164:22 173:6 187:13 270:8 298:6 310:3
**inference** 220:10
**inferences** 220:19 221:10
**infirm** 171:4
**influencing** 91:7
**informal** 71:24
**information** 25:19 34:7 35:19,22 44:9,14,17,21,23 45:3,25 47:5,7,10 47:13,24 49:3,7,10 50:19,23 51:4 59:17 69:21 73:14 77:22 79:20 111:14 115:13 116:17 120:21 122:16 125:24 135:4,6 150:8 153:2,10 154:7 156:2 159:19 172:13 176:3 195:3 196:13,15 196:21,25 197:3 203:25 204:2,19 204:22 205:4 213:19 216:9,18 217:14,18 218:3 220:15 236:16 237:17,24 239:14 240:6,11,19 241:12,18 244:23 244:24 257:18 259:21 260:5 261:4,9,19,24 262:6 264:2,6,13 264:19 265:12 266:2,5,25 267:16 267:24 268:9,11 268:22,24 279:6 280:5,12,20,22 281:17,23 283:6 283:10,13,25 285:11 292:17 293:10 294:7,20 294:22 295:7,12 295:24 296:14 298:6,21 301:10 301:11,11 302:8 302:10 303:5 308:14,24 332:20 337:21 338:3
**informed** 282:6
**ingested** 207:16
**ingredients** 194:16
**initial** 29:18 48:18 60:10,22 84:11,14 85:2 331:14
**initially** 154:14 332:5,11
**inject** 190:14
**input** 45:24 235:22
**inquire** 24:23 164:15 269:22
**inquired** 265:20
**inquiries** 46:22 218:3,5 240:5 269:17 278:17 283:16
**inquiring** 93:12
**inquiry** 22:11 45:16,18,21 74:14 126:15 208:16 219:6 222:23 223:6 224:23 239:25 244:18 266:8,21 267:5,7,8 276:8,9 280:8 284:25 291:10 302:13
**ins** 69:13 70:2,13 70:14,24 71:7,11 71:23 72:18 130:17 142:4 149:14 227:14 266:16
**insincere** 183:4 200:18,20,22 223:5 226:16,18
**insofar** 273:15
**instance** 56:18 96:23 104:6 196:11,12 199:23 214:15 219:22 241:22 276:6 278:16
**instances** 284:3
**instant** 46:17 98:19
**institutional** 119:16
**institutionally** 120:17
**instruct** 46:11 60:24 92:21 93:8 96:12 98:23 105:6 111:24 112:6 113:8 117:11 125:5 132:13,21 148:11 165:4 210:7 221:20,23 246:12 256:12 274:20 275:3 286:21 289:3
**instructed** 68:5 107:22 110:9,10 131:9 148:8 149:6 227:18 228:5 230:21 231:3 234:5 256:14 288:8
**instructing** 103:5 115:10 117:2 140:5
**instruction** 61:16 110:13 133:9 142:23 149:9 201:14 231:14
**instructions** 18:10 54:23 61:24 140:13,18 145:12 146:14 188:25 197:8 289:6 291:19
**insufficient** 127:20 157:25
**insurance** 304:15
**intend** 257:12
**intended** 17:18 145:4 235:12
**intent** 235:15
**intention** 145:8
**interacted** 158:19
**interaction** 121:11 282:13,19
**interactive** 160:5 160:6
**interagency** 10:2 12:7
**interest** 102:12 288:11,13,16
**interested** 163:14 249:12 281:17 339:18

**interfere** 241:6
**interim** 20:20
**intermediate** 53:10
**internal** 16:21 299:16
**internet** 4:8 77:20
**interpretation** 45:9 234:7
**interruption** 26:13
**interview** 263:19
**introduce** 4:22 5:7 137:13
**invitation** 23:13 23:14
**invite** 82:16,18
**involve** 94:10 103:13,18,22 215:6 237:5
**involved** 8:25 9:5 10:7,12,23 11:10 11:12,16,24 12:5 12:13,23 13:7,10 13:18 14:8,22 17:25 18:11,14 20:6,25 21:6 23:17,22 26:3 28:12 31:21 33:8 46:17 76:13,23,24 77:4 81:18,23 84:19 85:3,7 86:19 89:8 90:13 92:8 102:7,15,18 104:9 105:13 117:19 143:25 196:18 207:11 227:19 284:8 298:9 300:8
**involvement** 11:21 14:6 91:4,5 94:7 102:10 128:5
**involving** 88:19 327:22
**irregularity** 123:18
**irrelevant** 19:17 19:18 314:22
**isolated** 219:5 264:15
**isolation** 211:4 230:6
**issue** 13:6 20:3 30:13 41:18 51:16 66:15 70:8 73:4 73:14 89:2 91:6 92:9 93:7 95:2 104:8 107:8 122:15 123:9,13 124:6 129:24 134:16 144:15 183:10 186:10 215:16 241:2,19 247:21 248:11 250:15 252:16 266:24 273:6,14 273:16 276:25 290:2 304:3 313:25
**issued** 14:13 19:20 21:19 31:6 101:11 153:19 154:11 155:4 209:8,16
**issues** 10:2 18:13 18:21 21:18 65:25 69:14 72:16,25 88:4 89:9 90:4 91:23 92:17 93:12 97:5,13 102:12 105:13 112:20 123:7 129:16 149:10,13 180:14 215:2 277:6,9 320:24 335:9
**issuing** 155:6 189:23
**italicization** 143:22
**italicized** 143:15 144:10,14
**italicizing** 143:17 143:18
**italics** 142:20
**ithaca** 2:14

**j**

**james** 1:6
**janine** 1:4
**jehovah's** 119:24
**jnelson** 2:10
**job** 41:8 42:17 126:3 148:18 166:2,2 198:23 241:25 249:19 254:7 263:11 285:5 308:16,16 309:23 311:17 313:16
**johnson** 189:17,17
**jonathan** 2:8 5:2
**judge** 8:19 39:6 115:18 164:14 235:6 256:25 257:4
**judge's** 8:24
**judgement** 193:22
**judges** 39:7
**judgment** 73:7 124:14 135:15 145:2,3 169:11,12 174:18 192:14 193:13,15
**judgments** 193:19
**judicial** 108:11
**justification** 203:7 203:15 230:10 232:21,24 233:3 291:13 292:25 299:18
**justifications** 171:4 242:20
**justified** 165:21 202:21 203:7
**justify** 229:24

**k**

**k** 25:14 336:2
**kane** 46:20 48:13 52:20 53:13 55:3 55:6,7,12,25 57:19 98:18,25 99:16 102:10,19 103:2 104:23 105:3,13 106:3,21 107:20 110:14,17
**keep** 128:16 161:21 211:2 221:15 241:25 314:10
**keeps** 161:13
**kept** 112:24 135:12
**key** 188:15
**kind** 49:16 52:25 80:15 83:5 89:3 90:2 91:12 92:14 94:7,9,20 140:21 142:19 147:15 149:7 161:14,21 203:13 243:22 245:2 246:18 254:17 276:20 288:11 301:12 302:20 306:11 314:7 328:9,22

**kinds** 12:7 53:7,9 53:10 72:19 89:12 130:25 133:17 142:24 148:6 149:10 230:2 261:4 271:2
**know** 6:16 7:9,10 8:4 9:25 10:19 11:19 13:16 16:12 17:9,19 18:15 21:3 24:3,5 25:3 27:13,20 28:15,17 29:6,8,11,12 30:18 32:2,3,3,20 33:7 33:14 34:14,16 36:12 37:18 38:20 39:3,23 40:14 41:11,20,22 42:15 44:4 45:9 47:18 50:11,15 53:2 56:19 57:14 60:3 61:4 62:2 64:9,22 68:24 69:13,21,22 72:13,13,19,23 73:15,18,24 74:8 74:21,24 75:5,9,11 78:22,24 79:7 80:18 82:14,15 83:9,13 84:2,3 86:3 87:5,23,23 88:4,22,24 89:9 90:4,15,23 91:2,3 92:8 93:11 94:25 97:19 100:25 101:7 102:7,12,13 102:14 104:14 106:14 107:3,7 109:3,4 110:20 112:5 113:3,10,24 113:25 114:12,23 114:24 115:4,6,12 115:12,18,19,23 115:23,25 116:3,4 116:19,24 118:21 119:9 121:2,12 122:3,14 123:5,20 123:21 124:7,7 125:7 126:5,25 127:10 128:17 129:20,23 130:6 130:23,23 131:4 131:11,22 133:23 135:9,10 141:8 142:7,25 143:3 149:16 151:4,6,16 152:22 155:14,19 156:17 157:8,21 158:8,14,15 159:24 160:22 161:18,20,24 162:18 163:2,3,13 163:25 165:12 167:13,21 168:3 168:23 169:11,18 169:18,19,20 170:9,18,19 171:6 171:10,13,25 172:21,23,24 173:23 174:7,12 174:23 176:19 177:6,11,12,16 178:15,16,16 181:2,6 182:23 183:6,19 185:21 185:24 188:16,22 191:23 192:3 194:18,22 195:10 195:11,12 196:21 201:5,19 203:7 205:12 206:8,16 206:24 207:11,16 207:18 208:18,23 208:25 209:2,3,3,3 210:22,25 211:22 211:25 212:5,16 212:21,21 213:10 214:20,21 215:13 215:19 217:5 219:9,17,21 220:3 221:11,14 223:2,4 223:6,13 225:6,17 225:18 227:13 229:25 230:6,6 231:21 234:2,10 234:16,22 235:6 236:24 239:16 241:3 243:4 245:8 245:22,24 247:14 247:16,21 248:16 248:16,18,23 249:20 250:20 251:4 254:12,15 254:16 255:14,21 255:23 258:7,11 258:24 259:10,19 259:24 261:13,13 262:20,25 265:9 265:18 266:16,21 267:7,9 268:12 269:13 270:5 271:5,7 272:25 273:15,19 274:4 274:22 275:14 277:18 279:4 282:17 283:8,8,17 283:21 285:3,8,10 285:11,25 288:24 289:15,22,23,24 293:14,16 299:4 302:20,21 303:23 304:17,24 307:12 307:12,15 308:11 310:2,11 317:7 318:6 319:4,14,16 320:21 322:19 324:11,25 325:5 328:15,18 330:15 330:20 331:7,11 331:24 332:4 333:15,21,23 334:25 335:2
**knowing** 119:4
**knowledge** 8:17 8:22 24:20,23 94:5 95:16,22 98:2 106:5 112:25 117:5,7 130:13 133:8 143:20 145:8 165:13,16 282:24 316:16 321:3,22 332:10 332:13
**knowledgeable** 148:13 169:24
**knows** 237:18 271:13
**kolenovic** 1:5 3:9
**krista** 1:5 3:7
**kristi** 1:21 4:21 339:7,25
**kyle** 46:20 48:13 52:20 53:13 55:3 55:6,7,12,25 57:19 98:18,25 99:17 102:10,19 103:2 104:23 105:3,13 106:3,21 107:21 110:14,17

**l**

**l** 5:19 25:14 137:6 336:2
**labelled** 137:15
**labor** 1:13 8:7 9:22 11:6,8 76:22

79:3 89:19 96:25 320:6
**lack** 180:17
**ladies** 270:23
**landau** 11:18
**language** 295:14 297:7
**large** 16:13 82:2,5 84:4 86:15 324:5
**largely** 326:18
**late** 14:24 154:20 320:7
**laughing** 175:9
**laura** 1:6
**law** 2:12,18 8:7,8 9:19 10:6 12:23 18:16,19 20:3 36:13 37:8 38:17 39:11,15 48:15 58:15,16 63:8,8 64:4,10,12,15,19 64:21,22 65:4,5 79:2 81:5,22 83:24 85:6 86:22 87:6,10,11,17 88:17 89:4,16,19 93:17 94:19,21 96:5,24,25 98:13 101:3,24,25 103:13,15 111:21 128:10 130:14 133:15 137:18,19 138:16 148:23 150:18,19 173:5 184:4 222:15 241:7 245:8 290:14,19 292:8 299:21 302:17,18 302:23,23 309:16 310:13 312:3,20 313:11 314:2 324:19,19
**law.nyc.gov** 2:25
**lawfully** 31:9 322:13
**laws** 19:23 62:24 63:24 84:16 290:6 290:9,11,16 292:11 297:10
**lawsuit** 6:9 13:10 46:17,20 79:22
**lawyer** 52:23
**lawyers** 84:4
**lead** 18:6 21:22 135:7 202:16 234:3
**leader** 119:16 196:19 197:4,9,16 218:14
**leads** 18:8
**learn** 63:17
**leave** 151:7,8 249:3 250:8,10,15 250:17,19,24 251:8,19 253:21 254:9
**leaving** 235:6,7 257:4,7
**left** 169:12 174:3 305:6
**legal** 13:4,5,25 15:14 17:12 18:13 18:17,20 36:14 46:6 68:21 79:3 86:18 87:5,8 90:22 92:16 95:2 98:16 104:17 106:9 108:7,11 112:21,22 118:19 151:7 161:3 172:20 195:17 199:19 278:3,3 288:23 297:23 299:4 302:22 310:12 311:23 312:2 313:10 314:11 324:15 335:8,10 340:3
**legitimate** 235:16
**lengthy** 189:16
**lesser** 68:17 248:13
**letter** 67:24 158:9 158:18 159:18 236:5 238:19
**letters** 157:4,23 158:7 240:24
**level** 17:5,7,14 18:9 19:24 20:9 21:4 22:23 24:2 29:17,18,18,19 39:9 42:12 50:20 54:22 56:20 60:7 60:9,9 63:13 68:9 72:15 73:10 84:25 85:8 91:4 98:16 98:16 114:6 124:22 170:12 196:12 209:24,25 244:15 258:16 284:15 289:14 291:12 299:7 328:8
**levels** 160:19 166:14 328:9
**liberty** 1:3 4:16
**life** 118:4 166:25 187:25 188:2
**lifetime** 317:11
**limit** 96:12 165:9 210:7
**limitation** 19:5,7
**limited** 31:12,19 38:16 102:21 222:23 224:22 255:3 299:12
**line** 174:15 185:15 234:24 271:14 334:2 340:6
**lines** 188:8,8 210:24 211:18 214:12,14 215:7,9 222:2 271:3
**links** 26:7
**lisa** 11:18,20
**list** 145:15 147:20 154:12 211:25 299:23 300:5
**listed** 13:15 140:3 154:15,17 299:20
**listen** 225:5
**listing** 80:3
**listings** 158:9
**lists** 23:12 240:14
**literally** 32:12 153:12
**litigated** 90:4,21
**litigating** 89:8
**litigation** 7:24 25:9 47:17,18 48:24 74:15 87:14 87:19,21 88:5 89:22 90:14 91:5 92:11 95:18 96:2 97:5 98:25 99:4,6 99:8,9,14 102:10 102:16,25 103:2 104:17 108:10 117:16 153:22 154:9,10 215:21 243:4
**litigation's** 164:23

**little** 31:20 61:3 93:23 108:25 109:6 116:5 139:22 203:2 272:11 328:7
**living** 61:13
**liz** 1:4 3:10
**llp** 2:4 5:3,5
**local** 19:24
**location** 300:17 308:16
**lodged** 28:15
**logged** 79:16
**long** 7:13,25 8:9 40:20 82:24 165:25 271:4 328:18
**longer** 13:14 126:8 166:20
**look** 58:13,19 121:20 122:4 126:9 135:10 147:23,23,24 156:13 175:15 176:2 177:13 183:19 187:20 190:9 222:25 224:14 229:2 230:13,15 231:2,3 231:6,7 284:12 298:13 332:3 335:19
**looked** 175:25 317:13 318:7
**looking** 43:6,8,9 121:19 123:24 131:13 146:24 174:9 175:14 183:2 193:16 209:4 222:6 225:23 301:5 303:3 307:3 313:25 329:11
**looks** 42:22 184:18 303:2
**lora** 2:23 5:13
**lose** 216:15 241:24
**loses** 171:20 198:23
**loss** 292:19 294:9 295:15 296:17
**lost** 26:14 55:19 254:19 320:16
**lot** 37:10 46:21 72:6 92:24 123:5 188:10 215:14 246:22 330:19
**lower** 331:7,8
**lowest** 150:22,23
**lunch** 7:12,15 108:23 135:20,22 136:5

**m**

**m** 2:24 336:2
**madden** 2:4 5:2,5
**magistrate** 8:19 256:25 257:4
**maintain** 23:12
**maintaining** 149:19 261:17
**major** 105:13
**majority** 33:2 34:17 245:19 253:6
**maker** 39:2 115:17 169:8
**makers** 104:5 111:20
**making** 14:20 17:13 40:16 51:23 59:7,10 60:21 69:17,19 84:15 89:10,11 92:17 107:24 108:5 111:17 114:3 116:7 144:19 188:5 191:13,19 191:22 193:22 197:7 200:6 201:24 202:22 203:13 225:22 228:3 241:20 243:6 258:6,7 260:23 278:20,24 296:24 297:6 299:25 301:5 313:10 322:18 329:13
**management** 129:17
**manager** 79:7
**managers** 78:5 127:16,17
**mandate** 9:4 14:25 15:3,3 16:7 17:12 17:24 18:7 20:5 21:20 24:12 31:17 38:6 39:10 66:9 76:6,10 89:21 97:3 118:8 193:16 193:17 194:20 195:14,16 198:25 199:4 206:15 216:22 232:16 248:24 252:5 254:6 276:24 277:19 305:21 309:23 311:7 329:16 330:5
**mandated** 19:23
**mandates** 18:21 19:4 254:21 305:22 309:11 310:18,19,20
**manner** 16:9 67:2 70:15 105:22 149:5 174:22 191:3 193:7 212:12 234:25 235:10
**manuals** 75:5
**manufacturing** 189:18 214:17
**march** 71:5
**mark** 138:2 246:25 247:3
**marked** 138:5,7
**markets** 215:8
**marriage** 339:17
**match** 41:21 285:4
**material** 44:14 45:10 80:6,19 171:23 237:10,19 293:19
**materials** 27:4 45:19 97:14 126:10 215:23 236:10 279:15,16 294:4 307:4,13 337:17
**matter** 4:15 7:8 31:10 51:24 57:19 86:10 92:9,10,15 94:6,7,10 107:12 116:15 148:15 159:6 187:12 196:17 200:16 202:20 282:24 339:19
**matters** 8:17 12:14 34:23 36:11 85:11 88:19,24 94:8 95:20 102:13 103:24 126:19,23

127:10 135:7 282:22
**matthew** 1:5
**mayor** 1:10 12:20 19:3,14,16,21 118:5,8,20,22,24 256:8
**mayor's** 9:22 11:5 12:19 19:25
**mayoral** 28:25
**mcdonald's** 251:10
**mean** 24:4 30:2 53:25 64:10,23 80:5,7 82:5 83:14 84:7 90:9 91:3,9 93:22 123:5 140:25 152:4 156:24 157:8 162:10 174:6 177:10 187:5 200:25 208:2 213:9 215:10 225:5 237:16 240:24 242:22 244:16 245:18 248:6 249:8 250:13 251:2 255:19,20 259:3 260:9 276:17 285:18,24 309:24 310:10 313:8 319:13 320:5 325:23 326:7 333:2
**meaning** 144:24 226:5
**means** 51:13 78:12 80:9 144:20 246:8 251:16 325:21 327:2
**meant** 42:3,4 71:23 326:24
**measure** 323:22
**mechanically** 62:17
**medical** 11:20 14:11 31:25 32:5 32:24 33:7 34:22 86:12 89:7,11 98:14 123:19 158:2 189:5,11 214:22 215:2 247:22 259:13 274:24 301:20 305:23 306:4 310:21
**medication** 325:9
**medications** 204:20 205:2,6 217:19
**medium** 22:2 155:19
**meet** 157:24 158:7 159:17 284:17
**meeting** 20:11 26:19 82:16,18,19 82:20 83:7 116:11 128:18 129:5 261:24
**meetings** 18:5,12 18:15 19:15 20:9 21:14 22:5,21,22 23:8 25:22,24,25 26:4,22 37:10 61:24 129:2,3 130:7,25
**meets** 158:3
**member** 41:19,24 51:13 72:8 91:7 91:18,21 98:11 122:20 127:7,8,16 127:19 130:10 131:18,20 133:9 143:18,24,24 151:2,9 168:4 182:21 185:9 195:14 202:11 207:21 234:9 236:25 237:13 273:13 329:9
**member's** 73:20 231:2
**members** 37:17 38:17 39:14 49:15 58:25 59:15 69:9 70:19 71:8,24 81:2 82:8 84:16 84:19 85:9,24 86:11,23 87:13,17 87:21 91:19,25 94:22 96:5 97:7 97:10,15 104:3,5 106:4 107:22 111:16 112:9,13 112:23,23 113:4 113:21 114:9,13 114:24 115:7 116:6,19 117:13 119:21 125:13 126:17,22,25 128:6,15 129:6,13 129:15,23 130:16 131:9 132:2 135:9 138:17 148:7 153:4 161:15 170:5 171:18,23 173:4 174:9 176:25 179:5,14 182:6 183:22 185:6 188:24 201:13 203:14 215:24 216:10 221:23 226:21 227:3,15 230:20 231:14 259:2 265:25 266:6 291:20 293:4 320:23 322:6 326:23 334:19 337:19
**membership** 70:11
**memo** 155:25
**mental** 9:24 11:13 81:10,19 85:13 161:20 214:24
**mention** 28:21 158:2 177:8 186:4
**mentioned** 8:23 12:4,22 15:10 27:9 28:22,23 43:15 71:22 151:3 258:12 333:17
**mentioning** 209:9
**mercurio** 3:13 4:20
**merits** 73:21 90:25
**message** 74:9 116:12
**met** 129:6 297:16
**method** 23:9
**methods** 107:23 108:4
**metrics** 72:4
**mic** 270:25
**microsoft** 71:15 74:8
**mid** 71:5 141:8
**mill** 101:8
**millions** 206:2
**mimic** 44:6
**mind** 245:3,7 327:16

**minded** 53:19
**mindful** 53:20 94:24
**minds** 79:10 158:12
**mine** 102:2
**minicucci** 2:23 5:13,13
**minimus** 66:25 68:11 291:3
**ministerial** 41:14
**minute** 40:15 52:6 108:20 135:24 195:20 270:14
**minutes** 7:16 52:9 108:23 109:9 122:25 195:22,23 234:17 270:16 305:6,9
**missing** 73:17 219:23
**mission** 16:24 258:10
**missions** 149:21
**misstate** 311:3
**mistaken** 194:13
**misunderstanding** 194:14
**mitigate** 167:16 179:25
**mixed** 276:20,20
**model** 150:5 337:16
**moderna** 189:13 189:20
**modified** 63:24
**modify** 304:12
**molly** 12:10
**moment** 24:21 70:3 71:14 141:6 166:23 169:4 180:23 288:6 327:12
**moments** 71:22 167:20 233:17 269:6
**money** 260:22
**montalban** 11:2
**months** 25:9 75:3
**morning** 5:25 6:2 141:3
**mouth** 61:5,5
**move** 37:17,21 152:17 315:4
**moving** 37:11 75:19
**muddy** 107:8
**multiple** 78:14 95:16 131:17 158:22 241:21 298:23 312:7
**multitude** 318:10
**muslim** 124:9

**n**

**n** 2:2 3:2 5:19 88:8 137:2,2,2,6 336:2 336:2 337:2
**name** 4:19 11:15 82:14 162:24 340:4,5
**named** 17:17 44:2 48:24 52:20 57:18
**native's** 76:21
**nature** 27:3,14 44:9 90:6 92:12 97:17 99:15 106:20 117:24 120:22 121:20 193:3 196:9,10 207:9 220:2 221:5 228:25 248:12 252:2,3,5 258:10 261:10 262:17 263:8 270:7 283:22 285:4 292:5,5 300:5 309:22,23 327:18 328:3,4
**necessarily** 35:14 80:11,21 155:3 175:5 180:12,13 296:25 304:6 326:25 330:4
**necessary** 7:14 15:24 51:10 61:17 126:15 176:6 223:7,8 255:24 277:20 290:12 302:3 322:20
**necessity** 258:8
**need** 21:9 22:8,9 38:25 70:21 75:19 98:3 110:7 122:17 128:6 135:19 146:19 149:15 155:15 174:13,15 179:7 181:4 212:25 220:3 223:24 225:20 235:4,8 255:24 260:22 271:10 278:19 283:8,21 296:21,25 298:7 299:17 302:8,10 302:12,21 304:22 321:19 323:25 330:14
**needed** 11:21 22:25 25:19 36:2 68:10,23,23 75:16 107:11 127:18 131:15 146:17 176:8 185:12 261:16 263:12 283:10 297:5 331:25
**needing** 46:25
**needs** 7:7,11 13:25 15:25 50:13 128:16 152:9,15 153:6 172:13 241:4,6 262:4 276:10 284:19 287:25 288:3 310:11
**negative** 104:19 110:7,12
**negotiate** 7:14
**neither** 189:19 256:7 321:2
**nelson** 2:4,8 4:25 5:2,2,5,6,24 7:20 22:16 23:3 43:9 52:5,7,15 53:16 55:18 58:2 60:3,6 93:10 94:3,16,18 99:5,6,15,24 104:10 105:11 108:19,21 109:8 109:16,17,20,22 113:19 114:18 115:12 116:22 117:4,17 129:4 132:15 135:17 137:9 150:4 168:24 195:19,21 196:6 211:11 215:19 223:22,25 224:6 234:15 235:11,21 246:21 254:17 256:22 257:10,15,17 267:13 270:13,15 270:22 271:11

281:21 282:5 286:23 287:16 304:20 305:7 335:15,21 337:4
**nelsonmaddenbl...** 2:10
**neutral** 95:4
**never** 6:14 15:10 26:11 38:25 107:22 108:3 114:10 118:3 119:5 123:9 124:11 147:9 163:10 181:2 184:8 188:5 190:14 211:23 234:14 251:25 254:5 256:16 258:12,21 260:2 283:12 316:22 323:5
**nevertheless** 182:18
**new** 1:2,3,10,11,12 1:12,23 2:7,7,14 2:18,21,21 4:15,17 4:18 8:8,15 9:3,19 9:20,21,23 10:6 13:3 19:22 27:10 38:11 54:13 62:23 62:23 63:23,23 64:14,16,18,20 65:3 76:5 82:4 85:9,11 88:9,11 137:19 151:4 183:3 226:24 290:5,5,8,8,15 297:9,9 299:20 302:17,17 336:3 336:22 339:3,8 340:4
**newly** 182:17
**nodding** 328:13
**non** 56:11 333:14
**noncovid** 100:6,25
**nonemergent** 101:8
**nonlawyer** 84:5
**nonlegal** 86:18
**noon** 108:22
**normally** 286:8
**north** 2:13
**notary** 1:22 5:21 336:22 339:7 340:25
**notation** 327:15 328:23
**notations** 325:2,20 326:18
**note** 4:5 59:24 63:8 67:14 234:16 235:3 237:4 257:3 327:11
**noted** 137:3 331:3 335:25
**notes** 7:4 28:5 41:21,23 43:3 71:18 83:6,10 130:24 273:14 326:23 327:7
**notice** 282:8
**noticed** 327:12
**notification** 158:18
**notified** 283:9
**notwithstanding** 167:14 168:16,17
**november** 82:23 137:17 138:5 139:11 142:15 144:6 149:23 154:20 338:9
**novo** 53:8,18 54:2 131:24 203:9 252:9,12
**number** 4:19 16:13 19:5 27:19 27:20,23,24 28:17 28:18 32:16 33:12 34:9,21 57:17 67:25 74:13 82:2 101:23 133:5 137:15 150:2,23 151:14,18 152:15 153:5,15 163:7 165:8,9 178:3 253:4 257:19 261:9 281:6,8 298:6 300:9,16,17 332:17,18
**numbers** 28:12 29:9,14 32:2,12 33:7 34:10,12 54:7 70:10 82:5 101:16,20,21 128:8 153:13
**numerous** 114:23 233:15
**nuts** 20:16 23:25
**nutshell** 67:4
**nycha** 85:23 87:22 88:7 91:20
**nycha's** 87:25
**nyfrl** 98:19 102:7 340:4
**nypd** 238:8,13

**o**

**o** 5:19 137:2,2,2,6 336:2
**o'connor** 2:24 5:15,15
**o'dea** 1:5 3:7
**oath** 336:9
**object** 173:12
**objected** 173:10
**objecting** 173:21 176:14
**objection** 45:13 46:3,3 50:4 54:5 56:9 57:24 58:4 59:4,23 62:6 63:2 66:6 67:10,13 68:13 69:12 70:18 71:21 76:18 77:25 78:21 79:25 83:19 84:13 86:7,14 89:13 90:10 92:20 93:19 94:23 96:11 97:21 98:22 99:16 100:9,20 102:20 103:11 105:5,17 108:2 111:11,23 113:7 116:25 118:14 119:2 122:8,11 123:3 125:4,19 127:12 128:24 129:9 131:5 132:8,12,20 158:13 164:10 165:15 175:21 178:6 180:18 184:20 186:4 192:23 193:2 194:4 198:11 200:4 207:17 209:14 210:6 212:14,19 213:23 214:6 216:4 217:17,21 219:4 220:12,24 222:4 227:5,21 228:22 230:24 231:12,18 232:25 233:13

239:19 241:14 242:5 246:11 249:7 250:12,25 251:12,22 252:15 253:24 256:4,24 258:17 259:16,25 274:19 275:11 276:2 277:15 278:13 285:18 286:14 288:20 291:9,24 292:23 293:13 294:14 297:19 303:16,22 304:16 307:11 308:9 314:9 315:10 316:6 319:10,19 320:12 321:7 323:4 325:15 326:4 327:4,13,19 329:6 329:25
**objections** 173:11 179:17 201:15 204:14 311:9,16 316:12
**objective** 147:12 147:15 166:9 173:2 174:10 183:15 222:25 224:17 225:11,15 225:16,19,20,24 228:9 231:7 271:17 274:4 329:8
**objectively** 132:17
**objects** 122:24
**obligation** 127:17 161:4
**obligations** 128:5
**observance** 177:24 179:8,16 180:18 298:8
**observant** 197:21
**observation** 179:11 181:19 245:14
**observe** 124:25
**observed** 182:18
**obtain** 25:19 51:4 268:21 332:20
**obtained** 220:20 280:22 301:10
**obtaining** 45:2 196:25 220:15
**obviously** 12:17 13:5,15 17:13 21:18 24:14,22 28:7 32:13 36:14 37:8 38:4,6 54:19 63:7 68:19 72:7 84:6 89:17 91:25 96:20 102:7 112:20 124:10 128:7 129:11 153:4,21 156:17 167:21 169:20 176:23 178:13 187:22 196:11 204:23 214:21 234:18 250:2 255:22 275:14 301:20 306:7 310:7 314:19 333:11
**occasion** 41:20 74:7 90:19 160:20 276:11 280:9
**occasions** 123:12 158:22 170:6 185:25 280:20
**occur** 6:23 124:21 124:21 172:7
**occurred** 124:22
**occurrence** 141:5
**ocean** 303:14
**october** 8:3 9:11 9:11 14:24 15:2 31:18 56:16 334:21
**offend** 193:10
**offending** 190:22
**offer** 219:19 246:6
**offers** 176:24 246:8
**offhand** 28:17 213:9 264:11 273:25 274:2 284:5 332:17
**office** 6:5 9:22 11:5 76:22 79:3 87:23 88:3 104:4 104:5 249:24 282:21 320:6
**officer** 13:5 21:13 21:14 23:11,11 33:25 89:15 96:20 103:23 135:3 158:19 169:25 283:4 337:14,14
**officer's** 16:14
**officers** 18:8,9 23:15 26:9,10 34:13 54:14 61:6 62:14 78:4,4 225:22
**official** 1:10,11
**officials** 65:8
**offline** 266:19 309:24
**offsite** 278:11
**oh** 26:12 39:16 42:2 80:21 103:21 109:21 110:5 138:12 139:12 155:15 165:22 167:18 173:23 177:15 180:13 224:14 226:2 233:2 236:17 237:15 257:11 272:8 294:2 318:4 325:5
**okay** 5:17 6:16 7:25 8:21 12:4 23:3 37:2 39:16 48:9 50:6,25 52:4 60:5 67:21 74:5 77:6 81:14 84:14 92:5 109:10,21 110:2 117:6 127:13 131:7 133:21 138:10,13 139:13 150:18 152:6 153:7,10 159:13 162:5 178:8 179:11 184:18 198:15 199:3,11 202:9 208:13 211:6 216:3 220:6 226:2 227:6 230:25 238:15 239:9 240:10 247:5 253:14 256:22 261:8 270:15 271:21 274:3,10 277:8 280:5 282:5 285:22 287:13 290:20 297:14 307:3 309:17 311:6,12 314:19 315:4,24 317:8 319:18 321:10 327:10 330:24

331:8 332:4,14 334:6
**old** 79:22
**olr** 76:21
**omitting** 68:19
**onboarding** 143:25 146:3
**once** 314:12
**one's** 165:22 181:19
**ones** 121:3 140:13 201:10 272:16 283:15 327:24 332:6 333:23 335:3
**ongoing** 21:18
**open** 53:19 105:21 218:8,20
**operated** 78:10
**operating** 292:22 294:13 295:18 296:20
**operation** 300:13 300:18
**operations** 66:25 237:17 284:19 291:4,13 297:2 300:18 312:18 313:22 314:5 318:8 324:14
**opinion** 73:7 122:9 335:8,10
**opinions** 19:25 92:16
**opportunities** 71:24 72:12
**opportunity** 15:16 17:15 47:11 49:13 63:15 65:5 72:15 163:11
**oppose** 187:10
**opposed** 33:16 125:17 169:9 188:12,22 228:4 230:3
**opposition** 119:25 187:14 191:24 205:10,24 206:3
**opted** 163:17
**option** 54:25 55:3 55:24 56:3,14 251:10
**options** 54:23 164:6
**oral** 49:16 94:20 155:24
**orally** 47:22 186:24 216:12
**order** 8:18,24 9:11 11:17,22 15:24 19:20 25:4,17 31:6 39:24 40:17 46:5 48:13 56:16 66:19 92:23 102:21 106:15 132:14 145:22 146:18 152:19 164:13,24 169:22 189:9,23 197:20 235:18 248:15 254:23 255:2,5,8,8 255:13,23 256:3 270:6 277:22 278:2,4 311:4 317:18 322:11,20 322:23 323:11,16 323:18 324:10,16 324:17
**ordered** 48:5 106:13
**orders** 254:21 255:11,11 256:9 322:21
**ordinance** 30:24
**ordinarily** 36:21 50:9
**organization** 35:6
**organizational** 36:4
**organized** 21:13 36:5 85:21
**organizing** 17:22 37:10
**orientation** 82:20 82:22 142:3
**oriented** 43:5
**original** 18:3 315:23
**ought** 65:4,24 124:20 204:8 271:19
**outcome** 252:25 339:18
**outcomes** 242:10 242:12,13
**outline** 70:4 201:9
**outlook** 23:13 157:12
**outside** 13:19 46:4 55:6,16 56:5 67:17 75:16 77:17 90:16 91:19 92:22 97:22 99:18 111:25 116:15 125:6 132:14,22 163:24 164:10 165:3 185:18 219:9,10 236:19 238:10,13 239:10 249:5 250:11,23 251:20 253:21
269:19 283:19 286:15 301:19
**overall** 35:11 62:16,16 78:25 183:9 300:6,13,14
**overly** 148:24 152:24
**oversee** 36:12 39:12
**overseeing** 18:16 18:17 99:13
**oversight** 36:14,16 37:14 39:19 40:4 40:10,12,13,16 41:6 78:19,24
**owing** 96:2

**p**

**p** 2:2,2 3:2,2
**p.m.** 136:5 137:3 142:16 257:4,5,8 335:25
**page** 328:14 337:3 337:13 338:3 340:6
**painkillers** 228:16
**pandemic** 21:16 21:17 251:21 256:2 292:5
**panel** 9:2,6,8,14 10:8 11:5,25 12:14,25 13:22 14:23 15:5,9,13,22 17:3,6,22,24 19:2 20:7,13 24:9,10,15 25:10 27:25 28:5 28:20 29:21 30:4 30:23 32:10 36:3 36:18 37:6,11,17 37:25 38:4,10 41:19,24 43:15,21 45:3,6 46:15,19,24

46:25 48:5,14,16 48:25 49:3,5,15,23 49:25 51:3,7,8,13 51:18,22 53:12 54:9 55:4,4,11 56:4,6,25 57:4,9 57:13 58:6,24 59:16 62:11,12,15 65:24 67:23 69:9 70:10,11,19 71:3,9 71:24 72:8 73:20 74:22 75:11 77:8 77:10 78:20 79:6 79:7,7 81:3 82:3,8 82:10,17,19 83:16 84:9,16,19,24 85:5 85:8,23 86:11,11 86:22,23 87:7,10 87:12,13,18 89:4 89:15,20,25 90:2 91:7,15,18,19,21 92:2 93:4,6,18 94:22 95:10 96:3 96:8,9 97:8,10,16 98:5,12,12 99:23 100:6,15,24 101:15 103:3,10 103:14 104:2,22 105:2,10,12 106:4 106:13,19 107:11 107:18,22,25 111:15,19 112:8 112:14,23,23 113:4,14,17,22 114:4,10,11,13,17 114:22,24,25 115:7,14,15 116:2 116:5,10,18,20 117:13,15,19,21 119:9,22 120:11 122:17,19 125:10 125:13 126:18,19 126:22,23,25 127:7,8,10,16,19 127:22 128:6,14 128:23 129:2,5,8 129:13,15,23 130:10,16 131:9 131:18,20,25 132:5,11,24,25 133:8,25 135:8,8 137:20 138:16,25 139:3,5,22 140:21 141:18,25 142:6 143:18,23,24 148:7,12 149:6 150:2,25 151:9 152:13 153:2,4,20 153:25 156:23 157:5 158:12 161:3,10,11,15 162:7 163:15,18 163:19,22 164:4,7 165:7,25 166:2,4 166:17 168:4 170:5,12,21 171:18,22,24 173:4,9 174:9 175:19,24 176:9 176:16,25 178:3 178:10 179:6,15 181:25 182:6,20 183:5,5,12,21 184:19,23 185:6,9 188:24 190:5 197:10,22 198:2,6 198:15,16 199:21 199:22 200:9,21 201:13 202:10,15 203:6,14,22 204:12 206:21 207:21 208:9 209:25 210:9,13 212:18 213:6 214:3,9 215:4,24 216:10,15 217:13 218:22 219:22,24 220:19,25 221:11 221:17,19,21,24 224:21 227:3,15 227:18 228:2,5,20 228:23 229:9 230:20 231:2,15 232:8,17,22 233:6 233:21 234:9 235:23 236:9,21 236:24,25 237:13 237:18,23 238:17 239:5,14 240:5 243:22,25 246:17 247:6 248:25 251:16 256:11,14 257:19 258:23 259:2 261:9 262:16,24 264:3,6 265:7,20,24 266:4 266:6,9,14 268:5 269:2,4 272:22 273:13 275:3,6,21 276:4,15 278:8,14 280:21 281:16,19 282:10,14 283:7 284:17 286:18 287:2 289:14,24 290:4,7 292:2,10 292:13 293:4,8 294:3,19 295:9 296:3,3,12 297:15 298:2,17 299:25 301:8,13,14 302:7 302:14 303:2,10 303:20 304:10 308:12,18 312:5,6 316:8,16 317:12 317:13 318:18 319:2,5,9,12,13,17 320:19,23,24 321:3,21 322:6,16 326:23 329:9 331:4,18,22 332:2 332:2,15 337:19

**panel's** 28:4 31:21 46:9 67:16 93:3 99:21 105:9 112:3 113:12 125:9 132:23 164:16 191:13 212:8 215:17 229:15 256:10 274:25 327:16

**panelist** 124:17 128:12 133:22 134:4 142:12,17 143:4 145:15 149:8 161:9 191:7

**panelist's** 149:9

**panelists** 79:9 85:25 118:22 124:17 132:4,16 134:22 139:18 140:19 142:10 146:15,16 150:12 184:4 186:6 213:20 234:5 266:15 271:16 288:8 289:5

**panels** 79:10 218:23 240:4 275:7,21 284:6,9 291:20 324:25

**panoply** 200:9

**paolillo** 1:5 3:5

**paper** 209:8,15

**paragraph** 141:16 141:20
**paralegal** 3:12 137:23
**parameters** 309:15
**parenthetically** 158:2
**park** 2:6
**part** 6:12,15 9:7 13:23 17:4 36:6 46:22 49:11 50:10 97:12 99:2 134:14 137:14,23 185:8 194:9 226:10 245:10 275:20 279:19,22 285:11 314:8,15,20 315:2 333:21
**partial** 30:10
**partially** 29:24 30:3 273:9
**participants** 4:9 287:22
**participate** 92:7 96:7 128:19 334:22
**participated** 71:6 76:16 84:10 98:18 99:10 102:18 319:21
**participating** 70:20 92:17 94:8 335:18
**participation** 93:18 94:21 103:9
**particular** 35:5 73:24 91:5 120:19 121:5 129:6 142:11 149:12 175:4 180:6 185:10 186:9,11 198:13 205:21 212:20 214:4,8 233:4 244:5 263:21 264:21 273:20 275:14 276:8 281:18 291:15 298:7 301:6 302:9,11 307:13 308:15 312:25 313:2 322:18 324:24 326:8,12,13 329:12 333:15
**particularly** 37:17 98:3 141:4 189:20
**particulars** 98:11
**parties** 4:13 45:22 301:15,15 339:16
**pass** 153:24
**passing** 7:4
**pastor** 196:18
**path** 57:7,14
**pattern** 90:20 121:7,7 134:15 140:21 141:17 142:19 146:8 181:9,11 182:2 185:16
**patterns** 120:19 121:2,5 142:24 143:4 145:17
**pause** 257:14
**pausing** 180:22
**pay** 249:4 250:8 250:10,19,24 251:8,11,19 253:22 254:9 258:13,20 259:8
**paying** 18:19
**payroll** 259:22
**pending** 208:3
**people** 9:18 11:20 12:5 18:18 19:5 20:7 26:20 33:23 40:24 52:19,21 56:5 57:5,16,18 61:12 65:7 71:9 72:25 76:13 81:5 81:6,7,21 83:10 84:9,25 85:7 89:6 89:24,25 92:15 94:5 95:17 96:19 96:20 97:25 98:4 114:2,9 119:11 127:5 132:4 135:19 141:22 148:11 149:13 151:5 158:6 162:12,14 163:16 169:24 174:23 187:10 206:2,16 206:17 220:11 250:19,21 251:6 263:14 266:18 268:12 274:14,18 275:22,24 277:14 310:5 319:24 320:2,8 327:2 335:7
**people's** 334:25
**pepto** 204:17 205:5,17 206:22 206:25 207:10,13 207:23 208:10,14 208:15,19,24 209:9 210:4,16,18 210:25 211:4 213:22,25 214:5 214:11 215:6 216:11 217:7 220:23
**percent** 33:3,13,22 34:6 54:9 83:13 127:8,9 162:3 165:19 272:3
**percentage** 32:21 32:23 33:17 84:10 101:13 126:21,25 127:6 165:8 244:12 245:15,15 245:18 253:5
**percentages** 34:22
**perfectly** 226:14
**perform** 14:5 42:15 123:2
**performed** 38:16 133:2 139:10 215:8
**performing** 35:7 51:8 128:22
**period** 152:24 181:6 189:16
**permanently** 242:17
**permissible** 248:14 262:12,19 329:4
**permit** 105:17 187:17 249:4 253:20
**permitted** 162:12 162:14,20 163:25 173:7 250:23 307:15 324:19
**permitting** 120:17
**permutation** 172:2
**permutations** 169:2,6
**person** 13:8 35:7 35:15 50:12 53:4

65:22,22 81:9,24 92:10 104:15 144:13 148:25 162:16 163:7,21 168:5 170:13 172:19 174:25 175:2 177:23 186:23 190:3,7 193:4 195:5 198:8 198:22,23,24 199:4,15 202:3,6 226:5,13,14 232:19 249:5 308:6 328:10
**person's** 175:21 177:20 186:20 192:19 193:2 205:17 223:10 226:17 230:12
**personal** 8:16,22 24:19 38:15 91:12 143:20 145:8 150:7 165:12,16 184:7 187:16 206:11 219:14 227:19 228:20 229:11,16 230:2 278:5 324:22 327:7,11,14,14,23
**personally** 13:18 17:25 23:17 39:25 41:4 91:17 92:8 98:17 102:2 109:7 315:17 319:2
**personnel** 18:7 21:13 23:11 26:9 36:10,16 54:16 62:2,20 78:3 81:16,18 82:12 89:18 158:21 170:2 258:8
313:23 337:13
**persons** 10:5 14:22 38:18 40:22 47:5,8,9 48:17,23 48:23 66:2 73:23 85:19 87:16 89:9 113:21 115:16,23 132:10 164:6 259:23 300:10
**perspective** 16:6 16:23 17:16 72:9 87:8,8,9 95:16 250:3,6
**perspectives** 95:13 95:15 135:14 149:20
**persuasive** 307:7
**pertinent** 294:16
**pestana** 10:11 12:23 13:2,18 20:14
**pfizer** 189:12,20
**phase** 24:15 65:14 289:18,20 299:5
**phases** 289:22
**phrase** 110:8 287:14
**phrased** 105:24 287:9,10
**physical** 25:3 310:3
**physically** 310:22 311:2 313:16
**pick** 151:2 152:9
**picked** 152:5
**picture** 112:20 134:14 142:3
**piece** 31:12
**pieces** 188:10
**pillet** 1:5
**place** 4:12 71:11 82:24 84:21 89:5 92:15 113:22 184:23 222:19 224:15 244:22
**placed** 234:9
**plaintiff** 164:15
**plaintiffs** 1:8 2:5 4:25 5:4 44:2 45:7 45:25 48:14,23,24 52:20 55:10 57:18 106:11 164:19 269:21,22 307:14 310:19
**plans** 257:14
**plant** 227:24
**play** 182:11,12 275:17 277:6 326:13 330:20
**played** 275:18
**please** 4:4,22 5:6 5:18 7:5,8 22:12 27:13 41:24 47:2 109:24 118:11 138:14 180:9 181:6 208:4 223:23 305:9 314:13
**pllc** 2:12
**plus** 331:6
**point** 26:20 29:24 45:7 52:6 58:11 62:13 82:15 92:24 93:20,25 95:12 105:19,22 114:15 114:15 135:8 137:12 158:17 160:10 171:11 204:20 210:22 225:19,20 242:22 255:23 256:6
280:24 298:19
**pointed** 61:6 215:13 216:7
**points** 10:25
**police** 82:4 237:22
**policies** 12:7 15:18 15:19 24:7 39:11 103:8
**policy** 7:24 10:2 10:21 11:20 15:16 16:3,6,18 18:17 19:25 20:4,9,21 23:23 36:11,16,21 63:7,14 66:10 83:25 93:17 95:24 104:3,4 132:3 166:3,7,16 168:22 173:8,14 174:2 175:19,24 176:9 181:25 183:13,17 184:19,23 185:2 190:5 202:15,17 204:12,18 212:11 212:20 213:2 227:25 228:19,23 243:8 307:20 320:18
**political** 230:23 231:9 277:5
**pope** 119:9,15 120:12 121:3,19
**pope's** 121:16
**populations** 310:6
**portion** 179:6
**pose** 308:6 311:19 314:24,25 316:3 316:18 317:10,14 317:23
**posed** 6:24 165:3 269:25 304:22 307:16 315:8

**poses** 313:23
**posing** 305:25
**position** 7:22 80:6 80:11,22,23 99:11 144:9 216:23 234:10 241:8,9,10 241:15 246:16,17 246:22 247:4 263:9 266:23 267:11 268:15 310:12,16 311:23 323:5 334:21
**positions** 171:22 261:10,12 262:12 262:15 263:13
**possess** 187:13 329:15
**possibilities** 234:3 289:8,13
**possibility** 243:20
**possible** 50:24 131:6 152:18 166:8 171:16,21 179:22 233:9 243:14 312:12,13 314:25
**possibly** 147:20 248:15,16
**post** 289:20
**posted** 26:7 63:19
**potential** 7:4 102:23 122:15 178:2 307:6,22 308:4,4 314:4 318:7
**potentially** 103:17 120:18 178:9 193:8 197:2 219:15 240:16 241:6 242:11 245:3 263:15
**powerpoint** 22:23 337:15
**practice** 125:13 180:6,7,15 190:11 192:11,13 194:17 206:7,11,13,14,19 218:12 219:12 220:2 221:6 298:9
**practiced** 104:16 146:22 147:19 188:4,18 193:7 233:24
**practices** 164:16 164:18 182:18 193:10 205:15,18 218:17 219:8
**practicing** 218:13
**prayer** 327:14,15 329:18
**prayerful** 330:2,8
**prayers** 327:23
**pre** 84:22 89:17
**preceded** 144:5
**precise** 10:20 67:24 68:15 306:15
**precisely** 53:17 58:18 141:2 274:9 307:2
**predates** 138:23 139:2
**predicate** 58:2 274:16 317:19,20
**predict** 30:18
**prediction** 30:19
**preface** 274:12
**preferences** 228:21 229:11,16 230:3
**premise** 95:6 309:9
**preparation** 28:9
**prepare** 25:4,17 25:23
**prepared** 22:24 25:8 61:8 215:25
**preparing** 26:8 27:11 75:4
**prerequisite** 313:9
**prerogative** 165:20
**presence** 195:2 263:12 310:4
**present** 3:4 58:22 236:8 258:8 265:22 270:11 276:12 291:14 310:23 311:2 313:16 318:4 328:6 333:18
**presented** 42:19 72:20 175:16 176:4,17 180:24 200:8 204:25 216:13 217:9,11 221:2 229:19,20 230:16 232:2 233:5 251:25 276:7 293:24 302:7 333:21
**presents** 245:25
**preserve** 256:23
**pressed** 26:15
**presumably** 113:25 167:6
**presume** 87:14 147:10 180:22,23
**presumed** 170:24
**presumes** 274:11 274:13
**presuming** 88:8
**pretty** 94:3 132:18
**prevent** 67:3 92:15 254:6
**prevents** 190:12
**previous** 116:13 117:3 166:6 185:11
**previously** 60:18 130:22 142:7 149:11 220:17 221:11 290:23
**primarily** 9:19 10:15 11:16,18 12:15 20:13 84:3 86:17 99:11 129:16
**primary** 13:15 20:12 31:16 123:4 151:21 196:12 218:12
**prior** 27:7 43:21 60:21 94:5 97:12 114:24 116:14 117:14 139:11 149:9 158:17 166:19 167:7 235:7 244:14
**privilege** 96:14 118:18 335:14
**privy** 29:8
**probably** 7:16 78:14 154:20 206:2
**problem** 43:14 162:6
**procedural** 73:13 91:8 124:3 135:7 135:12 281:23
**procedurally** 134:24

**procedure** 82:7 84:23 115:15,19 162:8 281:22 338:3
**procedures** 93:14 93:16 128:20 133:16 140:9
**proceed** 138:10 231:10 281:20
**proceeding** 49:11 55:25 69:20 235:19 243:4 323:20 334:12
**proceedings** 4:1 158:15 217:5 317:12 334:23
**process** 9:9 10:7 11:23 12:3,24 13:22 14:17,20 15:4,13 16:11 17:2,2,18,21 18:3 19:23 20:7,18,18 21:2 24:14,16,17 25:11 35:17 37:11 37:15,18,22 38:23 39:3 44:22 45:24 46:9,14,23 47:20 48:20 50:8 56:8 56:12 58:17,23 62:4,4,13,15,16,21 67:16 73:3 74:25 77:13 78:25 83:23 84:7,21 85:13 93:3 95:24 96:8 98:9 99:21 103:10 103:14 105:9 112:3,5,18 113:12 116:6 117:25 118:9 124:20,23 125:3,9,14,17,22 132:23 139:7 144:2 146:3,10 152:11 154:22 160:6,11 165:18 169:25 196:23,24 208:9 210:8 217:25 227:17 243:8 252:24 256:10 263:20 268:14 274:25 285:8 289:19,21 295:21 299:16 301:24,25 302:25 319:4 322:16 323:19 331:11 335:6
**processes** 18:2 21:5 61:14 98:15 254:18 312:5 335:7
**produce** 22:17 295:6
**produced** 22:20
**product** 188:14 189:15 208:20
**production** 133:13 137:14 337:12 338:2
**productivity** 292:19 294:10 295:15 296:17
**products** 206:4,4 209:13 210:20,21 211:17 212:2 215:7 217:15 218:25 219:20 220:11,22
**professed** 177:24
**professional** 54:11 274:24
**professionals** 61:12 84:6
**program** 75:21 250:20
**progress** 72:3
**prohibit** 232:10,20
**prohibition** 205:11 250:14
**prohibits** 232:5
**project** 139:21
**promptly** 30:20 152:18
**pronounce** 226:9
**pronouncement** 121:16
**pronouncements** 119:17
**proof** 285:9,15 286:2
**proper** 16:17 261:17
**properly** 36:18 41:10,11 122:20 185:19 201:23,25 293:22 294:24 302:5
**prosecuting** 103:17
**protocol** 74:11,18 84:24 85:17
**protocols** 74:20 75:5
**prove** 310:11
**provide** 13:24 34:19 35:18 44:23 115:5 141:13,21 152:25 153:3 161:4 197:3 218:14 233:9 241:12 245:12 257:18 260:4 261:3,8 262:6 264:2,6,12 268:8 278:19 280:11 281:18 282:8 284:16,21 285:14 285:16,23 297:4 299:16 303:5 306:11,20 307:5 312:4
**provided** 16:22 44:15 46:2 47:4 48:16 49:6,10 62:22 63:6,14 79:19 90:22 97:15 102:22 108:7 112:18 141:12 164:21 171:24 174:10 176:4 179:24 193:9 195:4 196:16 203:25 204:2 212:22 216:9,19 241:17 244:24 264:18,22 265:13 265:24 266:2,4,14 267:2 268:10,17 268:19 271:16 274:5 280:20 289:11 292:25 293:11,19 294:5 294:20 295:11,25 296:14 298:17 299:6 301:10 303:6 306:13,16 308:12,24 322:3
**provides** 79:19 120:21 176:24 222:18 238:19 298:11
**providing** 45:11 49:22 79:24 81:21 158:22 191:15 204:19 237:6

241:19 251:17 296:22
**provision** 182:14 265:3 300:8
**public** 1:23 5:21 10:3 15:20 19:20 21:17 31:7,8 63:5 75:2 214:25 248:15 254:24 255:8,11,13 256:2 256:15 270:7 277:20 317:18 322:11,19,21 323:21,23 324:3 324:10 336:22 339:7 340:25
**publicly** 63:20
**pulled** 137:25 145:21 153:25
**pulling** 137:22
**purely** 42:9 171:5
**purpose** 45:2 72:5 79:23 115:25 165:2 205:3 220:14 249:17 254:3,8,15 275:25 276:4
**purposes** 29:3 39:22 115:4
**pursuant** 181:16 215:20 234:22 235:18 250:20
**pursue** 56:3
**purview** 256:5
**put** 9:8,14 11:4 15:5 22:19 23:5 24:2 35:25 69:4 82:16 114:25 124:13 157:22 173:17 181:7 186:9,17 214:20 245:18 285:9 307:20 308:3 325:19
**puts** 89:5 238:25
**putting** 10:8 13:22 14:2 17:21 20:7 28:15 80:21

**q**

**qualification** 58:21
**qualified** 82:11 83:15,17 84:8 96:21 331:25
**qualifier** 238:10
**qualitative** 104:13
**quality** 4:6,7 37:14 39:13,21 78:17 114:6 122:24 123:8,25 124:2 179:13
**quantify** 127:14 128:2
**queries** 49:20
**query** 50:22
**question** 6:23 25:21 34:12,25 37:3 42:24 46:4 46:13 51:16 53:24 55:14,19 58:3 60:4 67:14,19,21 90:8 93:9 94:14 95:6 99:3,17 102:9,11,17 103:6 104:13 105:8,12 105:21 106:2 109:18,23 110:2,4 111:25 116:13 125:6 130:12 144:11 146:2 165:5 177:6,7 179:21 184:24 194:6 201:6,11 206:22 207:9,19 208:3 211:20 216:5,7 218:7,19 218:20 219:7 221:22 223:25 224:2,18 227:22 229:11 233:16 235:15,16 236:17 238:15 242:6 246:24,25 247:3 251:13 256:13,19 256:23 260:18,20 260:21 262:25 271:12 274:12,13 274:17 275:4 277:11 287:15 288:23 293:11 295:3,5 297:24,25 298:20 307:17,18 307:24 309:10 314:13 315:19,23 318:13 321:13 322:10,16 327:6 328:16 330:25 333:12 334:9,20
**questionable** 131:20
**questioning** 198:3 271:14 334:2
**questionnaires** 218:24
**questions** 18:10 38:23 43:2,10 44:12 46:6 64:14 71:25 92:25 93:2 93:7 97:20 98:24 113:15 115:3 116:9,17 117:7,12 124:4 126:13 129:21 133:5,18 142:5 189:6 207:12,24 208:6 210:19 211:7 214:22 220:21 221:18 235:20 271:3,3 274:23 277:9 279:5 286:10 288:5 295:8 304:21 324:8 330:25 334:5 335:16
**quick** 31:9 185:23
**quickly** 152:22
**quiet** 133:4 288:6
**quite** 14:7 19:16 48:7 54:6 56:10 127:15 199:20 250:16 309:25 328:22
**quote** 140:23,25 141:8,9
**quoting** 223:16

**r**

**r** 2:2,8 3:2 5:19 137:2,6 339:2
**ra** 20:8 23:19 24:4 24:14,15,17 62:4 142:21 170:8 171:12 173:19,22 181:5 190:20 283:11 299:9,11
**ra's** 159:2
**raise** 7:8,9 66:22 123:12 129:24 257:5,8,13 272:18
**raised** 32:22,24 92:13 102:13 123:7,9 208:6
**raises** 130:12
**raising** 256:24 257:12

**random** 145:21 320:14
**range** 53:9 127:4
**rare** 74:4 123:16 123:22 130:4 280:9 282:15 283:18
**ras** 27:23
**rate** 34:4,15
**rationale** 275:14
**rationales** 275:15
**reach** 46:25 47:21 50:14 51:3
**reached** 29:12 44:7 56:22
**reaching** 54:17 84:2 283:5
**read** 109:23,25 143:9 159:5 223:23 224:5,12 336:8
**reading** 42:23,25 142:15 164:12 295:14
**reads** 150:6 169:16
**ready** 30:12 37:21 39:22 40:19 139:6 151:9 173:19
**really** 14:6,7 16:18 23:24 30:17 31:3 34:25 50:18 61:17 72:5 77:10 78:9 102:14 114:14 131:2,19 147:21 158:24 159:23 169:16 171:14 175:14 188:15 199:18 203:18 254:11 258:5 263:20 283:21 289:16,23 290:2 303:24 319:7 320:16 328:2 335:18
**reardon** 1:12
**reason** 31:8 91:16 113:21 143:21 152:16 154:12,14 158:3 159:15 167:22 201:3 219:21 311:15 312:12,13 322:9 324:15,23,25 340:6
**reasonable** 9:9 11:23 12:2 15:17 16:7 17:9,10 18:4 18:22 19:22 20:17 24:7,13 25:16 29:10,15 33:4,9,12 33:21 34:3 35:10 36:22 47:19 48:19 50:7,10 53:21 54:16 61:13,18 66:11,23 67:4 68:3,7 76:9,25 83:22 84:20 85:2 86:19 88:25 91:22 95:8,19,23 97:3 98:8,13 101:8 103:19 104:7 112:15,17 122:21 124:8 145:13 146:6 148:14 160:12 167:11 168:19 173:17 174:11,22 177:3 200:6 201:4,23 202:2,7 204:5,10 213:16 216:21 217:2 236:7 243:18 245:24 246:14 247:17 248:11 262:21 265:10,19 268:14 270:10 273:4 277:24 280:23 281:3 289:19,20 290:13 291:14 293:18 294:16,23 294:25 295:20 296:5,8,10 300:9 301:17 312:15 318:2,9 319:3 322:15,22 324:18
**reasonably** 95:22 168:3 171:22 309:12 322:24 323:2
**reasoning** 131:10 174:18
**reasons** 60:15 101:11 122:17 144:10 155:17 159:8 161:4 168:15 170:18 173:2 200:9 202:12,14 203:24 217:20 218:7 228:8 230:11,11 242:20 282:17,18 299:11 316:12 318:10
**rebut** 47:11 241:12,16
**recall** 11:14,15 15:11 26:11 27:6 62:14 63:21 71:14 82:25 109:18 111:3,12 124:2 210:15 213:9 261:7,23 264:10 272:20 273:21,25 274:2,3 284:5 289:10,12 291:6 309:2
**recap** 330:18
**receive** 45:6 157:9 158:18 213:20 235:23 236:10 237:23 238:7 239:14 295:7
**received** 16:2 45:19 47:14,24 49:3,19 74:15 96:24 106:6,16 116:18,24 117:14 133:9,14 135:17 158:6 162:10 166:6 197:9 236:17 239:4 281:25 338:5
**receives** 294:20
**receiving** 106:7 159:16 160:9
**recess** 52:12 109:13 136:5 196:3 270:19 305:13
**recipient** 145:4
**recipients** 157:14 157:14,19
**recollection** 23:24 26:6
**reconciled** 172:14 172:14,15
**reconsider** 135:4 281:13
**reconvene** 52:8
**record** 4:3,24 7:9 13:16 22:9 28:7 42:19 44:19 49:6 50:23 51:4 52:11

53:20 58:7,13 59:7 79:14 83:24 86:2,3,4,4 109:12 109:25 120:22 136:3 147:13,23 155:7 156:13,14 171:5,11 172:9 174:17,23 175:14 176:3 178:18 180:25 182:8 183:2,7,9 187:20 190:17 196:2 203:23 204:8 207:4 208:4 212:24 219:16 221:2 224:5 228:10 229:3,21 230:17,19 235:3 237:6 244:3,8 247:11 248:13,19 252:20,21,22 258:3 269:10,14 269:16 270:17 276:6 278:21,25 279:2,17,18,20,22 280:3,13 283:2 284:13 289:9 295:10 296:13 301:25 302:8 305:12 308:17 326:3,6 328:17 333:22 335:24 336:11,12 339:13
**recorded** 1:20 4:11 22:5 41:10 70:15 71:16 83:3 83:10
**recording** 4:7,12
**recordings** 22:13 337:13
**records** 27:10,15 27:15 44:10 49:23 61:23 87:4 148:18 156:22 208:8 210:13 211:24 215:12 217:8 289:25 328:2
**recourse** 57:4
**redact** 150:7
**redacted** 150:5 337:16
**refer** 27:2 29:16 54:8 98:5 183:24 255:14
**reference** 129:3
**referenced** 26:22 27:8 55:2 76:5 111:13
**referencing** 307:13
**referred** 27:3 76:7 100:2
**referring** 59:25 64:9 99:24 129:2 129:4 196:23 226:11 258:25 259:3
**refine** 227:15
**reflect** 80:11 122:6
**reflected** 79:13 267:15 297:3 337:20
**reflects** 155:8
**refusal** 199:17 277:2
**regard** 13:7 31:19 35:9,10 68:22 86:21 171:19 216:10
**regarding** 85:11 112:25 118:24 137:19 236:10 267:16 306:16 337:22
**regardless** 195:9
**regards** 266:22
**registered** 152:14
**regs** 75:6
**regular** 21:16 39:23 69:13
**regularly** 325:19
**regulation** 30:24
**rejection** 41:22 159:9,15 213:16
**relate** 83:6 97:13 100:17 132:15 156:22
**related** 14:14 21:18 38:23 61:15 74:15 88:20 89:9 89:10 97:16 98:24 126:19 180:14 328:22 334:17 339:16
**relates** 86:5 93:18 94:21 102:11 116:20 208:14
**relating** 96:9 103:8
**relation** 292:21 294:12 295:18 296:19
**relations** 9:22 11:6 11:8 76:22 79:3 320:6
**relationship** 298:25 300:22
**relevance** 205:16 205:20 207:5 211:6 214:5 224:8 323:16
**relevant** 20:2 45:4 74:14 77:14 90:5 114:14 115:2 117:8,15 120:13 120:18 121:4 126:6 131:14 153:25 166:14 176:20,22 178:19 183:8 206:15 207:14 208:15 216:23 219:24 235:17 245:8 247:15 261:20 262:2 303:18 310:7,8 329:12
**relied** 27:9 189:23 209:25 215:25 301:11 315:5,20 315:25 316:7,8 317:2
**religion** 88:20,22 95:9 124:10 167:4 186:10 193:5 226:22 232:5 246:4
**religions** 19:8 119:23 120:4 311:16
**religious** 1:3 4:16 14:10,15,21 28:14 29:10,14 31:23,25 32:4,7,7,22 33:2,4 33:7,12 34:22 53:2 59:19 60:23 62:24 67:3,12 68:3 84:11 86:12 88:25 89:6 90:6,7 91:22 92:12,12,16 92:18 95:7,8,19 97:13,17,18 98:14 111:22 112:10

113:5 117:25 118:2,25 119:25 120:14,22 123:20 133:17 140:22 141:19 142:21,25 145:17 146:5,20 147:3,7 148:4,9 159:9,25 160:17 166:5,10,18 167:6 167:8 168:12 170:14,16,23 171:6,7,8 173:11 175:10,21 176:12 177:25 178:4 179:9,17 180:19 181:17,20 182:3,9 182:21 183:3,15 184:12,22 186:10 186:17,21,22 187:4,12,13,16,19 187:21 188:4,5 190:6,12,22 191:2 191:21,23 192:5 192:21 193:3,10 193:18,21 194:5,7 194:8,9,17 195:6 196:9,10,19,20 197:4,7,9,11,12,13 197:16,24 198:4,9 198:13,18 199:13 199:16,25 200:11 200:14 202:3 205:8,10,18,22,24 206:3,7,12,18 207:15 208:17 209:23 210:5 211:8,14 212:12 213:6 217:20 218:11,14,16,17 219:8,12 220:4,8 221:4,5,7 222:4,6 222:9 223:11,14 223:15 224:13,16 225:6 226:3,8,15 226:20,24 227:25 228:4,12,18 229:2 229:5,12,17 230:3 230:11,22,23 231:8,17,20,23 232:16,20 233:11 233:12,18,20,23 233:24 234:7,20 236:14 246:9 247:23 248:3 259:12 260:24 261:22 263:3 265:6 271:23 273:24 276:13,14 276:22,23 277:4 278:10 285:17,22 286:3 288:10,19 290:25 294:7 298:8 305:23 306:4 310:21 311:9 316:3 323:3 323:7,11 324:23 325:4,7,11,13,24 327:18 328:4,11 328:12,21 329:2 329:22 330:3,4 333:8 335:12

**religiously** 89:10 197:20

**rely** 149:8,17 179:15 214:3 316:15,17 317:21 318:13,17 321:22

**relying** 114:2 225:15

**remain** 100:23 149:15 311:8

**remainder** 138:22

**remained** 270:2

**remaining** 91:14 268:3

**remains** 12:10 66:13

**remand** 51:11 247:12 248:20 280:2,6,14 281:12 282:2,8 283:12 338:5

**remanded** 219:25 248:3 282:25

**remanding** 243:11

**rematch** 51:24

**remember** 12:9 21:25 24:11 61:11 68:15,15 69:3 97:25 120:2 156:6 156:8,8,9 210:18 272:15 274:8 275:13 306:15,25 327:8

**remote** 4:14 262:7 262:12,18 263:2 263:10,15 264:14 264:22 265:3,14 265:18 267:17,19 268:9,13 337:22

**remotely** 133:2 188:6 278:12 303:12

**remove** 69:5 96:3

**rendered** 56:7 244:7 293:4

**rendering** 51:21

**renee** 11:7

**rent** 251:11

**repeat** 94:13,16 230:25 231:19 317:25

**repeatedly** 99:25 208:6 297:8

**rephrase** 60:4 203:3 260:17 315:22

**rephrased** 105:22

**report** 35:15 38:4 38:7,10,12 51:18 82:13,14 152:12 153:3

**reported** 82:16

**reporter** 1:22 4:20 5:18 109:23 138:2 223:23 224:12

**reports** 36:2 153:7 153:11,18

**repository** 156:22

**represent** 4:23

**representations** 13:19

**representative** 37:9

**representatives** 84:17

**representing** 13:9

**reps** 41:9

**request** 17:23 22:19 23:4 24:4 33:21 35:25 36:23 44:18 51:14,14,23 59:9 66:23 67:12 68:6,8 80:14,20 92:14 101:9 104:7 108:20 122:22 150:4 154:10 158:21 170:8 174:10 175:11 179:18 180:20 181:7,14 191:12 197:7 246:20 252:4,4 260:24

271:18 273:5 278:4 281:23 283:11,22 292:14 292:16,18 293:17 294:19 320:19 321:20
**requested** 27:23 29:11 216:21 241:5 243:17 245:6 246:7,19 247:8,18 311:18
**requesting** 124:8 244:4 249:18 267:14 283:5,25
**requests** 14:11,15 14:21 16:4 18:4 23:19 25:16 28:15 28:18,19 29:17 31:23 32:9,23,24 35:20 44:13 54:17 59:21 60:23 62:25 85:3 86:13 95:20 96:23 111:22 112:11 120:20 143:2 149:4,24 153:22,22 159:10 173:6 209:24 210:5 215:20 217:14 230:22 234:21 243:19 247:19 248:21 249:11,13 252:6 261:15 264:9 275:6 277:24 288:10 301:2
**require** 190:16 194:20 247:14 279:5 287:3,5,18 301:8 310:3
**required** 20:3,4 45:24 69:11 203:23 284:16,18 284:25 285:7,8,14 285:23 286:9 291:3 301:22 302:15
**requirement** 120:9 121:24 146:23 148:5 166:12 167:10 168:14 171:9 180:8 182:11 220:5 221:8 228:14 229:7 234:2 249:14 286:2,6 287:22 292:2 299:4,13 301:19 306:5 322:19
**requirements** 13:25 287:3 290:7
**requires** 148:23 195:14,16 245:8 249:14 299:5 301:7 302:23,23 324:17,19
**requiring** 198:17
**research** 108:12
**reserve** 307:24
**resolve** 58:13
**resolved** 214:22
**resource** 99:13
**resources** 14:3 16:21,25 18:21 26:21 61:9 300:7 300:11,14
**respect** 6:22 7:10 8:22 9:10 10:3,22 18:20 19:3,5,7,8 23:5 26:4 29:13 29:14 32:21 34:20 35:12,13,19 37:23 38:8,9 39:13 44:21 45:8,25 46:7,15 47:5,23 48:22 49:2 50:21 50:25 52:23 56:15 58:8 60:22,24 61:25 63:11,25 65:23 66:8,15 67:22 68:2,9 71:2 77:9 79:2,4,20 86:12,22 89:24,25 91:11,23 92:4,18 93:11,13,13,15 94:6 98:24 99:8,9 99:16 100:3,7 111:21 112:9 113:4 120:3 123:10 131:2 134:20 140:9 142:23 143:9,21 145:7 149:10 157:8 159:20 161:8 166:4,17 172:18 173:2,9 174:4 177:25 181:25 187:3,5 188:25 193:23 194:25 198:9,12 207:24 209:11,20 210:2 212:12,21 213:21 214:2 223:11 236:13,20 237:12,14 240:6 241:11 243:7 244:12 259:12 268:16 287:2,11 287:19 289:6 291:21,22,25 300:16 322:5 324:21
**respectful** 73:5
**respectfully** 312:3
**respective** 38:5,8
**respond** 24:24 241:2,10,17 260:19 286:10 316:14 329:21
**responded** 144:16
**response** 17:23 25:9 31:6 80:19 81:25 149:24 185:8,14,23 220:21 224:4 281:19,19 286:11 288:23 295:7 324:10 326:17
**responses** 49:19
**responsibilities** 91:13
**responsibility** 36:17 78:6 153:17 179:13
**responsible** 40:24
**rest** 333:7
**restrict** 169:7
**restrictive** 246:8 248:23
**result** 43:16 147:16 167:4 193:5 196:13 243:22 265:5
**resulted** 14:18 334:13,18
**resulting** 334:23
**results** 245:3 248:23
**resumed** 137:7
**retain** 157:7
**retaining** 292:19 294:10 295:16 296:17

**returning** 254:7
**reversal** 34:15 141:3
**reversals** 54:13
**reverse** 34:16 204:10 254:14
**reversed** 202:8 244:10
**reversing** 243:11 243:12
**review** 17:15,17 17:18 25:2 26:9 28:3,5 30:22 37:19 39:8,20 40:5,21,25 41:2,25 42:6,13,17,18 43:19 44:20 48:3 50:24 51:20 52:24 53:11,20 54:11,16 55:5 58:13 68:5 70:22 72:2 78:18 82:12 84:20 85:15 90:12 104:6 113:14 120:5,20 122:18,25 125:11 125:14 126:12 128:7,9 131:23,25 139:24 147:10,21 148:18 149:3 151:9 158:24 159:2 165:20 167:20 170:3 183:7 190:17 203:23 204:3 224:24 225:21 227:7 228:24 247:11 252:9,17 263:23 276:6 280:12 281:2 282:21 284:11 290:12 291:11 293:19 294:18 299:5,8 300:25 308:5 324:2,4 330:17
**reviewed** 25:6,7 25:11,12,12 30:11 34:7 39:25 44:19 49:5 55:11 59:6 59:14 111:18 114:5 170:7 179:12 208:8 211:24 212:23 215:12 233:6 241:21 243:9 251:25 265:25 272:16 289:11 293:2 295:22 316:22 319:22,22 332:2
**reviewer** 80:15,17 150:20
**reviewers** 150:19
**reviewing** 28:8 40:11 43:16,18 46:9 53:18 71:10 72:10,10 83:24 87:4 90:17 99:22 103:17 113:13 122:21 125:9 127:2 131:7 154:5 154:22 169:15 191:5 202:5,6 216:18,24 217:8 222:9 244:2,8 252:21,24 265:22 266:23 268:17 275:2 277:23 286:18 296:9 301:25
**reviews** 40:5 79:6 84:12 85:2 130:15 221:15,17 294:21 301:14 331:2,3
**right** 7:3 29:5 33:22 34:2,10 43:9,12,25 49:12 54:8 59:11 96:15 100:22 101:5 104:20 108:13 118:5 121:15 130:8 131:4,14 143:9 149:11 152:5,8,8 160:20 166:23 169:15 174:12 177:12,18 180:13 184:16 187:2,2 196:25 198:23 210:10 237:21 239:21,24 241:10 247:25 256:21 257:2,16 259:3 261:2 263:9 272:10 279:12,25 290:20 303:23 304:20 307:25 311:21 323:8 326:24 327:3 329:8 331:5
**rights** 54:15 58:15 58:16 62:24 63:8 63:24 64:8,15,17 64:19,21 65:3,8,8 65:18 66:3 81:8 103:13,16 151:20 158:20 170:3 290:6,9,16 292:6,8 297:10 299:21 302:17,18
**risk** 313:24 314:18 314:19,24,25 315:7,12 316:4,19 317:9,14,22
**rivera** 1:6
**rl** 255:25
**roberta** 1:12
**rocco** 3:13 4:20
**role** 10:19 12:24 13:20,21 25:23 39:6,19 40:4,10,12 40:13,16 41:6,14 182:11,12 223:10 275:17,18 302:21
**room** 130:9
**rough** 32:16
**roughly** 29:6,22 32:17,19 71:4 174:14 331:21
**routed** 123:20
**routinely** 62:19 292:13,16 294:4 295:10
**rq** 22:16 23:3 150:4 215:19 267:13 281:21
**rule** 8:11 92:23 129:12 130:8,11 173:23 174:2 234:22 250:9 259:18 262:11 301:22 310:23
**rules** 6:16 28:25 75:6 114:3
**ruling** 249:3 337:10
**run** 36:2 101:8 148:22

**s**

**s** 2:2 3:2 137:2,2,2
**sabina** 1:5 3:9
**salesforce** 75:22 75:23 138:19,24 139:10 150:20 154:7,23 268:24

**salient** 126:7
**sanctions** 198:22 199:7,8,17
**sanford** 10:15 37:12 78:18 133:21
**sarah** 2:9 5:5
**satira** 1:6
**satisfy** 14:3
**saving** 201:11 288:5
**saw** 236:23,25
**saying** 57:2 68:18 104:14 107:21 108:14 145:12 147:11,12 152:2 160:4 174:19 175:3,10 177:15 178:12 184:8,19 189:24 192:4,6,7,8 194:7 203:12 220:6 222:20 226:11,18 228:25 230:9,15 231:5 234:11,12 237:8 238:7 241:13 245:20,22 258:4 278:24 280:15,17 286:7 310:2 314:10,22 322:25 323:8,12,13,14,15 325:10 328:25 335:3
**says** 68:18 79:22 131:18 135:3 141:15 179:7 181:4 182:16,25 184:16,17 186:19 187:18,22 190:11 193:5 195:9,10 233:11 234:12,13 245:11 307:2 311:11
**scanlon** 235:6
**scenario** 168:22 171:2,14 174:20 175:4 177:19 188:9,10 192:15 192:25 193:12,20 197:14 200:13 247:10
**scenarios** 164:20 173:20 176:19,21 227:12,14
**schaeffer** 12:10
**scheinman** 334:13 335:3
**schimenti** 1:6 3:8
**schmitt** 1:6
**science** 119:23 306:20 315:6
**scientific** 206:5 214:10 274:4 306:13 322:8,12 324:2,4
**scope** 31:13 46:5,8 67:17 77:17 92:22 93:21,25 97:22 99:19 111:25 116:16 125:6,8 132:14,22 164:11 165:3 235:17 256:5 286:15
**screen** 4:10 43:6,8 43:12 96:3
**scripture** 119:10 231:11,16,20 234:7,12,13
**scrolling** 133:6
**scrupulous** 177:23 178:22 179:3,4,8 179:16 180:13,17 181:22 182:20 183:21 184:14 210:13 211:5,23 218:5 245:16 246:3,5 253:9,9 260:2 273:3,11,12
**search** 156:19
**seats** 304:4
**second** 42:22 43:17 44:3 48:12 57:21 70:6 99:2 106:2 107:17,25 108:5 124:14,24 193:6 305:21 334:14
**sections** 25:14
**secular** 228:3 277:4
**see** 39:9 41:2,22 54:6 68:24 73:2 73:19 75:2 80:18 88:13 94:2 122:6 138:7 140:2,23 141:9,19 146:17 146:20 156:13 161:22 181:2 184:15 186:19 208:2 211:11,12 211:19,21,21 222:24 230:14 276:18 281:22 291:11 310:13
**seeing** 43:5 53:22 134:16 146:9 184:5 185:10 211:15 216:25 222:21 224:17 254:15 327:20 335:19
**seek** 176:7
**seeking** 128:25 249:12 250:4 261:10
**seen** 4:10 123:9 146:4 168:23 172:2,3 179:13 180:5 181:10,15
**sees** 54:10
**segmented** 153:13
**seller** 145:6
**seller's** 145:8
**send** 42:2 47:13 51:13 74:9 134:21 154:9 217:14 218:23
**sending** 41:11 48:13 51:23 107:17 280:19 281:13
**sense** 61:2 142:5 149:18
**sensitive** 234:20
**sent** 23:14 40:19 46:24 133:15,22 134:4 144:7,13,16 144:18 146:12 154:17 157:4,12 157:13 219:7 236:12 248:2 272:14 279:23 331:18,21
**sentence** 124:24 141:8 164:13
**sentences** 224:3
**separate** 28:24 29:3 135:14 277:6
**separately** 269:2
**separateness** 298:24 300:21
**series** 44:12 52:21 153:13 154:6,6 173:18

**serve** 15:25 20:16 132:4,16
**served** 9:2
**service** 132:25
**services** 9:21 10:14 20:23,25 36:15 38:14 79:2 103:21 104:2 151:12 320:4
**serving** 13:4 91:18 95:10 132:11
**session** 137:24
**set** 12:17 14:11,19 23:8,8 28:24 57:20 58:14,17 90:3 100:12 115:21 138:19 139:6 145:16 167:5 235:20 236:6 241:7 293:6 309:15 339:11,21
**sets** 238:19 281:11
**setting** 18:11 334:16
**seven** 271:8
**severely** 107:18
**severing** 62:10
**share** 72:13
**shared** 26:2,25 112:22 149:17 240:20
**sheet** 340:2
**shoes** 36:19 329:4 329:10
**shoot** 174:7
**short** 106:16 175:13 246:18 249:10 304:23 305:8 330:24 334:2
**shortcuts** 186:12
**shorthand** 88:8 326:19,21,22
**show** 67:7 68:10 69:11 291:3 302:24
**showed** 185:11
**showing** 301:22
**side** 23:11 85:6 95:19 109:2 171:19,20
**sides** 146:9
**sidhu** 2:15
**sight** 216:15
**signature** 339:24
**signed** 336:19
**significant** 16:21 47:3 54:12 67:7 112:14 312:18
**significantly** 34:11
**silence** 70:3 177:11,17
**silent** 175:17 204:16
**silvia** 10:25
**similar** 27:22 102:12 105:23 274:24 282:8 313:6 334:18
**similarly** 1:7 103:22
**simply** 15:9 68:11 249:23 256:9 286:7 287:24
**sincere** 147:12 176:11 180:5 222:17,20 223:16 223:19 224:16 225:4,14 226:16 226:21,25 278:10 311:9,16 316:3 323:2,6,10 328:11 328:21 329:2,22 333:8
**sincerely** 146:20 147:3 148:3,9 166:10 167:8 175:22 182:9,19 184:12,22 185:17 186:22 192:10 193:6 198:18 199:12,16,25 200:14 205:8 211:8 219:14 221:4 222:3,8,12 223:12 224:10 228:12 229:5 298:8 325:4,7,11 325:24
**sincerity** 179:21 193:20 200:10 207:14 208:16 222:23 223:4 224:18 226:6,7 328:10
**single** 33:23 273:3
**sir** 242:3
**sit** 65:15,21 68:14 68:22 77:15 156:3 162:3 176:18 209:2,5 210:15 211:2 261:18 272:2
**site** 264:15 268:9
**sites** 264:23 265:4 265:14,18 267:17 267:19 268:13 270:12 337:23
**sitting** 7:3
**situated** 1:7
**situation** 75:12,13 133:24 134:5,9 149:7 163:7,15,16 163:20 170:13,20 177:7 181:4 211:24
**situations** 72:20 73:22 134:21 171:17 181:15,22 288:18
**six** 25:8
**size** 292:22 294:12 295:18 296:19 300:15
**skip** 56:19
**skipping** 201:10
**sky** 195:10,11,11
**slightly** 43:23 263:6 313:24
**small** 33:17
**smoothly** 115:5
**sole** 180:19 335:5
**solely** 173:21 273:6
**solicit** 279:15
**solicited** 204:22 244:23 335:9,11
**solutions** 340:3
**somebody** 7:7 83:15 133:15 312:12 325:23
**someone's** 90:13 95:2 208:16 273:12 329:10
**somewhat** 71:23
**soon** 135:21
**sorry** 10:19 26:15 32:7 36:24 45:14 52:2 53:24 55:18 64:25 83:20 86:8 127:13 132:7 143:11 144:3 152:2 159:4

160:24 162:11 167:18,19 178:25 207:8 225:9 226:9 233:2 236:18 238:5 246:24 255:6 256:18 258:24 259:17 260:13 269:11,21 272:6,11 276:3 287:13 290:22,22 291:18 294:2 297:20 305:9 318:5 320:5,7 326:5 328:15 332:8
**sort** 12:7 18:17 20:9 21:2,20 23:21,23 26:18 34:9 36:8 37:14 38:25 43:11 53:10 53:19 61:18,19,20 68:24 79:5 82:18 84:20 85:13 87:25 100:6 106:15 121:8 123:17 130:12 139:3,23 142:2,4,8 153:15 154:21,22 155:6 167:12 175:8 180:7 182:24 189:18 218:18 221:16 236:5 237:6 244:20 247:9,13 251:2 252:5 254:11 263:5 265:17 266:18 271:6 276:19 277:10 299:6,17 315:15 330:21
**sorts** 20:21 24:4 28:7 34:11 73:10 106:18 135:6 189:11 206:3,6 262:15 330:17
**sought** 86:24 252:7,23
**sound** 173:13
**sounds** 115:20 142:22 203:12 254:13
**source** 24:23 120:6 121:21 187:21 188:3,17 218:13 231:23 277:4,4,5 286:4 320:20
**sources** 139:24 140:4
**south** 2:6
**sovereign** 116:7
**space** 26:16 101:6
**speak** 25:18 41:18 50:13 163:11
**speaking** 17:25 91:25 92:3 150:21 262:9 324:24
**specific** 28:3 51:15 51:16,16 65:22,22 66:8 68:6 73:13 74:12 96:9 98:6 100:11 101:4,11 111:8 129:15 130:18 133:10,12 133:24 134:19,21 141:6,12,21 144:15 148:21 150:7 159:8 186:17 202:17 204:18 209:4,15 213:2,24 214:8,19 253:16 262:10 263:17 271:2 278:3 283:18 286:10 289:12 301:21 310:19 320:2 324:12
**specifically** 25:14 26:24 33:9 46:7 63:21 69:23 76:4 88:18,23 93:15 120:2 123:24 143:13 144:12 186:3 213:12 245:6 261:23 270:4 293:9 299:16 306:3 318:3
**specifics** 147:22
**spectrum** 131:23
**spend** 127:5,6 260:6,10,23
**spending** 75:3 127:25
**spends** 161:10
**spent** 40:8 305:3 330:15
**spiritual** 195:4
**split** 154:15
**spoke** 11:17 65:18 65:21 70:24 73:24 88:16
**spoken** 118:3 143:23
**spread** 274:15 275:23 309:5,7
**spreading** 275:9
**spreadsheet** 79:18 325:2,20 326:18
**ss** 336:4 339:4
**staff** 61:15 89:15 96:21 103:23
**staffing** 261:14,17 262:5
**stage** 41:15 48:18 50:19 58:23 62:12 62:21 84:11,14 102:21 117:16 252:18
**stages** 9:18 63:20 302:24
**stake** 249:22 250:5
**standard** 46:22 50:10 53:7,8,11,18 54:2 58:16,20 59:12 61:20,21 67:22 105:9 106:23 107:6,7,11 108:15 110:10,11 110:22 111:5 112:6,24 122:20 123:11 203:9 225:12 267:8 284:17 288:25 290:21
**standards** 14:10 14:19 15:6,15 21:6 23:18,22 46:10 52:24,25 53:10 55:2,25 56:2 57:21 58:14 59:2,18 60:11,14 60:25 61:25 62:22 63:9 67:16 75:9 87:5 93:4,13 99:22,25 100:11 100:19 105:14 106:3,9,21,24 107:15,19,23 108:4,7,14,17 110:13,17,18,24 111:2,8,13,15,22 112:4,9 113:5,13

114:19,21 116:11 116:21 118:2 119:6 125:10,14 128:20 129:19,22 130:5 132:23 138:21 139:23 140:10 148:19,19 201:21 203:5,11 241:7 256:11 275:2 286:20,25 290:12 291:17,21 293:6 320:9
**standing** 167:15
**standpoint** 87:11 229:14
**stands** 272:2
**start** 81:23 108:13 138:23 147:2 150:18 222:19,21 224:15,17,22 279:24 315:21
**starting** 222:24 238:9
**starts** 142:17
**state** 1:12,23 19:24 58:15 62:23 63:13 63:23 146:25 262:11 269:20,24 290:5,8,14,16,18 297:9 302:17 310:20 336:3,22 339:3,8
**stated** 117:3 144:10 172:8 204:13 227:23 228:15 290:3,23 305:20
**statement** 121:9 181:14 191:12 209:8 247:2 284:24 285:19,21 307:21
**statements** 118:23 184:8 209:19 279:8 306:19 321:4
**states** 1:2 63:15 164:14 184:4 232:19 288:17
**stating** 249:15 274:17
**statistics** 27:22 31:21 32:20 34:20 72:4 161:7,12,13 161:21 244:11
**stats** 37:19
**status** 250:8,17 251:19 306:23 315:9,13 316:5,20 317:15
**statuses** 250:15
**statutory** 295:14 299:14
**stay** 107:23
**stella** 10:18
**stem** 184:7,21 186:4 187:6,11,15 187:18 188:13 189:14 192:3,20 193:3 194:2,10,12 195:2 197:18 209:11 210:3 212:15
**stenographic** 1:22
**step** 185:21 208:3 224:20 329:4,9
**stepping** 42:21
**steps** 36:19 255:20
**stereotype** 206:17
**stereotyping** 121:14,15,17
**steven** 11:9
**stick** 314:13 315:22
**stood** 124:6
**stop** 235:9
**street** 2:13,20
**strength** 222:6
**stretch** 213:17
**strictly** 114:18
**strike** 53:24
**stringent** 181:20
**strong** 98:3 131:19 222:3
**structurally** 36:8
**structure** 12:17 14:3 31:11,11 36:4 75:8 115:14 300:20
**studies** 214:10 322:8 324:2,4
**study** 214:21
**style** 43:18 44:20
**subject** 19:12 86:10 92:9,10,14 94:6,7,10 99:20 103:3 113:17 115:8 116:14 148:15 198:25 199:3 237:12 246:14 251:6 274:25 311:2
**subjective** 225:12
**subjectively** 225:18
**submit** 280:13
**submitted** 27:8 33:21 236:21 238:2 259:23 267:4 296:2
**subscribed** 336:19 340:21
**subsequent** 104:25 108:9 164:13
**substance** 40:21 40:25 68:20 69:2 91:10 96:17 97:6 114:5 118:12 134:25 139:19 230:2
**substances** 227:20 228:18 229:10 230:4
**substantial** 33:11 34:9 68:12,16,21 69:3,14,15 315:9 315:13 316:4
**substantive** 41:18 123:6,9,13 124:4,6 224:2
**substitute** 179:3
**succinctly** 172:8
**suffer** 199:7,8,16 261:21
**suffered** 254:2
**sufficiency** 252:21
**sufficient** 233:10 286:12 291:12
**sufficiently** 297:11
**suffolk** 339:5
**suggest** 41:23 168:11 222:21 232:12,14 322:23
**suggested** 237:2 247:11 248:19 284:25 335:11
**suggesting** 249:2
**suggestion** 248:13
**suggests** 119:11 190:19
**suite** 2:6,13
**sujata** 2:15,16 5:6 270:25 304:22

**sum** 118:11
**summary** 297:3
**super** 79:5
**superceded** 79:24
**supervision** 61:16
**supervisors** 38:9
**supervisory** 13:20
**supply** 82:11
**support** 86:25 122:7 172:10 211:13 214:4 231:12 269:11,14 269:16 274:5 285:17 306:13,21 321:5,11,23 322:17
**supported** 42:9
**supporting** 182:21
**suppose** 6:5 227:23
**supposed** 146:16 158:10 159:24 170:12 172:22 224:25 286:17 320:10 326:19
**sure** 14:4 17:13 21:3 30:22 31:20 36:18 40:16 41:8 44:10 48:10 52:7 70:5 75:9,17,22 84:25 89:5 90:3 134:12 138:12 139:16 141:7 146:8 149:16 163:2,4,6 173:17 188:5 195:21 201:8 203:4 209:4 218:19 227:6 237:9 240:17 272:5,7,8 276:9 304:25 309:25 310:13 325:17 327:5 334:10,10 334:11
**surely** 175:12
**surprise** 271:6
**surrendering** 270:24
**suspension** 64:11
**swear** 5:18
**sweeteners** 228:17
**sworn** 5:21 339:12 340:21
**synthetic** 228:17
**system** 35:16,17 138:19,24 139:10 150:21 325:13
**systemic** 215:11

**t**

**t** 5:19 137:2,6 336:2 339:2,2
**take** 4:12 40:14,20 52:6 53:5 57:8 58:20,25 70:3 82:24 109:9 122:25 135:10,20 135:22,23 187:17 188:7 190:21 195:20,23 197:21 199:4,10 208:3 224:21 262:16 270:14 297:5 304:23 305:8 322:25 325:8 326:23 329:19 330:9,11
**taken** 6:12,15 52:12 71:18 109:13 130:24 136:5 171:22 175:18 184:8 196:3 207:23 224:20 239:17 270:19 305:13 309:24 323:5 336:9
**takes** 30:18
**talk** 19:14 29:4 72:15 90:24,24 95:13 134:17 320:23,24
**talked** 119:6 142:6 145:23 276:25
**talking** 39:11 43:25 47:25 48:6 50:18 52:18,25 55:9,11,13,20 61:11 84:15 101:3 108:17 154:23 160:3 170:11 186:14 196:24 201:2 226:8 234:11 255:21 263:5,7 286:16 289:17 314:2 315:16 330:16 334:24,25
**tandem** 48:12
**tap** 87:6
**targeted** 126:14
**teacher** 333:4,6
**teachers** 265:17 332:22,25 333:13
**teachings** 187:24
**team** 9:8,13 12:19 137:23 154:23
**teams** 71:15 74:9 74:10
**technology** 35:22
**telecommunicati...** 35:22
**telephone** 21:23
**tell** 24:21 27:13 28:18 29:13 33:11 49:22 65:15,21 69:22 76:19 77:11 90:16 101:24 102:2 104:18 118:11 128:8 129:12 162:2 168:24 186:23 207:20 209:5 213:13 218:9 240:12 261:25 267:18 318:25 319:25 325:16 327:20,22 331:10 331:20,22
**telling** 139:22 246:21
**tells** 329:19
**temporarily** 242:18 266:19
**temporary** 255:18 265:17
**ten** 52:6,8 108:20 109:9 195:20,22 195:23 270:14,16 305:9
**tended** 210:19
**term** 21:9 68:21 206:9 249:10 288:13,15
**terminate** 235:8
**termination** 304:13
**terms** 20:15 24:5 33:6 38:22 53:2 60:7 63:10 104:17 131:11 154:3 191:3 216:5 250:7 281:11 289:24 318:24

**test** 222:23
**tested** 184:6 188:7 188:23 208:21 210:23 211:18
**testified** 5:22 27:5 137:7 288:25
**testify** 114:21 145:7 256:9
**testifying** 8:11
**testimony** 24:19 25:5 38:21 97:11 103:4 113:20 117:16 124:2 140:8 234:18 246:15 291:6 336:9,11 339:13
**testing** 187:6,11 187:15 189:17 206:5 214:17 249:17
**tests** 215:8
**text** 143:9,12 184:13,15
**thank** 6:3 12:21 22:15,19 43:13 45:14 52:8,17 88:15 152:6 162:5 210:12 224:6 257:10 270:22 274:10 288:7 305:7 306:8 309:17 335:17,20
**thanks** 272:8
**theoretically** 236:23 255:21
**thing** 6:20 12:8 107:9 108:13 114:15 144:4 151:24 167:19 180:24 206:24 211:10 221:12,13 233:15 277:10 282:7
**things** 27:17 28:8 37:21 39:24 63:9 72:17 73:9 75:11 75:13 86:17 96:13 98:4 106:18 123:21 124:3 127:3 142:13 147:24 153:22 159:22 172:12,23 172:23,24 173:3 175:3 180:2 181:13 186:12 193:11 206:10,19 227:8 233:22 251:8 254:18 258:10 262:5 263:6,7,24 276:19 282:2 310:6 319:14 324:9 330:18
**think** 6:19 16:2 17:8 24:2 30:8 31:3 33:19 34:14 34:25 36:7 42:3,4 43:4 46:23 48:7 51:7 58:4 61:10 64:7 74:23 82:3,5 83:21 84:18 87:7 90:19 91:2,14,17 91:21 93:10,23 94:24 95:5,12 96:16 107:4 112:12 115:22,25 127:15 132:17 133:15 135:24 142:6,11,17 144:5 163:23 170:6 172:8 173:22 174:6 175:7 176:18 178:13 182:23 186:12 188:15 196:22 199:18 205:22 208:14 211:3 214:19,20 215:10 215:19 223:13 225:21 234:8 235:13 244:16,18 245:7 246:23 247:18,24,25 248:6,22 261:13 264:20 266:8 267:6,20 268:10 268:11 273:3 279:5 287:8 302:20 303:4,23 311:24 313:7 316:25 317:16 324:11 328:14,23 330:7 331:6,10 333:23
**thinking** 142:10 162:19 211:3 249:11
**thinks** 131:18
**third** 34:17 152:16 152:24 193:9
**thought** 49:24 73:3,3 94:9 238:6 254:20
**thoughts** 13:24 149:17,22
**thousand** 168:24
**threat** 269:25 270:4 271:24 272:19,24 273:6,7 273:10,13,16 274:7 305:19,25 306:12,17,22 307:5,7 308:7,13 309:5,20 310:7 311:14,20 312:11 312:13,21 313:7,8 313:15,17 314:7,8 314:15,15,20,22 314:23 315:2 316:23 321:5,11 322:5,7
**threats** 273:23 308:25
**three** 30:4,9 39:20 42:14 73:23 81:11 81:12 87:17 124:17,18 127:25 135:13 140:20 142:18 145:20 152:14 163:4,5 164:5 169:14,24 170:4 277:5
**throw** 163:5
**time** 4:4 7:7,14 11:9,14 12:20 13:2 18:24 21:10 28:11 30:18 40:8 40:14 52:11,13 81:3 106:16,17 109:12,15 126:18 126:22 127:5,6,8,9 127:18,20 130:10 136:4 137:3,5 140:6 150:25 151:7 152:24 153:19,19 161:9 166:6 181:17 189:16 196:2,5 201:12 234:18 255:3 261:11 268:7 270:18,21 288:6 305:2,3,12 305:15 330:16 333:10 335:23,25

**timeline** 139:3
**timely** 20:20
**times** 25:13 42:22 75:16 112:13 114:23 123:17 126:4,7 172:5,6 244:12 246:3,5 263:18 281:5 283:24 326:9
**timing** 161:15
**tip** 174:24,25
**title** 10:20 58:14 60:14,24 61:25 110:11 201:21 263:21 290:4 308:16
**today** 4:3 24:19 65:15,21 68:14,23 77:16,18 103:4 156:3 162:3 176:18 210:16 211:2 246:22 261:18 263:18 272:2
**today's** 8:18 25:4 25:17 335:23
**told** 82:9 106:25 110:16,21,25 140:9,14 197:16 330:11 333:7
**top** 43:12
**topic** 25:25 65:20 101:12 113:11 114:17 118:4 209:20
**topics** 8:23 21:21 26:8 93:2 99:19 112:2 113:11 164:12 215:25
**total** 29:9 32:6,8
**totally** 174:20
**touch** 105:8
**tough** 127:14 128:2
**train** 54:14 98:4
**trained** 54:11 61:13 111:20 112:9 113:4 115:24 227:3 319:9,12
**training** 113:10,16 114:8,13,16 115:6 116:3,4,14,24 117:13 213:19,25
**trains** 97:16
**transcript** 83:6 336:8,10
**transferring** 292:20 294:11 295:17 296:18
**transparent** 326:25
**treat** 58:7 204:13 228:20
**treated** 58:9
**treatment** 46:19
**trends** 72:2,24 149:12
**trial** 104:18
**tried** 321:14
**troubling** 149:13
**true** 13:11 180:3 190:2 193:12 220:18 276:11,16 284:22 285:13 286:24 306:12 312:22 336:10,13 339:13
**truly** 202:18 326:14
**truth** 159:14 232:23
**truthful** 189:3
**try** 37:2 44:10 203:2 260:16 293:14
**trying** 12:9 50:17 55:19 78:22 101:6 160:24 201:5,6,8 210:14 214:20 217:24 221:15 246:9 248:22 254:3,16 288:4 310:15 317:6,6 318:22 319:7 321:18 325:20
**tuesday** 144:6
**tums** 210:20 211:17
**turn** 85:15 247:15
**turned** 145:25
**turning** 247:20 248:11
**turns** 101:4 197:10
**two** 16:2 20:21 30:6,7,12 31:4 40:15 46:16 54:23 76:4 81:7 84:5,16 85:8,23 86:17,23 87:12,21 88:16 93:2 98:7 99:19 99:19 113:11 119:22 122:25 138:16 139:5,14 140:20 141:25 142:9,10,18 145:20,22 152:14 152:20,22 163:4,5 167:25 169:17 170:4,17,22 171:4 171:12 172:4,6,14 180:2,5 203:4 209:12 224:3 231:10 233:21 244:17 263:6 276:19 279:8 328:9 334:4 335:15
**tylenol** 204:16 210:20 211:5,7,7 211:16 213:8,12 213:15,21,25 214:5,11,13 215:5 216:11 217:6,16 220:23
**type** 148:10,25,25 214:17 278:15 300:17,18 314:14 314:17,18,21,25 327:10
**types** 146:16
**typically** 282:24
**typing** 43:3

**u**

**u.s.** 4:18
**uh** 48:21 74:19 76:11 77:21 134:7 159:11 184:2
**ultimately** 16:19 17:2 219:24 325:8
**unable** 254:5
**unanimous** 172:3 172:3
**unconstitutional** 334:15,16
**unconstitutional...** 105:14
**undergo** 223:6
**underlying** 195:13 252:4 278:2

**undermine** 223:4
**underpinning** 120:23
**understand** 28:4 36:25 39:16 45:4 45:6 58:4 60:13 66:16 79:15 80:2 89:23 92:5 95:5 97:11 100:4,10 120:6 131:15 144:17,23 145:4 145:10 158:10 160:23 161:17 162:13 187:21 205:7,13 208:24 210:21 212:4 219:11,13,25 220:3 224:11 227:22 237:9 251:23 254:3,18 257:3,15 260:14 266:11,23 268:15 283:21 288:7,12 290:21 310:12,15 311:23 314:11 317:7 325:21 326:7,16 327:2,5 330:14 333:2
**understanding** 21:4 49:24 63:12 63:22 65:23 66:4 66:13,13 67:5,6,15 67:20 83:25 91:12 91:15 94:14 98:13 101:2 108:8 114:8 130:3 145:10 146:10 161:2,5 165:17 184:10 186:20 189:6,7 205:17 214:13,18 227:16 292:4 298:15 301:3 308:15 324:8 325:3,6,10,17 326:12 331:9 333:3
**understands** 83:22
**understood** 7:6 55:21 58:19 66:19 90:19 91:16 94:4 160:11
**undue** 63:25 65:25 66:16,20,21 68:2 69:15,15,25 70:9 236:2,3,4,8,10,17 236:25 237:2,5,24 238:8,14,20 239:3 239:12,15 240:6 240:20 241:2,11 241:19,23 245:25 253:3,7,12 257:21 258:15 259:5,11 260:6,10 261:6,21 262:13,14,22 263:22,24 265:23 266:12,17,24 267:10 268:5,18 269:8,11,11,15,16 275:5 278:9 283:20 284:7,14 284:20 287:6,19 290:24 291:15,16 291:23 292:15,25 293:6 295:12 296:10,23 297:11 297:17 298:4,12 299:12,18,21 300:2,4 301:2,7 303:8 304:3,9,11 307:8,22 308:4,8 308:19 309:3,6,19 310:8 311:19 312:7,14,19 313:5 313:9,14,17 314:2 314:24 316:24 317:23 318:5,6,16 321:5,11,23 322:5 323:9,17 324:12 324:21 331:15 332:11 333:9,19 333:20,24
**unemployment** 304:14
**unequivocal** 187:9
**unequivocally** 186:23 187:9
**unexplained** 179:23
**unfavorable** 221:14
**unfilled** 261:10,12
**uniform** 16:8 17:5 173:14
**uniformly** 16:15
**union** 56:22 334:19
**unique** 16:22 72:9 99:11 100:12
**united** 1:2 63:15 288:17
**universal** 233:8
**universe** 55:12,15 55:16,17,20
**unreasonably** 235:2
**unscrupulous** 178:14,24,25 179:15
**untrue** 197:10 285:2
**unusual** 181:9
**unvaccinated** 132:10 259:23 264:8,14,15 265:14 274:14 275:10,22 277:13 305:22 313:23 316:2,18
**unwilling** 250:3
**upbringing** 187:24
**upheld** 277:23
**uphold** 307:8 308:7,18
**upload** 51:19
**uploaded** 80:19
**uploading** 135:2
**ups** 142:9
**use** 16:20 21:8 59:24 104:9 107:6 108:4 110:13,19 116:3 138:24 153:14 178:4 187:14 188:12 198:10 204:16,19 205:2,4,16 206:3,4 207:13 208:10,15 209:11 210:2,16 211:7,16 212:13 212:15 213:7,12 213:15 214:5 217:15 220:10,22 222:9 230:2 231:13
**useful** 45:5
**users** 137:20 142:2
**uses** 53:15
**usually** 26:7 123:17 126:14 183:22 281:15
**utilize** 53:12
**utilized** 110:22

**v**

**v** 95:19 340:4
**vacancies** 261:15
**vaccinate** 277:2,3
**vaccinated** 132:4 166:19,20,24 168:12,18 176:13 177:9,17,21,21 184:10 232:6,21 245:21 250:4 270:8 274:18 275:10,24
**vaccination** 61:22 63:12 68:4,7 98:7 100:17 119:25 120:18 146:23 148:5 166:11 168:6 170:14 185:20 201:17 232:10 270:11 306:5,23 315:8,12 316:5,19 317:15 323:21 324:5 328:24 329:3,24
**vaccinations** 25:15 166:6 170:15 193:8
**vaccine** 9:3 14:25 17:12 18:20 20:5 21:20 24:12 66:9 76:6,10 118:8 119:12 120:8 121:10,23 167:10 168:14 171:9 173:10,21 175:22 176:14 178:5 179:16 180:8 182:11 187:17 190:21 191:10,25 192:2,12,21 193:15,16 194:3 194:11,14,20 195:2,7 198:10,22 198:25 199:4,5,10 204:14 206:15 216:22 219:10,13 219:16 220:5 221:7 222:2 228:13 229:7 231:13 232:15 233:25 249:14 252:5 275:16 276:24 286:6 291:25 328:13 329:16 330:5,7,12
**vaccine's** 194:15
**vaccines** 122:8 167:16 173:12 175:19 177:25 180:18 181:5 184:6,8,20 187:4 188:7,20 189:13 190:16 197:19,22 212:16 329:19
**valid** 170:25 276:16
**validity** 276:22
**value** 79:23 87:10
**values** 167:6,9
**varied** 10:15 149:20
**variety** 179:19 207:3 234:2 282:17 326:10
**various** 9:15 10:24 12:16 14:12 20:10 24:6 25:9 26:8 36:11,12,20 37:16 38:24 54:15 63:20 69:17 72:16,19 84:12 85:20 119:14 124:15 128:5 130:24 147:24 172:5,5,6 172:11 177:22 186:14 201:21 212:22,24 220:25 230:2 231:3 254:18 259:6 269:3 275:15 294:15 334:16 335:9
**vast** 33:2 245:19 253:6
**vehicle** 277:25 278:2
**vendor** 35:24,25 36:2
**verbal** 139:17
**verify** 284:9
**veritext** 4:21 340:3
**versa** 244:25
**verse** 243:5
**versus** 4:17 33:7 149:18
**vice** 244:25
**video** 1:20 4:11,14 22:2 86:3
**videoconference** 1:16,20 71:13
**videographer** 3:13 4:2 5:17 52:10,13 109:11,14 135:25 137:4,21 195:25 196:4 270:17,20 305:4,5,11,14 335:22
**view** 36:7 43:11 45:7 66:20 100:5 119:10 121:18 140:5 148:8,22 169:19 184:5 185:5 186:8 187:16 218:10
**views** 47:23 120:12 121:3
**vii** 58:14 60:14,24 61:25 110:11 201:21 290:4
**violate** 198:17 199:15,17
**violating** 191:9
**virtual** 22:2 25:3
**virtually** 4:6 6:6 33:22 90:15 244:3
**volume** 16:16
**volunteered** 204:21
**volunteering** 211:12
**volunteers** 221:12
**voracity** 193:23
**vote** 36:9 41:3,7 41:21 42:5,8,9 73:23 80:16 85:10 90:23 123:14 138:20 139:7 145:24 151:5 152:15,16,20,22 152:25 153:6 168:4 170:16
**voted** 30:6,7,11 41:7,9,9 101:23,25 102:6 151:23,24 152:3,10 153:4 265:25 327:23,24
**voter** 101:18,22 102:4 122:4,5 123:13 169:8,12 169:16 172:18 174:3 182:3
**voter's** 123:19

**voters** 42:14 101:15 121:25 128:20,22 169:17 171:4,12
**votes** 28:4,5 39:14 39:20 40:17,23 41:10 81:22 102:2 102:24 116:7,7 139:9 152:14 170:17 179:14 258:25
**voting** 71:10 81:5 81:6,7 104:10 139:2,25 146:7 151:22
**vulnerable** 310:5

**w**

**w** 336:2
**wait** 80:16 110:5 137:25 152:23
**waive** 105:16
**waived** 183:23
**walk** 81:4
**want** 16:4 28:22 30:21 35:3 40:11 48:9,10 55:8 58:21 59:24 68:17 69:4 72:7 80:8 134:16 135:13 176:6 211:10 219:10 235:2 245:12,20,21 249:18 271:12,14 280:2 281:21 283:13 289:15,17 305:20 311:3 316:10 317:7 334:6
**wanted** 16:20,24 57:7,8,9 72:11 73:2 75:17 87:6 101:9 108:10 127:21 139:24 141:7,15 142:13 155:16,17 160:13 160:18 218:14 265:21 266:11 268:15 271:5 283:7 305:18
**wanting** 186:16
**wants** 135:4 164:6 283:7
**warranted** 23:16
**way** 13:16 28:13 35:2,5 39:3 41:7 46:18 47:12,22 51:15 61:3 63:25 63:25 64:4,5 65:3 91:7 92:11 95:4 97:18 100:13,18 102:18 105:23 107:9 119:3 121:14 124:12 127:14 128:3 146:21 148:12,21 149:5 150:23 151:10 155:9,10 157:7 162:15 169:4,8 170:22 171:9 174:24,25 178:10 183:5 186:12 188:13 190:11 192:11 206:20 208:15 209:12 210:3 213:4,4 214:20 215:11 218:8,8,10 221:16 233:25 256:4 275:19,19 286:2 287:9 295:20 313:22 330:22 339:18
**ways** 125:23,25
**we've** 26:14 27:19 31:13 43:22 69:2 92:24 110:24 115:13 116:16 122:16 130:17,25 162:10 189:7 201:10 205:23 215:20 234:16 259:5 279:25 283:15,16 288:5 318:15 319:15 321:15
**week** 128:12
**weekend** 127:24
**weekly** 70:13,14 70:24,25 71:4 72:18 152:12 153:2
**weigh** 9:18 183:19 186:15 228:10 231:6
**weighed** 94:25 221:9
**weighing** 174:11 176:25 177:15,22 229:22
**weight** 131:9,11
**weights** 203:11
**welcome** 52:16
**went** 21:3 48:17 75:6,10 112:19 125:21,23 145:19 146:9 227:16 290:2
**whatsoever** 192:14
**whereof** 339:20
**wide** 335:2,3
**willing** 254:5
**win** 241:24
**window** 163:24
**wins** 171:19
**withdraw** 60:6 124:23 221:22
**withdrawn** 97:9 100:4 212:10 279:14 281:9
**witness** 4:10 5:18 5:20 6:14 7:2 8:12 45:14 46:11,12 60:5 67:15,18 83:20 86:8 92:21 93:8 96:12,15 97:23 98:23 102:22 103:4,5 105:6,18 108:24 109:3,10 111:24 112:2,7 113:8 115:9,10 117:2,12 118:15 125:5 127:13 132:7,13 132:21 165:4 178:8 210:7,10,12 224:4 233:2 246:12 256:5 259:17 274:20 275:4 276:3 286:21 287:12 288:21 289:3 297:20 307:18 326:5 337:3 339:10,14,20 340:5
**witnesses** 119:24
**wondering** 42:24
**word** 23:21 26:23 59:25 64:24 68:19 68:19 69:3 74:18 76:2 83:16 88:7 104:10 143:14,17

143:19 144:9,20 178:14 183:7 223:9,20 224:12 235:13,14 262:23 280:14 335:17
**words** 61:4 68:15 69:4,5 110:19,20 178:21
**work** 16:23 37:10 37:14 38:7,8,10,16 40:22 41:2 62:17 71:2 77:14 78:19 79:6 83:15 86:20 95:2 98:11,15 108:18 112:25 123:8 126:18,21 127:7,9,17,18,21 127:22 128:4,14 128:22 129:8,13 129:18 139:23 140:16,17 148:17 149:6 150:23 151:13,21 212:9 214:17 215:18 221:19 245:21 249:16,19 251:10 258:9 262:7,12,17 262:19 263:2,10 263:12 264:14,15 264:22 265:4,18 270:12 278:15 310:5 311:9 317:19
**worked** 9:8,15,16 37:12 56:11 88:23 92:10
**workers** 262:8 263:3 264:8,14
**workflow** 128:16
**workforce** 300:20
**working** 9:24 10:21 23:21 30:20 35:24 37:13 75:15 127:22 129:19 154:23 171:15 249:25 250:10 258:14 265:18 266:18 303:12 322:10
**workings** 156:23
**workplace** 306:6 310:4,23
**works** 112:18 280:8 295:21 301:24
**workspace** 303:13
**workweek** 127:20
**world** 75:3 207:10 251:3
**worry** 271:10
**wrap** 210:14
**write** 237:7
**writing** 22:19 23:6 49:20 74:21 85:17 86:3 150:10 155:24 156:12,15 161:16 216:6,12 267:2,9,12 282:4 319:21
**writing's** 155:25
**writings** 25:4 217:8 267:4,5,14 337:20
**written** 23:9 49:16 64:4,11 93:16 94:20 153:8 155:7 215:22 258:2 281:10 288:5 337:17
**wrong** 34:18 108:16 110:18
169:17 192:5,17 333:3 334:8
**wrote** 140:22 143:5 186:6 319:18

**x**

**x** 1:3,15 20:19 27:19 101:23 337:2
**xu** 10:18

**y**

**y** 27:20 88:8
**yeah** 20:12 21:12 21:25 26:15 53:15 56:10 62:7 65:10 75:22 76:19 78:22 81:13 83:21 84:7 85:6 90:11 97:24 98:21 114:20 118:15 123:5 124:5 127:13 156:25 160:23 185:3 203:20 239:24 249:8 251:14 255:20 260:12,16 272:9 272:11,12 275:13 281:7 287:12 288:21 302:19 308:11 309:8,10 309:16 319:22 325:16 327:5 331:13 332:12
**years** 75:4 214:16 214:16
**york** 1:2,10,11,12 1:12,23 2:7,7,14 2:18,21,21 4:17,19 8:8,15 9:3,19,20 9:21,23 10:6 13:3 19:22 27:10 38:11 54:14 62:23,23 63:23,23 64:15,16 64:19,20 65:3 76:5 82:4 85:9,11 88:9,11 151:4 290:5,5,8,8,16 297:9,9 299:20 302:17,18 336:3 336:22 339:3,8 340:4
**yorkers** 1:3 4:16

**z**

**z** 5:19 137:6
**zeros** 137:15 150:2
**zoom** 1:16 21:24 43:11 71:12,15

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# Exhibit 12:
# Problem Code Documents

**Department of Education**

November 18, 2022

Brooklyn, New York

Title: Teacher/
Applicant ID:
PRP#:

Dear Ms.

Your name was recently submitted to the Office of Personnel Investigation (OPI) for security clearance to work with the NYC Department of Education (DOE) or a DOE contracted vendor. According to our records, your services with the DOE were terminated due to noncompliance with the vaccine mandate and you currently appear out of compliance. The purpose of our contact was to request information so that your application could be processed for security clearance. Requests were sent to you at the email address you provided @aol.com' on November 10, 2022 and November 16, 2022. You were given a deadline to provide the requested information. To date, we have not received the required information.

Due to your non-compliance, you are unable to work with the DOE or any DOE contracted vendors. As such, your case has been administratively closed, and no security clearance determination has been made. Please note that at this time, you do not have security clearance to work with the DOE and/or one of its contracted vendors.

Sincerely,

The Office of Personnel Investigation
Division of Human Resources
NYC Department of Education

cc: File

From: kking@uft.org >
Date: Thu, Apr 28, 2022 at 12:50 PM
Subject: response from UFT regarding the problem code
>

Karen King (KKing@uft.org)To:you Details
Hello,

Technically you should receive charges. At this time, however, the DOE is not going to issue 3020-a charges because they do not believe they have to do so. We have filed a legal challenge to protect your due process rights, should the judge decide in our favor, you will be entitled to a hearing at that time.

The problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. DOE's central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.

**Karen King**
*Administrative Assistant to the Assistant Secretary &*
*Director of Personnel, Payroll, and Special Projects*
United Federation of Teachers
50 Broadway, 13th Floor
New York, N.Y. 10004
kking@uft.org

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x

MICHAEL KANE, et al,

Plaintiffs,

- against –

21-CV-7863 (VEC) (Lead Case)

BILL DE BLASIO, et al.,

Defendants.

------------------------------------------------------------------- x

MATTHEW KEIL, et al.

Plaintiffs,

- against -

21-CV-8773 (VEC)

THE CITY OF NEW YORK, et al.,

Defendants

------------------------------------------------------------------- x

**MALLORY O. SULLIVAN**, under penalty of perjury, declares pursuant to 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am the Deputy Director of the Office of Employee Relations ("OER") at the New York City Department of Education ("DOE"), and I have held this position since November 2014. Prior to serving in my current position, I was an Agency Attorney with the DOE's Office of the General Counsel for approximately four years.

2. I submit this declaration to provide information about DOE's employment record system in response to certain allegations regarding "problem codes" as set forth in the Declaration of Natasha Solon dated May 20, 2022 (ECF dkt. 162). I am familiar

with the facts set forth herein based on my personal knowledge as well as discussions with other DOE employees and the review of DOE records.

3. In my role as Deputy Director, I oversee the DOE's Office of Personnel Investigation ("OPI"), which is responsible for, among other things, screening and conducting background investigations for all candidates for employment with the DOE or with vendors under contract with the DOE and monitoring employee and vendor employee security clearances. As a part of these processes, OPI uses internal system codes.

4. The DOE maintains electronic employment records and employee service histories for DOE employees ("DOE employment records"). DOE employment records are kept within a system called NYCAPS, which is operated by the City of New York for all DOE and City employees. DOE employment records are only visible to the DOE and reflect employees' dates of employment, titles held, and various changes in active employment status.

5. In addition, DOE has codes within NYCAPS designed to engender special attention should an individual seek employment, re-employment, or change titles with the DOE. Such a code might be used where, for example, an employee left DOE employment with a performance issue, had a nomination for employment rescinded, or was the subject of an arrest. This is designed to ensure that prior to any new employment or new title within DOE, the employee's application undergoes further review by OPI. These types of codes have been colloquially referred to as "problem codes." These codes are only visible to internal DOE Human Resources staff, and the underlying basis for such code is only accessible by OPI.

8. Separately, DOE implemented an internal NYCAPS code specific to the Commissioner of Health Order mandating vaccination of DOE employees ("Vaccination Mandate"). This code remains visible to only OPI staff to ensure vaccination status was

reviewed prior to any return of an employee placed on a leave without pay due to non-compliance with the Vaccination Mandate. A DOE employee would not have a "problem code" in their service history as a result of any non-compliance with the Vaccination Mandate.

9. In this instant case, Natasha Solon was placed on leave without pay due to non-compliance with the Vaccination Mandate, and returned to service once compliance with the Vaccination Mandate was confirmed. At no point did Natasha Solon have a "problem code" in her service history as a result of her non-compliance with the Vaccination Mandate nor was there ever any code in her service history arising out of her vaccination status visible to anyone outside of OPI.

Dated: May 27, 2022
New York, New York

By: [signature]
Mallory O. Sullivan
Deputy Director
Office of Employee Relations

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MICHAEL KANE, et al.,<br><br>Plaintiffs,<br><br>- against -<br><br>BILL DE BLASIO, et al.,<br><br>Defendants. | Case No. 21-cv-7863 (VEC) (Lead) |
| MATTHEW KEIL, et al.<br><br>Plaintiffs,<br><br>- against -<br><br>THE CITY OF NEW YORK, et al.,<br><br>Defendants. | Case No. 21-cv-8773 (VEC) |

**DECLARATION OF BARRY BLACK IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**BARRY BLACK**, an attorney admitted to practice before this Court, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true:

1. I am an attorney for Plaintiffs and fully familiar with the facts and circumstances of this case.
2. I respectfully submit this declaration in response to Mallory O. Sullivan's Declaration.
3. Attached as Exhibit 1 is a true and correct copy of a declaration from Betsy Combier.
4. Attached as Exhibit 2 is a true and correct copy of a declaration from Plaintiff Dennis Strk.
5. Attached as Exhibit 3 is a true and correct copy of a declaration from proposed class member Patricia Catoire.

**First False Assertion in Sullivan Declaration**

6. The Sullivan Declaration asserts that there are two different kinds of codes in the NYCAPS system: a "problem code" and some other unnamed code, the "problem code" indicating anything from a performance issue to criminal activity, and the unspecified code flagging the absence of vaccination. Glaringly absent from Sullivan's recitation is how these codes appear to the reader. That is because there is no difference; they are one and the same.
7. Indeed, DOE Human Resources Director Eric Amato explicitly stated in an email to UFT Assistant Secretary Michael Sill and General Counsel Beth Norton that a "[p]roblem code was added to all employees who were placed on 2VM vaccine mandate leave. Our central offices placed this code on all employees who went on the leave." Ex. 1, ¶ 13, Ex. A.
8. Moreover, terminated Plaintiffs had a problem code plainly visible in their payroll portal, indicated by a "**Problem** PR" notation in their salary history tab. Ex. 2, ¶ 5, Ex. A; Ex. 1 ¶ 10 (DOE's "problem code" is also referred to as a "pr" code).

**Second False Assertion in Sullivan Declaration**

9. The Sullivan Declaration falsely posits that the no one outside DOE's Office of Personnel Investigations has access to the problem code. To the contrary, any non-DOE school or official that wants to learn whether a former DOE employee has a problem code in his or her personnel file can easily do so in a variety of ways. For example, non-DOE schools which offer DOE-funded positions have access to the DOE's payment portal, Galaxy, which allows them to see problem codes; indeed Plaintiffs present evidence of at least 15 former DOE employees who were not hired at non-DOE schools because the non-DOE schools discovered their problem codes. Ex. 1, ¶¶ 14-18. Simple phone calls work as well: a former UFT Special Representative explained that she used to "receive[] countless calls every week asking . . . if there was a problem code on an employee's personnel file" and that her UFT colleague next door would then check her computer and "tell [her] 'yes' or 'no' within a minute." Ex. 1, ¶ 8. In some instances, DOE representatives disclosed the problem codes to prospective employers from non-DOE schools calling to verify employment. Ex. 1, ¶ 19. In one instance, a third-party HR representative at Bright Start Learning Center of NYC—a non-DOE school operating pursuant to NYS Department of Health Bureau of Early Intervention directives—informed a former DOE employee that she had had been flagged as "ineligible" in her personnel file. Ex. 3, ¶¶ 8-9, 13.

10. It is noteworthy that such evidence was already in the record before Defendants filed the Sullivan declaration, but Defendants did not even attempt to discredit it. ECF No. 162 ¶¶ 11-13 (Plaintiff Solon was told by an official at non-DOE school that it could not hire her because of the problem code in her personnel file).

**Further Evidence of Irreparable Harm**

11. Plaintiffs' irreparable harm did not cease with their terminations. Instead, the problem codes in their files make them unemployable indefinitely at both DOE and non-DOE schools.

12. The UFT has stated unequivocally that such problem codes "will be removed once [they] are eligible to return to work." Ex. 1, ¶ 13, Ex. A.

13. Thus, Plaintiffs face ongoing coercion to violate their religious beliefs and become vaccinated, in order to become employable -- and remove the scarlet letter from their permanent records.

14. The Court is reminded that Plaintiff Solon's problem code was removed within 24 hours of her getting vaccinated. ECF No. 162 ¶ 18.

Dated: New York, New York
June 3, 2022

Respectrfully submitted,

Barry Black
Nelson Madden Black LLP
*Attorney for Plaintiffs*
475 Park Avenue South, Suite 2800
New York, NY 10016
(212) 382-4303

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAEL KANE, et al., Plaintiffs, - against - DE BLASIO et al., Defendants. | Case No. 21-cv-7863 (VEC) (Lead) |
| MATTHEW KEIL, et al. Plaintiffs, - against - THE CITY OF NEW YORK et al., Defendants. | Case No. 21-cv-8773 (VEC) |

**DECLARATION OF BETSY COMBIER**

Betsy Combier declares as follows, pursuant to 28 U.S.C. § 1746:

1. My name is Betsy Combier and I am the President and lead paralegal of Advocatz, a paralegal consulting business for people who need a partner as they go through the Courts, grievances, or life problems.

2. I respectfully submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3. I know the facts stated herein to be true based upon my personal knowledge and based upon my review of the files of hundreds of my clients whom I have represented in proceedings with the New York City Department of Education ("DOE"), except

for statements which are made on information and belief and, as to those, I verily believe them.

4. I have a degree in Child Psychology from Northwestern University, an MA Certificate from the Johns Hopkins' School for Advanced International Studies where my specialization was the Soviet Military Industrial Complex, an MPS in Interactive Telecommunications from New York University, and a Certificate in Art and Drama Therapy from The New School.

5. I have successfully assisted parents, children, and caregivers with the educational needs of their children, and I have been advocating for the due process rights of Union members—in particular, members of the AFL-CIO, United Federation of Teachers ("UFT") and Local 32 B&J—for 17 years.

6. From 2007-2010, I worked as Special Representative to the UFT where my job was to oversee the eight re-assignment centers in the NYC DOE, first in all boroughs, and then at the Manhattan, Brooklyn, and Bronx locations.

7. I am very familiar with the arbitration hearing process, set forth in New York Education Law § 3020-a, having assisted teachers in approximately 300 3020-a hearings since 2003.

8. I am also very familiar with "problem codes"—the flag the DOE puts in the personnel file of employees to indicate that they should not be hired due to unexplained misconduct of some kind. Employees can be flagged for everything from receiving an unsatisfactory or ineffective rating to engaging in egregious criminal acts. During the three years I worked at the UFT headquarters, I received countless calls every week

asking me if there was a problem code on an employee's personnel file. When that happened, I would simply ask the person next door to my office, another UFT Special Representative, whether she could check her computer, and she would tell me "yes" or "no" within a minute.

9. When the DOE puts a problem code in the employee's personnel file, it also places a flag on the employee's fingerprints, which is then sent to the national databases at both the Federal Bureau of Investigation and the State Division of Criminal Justice Services.

10. I have represented more than 15 DOE employees before the DOE's Office of Personnel Investigation in proceedings in which they requested the removal of their problem codes. The flag has several names such as "problem code," "pr" code, "pc" code, "ineligible," and "no hire/inquiry" code; however, all refer to a salary block, whatever title it is given.

11. I have helped approximately 20 DOE employees get their problem codes removed from their personnel files.

12. I know of many former DOE employees who have problem codes in their personnel files because they declined to be vaccinated in violation of the DOE's mandate and were not granted a religious or medical exemption. The DOE places a problem code on the employee's personnel file immediately upon getting information that the employee did not submit proof of vaccination. As soon as the employee gets the vaccination and submits proof, the code is removed from his or her file.

13. Attached as Exhibit A is a true and correct redacted copy of an email one of my clients received from Eric Amato at the DOE. The email was also sent to UFT Assistant Secretary Michael Sill and copies UFT officials including its General Counsel Beth Norton. The email confirms that DOE employees who were placed on leave without pay for failing to be vaccinated in violation of the DOE's mandate had a problem code (as opposed to any other kind of code) added to their personnel files.

14. I am aware that non-DOE schools located in counties outside New York City receive funds from the NYC DOE for certain teaching positions. These may include, for example, special education or STEM teachers.

15. The DOE pays the salaries for these positions using the same system it uses to pay traditional DOE employees, which is called Galaxy. Galaxy indicates whether the employee has a problem code in his or her file and blocks payment to the employee with this flag/code if viewed in the personnel file.

16. Many of my clients with problem codes in Galaxy have looked for other teaching jobs outside the NYC DOE while their problem code appeals were ongoing.

17. At least 15 of my clients with problem codes were not hired by prospective schools outside the DOE because such schools saw the problem codes in Galaxy, even though those schools were located outside New York City.

18. Such schools were able to see the codes because the position applied for was financed by the DOE and so the school used the Galaxy system and could check the prospective employee's file.

19. I also have several clients who applied to schools outside of the DOE who were not hired by their prospective employers because when the prospective employers reached out to the DOE to verify my clients' previous employment, the DOE representative told them about the problem codes in my clients' files.

20. In sum, any non-DOE school that wants to learn whether a former DOE employee has a problem code in his or her personnel file can readily do so.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
June 3, 2022

Betsy Comb

By: Betsy Combier

# EXHIBIT A

From: **Amato Eric** <EAmato4@schools.nyc.gov>
Date: Wed, Feb 9, 2022 at 8:06 AM
Subject: RE: PR code
To: [redacted] Michael Sill <msill@uft.org>
Cc: Beth A. Norton
<bnorton@uft.org>, Kking@uft.org <Kking@uft.org>, dcampbell@uft.org <dcampbell@uft.org>

PR = Problem code – Problem code was added to all employees who were placed on 2VM vaccine mandate leave. It was placed there the day you went on the leave. Our central offices placed this code on all employees who went on the leave. It will be removed once you are eligible to return to work.

Thanks,
Eric

5. In October, 2021, I was involuntarily suspended for failing to get vaccinated in violation of my sincerely held religious beliefs.
6. After the Second Circuit held that the DOE's religious exemption policy was unconstitutional, I was able to apply for reconsideration by the Citywide Panel. The email sent to me stated that we did not need to submit anything because they would rely on the original material.
7. I received no response for months. Meanwhile my situation became desperate.
8. I depleted all of my savings, my son had to take a leave of absence from school because I could not pay the parental portion of tuition, and my children and I were running out of food, and on the brink of losing our home.
9. I owed over $2,000 in heating bills.
10. I applied to over sixty jobs during this period. Despite my extensive qualifications and spotless record, few positions called me back, and none offered me a job.
11. Finally, during an interview in Westchester, the woman conducting the interview took pity on me. She told me she liked me and wished she could hire me.
12. However, she said she had to be honest with me – neither she nor anyone else would be able to hire me.
13. I asked why. She said that there was a "problem" code in the system flagging my name. Outside schools cannot see the reason for the code, other than there is a problem flagged indicating not to hire. Examples she gave me of typical problem codes arose from robbery and other serious misconduct.
14. I have a spotless record and was shocked to find out about this code.

15. I investigated further and learned that the internal records at the DOE showed the reason for the problem code was that I was not vaccinated.

16. My situation grew more desperate every day, and it soon became clear that I would get no other work while this code remains.

17. Finally, to save my family and our home, I took the vaccine, which is against my sincerely held religious beliefs.

18. Within twenty-four hours of submitting my paperwork to the DOE, I was reinstated, and the problem code was removed.

19. Even though I felt I had no choice, this decision has been deeply traumatic and continues to cause irreparable harm.

20. I pray every day for help to overcome my anger, pain, and guilt for having to violate my faith.

21. The experience continues to impact me and to cause me serious distress.

22. I do not feel safe at my job. I do not feel safe in society.

23. The fact that the courts would continue to uphold this brazen unconstitutional condition and fail to intervene to protect us as we lose everything we have worked so hard to achieve continues to shake my faith in this country.

24. If, as the Second Circuit admitted, the DOE violated the Constitution, how can this Court or any other continue to allow the DOE to continue to harm so many of us for not taking the vaccine?

25. I am vaccinated now, but when the inevitable booster requirement comes, I will have to go through all of this again. I do not think that I can violate my faith again. The harm it caused me to do it to save my family was too severe.

26. I only hope that this Court intervenes before that occurs, or at least intervenes before more of my colleagues are forced to be violated the way I was.

27. This is spiritual rape. There is no other way to put it. I did not consent to this.

28. This Court must help us to stop the continuing injustice.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 20, 2022

By: Natasha Solon

From: **Beth A. Norton** <BNorton@uft.org>
Date: Thu, Jul 28, 2022, 12:36 PM
Subject: RE: Questions about voluntary resignations and follow ups
To:
Cc: Michael Sill <MSill@uft.org>, Michael Mulgrew <MMulgrew@uft.org>, Tanisha Franks <TFranks@uft.org>, Karen King <KKing@uft.org>

The arbitration award doesn't "expire," I am not sure what you mean by that.

As the language you quoted from the waiver indicates, you will be deemed to have voluntarily resigned your position with the DOE on September 6 if you are not, at that time, in compliance with the health order (vaccinated with 2 shots of Pfizer or Moderna, or 1 shot of J&J). This will be treated as a traditional resignation, it is not a termination. You will be permitted to cash out your CAR and vacation days at the contractual rates. The code on your file indicates that you are not vaccinated, that will not be lifted until such time as you are vaccinated.

You should be receiving an email from the DOE in the next week or so asking for your intent for the fall.

At this time there is no indication that the vaccine mandate will be lifted, so if you wish to return you would have to comply with the health order. If that changes we will let you know.

Regards,

**Beth A. Norton**
General Counsel
United Federation of Teachers
52 Broadway 14th Floor
New York, NY 10004
212-701-9420

# Exhibit 13:
# RF Exemption Request

**September 13th, 2021**

**To whom it may concern,**

**My name is R F , my employee ID is #....... I have been employed with the NYCDOE for 20 years now. I am extremely proud of all the work I've done with the communities of the Bronx that I've had the privilege of working with. I am currently an Assistant Principal with in the Bronx.**

**<u>"Religious liberty is a foundational principle of enduring importance in America enshrined in our Constitution and other sources of Federal law."</u>** I know that the law in this Country allows for personal religious beliefs and that's what makes me so proud to be an American, where my beliefs and freedoms are protected. I get to work in a city that is literally called the Melting Pot of the Country. It is filled with all different cultures and religions and we can live together respecting and encouraging one another's differences.

My faith, and religious journey is the most important thing in my life. I am a devout Christian; my life is led by the Holy Spirit that lives inside of me. It is my religious belief that my God is my healer and I put all my faith and hope in Him. It is my religious belief that it is a complete betrayal of faith to put my hope and faith in any vaccine to keep my body healthy. My God will heal me and my family. We have all contracted covid and He kept us all, safe and whole.

Any blood that may be in any vaccines is sacrilegious and I cannot allow my body to be corrupted or made unclean. 1 Corinthians 3:17 "If anyone destroys God's temple, God will destroy that person; for God's temple is sacred, and you together are that temple". Exodus 15:26 "I am the Lord that heals you." Fetal cells that may be used in creating this vaccine, goes against my stance on abortion. As a Christian I am against murder. Exodus 20:13 "You shall not murder." Therefore, taking this vaccine will desecrate my body. Even though I have been fully vaccinated in my childhood, that choice was performed by the choices of my non-religious parents, whom I loved dearly. As an adult, husband and father, I choose to live out my life through God's command from His Holy word, the Bible.

My faith and relationship in God are what helps guide my life and helps me discern what is needed to keep my body in line with the Word of God. I am created in the image of God. My body/blood is a sacred being and must remain pure in the sight of God. Taking this vaccine or any other vaccine for that matter would go against everything I believe and base my life upon.

I ask that you please keep this confidential, I am only sharing these personal things so you could have a better understanding of my declination of this vaccine due to my religious beliefs. Please understand my convictions. Thank you for your time and consideration.

Sincerely,

R F

# Exhibit 14:
# Extension of Medical Exemption

**From:** solas_donotreply@schools.nyc.gov <solas_donotreply@schools.nyc.gov>
**Sent:** Thursday, December 8, 2022 4:11 PM
**To:** <AP @schools.nyc.gov>
**Cc:** Cheatham Michael <MCheatham@schools.nyc.gov>; Gonzalez Sabrina <SGonzalez7@schools.nyc.gov>; Tu Vera <VTu@schools.nyc.gov>; Yin Jinmei <JYin4@schools.nyc.gov>; Bonilla Jessica <JBonilla10@schools.nyc.gov>; O'Hara Katharine <KOhara7@schools.nyc.gov>; Ray Janiece <JRay2@schools.nyc.gov>; Pedone Allison <APedone@schools.nyc.gov>; Mar n Dedosha <DMartin34@schools.nyc.gov>; Wilson Ovella <OWilson@schools.nyc.gov>; Cox Kyra <KCox@schools.nyc.gov>; Cox Kyra <KCox@schools.nyc.gov>; Mercado Karen <KMercad@schools.nyc.gov>;
Walsh Joanne <JWalsh38@schools.nyc.gov>; Aiello Robert <RAiello@schools.nyc.gov>
**Subject:** Extension of Your COVID-19 Vaccine Medical Exemption

12/08/2022
Case#: A85819
File#:
Emp ID:

Dear A P,

The HR Connect Office of Medical, Leaves and Records Administration, along with the Office of Disability Accommodation, have extended your COVID-19 vaccine medical exemption until January 27, 2023.

As you have previously been advised, if you wish to apply for an exemption to the vaccine mandate after that date, you will be required to submit a new application in January with updated medical information.

Please do not submit an application at this time. You will be advised on a timeline for such applications but anticipate it will be after January 3,2023
.
As you have previously been advised, while your exemption is in place, if your usual place of work is in a school building, unless otherwise directed, you will be given a non-school work location. Unless/until notified of this alternate location, you may work remotely. During this period, you must remain within regular commuting distance of your school during workdays. You are expected to continue to support your school with work assigned by your school. You must work a full workday and regular work hours. You should check-in daily with your school's payroll secretary or regular timekeeper for timekeeping purposes. Please note that this work assignment and/or location is subject to change.

If your usual place of work is not in a school building, you should remain in your current assignment and location unless you are advised otherwise. This exemption and any related accommodation(s), as well as your work location assignment, are subject to change as per changes in applicable law and DOE and/or City policy.

Sincerely,

*HR Connect*
Medical, Leaves, and Records Administration